USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12/13/2021

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
:
GARY H. RAGAN, *individually and on behalf of all* :
*others similarly situated*, :
:
                  Plaintiff, :    21-cv-7985 (LJL)
:
    -v- :    OPINION AND ORDER
:
APPHARVEST, INC. et al., :
:
                  Defendants. :
:
------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

      Pending before the Court are motions by four parties to be appointed as lead plaintiff in this federal securities fraud action. Dkt. Nos. 6, 9, 11, 15. In addition, the parties move for approval of their selection of lead counsel and to consolidate this case with a related case pending before this Court, *Plymouth County Retirement Ass'n v. AppHarvest, Inc., et al.*, No. 21-cv-9676-LJL. For the reasons that follow, the Court appoints Alan Narzissenfeld as lead plaintiff and approves the selection of Levi & Korsinsky, LLP as lead counsel. It also consolidates 21-cv-7985 and 21-cv-9676.

## BACKGROUND

      The following facts are taken from the *Ragan* complaint and the *Plymouth County* complaint, as well as the various applications to be lead plaintiff.

**I.    The Allegations of the *Ragan* Complaint**

      The action was initiated as a putative securities fraud class action by complaint filed on September 24, 2021 by Gary H. Ragan (the "*Ragan* action"). Dkt. No. 1. The defendants are AppHarvest, Inc. ("AppHarvest"), a sustainable food company whose common stock trades on the NASDAQ exchange under the symbol "APPH," its Chief Executive Officer Jonathan Webb

("Webb"), and its Chief Financial Officer Loren Eggleton ("Eggleton," and collectively with AppHarvest and Webb, "Defendants").  Dkt. No. 1 ¶¶ 2, 13–15.  AppHarvest operates applied technology greenhouses to produce fresh, chemical-free, non-GMO fruits, vegetables, and related products, including tomatoes.  *Id.* ¶¶ 2, 17.

AppHarvest became a public company following a business combination with a special purpose acquisition company ("SPAC") named Novus Capital Corporation ("Novus") that closed on or about January 29, 2021.  *Id.* ¶¶ 3, 18.  Several months later, on May 17, 2021, AppHarvest announced its results for the first quarter of 2021, held an investor conference call, and filed a quarterly report with the United States Securities and Exchange Commission ("SEC") on Form 10-Q.  *Id.* ¶¶ 19–22.  It announced that during the first quarter it had $2.3 million in net sales meeting expectations, that it had a "$4.5 million gross loss driven by launch of commercial operations, sales and training new labor force," and that its "$12.4 million adjusted EBITDA loss compared to initial expectation of loss of $14.0 million to $16.0 million amid rapid scaling of the business." *Id.* ¶ 19.  It stated that it had "generated $2.3 million in net sales in the first quarter 2021 as it began harvesting from its initial high-tech indoor farm in Morehead, Ky., representing 3.8 million pounds sold with the farm only partially planted as the facility ramped up."  *Id.*  During the earnings call that same day, Eggleton stated, "This being our first harvest of our new facility, we expect our grade mix to migrate upward over the coming quarters as we fine tune our farm operations and implement additional technology and data analytics into our processes."  *Id.* ¶ 20.  Webb stated, "It's important that a tomato is not a tomato is not a tomato" and that AppHarvest's exclusive distributor, Mastronardi Produce, had "made it abundantly clear that they can deliver and put on store shelves every tomato and fruit and vegetable we grow," *id.* ¶ 21.  In its Form 10-Q filed that same day, AppHarvest stated that Mastronardi was its "sole,

exclusive marketing and distribution partner" and it was "highly dependent" on its relationship with Mastronardi, such that any significant or unexpected rejection of its products by Mastronardi could negatively impact its results of operations. *Id.* ¶ 22

On August 11, 2021, before the market opened, AppHarvest announced its second quarter financial results. It reported a $32.0 million net loss, attributing the lower than expected results to "operational headwinds with the full ramp up to full production at the company's first CEA facility, including labor and productivity challenges related to the training and development of the new workforce and historically low market prices for tomatoes during the second quarter of 2021 based on USDA reports." *Id.* ¶¶ 4, 24. It also lowered its full year sales guidance to a range of $7 million to $9 million from a range that it had previously announced of $20 million to $25 million. *Id.* AppHarvest attributed the downward adjustment of its guidance to the "aforementioned operational headwinds associated with the full ramp up of the Morehead farm and moderated produce market price expectations and a strategic decision to broaden its business model by investing in farm operations technology, operational best practices and value-added products." *Id.* ¶ 24.

