UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re AppHarvest Securities Litigation | Case No. 1:21-cv-07985-LJL |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
PLAINTIFF'S FIRST CONSOLIDATED AMENDED COMPLAINT**

May 2, 2022

COOLEY LLP
Aric H. Wu
55 Hudson Yards
New York, NY 10001
Tel: (212) 479-6000
ahwu@cooley.com

Peter M. Adams (*pro hac vice forthcoming*)
Linh K. Nguyen (*pro hac vice forthcoming*)
4401 Eastgate Mall
San Diego, CA 92121
Tel: (858) 550-6000
padams@cooley.com
lknguyen@cooley.com

*Attorneys for Defendants AppHarvest, Inc.,
Jonathan Webb, Loren Eggleton, and David
Lee*

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ..................................................................................................iii

TABLE OF ABBREVIATIONS ...........................................................................................ix

INTRODUCTION ................................................................................................................ 1

BACKGROUND ..................................................................................................................3

I.      AppHarvest Begins to Build the Foundation to Redefine Agricultural Production in
        the United States. .......................................................................................................3

        A.      AppHarvest Partners with Mastronardi. ..........................................................4

        B.      AppHarvest Constructs and Opens Its First CEA Facility ................................4

II.     AppHarvest Sells Its First Tomatoes and Reaffirms Its Guidance for 2021 .................7

III.    AppHarvest Has a Successful First Quarter, Meeting Its Net Sales and Adjusted
        EBITDA Guidance for Q1 2021. ..................................................................................9

IV.     AppHarvest's Reports Unexpected Q2 Results and Lowers Guidance for 2021. ......... 10

V.      Wall Street Reacts to AppHarvest's Lowered Guidance. ............................................ 12

VI.     Post-Class Period Events. ......................................................................................... 12

VII.    This Lawsuit .............................................................................................................. 13

LEGAL STANDARDS ...................................................................................................... 14

ARGUMENT ..................................................................................................................... 15

I.      Plaintiff Fails to Adequately Plead Falsity. ............................................................... 15

        A.      The Challenged Statements Are Not Actionable. ........................................... 15

        B.      Defendants Said Nothing Materially False or Misleading ............................... 19

                1.      The CW Allegations Are Not Reliable. ................................................ 20

                2.      No Alleged Omission Rendered Defendants' Statements Materially False
                        or Misleading When Made .................................................................. 22

II.     Plaintiff Fails to Plead Any Facts to Support an Inference of Scienter ....................... 29

        A.      Plaintiff Fails to Plead a Motive to Defraud. ................................................. 30

# TABLE OF CONTENTS
## (continued)

**Page**

1. Securing Favorable Financing Is Not Indicative of Scienter. ........................ 30

2. A Motive To Acquire Another Company Is Not Indicative Of Scienter. ...... 31

3. Plaintiff Fails to Plead Any Stock Sales by the Individual Defendants. ........ 31

B. Plaintiff Fails to Plead Facts That Show Conscious Misbehavior or Recklessness. ... 32

1. Plaintiff's Core Operations Theory Does Not Suggest Scienter. ................... 32

2. There Are No "Admissions" Of Scienter. ....................................................... 33

3. Mr. Webb's Infrequent Presence at Morehead Does Not Suggest Scienter. 34

4. Scienter Cannot Be Inferred From The Mastronardi Agreement. ................ 34

5. Plaintiff's Vague Allegations About Internal Forecasts And Data Fail To Give Rise To A Strong Inference Of Scienter. ............................................... 35

6. Scienter Cannot Be Inferred From Company Personnel Changes. ............... 35

7. Scienter Cannot Be Inferred From The Individual Defendants' Accurate Answers to Analyst Questions. ..................................................................... 37

8. Scienter Cannot Be Inferred From Mr. Ubben's Single Stock Sale. ............ 37

C. The Unreliable And Vague CW Allegations Are Not Indicative of Scienter. ............. 38

D. The Inference Of Scienter Is Not As Compelling As The Opposing Inference. ......... 38

III. Plaintiff Has Failed to Plead Loss Causation. ................................................................. 39

IV. Plaintiff Fails to State a Claim Under Section 20(a) ....................................................... 39

CONCLUSION ........................................................................................................................... 39

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adient plc Sec. Litig.*,
  2020 WL 1644018 (S.D.N.Y. April 20, 2020) ............................................................16, 17, 23

*In re AOL Time Warner, Inc. Sec. Litig.*,
  503 F. Supp. 2d 666 (S.D.N.Y. 2007).........................................................................39

*In re Aratana Therapeutics Inc.*,
  315 F. Supp. 3d (S.D.N.Y. 2018) ..............................................................................18

*Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*,
  28 F.4th 343 (2d Cir. 2022) ...........................................................................29, 32, 36

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).....................................................................................14

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007)...............................................................................3

*In re Avon Sec. Litig.*,
  2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019).........................................................33

*In re Banco Bradesco S.A. Sec. Litig.*,
  277 F. Supp. 3d 600 (S.D.N.Y. 2017).....................................................................3

*Basic v. Levinson*,
  485 U.S. 224 (1988)...................................................................................19

*Bd. of Trs. of City of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO*,
  811 F. Supp. 2d 853 (S.D.N.Y. 2011).....................................................................38

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).....................................................................................14

*Boca Raton Firefighters & Police Pension Fund v. Bahash*,
  506 F. App'x 32 (2d Cir. 2012) ............................................................................28

*Boguslavsky v. Kaplan*,
  159 F.3d 715 (2d Cir. 1998)................................................................................39

*Born v. Quad/Graphics, Inc.*,
  521 F. Supp. 3d 469 (S.D.N.Y. 2021).......................................................10, 15, 22, 25

*Bos. Ret. Sys. v. Alexion Pharms., Inc.*,
556 F. Supp. 3d 100 (D. Conn. 2021)................................................................35

*Browning v. Amyris, Inc.*,
2014 WL 1285175 (N.D. Cal. Mar. 24, 2014).........................................................27

*In re Campbell Soup Co. Sec. Litig.*,
2020 WL 7022655 (D.N.J. Nov. 30, 2020) .........................................................37

*Campo v. Sears Holdings Corp.*,
635 F. Supp. 2d 323 (S.D.N.Y. 2009)..................................................................20

*In re Chembio Diagnostics, Inc. Sec. Litig.*,
2022 WL 541891 (E.D.N.Y. Feb. 23, 2022)........................................................33

*Chill v. Gen. Elec. Co.*,
101 F.3d 263 (2d Cir. 1996)................................................................................32

*In re Citigroup, Inc. Sec. Litig.*,
330 F. Supp. 2d 367 (S.D.N.Y. 2004)..................................................................25

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
450 F. Supp. 3d 379 (S.D.N.Y. 2020)..................................................................32

*City of Warren Police & Fire Ret. Sys. v. Foot Locker, Inc.*,
412 F. Supp. 3d 206 (E.D.N.Y. 2019) .................................................................18

*Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*,
433 F. Supp. 3d 515 (S.D.N.Y. 2020)..................................................................29

*In re DDAVP Direct Purchaser Antitrust Litig.*,
585 F.3d 677 (2d Cir. 2009)................................................................................37

*Dobina v. Weatherford Int'l Ltd.*,
909 F. Supp. 2d 228 (S.D.N.Y. 2012)..................................................................31

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)......................................................................................38, 39

*ECA, Local 134 IBEW Joint Pension Tr. v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)...............................................................15, 30, 31, 32

*In re eSpeed, Inc. Sec. Litig.*,
457 F. Supp. 2d 266 (S.D.N.Y. 2006)..................................................................31

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
986 F. Supp. 2d 487 (S.D.N.Y. 2013)..................................................................29

iv

*In re Fed Ex Corp. Sec. Litig.*,
   517 F. Supp. 3d 216 (S.D.N.Y. 2021)......................................................................14, 16, 21

*In re Francesca's Holdings Corp.*,
   2015 WL 1600464 (S.D.N.Y. Mar. 31, 2015) ........................................................................21

*Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*,
   336 F. Supp. 3d 196 (S.D.N.Y. 2018), *aff'd*, 779 F. App'x 69 (2d Cir. 2019)............21, 24, 33

*Frederick v. Mechel OAO*,
   475 F. App'x 353 (2d Cir. 2012) ...........................................................................................32

*Garber v. Legg Mason, Inc.*,
   537 F. Supp. 2d 597 (S.D.N.Y. 2008).....................................................................................14

*In re GeoPharma, Inc. Sec. Litig.*,
   399 F.Supp.2d 432 (S.D.N.Y.2005).........................................................................................30

*Glaser v. The9, Ltd.*,
   772 F. Supp. 2d 573 (S.D.N.Y. 2011)................................................................................20, 35

*Goel v. Bunge, Ltd.*,
   820 F.3d 554 (2d Cir. 2016)......................................................................................................3

*Gregory v. ProNAi Therapeutics Inc.*,
   297 F. Supp. 3d 372 (S.D.N.Y. 2018).....................................................................................21

*In re Health Mgmt. Sys., Inc. Sec. Litig.*,
   1998 WL 283286 (S.D.N.Y. June 1, 1998) .......................................................................23, 26

*In re IAC/InterActiveCorp Sec. Litig.*,
   478 F. Supp. 2d 574 (S.D.N.Y. 2007).....................................................................................16

*IKB Int'l S.A. v. Bank of Am. Corp.*,
   584 F. App'x 26 (2d Cir. 2014) ..............................................................................................35

*In re Initial Pub. Offering Sec. Litig.*,
   399 F. Supp. 2d 261 (S.D.N.Y. 2005).....................................................................................39

*Jones v. Perez*,
   550 F. App'x 24 (2d Cir. 2013) ..............................................................................................37

*Kalnit v. Eichler*,
   264 F.3d 131 (2d Cir. 2001).....................................................................................................31

*Kleinman v. Elan Corp.*,
   706 F.3d 145 (2d Cir. 2013).....................................................................................................20

*Kramer v. Time Warner Inc.*,
   937 F.2d 767 (2d Cir. 1991)..................................................................................3

*Loc. No. 38 IBEW Pension Fund v. Am. Express Co.*,
   724 F. Supp. 2d 447 (S.D.N.Y. 2010)....................................................21, 23, 38

*Long Miao v. Fanhua, Inc.*,
   442 F. Supp. 3d 774 (S.D.N.Y. 2020)...............................................20, 21, 26, 37

*Malin v. XL Cap. Ltd.*,
   499 F. Supp. 2d 117 (D. Conn. 2007).................................................................30

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011).............................................................................................19

*Nappier v. Pricewaterhouse Coopers LLP*,
   227 F. Supp. 2d 263 (D.N.J. 2002) ....................................................................34

*In re Nokia Oyj Sec. Litig.*,
   423 F. Supp. 2d 364 (S.D.N.Y. 2006).....................................................14, 26, 27

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)...............................................................................32

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015)...........................................................................................19

*In re Omnicom Grp., Inc. Sec. Litig.*,
   597 F.3d 501 (2d Cir. 2010)...............................................................................14

*Ong v. Chipotle Mexican Grill, Inc.*,
   294 F. Supp. 3d 199 (S.D.N.Y. 2018).................................................................19

*In re Progress Energy, Inc.*,
   371 F. Supp. 2d 548 (S.D.N.Y. 2005).................................................................24

*In re Regeneron Pharms., Inc. Sec. Litig.*,
   2005 WL 225288 (S.D.N.Y. Feb. 1, 2005)..........................................................31

*In re Rhodia S.A. Sec. Litig.*,
   531 F. Supp. 2d 527 (S.D.N.Y. 2007).................................................................39

*Rice v. Intercept Pharm., Inc.*,
   2022 WL 837114 (S.D.N.Y. Mar. 21, 2022) (Liman, J.) ..........................32, 35, 36

*Richman v. Goldman Sachs Grp., Inc.*,
   868 F.Supp.2d 261 (S.D.N.Y. 2012)...................................................................20

*Ronconi v. Larkin*,
  253 F.3d 423 (9th Cir. 2001) ..................................................................................24

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
  573 F.3d 98 (2d Cir. 2009)................................................................................29, 32

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*,
  75 F.3d 801 (2d Cir. 1996)......................................................................................35

*In re Sanofi-Aventis Sec. Litig.*,
  774 F. Supp. 2d 549 (S.D.N.Y. 2011).....................................................................17

*Set Cap. LLC v. Credit Suisse Grp. AG*,
  996 F.3d 64 (2d Cir. 2021)......................................................................................35

*Singh v. Schikan*,
  106 F. Supp. 3d 439 (S.D.N.Y. 2015).....................................................................20

*Steamfitters Loc. 449 Pension Plan v. Skechers U.S.A., Inc.*,
  412 F. Supp. 3d 353 (S.D.N.Y. 2019).....................................................................18