On the news of the lower than expected results and the lowered guidance, AppHarvest's share price fell $3.46 or approximately 29% to close at $8.51 per share on August 11, 2021, on unusually heavy trading volume. *Id.* ¶¶ 5, 25.

The *Ragan* action is brought on behalf of a putative class of persons and entities that purchased or otherwise acquired AppHarvest securities between May 17, 2021 and August 10, 2021 and who were damaged thereby. *Id.* ¶¶ 1, 26. The complaint alleges that Defendants made materially false and/or misleading statements and failed to disclosed to investors (1) that AppHarvest lacked sufficient training for its recently expanded labor force; (2) that, as a result,

AppHarvest could not produce Grade No. 1 tomatoes consistently; (3) that, as a result of the foregoing, Defendants' positive statements about AppHarvest's business, operations, and prospects were materially misleading and/or lacked a reasonable basis. *Id.* ¶ 6. The complaint alleges that all Defendants violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 promulgated thereunder, *Id.* ¶¶ 8, 44–54; it also alleges that Webb and Eggleton are liable under Section 20(a), the control person provision of the Exchange Act, *id.* ¶¶ 55–58.

## II.     The *Plymouth County Action*

On November 22, 2021, the night before the statutory deadline for filing lead plaintiff motions, a related complaint was filed in this Court by the Plymouth County Retirement Association. *Plymouth County Retirement Ass'n v. AppHarvest, Inc., et al.*, No. 21-cv-9676-LJL (the "*Plymouth County* action"). The *Plymouth County* action alleges similar claims against the identical defendants but on behalf of a significantly expanded class—all persons who purchased AppHarvest securities between October 9, 2020 and August 10, 2021. *Plymouth County*, 21-cv-9676, Dkt. No. 1 ¶ 1 ("*Plymouth County* Complaint"). The *Plymouth County* action begins the story on September 28, 2020, when Novus and AppHarvest entered into an agreement for Novus and AppHarvest to merge through a reverse merger, with AppHarvest the resulting public company. *Id.* ¶¶ 3, 21. As the *Plymouth County* Complaint tells the story, as a result of the merger, Novus provided about $425 million of gross proceeds to AppHarvest in exchange for all of the issued and outstanding shares of AppHarvest, which then became a wholly owned subsidiary of Novus. *Id.* ¶¶ 19, 21. Then, upon the closing of the merger on January 29, 2021, Novus changed its name to AppHarvest, Inc., and on February 1, 2021, AppHarvest common stock began trading on the NASDAQ. *Id.* ¶ 22.

Plymouth County alleges material misstatements and omissions dating to October 9, 2020, the date the Registration Statement to approve the merger was filed by AppHarvest with the SEC. *Id.* ¶¶ 24, 45. Because the alleged misstatements are relevant to the appointment of lead plaintiff, the Court describes them at some length:

- The Registration Statement contained the following statements:

    o It stated that "AppHarvest's first controlled environment agriculture facility, which spans more than 63 acres and is expected to provide approximately 45 million pounds of annual production capacity, [was] scheduled to open its first 30 acres of growing space in Morehead, Kentucky in October 2020, with the remainder opening in early 2021." It also stated that the Morehead facility "is among the world's largest such facilities at 2.76 million square feet all under one roof. Revenue from the first harvest at the facility is expected in 2021. The farm includes cutting-edge technology." *Id.* ¶ 30.

    o It stated that there would be a "[s]trong and available local labor force" in Appalachia, where the Morehead facility was located and that "AppHarvest has rapidly hired in the region as it prepares to open its first controlled environment agriculture facility and benefited from a strong network of employer assistance programs ready to help companies interested in locating in the region to provide jobs for its ready workforce." *Id.* ¶¶ 31–32.

    o It also discussed AppHarvest's relationship with Mastronardi and stated that AppHarvest was "well-positioned to grow its brand with consumers through its distribution partner which provides AppHarvest with full distribution on day one of production, allowing customers to experience AppHarvest's products and grow customer recognition and loyalty." *Id.* ¶¶ 33–34.[1]