*Taubenfeld v. Hotels.com*,
  385 F. Supp. 2d 587 (N.D. Tex. 2004) ...................................................................18

*Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*,
  531 F.3d 190 (2d Cir. 2008).....................................................................................35

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)..................................................................................................14

*In re Vantive Corp. Sec. Litig.*,
  110 F. Supp. 2d 1209 (N.D. Cal. 2000) ..................................................................20

*In re WEBMD Health Corp. Sec. Litig.*,
  2013 WL 64511 (S.D.N.Y. Jan. 2, 2013) ..........................................................17, 21

*Wochos v. Tesla, Inc.*,
  2018 WL 4076437 (N.D. Cal. Aug. 27, 2018) ........................................................34

*Woodward v. Raymond James Fin., Inc.*,
  732 F. Supp. 2d 425 (S.D.N.Y. 2010).....................................................................31

vii

**Statutes**

15 U.S.C.
    § 78u–5(i)(1)(A)-(C) ...............................................................................................15
    § 78u-4 ..................................................................................................................29
    § 78u-4(b)(1) .........................................................................................................14
    § 78u-4(b)(1)(B) ....................................................................................................19
    § 78u-4(b)(2) .........................................................................................................15
    § 78u-5(i)(1)(A)-(D) .............................................................................................16

17 C.F.R. § 240.10b-5 ...................................................................................................13, 14

**Rules**

Federal Rule of Civil Procedure 8 ..................................................................................2, 14

Federal Rule of Civil Procedure 9(b) ..............................................................................2, 14

**TABLE OF ABBREVIATIONS**

| | |
|---|---|
| **AppHarvest or Company** | AppHarvest, Inc. |
| **CAC** | Plaintiff's First Consolidated Amended Complaint |
| **CEA** | Controlled environment agriculture |
| **CW** | Confidential witness |
| **Defendants** | AppHarvest, Inc., Jonathan Webb, Loren Eggleton, and David Lee |
| **EBITDA** | Earnings Before Interest, Taxes, Depreciation, and Amortization |
| **GAAP** | Generally Accepted Accounting Principles |
| **GMO** | Genetically Modified Organism |
| **Individual Defendants** | Jonathan Webb, Loren Eggleton, and David Lee |
| **Mastronardi** | Mastronardi Produce Limited |
| **Mastronardi Agremeement** | AppHarvest's 10-year agreement with Mastronardi, signed on March 18, 2019 (as amended December 20, 2020) |
| **Plaintiff** | Lead Plaintiff Alan Narzissenfeld |
| **Prospectus** | January 1, 2021 Form 424B3 |
| **PSLRA** | Private Securities Litigation Reform Act |
| **SEC** | Securities and Exchange Commission |
| **TOV** | Tomatoes on the Vine |
| **USDA** | United States Department of Agriculture |
| **Wu Declaration** | Declaration of Aric H. Wu in Support of Defendants' Motion to Dismiss Plaintiff's First Consolidated Amended Complaint |

**INTRODUCTION**

This case is a textbook example of a plaintiff trying to spin a company's reduction of its annual revenue guidance into an actionable violation of the federal securities laws. Those laws and relevant pleading standards, however, foreclose such attempted fraud-by-hindsight. And for good reason: markets are complex, and financial predictions made months or even a year into the future—particularly for a young, public company like AppHarvest—are always uncertain.

AppHarvest is a sustainable food company headquartered in Central Appalachia. It builds some of the largest high-tech indoor greenhouses in the world. Since 2019, AppHarvest has invested hundreds of millions of dollars to further its mission of reliably and sustainably increasing crop yields, improving access to nutritious, non-GMO food, and providing a consistent and safe supply of U.S.-grown produce. In October 2020, AppHarvest opened its flagship 60-acre indoor farm, the first of its kind, in Morehead, Kentucky. This massive undertaking required the Company to hire and train hundreds of new employees amid a global pandemic. In January 2021, the Company began harvesting produce from the first half of the Morehead farm.

Despite these and many other challenges, a few months later, AppHarvest posted a positive first quarter. It reported that the Company's Q1 2021 financial results were in line with its guidance, even though the Morehead farm was not fully operational the entire time. Based on the strength of those results, AppHarvest reaffirmed previously issued guidance for the full year of 2021. Although optimistic about the Company's prospects, AppHarvest also warned investors that its projections were not a guarantee and "were subject to a number of risks and uncertainties" detailed in the Company's SEC filings, including that AppHarvest had "***only just begun [its] first growing season, which ma[de] it difficult to forecast future results of operations***."

Unfortunately, like many new companies, AppHarvest experienced some growing pains that impacted its second quarter as an operating company. On August 11, 2021, the Company disclosed disappointing Q2 results stemming from historically low market prices for tomatoes, and unanticipated labor and productivity challenges. These headwinds led to lower quality tomatoes, which compounded the pricing difficulties in the market and had unexpected adverse effects on

distribution costs. As a result, as soon as it announced its financial results for the second quarter, the Company lowered its financial guidance for the full year. As Defendants explained, "***starting in July***," they had taken a "hard independent look at everything," which led them to proceed with "more moderated assumptions." Following this news, the Company's stock price declined, which then spawned this litigation.

Plaintiff's prolix, convoluted, 164-page complaint is defective to its core. According to Plaintiff, Defendants somehow knew, six months before it was publicly disclosed, that the Company was experiencing certain challenges that would later materially impact its second quarter financial results and 2021 guidance. But that accusation is as implausible as it is unsubstantiated. The vast majority of the challenged statements were made on or before May 17, 2021, which is when AppHarvest released its positive Q1 results. How then could Defendants have misled investors about its business and prospects when the Company just achieved its Q1 forecasts? Plaintiff does not say. Instead, he proffers only vague and unsubstantiated allegations. The CAC relies on Defendants' post-hoc statements about AppHarvest's second quarter results and the subjective opinions of three rank-and-file former employees who had no personal knowledge of farm-wide operations, no direct contact with any Individual Defendant, and only one of whom worked at the Company for the entire Class Period. The CAC's defects are legion. It does not come close to clearing the high hurdles imposed by Rule 8, Rule 9(b), and the PSLRA.

First, Plaintiff has not pled falsity. Most—if not all—of the challenged statements are not actionable as a matter of law. They are either forward-looking statements protected by the PSLRA's safe harbor, puffery, opinions, or demonstrably true. But even if the challenged statements were potentially actionable, none of the omissions render any of the statements materially false or misleading when made.

Second, Plaintiff has not pled scienter. There is not a single particularized fact alleged (no documents, no conversations, no emails, nothing) as to the state of mind of any Defendant—*i.e.*, nothing regarding any contemporaneous knowledge of the unspecified training, retention and staffing, or incentive compensation issues alleged by Plaintiff, let alone any well-pleaded facts

2

showing that any Individual Defendant intended to mislead the investing public. Nor does Plaintiff plead a plausible motive. His allegations surrounding the Company's efforts to obtain financing and to acquire another company are so common for public companies that the Second Circuit has held that such efforts are not evidence of a plausible motive to defraud. Further, there were no stock sales by any Individual Defendant, which undercuts any possible inference of recklessness or intent to deceive. Without these facts, Plaintiff has not pled any inference of scienter, must less a strong one as required under the PSLRA.

Third, Plaintiff has not pled loss causation. Plaintiff has totally failed to connect any disclosures or comments about AppHarvest's second quarter results and its lowered annual guidance to any alleged false or misleading statement or fraud on the market.

For all of these reasons, each of which is an independent and sufficient basis for dismissal, this Court should grant Defendants' Motion to Dismiss.

## **BACKGROUND**[1]

### I.    AppHarvest Begins to Build the Foundation to Redefine Agricultural Production in the United States.

AppHarvest is headquartered in Morehead, Kentucky and is incorporated under Delaware law as a public benefit corporation. (¶¶28, 116; Ex. 8 at 3.)[2] AppHarvest believes that CEA is the solution to the world's growing food security crisis.[3] (Ex. 8 at 24.) CEA is a high-tech, indoor farming method that "blends a combination of engineering, plant science, and computer managed

---

[1] In addition to setting forth Plaintiff's allegations, this motion refers to "statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 629 (S.D.N.Y. 2017) (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). It also includes "matters of which judicial notice may be taken, including documents that both 'bear on the adequacy' of SEC disclosures and are 'public disclosure documents required by law.'" *Banco Bradesco*, 277 F. Supp. 3d at 629 (quoting *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) and *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773-74 (2d Cir. 1991)).

[2] All "¶" references are to the CAC, and all "Ex." and "App." references are to the exhibits and appendices attached to the Wu Declaration filed herewith. Unless otherwise noted, all emphasis is added and all internal quotation marks, elipses, brackets, and citations are omitted.

[3] The United Nations predicts that by 2050, global food production must increase by at least 50 percent to feed the growing population. (Ex. 8 at 24.) Conventional agriculture techniques, which use up more than 70 percent of the world's freshwater, cannot keep pace with increasing demand for food. (*See id.*)

greenhouse control technologies." (¶38.) High-tech greenhouses can produce up to 30 times more crops compared to traditional open-field agriculture, while using up to 90% less water. (¶40; Ex. 8 at 25.) They can also cultivate crops year-round and optimize supply. (¶39.)

Jonathan Webb founded AppHarvest in 2018 and, at all relevant times, served as the Company's CEO and Chairman of the Board. (¶¶29, 38.) Loren Eggleton served as the Company's CFO at all relevant times. (¶30.) David Lee served as a director and the Company's President at all relevant times. (¶31.) From the beginning, AppHarvest has warned investors that its "management [team] has limited experience in operating a public company." (Ex. 8 at 20.)

**A.     AppHarvest Partners with Mastronardi.**

In March 2019, AppHarvest entered into a ten-year marketing and distribution agreement with Mastronardi, the largest North American producer and distributor of greenhouse-grown produce. (¶34.) Under the Agreement, Mastronardi became the sole marketer and distributor of Morehead farm tomatoes and agree to purchase all of AppHarvest's USDA Grade No. 1 tomatoes.[4] (¶57; Ex. 2 at 2.) Under the Agreement, Mastronardi and its customers (*e.g.*, grocery stores) are entitled to inspect the tomatoes and may return them—at cost to AppHarvest—if they decide they do not qualify as Grade No. 1 . (¶59; Ex. 2 at 5.) AppHarvest may sell any returned produce. (¶62; Ex. 2 at 2.) The Mastronardi Agreement also provides that "given enough time to make adjustments before the beginning of each growing season," AppHarvest and Mastronardi will work together to create forecasts for the next growing season.[5] (¶56; Ex. 2 at 5.)

**B.     AppHarvest Constructs and Opens Its First CEA Facility.**

In May 2019, AppHarvest announced that it would begin construction on the Company's

---

[4] The USDA's criteria for Grade No. 1 tomatoes is vague and subjective. The requirements include: "Mature," "Not overripe or soft," "Clean," "Well developed," "Fairly well formed," "Fairly smooth," and free from "Decay," "Freezing injury," "Sunscald," and no damage from any other cause. (Ex. 1 at 2–3.) The standard for Grade No. 2 tomatoes is nearly the same as for Grade No. 1: "Mature," "Not overripe or soft," "Clean," "Well developed," "Reasonably well formed," "Not more than slightly rough," and free from "Decay," "Freezing injury," "Sunscald," and "serious[]" damage. (*Id.*)

[5] A growing season consists of the preparation, planting, and harvesting of crops. (¶56.) The Company's first growing season began in October 2020. (Ex. 8 at 15.) The second growing season began during AppHarvest's summer refresh (i.e., replanting) in the third quarter of 2021. (Ex. 52 at 2.)

first and flagship 60-acre (*i.e.*, 2.7 million square feet) indoor greenhouse in Morehead, Kentucky. That massive facility also includes the Company's executive offices, a packhouse, and a 10-acre retention pond. (¶49; Ex. 4 at 3; Ex. 8 at 26.) Housing approximately 45 football fields of indoor growing space, the Morehead greenhouse has many advantages. (Ex. 10 at 2–3.) First, it runs completely on recycled rainwater, uses 90% less water than open field farming, removes harsh chemical pesticides, can get up to 30 times more yield per acre than open field farming, and avoids soil depletion. (¶40; Ex. 10 at 2–3; Ex. 7 at 5.) Second, it enjoys favorable taxation policies, low utility costs, lower-than-average labor costs, and a lower-than-average cost of living. (Ex. 8 at 28–29.) Third, the Morehead farm is also centrally located within "a day's drive" of nearly 70% of the U.S. population, reducing transportation costs compared to existing growers by up to 80%. (*Id*. at 21; Ex. 3 at 2.) Fourth, the farm's location in Central Appalachia provides access to an available and educated labor force that has been underutilized due to the coal industry's rapid decline. (Ex. 8 at 26, 28.) AppHarvest was confident it could attract the local workforce because the Company pays employees a living wage, covers 100% of all premiums for comprehensive benefits, grants 401(k) matches, and awards equity to full-time employees. (Ex. 28 at 8.)