---

[1] In a sur-reply in further support of its application to be Lead Plaintiff, Plymouth County points to what it claims is another alleged misstatement in the Registration Statement—a projection that AppHarvest would earn $25 million in net revenue in 2021. Dkt. No. 37-1. That statement is not alleged in the Plymouth County complaint. The preceding pages of the publicly-filed document, of which the Court can take judicial notice on this motion but which were not included in Plymouth County's sur-reply caution investors "not to rely on the projections in making a decision regarding the Business Combination, as the projections may be materially different that actual results" and states that the company "will not refer back to the financial projections in our future periodic reports filed under the Exchange Act." Novus Capital Corp., Registration Statement (Form S-4), at 91 (Oct. 9, 2020). It adds that "the financial projections do not take into account any circumstances or events occurring after the date they were prepared" and that they were being included only "because they were made available to Novus and its board of directors in connection with their review of the proposed transaction." *Id.* The sur-reply casts further doubt on Plymouth County's competence to act as Lead Plaintiff in this

5

- On October 21, 2020, AppHarvest issued a press release to announce the opening of its Morehead facility. The press release described the facility as "one of the world's largest high-tech greenhouses," and stated that it would "redefine American agriculture," that AppHarvest "and its mission represent a stark change to the existing American food system, which is increasingly reliant on imports," and that the company expected to create more than 300 jobs at the Morehead facility. *Id.* ¶ 35.

- On November 19, 2020, AppHarvest issued a press release to announce that it had planted its initial crop of tomatoes in October 2020 and expected to begin recognizing revenue no later than the first quarter of 2021. *Id.* ¶ 36.

- On January 11, 2021, AppHarvest filed a proxy statement/prospectus for the purpose of soliciting approval of the merger at the shareholder meeting to be held on January 29, 2021; the proxy statement/prospectus made substantially similar statements to those in the Registration Statement. *Id.* ¶ 37.

- On January 19, 2021, AppHarvest issued a press release announcing that its first harvest of tomatoes from Morehead would be shipping to grocery stores that week and that "[a]t ramp-up, AppHarvest's Morehead facility alone is expected to produce about 45 million pounds of tomatoes annually from about 720,000 tomato plants." *Id.* ¶¶ 38–39.

- On February 25, 2021, AppHarvest issued a press release announcing its full-year 2020 financial results and containing guidance with respect to its first quarter of 2021 and fiscal year 2021. In particular, AppHarvest announced that it currently expected that in the first quarter of 2021 it would receive net revenue in the range of $2.1 million to $2.6 million and that adjusted EBITDA loss would be in the range of $14 million to $16 million. For the fiscal year ending December 31, 2021, it expected net revenue to be in the range of $20 million to $25 million and adjusted EBITDA loss to be in the range of $43 million to $45 million. *Id.* ¶ 40.

- On May 17, 2021, AppHarvest issued its first quarter 2021 earnings release, held an investor conference call, and filed its first quarter 2021 Form 10-Q with the SEC. Plymouth County alleges the same misstatements as are alleged in the *Ragan* action. *Id.* ¶¶ 41-44.

Plymouth County alleges the same corrective disclosure as is alleged in the *Ragan* action—the August 11, 2021 announcement by AppHarvest, lowering its sales guidance to a range of $7 million to $9 million and updating its full-year 2021 outlook for adjusted EBITDA to a range of $70 million to $75 million from a prior range of $48 million to $52 million. *Id.* ¶ 46. It alleges that AppHarvest's prior statements were materially misleading in the same respects as

---

case.

6

alleged in the *Ragan* action (with almost identical language): "Defendants failed to disclose to investors: (1) that AppHarvest lacked sufficient training and management for its labor force; (2) that, as a result, the Company could not produce Grade No. 1 tomatoes consistently; (3) that, as a result, the Company's financial results would be adversely impacted; and (4) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis." *Id.* ¶ 45.

## III.   The Lead Plaintiff Applications

Four parties originally filed applications to be lead plaintiff pursuant to the PSLRA; two of those parties have since withdrawn their applications.[2]  The two remaining movants are Alan Narzissenfeld and the Plymouth County Retirement Association.