In October 2020, the Company officially opened the Morehead farm. (Ex. 5 at 2.) On November 19, 2020, AppHarvest announced that it had planted its first crop of beefsteak tomatoes on the first half (*i.e.*, 30 acres) of the Morehead farm. (¶50; Ex. 6 at 2.) On December 15, 2020, AppHarvest issued its first full-year financial guidance. (¶51.) The Company projected $21 million in net revenue and negative $41 million in adjusted EBITDA for 2021. (¶¶51, 126; Ex. 7 at 6.) But AppHarvest also warned investors not to rely on its forecasts because they were forward looking statements based on "*current expectations*," "*inherently uncertain*" "*assumptions*," and were "*subject to a number of risks and uncertainties*." (Ex. 7 at 3–4.) The Company "*anticipate[d] that subsequent events and developments* [*would*] *cause [its] assessments to change*." (*Id*.)

On January 11, 2021, in connection with its "go-public" reverse merger with Novus, AppHarvest filed a Registration Statement and Prospectus (together, the "Prospectus"). That SEC filing was replete with robust disclosures about AppHarvest's financial projections; operations;

5

ability to hire, train, and retain employees; growth prospects, and the COVID-19 pandemic.[6] (Ex. 8 at 8–20; *see also* **App. A** (cataloguing AppHarvest's risk disclosures).) For example, the Prospectus specifically warned investors that AppHarvest:

- "*is a development stage company with no revenue to date*," and "*has only just begun its first growing season, which makes it difficult to forecast future results of operations*." (*Id*. at 3, 6.)

- had a management team with "*limited experience in operating a public company*" and personnel "that *may not have . . . the appropriate level of knowledge, experience, and training . . . required of public companies*." (*Id*. at 20.)

- "*may be unable to successfully execute on its growth strategy*," and that "*if [it did] not effectively manage its growth, it may not be able to . . . satisfy customer requirements or maintain high-quality product offerings*." (*Id*. at 8, 12.)

The Prospectus forecasted $25 million in net revenue and an adjusted EBITDA loss of $31 million for 2021. But the Company reiterated that its projections:

- were "*forward looking statements that are inherently subject to significant uncertainties and contingencies*," and that they "*should not be relied upon as being indicative of future results*." (*Id*. at 22–23.)

- "*reflect numerous estimates and assumptions . . . which are difficult to predict and many of which are beyond AppHarvest's . . . control*." (*Id*. at 22–23.)

And the Prospectus warned that:

- "*revenue growth could slow or . . . decline for a number of reasons*, including slowing demand for AppHarvest's products . . ." (*Id*. at 15.)

- "*[i]f . . . [its] products . . . have quality problems, the Company may not be able to fully recover costs and expenses incurred in operation . . . [and] could be materially and adversely affected.* (*Id*. at 12.)

- "*there can be no assurance that the projected results will be realized or that actual results will not be significantly . . . lower than projected*." (*Id*. at 22–23.)

Regarding labor, in particular, the Prospectus expressly cautioned investors that:

- indoor farming is "*labor intensive*" and "*depends on employing a skilled local labor force*," which means that a "*failure to . . . retain qualified employees could negatively*

---

[6] As of January 2021, AppHarvest had 350 employees and had received more than 10,000 applications for those positions. (¶68; Ex. 9 at 3.)

6

*impact [its] business, results of operations and financial condition*." (*Id*. at 10.)

- the Company had "*rapidly hired*" employees and that "*even if [it] is able to . . . train its labor force*," it could "*no[t] guarantee that [it would] be able to retain these employees*." (*Id*. at 10–11.)

AppHarvest also disclosed the Mastronardi Agreement terms and cautioned: (*Id*. at 11.) :

- Mastronardi is the Company's "exclusive marketing and distribution partner" and "is only obligated to purchase AppHarvest's products that are at or above USDA Grade 1 standards . . . *and of a quality required by Mastronardi's customers*." (*Id*. at 11.)

- Mastronardi and its customers had a period to inspect AppHarvest's produce and that "*[a]ny significant or unexpected rejection of AppHarvest's products could negatively impact [its] results of operations*." (*Id*. at 11.)

In addition, the Company warned that it was not immune to the COVID-19 pandemic:

- it was relying on "*a single facility for all its operations*," which meant that "*[a]ny . . . period of reduced production at the Morehead facility*" due to "disease outbreaks or pandemics" could "*disrupt AppHarvest's ability to . . . operate its business*." (*Id*. at 9.)

- it warned that the "*pandemic could result in labor shortages, which could result in AppHarvest's inability to plant and harvest crops at full capacity and could result in spoilage or loss of unharvested crops*." (*Id*. at 18.)

AppHarvest repeated or referenced these risk warnings and similar cautionary language in *every* earnings call held and every SEC filing and press release challenged by Plaintiff. (Exs. 11, 14–16, 18–20, 22–25, 28, 35, 36.)

## II.    AppHarvest Sells Its First Tomatoes and Reaffirms Its Guidance for 2021.

On January 16, 2021, AppHarvest announced that it had completed its first harvest of beefsteak tomatoes and had started shipping to national grocers such as Kroger and Walmart. (¶130; Ex. 9 at 2.) Based on those "early sales," the Company reaffirmed its 2021 financial guidance. (¶126; Ex. 11 at 2.) But it again warned investors that its projections were forward-looking and subject to numerous risk and uncertainties as detailed in the Prospectus. (Ex. 11 at 3.)

On February 10, 2021, AppHarvest filed another Registration Statement, which repeated the same cautionary language and risk warnings contained in the Prospectus. (Ex. 15 at 5–16.) AppHarvest emphasized that it had "*only just begun [its] first growing season, which makes it difficult to forecast future results of operations*"; that "*even if [it is] able to . . . train its labor*

7

*force, there is no guarantee that [the Company] will be able to retain these employees*"; that its "*business could be adversely affected if [it] fail[ed] to effectively manage [its] future growth*"; that "*[i]f . . . [its] products . . . have quality problems, the Company may not be able to fully recover costs and expenses incurred in operatio*n"; and that it "*rel[ies] on a single facility for all of [its] operations*." (¶141; Ex. 15 at 5, 7, 9.)

On February 25, 2021, AppHarvest announced that for the first quarter of 2021—its first quarter of production ever—the Company was projecting net revenue of $2.1–2.6 million and an adjusted EBITDA loss of $14–16 million. (Ex. 16 at 2.) For the full year 2021, AppHarvest forecasted $20–25 million in net revenue and an adjusted EBITDA loss of $43–45 million. (Ex. 17 at 3.) At the time, Mr. Webb explained that "favorable crop yields and market pricing" supported an "outlook that is better than [] expected in December 2020." (¶144; Ex. 16 at 2.) In particular, the Morehead farm "exceeded a new performance threshold for the facility, harvesting more than 120,000 pounds of tomatoes in a single day during the week of February 22." (Ex. 18 at 2.) Despite its optimism, AppHarvest still cautioned investors that "*its expectations are based on information available at the time*" and "*subject to changing conditions*," "*risk*," and "*uncertainties*." (Ex. 16 at 3.) The Company again directed investors to the risk disclosures in its February Registration Statement. (Ex. 17 at 4.) Around the same time, Defendant Lee also reminded investors that they should "not to get ahead of [themselves]" as this was AppHarvest's "first at-scale facility." (Ex. 21 at 2.)[7]

On March 4, 2021, in its amendment to the February Registration Statement, AppHarvest again warned investors that it was "*difficult [for the Company] to forecast future results of operations*" because it had "*not "completed [its] first growing season*." (Ex. 20 at 5.) AppHarvest repeated the risk disclosures and cautionary language regarding the Company's financial projections, operations, ability to hire and retain employees, growth prospects, and the COVID-19 pandemic. (¶¶156, 163; Ex. 20 at 5–17.)

---

[7] By the end of March, AppHarvest employed 500 people. (Ex. 26 at 4.)

On April 1, 2021, AppHarvest announced that it had harvested its first TOV crop, which had been planted in January on the second 30 acres of the Morehead farm. (¶167; Ex. 22 at 2.) The Company noted that the TOV would be shipped to Kroger that week "on schedule." (Ex. 22 at 2.)

### III.    AppHarvest Has a Successful First Quarter, Meeting Its Net Sales and Adjusted EBITDA Guidance for Q1 2021.

On May 17, 2021, AppHarvest announced that it met its financial guidance for Q1 2021 despite the Morehead farm being less than fully operational the entire time. (Ex. 26 at 5.) For the quarter, AppHarvest sold 3.8 million pounds of beefsteak and TOV tomatoes with "*varying level of quality for each.*" This yielded $2.3 million in net sales (compared to the net sales projection of $2.1–2.6 million) and an adjusted EBITDA loss of $12.4 million (improving on the range of $14–16 million). (¶179; Ex. 24 at 2; Ex. 25 at 4; Ex. 31 at 4.) AppHarvest also disclosed that "as of the first week of May," the Company had ramped up production of the Morehead farm to its full 60 acres. (Ex. 24 at 2.) Finally, AppHarvest reported that the Company expected to have five CEA facilities operational by the end of 2022.[8] (Ex. 25 at 4.) Based on these results, AppHarvest reiterated its full-year 2021 net sales guidance of $20–25 million and altered its projected adjusted EBITDA loss to $48–52 million due to the Company's acquisition of Root AI. (¶174; Ex. 24 at 3.)

Despite these positive results, Defendants candidly acknowledged that Q1 had its challenges given that it was the Company's "first harvest [at] a new facility." (Ex. 28 at 8.) Mr. Eggleton disclosed that the cost of training the Company's labor force had been substantial, contributing to a gross loss of $4.5 million, and that despite these efforts, the "blended price per pound [AppHarvest] realized during the first quarter . . . reflect[ed] a mix of *varying grades* of tomatoes." (*Id.* at 8.) He expressed hope that the Company's continued investment in training and "fine-tune[ing]" of its farm operations "would "lead[] to greater labor productivity" and a tomato "grade mix [that would] migrate upward over the coming quarters." (¶101; Ex. 28 at 8.) And Mr. Lee added that he believed the Company's "new training" of employees would "support higher

---

[8] AppHarvest disclosed that internal survey results showed that 93% of employees were proud to work for the Company and 87% stated they would recommend the Company as a great place to work. (Ex. 28 at 8.)

productivity in Q4." (¶100; Ex. 28 at 6.)

The market understood that AppHarvest's Q1 results, though positive, were impacted by a lower quality mix. A Cowen analyst observed that "the price AppHarvest had received per pound of tomato had "come in below [] expectations due to seasonal conditions and quality (*likely lower Grade 1 output*)." (Ex. 40 at 2.) However, analysts expected quality would improve over time. (Ex. 39 at 3.)[9]

On the heels of its Q1 success, AppHarvest announced, on June 16, 2020, that it had secured a $75 million credit facility to "fuel expansion of its rapidly growing network of high-tech [CEA] facilities in Central Appalachia." (¶122; Ex. 38 at 2.) About a month later, the Company announced that it had entered a credit agreement for a $91 million construction loan to build a new farm in Richmond, Kentucky. (¶122; Ex. 41 at 2.)

## IV.    AppHarvest's Reports Unexpected Q2 Results and Lowers Guidance for 2021.

On August 11, 2021, AppHarvest issued a press release announcing its operating and financial results for the second quarter of 2021. (¶217; Ex. 42 at 2.) Unlike the prior quarter, AppHarvest reported disappointing net sales of $3.1 million in Q2. Although the Company sold 8.6 million pounds of tomatoes (a 4.8 million pound increase over Q1), the average price was only $0.36 per pound (a 41% decrease from Q1). (¶218; Ex. 42 at 2; Ex. 43 at 3; Ex. 46 at 2.) AppHarvest also reported a Q2 net loss of $32.0 million and a non-GAAP Adjusted EBITDA loss of $22.6 million.

The Company explained that its unfortunate Q2 performance was due to "historically low market prices for tomatoes" and "labor and productivity challenges related to the training and development of the new workforce" that the Company did not uncover until July. (¶¶220, 230; Ex. 42 at 3; Ex. 45 at 10 (Mr. Lee clarifying that his "taking a hard independent look at everything . . . *starting in July*" led the Company to make "more moderated assumptions.")) While AppHarvest

---

[9] "The Second Circuit . . . has held that district courts can take judicial notice of analyst reports for the fact that they contain certain information without considering the truth of the matters asserted." *Born v. Quad/Graphics, Inc.*, 521 F. Supp. 3d 469, 486 (S.D.N.Y. 2021)

had "more than doubled production" from Q1, the challenges "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher distribution and shipping fees." (¶230; Ex. 45 at 4; Ex. 42 at 3.) The Company also previewed several organizational changes geared toward improving operations. It revealed that it had "eliminated some layers of the organization to connect leadership more closely to the business." (Ex. 42 at 4.) To that end, Mr. Lee "assumed responsibility for operations in July as part of a reorganization focused on improved accountability and cost containment." (*Id*.)