The Narzissenfeld motion is supported by a certification and a declaration appropriately signed by Narzissenfeld on November 22, 2021—the day before the motion was due and, significantly, before the *Plymouth County* action was filed. Dkt. No 14-1, 14-4. Accordingly, it focuses on the class period alleged in the only then-pending class action (and the action in which lead plaintiff motions were due)—the *Ragan* action, which alleges a class period of May 17, 2021 to August 10, 2021. Narzissenfeld alleges that he lost $391,369.23 as a result of his transactions in AppHarvest securities during that period. Dkt. Nos. 12, 14-2. Narzissenfeld claims he is qualified to represent the class. He possesses a bachelor's degree in computer science from the University of Florida and has completed courses in the Master of Business Administration program at the University of Miami. He has been investing in the stock market

---

[2] Notice to members of the putative class advising them of the allegations of the complaint and their option to seek appointment as lead plaintiff was published on BusinessWire on September 24, 2021. Dkt. No. 8-1. *See* 15 U.S.C. § 78u-4(a)(3)(A)(i); *In re Hebron Tech. Co. Sec. Litig.*, (S.D.N.Y. Sept. 16, 2020) (finding that notice published on BusinessWire satisfied PSLRA and Rule 23).

7

for over 30 years. He is the owner and founder of Big League Cards which opened in 1992 and has a related consulting business in the collectible's industry and a technology company called Instant Evaluate. Dkt. No. 14-4. He has never sought to serve nor served as class representative in any federal securities fraud case within the past three years. Dkt. No. 14-1. Narzissenfeld seeks approval of the law firm Levi & Korsinsky, LLP as lead counsel. Dkt. No. 11.

In an opposition memorandum to the other motions to be appointed lead plaintiff, Narzissenfeld details his transactions during the expanded class period alleged in the *Plymouth County* action. He had gross purchases of shares amounting to nearly 630,000, retained shares of almost 75,000, and net funds expended of approximately $84,000, and a potential LIFO gain during this period of time of $175,000. Dkt. No. 25, Ex. A.

Plymouth County has no losses (or gains) for the class period in the *Ragan* action. Dkt. No. 33. It made two arguably relevant purchases of securities, both of the common stock of Novus before AppHarvest began trading on NASDAQ: an October 27, 2020 purchase of 21,589 shares and an October 28, 2020 purchase of 20,792 shares. Dkt. Nos. 17-4; 33. It retained 35,401 shares at the end of the class period, having sold 6,980 shares during the class period, resulting in a claimed loss of $237,645.81. *Id.* It claims $128,107.10 in losses for the expanded class period alleged in the *Plymouth County* action. Dkt. No. 17-4. In the past three years, it has been appointed as lead plaintiff in nine federal securities class actions and sought to serve as lead plaintiff and representative party in an additional three actions but either withdrew its motion, was not appointed lead plaintiff, or the lead plaintiff decision is still pending. Dkt. No. 17-4. Plymouth County asks the Court to approve its selection of Scott & Scott as lead counsel. Dkt. No. 15.

Two original applicants have withdrawn their motions because they do not have the largest financial stake. John Whitlow has withdrawn his motion to be appointed lead plaintiff. Dkt. No. 24. Whitlow claims to have lost $106,684 in connection with purchases of AppHarvest securities. Dkt. No. 8-2, 8-3. In the past three years, he has not sought to serve or served as a representative party on behalf of a class in a securities class action. Dkt. No. 8-2.

Brandon York and Marc Pierre also have withdrawn their motion to be lead plaintiff. Dkt. No. 23. York and Pierre purchased 821 AppHarvest securities for $11,120, retained all of those securities, and as a result suffered a loss of $5,594. Dkt. No. 13 at 7; Dkt. No. 18-1. They have not sought to serve as a representative party on behalf of a class under the federal securities laws in the past three years. Dkt. No. 18-3. Their docu-signed joint declaration does not reflect that they had any prior relationship with one another or knowledge of one another prior to joining together to apply to be lead counsel. Dkt. No. 18-4. York is an attorney from North Carolina who has been investing in the securities markets for 15 years; Pierre is a physical therapist from Florida who has been investing in the securities markets for seven years. Dkt. No. 18-4 ¶¶ 2—3.

Whitlow and York and Pierre will not be considered for appointment as lead plaintiff and their motions will be denied. *See Lucas v. United States Oil Fund, LP*, 2020 WL 5549719, at *3 (S.D.N.Y. Sept. 16, 2020).

## DISCUSSION

Three issues are before the Court: (1) the appointment of lead plaintiff; (2) the selection of lead counsel; and (3) consolidation. The Court addresses them in turn.

### I. Appointment of Lead Plaintiff

The PSLRA establishes the framework courts use to select a lead plaintiff in class actions brought under the federal securities laws. First, the PSLRA requires any prospective lead

9

plaintiff to file a motion for appointment as lead plaintiff within sixty days of the publication of notice of the securities class action. 15 U.S.C. §§ 78u–4(a)(3)(B)(iii)(I)(aa), 78u–4(a)(3)(A)(i).