In light of its Q2 results, AppHarvest lowered its full-year 2021 guidance, projecting net sales of $7–9 million from a prior range of $20–25 million and an adjusted EBITDA loss of $70–75 million from a prior range of $48–52 million. (Ex. 42 at 5.) AppHarvest explained that this was part of a larger "change in [] philosophy" to "significant[ly] reduc[e] risk regarding [the Company's] outlook." (¶230; Ex. 45 at 7, 10.)

On a conference call later that day, Defendants expounded on AppHarvest's second quarter results. Although "total production [had] beat expectations, [] problems associated with ramping up [the Morehead] facility adversely affected results." (Ex. 44 at 4.) Mr. Eggleton explained that in the second quarter, the market price for tomatoes hit a "historic[] low" and, on top of that, the Company "realized lower pricing and higher distribution fees." (¶230; Ex. 45 at 10.) Mr. Lee reported that "lower quality [tomatoes] than we anticipated" due to "labor and productivity challenges associated with the training and development of the new [Morehead] workforce," drove lower net sales. (¶¶227, 230; Ex. 45 at 5; Ex. 43 at 3.) The Company also noted that that the "AppHarvest brand has not yet earned a price premium," which informed the Company's revised guidance. (Ex. 44 at 4.)

Mr. Webb assured investors that the Company's problems were "solvable" and noted that management was "aggressively leaning in on the training programs internally." (¶227; Ex. 45 at 12.) Mr. Lee also added that, in addition to the changes in operational leadership, the Company was implementing changes to its piece rate bonus system "to drive improvements in [] operational productivity and ability to meet surges in demand for plant care." (¶227; Ex. 45 at 5.) He also

11

noted that AppHarvest had also "overhauled [its] pack house to minimize bottlenecks while increasing quality checks." (¶227; Ex. 45 at 5.)

## V.    Wall Street Reacts to AppHarvest's Lowered Guidance.

Despite the Company's lowered guidance for 2021, analysts remained "confident [that] the business model of [CEA] will work and be able to deliver results, once initial headwinds are overcome." (*E.g.*, Ex. 46 at 2.) Analysts recognized that the Company's "initial organizational structure" stymied the flow of information to leadership, which "limited the immediate and necessary action taken." (Ex. 48 at 3.) They also understood that after AppHarvest rapidly scaled its business and quadrupled its work force in less than one year, "there were bound to be inefficiencies." (Ex. 51 at 4.) But analysts were confident that the "labor productivity and yield quality" problems were "transitory," "not unique to [AppHarvest]," and would "improve as the workforce and training programs mature and incorporate a season's worth of experience." (Ex. 51 at 5.) They also noted that AppHarvest continued to have "strong support from qualified parties," including Mastronardi, Equilibrium Capital, and Rabo AgriFinance. (Ex. 47 at 2.)

## VI.    Post-Class Period Events.

AppHarvest leadership continued to believe in the Company and its mission. To that end, on August 16, 2021, Mr. Lee purchased $100,000 worth of AppHarvest stock. (Ex. 49 at 2.) On August 19, 2021, Mr. Eggleton purchased $5,000 worth of AppHarvest stock. (Ex. 50 at 2.)

On November 10, 2021, AppHarvest announced positive Q3 operating and financial results. (Ex. 52 at 2.) The Company reported that it delivered "higher than expected net sales of approximately $543,000 on 1.5 million pounds of tomatoes sold," in July and August before it refreshed and replanted its crops in September ahead of its second growing season. (*Id*.) AppHarvest also reported that through the first two weeks of harvesting in the fourth quarter, the Company "exceeded its internal projection for the percentage of USDA No. 1 tomatoes." (*Id*.)

On February 24, 2022, AppHarvest announced its full year 2021 results, reporting that it had achieved $9.1 million in net sales and an adjusted EBITDA loss of $70–75 million, at the "high end" of its revised 2021 guidance range. (Ex. 53 at 2.) The Company noted that the financial

12

results were driven by "higher net sales price per pound in the fourth quarter of 2021" due to "better operating performance and gross market prices for tomatoes as well as cost containment." (Ex. 53 at 2.) AppHarvest also reported that it was on track to open three additional CEA indoor farms in 2022. (Ex. 53 at 3.)

For the full year 2022, AppHarvest announced financial guidance that was similar to its original 2021 guidance: $24–32 million in net sales and an adjusted EBITDA loss of $70–80 million, noting that the Company expected to be operating three new farms in 2022 that would contribute "mid-single digit millions of dollars" to the projected total net sales. (Ex. 53 at 4.)

## VII.    This Lawsuit.

On the heels of the AppHarvest's announcement of its Q2 2021 results and downward revision of its 2021 financial guidance, purported shareholders raced to the courthouse to capitalize on the Company's stock drop. The initial complaint in this case was filed on September 24, 2021, just six weeks after the guidance revision. (ECF No. 1.) On March 2, 2022, Plaintiff filed his CAC accusing Defendants of violating Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b), and 17 C.F.R. § 240.10b-5 ("Rule10b-5") promulgated thereunder. The CAC challenges approximately 140 statements made between February 1 and August 10, 2021.

With the benefit of hindsight, Plaintiff contends that Defendants' Class Period statements—about the Company's financial guidance, its labor force, and the Morehead farm's operations—were false or misleading because they omitted material adverse facts about training, employee retention and staffing, and the Company's piece rate bonus structure. (*E.g.*, ¶127.) Plaintiff challenges 140 statements, most of which were made on or before the Company released its positive Q1 results. The CAC relies almost exclusively on statements attributable to three former low-level employees of the Company. (¶¶50–98.) CW1 purports to be a former crop care specialist, *i.e.*, farm laborer, who worked at the Morehead farm from October 2020 through July 2021. (¶35.) CW1's responsibilities included tending to and harvesting crops. (*Id*.) CW2 purports to be former tomato packer and quality control specialist who worked in the Morehead farm's packhouse in January 2021 and left the Company before Q2, *i.e.*, at the end of March. (¶36.) CW2

13

was responsible for "randomly inspect[ing] tomatoes" before they were shipped. (*Id*.) CW3 purports to be a former Senior Cost Accountant who left the Company before the start of the Class Period. (¶37.) CW3 "was responsible for all direct agricultural cost of sales analysis, costing and valuation, and reporting." (*Id*.)

None of the of the CW job descriptions suggest any CW had access to firm-wide operations data. Additionally, none of the CWs reported directly to or had any direct contact with any Individual Defendant.

## LEGAL STANDARDS

To state a claim under § 10(b) and Rule 10b-5, the plaintiff must plausibly allege: (1) a material misrepresentation or omission ("falsity"), (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) loss causation, and (6) economic loss. *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010). Plaintiff must clear three pleading hurdles.

First, Plaintiff must satisfy Rule 8 and allege enough facts to state a plausible claim for relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court must not accept "conclusory statements" as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Nor should it accept unwarranted deductions, unreasonable inferences, or allegations that contradict matters properly subject to judicial notice. *Garber v. Legg Mason, Inc.*, 537 F. Supp. 2d 597, 613 (S.D.N.Y. 2008).

Second, Plaintiff must satisfy Rule 9(b), which requires him to "state with particularity the circumstances constituting the alleged fraud." *In re Fed Ex Corp. Sec. Litig.*, 517 F. Supp. 3d 216, 228 (S.D.N.Y. 2021). Plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief [] all facts on which that belief is formed." *Id*.

Third, Plaintiff's claims are subject to the PSLRA, which imposes "exacting pleading requirements" for falsity and scienter. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). As to falsity, the Complaint must identify each allegedly false statement, specify with particularity the reasons why the statement was false when made. *See In re Nokia Oyj Sec. Litig.*, 423 F. Supp. 2d 364, 391-92 (S.D.N.Y. 2006); 15 U.S.C. § 78u-4(b)(1). As to scienter, the

14

Complaint must plead "with particularity facts giving rise to a *strong* inference that the defendant acted with . . . an intent to deceive, manipulate, or defraud." *ECA, Local 134 IBEW Joint Pension Tr. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (emphasis original); 15 U.S.C. § 78u-4(b)(2).

## ARGUMENT

### I.     Plaintiff Fails to Adequately Plead Falsity.

Plaintiff fails to adequately plead falsity for at least two reasons: (1) the challenged statements are inactionable as a matter of law; and (2) the CAC contains no particularized facts to suggest that any challenged statement was materially false or misleading when made.[10]

#### A.     The Challenged Statements Are Not Actionable.

Most—if not all—of the challenged statements in the CAC (***there are approximately 140***) are not actionable as a matter of law.

**Forward-Looking Statements**. Forward-looking statements are inactionable under the PSLRA's safe harbor provision if: (i) the forward-looking statement is identified and accompanied by meaningful cautionary language, (ii) the forward-looking statement is immaterial, ***or*** (iii) the plaintiff fails to plead that the forward-looking statement was made with actual knowledge that it was false or misleading. 15 U.S.C. § 78u–5(i)(1)(A)-(C). Forward-looking statements take many forms, such as "a projection of revenues . . . or other financial items," "the plans and objectives of management for future operations," "a statement of future economic performance," or "the assumptions underlying or relating to" projections, plans, objectives, or future performance. *Id.*

---

[10] The CAC is a puzzle pleading. It spans 347 paragraphs (164 pages), of which 93 paragraphs (73 pages) are used to excerpt Defendants' statements from nearly all of AppHarvest's public disclosure made during the Class Period. (¶¶123–216.) Although Plaintiff claims that he is challenging only bolded and underlined text, he bolds and underlines many unchallengeable statements. (*E.g.*, ¶126 (challenging the statement that AppHarvest provided financial guidance during its December 15, 2020, Analyst Day presentation).) And, after each group of challenged statements, Plaintiff repeats a nearly identical laundry list of omissions that supposedly render the statements false or misleading. (*E.g.*, ¶¶127, 131, 133, 138.) But some of the challenged statements are totally unrelated to the alleged omissions. (*E.g.*, ¶¶192-93 (asserting that Mr. Lee's statement that AppHarvest did not have any "challenges with recruiting and staffing" was misleading because Defendants' omitted that AppHarvest's piece rate bonus structure incentivized employees to produce low quality tomatoes).) This method of pleading is plainly deficient. *See, e.g., Born v. Quad/Graphics, Inc.*, 521 F. Supp. 3d 469, 478 (S.D.N.Y. 2021) (dismissing puzzle pleading that "plac[ed] the burden on the Court to sort out the alleged misrepresentations and then match them with the corresponding adverse facts").

Here, many of the challenged statements are forward-looking. (¶¶126, 132, 144, 148, 174, 182, 185.) For example:

- "[W]e reiterate our full-year 2021 guidance." (¶126.)

- "[A]s much as we can build and grow . . . we'll be on the top 25 grocery shelves throughout the U.S." (¶132.)

- "Our favorable crop yields and market pricing currently support a 2021 sales outlook that is better than we expected in December 2020." (¶144.)

(*See* **App. B** (cataloguing forward-looking statements challenged in the CAC).) These statements are, by definition, forward-looking. *See* 15 U.S.C. § 78u-5(i)(1)(A)-(D); *In re IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574, 586 (S.D.N.Y. 2007) (statements about earnings projections and "prospective performance" are forward-looking).

And the forward-looking statements identified in the CAC were without exception accompanied by meaningful cautionary language, which includes risk warnings conveying "substantive information about factors that realistically could cause results to differ." *In re Fed Ex Corp. Sec. Litig.*, 517 F. Supp. 3d at 233. Disclosures need not include all such factors so long as the ones included are "directly relate[d] to the risks that ultimately are alleged to have, in part, brought about Plaintiffs' losses." *In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *19 (S.D.N.Y. April 20, 2020). Here, each of the press releases challenged by Plaintiff expressly warned investors that statements regarding "AppHarvest's future financial performance, as well as AppHarvest's growth plans and strategy . . . ***estimated adjusted EBITDA, revenues and losses***" were forward-looking statements based on "various assumptions" and "current expectations of AppHarvest's management" and were subject to change. (*E.g.*, Ex. 16 at 3; Ex. 18 at 2; Ex. 22 at 2; Ex. 24 at 3–4 (emphasis added).) Defendants made similar warnings at the outset of each Class Period conference call (*e.g.*, Ex. 28 at 3–4), which also expressly referred investors to additional, detailed risk factors in the Company's SEC filings. In those filings, the Company highlighted the unique risks it faced. For example:

- "AppHarvest has only just begun its first growing season, which makes it difficult to forecast future results of operations."