Next, the PSLRA lays out standards for choosing one lead plaintiff from among the candidates who file motions. The PSLRA provides that:

> the court shall adopt a presumption that the most adequate plaintiff in any private action arising under this chapter is the person or group of persons that—
>
> (aa) has either filed the complaint or made a motion in response to a notice [of the complaint within sixty days of the publication of this notice];
>
> (bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and
>
> (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

*Id.* § 78u–4(a)(3)(B)(iii)(I). Once the Court identifies a presumptive lead plaintiff, this presumption:

> may be rebutted only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff—
>
> (aa) will not fairly and adequately protect the interests of the class; or
>
> (bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class.

*Id.* § 78u–4(a)(3)(B)(iii)(II). If the Court finds that the movant with the largest financial interest in the class action is otherwise ineligible for appointment as lead plaintiff, the Court applies the criteria of the PSLRA to the movant with the second-highest financial interest. This investigation continues until the Court identifies a suitable lead plaintiff. *See, e.g.*, *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 589 F. Supp. 2d 388, 396 n.7 (S.D.N.Y. 2008).

"[C]ourts in this Circuit typically examine four factors to determine a lead plaintiff's financial interest: '(1) the total number of shares purchased during the class period; (2) the net shares purchased during the class period (in other words, the difference between the number of

shares purchased and the number of shares sold during the class period); (3) the net funds expended during the class period (in other words, the difference between the amount spent to purchase shares and the amount received for the sale of shares during the class period); and (4) the approximate losses suffered.'" *Villare v. ABIOMED, Inc.*, 2020 WL 3497285, at *4 (S.D.N.Y. June 29, 2020) (quoting *Irving Firemen's Relief & Ret. Fund v. Tesco PLC*, 2015 WL 1345931, at *2 (S.D.N.Y. Mar. 19, 2015). "Of these factors, courts have consistently held that the fourth, the magnitude of the loss suffered, is most significant." *Villare*, 2020 WL 3497285, at *4 (quoting *In re Braskem*, 2015 WL 5244735, at *4 (S.D.N.Y. Sept. 8, 2015) (collecting cases)).

Measured by these standards, Narzissenfeld has the largest financial interest with respect to the class period alleged in the *Ragan* action. He suffered $391,369.23 in losses as a result of his transactions in AppHarvest securities during that period. Dkt. Nos. 12, 14-2. Plymouth County's claim is based on the longer class period alleged in the *Plymouth County* action. Dkt. No. 17-4. But, if the *Ragan* class period is used, then Plymouth County suffered no losses—it did not purchase any AppHarvest securities after October 2020.[3]

"Where there are two potential class periods, courts addressing lead plaintiff motions generally apply the longer class period." *Lucas v. United States Oil Fund, LP*, 2020 WL 5549719, at *4 (S.D.N.Y. Sept. 16, 2020). The logic is that "the longer class period encompasses more potential class members and damages." *Hom v. Vale, S.A.*, 2016 WL 880201, at *4 (S.D.N.Y. Mar. 7, 2016); *see also Rauch v. Vale S.A.*, 378 F. Supp. 3d 198, 209 n.11 (E.D.N.Y. 2019) ("For the purposes of appointing lead plaintiff in cases involving two potential

---

[3] If the longer class period is used and purchases from before the alleged misstatements are included, Narzissenfeld suffered a negative loss or, put otherwise, a gain. Dkt. No. 36.

class periods, courts use the longer class period in the analysis."); *In re Doral Financial Corp. Sec. Litig.*, 414 F. Supp. 2d 398, 402–03 (S.D.N.Y. 2006) (utilizing the long time period which both encompassed more potential class members and was defined by the beginning and end date when the defendant made its alleged misstatements). The rule does not apply, however, when the proposed longer class is obviously "implausible" or "frivolous." *Villare*, 2020 WL 3497285, at *4. The concern is that a potential lead plaintiff not "manipulate the class period so that they have the largest financial interest." *Id.* at *4. The concern is heightened, as it is here, when a complaint alleging the longer class period is filed on the eve of the expiration of the statutory sixty-day period for the filing of lead plaintiff motions. *Id.* at *5.[4]

The court, of course, "should not make any binding determinations regarding the proper class period as part of the lead-plaintiff analysis." *In re BP, PLC Sec. Litig.*, 758 F. Supp. 2d 428, 434 (S.D. Tex. 2010) (quoting *Plumbers & Pipefitters Local 562 Pension Fund v. MGIC Inv. Corp.*, 256 F.R.D. 620, 624 (E.D. Wis. 2009)).