16

- "If . . . AppHarvest's products . . . have quality problems, the Company may not be able to fully recover costs and expenses incurred in operation . . . [and] could be materially and adversely affected."

- "Any significant or unexpected rejection of AppHarvest's products could negatively impact AppHarvest's results of operations[.]"

- "AppHarvest depends on employing a skilled local labor force, and failure to attract and retain qualified employees could negatively impact AppHarvest's business, results of operations and financial condition."

- "Even if [AppHarvest is] able to . . . train its labor force, there is no guarantee that [the Company] will be able to retain these employees."

(*See* **App. A**.) Plaintiff's contention that AppHarvest's cautionary language and risk disclosures were themselves materially false and misleading lacks merit. Plaintiff fails to allege facts showing that any risk had already materialized, and that Defendants knew that when the statements were made. (*Infra* at Section I.B.2.e.) Thus, AppHarvest expressly (and repeatedly) cautioned what common sense dictates: projections about financial and operational performance are estimates—not guarantees—subject to numerous risks and uncertainties.

Additionally, to the extent any challenged forward-looking statement was unaccompanied by cautionary language, it is still inactionable because Plaintiff fails to plead particularized facts showing that any Defendant "***actually knew***" their predictions were unreasonable." *In re WEBMD Health Corp. Sec. Litig.*, 2013 WL 64511, at *7 (S.D.N.Y. Jan. 2, 2013); *see infra* at Section II.B.

Plaintiff also makes much of Defendants' periodic statements that AppHarvest was "on track" to meet its financial guidance for 2021. (¶182; *see* ¶¶126, 144, 148, 174, 185, 191.) But these statements are also protected by the safe harbor. *See In re Adient*, 2020 WL 1644018, at *9, 19 (concluding that defendants' "repeat[ed] assur[ances]" that the company was "on track" to reach its goals were protected under the safe harbor because they "could not meaningfully be distinguished from the future projection of which they [were] a part").

**Corporate Optimism**. Many of the challenged statements are "puffery" (¶¶12, 130, 132, 144, 148, 152, 153, 159, 160, 165, 188, 191, 192, 195, 197, 200, 201, 209, 210), which is not actionable under § 10(b) because such statements "make[] no specific claims on which reasonable persons can rely." *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 565 (S.D.N.Y. 2011). For

17

example, Plaintiff challenges:

- "... what are those products that we can be making with this *good, healthy, consistent* supply coming out of our facilities here in Central Appalachia." (¶130.)

- "We are pleased by our *fast start* to the year, the *encouraging operating and financial performance* of our Morehead facility and our team's ability to scale the business." (¶174.)

(*See* **App. C** (cataloguing statements of optimism challenged in the CAC).) Courts have repeatedly found similar statements inactionable as a matter of law. *See, e.g.*, *Steamfitters Loc. 449 Pension Plan v. Skechers U.S.A., Inc.*, 412 F. Supp. 3d 353, 363 (S.D.N.Y. 2019) ("it all works" held inactionable); *City of Warren Police & Fire Ret. Sys. v. Foot Locker, Inc.*, 412 F. Supp. 3d 206, 223 (E.D.N.Y. 2019) (characterizations as "strong," "positive," and "great" held inactionable); *Taubenfeld v. Hotels.com*, 385 F. Supp. 2d 587, 593 (N.D. Tex. 2004) ("we're not seeing any slowing" and "we are extremely profitable" held inactionable).

**Statements of Opinion**. Plaintiff also challenges numerous opinion statements, which include "subjective statements that reflect judgements as to values that [are] not objectively determinable" and "express expectations about the future." *In re Aratana Therapeutics Inc.*, 315 F. Supp. 3d at 758 (S.D.N.Y. 2018); (¶¶12, 126, 130, 132, 144, 148, 152, 153, 159, 160, 165, 168, 174, 182, 188, 191, 197, 200, 209.) For example:

- "We *believe* there is a large population of workers in the Central Appalachian region who are eager to find long-term career opportunities like those being offered by AppHarvest . . . we *believe* we can staff and retain our workers with less churn, immigration challenges and unfilled positions that many of our competitors v." (¶¶152, 159, 200, 209.)

- "And our affirmation of our guidance in 2021 reflects that we *think* we're on track." (¶182.)

(*See* **App. D** (cataloguing expression of opinion challenged in the CAC).) Such opinion statements are actionable only "where it can be shown not merely that a proffered opinion was incorrect or doubtful, but that the speaker deliberately misrepresented his actual opinion" at the time he spoke. As opinions, these statements are only inactionable if Plaintiff alleges that (1) "the

18

speaker d[oes] not hold the belief ... professed"; (2) the "fact[s] [ ] supplied" in support of the belief professed are "untrue"; or (3) the speaker omits information that "makes the opinion statement . . . misleading to a reasonable person." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 186, 194 (2015). "That is no small task for an investor." *Id*. at 194. Plaintiff cannot meet the first two prongs because the CAC fails to plead that Defendants knew any contradictory information when the challenged statements were made, let alone that they subjectively believed those statements to be false. (*See infra* at Section II.B.) Plaintiff likewise fails to meet the third prong because the CAC does not allege facts suggesting that Defendants omitted any information that would have contradicted the statements' implications. (*See infra* at Section I.B.2.**)**

*Accurate Statements of Fact*. Many of the alleged misstatements are demonstrably true and presumably not in dispute. (¶¶12, 132, 136, 153, 160, 171, 179, 185, 188, 197, 201, 206, 210, 215.) Such statements include:

- "We use less land, less water, and we have predictable growing practices, so we can control the environment and have a predictable supply year-round." (¶132.)
- ". . . Net sales for the three months ended March 31, 2021 were $2.3 million compared to $0 for the comparable prior year period, due to initial tomato sales produced at our Morehead CEA facility." (¶¶179, 206, 215.)

(*See* **App. E** (cataloging accurate statements of historical fact challenged in the CAC)). These statements cannot support a §10(b) claim where, as here, Plaintiff does not allege any particularized facts demonstrating that they were inaccurate or untrue at the time they were made. *See Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 232 (S.D.N.Y. 2018) (dismissing complaint because "the alleged misstatements at issue are [] not demonstrably false").

**B.    Defendants Said Nothing Materially False or Misleading.**

Even assuming there is an actionable statement buried in the morass of the CAC (there is not), Defendants said nothing materially false or misleading. A securities-fraud complaint must

19

"specify each statement alleged to have been misleading [and] the reason . . . why the statement is misleading." 15 U.S.C. § 78u-4(b)(1)(B). And because Plaintiff alleges the omission of material facts, the CAC must adequately plead that Defendants had a duty to disclose the omitted information. *Basic v. Levinson*, 485 U.S. 224, 239 n.17 (1988). Rule 10b-5 does not require the disclosure of **all** material information. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 43 (2011). "Disclosure is required . . . only when necessary to make statements made, in the light of the circumstances under which they were made, not misleading." *Kleinman v. Elan Corp.*, 706 F.3d 145, 153 (2d Cir. 2013). Put differently, an omission is not actionable when a challenged statement is merely incomplete; it is only actionable where the information revealed is "so incomplete as to mislead." *Richman v. Goldman Sachs Grp., Inc.*, 868 F.Supp.2d 261, 273 (S.D.N.Y. 2012). Further, Plaintiff must, "at a minimum, plead facts to demonstrate that [the] omitted facts [] existed, and were known" to defendants when they spoke. *Singh v. Schikan*, 106 F. Supp. 3d 439, 446 (S.D.N.Y. 2015). "This requirement is the PSLRA's single most important weapon against pleading fraud by hindsight." *In re Vantive Corp. Sec. Litig.*, 110 F. Supp. 2d 1209, 1216 (N.D. Cal. 2000).

Here, Plaintiff does not come close to meeting these standards. He relies almost exclusively on statements attributable to three CWs, but none of their allegations are reliable. And even if the Court credits the CW allegations (it should not), nothing Defendants said during the Class Period was rendered materially false or misleading by the alleged omissions.

### 1.    The CW Allegations Are Not Reliable.

The Court should not consider any of the CW allegations because the CWs are not reliable. Courts generally credit CW allegations in two situations: (i) when they are corroborated with independent, particularized facts; and (ii) when their "positions and/or job responsibilities are described sufficiently to indicate a high likelihood that they actually knew facts underlying their allegations." *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 590 (S.D.N.Y. 2011); *Long Miao*, 442 F. Supp. 3d at 799 ("[C]ourts generally have not credited the statements of CWs . . . whose descriptions do not suggest that they had been in position to know the facts attributed to them.").

20

Here, no particularized facts corroborate the CW allegations and for several reasons, none are reliable on their own.

First, the Court should disregard the statements attributable to CW3 because he did not work at AppHarvest during the Class Period. *See Campo v. Sears Holdings Corp.*, 635 F. Supp. 2d 323, 335 (S.D.N.Y. 2009) (refusing to credit CWs who "left the company before the Class Period").

Second, the Court should not consider CW1's and CW2's allegations about firm-wide operations because their job descriptions do not suggest they had personal knowledge of such information. CW1 was one of an unspecified number of crop care specialists working on a 60-acre farm. *E.g.*, *Loc. No. 38 IBEW Pension Fund v. Am. Express Co.*, 724 F. Supp. 2d 447, 460 (S.D.N.Y. 2010) (refusing to credit the statements of "rank-and-file" employees because none "had access to aggregated data"). Similarly, CW2 was another low-level employee, and left the Company before Q2 2021, the quarter for which the Company released disappointing results. (¶36; s*ee In re Francesca's Holdings Corp.*, 2015 WL 1600464, at *14 (S.D.N.Y. Mar. 31, 2015) (disregarding CW who left near the "beginning of the Class Period" and "cannot speak to whether the Company's terms with its [] Vendors changed in any material way" afterwards).) On top of that, CW2 worked in the packhouse and none of CW2's job duties suggest CW2 had any insight into greenhouse operations. *See Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 223 (S.D.N.Y. 2018) (disregarding statements from CWs that worked within one unit and did not have insight into other corporate units).

Third, the CWs' allegations are "unmoored in time." *Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 408–09 (S.D.N.Y. 2018); *Miao*, 442 F. Supp. 3d at 799 ("[S]tatements of CWs that cannot situate in time relevant occurrences are [] disregarded because they cannot establish that the challenged statements were knowingly false when made.") No CW specifies **when** and to what extent the inadequate training, employee churn, and incentive piece rate bonus structure materially affected tomato quality, or **how long** such an effect lasted. *See In re Fed Ex*, 517 F. Supp. 3d 216 at 232 (rejecting CW allegation that there was "significant doubt" within company about its ability to meet its target because CW did "not specify when . . . the alleged

21

doubt existed" or "how long [it] persisted"). To the extent the CWs are claiming that the alleged issues materially affected tomato quality, and thus net sales and cost of goods sold, for the entire time they worked at the Morehead farm (*e.g.*, ¶¶8, 71), that is inconsistent with the undisputed fact that ***AppHarvest met (and slightly exceeded) its financial guidance for the first quarter of 2021***. (Ex. 24 at 2; *see* ¶173; *see In re WEBMD*, 2013 WL 64511, at *11 (concluding defendants could not have materially misrepresented customer demand for WebMD's products when plaintiffs "fail[ed] to show *cognizably diminished demand from the beginning of the Class Period*").)

Stripped of the CW allegations, the CAC must be dismissed because it fails entirely to satisfy any of the relevant pleadings standards to establish both falsity and scienter.

### 2. No Alleged Omission Rendered Defendants' Statements Materially False or Misleading When Made.

Even if the Court credits the CW allegations, none of them render any of the challenged statements materially false or misleading. Plaintiff challenges nearly 140 statements made by Defendants during the Class Period (¶¶123-216), which can be bucketed into five categories: (a) AppHarvest's financial projections, (b) hiring and recruiting, (c) operations at the Morehead farm, (d) historical financial results, and (e) risk disclosures. Plaintiff claims all of these statements were materially false or misleading because Defendants omitted certain adverse facts. In other words, Plaintiff contends that, for the entire Class Period (from February 1 to August 10, 2021), every time Defendants spoke, they should have disclosed that AppHarvest was: (i) inadequately training employees, (ii) having difficulty hiring, staffing, and retaining employees, and (iii) using an incentive compensation structure that caused employees to damage crops. (¶¶126-27, 132-33, 144-45, 148-49, 174-75, 182-83, 185-86, 191, 193. However, Plaintiff pleads no particularized facts to support these alleged omissions, much less to show ***when and to what degree*** they impacted AppHarvest's operations, revenues, or costs.