There is a division of authority as to the appropriate standard to apply before rejecting a longer class period—whether the court must find that the allegation of the longer class period is "obviously frivolous" or instead whether it applies the *Twombly* plausibility standard. *See*

---

[4] Plymouth County appears to have engaged in the same type of gamesmanship here as the losing lead plaintiff applicant in *Villare*. In particular, the only reason it appears to have waited until the day before the lead plaintiff motions were due to file its complaint and issue a PSLRA notice was to make it more difficult for others to compete with it to be lead plaintiff and the only reason it makes allegations regarding the Registration Statement appears to be to qualify itself to act as lead plaintiff. "The specter of gamesmanship on these facts causes the Court to question whether [Plymouth County] will 'fairly and adequately protect the interests of the class.'" *Maliarov v. Eros Int'l PLC*, 2016 WL 1367246, at *4 (S.D.N.Y. Apr. 5, 2016) (quoting 15 U.S.C. § 78u-4(a)(3)(B)(iii)(ll)(aa)). By contrast, Narzissenfeld's application is based on purchases and sales within the class period defined by the original complaint—which was not filed by him or anyone related to him or by the law firm representing him. The same concerns of gamesmanship do not arise in those circumstances.

*Villare*, 2020 WL 3497285, at *4. The Court would not apply the longer period used by Plymouth County under either standard. At the time Plymouth County purchased its Novus shares, there were only two sets of arguably relevant statements in the public domain—those in the October 9 Registration Statement and those in the October 21, 2020 press release announcing the opening of the Morehead facility.

Significantly, neither sets of statements spoke to AppHarvest's operations. Nor did either speak to AppHarvest's projected financial or operational results for 2021. Neither the Registration Statement nor the October 21, 2020 release made statements on topics that either complaint alleges was the subject of the August 2021 corrective disclosure—AppHarvest's operations and projected results for 2021, the "operational headwinds" AppHarvest experienced as it ramped up to full production, the labor and productivity challenges related to the training and development of the new workforce, or the low market prices for tomatoes during the second quarter of 2021. Nor did either of those sets of statements make reference to the ability of AppHarvest to produce Grade No. 1 tomatoes consistently. In fact, the Registration Statement disclosed that AppHarvest employed only "40 full-time employees, including . . . 15 at its Morehead facility" as of June 30, 2020, and stated simply that it expected to employ 350 employees at the Morehead facility by the end of 2020. Dkt. No. 29-1 at 8. The October 21, 2020 press release discussed that the company expected to create more than 300 jobs at the Morehead facility. *Id.* ¶ 35.

The strongest statements that the Registration Statement made with respect to 2021 were that the Morehead facility would open in full in early 2021, that the revenue from the first harvest at the facility was expected in 2021, and that it would provide approximately 45 million pounds of annual production capacity. *Id.* ¶ 30. The October 21, 2020 press release made no

13

statements about AppHarvest's operations or its actual or projected financial results. It simply stated that the Morehead facility had opened and that the company expected to create more than 300 jobs at the Morehead facility. *Id.* ¶ 35. Plymouth County does not even allege that those statements were false and misleading. *See Villare*, 2020 WL 3497285, at *5. The Morehead facility apparently did open, and revenue from the first harvest was received in 2021. There are no allegations regarding the annual production capacity of the Morehead facility or the number of persons who would be employed at that facility.

Thus, at the time that Plymouth County made its purchases, neither Novus nor AppHarvest could have made any statements the falsity of which was demonstrated or corrected by the August 2021 release. At the time, AppHarvest was just completing planting its first crop of tomatoes at the partially opened Morehead facility. The operational headwinds which occurred during and were the result of the ramping up of the Morehead facility could not have materialized before the Morehead facility had even begun to ramp up. Thus, the *Plymouth County* complaint lacks any allegation that would support extending the class period to the date when Plymouth County made its purchases.[5] Plymouth County has no relevant losses. Narzissenfeld therefore has the largest financial stake.[6]

---

[5] The Court expresses no view with respect to whether any date earlier than that stated in the *Ragan* action is a permissible start date for the putative class action.