### a. AppHarvest's financial projections were not misleading.

Plaintiff claims that a number of forward-looking statements affirming or raising AppHarvest's 2021 financial guidance were false or misleading; *see* **App. F** (cataloging, for the

22

Court's convenience, statements about AppHarvest's financial projections challenged in the CAC.) As discussed, *supra* at Section I.A., these forward-looking statements are protected under the PSLRA safe harbor and are not actionable as a matter of law. But even setting that aside, none of these statements were materially false or misleading when made.

Projections can only be false if particularized allegations demonstrate that the company "knew it would be unable to meet [the] projections" when they were made. *Born v. Quad/Graphics, Inc.*, 521 F. Supp. 3d 469, 483 (S.D.N.Y. 2021). To make that showing, Plaintiff must "establish what specific contradictory information [defendants] received [and] when they received it." *Local No. 38 IBEW Pension Fund*, 724 F. Supp. 2d at 461. None of Plaintiff's allegations about employee training, employee retention, and the piece rate bonus structure come close to meeting this high bar.

**Employee Training.** Plaintiff relies on CW allegations and Defendants' post-Class Period statements about employee training, but neither demonstrates when and to what degree AppHarvest's firm-wide training was inadequate, much less how it materially affected AppHarvest's tomato quality, net sales revenue, or costs of goods sold at any point in time. (¶¶76-80; 217-31.)

First, the "subjective views" of CW1 and CW2, two rank-and-file employees, do not demonstrate that AppHarvest's firm-wide employee training was inadequate. *See In re Adient*, 2020 WL 1644018, at *15.[11] Nothing in the CAC suggests that CW1 and CW2 are authorities on what constitutes adequate training. Nor do they say anything regarding anybody's training other than their own or how the training changed over the relevant period.[12]

---

[11] Notably, none of the CWs state that they did not know how to do their own jobs. CW1 admits that crop care specialists like her were told "that they should pick tomatoes that they considered to be 'bright orange with a little bit of green' which would enable the fruit to ripen further." (¶77.) In fact, CW1 was knowledgeable enough to recognize when other employees were doing a task incorrectly. (*E.g.*, ¶82 (alleging that CW1 noticed when other Crop Care Specialists "did not adhere to the proper procedures."); *see* ¶73). CW2 likewise admits that he received training on-the-job when he needed help. (¶79.) Moreover, far from confirming that there was a lack of training, CW2's contention that there was disagreement about what qualified as Grade No. 1 merely reflects that the criteria for No. 1 and No. 2 tomatoes are substantially similar, subjective, and evolve with customer preferences. (¶¶78-79). (*See supra* at Section I.A. n. 4.)

[12] Both CWs speak only to their own training during orientation at or before the beginning of the Class Period, even though Plaintiff acknowledges that AppHarvest was modifying its training during the Class Period. (*See* ¶¶99–101

Second, unsurprisingly given their roles at the Company, the CWs do not provide details to support when and how the alleged lack of training materially affected tomato quality for the entire operation or how it flowed through to net sales. The CWs do not quantify the impact of the alleged training issues at all, much less as to revenue or cost of goods. *See In re Health Mgmt. Sys., Inc. Sec. Litig.*, 1998 WL 283286, at *4 (S.D.N.Y. June 1, 1998) (concluding that allegations that the company was encountering "financial difficulties" were insufficient where plaintiff failed to allege "the extent of the alleged lower margins or decreased profitability"); *see also Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001) (affirming dismissal where plaintiff failed "to allege specific facts that show how these 'problems' and 'difficulties' translated into decreasing revenues").[13] In fact, the CWs say nothing about the Company's net sales, distribution costs, or financial guidance, let alone that the training issues had a material adverse effect on any of them.

Third, Defendants' statements about training issues made ***after*** the end of the Class Period were not admissions that Defendants knew all along that training issues would prevent AppHarvest from meeting its financial guidance. Defendants merely identified "Q2 2021 Problems" that they believed, ***in hindsight***, had lowered the Company's net sales in the second quarter and for the year to date. (Ex. 44 at 4; Ex. 45 at 10 (clarifying that AppHarvest's downward revision of its 2021 financial guidance came after Mr. Lee took "a hard independent look at everything . . . *starting in July*").) "[R]etrospective observations" like these are not "admissions of prior knowledge." *Frankfurt-Tr.*, 336 F. Supp. 3d at 220. That AppHarvest's Q2 10-Q disclosed that Defendants discovered that training issues also existed in the first quarter, does not change the analysis, especially when—and this bears repeating—***AppHarvest met (and slightly exceeded) its financial guidance for Q1***. (Ex. 24 at 2; *see* ¶173.)[14] This particularly notable here where the vast majority

---

(mentioning "new training").)

[13] Along the same lines, CW1 claims that the lack of training caused an excessive amount of decomposing plant waste to accumulate on the ground (¶74), but never quantifies how it affected AppHarvest's ability to produce Grade No. 1 tomatoes or translated into lower net sales.

[14] Plaintiff cannot claim that Defendants disclosed to the market in May 2021 that AppHarvest had issues with training, and also assert that the information was hidden until August 2021. (*See* ¶¶99-101, 243-44; *see In re Progress Energy, Inc.*, 371 F. Supp. 2d 548, 552 (S.D.N.Y. 2005) ("[I]t is indisputable that there can be no omission where the allegedly omitted facts are disclosed.").) Mr. Eggleton warned investors of the "demands required of training our labor force," and made clear that the tomatoes harvested in Q1 were of "varying levels of quality." (Ex. 28 at 8.) He also stated that

of the challenged statements were made during Q1 and right when the Company released its positive Q1 results.

**Employee Retention and Staffing.** Plaintiff speculates that several Company policies, including increased working hours and COVID-19 quarantine requirements, affected labor productivity, which in turn contributed to a greater number of low-quality tomatoes.[15] (¶¶81, 84–91, 123–216.) But Plaintiff does not plead facts to support his speculation, much less facts indicating how and to what extent any alleged employee turnover and COVID-19 absences materially impacted the Company's ability to meet its financial guidance, much less when the purported impact was known and by whom. *See Born*, 521 F. Supp. 3d at 484 (dismissing allegations that were "simply insufficient to allow the Court to infer that [defendant] knew it would be unable to achieve its financial projections").[16] Not to mention, Plaintiff cannot claim that the alleged employee turnover and COVID-19 absences materially affected productivity and tomato quality during the *entire* Class Period given that *AppHarvest met its financial guidance for the first quarter of 2021*.[17] (Ex. 24 at 2; *see* ¶173.)

Neither do Defendants' post-Class Period statements establish that employee retention and staffing was a material problem during the Class Period. Defendants disclosed after the Class Period that AppHarvest had endured employee "productivity challenges," which contributed to AppHarvest's second quarter results and its reduced guidance for 2021. (*E.g.*, ¶240.) But that

---

AppHarvest expected its "grade mix to migrate upward over the coming quarters" as a result of the Company's further investment in training. (*Id*. at 8.) Mr. Lee also told investors that the Morehead farm would "benefit from new training that we anticipate will support higher productivity in Q4." (*Id*. 28 at 6.)

[15] Although the CWs complain that AppHarvest was mismanaged because of alleged scheduling policies and unsanitary conditions in the greenhouse (¶¶74, 85), it is well-established that these sorts of issues "fall outside the securities laws." *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 376 (S.D.N.Y. 2004) ("[A]llegations of garden-variety mismanagement are not actionable under section 10(b).").

[16] Plaintiff claims that employees who left were not replaced. But neither CW speaks to whether these employees were replaced. CW1 alleges only that the employees on CW1's team were not replaced. (¶86.) Defendants' post-Class Period statements that AppHarvest had "ramped up to 400 employees" and "hir[ed] 400 employees" also do not establish that departed employees were not replaced. (*See* ¶88; Ex. 45 at 10.) Given that AppHarvest had 69 employees as of the end of September 2020 and did not open the Morehead farm until the end of October 2020, Defendants' statements were likely referring to the employees hired since the Morehead farm opened. In any event, Defendants did not state that AppHarvest lost 20% of its workforce as of August 11, 2021, and even if they had, such a post-hoc statement gives no indication of the rate of employee churn during the Class Period.

[17] It also would not have been a surprise to investors to learn that some Company employees would miss work during a global pandemic.

25

disclosure did not reference employee attrition or churn, much less any details when and how and to what extent it impacted the Company's financial results and who knew about it. (*See* ¶¶217-31.)

**Piece Rate Bonus Structure.** Plaintiff claims—based solely on the CW allegations—that AppHarvest's piece rate bonuses and leaderboard "encouraged" greenhouse personnel to work "fast and careless," which allegedly resulted in more damaged tomatoes. (¶¶82, 83, 96.) But these allegations are "so vague as to be meaningless." *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 800 n.21, 803-04 (S.D.N.Y. 2020). Plaintiff alleges no facts to quantify how much damage was caused by the bonus structure, or to explain how and when it materially contributed to AppHarvest's decreased net sales and increased cost of goods sold. *See In re Health Mgmt. Sys., Inc. Sec. Litig.*, 1998 WL 283286, at *4.

*　　*　　*

Notwithstanding the above, even if Plaintiff adequately pleaded a material omission (he has not), there are no facts in the CAC to support Defendants' contemporaneous knowledge of the adverse facts, much less that Defendants fully appreciated the impact of any training or productivity challenges before it was publicly disclosed in August 2021. (*See infra* at Section II.B.) As such, Plaintiff has not adequately pleaded that any of Defendants' forward-looking statements or forecasts were false or misleading when made. *See In re Nokia*, 423 F. Supp. 2d 364 at 404–05 ("[T]here is no allegation . . . that Nokia had contrary facts suggesting its sales would drop to the level that they ultimately did. That the sales did later fall, however, does not make an earlier rosy prediction fraudulent.").

### b.     Statements about employee recruiting were not misleading.

Plaintiff challenges many statements relating to AppHarvest's employee recruiting. (¶¶152-53, 159-60, 185, 188, 191-92, 197, 200-01, 209-10; *see* **App. F** (cataloging statements about AppHarvest's labor force challenged in the CAC).) These statements, however, are unrelated to or do not discuss the alleged omissions—*i.e.*, employee training or retention or the piece rate bonus structure. Some statements praise the strength of the local labor force and indicate that Defendants believed this was an advantage for AppHarvest. (*E.g.*, ¶152 ("We believe there is a

26

large population of workers in the Central Appalachian region who are eager to find long-terms career opportunities like those being offered by AppHarvest."); ¶¶ 159, 191, 197, 200, 209.) The rest discuss the Company's ability to *recruit and hire* employees even during a global pandemic. (*E.g.*, ¶192 ("[T]hankfully COVID has not in any way impacted our operation. . . . With regard to labor, we have had absolutely no shortage of interest. I mean multiples of the amount of roles that we [want to] fill, have lined up to work with us."); ¶¶153, 160, 185, 188, 191, 195, 197, 201, 210.)[18] When read in context, as the law requires, *see In re Nokia*, 423 F. Supp. 2d at 404, no statement is rendered materially false or misleading by the alleged omissions about employee training and retention issues and COVID-19 absences. And, regardless, Plaintiff has not adequately alleged the material impact of the alleged employee training and retention issues or the piece rate bonus structure. (*Supra* at Section I.B.2.a.)

### c. Statements about Morehead were not misleading.

Plaintiff claims that Defendants misled investors about AppHarvest's operations and the crops produced by the Morehead farm by omitting the alleged issues with employee training, employee staffing, and the piece rate bonus structure. (¶¶130, 132, 165, 168, 174, 188, 191, 195; *see* **App. F** (cataloging statements about the Morehead farm challenged in the CAC.) Plaintiff is wrong. Again, when read in context, none of the challenged statements was materially false or misleading when made.

**Statements about the Morehead farm's operations.** Plaintiff challenges as false certain statements about the Morehead farm's performance in Q1. (*E.g.*, ¶168 ("This harvest also has proved the team can handle the production ramp-up at our Morehead facility"); ¶188 ("We, we built this first facility in the middle of a global pandemic, and we stood up the facility."); *see* ¶¶130, 132, 165, 191, 195.)[19] But there are no well-pleaded facts showing that the Morehead farm was not ramping up to make use of its full growing capacity during the pandemic and amid an ice

---

[18] The statements about the workforce in Appalachia and AppHarvest's ability to recruit and hire employees were also demonstrably true or opinion statements. (*See supra* at Section I.A.)