[6] Narzissenfeld also argues that Plymouth County should be barred from served as lead plaintiff pursuant to the PSLRA's 5-in-3 rule. *See* 15 U.S.C. § 78-u4(a)(3)(B)(vi) ("Except as the court may otherwise permit, consistent with the purposes of this section, a person may be lead plaintiff . . . in no more than 5 securities class actions brought as plaintiff class actions . . . during any 3-year period."). The 5-in-3 rule, however, is discretionary. "[A]s many courts have noted, the provision of the PSLRA restricting the use of professional plaintiffs was largely directed at private individuals, and courts have routinely waived the restriction in the case of qualified institutional investors." *Iron Workers Loc. No. 25 Pension Fund v. Credit-Based Asset Servicing & Securitization, LLC*, 616 F. Supp. 2d 461, 467 (S.D.N.Y. 2009) (citing cases); *see also In re Boeing Co. Aircraft Sec. Litig.*, 2019 WL 6052399, at *8 (N.D. Ill. Nov. 15, 2019) (applying the "'5-in-3' limitation to bar MPERS from serving as lead plaintiff would be inconsistent with the

Narzissenfeld also satisfies the remaining Rule 23 standards for appointment as lead plaintiff. For purposes of choosing a lead plaintiff under the PSLRA, "[t]he parties moving for lead plaintiff are only required to make a prima facie showing that they meet Rule 23 [of the Federal Rules of Civil Procedure], and courts need only consider the typicality and adequacy requirements." *Aude v. Kobe Steel, Ltd.*, 2018 WL 1634872, at *3 (S.D.N.Y. Apr. 4, 2018). Movants can demonstrate typicality by showing that their claims "arise from the same conduct from which the other class members' claims and injuries arise," *In re Crayfish Co. Sec. Litig.*, 2002 WL 1268013, at *5 (S.D.N.Y. June 6, 2002), and they can demonstrate adequacy if they "(1) [have] no conflict of interest with the other members of the class, (2) [have] sufficient interest in the outcome of the case, and (3) [have] selected counsel that is qualified, experienced, and generally able to conduct the litigation in question," *Aude*, 2018 WL 1634872, at *4.[7]

Narzissenfeld's claims are typical because he, like those in the putative class whom he seeks to represent, purchased AppHarvest securities on the basis of the statements alleged to be false and misleading and he was injured thereby. His claims "arise from the same conduct from which the other class members' claims and injuries arise." *In re Crayfish Co. Sec. Litig.*, 2002

---

PSLRA's purpose of promoting institutional investors as lead plaintiffs in securities fraud class actions" (emphasis omitted)), *reconsideration denied*, 2020 WL 476658 (N.D. Ill. Jan. 28, 2020); *Nakamura v. BRF S.A.*, 2018 WL 3217412, at *5 (S.D.N.Y. July 2, 2018) (5-in-3 rule largely directed at private individuals). As the legislative history reflects, institutional investors did not represent the type of professional plaintiff the 5-in-3 rule sought to restrict. *See In re Pfizer Inc. Sec. Litig.*, 233 F.R.D. 334, 338 n.4 (S.D.N.Y. 2005).

[7] The Court's determination of adequacy and typicality for purposes of appointing a lead plaintiff is not preclusive of a later challenge at the class certification stage with respect to those factors. *See, e.g.*, *Khunt v. Alibaba Grp. Holding Ltd.*, 102 F. Supp. 3d 523, 536 (S.D.N.Y. 2015) ("[I]n deciding a motion to serve as lead plaintiff, '[t]he moving plaintiff must make only a preliminary showing that the adequacy and typicality requirements under Rule 23 have been met.' . . . In fact, a 'wide ranging analysis under Rule 23 is not appropriate at this initial stage of the litigation and should be left for consideration of a motion for class certification.'" (internal citations and alterations omitted) (quoting *Weinberg v. Atlas Air Worldwide Holdings, Inc.*, 216 F.R.D. 248, 252 (S.D.N.Y. 2003)).

15

WL 1268013, at *5. His certification pursuant to the federal securities laws, his declaration that he intends to oversee this litigation, and his selection of experienced and capable counsel in Levi & Korsinsky, LLP demonstrate that he will adequately represent the class and does not have interests antagonistic to the class.