27

storm—indeed, none of these facts are disputed or disputable. Nor has Plaintiff adequately alleged how the unspecified training or productivity issues rendered such statements materially misleading when made. (*See supra* at Section I.B.2.b.) In any event, a company can still be "ramping up" (as AppHarvest was) even as it encounters operational difficulties along the way. *E.g.*, *Browning v. Amyris, Inc.*, 2014 WL 1285175, at *11 (N.D. Cal. Mar. 24, 2014) (statement that production was "ramping up quickly" was not inconsistent with the allegation that Brazilian production facility had problems). Here, AppHarvest indisputably ramped up from selling no tomatoes in 2020 to selling 8.6 million pounds of tomatoes in Q2 2021. (*See, e.g.*, ¶179; Ex. 42 at 2.)

**Statements about the Morehead farm's tomato production capacity.** Plaintiff challenges several statements about the predictability of Morehead farm's crop supply. (*E.g.*, ¶132 ("we use less land, less water, and we have predictable growing practices, so we can control the environment and have a predictable supply year-round.") But, when read in context, these statements are not materially false or misleading. Defendants are clearly referring to the advantages of the Morehead farm's location and the use of CEA.[20] (*E.g.*, ¶130 (alleging that Mr. Webb stated, in response to a question about the Morehead farm's location in Central Appalachia, "Oh no, that's our advantage"). Far from alleging facts showing the statements are misleading, Plaintiff admits that AppHarvest's growing practices and supply are predictable and consistent due to the Company's use of CEA. (¶ 39 (alleging that "CEA producers [like AppHarvest] can cultivate and harvest crops year-round, optimize their supply, and plan harvests during exact peak price points for fruits and vegetables"). Plaintiff also does not, and cannot, dispute that AppHarvest shipped tomatoes to national grocers "on schedule" throughout the Class Period. (Ex. 22 at 2.)

Moreover, because all of the challenged statements regarding the Morehead facility's operations were made prior to Q2 2021 (*see* **App. F** (cataloging statements about the Morehead facility that are challenged as false in the CAC)), Plaintiff cannot adequately allege the materiality of any supposed omission.

---

[20] *Compare* ¶130 with Ex. 12 at 2, and ¶ 132 with Ex. 13 at 2–3.

### d.    AppHarvest's historical financial results were not misleading.

Plaintiff challenges several statements that accurately report the Company's historical financial and operating results. (¶¶179, 182, 191, 206, 215; *see* **App. F** (cataloguing statements about AppHarvest's historical results that are challenged as false in the CAC).) But "a violation of federal securities law cannot be premised upon a company's disclosure of accurate historical data." *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 38–39 (2d Cir. 2012). Plaintiff does not allege that the Company's reported historical financial data was incorrect.

### e.    AppHarvest's risk disclosures were not misleading.

Most of the challenged statements are AppHarvest risk disclosures. (*See* **App. F** (cataloguing AppHarvest's risk warnings that are challenged as false in the CAC).) Risk disclosures are only actionable if a company warns about a risk when that risk has ***already materialized***. *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013). And a plaintiff must allege that defendants knew the risk disclosures were inadequate at a time they were made. *Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*, 433 F. Supp. 3d 515, 537 (S.D.N.Y. 2020). Here, Plaintiff's conclusory allegations fall well short. Relying solely on unreliable CW statements and Defendants' post-Class Period statements, Plaintiff repeatedly and baldly claims that the alleged operational issues were "already" happening (*E.g.*, 138). None of this suggests that any risk had already materialized, and Plaintiff's allegations, even if credited, say nothing about when such risk might have materialized or how it would have been material at that time. (*See supra* at Section I.A.) Nor does Plaintiff say anything to support that any Individual Defendant knew, at any relevant time, that any such risk had materialized. (*See infra* at Section II.B.) These deficiencies are fatal.

## II.    Plaintiff Fails to Plead Any Facts to Support an Inference of Scienter

The PSLRA requires Plaintiff to state "with particularity" facts giving rise to a "strong inference" that the defendant acted with the intent "to deceive, manipulate, or defraud." 15 U.S.C. § 78u-4. Plaintiff can satisfy this element by adequately alleging "(1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious

misbehavior or recklessness." *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 355 (2d Cir. 2022). Ultimately, the "inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 111 (2d Cir. 2009). The CAC does not support any inference of scienter, let alone a strong one.

### A. Plaintiff Fails to Plead a Motive to Defraud.

To plead a strong inference of scienter through "motive and opportunity to defraud," Plaintiff must allege that "Defendants benefitted in some concrete and personal way from the purported fraud." *ECA,* 553 F.3d at 198. Pleading generalized business motives—"such as the desire for the corporation to appear profitable"— is not enough. *Id.* Here, Plaintiff alleges two motives (1) Defendants' desire to obtain favorable financing terms; and (2) to acquire a robotics company called Robotics AI. (¶¶278–93.) But neither suggests scienter in any sense. Moreover, the fact that no Individual Defendant sold stock during the Class Period undercuts any purported motive to defraud.

### 1. Securing Favorable Financing Is Not Indicative of Scienter.

Plaintiff alleges that that Defendants were motivated to conceal the Company's operational setbacks in Q2 so they could secure favorable financing terms for (i) a $75 million credit facility from Rabo AgriFinance; and (ii) a $91 million construction loan from Equilibrium Capital. (¶¶122, 278–88.)) But as "courts in this Circuit have consistently held," ***business motives such as these—to finance and grow the company—are far too generalized to constitute scienter***. *In re GeoPharma, Inc. Sec. Litig.*, 399 F.Supp.2d 432, 450 (S.D.N.Y.2005). Otherwise, "all companies . . . could be the subject of securities fraud actions." *Malin v. XL Cap. Ltd.*, 499 F. Supp. 2d 117, 157–58 (D. Conn. 2007).

But even setting that aside, Plaintiff's own allegations undermine his theory. He admits that both loans were contingent on the Company's ***first quarter*** results. (¶121 (alleging that the lenders wanted "to see how AppHarvest would perform in its ***first quarter***" before moving forward

with financing).) And the Company "parlay[ed] its successful first quarter into securing" financing. (*Id.* (alleging that the Company achieved the financing). Plaintiff does not (and cannot) allege that AppHarvests's first quarter results were inaccurate.

## 2.    A Motive to Acquire Another Company Is Not Indicative of Scienter.

Plaintiff next alleges that Defendants were motivated to inflate the Company's stock price because, in April 2021, they used AppHarvest stock (and $10 million in cash) to acquire Root AI. (¶¶289–293.) But the "desire to achieve a lucrative acquisition. . . fail[s] to establish the requisite scienter because [it] can be attributed to virtually every company seeking . . . to acquire another." *ECA*, 553 F.3d at 201 (2d Cir. 2009); *see Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 243–44 (S.D.N.Y. 2012) ("[A]n acquisition program funded by stock issuances . . . is not sufficient to allege scienter."). Moreover, Plaintiff alleges that AppHarvest acquired Root AI to "optimize operations" and help the Company "make more and more and better and better product." (¶293.) Certainly, scienter cannot be inferred from "achieving a superior [acquisition that] benefitted all shareholders," including Plaintiff. *See Kalnit v. Eichler*, 264 F.3d 131, 141 (2d Cir. 2001).

## 3.    Plaintiff Fails to Plead Any Stock Sales by the Individual Defendants.

Plaintiff fails to plead any stock sales by any Individual Defendant. As senior executives at the Company, they were surely well-positioned to reap profits from insider knowledge. For this reason, "the fact that [none of them] sold stock during the putative class period undermines [Plaintiff's] motive allegations." *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 289 (S.D.N.Y. 2006). Moreover, Defendants Lee and Eggleton ***purchased*** roughly 15,000 shares on the open market immediately after the Company reported its disappointing Q2 results, which "is inconsistent with an intent to commit fraud." (Ex. 49 at 2; Ex. 50 at 2.) *See In re Regeneron Pharms., Inc. Sec. Litig.*, 2005 WL 225288, at *22 (S.D.N.Y. Feb. 1, 2005). The only individual alleged to have sold stock is Jeffrey Ubben,[21] a non-employee board member who is not a

---

[21] On June 10, 2021, Inclusive Capital Partners Spring Master Fund, L.P. ("In-Cap Spring Master Fund") sold 3 million shares of AppHarvest stock. Mr. Ubben indirectly controls Inclusive Capital Partners, L.P., which acts as investment manager to In-Cap Spring Master Fund. (Ex. 37 at 2.)

31

Defendant. (¶¶274–277.) Mr. Ubben's sales are irrelevant to the Individual Defendants' scienter. *Woodward v. Raymond James Fin., Inc.*, 732 F. Supp. 2d 425, 438 (S.D.N.Y. 2010) (concluding that stock sales executed by someone who was "not a defendant" cannot "be evidence of the Defendants' scienter").

## B.    Plaintiff Fails to Plead Facts That Show Conscious Misbehavior or Recklessness.

Having failed to plead motive, Plaintiff's allegations of conscious misbehavior or recklessness "must be correspondingly greater." *ECA*, 553 F.3d at 198-99. The burden to plead "a fraud claim based on recklessness" is "significant." *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 270 (2d Cir. 1996). Plaintiff must plead "strong circumstantial evidence of conscious misbehavior or recklessness." *Ark. Pub. Emps. Ret. Sys.*, 28 F.4th at 355. That is, the CAC must plead something akin to "deliberate illegal behavior," *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000), "a state of mind approximating actual intent," or an "***extreme departure*** from the standards of ordinary care to the extent that ***the danger was either known to the defendant or so obvious that the defendant must have been aware of it***." *S. Cherry St., LLC*, 573 F.3d 98 at 109 (emphasis in original).

Plaintiff asserts eight different buckets of recklessness. But this kitchen-sink approach to pleading scienter is plainly inadequate. Whether taken individually or collectively, these allegations are far too vague and general to give rise to any plausible inference of scienter, much less a strong one.

### 1.    Plaintiff's Core Operations Theory Does Not Suggest Scienter.

Plaintiff starts with a core-operations theory—that Defendants must have known their statements were false because the Morehead facility was "AppHarvest's core business." (¶¶236-38.) But even assuming the core operations doctrine survived the PSLRA,[22] it "is plainly insufficient to raise a strong inference of . . . scienter" on its own. *Rice v. Intercept Pharm., Inc.*,

---

[22] *Frederick v. Mechel OAO*, 475 F. App'x 353, 356 (2d Cir. 2012) (explaining that the Second Circuit has "not yet expressly addressed whether, and in what form, the 'core operations' doctrine survive[d] [the PSLRA] as a viable theory of scienter")

2022 WL 837114, at \*22 (S.D.N.Y. Mar. 21, 2022) (Liman, J.). Because Plaintiff fails to plead the usual hallmarks of scienter "indicating that [D]efendants might have known their statements were false," his core operations theory fails on its face. *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 424 (S.D.N.Y. 2020).

In any case, Plaintiff fails to plead any "contradictory facts of critical importance" that were "so were apparent" that the Individual Defendants should have known about them merely "by virtue of their positions with the company." *In re Chembio Diagnostics, Inc. Sec. Litig.*, 2022 WL 541891, at \*10 n.9 (E.D.N.Y. Feb. 23, 2022). Nothing in the CAC suggests the alleged "labor and productivity issues" were so widespread that they would have been obvious to the Individual Defendants. *Compare In re Avon Sec. Litig.*, 2019 WL 6115349, at \*20 (S.D.N.Y. Nov. 18, 2019) (crediting core operations theory because the plaintiff alleged "a widespread delinquency problem in the company's single largest market" and because a defendant made "multiple trips to check on operations").

### 2. There Are No "Admissions" of Scienter.

Plaintiff contends that, during the Q1 earnings call, Messrs. Lee and Eggleton "admitted" that the Company had been suffering from productivity issues (¶¶244, 248). But these statements are not admissions. Mr. Lee's disclosure—that the Company would conduct its annual, pre-planned training during the refresh period (¶¶100, 191, 244)—does not in any way confess knowledge of the alleged operational headwinds that derailed the Company in Q2. Similarly, Mr. Eggleton said only that the time and resources spent on initially training the Company's roughly 500 brand new AppHarvest employees required an initial investment and therefore contributed to gross loss. Plaintiff's supposition is even less convincing considering these statements were made in Q1, and the Company indisputably met its Q1 targets.

Plaintiff also alleges that, shortly after the Q2 results were released, Defendants "admitted" that they knew about the executional challenges since January 2021 (¶¶240-41.) But those statements were clearly made "retrospectively with the benefit of hindsight, and not stating that [anyone] knew" about the challenges at some unspecified earlier date. *Frankfurt-Tr.*, 336 F. Supp.

3d at 228.