## II.     Selection of Lead Counsel

Under the PSLRA, "[t]he most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. § 78u–4(a)(3)(B)(v). The PSLRA "evidences a strong presumption in favor of approving a properly-selected lead plaintiff's decisions as to counsel selection and counsel retention." *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, 2008 WL 4128702, at *2 (S.D.N.Y. Sept. 3, 2008) (quoting *In re Cendant Corp. Litig.*, 264 F.3d 201, 276 (3d Cir. 2001)); *see also, e.g.*, *In re Ply Gem Holdings, Inc., Sec. Litig.*, 2014 WL 12772081, at *2 (S.D.N.Y. Oct. 14, 2014) (same).

Narzissenfeld has selected Levi & Korsinsky, LLP as class counsel. The firm is experienced and qualified to handle this securities fraud matter. It has been lead or co-lead counsel in a large number of securities fraud class actions, including in this District. The selection of Levi & Korsinsky, LLP as class counsel is approved.

## III.    Consolidation

Federal Rule of Civil Procedure 42(a) provides that a district court may consolidate "actions before the court involv[ing] a common question of law or fact." Fed. R. Civ. P. 42(a). "A determination on the issue of consolidation is left to the sound discretion of the Court," *In re UBS Auction Rate Sec. Litig.*, 2008 WL 2796592, at *1 (S.D.N.Y. July 16, 2008) (quoting *Albert Fadem Trust v. Citigroup Inc.*, 239 F. Supp. 2d 344, 347 (S.D.N.Y. 2002)), and involves weighing considerations of convenience, judicial economy, and cost reduction while ensuring that the "paramount concern for a fair and impartial trial" is honored, *Johnson v. Celotex Corp.*,

899 F.2d 1281, 1284–85 (2d Cir. 1990). "In securities actions where the complaints are based on the same public statements and reports, consolidation is appropriate if there are common questions of law and fact . . . ." *Weltz v. Lee*, 199 F.R.D. 129, 131 (S.D.N.Y. 2001) (internal quotation marks omitted) (quoting *Werner v. Satterlee, Stephens, Burke & Burke*, 797 F. Supp. 1196, 1211 (S.D.N.Y. 1992)).

Consolidation is plainly appropriate here. The two cases arise from the identical set of facts, name the identical defendants, are based on the same alleged misstatements and omissions, and contain the identical claims. The cases involve substantially identical questions of law and fact. Accordingly, the two cases will be consolidated.

The actions shall be referred to collectively as *In re AppHarvest Securities Litigation*, No. 21-cv-7985-LJL (the "Consolidated Action"). The Clerk of Court shall filed a copy of this Order in the separate files for both 21-cv-7985-LJL and 21-cv-9676-LJL. Unless otherwise ordered by the Court, all future filings should be made and docketed only under docket number 21-cv-7985-LJL. All counsel who have entered appearances in 21-cv-7985-LJL and 21-cv-9676-LJL shall be deemed to have entered an appearance in the Consolidated Action under the docket number 21-cv-7985-LJL. All motions for admission *pro hac vice* and all orders granting such motions in both cases shall also be deemed filed in the Consolidated Action under the docket number 21-cv-7985-LJL. Counsel is directed to alert the Clerk of Court to the filing or transfer of any case that might properly be consolidated as part of this litigation. Every pleading filed in the Consolidated Action shall bear the following caption:

> The Court's consolidation order does not make any person, firm, or corporation a party to any action in which the person or entity has not been named, served, or added as such in accordance with the Federal Rules of Civil Procedure.

17

## CONCLUSION

For the reasons set forth above, the motion at Dkt. No. 11 to approve Narzissenfeld as lead plaintiff and to approve Levi & Korsinsky, LLP as lead counsel are GRANTED.

The motion at Dkt. No. 15 to consolidate the related actions is also GRANTED. The above-captioned case and *Plymouth County Retirement Ass'n v. AppHarvest, Inc., et al.*, No. 21-cv-9676-LJL are consolidated under the caption In re AppHarvest Securities Litigation, and the files of these actions shall be maintained in one file under Master File No. 21-cv-7985-LJL. The Clerk of Court is respectfully directed to consolidate these cases under Dkt. No. 21-cv-7985-LJL and close Case No. 21-cv-9676-LJL. The consolidation is for all purposes, including, but not limited to, discovery, pretrial purposes, and trial.

All other motions are DENIED.

The Clerk of Court is respectfully directed to terminate the motions at Case No. 21-cv-7985-LJL, Dkt. Nos. 6, 9, 11 and 15 and Case No. 21-cv-9676-LJL, Dkt. No. 8.

SO ORDERED.

Dated: December 13, 2021
      New York, New York

                                      LEWIS J. LIMAN
                                      United States District Judge