### 3.    Mr. Webb's Infrequent Presence at Morehead Does Not Suggest Scienter.

Plaintiff does not allege that an Individual Defendant witnessed or knew about the alleged production challenges. Instead, Plaintiff alleges that Defendant Webb must have known or recklessly disregarded the alleged issues at the greenhouse because he (1) gave tours at the greenhouse once or twice a month; (2) filmed several interviews there; and (3) the Company's executive offices are located there. (¶¶247-51.) These allegations are simply too vague and speculative. *See, e.g.*, *Wochos v. Tesla, Inc.*, 2018 WL 4076437, at *6 (N.D. Cal. Aug. 27, 2018) (rejecting "[t]he allegation that Defendants must have known from visiting the plants that Tesla's goals were impossible to reach"); *Nappier v. Pricewaterhouse Coopers LLP*, 227 F. Supp. 2d 263, 277 (D.N.J. 2002) (finding "general allegations that, in conducting its inventory inspection, [defendant] must have seen large numbers of trucks filled with sold-but-unshipped soup, are simply insufficient").

### 4.    Scienter Cannot Be Inferred From The Mastronardi Agreement.

Plaintiff's next theory depends on multiple wobbly inferences. He asks the Court to infer that Defendants knew or must have known about the Company's operational setbacks because (1) they must have known that Mastronardi was only required to purchase Grade No. 1 tomatoes, and (2) therefore must have known that Grade No. 2 tomatoes offered "very little to no value." (¶¶252-57.) But nothing in the agreement, which was disclosed in the Company's SEC filings, says that Mastronardi would *only* buy Grade No. 1 tomatoes. In fact, Mastronardi purchased Grade No. 2 tomatoes from the Company in Q1. (Ex. 28 at 8 (buying "a mix of varying grades of tomatoes").) It was only later in Q2 that Defendants realized that AppHarvest got little value from Grade No. 2 tomatoes. (*See id*. at 8.) Regardless, it would be unreasonable to infer that Defendants knew the Company was not producing enough Grade No. 1 tomatoes to meet the Company's projections just because they knew Mastronardi would pay less for Grade No. 2 tomatoes. That's a textbook non-sequitur.

### 5. Plaintiff's Vague Allegations About Internal Forecasts and Data Fail to Give Rise to a Strong Inference of Scienter.

Plaintiff also contends that Defendants knew about the Company's operational difficulties because the CWs mentioned the existence of internal forecasts and data. (¶¶258–60.) There are a host of reasons why scienter cannot be inferred from these allegations. *First*, Plaintiff does not allege what the data and forecasts say. Pleading the mere "existence" of data and forecasts is not enough. *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 812 (2d Cir. 1996). For that reason alone, Plaintiff cannot allege that the forecasts and data contained information that contradicted any challenged statement. *See IKB Int'l S.A. v. Bank of Am. Corp.*, 584 F. App'x 26, 28 (2d Cir. 2014). *Second*, the CAC lacks well-pleaded facts indicating that Messrs. Webb or Lee reviewed, or even knew about, the forecasts or unspecified data. All that Plaintiff alleges here is that the Individual Defendants had "access" to data, (¶258.), but that's plainly not enough. *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 83 (2d Cir. 2021). *Third*, Plaintiff does not plead that the forecasts and data measured training or any the alleged operational deficiencies alleged. (*See* ¶¶96-98.) For example, Plaintiff does not allege that the forecasts estimated how many Grade No. 1 tomatoes would be harvested at any time. So even if Plaintiff adequately alleged that an Individual Defendant had reviewed the data, nothing suggests they would have discovered the alleged operational difficulties of their impact. *And fourth*, Plaintiff's "broad reference[s] to raw data" fails to "raise[] an inference of scienter" because Plaintiff does not allege that the data "had been collected into reports" or another a digestible format. *See Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 196 (2d Cir. 2008).

### 6. Scienter Cannot Be Inferred From Company Personnel Changes.

Next, Plaintiff asks the Court to infer that the Individual Defendants knew their statements were false because Ms. Butler was demoted from COO to CPO in April 2021 and terminated in July 2021. (¶¶261-68.) Because executives leave companies for all sorts of reasons, an executive departure cannot establish scienter by itself. *Rice*, 2022 WL 837114, at *22. Rather, executive

departures can only supplement other scienter allegations, and only if the departures are "highly unusual and suspicious." *Glaser*, 772 F. Supp. 2d at 598; *see, e.g.*, *Bos. Ret. Sys. v. Alexion Pharms., Inc.*, 556 F. Supp. 3d 100, 136 (D. Conn. 2021) (finding executive's departure suspicious because he resigned "shortly after the company launched the internal investigation into sales practices" and because he had "direct involvement in the unethical and illegal sales practices").

Plaintiff fails to plead any allegations that could meet this high bar. Plaintiff alleges Ms. Butler's demotion and termination were suspicious because they were "abrupt." (¶ 268.) But Plaintiff's bald characterization is not supported by any allegations. Nothing about the timing of Ms. Butler's demotion or resignation was suspicious—she was demoted shortly before the Company announced ***positive results*** in line with its year-end guidance, and she was terminated after she was no longer involved in the Company's operations as COO.

Plaintiff also claims that Defendants must have known about the alleged operational issues simply because Ms. Butler was a COO. (¶ 268.) But this theory fails because Plaintiff does not plead that (1) Ms. Butler was responsible for training; (2) she was demoted because of the operational issues allegedly occurred; or (3) she was terminated because of the operational issues. But setting that aside, even if the termination were "related" to the alleged operational issues, that "is not . . . suspicious." *Rice*, 2022 WL 837114, at *23; *see Ark. Public Emps. Ret. Sys.*, 28 F.4th at 356 (holding that "the departure of two high-level employees responsible for the trial . . . is no reason to doubt the veracity . . . of [the defendant's] disclosures"). The very most that could possibly be inferred from Ms. Butler's demotion and termination is that Defendants believed there was room for improvement with respect to farm operations, a fact that Defendants disclosed following the Company's successful first quarter. And nothing suggests that Defendants knew any statements they made about the Company's financial performance were materially incomplete in that training and productivity issues were having a material effect on net sales.

Plaintiff also claims that hiring "three new senior personnel" suggests that Defendants knew about the alleged operational issues. (¶268.) But those allegations lack particularity and are clearly insufficient—AppHarvest announced those hires in late July and early August 2021, well

36

after the challenged statements were made. Although Plaintiff guesses that they were recruited earlier, no facts support that.

**7.      Scienter Cannot Be Inferred From The Individual Defendants' Accurate Answers to Analyst Questions.**

Plaintiff alleges that the Individual Defendants must have known about the alleged operational setbacks because they gave "detailed answers" to analysts' questions about the Company's operations. (¶¶269–73.) This makes no sense. An Individual Defendant's knowledge of certain Company details does not mean that he also knew in real time about the alleged operational issues or their ultimate impact on Q2 performance and the Company's 2021 guidance. Plaintiff does not allege that the Individual Defendants "knew facts contradicting their statements in response to analyst questions." *See In re Campbell Soup Co. Sec. Litig.*, 2020 WL 7022655, at *7 n.4 (D.N.J. Nov. 30, 2020). Accepting Plaintiff's position would deem executives of even the largest public companies knowledgeable of virtually every problem. That's why "it is practically hornbook law that 'accusations' such as these . . . are entitled to no weight." *E.g.*, *Long Miao*, 442 F. Supp. 3d at 806.

**8.      Scienter Cannot Be Inferred From Mr. Ubben's Single Stock Sale.**

Plaintiff's final theory of recklessness is a patchwork of defunct inferences that borders on conspiracy. Plaintiff contends that Mr. Ubben, a non-party board member, (1) must have known about the alleged operational issues because he "had access to relevant inside information,"[23] (2) and must have known about Ms. Butler's demotion and termination, (3) which must have occurred because of the alleged operational issues,[24] and (4) must have induced him to sell AppHarvest stock.[25] Moreover, because Mr. Ubben must have known all of this, the Individual Defendants must have known it too, and "even earlier" than Mr. Ubben did. (¶277.) Aside from being almost incomprehensible, Plaintiff's "guilt by association" theory is not permissible as a matter of law. *In*

---

[23] *See supra* Section II.B.5.
[24] *See supra* Section II.B.6.
[25] *See supra* Section II.A.3.

*re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 695 (2d Cir. 2009).

### C.    The Unreliable and Vague CW Allegations Are Not Indicative of Scienter.

Scienter cannot be inferred from the CW allegations because they do not purport to have "direct knowledge that [a certain] view was held by defendants." *See Jones v. Perez*, 550 F. App'x 24, 28 (2d Cir. 2013). Nor could they—none of the CWs allege to have ever spoken with or otherwise interacted with any Individual Defendant. In addition, the CW allegations are unreliable, vague, and unmoored in time, and therefore fail to "establish what specific contradictory information the Individual Defendants received or when they received it." *See Local No. 38 IBEW Pension Fund v. Am. Exp. Co.*, 724 F. Supp. 2d 447, 461 (S.D.N.Y. 2010); *see also supra* at I.B.1.

### D.    The Inference of Scienter Is Not as Compelling as The Opposing Inference.

Taking a holistic view of the CAC, the more cogent and compelling inference by far is that Defendants believed what they were saying. During the relevant period, AppHarvest was a brand-new public company, led by an inexperienced management team that hired hundreds of employees during a global pandemic to cultivate, harvest, evaluate, and process millions of pounds of tomatoes from the Company's inaugural crops in a newly constructed and innovative greenhouse. Despite all of this, the Company met its ambitious Q1 projections. Encouraged and validated by that result, Defendants reaffirmed the Company's year-end guidance. But due to a 10-year-low market price for tomatoes and unforeseen operational setbacks related to employee training, AppHarvest unexpectedly fell short of its Q2 and year-end projections. It proved difficult to apply the subjective Grade No. 1 standard. And it was even harder to predict how Mastronardi and its retailers would apply that Grade No. 1 standard since the Company's relationship with them was—like everything else—new. Nevertheless, the Individual Defendants bet on themselves to course correct by buying stock shortly after the Q2 results were released. And Mastronardi also continued to bet on AppHarvest by deepening its partnership with the Company. And they bet right—the Company exceeded its more conservative year-end guidance for 2021. And for 2022, AppHarvest guided right back to where it initially started. Put simply, there's no fraud, and Plaintiff's conjecture and supposition cannot change that. *See Bd. of Trs. of City of Ft. Lauderdale Gen.*

38

*Emps.' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 882 (S.D.N.Y. 2011) ("[T]he inability to anticipate future events, no matter how costly, does not amount to fraudulent intent or conscious recklessness under the PSLRA.").

### III.    Plaintiff Has Failed to Plead Loss Causation.

To plead loss causation, Plaintiff must allege that Defendants' fraud "proximately caused [Plaintiff's] economic loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005). This is ordinarily done by identifying, on the day of a significant stock price decline, a "corrective disclosure"—*i.e.*, a statement that corrects an earlier misrepresentation. Unless the disclosure "addressed the specific fact allegedly concealed," it was not "corrective." *In re Rhodia S.A. Sec. Litig.*, 531 F. Supp. 2d 527, 545 (S.D.N.Y. 2007). This ensures that the stock price decline reflects "the earlier misrepresentation," not "changed economic circumstances" or "changed investor expectations." *Dura Pharms.*, 544 U.S. at 342–43.

Plaintiff claims that AppHarvest's August 11, 2021, press release was a corrective disclosure because it attributed disappointing Q2 results to employee training issues, higher than expected shipping costs, and unusually low market prices for tomatoes, and revised 2021 year-end guidance. (¶¶217, 297.) But Plaintiff fails to identify specific facts revealed on that day that were both new to investors and that corrected a specific, earlier misstatement of material fact. As a matter of law, "the mere failure to meet earnings forecasts is insufficient to establish loss causation." *In re AOL Time Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666, 678–79 (S.D.N.Y. 2007). If it were, "then any investor who loses money in the stock market could sue to recover for those losses without alleging that a fraudulent scheme was ever disclosed." *In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 261, 266–67 (S.D.N.Y. 2005).

### IV.    Plaintiff Fails to State a Claim Under Section 20(a).

Because Plaintiff fails to plead a primary §10(b) violation, his § 20(a) claim necessarily fails. *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998).

### <u>CONCLUSION</u>

For these reasons, AppHarvest respectfully requests that the Court dismiss the CAC.

Dated:   May 2, 2022

Respectfully submitted,

By: */s/ Aric H. Wu*

COOLEY LLP
Aric H. Wu
55 Hudson Yards
New York, NY 10001
Tel: (212) 479-6000
ahwu@cooley.com

Peter M. Adams
(*pro hac vice application forthcoming*)
Linh K. Nguyen
(*pro hac vice application forthcoming*)
4401 Eastgate Mall
San Diego, CA 92121
Tel: (858) 550-6000
padams@cooley.com
lknguyen@cooley.com

*Attorneys for Defendants AppHarvest, Inc., Jonathan Webb, Loren Eggleton, and David Lee*

40