**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re AppHarvest Securities Litigation | Case No. 21-cv-7985-LJL |
| | Hon. Lewis J. Liman |

## SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT

Dated: August 12, 2022

**LEVI & KORSINSKY, LLP**

Shannon L. Hopkins (SH-1887)
Gregory M. Potrepka (GP-1275)
Michael J. Keating (*Pro Hac Vice*)
1111 Summer Street, Suite 403
Stamford, CT 06905
Telephone: (203) 992-4523
Facsimile: (212) 363-7171
shopkins@zlk.com
gpotrepka@zlk.com
mkeating@zlk.com

*Counsel for Lead Plaintiff and Lead Counsel for the Class*

**TABLE OF CONTENTS**

GLOSSARY OF TERMS ........................................................................................ v

CHRONOLOGY OF EVENTS .............................................................................. vi

SUMMARY OF THE ACTION ............................................................................. 1

JURISDICTION AND VENUE ............................................................................. 8

PARTIES ................................................................................................................. 9

    I.     Plaintiff ................................................................................................. 9

    II.    Defendants .......................................................................................... 9

    III.   Relevant Non-Parties ...................................................................... 10

STATEMENT OF FACTS ................................................................................... 14

    I.     Company Background ....................................................................... 14

    II.    Throughout the Class Period, AppHarvest Touted Purported Labor Advantages Because Market Participants Understood That the Availability and Dependability of Skilled Labor is Integral to CEA ... 16

    III.   AppHarvest Commences Tomato Production at its Flagship Morehead Facility Pursuant to a Long-Term Agreement with AppHarvest's Exclusive Distributor, Mastronardi ... 18

    IV.   Defendants Misleadingly Portray AppHarvest as a Start-Up Manufacturer That is Efficiently Staffing its Production Team to Meet Demand ... 24

    V.    Prior to and Throughout the Class Period, AppHarvest Suffered Exorbitant Amounts of Wasted and Low-Quality Produce Caused by the Company's Failure to Train Employees and a Bonus Structure That Incentivized Poor Workmanship ... 26

    VI.   AppHarvest's Productivity Challenges Throughout the Class Period Were Exacerbated by Attrition and Churn Caused by the Company's Own Policies, as Well as Personnel Absences Due to the COVID-19 Pandemic ... 36

    VII.  The Individual Defendants Knew About the Company's Productivity and Labor Challenges at the Time They Made Contradictory False Statements ... 39

DEFENDANTS' MATERIAL CLASS PERIOD MISREPRESENTATIONS AND OMISSIONS ... 51

    I.     False and Misleading Statements in AppHarvest's February 1, 2021 Press Release . 52

    II.    False and Misleading Statements in a February 1, 2021 Interview on Cheddar News ... 55

    III.   False and Misleading Statements in a February 1, 2021 Interview on the TD Ameritrade Network ... 57

    IV.   False and Misleading Statements in AppHarvest's February 2, 2021 Form 8-K ... 59

    V.    False and Misleading Statements in AppHarvest's February 10, 2021 Form S-1 ... 65

    VI.   False and Misleading Statements in AppHarvest's February 25, 2021 Press Release 70

VII.    False and Misleading Statements in AppHarvest's March 1, 2021 Press Release ..... 73

VIII.   False and Misleading Statements in AppHarvest's March 2, 2021 Form S-1/A ........ 76

IX.     False and Misleading Statements in AppHarvest's March 4, 2021 Prospectus .......... 83

X.      False and Misleading Statements in a March 4, 2021 Interview with Benzinga ........ 91

XI.     False and Misleading Statements in AppHarvest's April 1, 2021 Press Release ....... 93

XII.    False and Misleading Statements in AppHarvest's April 6, 2021 Form S-8 ............. 95

XIII.   False and Misleading Statements in AppHarvest's May 17, 2021 Press Release ...... 96

XIV.    False and Misleading Statements in AppHarvest's May 17, 2021 Form 10-Q .......... 99

XV.     False and Misleading Statements in AppHarvest's May 17, 2021 Earnings Call .... 105

XVI.    False and Misleading Statements in a May 17, 2021 Interview with
        Cheddar News ....................................................................................................... 108

XVII.   False and Misleading Statements in a May 17, 2021 Interview on Yahoo! Finance
        Live ...................................................................................................................... 111

XVIII.  False and Misleading Statements in a May 25, 2021 Interview by Stephens Inc ..... 113

XIX.    False and Misleading Statements in a May 26, 2021 Industry Focus Interview ...... 117

XX.     False and Misleading Statements in a June 3, 2021 Interview with Seeking Alpha  119

XXI.    False and Misleading Statements in AppHarvest's June 4, 2021 Form S-1 ............. 120

XXII.   False and Misleading Statements in AppHarvest's June 9, 2021 Prospectus ........... 129

THE TRUTH IS REVEALED ................................................................................................. 137

ADDITIONAL SCIENTER ALLEGATIONS ....................................................................... 148

I.      The Individual Defendants Knowingly and/or Recklessly Made Material
        Misstatements and/or Omitted Material Facts. ...................................................... 149

        A.    Defendants' Internal Reporting and Forecasts Evidencing Declining Yield and
              Grade 1 Product Support a Strong Inference That Defendants Knew of Production
              Shortfalls ...................................................................................................... 149

        B.    Defendants Were Aware of the Importance of USDA Grade No. 1 Tomatoes to
              Pricing and Revenue Because Defendant Webb Personally Signed the
              Mastronardi Morehead Agreement Detailing the Terms of AppHarvest's
              Agreement with its Sole Distributor ................................................................ 152

        C.    Defendants' Class Period Personnel Changes Support a Strong Inference that
              Defendants Knew of Undisclosed Operational Problems at the Morehead Facility
              During the Class Period ................................................................................. 154

        D.    Defendants Were Aware of the Severe Operational Issues at the Morehead
              Facility Because Their Corporate Offices Were Located at the Morehead Facility,
              Prompting Defendants to Regularly Visit and Host Plant Tours ........................ 157

        E.    The Morehead Facility's Production was the Company's Core Operations
              Because Its Tomatoes Were AppHarvest's Sole Source of Revenue During the
              Class Period ................................................................................................. 159

F.   Defendants Admit They Were Aware Operational Challenges Negatively Affected the Tomato Harvest at the Morehead Facility for the Entire Class Period 160

G.   Defendants' Regular Responses to Analyst and Media Questions Concerning the Morehead Facility's Operations Shows They Closely Monitored and Tracked Staffing Levels and Volume of Saleable Tomato Production ........................... 162

H.   AppHarvest Board Member Jeffrey Ubben's Suspicious Stock Sales Supports Scienter ................................................................................................. 166

II.   AppHarvest Acted with Corporate Scienter ............................................ 167

LOSS CAUSATION................................................................................................ 168

POST CLASS PERIOD EVENTS ......................................................................... 171

CLASS ACTION ALLEGATIONS ....................................................................... 173

PRESUMPTION OF RELIANCE ......................................................................... 175

NO STATUTORY SAFE HARBOR...................................................................... 177

CLAIMS FOR RELIEF ......................................................................................... 177

PRAYER FOR RELIEF ......................................................................................... 182

JURY DEMAND..................................................................................................... 183

## GLOSSARY OF TERMS

| Term | Description |
|------|-------------|
| 2021 Q1 Earnings Call | An earnings call Defendants held on May 17, 2021 with analysts to discuss AppHarvest's first quarter fiscal 2021 quarter results. |
| 2021 Q2 Earnings Call | An earnings call Defendants held on August 11, 2021 with analysts to discuss AppHarvest's second quarter fiscal 2021 quarter results. |
| AppHarvest or the "Company" | AppHarvest, Inc. |
| AOP | Annual Operating Plan |
| Board of Directors | AppHarvest's Board of Directors during the Class Period |
| CEA | Controlled Environment Agriculture |
| CEO | Chief Executive Officer |
| CFO | Chief Financial Officer |
| Class Period | February 1, 2021, to August 10, 2021, inclusive |
| CW | Confidential Witness |
| Defendant Eggleton or Eggleton | Loren Eggleton, AppHarvest's CFO |
| Defendant Lee or Lee | David Lee, AppHarvest's President and Member of the Board of Directors |
| Defendant Webb or Webb | Jonathan Webb, AppHarvest's CEO and Chairman of the Board of Directors |
| EBITDA | Earnings Before Interests Taxes Depreciation and Amortization |
| ERP | Enterprise Resource Planning: software that firms use to manage day-to-day business activities such as accounting, procurement, project management, compliance, and supply chain operations. |
| FP&A | Financial Planning & Analysis |
| Greenhouse | The section of the Morehead Facility where tomatoes are grown and harvested. |
| Morehead Facility | AppHarvest's 63-acre CEA facility in Morehead, Kentucky |
| Mastronardi | Mastronardi Produce Limited, AppHarvest's exclusive distributer throughout the Class Period. |
| Mastronardi Morehead Agreement | AppHarvest's 10-year agreement with Mastronardi Produce Limited, signed on March 18, 2019, and amended December 20, 2020, pursuant to which Mastronardi became AppHarvest's exclusive marketing and distribution partner. |
| Novus | Novus Capital Corp., a SPAC that entered a business combination with AppHarvest immediately before the Class Period. |
| Packhouse | The section of the Morehead Facility where tomatoes are packed for distribution and inspected for quality before shipment. |
| SPAC | Special Purpose Acquisition Company |
| SEC | United States Securities and Exchange Commission |
| USDA | United States Department of Agriculture |

## CHRONOLOGY OF EVENTS[1]

| Date | Event |
|---|---|
| 01/19/2018 | AppHarvest is founded by Defendant Webb. |
| 03/28/2019 | AppHarvest enters the Mastronardi Morehead Agreement making Mastronardi the Company's exclusive marketing and distribution partner for the Morehead Facility. Under the agreement, Mastronardi is only obligated to purchase AppHarvest products that are at or above USDA Grade No. 1 standards. According to CW6, AppHarvest would update Mastronardi weekly, if not daily, on the quality and volume of tomatoes available to be picked up at the Greenhouse so that Mastronardi could do "a first cut at logistics planning" regarding expected shipments. |
| 09/28/2020 | AppHarvest and Novus enter into a definitive business combination agreement. |
| At a minimum: 10/2020-07/2021 | CWs 1, 2 and 4 confirm AppHarvest's employee training was inadequate, causing productivity issues throughout the Morehead Facility. CW1, a Crop Care Specialist described the orientation process as "a joke." CWs 1 and 4 stated that nothing in the orientation process taught any employees how to actually do the jobs they would be performing. Additionally, CW1 stated that Crop Care Specialists (a group that includes the Company's harvesters) were not instructed on what qualified as a USDA Grade No. 1 tomato. CW2, a Quality Control Specialist and Packer described work in the Packhouse as "trial by fire" and that there "was not real training." Rather, orientation was "just a little briefing" devoting "25 or 30 minutes" on quality standards which "really changed on the fly" "day to day" and "week to week." CW4 explained that Greenhouse personnel were given unreliable and fluctuating instructions regarding quality, including to "just send it" to the Packhouse when in doubt, which caused worker confusion and quality of the harvest to be negatively affected. |
| 11/19/2020 | Defendants announce planting tomatoes on first 30 acres of the Morehead Facility. |
| 12/10/2020 | Marcella Butler is promoted to Chief Operating Officer at AppHarvest. As Chief Operating Officer, Ms. Butler led "the Development, Construction, and **Farm Operations teams** for AppHarvest" including staffing and execution. |
| Q4 2020 – Q2 2021 | AppHarvest's workforce suffered massive attrition, churn, and COVID-related absences that negatively affected productivity. CW1 estimated that AppHarvest lost two to three personnel each week during CW1's tenure. CW2 echoed CW1's experience, saying that "50% to 60%" of personnel left after the first month on the job. CW2 recalled that of the "40 to 50" personnel starting at the same time as CW2, only one person is still employed at AppHarvest. According to CW4 and CW5, respectively, 10 personnel left the west half of the Greenhouse each week, and the Company sustained such high turnover that it needed to hire contract labor to offset missing workers. CW6 confirmed AppHarvest's attrition and retention metrics in the first half of 2021 were far worse than expected because the Company fell short week over week. |

---

[1] Unless otherwise indicated, throughout this First Amended Consolidated Class Action Complaint, emphasis is added and all internal quotations and citations are omitted. Emphasis in bold and underlined font indicates a false and/or misleading statement.

| | |
|---|---|
| Q1 2021-Q2 2021 | CWs 1, 2, 4, 5, and 6 confirm that AppHarvest's first harvest at the Morehead Facility, which started in January 2021, was ravaged by operational issues. According to CW6, senior leadership at AppHarvest "knew we were a long way off" from global standards of productivity during the Class Period, including 50% below global standards in the "toughest times" of the first harvest season which occurred during the end of Q1 through the "summer refresh." CW 1 through CW 6 confirmed that anywhere from 5-10% of all tomatoes were wasted at the Morehead Facility. CW5 estimated that 50% of all crops were wasted during the first harvesting season. According to CW4, poor conditions, lack of training and the "piece rate" bonus structure led to significant waste during the Class Period. CW2 confirmed that "half" of the inspected tomatoes were USDA Grade No. 2 or "Bad." According to CW2, "Bad" tomatoes would be thrown away immediately and according to Defendant Webb, USDA Grade No. 2 tomatoes sold for "little to no value[.]" CW6 confirmed that upwards of 30% to 35% of AppHarvest's tomatoes would be rejected by Mastronardi for failing to meet quality standards during the "toughest times," forcing AppHarvest to reforecast. 

CW6 participated in weekly forecasting meetings with Defendants Lee and Eggleton which CW6 confirmed "got quite operational" and focused on key metrics, including yield and quality because those were the two primary inputs to revenue and AppHarvest was "very revenue driven" at this time. CW6 confirmed that discussion at such forecast meetings also concerned "ways to close the gap" between AppHarvest's underperformance as compared to the current forecast. CW6 confirmed that during the "toughest times," AppHarvest's senior leadership (including Defendants Lee and Eggleton and CW6) participated in meetings twice a week to discuss labor productivity with and "keep an eye on it." CW6 confirmed that throughout the toughest times, it was "repeatedly cited" at both the forecast meetings and the leadership meetings that employee training, turnover, and poor work ethic were the "root cause" of the overall production challenges. |
| 1/19/2021 | AppHarvest announces tomato shipments from its first harvest. |
| 2/1/2021 | The Class Period begins. After combining with Novus, AppHarvest common stock and warrants trade on NASDAQ. Defendants "**reiterate**" pre-harvest sales guidance purportedly based on false justifications concerning AppHarvest's operations and ability to scale, and Webb falsely touts "**consistent supply coming out of our**" Morehead Facility. |
| 2/25/2021 | AppHarvest announces full-year net revenue to be between $20 million to $25 million. Defendant Webb misattributes the reason for reiterating the outlook to "**our favorable crop yields and market pricing**[,]" despite worse yield and pricing from damaged, low-quality tomatoes. |
| 3/2/2021 | AppHarvest files a registration statement amendment with the SEC containing language never used in previous filings falsely touting a false "belief" the Company could "**retain our workers with less churn**" and fill "**unfilled positions**" and that Defendants affirmatively "**were able to efficiently hire many employees as we opened our first facility in Morehead[.]**" |

| | |
|---|---|
| 4/1/2021 | Despite the Company's dysfunctional harvesting efforts, Defendant Webb misleadingly claims: "**This harvest has proved the team can handle the production ramp up at our Morehead Facility[.]**" |
| 4/12/2021 | After just four months, during which AppHarvest was woefully failing to train and retain employees, AppHarvest's Board of Directors determined Marcella Butler was "no longer an 'officer'…or an 'executive officer.'" Ms. Butler was demoted to Chief People Officer, just one month before first quarter results were announced. Defendant Lee admitted that the decision to eliminate this "C-level" position was in response to the Company's underlying productivity challenges in order to "change[] *operational* leadership." CW6 confirmed Ms. Butler's demotion and subsequent departure from AppHarvest were due to AppHarvest's labor issues, including productivity, attrition, and churn. |
| 05/17/2021 | AppHarvest announces Q1 2021 results, falsely attributing its "**reiterated**" sales outlook to "**operating and financial success of our Morehead facility and our team's ability to scale the business**[.]" In response to a direct analyst question regarding how AppHarvest's pricing reflected "quality of the output, so non-grade 1 versus just broader market conditions," Defendant Lee falsely stated during the 2021 Q1 Earnings Call that AppHarvest "**performed well…in market pricing.**" Further, Defendants Lee and Eggleton made muted, misleading admissions that AppHarvest identified the need to address operational issues through "training." |
| 5/25/2021 | Defendant Lee falsely tells a Stephens Inc. analyst: "[**H]aving, um, 500 plus employees ready to, to join us, if we want, proved and validated the model that we really could hire local talent, give them a living wage, provide full-time employees stock and execute well.**" |
| 6/3/2021 | Defendant Webb falsely states: "**And again, in this time where you, you read in the news about labor shortages, you read in the news about, uh, people having issues of people showing up to work. We hired 500 employees in the middle of COVID, uh, and they're showing up every day.**" |
| 07/09/2021 | Ms. Butler enters into a termination agreement, signed by Defendant Lee. |
| 8/11/2021 | AppHarvest announces disappointing Q2 2021 results, with net sales of only $3.1 million, while reducing full year projections for net sales by ~65%, and for EBITDA by ~45%. AppHarvest attributed the missed guidance to "*operational headwinds* associated with the full ramp up of the Morehead farm].]" Explaining these "headwinds," Defendant Webb stated on the 2021 Q2 Earnings Call stated he could not "be more blunt than that, but it was training and management protocols." Defendants admitted that for the entire "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce." Defendant Lee admitted that the "executional challenges" were "very real in our first major *full season of harvest*[.]" Consequently, AppHarvest suffered "lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees" caused by rejections (*i.e.*, "re-pack and re-sort costs"). AppHarvest also discloses Ms. Butler's termination, and that operational performance caused AppHarvest to reduce its footprint guidance from twelve farms to nine. |

|  | On this news, AppHarvest's stock price fell $3.46 per share, or approximately 29%, and its warrant price fell $1.72 per warrant, or approximately 44%. |
| --- | --- |

Lead Plaintiff Alan Narzissenfeld ("Plaintiff") brings this action pursuant to 15 U.S.C. §§ 78j(b) and 78t(a) ("Section 10(b)" and "Section 20(a)," respectively) of the Securities Exchange Act of 1934 (the "Exchange Act") and 17 C.F.R. § 240.10b-5 ("Rule 10b-5") promulgated thereunder by the SEC, on behalf of himself and all persons and entities other than Defendants (defined below) who purchased or otherwise acquired securities of AppHarvest, Inc., between February 1, 2021 and August 10, 2021, inclusive, and were injured thereby (the "Class").

Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters. Plaintiff's information and belief is based on the investigation of his undersigned attorneys ("Lead Counsel"), which included, among other things: (i) review and analysis of AppHarvest's public filings with the SEC; (ii) review and analysis of Defendants' other public statements, including AppHarvest's press releases and dozens of interviews that Defendants participated in with various news outlets; (iv) interviews with individuals who are former employees of AppHarvest; (v) review and analysis of reports of securities and financial analysts, news articles, and other commentary and analysis concerning AppHarvest and the industry in which it operates; and (vi) review of pertinent court filings.

Lead Counsel's investigation into the matters alleged herein is continuing, and many relevant facts are known only to, or are exclusively within the custody or control of, Defendants. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY OF THE ACTION

1.     This class action concerns material misstatements and omissions made by AppHarvest (a firm that grows fruits and vegetables using Controlled Environment Agriculture) and its executive officers regarding the Company's sole operating facility in Morehead, Kentucky.

Unbeknownst to investors, throughout the Class Period, the Morehead Facility was beleaguered by lower saleable yield, quality and prices, and higher distribution and transportation fees associated with product rejections—all caused by inadequate employee training and an inability to reliably hire and retain employees due to attrition, labor churn, and the COVID-19 pandemic. Because Defendants knew about these issues at the time they made their false statements to the market, Defendants are liable to Plaintiff and the Class for securities fraud.

2.      Controlled Environment Agriculture, as the name suggests, is the process of growing produce indoors which allows firms to cultivate and harvest crops year-round, unlike traditional outdoor farms where seasons are shortened by weather. AppHarvest's CEA operations began with the construction of its first and flagship facility—the Morehead Facility—which houses the Company's executive offices and headquarters, a Greenhouse covering sixty acres to grow and harvest tomatoes, and a Packhouse where tomatoes are graded for quality, boxed, and shipped.

3.      Agricultural operations, even at technologically sophisticated CEA facilities, require significant amounts of reliable and efficient labor resources to perform tasks such as planting, picking, packing, and quality control. AppHarvest commenced the Morehead Facility's inaugural growing and harvesting season in two waves: first, planting Beefsteak variety tomatoes on thirty acres in November 2020 (harvesting began in January 2021); and second, planting Tomatoes on the Vine variety tomatoes on the remaining thirty acres a couple months later (harvesting began in April 2021).

4.      Given AppHarvest's large operation at the Morehead Facility, market participants understood AppHarvest's operations and prospects were dependent on its ability to efficiently hire, manage, and retain a huge workforce. To operate at full force, the Company's admitted goal was to ramp up from sixty-nine employees, as of September 30, 2020, to five hundred employees when

it started planting Tomatoes on the Vine.

5.      AppHarvest, however, was ill-equipped to scale production due to its failure to train new workers and its inability to retain critical personnel to grow and harvest its tomatoes. And the Individual Defendants—Jonathan Webb (CEO and Chairman of the Board of Directors), Loren Eggleton (CFO), and David Lee (President and Board of Directors Member)—knew it.

6.      Lack of training, and widespread attrition and churn led to an inexperienced, revolving workforce which caused massive quantities of undisclosed wasted tomato plants and fruit "daily" throughout the entire first harvesting season. Indeed, former employees observed that AppHarvest workers damaged a "shocking amount" of tomatoes in the Morehead Facility, with estimates ranging from *5% to 50%* of total tomato production in the first growing season.

7.      AppHarvest's training and staffing issues also resulted in undisclosed poor quality which drove down sales prices. Pursuant to AppHarvest's agreement with its exclusive distributor Mastronardi Produce Limited, Mastronardi is only obligated to purchase top quality USDA Grade No. 1 tomatoes. Defendants admit Grade 1 tomatoes sell for a "premium," compared to low-quality Grade 2 tomatoes which sell for "very little to no value," and "Bad" (scrap) tomatoes which went unsold during the first harvesting season because they were discarded, composted, or donated.

8.      According to former employees, despite the financial importance of top-quality Grade 1 tomatoes, the Company was "a long way off" from achieving its goals and forecasts during the Class Period, with about "*half*" of the tomatoes that were inspected being either Grade 2 or "Bad." Further, *30% to 35%* of AppHarvest's shipments to Mastronardi were rejected, which was "many times" more than Defendants' target of 6% or 7%. As a result, Mastronardi increased audits of AppHarvest's shipments and issued notices regarding the poor quality and rejections.

9.      These undisclosed productivity failures at every layer of the Company's operations

were the product of a lack of training and an inability to retain experienced employees. According to witnesses, the orientation process was "a joke." Greenhouse employees were neither instructed how to perform their job, nor given accurate information, if any, regarding how to identify a USDA Grade No. 1 tomato. Indeed, according to witnesses who worked in the Greenhouse, when instructed about quality (some were not), the directions were inconsistent and unreliable— sometimes fluctuating on an hourly basis. This lack of training and consistency resulted in confusion and AppHarvest's productivity metrics measuring well below **_50%_** in relation to the Company's standards for specific Greenhouse jobs (*i.e.*, picking, de-leafing, lowering, etc.).

10.     Witnesses further recalled a "shocking" amount of employee turnover during the Class Period, with as much as ten personnel resigning every week from just one-half of the Greenhouse, and upwards of "50% to 60%" of Greenhouse personnel leaving after their first month. COVID-19 further exacerbated staffing and turnover, causing "a couple" of employees per team calling out sick every week and quarantining for weeks at a time. When employees called out sick, they were not replaced, leaving the operations teams short-staffed.

11.     Despite these glaring and devastating issues negatively impacting AppHarvest's sales and costs, Defendants made remarkably false and misleading statements that AppHarvest was able to successfully staff the facility and scale production to execute on its plan, including, statements about: (i) operations (*e.g.*, the "harvest also has proved the team can handle the production ramp-up at our Morehead facility;" and that AppHarvest's "facility operated at full, you know, ramping up into full capacity with no issues"); and (ii) labor reliability and staffing (*e.g.*, "in this time where you, you read in the news about labor shortages…We hired 500 employees in the middle of COVID, uh, and they're showing up every day;" "[h]aving 500 plus employees ready to, to, join us, if we want, proved and validated the model that we really could

hire local talent…and execute well;" and Defendants "were able to efficiently hire many employees as we opened our first facility in Morehead[.]").

12.     Defendants also made false justifications for their decisions to twice "reiterate" and once *raise* full year 2021 net sales and/or EBITDA guidance despite the severe undisclosed operational issues AppHarvest faced since the start of its first growing season. For instance, Defendants falsely claimed AppHarvest's outlook was "supported by early sales from [AppHarvest's] first harvest;" the result of "favorable crop yields and market pricing;" and supported by "encouraging operating and financial performance of our Morehead facility and our team's ability to scale the business."

13.     Defendants knew that their statements, affecting AppHarvest's sole operating facility and core business, were false when made. Confidential witnesses confirmed that Defendants knew about AppHarvest's productivity challenges throughout the Class Period. For example, CW3 received projections from Defendant Eggleton, who approved them, which included details such as expected yield, sales (including a breakdown by USDA Grade No. 1 versus USDA Grade No. 2 tomatoes), costs, returns, market price, expected returns and expected damaged tomatoes. According to CW6, who reported to Eggleton and worked in the Company's Financial Planning and Analysis Department, results concerning such metrics were tracked during the Class Period and were frequent topics of discussion among Defendants Lee and Eggleton because of AppHarvest's poor performance during this time.

14.     CW6 stated, for example, that yield and the product-mix split between Grade 1 and Grade 2 tomatoes were tracked in real time by recording the grade and weight for each box shipped in a shared drive. In turn, such yield and quality data (which CW6 stated were the two primary inputs for AppHarvest's revenue) was a key focus of weekly forecasting meetings that CW6

attended with Defendants Lee and Eggleton where they discussed "ways to close the gap" between AppHarvest's underperformance as compared to the current forecast, as well as issues with employee training, turnover, poor work ethic, and inconsistent hiring standards that were "repeatedly cited" as the "root cause" of the overall production challenges.

15.     CW6 further stated that leadership meetings with Lee and Eggleton were held twice a week during the first harvesting season's "toughest times" (lasting from late Q1 through AppHarvest's "summer refresh" in Q3 2021) do discuss productivity metrics such as yield, quality, rejections by Mastronardi, attrition, employee absences, and productivity metrics for Greenhouse workers who were not pickers. Thus, CW6 confirmed, "***everyone knew what everyone else knew***." According to CW6 the purpose of the productivity meetings was to "keep an eye on" the Company's poor labor productivity, including yield and quality. And it was "repeatedly cited" at these meetings that training, turnover, poor work ethic and inconsistent hiring standards were repeatedly cited as the "root cause" of the overall production challenges.

16.     The former employees' accounts are bolstered by Defendants' own admissions. In AppHarvest's Q2 2021 Quarterly Report on SEC Form 10-Q, Defendants explained that for the "***six months***" ended June 30, 2021 (*i.e.*, from before the beginning of the Class Period), net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce" such as "lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees" which were incurred from "re-pack and re-sort costs" associated with product rejections. Further, Defendant Lee admitted on the 2021 Q2 Earnings Call that AppHarvest's "executional challenges" were "very real in our first major ***full season*** of harvest as a company"—a harvest which began in January 2021.

17.     Additionally, Defendant Webb personally visited the Greenhouse to host tours and

greeted employees "every morning" as they entered the facility, and therefore saw the wasted tomatoes and debris and new and missing faces as a result of turnover firsthand. Indeed, CW4 confirmed with photographic evidence that the wasted fruit at the Morehead Facility was copious and unavoidable. Defendant Webb admitted to reporter Jonah Lupton that he was at the Morehead Facility "every morning" because "we're up at 5:00 AM in the facility, you know, elbow tapping everyone as they come in," and therefore Defendant Webb stated: "I've been able to do what I love the most, which is **sleep on the farm**[], start construction at three and four in the morning, **going to our operations**." Investors however were left in the dark because witnesses confirmed that Webb's team manipulatively instructed that the Greenhouse be scrubbed of debris when investors or visitors were given tours.

18.     Knowing that the Company's operations and staffing challenges decimated Class Period sales, Board Member Jeffrey Ubben cashed out before the truth was disclosed, selling 3 million shares, at an average price of $16.50 per share for $49.5 million in proceeds.

19.     The truth was revealed before market open on August 11, 2021, when AppHarvest issued, among other disclosures, Q2 2021 results and updated the Company's fiscal year 2021 outlook. AppHarvest announced net sales of $3.1 million and a $32 million net loss. Additionally, AppHarvest lowered full-year 2021 net sales guidance to a range of $7 million to $9 million and EBITDA guidance to a range of a loss of $70 million to $75 million.

20.     The Company explained that "[s]econd quarter 2021 results were adversely impacted by operational headwinds" including "[l]abor and productivity challenges result[ing] in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher distribution and shipping fees." Likewise, during the 2021 Q2 Earnings Call, Eggleton stated that the "primary driver" of the guidance reduction was "the lower net sales expectation, due to the

quality challenges we encountered in ramping up our first facility and higher-than-expected cost of goods sold with labor farm costs, associated with lower-than-expected labor productivity."

21.     On this news, AppHarvest's common stock price fell $3.46 per share, or approximately 29%, from $11.97 per share at market close on August 10, 2021, to $8.51 per share at market close on August 11, 2021, and AppHarvest warrant prices fell $1.72 per warrant, or approximately 44%, from $3.87 to $2.15 per warrant over the same time.

22.     Analysts and investors reacted immediately. The same day, Barclays wrote that AppHarvest's financial results were "well below [investors'] expectations" and the Financial Times observed "near term forecasts disappear[ed] faster than a sugar cube in water[.]" On August 22, 2021, a Seeking Alpha report stated it was "disingenuous" for Defendants to "raise profitability expectations" in the first quarter "ahead of what was clearly going to be a poor quarter."

23.     Defendants' fraud as alleged herein caused investors to lose millions of dollars. Plaintiff now seeks damages individually and on behalf of the Class.

## JURISDICTION AND VENUE

24.     The federal law claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

25.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act, codified at 15 U.S.C. §78aa ("Section 27"). In connection with the acts, conduct, and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the U.S. mail, interstate telephone communications, and the facilities of national securities exchanges.

26.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and Exchange Act Section 27 because many of the false and misleading statements were disseminated in or from the Southern District of New York.  AppHarvest common stock and warrants trade on the NASDAQ, located in this District, and the Company's transfer agent for its securities during the Class Period was the Continental Stock Transfer & Trust Company which is located in this District at One State Street Plaza, 30th Floor, New York, New York 10004.

## PARTIES

### I.     Plaintiff

27.     Plaintiff Alan Narzissenfeld, the Court-appointed Lead Plaintiff, was damaged by purchasing the AppHarvest securities set forth in his amended certification, filed on March 2, 2022 at ECF No. 46-1 and incorporated herein, at artificially inflated prices during the Class Period caused by Defendants' materially false and misleading public statements.

### II.    Defendants

28.     Defendant AppHarvest, Inc., was incorporated as a public benefit company in Delaware in January 2018 and, since February 2021, has maintained its principal executive offices at the Morehead Facility. AppHarvest describes itself as a "sustainable food company creating a resilient and scalable ecosystem of applied technology greenhouses to serve the rapidly growing consumer demand for fresh, chemical-free, non-GMO fruits, vegetables and related products."

29.     Defendant Jonathan Webb founded AppHarvest and has served as its Chief Executive Officer and as a member of the Board of Directors since the Company's inception, including as Chairman after AppHarvest's business combination with Novus. Webb served as the Company's President from January 2018 through January 2021. Webb is a Kentucky native and

purports to have developed relationships within the Appalachian community that include civic leaders, strategic vendors, and suppliers.

30.     Defendant Loren Eggleton has served as AppHarvest's Chief Financial Officer since November 2020. Previously, Eggleton served as Senior Vice President, Finance and Treasurer from September 2020 through November 2020, and served as CFO of AppHarvest from July 2019 through September 2020.

31.     Defendant David Lee has served as President since January 2021 and on the Company's Board of Directors since August 2020.

### III.    Relevant Non-Parties

32.     Non-Party Marcella Butler joined AppHarvest in July 2020 and served as an executive officer of the Company from that time until April 2021, when the Company stripped her of that status. Throughout her tenure, Ms. Butler reported directly to Defendant Webb. From July 2020 through November 2020, Ms. Butler served as AppHarvest's Chief People Officer, responsible for the Company's human resource management. On December 10, 2020, the Company entered into an employment agreement promoting Ms. Butler—at which time she began serving as AppHarvest's Chief Operating Officer. On April 14, 2021, the Company announced in a Current Report filed with the SEC on Form 8-K that on April 12, 2021 its Board of Directors "determined that the duties and responsibilities of Marcella Butler have evolved such that she is no longer an 'officer' within the meaning of Rule 16a-1(f) under the Securities Exchange Act of 1934…or an 'executive officer' within the meaning of Rule 3b-7 under the Exchange Act." From April 12, 2021 (following her demotion) through July 9, 2021, Ms. Butler served as AppHarvest's Chief People Officer, but not as an executive officer. On July 9, 2021, Ms. Butler entered a

separation agreement with AppHarvest, signed by Defendant Lee, thereby terminating her employment.

33.     Non-party Novus Capital Corp. was a Special Purpose Acquisition Company that AppHarvest combined with on January 29, 2021 to allow AppHarvest to trade on the NASDAQ. Although the corporation that was Novus is the legal entity that survived the business combination, throughout this complaint Novus shall mean the blank check SPAC as it existed prior to the business combination, and AppHarvest shall mean both the combined company surviving the business combination, as well as the privately-held operating company with the name AppHarvest, Inc., that preceded the business combination.

34.     Non-party Mastronardi Produce Limited is the largest producer and distributor of greenhouse-grown produce in North America. In March 2019, AppHarvest and Mastronardi entered into a 10-year agreement pursuant to which Mastronardi would be the sole distributor of AppHarvest's USDA Grade No. 1 products harvested from the Morehead Facility. Mastronardi also has the right of first refusal to distribute products grown from additional CEA facilities built by AppHarvest during the duration of the contract.

35.     CW1 is a former AppHarvest Crop Care Specialist at the Morehead Facility who was employed in that role from October 2020 (the month before AppHarvest began planting its first crops) through July 2021. CW1's day-to-day responsibilities included harvesting tomatoes in addition to pruning, performing truss support, de-leafing, and repositioning tomato plants. CW1 reported to an Assistant Grower, who reported to one of the Morehead Facility's two Growers (at the time Diego Camacho and Jonathan Minnig), both of whom reported to Head Grower Jose "Pepe" Calderon ("Calderon"), who reported to Defendant Webb.

36.     CW2 is a former AppHarvest Quality Control Specialist at the Morehead Facility, who was employed in that role from January 2021 through March 2021. CW2 worked in the Morehead Facility's Packhouse, where the Company's tomatoes arrived from the Greenhouse and were put into boxes for shipment by Packers. After AppHarvest's Packers filled boxes for distribution, the boxes would be loaded onto conveyer belts and Quality Control Specialists would randomly inspect tomatoes in the boxes prior to shipment. If the Quality Control Specialists observed any deviations from quality standards, the findings from the inspection would be recorded and this would be followed by a visit to the Greenhouse to inform the pickers responsible that products with deviations had been detected. CW2 was originally hired as a tomato packer but was quickly promoted to CW2's quality control position. During CW2's employment at AppHarvest, CW2 was one of only four Quality Control Specialists employed by AppHarvest. CW2 reported to Packhouse Supervisor Wayne Howard ("Howard") who reported to the Assistant Packhouse Manager named Leo, who reported to the Packhouse Manager, who reported to Defendant Webb. CW2 also recalled that Quality Control Specialists received instructions from Calderon regarding quality standards.

37.     CW3 is a former AppHarvest Senior Cost Accountant who was employed at the Company in that position from October 2020 through December 2020. CW3 reported to AppHarvest's Controller Kathi Shrider, who reported to Defendant Eggleton. CW3 was responsible for all direct agricultural cost of sales analysis, costing and valuation, and reporting. CW3 also managed AppHarvest's fixed assets and inventory control.

38.     CW4 is a former Group Lead of Crop Care Specialists who worked at AppHarvest from October 2020 to September 2021. CW4 was initially hired by the Company as a Crop Care Specialist, during which time CW4's day-to-day responsibilities included harvesting, truss

support, pruning, and de-leafing. In April 2021, CW4 was promoted to Team Lead, and around May 2021 when AppHarvest eliminated the Team Lead position, this witness was promoted to the newly created position of Group Lead. In CW4's roles as Team Lead and Group Lead, this witness managed Crop Care Specialists, thereby overseeing and participating in every task performed by Crop Care Specialists (including the same responsibilities that CW4 performed when CW4 was a Crop Care Specialist). In CW4's tenure as a Team Lead and Group Lead, CW4's responsibilities were substantially the same, with the primary difference being the number of Crop Care Specialists that CW4 was required to manage—overseeing upwards of thirty personnel when CW4 was promoted to Group Lead. CW4 reported directly to John Green, Assistant Grower, except for a brief period following CW4's promotion to Team Lead, during which CW4 reported to Jamie Rogers, Assistant Grower. Mr. Green reported to Josh Ballard, Senior Director of Greenhouse Operations who reported to Defendant Webb.

39.     CW5 is a former AppHarvest employee who worked in the Morehead Facility's sole Maintenance Department from June 2020 to March 2022. CW5 oversaw six personnel, and was responsible for "preventative, corrective, and everyday maintenance" at the Morehead Facility. CW5 reported to AppHarvest's Senior Maintenance Manager Daniel Markey, who at different times reported to Anthony Vicars, Vice President of Greenhouse Operations, Josh Ballard, and Julie Nelson, Executive Vice President, Operations. Messrs. Vicars and Ballard reported to Marcella Butler during her tenure as Chief Operating Officer, who reported to Defendants Webb and Lee.

40.     CW6 is a former AppHarvest employee who worked in the Company's Financial Planning and Analysis Department from the third quarter of 2020 to the fourth quarter of 2021. CW6 reported to Defendant Eggleton and worked with FP&A employees to analyze different areas

of the business and made various projections at operational and strategic levels, including evaluating scenarios and making financial projections related to strategic initiatives that could range from labor and tomato pricing to construction builds.

## STATEMENT OF FACTS

I.      **Company Background**

41.     AppHarvest, founded on January 19, 2018 by Defendant Webb among others, is a domestic producer of fruits and vegetables. As opposed to traditional outdoor agriculture, AppHarvest grows all its crops indoors utilizing Controlled Environment Agriculture technology. CEA blends "a combination of engineering, plant science, and computer managed greenhouse control technologies used to optimize plant growing systems, plant quality, and production efficiency."[2]

42.     CEA techniques can include the use of a fixed greenhouse structure, rainwater collection, natural and/or artificial light, and specialized harvesting technology. By using high-tech greenhouses, CEA producers can cultivate and harvest crops year-round, optimize their supply, and plan harvests during exact peak price points for fruits and vegetables—which cyclically track the traditional growing and harvesting seasons of outdoor agriculture. For example, on average, prices for crops like tomatoes have been lower when traditional outdoor agriculture harvests are at their seasonal peak, and prices, on average, have been higher during off-seasons. CEA facilities which operate year-round can target peaks and plan around valleys.

43.     AppHarvest utilized several popular CEA techniques when designing and constructing its own greenhouses, including AppHarvest's flagship facility located in Morehead, Kentucky. Although the Company had broken ground on construction projects in Berea and

---

[2] *See* https://www.nyserda.ny.gov/Business-and-Industry/Agriculture/Controlled-Environmental-Agriculture (last visited June 30, 2022).

Richmond, Kentucky, the Morehead Facility was AppHarvest's only operating CEA facility during the Class Period. CEA techniques at the Morehead Facility include, for example, a 10-acre retention pond holding roughly 70 Olympic-sized swimming pools of water, which was designed to reduce water costs. Further, AppHarvest introduced a hybrid lighting array with traditional high-pressure sodium grow lights with LEDs that purportedly results in 40% reduced energy use. By using CEA technology, AppHarvest believes it can grow thirty times more food on a single indoor acre compared to a traditionally farmed outdoor acre.

44.    On September 28, 2020, AppHarvest and Novus entered into a business combination agreement. As a SPAC, Novus was a "blank check" company, meaning it had no commercial operations and was formed strictly to raise capital through an initial public offering ("IPO"), for the purpose of acquiring or merging with an existing private company—here AppHarvest. The merger (often called a "de-SPAC" transaction) creates a single entity that will trade publicly, giving the private company a public listing and proceeds from the SPAC's IPO.

45.    SPAC transactions have been the subject of recent scrutiny. For example, SEC Chairperson Gary Gensler remarked in December 2021 that he "believe[s] the investing public may not be getting like protections between traditional IPOs and SPACs" and that the SEC is considering administrative rulemaking regarding SPAC transactions.[3] Further, on February 25, 2-2022 the Wall Street Journal reported that, of sixty-three publicly traded companies that were former SPACs, thirty (nearly **one-half**) failed to meet projections.[4] The Wall Street Journal article highlighted AppHarvest as one of those companies that reported "Rosy Forecasts" in 2021. A

---

[3] *See* https://www.cnbc.com/2021/12/09/sec-chair-gensler-seeks-tougher-spac-disclosure-liability-rules.html (last visited June 30, 2022).

[4] See Heather Somerville & Eliot Brown, *SPAC Startups Made Lofty Promises. They Aren't Working Out.*, The Wall Street Journal, available at: https://www.wsj.com/amp/articles/spac-startups-made-lofty-promises-they-arent-working-out-11645785031 (last visited June 30, 2022).

former SEC regulated quoted in the article warned that the SPAC "practice was perhaps being abused" because projections from SPACs and their targets were "beginning to get outside the realm of feasible outcomes."

46.     On February 1, 2021, before market open, AppHarvest announced it had completed the merger with Novus, that the resulting company would be renamed AppHarvest, Inc., and that its common stock and warrants would begin trading immediately on the NASDAQ under the new ticker symbols $APPH and $APPHW, respectively.

## II.     Throughout the Class Period, AppHarvest Touted Purported Labor Advantages Because Market Participants Understood That the Availability and Dependability of Skilled Labor is Integral to CEA

47.     In the United States, rising demand for fruits and vegetables compared to existing domestic supply has necessitated significant imports of foreign produce. The majority of America's supply of fresh tomatoes and other vine crops, including cucumbers, bell peppers and eggplants, are imported. Indeed, over approximately the last three decades, the United States' reliance on imports has more than doubled, and the country's single largest import partner is Mexico, which comprises 70% of the United States' total fruit and vegetable imports.

U.S. Domestic Percentage of Crops Imported:



48.     Located in Eastern Kentucky, AppHarvest touts its Central Appalachian geographic location as a competitive advantage for several purported reasons, including that: production occurs closer to end-customers which reduces shipment times and costs; and because Kentucky

16

has reliable rainfall, unlike Mexico (two-thirds of which is considered "arid" or "semi-arid") and California (another traditionally important producer of domestically consumed fruits and vegetables).

49.     Importantly, at all relevant times, AppHarvest touted that Central Appalachia purportedly has a strong, skilled, and available local labor force that is seeking to move forward in a new industry (such as CEA) following the precipitous decline of the coal industry. In the Company's Registration Statement filed on Form S-1 on February 10, 2021, AppHarvest stated that coal industry employment dropped 27% between 2005 and 2015, which has led to a labor participation rate in Eastern Kentucky of 45%, far lower than the state average of 60% and the national average of 64%. In Morehead, Kentucky, the U.S. Census Bureau estimates that 24% of residents live in poverty, nearly double the national average, which AppHarvest touted as an indicator of a large available labor pool.

50.     Furthermore, AppHarvest's public filings suggest other ways (beyond labor availability) that the Company's location would support its labor needs. AppHarvest emphasizes that nearly 32% of Appalachian workers sixteen and older commute to work in a county other than that in which they live, higher than the 28% national rate. During the Class Period AppHarvest also told investors that it was the beneficiary of a "strong network of employer assistance programs" which help companies interested in locating in the region to provide jobs for its "ready workforce." Such programs include the Kentucky Skills Network which AppHarvest touted as a "first stop for all workforce needs" that provided the Company custom tailored staffing solutions.

51.     Defendants caused AppHarvest to disclose information like this because Defendants knew that market participants would be acutely interested in the availability and

dependability of labor—particularly given that AppHarvest was creating massive CEA facilities from scratch.

### III.    AppHarvest Commences Tomato Production at its Flagship Morehead Facility Pursuant to a Long-Term Agreement with AppHarvest's Exclusive Distributor, Mastronardi

52.    On April 15, 2019, AppHarvest secured financing for construction of the Morehead Facility, the Company's first and only CEA facility during the Class Period, with a Greenhouse containing nearly 2.8 million square feet of growing space over approximately sixty-three acres, a Packhouse for packing the Company's produce for distribution, and office space. Throughout the Class Period, the Morehead Facility exclusively produced tomatoes, which were grown in two varieties: Beefsteak and Tomatoes on the Vine.

53.    The two tomato varieties were planted in stages at the Morehead Facility. On November 19, 2020, AppHarvest announced it had begun planting its first tomato crop, which were Beefsteak tomatoes, on its first thirty acres of growing space. The Company announced that the first Beefsteaks began to be harvested in January 2021. According to CW3, AppHarvest planted Tomatoes on the Vine in January/February 2021 on the remaining thirty acres, and the Company announced that it began harvesting these crops in April 2021. In total, the Morehead Facility had 720,000 tomato plants growing heading into Q2 2021.

54.    During AppHarvest's Analyst Day on December 15, 2020, Defendants claimed that the Morehead facility was intended to be the Company's first of twelve CEA facilities that were expected to go live by 2025. This was reflected in a slide presentation Defendants gave during AppHarvest's Analyst Day and which was concurrently published on the Investor Relations page of the Company's website:



55.     AppHarvest's intended massive scale and perishable products requires it to have a reliable source of demand so that the Company can optimize the timing of its sales based on when its products are ripe and ready to go to market. Therefore, on March 28, 2019, and as amended on December 18, 2020, AppHarvest entered into a 10-year agreement with a buyer for tomatoes harvested at the soon-to-open Morehead Facility: Mastronardi Produce Limited.

56.     The first instrument comprising the Mastronardi Morehead Agreement, dated March 28, 2019, is titled the Purchase & Marketing Agreement Exclusive Production AppHarvest, LLC (United States), and was filed by Novus with the SEC on November 9, 2020 as Exhibit 10.20 to Form S-4. Defendant Webb signed the Purchase & Marketing Agreement Exclusive Production AppHarvest, LLC (United States) on behalf of AppHarvest and initialed every page, save for the cover page and the exhibits. The second instrument comprising the Mastronardi Morehead Agreement, dated December 18, 2020, is titled Amendment No. 1 To Purchase & Marketing Agreement Exclusive Production AppHarvest, LLC (United States), and was filed by Novus with the SEC on December 21, 2020 as Exhibit 10.31 to Form S-4/A. Defendant Webb signed the

Amendment No. 1 To Purchase & Marketing Agreement Exclusive Production AppHarvest, LLC (United States).

57.     Under the Mastronardi Morehead Agreement, Mastronardi became AppHarvest's sole, exclusive marketing and distribution partner for all tomatoes, peppers, cucumbers, berries, and leafy greens produced at the Morehead Facility. AppHarvest is responsible for growing, producing, packaging, and delivering all its produce to Mastronardi, whereas Mastronardi is responsible for marketing, branding and distributing AppHarvest's products to its customers.

58.     Mastronardi sells all the USDA Grade No. 1 produce that AppHarvest grows at market prices and AppHarvest receives the gross sale price of the products, less a marketing fee and Mastronardi's costs incurred in the sale and distribution of the products.

59.     The Mastronardi Morehead Agreement requires AppHarvest to stay in close communication with Mastronardi regarding AppHarvest's future estimated production, including joint sales and delivery forecasts for each "growing season." A growing season consists of the preparation, planting and harvesting of crops. AppHarvest's annual summer "refresh," which starts in August, marks the beginning of a new growing season. Specifically, the Mastronardi Morehead Agreement states as follows:

> Given enough time to make adjustments before the beginning of each growing season, **Grower and Mastronardi will consult with each other to plan future marketing and sales strategies for the following season**, including forecasting the type of seeds and products to be grown as well as the quantities that should be cultivated for the next season and **the approximate pack and schedule of delivery together with a forecast of future sales** (in each case a, "Future Forecast" and collectively with the Initial Forecast referred to as a, "Forecast").

60.     CW6 confirmed that AppHarvest exchanged information with Mastronardi concerning plans and forecasts during the Company's first growing season. CW6 explained that Mastronardi administered a database, which CW6 believed was called the "Mastronardi Portal,"

in which Mastronardi's suppliers like AppHarvest could log-in and provide a daily and weekly forecast of what would be available to be picked-up at the greenhouse so that Mastronardi could do "a first cut at logistics planning." CW6 understood that AppHarvest's forecasts were based on possibly daily – but definitely weekly – estimates of labor productivity to determine the volumes of beefsteak and Tomatoes on the Vine that would be harvested.

61.     Critically, under the Mastronardi Morehead Agreement, Mastronardi is obligated to purchase all AppHarvest's products that are at or above USDA Grade No. 1 standards which include characteristics such as being free from damage, decay, and sunscald.[5]

62.     CW2 confirmed that AppHarvest's internal quality ranking system for tomatoes that had been sent from the Morehead Facility Greenhouse to the Packhouse for distribution consisted of three grades: USDA Grade No. 1, USDA Grade No. 2, and "Bad." According to CW2, AppHarvest designated any tomato as "Bad" if it was not commercially saleable. "Bad" tomatoes were thrown away in the Packhouse. CW2 described Grade No. 2 tomatoes as still being "edible" but having obvious visible deformity making them unfit for public display. CW2 said Grade No. 2 tomatoes could be shipped to clients such as restaurants who would use the tomatoes, but not to grocery stores whose customers were unlikely to purchase tomatoes with imperfections.

63.     CW2 recalled AppHarvest had different packaging that identified whether tomatoes in the box were USDA Grade No. 1 or USDA Grade No. 2. Thus, AppHarvest and its customers were able to clearly identify which grade of tomatoes were being sent/received and thus assign the corresponding price to each box of shipped tomatoes. Indeed, CW6 confirmed that AppHarvest was able to track this data in real time. According to CW6, yield and quality were analyzed by AppHarvest's FP&A department primarily by using measurements from the Packhouse, including

---

[5] *See* https://www.ams.usda.gov/grades-standards/tomato-grades-and-standards (last visited June 30, 2022).

the number of boxes shipped per grade, and the weight of the boxes being loaded at the docks. Such data from the Packhouse was input in real time into a shared drive (likely Microsoft Azure or OneDrive), and available for the FP&A department to utilize in the Microsoft Business Intelligence application.

64.    However, throughout the Class Period, Mastronardi was *not obligated* to purchase any crops that fell below USDA Grade No. 1. Indeed, under the Mastronardi Morehead Agreement, Mastronardi is afforded a period of time after receiving products from AppHarvest to inspect the Company's products and determine, in Mastronardi's sole discretion, whether the products satisfy USDA Grade No. 1. If Mastronardi rejects AppHarvest's produce because it fails to satisfy Mastronardi's quality standards, AppHarvest must accept the rejected produce and bear all associated costs. Furthermore, the Mastronardi Morehead Agreement provides that AppHarvest shall accept any products that are rejected by Mastronardi's customers (and bear all costs associated with such rejections) when the customer determines that such products fail to satisfy USDA Grade No. 1 quality standards, and the fault was not caused by Mastronardi.

65.    Therefore, failing to produce tomatoes to Mastronardi that meet USDA Grade No. 1 presents considerable risk to AppHarvest that it will not be able to sell its products at all, or for "little to no value," or that it would alienate or antagonize its sole distributor, who was not required to purchase anything that did not qualify as USDA Grade No. 1, and who AppHarvest relied upon entirely. Indeed, AppHarvest admitted in its quarterly reports filed on Forms 10-Q for the first and second quarters of 2021, and two prospectuses in June 2021, that "[s]ubstantially *all* of our net sales are generated from the sale of tomatoes under an agreement with one customer, Mastronardi."

66.    Thus, Defendants knew it was highly important to satisfy Mastronardi's quality demands. Indeed, prior to and throughout the Class Period, AppHarvest filed at least eighteen (18)

documents with the SEC (including nine documents signed by Defendant Webb, two documents signed by Defendant Lee, and eight documents signed by Defendant Eggleton), stating that the Company was "highly dependent" on its relationship with Mastronardi and that "because Mastronardi acts as an intermediary between us and the retail grocers or foodservice providers, we do not have short-term or long-term commitments or minimum purchase volumes with them to ensure future sales of our products."

67.     Mastronardi also informed AppHarvest about the importance and need for USDA Grade No. 1 tomatoes through an ongoing inspection and audit process. CW6 stated that during the first harvest season, Mastronardi sent trucks to AppHarvest to pick up fruit, and most of the fruit was shipped to a Mastronardi facility in Michigan where it went through a quality assurance inspection.  CW6 confirmed that during times that AppHarvest's product quality was poor, Mastronardi increased its audits of the AppHarvest fruit and during these "weaker" performance periods Mastronardi would inform AppHarvest that it needed to tighten up specifications because Mastronardi was having to reject a lot of fruit.

68.     Furthermore, even though AppHarvest retains the right to theoretically sell products which fail to meet USDA Grade No. 1 (which it was forced to do because of operational failures during the Class Period), AppHarvest is not permitted under the Mastronardi Morehead Agreement to market or sell such products as satisfying USDA Grade No. 1, and thus cannot command USDA Grade No. 1 prices in the market. The failure to meet USDA Grade No. 1 quality results in a significant headwind to pricing, and thus, sales. As Defendant Eggleton (in the presence of Defendants Webb and Lee) explained on the 2021 Q1 Earnings Call, "tomatoes with Grade No. 1 sell[] at a *premium*[.]" Further, at the end of the Class Period in the 2021 Q2 Earnings Call, Defendant Webb admitted that "we get *very little to no value in our #2 tomatoes*."

69.     Accordingly, at all relevant times, Defendants understood that harvesting crops that meet the USDA Grade No. 1 standard was vital to the Company's business and they educated investors to expect the same.

## IV.    Defendants Misleadingly Portray AppHarvest as a Start-Up Manufacturer That is Efficiently Staffing its Production Team to Meet Demand

70.     Even when performed in technology-assisted CEA facilities, agriculture is highly labor-intensive. To ensure the Morehead Facility's tomatoes were efficiently grown and picked to maximize USDA Grade No.1 yield (and therefore generate higher prices and sales), AppHarvest required a labor force that was properly staffed and trained.

71.     AppHarvest was essentially attempting to build this labor force from scratch at the beginning of the Company's first growing season in late 2020. Indeed, at the beginning of 2020 before operations began, AppHarvest only employed twenty people. However, AppHarvest disclosed in its Annual Public Benefit Corporation Report for the year ended December 31, 2020, that the Company's "GOAL" was to staff the Morehead Facility with up to "*500* LIVING WAGE JOBS[.]"

72.     Given the scale at which AppHarvest needed to staff the Morehead Facility, and the time frame in which Defendants decided to simultaneously commence operations and go public, Defendants knew information regarding the Company's staffing would be highly material to investors who were observing whether AppHarvest could execute on its novel CEA business model. Indeed, Defendants were frequently asked about AppHarvest's ability to staff up its operations by analysts and reporters during the countless interviews they gave prior to and during the Class Period.

73.     Consequently, Defendants made frequent statements regarding the progress of the Company's hiring efforts to assuage investors that hiring, and employee retention were being met, and that AppHarvest would, thus, have no problems scaling its business and achieving its forecasts.

74.     For example, AppHarvest announced on March 2, 2021 in a filing with the SEC that as of December 31, 2020, the Company had 224 employees. Furthermore, Defendant Webb touted during a January 19, 2021 interview with the Associated Press that AppHarvest received over 10,000 applications for its open positions at the Morehead Facility and hired 350 employees by late January 2021. On May 17, 2021, AppHarvest announced that during a two week stretch in February it had hired an additional 100 employees for its Morehead Facility. These periodic updates were similar to many others (a small sampling of which is included below) that Defendants disseminated in order to convince investors the Company was staffing the Morehead Facility, because they knew this was an issue that was keenly monitored by investors in evaluating whether AppHarvest would be able to scale its production and be profitable.

| Date | Type | Statement Regarding AppHarvest's Hiring Efforts |
|------|------|-------------------------------------------------|
| 1/11/2021 | SEC Filing - 424B3 | "As of September 30, 2020, AppHarvest had 69 full-time employees, including 34 at its Lexington location and 35 at its Morehead facility…"<br><br>"Headcount increased from 15 employees as of September 30, 2019, to 69 employees as of September 30, 2020" |
| 3/2/2021 | SEC Filing - S-1/A | "Headcount increased from 15 employees as of December 31, 2019, to 224 employees as of December 31, 2020." |
| 3/15/2021 | Interview of Webb by Lupton Capital | "We've had nearly eight or nine thousand people apply to work at our company. We have nearly 400 people on the team right now." |
| 3/23/2021 | Article published on CBS News | "AppHarvest has created more than 500 jobs at their one Morehead facility." |
| 4/9/2021 | Interview of Webb by Cheddar News | "Here at AppHarvest, we have about 550 employees…" |
| 4/21/2021 | News Release on AppHarvest website | "As of March 31, 2021, AppHarvest has created 500 jobs…" |

| | | |
|---|---|---|
| 5/17/2021 | Investor Presentation in connection with Q1 Results | Touting Company's "500+ total employees" |
| 5/17/2021 | AppHarvest's Chief Sustainability Officer on the 2021 Q1 Earnings Call | "Our team has now grown to 500 employees at the end of the first quarter." |
| 6/30/2021 | Interview of Webb by Bloomberg | Touting Company's "550 people working now" |

75.     All of these updates contributed to the perception that Defendants were diligently building out a workforce to meet AppHarvest's rapidly growing production needs. In reality, Defendants knew the Company's productivity was plagued by worker attrition and ineffective (and almost nonexistent) training.

**V.      Prior to and Throughout the Class Period, AppHarvest Suffered Exorbitant Amounts of Wasted and Low-Quality Produce Caused by the Company's Failure to Train Employees and a Bonus Structure That Incentivized Poor Workmanship**

76.     At the same time AppHarvest began publicly trading, and when the Morehead Facility's first 30 acres were being harvested, the Company was already experiencing severe challenges in producing USDA Grade No. 1 tomatoes due to known problems with staffing retention and work execution. Former AppHarvest employees confirmed that the Company suffered productivity challenges from the very first harvest in January 2021 through the end of the Class Period.

### *AppHarvest's Waste, Damage, and Poor Quality*

77.     CW1 confirmed that work execution problems at the Morehead Facility's Greenhouse existed—and started to affect the Company's production—before harvesting even began (but certainly by January 2021) and continued throughout CW1's tenure. CW1 described

the frequency of the problems that CW1 observed as occurring "pretty consistently" throughout CW1's tenure.

78.     According to CW1, AppHarvest workers damaged a "shocking amount" of tomatoes in the Morehead Facility. In fact, CW1 stated that throughout CW1's tenure at AppHarvest, and on a consistent basis, anywhere from *5% to 10%* of the tomatoes on a given vine ended up being damaged by workers—which was a "pretty accurate" estimate. Other personnel believed the damage was even worse. Based on CW5's daily observations of the Greenhouse, in addition to conversations with Leo Ruiz (Production Manager), John Minnig (Head Grower) and Anthony Vicars (Vice President of Greenhouse Operations), CW5 estimated that up to *50%* of AppHarvest's crop was wasted in the first growing season (October 2020 through August 2021) due to disease, insects and damage (nicks, cuts, punctures, and improper harvesting) caused by employees in both the Greenhouse and Packhouse. CW5 stated wasted tomatoes were "for the most part" a consistent problem throughout October 2020 through June 2021, but got worse in the first two quarters of 2021.

79.     CW1 recalled that the crops were destroyed in multiple ways. For example, a main reason for waste that CW1 saw during CW1's entire tenure was when any tomato touched the ground. Many times, CW1 confirmed, this was due to overripe tomatoes falling to the ground— indicating AppHarvest's Greenhouse teams could not keep up with the pace of the harvest. CW1 also recounted that Greenhouse employees often pulled too hard on the plants, thereby damaging or dropping the tomatoes.

80.     Furthermore, according to CW1, throughout the Greenhouse, tarps were laid on the floor between the rows of plants which accumulated large quantities of decomposing leaves and "a lot of tomatoes on the ground." CW1 stated that decomposing organic material fostered large

numbers of gnats which rendered the floor of the Morehead Facility unsanitary. According to CW1, the gnats were so bothersome to employees that they would "eat you alive." Further, CW1 said that the Greenhouse's high temperature (upwards of ninety degrees Fahrenheit for weeks at a time) led to materials on the ground between the rows spoiling quickly. Thus, according to CW1, it was a Company rule that, when a tomato touched the ground (for instance, because employees mishandled the plant), the produce could not be washed or saved—it was simply no longer saleable. CW1 said this was so even if the tomato was not ripe and was still attached to the plant.

81.      CW2 confirmed that tomatoes that had reached the Packhouse from the Greenhouse "constantly" had holes, cuts, scars, spots, were leaking fluid or flesh, or had other imperfections. CW2 confirmed that even for those tomatoes that were not immediately damaged and discarded in the Greenhouse, "*half*" inspected in the Packhouse were not USDA Grade No. 1, but rather were either Grade No. 2 or "Bad." According to CW2, "Bad" tomatoes included tomatoes with cuts, holes, bacteria, and mold. CW2 said if there was mold on a single tomato in a box that had been inspected, it meant the entire box was considered "Bad" and was required to be discarded.

82.      CW4 explained that there were numerous causes of wasted and poor-quality tomatoes that consistently occurred throughout the harvesting season (beginning in January 2021 and ending just prior to the "summer refresh" in Q3 2021). For instance, Crop Care Specialists tasked with de-leafing vines would move quickly and nick tomatoes with their knife. CW4 also recalled that throughout the growing season employees tasked with positioning truss supports would do so incorrectly, and therefore small plastic elbows on the supports would poke holes in the tomatoes. Further, CW4 stated that tomatoes were damaged during the leaning and lowering of crops (leaning was done to allow the plants to grow upwards but when it was done too fast, plants slammed together and trusses would break).

28

83.    CW4 recalled tomatoes that had imperfections, were moldy, or fell on the floor. CW4 confirmed that any tomato that contacted the floor automatically needed to be discarded. CW4 stated that tomatoes were wasted "daily" during the harvesting season due to contact with the floor of the Greenhouse. Indeed, CW4 took the photographs below at the Morehead Facility in approximately May or June of 2021 and stated that the pictures were representative of how the entire Greenhouse looked throughout the duration of the first de-leafing and harvesting season (the de-leafing season was coextensive with the harvesting season but started earlier in about October 2020), except for when news media or investors visited the Greenhouse, when it was deemed necessary to "hide the waste."

 

84.    As part of CW5's responsibilities in the Maintenance Department, CW5 prepared and cleaned the Greenhouse of debris immediately before investor and visitor tours, which were generally led by Defendant Webb. CW5 stated that requests for clean-ups were initiated by Webb's

team, if not Defendant Webb himself, and CW5's team was directed to perform them at morning stand-up meetings attended by CW5, the Packhouse Manager, the General Manager, the Head Grower, the Environmental, Health, and Safety Coordinator, the Compliance Manager, the Labor Manager, the Logistics Manager, and others. According to CW5, either Webb, or his team, would inform the Maintenance Department when tours were coming through so that they could create "better eye appeal" for the facility, including ensuring there was no rotting fruit on the ground.

85.     CW4 said that the Greenhouse did not have any personnel assigned to inspect quality until May 2021. In May of 2021, CW4 said that approximately two to four Team Leads in the western half of the Greenhouse where CW4 worked were assigned to stand at the end of rows and inspect boxes of tomatoes that were placed on rolling carts after they were harvested. The Greenhouse quality inspectors carried an electronic tablet and recorded their results into a "live" Excel spreadsheet so that AppHarvest could "map" quality performance within the Greenhouse.

86.     CW4 stated that due to confusion over quality standards in the Greenhouse throughout the first harvest season, Greenhouse personnel were directed to just pick the tomatoes and it would be up to the Packhouse to determine tomato grades.  To that end, although the quality standards "changed all the time," the harvesters and Greenhouse quality inspectors, as directed, only evaluated the tomatoes as "good or bad" and "let the packhouse figure out" the grades.

87.     AppHarvest's quality and productivity issues during the Company's first growing season was reflected in its financial results. For example, CW6 stated that there were "global standards" for labor productivity that AppHarvest targeted, which included measuring the percentages of tomatoes that were USDA Grade No. 1 and USDA Grade No. 2. CW6 believed that the "global standards" were around 84% (of USDA Grade No. 1) for Tomatoes on the Vine and 86% (of USDA Grade No. 1) for Beefsteak tomatoes. However, CW6 clarified that even if those

figures were not exactly precise, CW6 confirmed that "we" (speaking for AppHarvest's senior leadership) "knew we were a long way off" from achieving the standards. CW6 recalled that in at least one instance during AppHarvest's "toughest times" of the first growing season, the Company was approximately 50% off the "global standard" for quality.

88.     CW6 also noted there were other productivity standards in addition to quality concerning how productive each Greenhouse worker should be with respect to their respective job. CW6 stated that in the "toughest times" AppHarvest was well below 50% in relation to the standards.

### *AppHarvest's Failure to Train Employees*

89.     CW1 attributed the waste CW1 observed, in considerable part, to AppHarvest's failure to train its employees. According to CW1, the orientation process was "a joke" and "the weirdest" orientation process CW1 had ever participated in. CW1 said orientation only entailed watching a movie concerning, at most, fifteen minutes dedicated to the Greenhouse, and the rest devoted to information concerning AppHarvest as a company, such as its positions on climate change. CW1 stated nothing in the orientation process taught employees how to actually do the jobs they would be performing.

90.     CW1 recalled that Crop Care Specialists were not given any instruction regarding how to identify a USDA Grade No. 1 tomato. Rather, with respect to the topic of "quality," the sole instruction Crop Care Specialists were given was that they should pick tomatoes that they considered to be "bright orange with a little bit of green" which would enable the fruit to ripen further. CW1 stated that after the initial orientation, Crop Care Specialists were required to watch very brief video training materials that lasted approximately fifteen minutes per task that a Crop Care Specialist could perform (*e.g.*, picking, lowering, de-leafing, etc.). Cumulatively, these video

segments of the various tasks lasted two hours at most. Other than orientation and these cursory video segments, CW1 stated Crop Care Specialists were not given any further formal training.

91.     CW4 confirmed that inadequate training "absolutely" caused Greenhouse operational execution to suffer throughout the first growing and harvesting seasons. According to CW4, during CW4's tenure new Greenhouse employees, including Team and Group Leads, did not receive any training during orientation for the job that they were supposed to perform. According to CW4, over a single week in June or July of 2021, Group Leads were given a series of instructions on how to perform specific Crop Care Specialist tasks. However, before June/July 2021, CW4 stated that Group Leads and Crop Care Specialists alike were expected to figure out their assigned tasks simply by "doing it," and not from formal training.

92.     In particular, CW4 confirmed that quality was impacted throughout the first harvest season because of the poor training and disorganization. CW4 stated that with respect to tomato quality, Group Leads and Crop Care Specialists were given inconsistent and fluctuating instructions regarding quality standards during the Company's first harvest season, which sometimes changed on an hourly basis. Quality standards were relayed by CW4's Assistant Grower (John Green) and Harvest Lead (Ron Adkins), including during daily morning Team meetings. CW4 explained that although Adkins communicated the changes in the quality standards, he told Greenhouse workers, "just send it," even when the quality standards had changed.

93.     CW2 said training in the Packhouse, both as a Packer and as a Quality Control Specialist, was essentially "trial by fire." CW2 said orientation consisted of filling out paperwork and being shown presentations of AppHarvest's business strategy. While the entire presentation lasted only six to seven hours, the amount of time spent on quality was only about twenty-five or

thirty minutes. Furthermore, throughout CW2's tenure, the quality standards "really changed on the fly," with some days' tomatoes containing small, healed cuts being deemed acceptable as USDA Grade No. 1 but on other days not acceptable.  CW2 reiterated the quality standards changed "day to day" and "week to week" during CW2's tenure.  The Company's changing standards were usually conveyed to the Quality Control Specialists by Howard, who received them from the Assistant Packhouse Manager or Calderon.

94.     CW2 described the information regarding quality standards that CW2 received at orientation and on the job as "just a little briefing" and "not real training." CW2 recounted that this "100%" led to regular disagreement among the quality control staff about what qualified as USDA Grade No. 1—in some cases where half of the team believed tomatoes were of sufficient quality and the other half of the team disagreed. In such situations, CW2 stated it was necessary to go to Howard, who would go to Calderon, to get up-to-date information on the quality standards. But a Quality Control Specialist could be operating under one set of guidance regarding quality standards, and then the next hour be told it no longer was correct, which could in turn change again the following day.

95.     Thus, the quality of tomatoes shipped to Mastronardi or directly to end customers throughout the Class Period wildly fluctuated. Not only did this result in lower net sales if the tomatoes were USDA Grade No. 2 and therefore sold for "little to no value," or "Bad" and therefore discarded, but also resulted in higher distribution, packaging, and shipping expenses from rejections. As Defendants disclosed at the end of Class Period in an investor slide deck, AppHarvest suffered rejections during the Class Period, leading to "Distribution costs much higher than expected; Additional *re*-pack and *re*-sort costs resulting from poor quality mix (fewer USDA #1 tomatoes than expected)[.]"

96.     CW6 confirmed that Mastronardi rejected AppHarvest fruit during the Class Period. According to CW6, AppHarvest's target was whatever the global standards were for rejected tomatoes, which CW6 believed was 6% or 7%. However, during AppHarvest's "toughest times" for productivity, AppHarvest was rejecting "many times" more than the Company's goal, with upwards of 30% to 35% of AppHarvest's fruit being rejected. CW6 stated that tomatoes rejected by Mastronardi were primarily donated or used as compost.

97.     CW6 stated that rejected fruits impacted the Company's financial forecast because the forecast was based in part on the anticipated percentages of USDA Grade No. 1 and USDA Grade No. 2 tomatoes, but if those percentages were not being achieved in a given week, then it would be necessary to revise the forecast in an ensuing week. Thus, the FP&A department would review reported rejections to try to determine quality trends. The impact on the forecast "depended on the severity" of the trend. CW6 confirmed that during the "toughest" periods (*i.e.*, times in late Q1 2021 through the summer refresh when more fruits were being rejected for quality) it was definitely necessary to reforecast.

### *AppHarvest's "Piece Rate" Bonus Resulted in Lower Yield and Quality*

98.     CW1 further confirmed productivity failures were caused by AppHarvest's human resource policies such as pay and scheduling, and that insufficient and unreliable staffing led to reduced production. For example, CW1 stated the Company offered Crop Care Specialists a "piece rate" bonus which entitled them to additional pay beyond their base pay rate for meeting productivity goals (*e.g.*, number of rows worked on an assigned task). CW1 consistently observed throughout CW1's tenure, the "piece rate" structure instituted by AppHarvest caused employees to work too fast, which resulted in damage to the tomato plants.

99.     CW1 gave the example of when employees were tasked with lowering the plants to the ground and incentivized by the number of rows of tomato plants they could work through. Lowering was a method to improve the way the plants grew, but employees often worked fast and careless to qualify for "piece rate" compensation incentives. Thus, CW1 observed throughout CW1's tenure, Crop Care Specialists who were "lowering the plants" did not adhere to the proper procedures but "just threw over" the plants which caused tomatoes to fall, hit the ground, and become unsaleable.

100.    Likewise, CW4 confirmed that AppHarvest's piece-rate incentive program "absolutely" resulted in Crop Care Specialists working too quickly and thereby damaging plants. For example, CW4 recalled that "piece rate" bonuses for Crop Care Specialists tasked with de-leafing plants caused workers to move very quickly from plant-to-plant with their knife and nicking tomatoes in the process resulting in waste.

101.    Additionally, Greenhouse personnel assigned to harvest duty spent less time checking tomatoes for quality, because faster harvesting meant potentially higher compensation because of the "piece rate" bonuses. CW4 stated that this resulted in damaged and poor-quality tomatoes being sent to the packhouse. Common defects included tomatoes with scarring at the top, tomatoes that were too red (CW4 noted that it was the coloring of the tomatoes that was the quality standard that changed most often), incisions on the sides, and irregular shapes. CW4 said that such imperfections and poor quality were consistent throughout the first harvest season.

102.    CW2 stated the "piece rate" incentive system also resulted in diminished quality. According to CW2, the piece-rate for pickers in the Greenhouse was based on the quantity of the tomatoes that were picked, regardless of quality. Thus, the piece rate bonus incentivized pickers to harvest as many tomatoes as they could, and quality suffered as a result.

**VI.     AppHarvest's Productivity Challenges Throughout the Class Period Were Exacerbated by Attrition and Churn Caused by the Company's Own Policies, as Well as Personnel Absences Due to the COVID-19 Pandemic**

### *AppHarvest's Dysfunctional Human Resource Policies Resulted in Lost Productivity, Attrition, and Churn*

103.    Throughout the Class Period, AppHarvest's productivity was abysmal for numerous reasons including lack of training, duplication of work because of poor performance the first time, conflicting directions over work assignments, and an inability to retain personnel. Confidential witnesses confirmed that AppHarvest's own human resource policies compounded these difficulties.

104.    CW1 recalled that to mitigate lost productivity, AppHarvest increased the Company's hourly requirements which in turn caused massive worker dissatisfaction and according to CW1, a "shocking" amount of turnover. CW1 stated that when CW1 was hired, employees were told they would get nine paid holidays, and that their work week would be 6:00 a.m. to 3:00 p.m. for five days a week. CW1 recalled that before the first harvest, AppHarvest informed workers that they would need to work holidays and that regular business hours would be extended to 4:00 p.m. Furthermore, CW1 said "nine times out of ten" AppHarvest would require workers to work Saturdays—an instruction that was not relayed to employees until late in the week, and "several times" even "after lunch" on Friday.

105.    CW1 stated that AppHarvest changed its hours requirements to demand more hours out of employees because of employee turnover and the Company's inability to retain sufficient staff, requiring the remaining workers to "pick up the slack" for workers who had left. The change in policy, however, caused more turnover. CW1 observed personnel "began jumping ship" as soon as AppHarvest changed its hours policy, and that prior to the first harvest "at least one person a week" from CW1's team left the Company. During the first harvest, CW1 stated that one person

from CW1's team left the Company approximately every one to two weeks for the remainder of CW1's tenure. CW1 recalled personnel were not replaced, and that although CW1's team started with twenty to thirty personnel, that number fell to fourteen or fifteen by the end of CW1's tenure. Throughout the entire Morehead Facility Greenhouse, CW1 estimated that two to three employees left the Company every week throughout CW1's tenure.

106.     CW2 confirmed that when this witness was hired, Packhouse employees were also told they would be working five days a week with Saturday hours "pitched as an occasional thing." However, after CW2 started, employees were required to work virtually every Saturday due to staffing shortages. CW2 said AppHarvest often required employees to work upwards of ten hours a day, six days a week, and that if they only had to work eight-hour shifts, they felt "lucky."

107.     CW4 stated that turnover was significant throughout CW4's tenure at AppHarvest, with the west side of the Greenhouse losing at least 10 personnel every week. Reasons for the turnover included the working conditions, especially the heat.  Some workers left because they got sick from mold exposure and the dust and particles in the air.  Some workers left because of frustration with the changing standards, including policy and attendance changes. CW4 stated that the turnover resulted in less trained staff and thereby lower yields because there were fewer Crop Care Specialists to do the work like leafing. This, in turn resulted in plants not being harvested fast enough, causing the tomatoes to get moldy and infected.

108.     CW5 confirmed that employee turnover and churn had been consistently high throughout October 2020 and June 2021. CW5 stated that because of this, it was sometimes the case that AppHarvest had to bring in contract labor to help during times of poor attendance.  CW5 believed there were concerns and frustrations about the turnover and attrition because CW5 recalled that Greenhouse personnel were concerned about having adequate labor to meet

production requirements.  Employee churn, attrition and attendance were discussed at the morning stand-up meetings CW5 attended, including how many employees had called in to say they would be out as well as how many workers had not reported to work at all, along with how many new staff had been brought on.

109.    Thus, AppHarvest was not able—in the midst of the Company's heavily publicized first harvest—to maintain a sufficient and dependable labor force at the Morehead Facility. That fact is further corroborated by Defendants' own public disclosures. For example, AppHarvest announced that the Company's "GOAL" was to operate the Morehead Facility with five hundred people. In AppHarvest's first quarter 2021 earnings statements and during the 2021 Q1 Earnings Call, Defendants Webb and Lee bragged that AppHarvest had reached that threshold. Yet, one quarter later, during the 2021 Q2 Earnings Call, Defendants admitted numerous times that the Company's workforce had fallen by *20%* to "400 people."

110.    CW2 confirmed that the Company had suffered incredibly high attrition, with upwards of "50% to 60%" of Greenhouse personnel leaving after their first month. CW2 stated that of the 40 to 50 personnel who were hired at the same time as CW2, only one individual is still employed by AppHarvest.

111.    CW6 explained that AppHarvest's attrition and retention metrics in the first half of 2021 were far worse than expected because AppHarvest was clearly falling short week over week, which was discussed at meetings with Defendants Lee and Eggleton. *See* Statement of Facts, § VII.

### *The COVID-19 Pandemic Amplifies Productivity Losses*

112.    The COVID-19 pandemic also affected the number of personnel working. According to CW1, although COVID-19-related absences began to taper off somewhat towards

the end of CW1's tenure (July 2021), a lot of workers did not come to work because of COVID-19 during the Class Period. CW1 stated that from CW1's team alone, "a couple" of employees would call out sick each week because of COVID-19.

113.    According to CW1, when an employee called out of work due to COVID-19, they were required to quarantine for two weeks and were not replaced, so teams would be short-staffed by the amount of personnel that were out due to COVID-19. Furthermore, CW1 stated the Company had no way to verify if an absent worker had actually contracted COVID-19, so theoretically any employee could take advantage of the pandemic if they wanted to take a two-week leave of absence. CW1 said as a result of the employee absences, COVID-19 "definitely" negatively affected total employee hours worked, and production.

## VII.    The Individual Defendants Knew About the Company's Productivity and Labor Challenges at the Time They Made Contradictory False Statements

114.    Defendants knew about the operational problems AppHarvest was experiencing during the Class Period through visits to the Morehead Facility and access to internal company reports but hid these issues from investors.

### *Webb's Physical Observations*

115.    Beginning in a Form 8-K filed by AppHarvest on February 25, 2021, and in every subsequent filing with the SEC, the Company identified the Morehead Facility as the "Address of Principal Executive Offices." CW1 stated Defendant Webb gave tours at the Greenhouse one to two times every month throughout CW1's tenure for VIPs such as Martha Stewart (a member of the Board of Directors).

116.    Defendant Webb admittedly spent a significant amount of time at the Morehead Facility and was acquainted with workers there. By his own admission during an interview by Jonah Lupton of Lupton Capital on March 15, 2021, Defendant Webb was at the facility "every

morning" at 5:00 am during the Class Period to greet the employees starting their shifts. Additionally, in an interview by Renita Sherbill of Seeking Alpha on June 3, 2021, Defendant Webb told Sherbill that due to the COVID-19 pandemic, Defendant Webb had fewer responsibilities to travel away from the Morehead Facility on behalf of AppHarvest. Accordingly, Defendant Webb admitted to Sherbill that this additional free time allowed him to "do what [he] loves the most, which is sleep on the farms" (there was only one singular "farm"—the Morehead Facility) and "go[] to our operations." Accordingly, Defendant Webb would have personally observed the significant waste of tomatoes and lack of sufficient staffing on a daily basis.

117.    Indeed, Defendant Webb made it a priority to know what was happening at the Morehead Facility and was so intimately involved with the Morehead Facility's operations that he regularly took media appearances from *within the Greenhouse*. In a June 21, 2021 appearance on the Authentic Avenue Podcast, Defendant Webb said he regularly took media appearance from within the Greenhouse because he was "trying to show [investors] we're authentic. We're genuine. We, you know, we want to show the consumer, here's the way we're operating."[6]

---

[6] September 29, 2020, TD Ameritrade Network, The Watch List; September 29, 2020, Yahoo Finance; September 29, 2020, CNBC, Squawk Box; September 30, 2020, Cheddar News; January 19, 2021, Yahoo Finance; January 20, 2021, Cheddar News;  February 1, 2021, NASDAQ; February 1, 2021, Fox Business, The Claman Countdown; February 1, 2021, Cheddar News; February 1, 2021, Yahoo Finance; February 2, 2021 CNBC, Squawk Box; March 1, 2021, YouTube, Bobby Clark, "Jonathan Webb – Startup to NASDAQ in 3 years"; March 18, 2021, CNBC, Mad Money with Jim Cramer; March 23, 2021, YouTube, CBS Mornings, "Entrepreneur hopes to make Appalachia hub for indoor farming"; May 18, 2021, Pattrn; August 8, 2021, CNN.



*__AppHarvest's Internal Planning and Reporting Structure__*

118.   In addition to Webb's first-hand observations of the Company's productivity challenges, Defendants knew of AppHarvest's disastrous first growing season because they tracked employees' productivity in real time and knew of the poor results.

119.   Indeed, everyone at AppHarvest knew of the poor results because the Company made that data publicly viewable within the Morehead Facility. According to CW1 and CW4, after morning team meetings with the team's respective Assistant Grower, employees would grab their assigned infrared scanner and work in the rows of tomatoes in the Greenhouse. CW4 confirmed that the scanners were also referred to as "clickers" and were manufactured by the indoor agriculture technology firm Priva.

120.   According to CW 1, when employees finished working on a row (*e.g.*, harvesting, de-leafing, etc.), they scanned a marking at the end of a row to indicate it had been completed.

CW4 echoed the same stating that Greenhouse employees clicked their Priva clickers when they began a task at the location they were assigned to work, and then clicked again when they completed the task. CWs 1 and 4 explained the scanned information was instantly uploaded to the Company's digital file system, which was then used to track the productivity of each worker. CW1 and CW4 stated that AppHarvest encouraged competition among Greenhouse personnel by displaying scanned information on a so-called "leader board" or "Priva Board" located in the "canteen area" of the Greenhouse, which was updated daily and viewable by all employees. According to CW4, the Priva Board tracked "everyone's name."

121.    AppHarvest's real-time production information was then tracked against forecasts. CW6 stated that the FP&A department created standardized times that each Greenhouse task (*e.g.*, harvesting, lowering plants, etc.) were supposed to take.  For example, CW6 stated that forecasting productivity for a certain task entailed determining the amount of work to be done by the number of personnel available to perform the work, which resulted in the estimated number of "people hours" required to do the work. CW6 confirmed that the Company's forecasted headcount numbers took into account factors such as employee churn, and thus, the forecasts (and the effort to meet them) affected decisions such as the number of employees that needed to be hired. CW6 recalled that workers' actual performance was compared to such forecasts.

122.    CW6 stated that worker productivity was identified as a challenge beginning in late 2020, and that AppHarvest experienced its "toughest times" consistently from late in the first quarter of 2021, including March 2021, through the second quarter of 2021 and the summer clean-up. CW6 stated that at first it was extrapolated that the poor labor productivity reflected that the workers were new to working in the Greenhouse. However, CW6 explained that after productivity

issues lingered the Company's internal consensus was that the productivity challenges reflected not having the right people in place.

123.    All such information was known by the Individual Defendants at the time. CW6 explained that FP&A's role was to "corral information and disseminate it" to Defendants Lee and Eggleton for feedback, including through meetings. For instance, CW6 explained that CW6 participated in a call that included Defendants Lee and Eggleton approximately once a week to primarily discuss the state of the Company's financial results (actuals) compared to the current baseline forecast, as well as upside and downside scenarios. During the "toughest times," it was discussed at these meetings "ways to close the gap" between AppHarvest's underperformance compared to forecasts, and the expected time needed for the closing the gap depending on the various scenarios.

124.    During these forecast meetings, Lee, Eggleton, CW6, and other participants discussed a variety of metrics including yield, quality, rejections from Mastronardi, attrition and employee absences, and productivity metrics for the various Greenhouse workers' particular functions. CW6 stated that significant attention was paid to yield and quality metrics during these forecast meetings because AppHarvest was "very revenue driven," and yield and quality were the two primary inputs to forecasting and understanding the Company's revenue. CW6 confirmed that the meetings "got quite operational" with respect to metrics such as yield and quality, and included reviews of the forecasts discussed in the prior meetings and reasons for changes to those forecasts.

125.    CW6 stated that the Company's Annual Operating Plan was essentially a major topic of just about "every other forecast meeting" with respect to where current performance positioned AppHarvest in relation to achieving the Annual Operating Plan. AppHarvest's Annual Operating Plan was developed at the very beginning of a year and set targets for the year. CW6

said that discussions concerning the Annual Operating Plan were held at the same time as discussions concerning the current forecasts because "all of us were so familiar with the Annual Operating Plan and most recent forecast" that there was no need to formalize matters with separate meetings.

126.    CW6 also recalled that throughout the "toughest times" of labor challenges in the first harvesting season there were leadership meetings twice a week (typically mid-week and end-of-week) to discuss labor productivity and "keep an eye on it." These leadership meetings were attended by FP&A team members including CW6, Defendants Lee and Eggleton, Marcella Butler during her tenure as COO, and Julie Nelson after her hiring.

127.    According to CW6, inadequate training, turnover, poor work ethic and inconsistent hiring standards were "repeatedly cited" as the "root cause" of the Company's productivity challenges at both the leadership meetings, and at CW6's weekly forecast meetings with Lee and Eggleton, during the Company's "toughest times."

128.    Additionally, as CW6 reported to Defendant Eggleton, they worked frequently together in the normal course of their job duties. CW6 gave the example that at the ends of months, as the accounting books were closed, the end-of-month account results were "pulled into" the FP&A models by which adjustments were made to the forecasts from the prior month (this was in Excel).  To that end, CW6 and Eggleton interacted with each for "many hours" on a daily basis as they discussed near-, medium-, and long-term financial matters relating to the forecasts.  CW6 stated that Defendant Eggleton visited CW6's desk as frequently as every two hours with various items to address, such as pulling numbers or posing questions.

129.    Thus, during CW6's employment, CW6 explained that among the Company's senior leadership—including Defendants Lee and Eggleton—information was not segregated in a

manner where it was known to some but not others. Rather, "everyone knew what everyone else knew" regarding fundamental financial data.

130.    CW3 also provided detail concerning AppHarvest's internal planning and reporting mechanisms. As stated above, the Mastronardi Morehead Agreement required AppHarvest to work in consultation with Mastronardi to prepare a detailed forecast before the growing season, including forecasts of "sales" and "delivery" date. CW3 confirmed that the Company did, in fact, prepare forecasts for the first growing season at the Morehead Facility. CW3 stated that CW3 was tasked with creating a "routing" for Beefsteak tomatoes in AppHarvest's ERP system, Microsoft Dynamics. A routing involves identifying and mapping out all the steps, processes, and unit costs that are necessary to create a unit of production (here Beefsteak tomatoes).[7] CW3 confirmed that in connection with this assignment, Defendant Eggleton provided CW3 spreadsheets including detailed profit and loss projection documents which Defendant Eggleton had approved. CW3 confirmed that AppHarvest's projections provided by Defendant Eggleton included many details such as forecasted yield, sales (including a breakdown by USDA Grade No. 1 versus USDA Grade No. 2 tomatoes), costs, returns, market price, expected product returns from Mastronardi and expected damaged tomatoes.

131.    AppHarvest, itself, admits that these same categories of information are tracked and the actual results are compared against the forecasts described by CW3. For example, in an advertisement posted by AppHarvest soliciting applications for a "Senior Cost Accountant" (the same position CW3 held, and therefore a position that worked directly with Defendant Eggleton), the Company describes various internal reporting processes including "*daily*, weekly, and monthly greenhouse production" and cost reviews and numerous reports that were provided to

---

[7] *See* Martin Murray, "Production Routing in Manufacturing" available at:
https://www.thebalancesmb.com/production-routing-2221386 (last visited June 30, 2022).

"management," including reports of "emerging issues" related to "cost performance" (something that Defendants admitted in their Q2 Form 10-Q had been disrupted by operational problems for the entire "six months" ended June 30, 2021):[8]

**What You'll Do**

- Setting standard costs and support in creation/maintenance of new Item No., BOM(s), & Routing(s) in ERP system.
- Review the ***daily, weekly, and monthly greenhouse production and record cost accounting transactions***.
- Review ***monthly Purchase Variances, revision of standard costs, or inventory revaluation entries***
- Review COGS actual vs. standard and ***provide margin analysis to management***
- Investigate cycle counts & review consumption entries to identify incorrect posts and ***provide management with a correcting entry***
- Maintain and report COGS functions including inventory transactions, unsupported inventory, and gross margin analysis
- ***Prepare reporting for senior management on cost performance vs. budget, and highlight and investigate emerging issues***
- Develop KPI for the Greenhouse and Packhouse Operations
- Assist with analysis of capital expenditure requests and calculations of ROI for capital spending
- Manage fixed asset accounting including detailed ledgers, roll forwards, depreciation/amortization schedules and asset tagging
- ***Work with management to develop strong inventory control*** that meets SOX Compliance, and assist with setting up appropriate safety stock levels and leverage ERP for managing/ordering inventory
- Monitor inventory activity and processes to ensure they are consistently applied throughout operations
- Participate in ***month end close activities*** (journal entries, reconciliations, review/analysis of inventory & COGS) as directed and maintaining integrity of ***monthly inventory reports***
- Other ad hoc greenhouse production related analysis as required
- Participation in physical inventory counts and asset tagging may be required

---

[8] *See* https://www.linkedin.com/jobs/view/senior-cost-accountant-at-appharvest-2895522935/ (last visited June 30, 2022).

*Defendants' Admissions*

132.    Defendants vaguely alluded during the 2021 Q1 Earnings Call that AppHarvest was facing operational headwinds due to insufficient or non-existent "training" with respect to the actual growing and harvesting process. Indeed, as Defendants would be forced to admit just three months later, and consistent with CW accounts, AppHarvest lacked any kind of actual training program and was unable to train the large number of individuals being hired to scale production, particularly in light of the significant turnover.

133.    Defendant Lee stated on the 2021 Q1 Earnings Call that "***With momentum from season one***, we'll take July and August during our summer refresh and prepare for Morehead 2.0, ***the operation of which will benefit from new training that we will anticipate will support higher productivity in Q4***. Summer refresh will be an annual activity for us, where we will not produce for about 8 weeks in Q3 as we prepare for the next season."

134.    Similarly, Defendant Eggleton stated on the 2021 Q1 Earnings Call that "[g]ross loss was $4.5 million, which reflects the phased launch of commercial operations and sales at our Morehead facility and the demands required of training our labor force of our newly started operations. We expect gross margin to ***improve over the coming quarters as we seek to increase our utilization and yield, leading to greater labor productivity*** and overhead leverage over a larger number of pounds sold."

135.    Although Defendants Lee and Eggleton made these vague and highly generic statements that are reflective of their state of mind, Defendants did not disclose any of the underlying issues, such as the significant waste and understaffing at the Morehead Facility or the resulting effects on the Company's operations, product quality, sales, revenue, and costs. Indeed, Defendant Lee's description of "Morehead 2.0" was ostensibly positive and upbeat—as though

the "new training" would be accretive to AppHarvest's purportedly existing "momentum," and provide incremental "higher productivity" rather than being, as was actually true, necessary to essentially *re-start* after a disastrous first growing season. CW6 confirmed that Defendants' references to "2.0" meant "a *reset* of operations" and organizational structure, leadership, and "a big push" to reset and improve hiring standards and employee training.

### ***Defendants' Class Period Remedial Actions***

136.    Defendants later admitted, in the corrective disclosures at the end of the Class Period, that AppHarvest had begun taking undisclosed remedial actions months earlier to address the Company's productivity issues, yet they did not disclose the truth to investors at that time. These actions evidence Defendants' knowledge of the Company's underlying productivity issues at the time they made their false and misleading statements. For example, on August 11, 2021, during the Company's 2021 Q2 Earnings Call, Defendant Lee stated, in pertinent part:

> [T]he speed bumps associated with our initial harvest are fixable, and ***we've already deployed solutions against these problems in advance of our next harvest***. For example, ***we overhauled our pack house*** to minimize bottlenecks while increasing quality checks, which helps us deliver our targeted volume of USDA grade #1 tomatoes. We're ***also implementing changes to our piece rate or bonus system*** to drive improvements in our operational productivity and ability to meet surges in demand for plant care. And lastly, ***we changed operational leadership*** and the chain of command structure within Morehead and all our future farms going forward. As of late July, I am now directly accountable for the performance inside our high-tech farms.

137.    Defendant Lee explicitly linked changes in "operational leadership" to productivity issues the Company experienced in its first tomato harvest season. For example, in response to an analyst from Stephens, Inc. inquiring what "operational fine-tuning you're doing as you figure out how to get the optimal results and mix with your tomato crops[,]" Defendant Lee emphasized AppHarvest's "chain of command" changes:

And then I got to tell you that the management focus and simplification, having a clear chain of command, I am accountable to Jonathan and that we now have experienced operators running Morehead and with Julie helping optimize across our future network. I think that's really important. Having that absolute focus on daily delivery of results is the last piece that you'll see on that slide.

138.    Similarly, when Defendant Webb was asked by a Cowen analyst during the 2021 Q2 Earnings Call about "higher distribution fees" and "the impact of mix in Q2," Webb stated that AppHarvest had "replaced management" to address the issues.

139.    However, Defendant Lee also misleadingly suggested during the 2021 Q2 Earnings Call that these "operational leadership" changes, including the operational restructuring at the managerial level had occurred only in the "past several weeks" preceding August 11, 2021, stating:

> "[O]ne driver of the value we expect to deliver and one we've already completed today is to move forward with a smaller, more nimble corporate center. As part of this initiative, *in the past several weeks, we notified employees of restructuring action that eliminated a C-level position, reduced head counts and streamlined the structure of our corporate office*…Our restructuring has the intended effect of reducing our cost structure, *but it also represents a shift of resources toward our best opportunities in operations* and tech. We believe these businesses will benefit from a deeper level of investment *and focus* when they're supported by a smaller corporate office."

140.    In reality, the operational issues (which Defendants did not disclose to investors), and the purported remedial steps they were implementing, started and were known by Defendants months earlier and continued throughout the Class Period. For example, the only "C-level" position AppHarvest ever eliminated was the Chief Operating Officer position held by Marcella Butler.[9] Defendants disclosed on April 14, 2021—without explaining the circumstances to investors—that the Board of Directors relieved Ms. Butler of her position as Chief Operating Officer two days earlier, and only four months after she had been promoted into that role, and four

---

[9] "C-level" is widely used vernacular describing a cluster of a corporation's most important senior executives. "C" refers to the titles of such executives, which tend to start with the letter C, for "Chief." *See* INVESTOPEDIA, "C-Suite" available at: https://www.investopedia.com/terms/c/c-suite.asp (last visited June 30, 2022).

months before Defendants disclosed the truth (including a full month before Defendants' quarterly statements on May 17, 2021 regarding Q1 2021).

141.    CW6, who was hired by Ms. Butler and was "very familiar" with her, confirmed that her transition from Chief Operating Officer back to Chief People Officer, and eventual departure from AppHarvest were related to the Company's labor issues, including productivity, attrition, and churn.  CW6 recalled there being excitement at the Company by Butler's hiring and her initial efforts to fill corporate and farm headcount. However, according to CW6, being a good Chief People Officer was not enough to be a good Chief Operating Officer and "the fit was not there" for Butler to continue in the COO role.  During her tenure as COO, there had been "a lot of tough times dealing with productivity," which ultimately "set the trajectory" for Butler to leave.

142.    Furthermore, the employees that AppHarvest hired in the second or third quarters of 2021 to address its operational issues were filling senior level positions (in effect, replacing Ms. Butler) which would have required a reasonable recruitment period preceding the new hires' actual start date. These new hires' roles and responsibilities all concerned enhancing productivity of operations.

143.    For example, AppHarvest announced on August 11, 2021, that to "improve operational performance," Adam Reel was hired as Vice President of Supply Chain and Procurement "[e]arlier in the second quarter"—meaning his recruitment reasonably began in the first quarter. In this role, Mr. Reel is responsible for "ensuring implementation of best practices learned in the first growing season and deploying them as standard operating procedures." Mr. Reel reports to Ms. Nelson who reports to Defendant Lee.

144.    AppHarvest announced on July 26, 2021 that it had hired Mark Keller as Senior Vice President, Software Applications Platform. In this role, Mr. Keller is responsible for

"operationaliz[ing AppHarvest's] Project TalOS platform." According to the Q1 2021 investor presentation posted on AppHarvest's website on May 17, 2021, Project TalOS is a "comprehensive technology vision" that looked to: (a) "deliver consistent performance"; (b) create "superior flavor driven by genetics to create pricing power"; and (c) utilize a "farm management platform to promote data-driven decision making" at the Morehead Facility. According to Mr. Keller's LinkedIn profile, Mr. Keller "Built the Software team from Scratch" and "Designed/Built the Mobile solution and Cloud Services Powering the future of Sustainable Agriculture."[10]

145.    Further, AppHarvest announced on August 5, 2021, that it had hired Julie Nelson as Executive Vice President, Operations. In this role, Ms. Nelson is responsible for "driv[ing] productivity across [AppHarvest]" and "optimiz[ing] operations to support profitable growth." Ms. Nelson reported to Defendant Lee. On February 24, 2022, AppHarvest announced it promoted Ms. Nelson to Chief Operating Officer, making Ms. Nelson the official replacement for Ms. Butler.

146.    The hires of senior level managers such as Reel, Keller, and Nelson—beginning ""[e]arlier in the second quarter"—clearly demonstrate that Defendants attempts to address AppHarvest's undisclosed operational and productivity failures.

## DEFENDANTS' MATERIAL CLASS PERIOD MISREPRESENTATIONS AND OMISSIONS

147.    Throughout the Class Period AppHarvest suffered lower saleable yield, quality and prices, and higher distribution and transportation fees caused by widespread operational inefficiencies from inadequate training and an inability to reliably retain and staff the Morehead Facility due to attrition, labor churn, and the COVID-19 pandemic. To conceal these issues from investors, throughout the Class Period, Defendants issued a series of material misstatements and omitted material facts in the Company's public filings, press releases and other documents. These

---

[10] *See* https://www.linkedin.com/in/mark-keller-41a2b0/ (last visited June 30, 2022).

material misstatements and omissions created the false impression that AppHarvest was executing on its novel CEA concept at scale, on schedule, and in-line with previously announced expectations.

148.    Plaintiff asserts that all statements set forth below that are bolded and underlined were materially false and/or misleading for the reasons set forth therein. Non-bolded statements are included for context.

## I.    False and Misleading Statements in AppHarvest's February 1, 2021 Press Release

149.    The Class Period begins on February 1, 2021, when AppHarvest began trading on the NASDAQ after completion of the business combination with Novus.  That morning, before market open, AppHarvest issued a press release announcing the completion of the business combination with Novus via Globe Newswire, a widely circulated national wire service (the "February 1 Press Release").[11]

150.    In the February 1 Press Release, AppHarvest stated that the "Company reaffirms Full-Year 2021 Guidance[,]" on full-year 2021 net revenue of $21 million and Adjusted EBITDA loss of $41 million, which guidance was originally issued on December 15, 2021, *i.e.*, before the Company even began its first harvest. Defendants falsely attributed the "reaffirm[ed]" guidance to AppHarvest's purportedly strong operational performance, which at that time had already deteriorated. Specifically, Defendants Lee and AppHarvest stated, in pertinent part:

> AppHarvest President David Lee [said,] "…**With our first harvest already underway and produce shipping to major grocery outlets, we reiterate our full-year 2021 guidance.**"
>
> **Supported by early sales from its first harvest, AppHarvest reaffirms guidance on full-year 2021 net revenue** of $21 million **and Adjusted EBITDA** of ($41) million **provided during its Analyst Day presentation on December 15, 2020.**

---

[11] All of the Company's press releases and all of the documents it filed with the SEC during the Class Period were concurrently published on the Company's Investor Relations webpage.

151.    The above statements were materially false, misleading, and/or lacked a reasonable basis when made because such statements touted the Company's "harvest," "shipping," and "sales" as the basis that underpinned and "supported" Defendants' decision to "reiterate" and "reaffirm[]" the Company's full-year year net revenue and Adjusted EBITDA guidance. The Company's previous guidance that was being "reiterate[d]" and "reaffirm[ed]" was created in December 2020, before the Company even began harvesting, shipping, or selling tomatoes. However, AppHarvest's "harvest," "shipping," and "sales," all of which commenced in January 2021, were already performing poorly and affected by insufficient staffing given that:

(i)    Defendants admitted that for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)   Defendants admitted that for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii)  Defendants Lee's and Eggleton's admissions on the Q1 2021 Earnings Call that "training" issues existed in the first quarter of 2021 that were hampering "productivity" and driving gross loss;

(iv)   Defendants' admissions in the 2021 Q2 Earnings Release, the Q2 2021 Earnings Presentation, and the 2021 Q2 Earnings Call that "operational" and "executional" challenges—including lower quality production and saleable yield, and higher distribution and shipping expense incurred as a result of rejections—existed for the "initial growing season" and the "full season of harvest as a Company";

(v)    according to CW1 and CW4, AppHarvest did not offer employees adequate (if any) training throughout the Class Period. According to CW1, AppHarvest's inadequately trained workforce contributed to 5-10% of crops being wasted or damaged during CW1's tenure, which resulted in lost sales. According to CW5, up to 50% of AppHarvest's crop was wasted in the first growing season caused by workers in the Greenhouse and Packhouse. Further, CW4 confirmed that tomatoes were wasted "daily" during harvesting season;

(vi)    CW6 explained that during the Class Period, AppHarvest's attrition and retention metrics in the first half of 2021 were far worse than expected because AppHarvest was clearly falling short week over week. Indeed, according to CW1 and CW2, throughout the Class Period, AppHarvest suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including:

        a.   dissatisfaction with mandatory expanded working hours—including forced overtime, Saturdays, and holidays, and

        b.   infection and quarantining due to the COVID-19 pandemic,

all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes.

CW4 likewise stated that there was significant turnover throughout CW4's tenure at AppHarvest, with the west side of the Greenhouse losing at least 10 personnel every week. CW4 stated that the turnover resulted in less trained staff and thereby lower yields because there were fewer Crop Care Specialists to do the work.

CW5 confirmed that employee turnover and churn had been consistently high throughout October 2020 and June 2021, causing concern amongst Greenhouse personnel that AppHarvest had inadequate labor to meet production requirements as was discussed at the morning stand-up meetings CW5 attended;

(vii)   according to CW1, CW2, and CW4, throughout the Class Period, AppHarvest's own incentive piece rate structure incentivized disruptive and inefficient workmanship that wasted, damaged, and produced low quality tomatoes;

(viii)  CW6 stated that Mastronardi informed AppHarvest that it needed to tighten up specifications because Mastronardi was having to reject a lot of fruit throughout the Class Period—upwards of 30% to 35% during the Company's "toughest times," which was "many times" more than AppHarvest's target which CW6 believed was 6% or 7%;

(ix)   according to CW2, "half" of all tomatoes inspected were USDA Grade No. 2 or not commercially saleable, and CW6 confirmed that AppHarvest was a "long way off" its quality goals;

(x)    CW6 stated that in the "toughest times" of the first growing season AppHarvest was well below 50% in relation to the Company's productivity standards for specific Greenhouse jobs.

152.   Thus, Defendants' statements regarding AppHarvest's "reiterate[d]" and "reaffirm[ed]" guidance being "supported" by AppHarvest's "harvest," "shipping," and "sales" operations and were materially false, misleading and/or lacked a reasonable basis because AppHarvest's "harvest," "shipping," and "sales" were being negatively impacted by the foregoing.

## II.   False and Misleading Statements in a February 1, 2021 Interview on Cheddar News

153.   In connection with the Company's public trading, and in addition to issuing the February 1 Press Release, Defendants Webb and Lee went on a blitz of interview and media appearances to promote AppHarvest's securities.

154.   On February 1, 2021, during trading hours, Defendants Webb and Lee were interviewed by anchor Kristen Scholer on Cheddar News. During the interview, Webb stated in pertinent part:

> Scholer: So Jonathan, I want to bring you in as well because we saw some of this action first hand recently. So your first tomato harvest – just a couple of weeks ago making its way to the different grocery stores – we're talking about Walmart, Publix, Kroger, Food City among others. Your location in Central Appalachia – how is that conducive to business? <u>Have there been any issues with the supply and the distribution of your products</u>? [Underlined emphasis added to question.]

> Webb: **Oh no, that's our advantage**…Our job right here is to keep charging and build facilities on the ground and David Lee and our Board member Martha Stewart and others are thinking through – you know – what are those [] products that we can be making with this good, healthy, **consistent supply coming out of our facilities** here in Central Appalachia.

155.   Defendant Webb's statements above touting the Company's purported "consistent supply" as an "advantage" and refuting "any issues" with AppHarvest's "supply and distribution" were materially false, misleading, and/or lacked a reasonable basis when made because by February 1, 2021, AppHarvest's "supply and distribution" was already significantly negatively impacted by inconsistent quality and saleable yield, and rejections by Mastronardi, given that:

(i)     Defendants admitted that for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)    Defendants admitted that for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii)   Defendants Lee's and Eggleton's admissions on the Q1 2021 earnings call that "training" issues existed in the first quarter of 2021 that were hampering "productivity" and driving gross loss;

(iv)    Defendants' admissions in the 2021 Q2 Earnings Release, the Q2 2021 Earnings Presentation, and the 2021 Q2 Earnings Call that "operational" and "executional" challenges—including lower quality production and saleable yield, and higher distribution and shipping expense incurred as a result of rejections—existed for the "initial growing season" and the "full season of harvest as a Company";

(v)     according to CW1 and CW4, AppHarvest did not offer employees adequate (if any) training throughout the Class Period. According to CW1, AppHarvest's inadequately trained workforce contributed to 5-10% of crops being wasted or damaged during CW1's tenure, which resulted in lost sales. According to CW5, up to 50% of AppHarvest's crop was wasted in the first growing season caused by workers in the Greenhouse and Packhouse. Further, CW4 confirmed that tomatoes were wasted "daily" during harvesting season;

(vi)    CW6 explained that during the Class Period, AppHarvest's attrition and retention metrics in the first half of 2021 were far worse than expected because AppHarvest was clearly falling short week over week. Indeed, according to CW1 and CW2, throughout the Class Period AppHarvest suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including:

        a.   dissatisfaction with mandatory expanded working hours—including forced overtime, Saturdays, and holidays, and

        b.   infection and quarantining due to the COVID-19 pandemic,

        all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes.

CW4 likewise stated that there was significant turnover throughout CW4's tenure at AppHarvest, with the west side of the Greenhouse losing at least 10 personnel every week. CW4 stated that the turnover resulted in less trained staff and thereby lower yields because there were fewer Crop Care Specialists to do the work.

CW5 confirmed that employee turnover and churn had been consistently high throughout October 2020 and June 2021, causing concern amongst Greenhouse personnel that AppHarvest had inadequate labor to meet production requirements as was discussed at the morning stand-up meetings CW5 attended;

(vii)    according to CW1, CW2, and CW4 throughout the Class Period AppHarvest's own incentive piece rate structure incentivized disruptive and inefficient workmanship that wasted, damaged, and produced low quality tomatoes;

(viii)   CW6 stated that Mastronardi informed AppHarvest that it needed to tighten up specifications because Mastronardi was having to reject a lot of fruit throughout the Class Period—upwards of 30% to 35% during the Company's "toughest times," which was "many times" more than AppHarvest's target which CW6 believed was 6% or 7%;

(ix)     according to CW2, "half" of all tomatoes inspected were USDA Grade No. 2 or not commercially saleable, and CW6 confirmed that AppHarvest was a "long way off" its quality goals;

(x)      CW6 stated that in the "toughest times" of the first growing season AppHarvest was well below 50% in relation to the Company's productivity standards for specific Greenhouse jobs.

## III.    False and Misleading Statements in a February 1, 2021 Interview on the TD Ameritrade Network

156.    On February 1, 2021, during trading hours, Webb was interviewed by anchor Tom White on the TD Ameritrade Network, an over-the-top broadcast streaming channel. During the interview, Webb stated in pertinent part:

White: What kind of contracts do you have with distributors and stores across the country? And do you expect that to grow sequentially moving into 2022 and beyond?

Webb: …We use less land, less water, and **we have predictable growing practices**, so we can control the environment and **have a predictable supply year-round**. It's a premium product at a conventional price. Uh, **as much as we can build and grow, we'll, we'll be on the top 25 grocery shelves throughout the U.S.**

157.    Defendant Webb's statements above touting the Company's purported "predictable growing process" resulting in "a predictable supply," and that AppHarvest was poised to sell "as much as we can build and grow" were materially false, misleading, and/or lacked a reasonable basis when made because by February 1, 2021, AppHarvest's "growing practices" and "supply" were highly unpredictable and AppHarvest's ability to put products on "grocery shelves" was significantly negatively impacted (indeed, much of what AppHarvest attempted to "grow" never made it "grocery shelves" because it was damaged or poor quality), given that:

(i)     Defendants admitted that for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)    Defendants admitted that for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii)   Defendants Lee's and Eggleton's admissions on the Q1 2021 earnings call that "training" issues existed in the first quarter of 2021 that were hampering "productivity" and driving gross loss;

(iv)    Defendants' admissions in the 2021 Q2 Earnings Release, the Q2 2021 Earnings Presentation, and the 2021 Q2 Earnings Call that "operational" and "executional" challenges—including lower quality production and saleable yield, and higher distribution and shipping expense incurred as a result of rejections—existed for the "initial growing season" and the "full season of harvest as a Company";

(v)     according to CW1 and CW4, AppHarvest did not offer employees adequate (if any) training throughout the Class Period. According to CW1, AppHarvest's inadequately trained workforce contributed to 5-10% of crops being wasted or damaged during CW1's tenure, which resulted in lost sales. According to CW5, up to 50% of AppHarvest's crop was wasted in the first growing season caused by workers in the Greenhouse and Packhouse. Further, CW4 confirmed that tomatoes were wasted "daily" during harvesting season;

(vi)    CW6 explained that during the Class Period, AppHarvest's attrition and retention metrics in the first half of 2021 were far worse than expected because AppHarvest

was clearly falling short week over week. Indeed, according to CW1 and CW2, throughout the Class Period AppHarvest suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including:

a.      dissatisfaction with mandatory expanded working hours—including forced overtime, Saturdays, and holidays, and

b.      infection and quarantining due to the COVID-19 pandemic,

all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes.

CW4 likewise stated that there was significant turnover throughout CW4's tenure at AppHarvest, with the west side of the Greenhouse losing at least 10 personnel every week. CW4 stated that the turnover resulted in less trained staff and thereby lower yields because there were fewer Crop Care Specialists to do the work.

CW5 confirmed that employee turnover and churn had been consistently high throughout October 2020 and June 2021, causing concern amongst Greenhouse personnel that AppHarvest had inadequate labor to meet production requirements as was discussed at the morning stand-up meetings CW5 attended;

(vii)    according to CW1, CW2, and CW4 throughout the Class Period AppHarvest's own incentive piece rate structure incentivized disruptive and inefficient workmanship that wasted, damaged, and produced low quality tomatoes;

(viii)   CW6 stated that Mastronardi informed AppHarvest that it needed to tighten up specifications because Mastronardi was having to reject a lot of fruit throughout the Class Period—upwards of 30% to 35% during the Company's "toughest times," which was "many times" more than AppHarvest's target which CW6 believed was 6% or 7%;

(ix)     according to CW2, "half" of all tomatoes inspected were USDA Grade No. 2 or not commercially saleable, and CW6 confirmed that AppHarvest was a "long way off" its quality goals;

(x)      CW6 stated that in the "toughest times" of the first growing season AppHarvest was well below 50% in relation to the Company's productivity standards for specific Greenhouse jobs.

## IV.   False and Misleading Statements in AppHarvest's February 2, 2021 Form 8-K

158.    Given that Novus, the Company's predecessor registrant with the SEC, was a shell

company, AppHarvest was required to file on SEC Form 8-K all of the information that would be required if the Company were filing a general form for registration of securities on SEC Form 10. Thus, AppHarvest filed a Current Report with the SEC on Form 8-K (the "February 2 Form 8-K"), signed by Defendant Eggleton. The February 2 Form 8-K was accepted by the SEC after close of trading on February 1, 2021 and deemed filed by the SEC on February 2, 2021.

159.     The February 2 Form 8-K announced the completion of the business combination between AppHarvest and Novus. In doing so the February 2 Form 8-K incorporated by reference numerous false and/or misleading statements contained in a prospectus and definitive proxy statement filed by Novus with the SEC on January 11, 2021 (the "January 11 Proxy Statement/Prospectus").

160.     With respect to AppHarvest's "**Risk Factors**" (emphasis in original), the February 2 Form 8-K directed investors to the false and misleading January 11 Proxy Statement/Prospectus, stating in pertinent part: "**The risks associated with the Company's business are described in the Proxy Statement/Prospectus in the section entitled '*Risk Factors*' beginning on page 39 of the Proxy Statement/Prospectus and are incorporated herein by reference.**"

161.     The January 11 Proxy Statement/Prospectus, and therefore the February 2 Form 8-K by reference, contained false, misleading, and woefully incomplete risk disclosures with respect to investing in AppHarvest which state, in pertinent part:

**Risks Related to AppHarvest**

…Even if [AppHarvest's] investments do result in the growth of its business, **if AppHarvest does not effectively manage its growth, it may not be able to execute on its business plan** and vision, respond to competitive pressures, **take advantage of market opportunities, satisfy customer requirements or maintain high-quality product offerings, any of which could adversely affect AppHarvest's business, financial condition and results of operations.**

\*\*\*

***AppHarvest depends on employing a skilled local labor force, and*** <u>**failure to**</u>
<u>**attract and retain qualified employees could negatively impact AppHarvest's**</u>
<u>**business, results of operations and financial condition.**</u>

\*\*\*

…even <u>**if AppHarvest is able to identify, hire and train its labor force, there is**</u>
<u>**no guarantee that AppHarvest will be able to retain these employees. Any**</u>
<u>**shortage of labor or lack of regular availability could restrict AppHarvest's**</u>
<u>**ability to operate its greenhouses profitably, or at all.**</u>

\*\*\*

<u>**Any significant or unexpected rejection of AppHarvest's products could**</u>
<u>**negatively impact AppHarvest's results of operations, and AppHarvest may**</u>
<u>**be unable to sell the rejected products to other third parties.**</u>

\*\*\*

<u>**If AppHarvest's products**</u> fail to gain market acceptance, are restricted by
regulatory requirements or <u>**have quality problems, the company *may* not be**</u>
<u>**able to fully recover costs and expenses incurred in its operation, and its**</u>
<u>**business, financial condition or results of operations *could* be materially**</u>
<u>**and adversely affected.**</u>

\*\*\*

<u>**In future periods, revenue growth could slow or revenue could decline for a**</u>
<u>**number of reasons, including**</u> slowing demand for AppHarvest's products,
increasing competition, a decrease in the growth of the overall market, or
<u>**AppHarvest's failure, for any reason, to take advantage of growth**</u>
<u>**opportunities. If AppHarvest's assumptions regarding these risks and**</u>
<u>**uncertainties and future revenue growth are incorrect or change, or if it does**</u>
<u>**not address these risks successfully, AppHarvest's operating and financial**</u>
<u>**results could differ materially from its expectations, and its business could**</u>
<u>**suffer.**</u>

\*\*\*

<u>**The COVID-19 pandemic could negatively impact on AppHarvest's business,**</u>
<u>**results of operations and financial condition**</u>*.[…]*

\*\*\*

…<u>**Although AppHarvest has not experienced material financial impacts due**</u>
<u>**to the pandemic**</u>, the fluid nature of the COVID-19 pandemic and uncertainties

regarding the related economic impact are likely to result in sustained market turmoil, which could also negatively impact the company's business, financial condition and cash flows. Although AppHarvest's business is considered an "essential business," **the COVID-19 pandemic could result in labor shortages, which could result in AppHarvest's inability to plant and harvest crops at full capacity and could result in spoilage or loss of unharvested crops**….**The extent of COVID-19's effect on AppHarvest's operational and financial performance will depend on future developments**, including the duration, spread and intensity of the pandemic, all of which are uncertain and difficult to predict considering the rapidly evolving landscape. **As a result, it is not currently possible to ascertain the overall impact of COVID-19 on AppHarvest's business. However, if the pandemic continues to persist as a severe worldwide health crisis, the disease could negatively impact AppHarvest's business, financial condition results of operations and cash flows, and may also have the effect of heightening many of the other risks described in this "Risk Factors" section**.

(Underlined emphasis added and challenged, all other emphasis in original).

162.    The above statements were materially false, misleading, and/or lacked a reasonable basis when made because: (a) Defendants speculatively portray AppHarvest's ability to "effectively manage its growth," "execute on its business plan," "satisfy customer requirements or maintain high quality product" offerings as contingent or potential when AppHarvest was already failing to do all of these things resulting in lower saleable yield and quality products, and higher customer rejections and costs; (b) Defendants speculate that "failure to attract and retain qualified employees could negatively impact" AppHarvest's business when the Company was already suffering massive attrition, and Defendants misrepresent that a potential "shortage of labor or lack of regular availability" or the Company's potential inability to "train its labor force" and "retain" employees could potentially affect AppHarvest, including its "ability to operate its greenhouses profitably," when, in reality, those situations had already transpired; (c) Defendants speculate that "significant or unexpected rejection of AppHarvest's products" could "negatively impact" results when AppHarvest was already experiencing massive customer rejections from Mastronardi because of poor quality that eroded sales and inflated costs, and Defendants speculate further that

the Company may not be able to resell rejected products to "other third parties" when AppHarvest was not doing so, but rather was selling "substantially all" of its products to Mastronardi and donating or composting the rejections; (d) Defendants speculate that "quality problems" could "materially and adversely" affect AppHarvest's "business, financial condition or results of operations" when they were already doing so; (e) Defendants make a boilerplate and vague disclaimer that if AppHarvest fails to "take advantage of growth opportunities" "for any reason" it might see declining revenue, when Defendants were already experiencing wide-ranging execution problems for the entire first harvesting season that were doing exactly that; and (f) Defendants falsely misrepresent AppHarvest "has not experienced material financial impacts due to the pandemic" and speculate that the COVID-19 pandemic, due to contingent and vague "future developments," *could* negatively impact AppHarvest's "business, results of operations and financial condition" and "cash flows," *could* "result in labor shortages," *could* cause an "inability to plant and harvest crops at full capacity," and *could* "result in spoilage or loss of unharvested crops" when all of those things were already happening because COVID-19 had caused AppHarvest to operate severely understaffed during the first growing and harvesting season because employees were quarantining. The material falsity of Defendants' speculative, contingent, and woefully incomplete statements of known risks is supported by ample evidence, given that:

(i)    Defendants admitted that for the "***six months***" ended June 30, 2021, *i.e.*, beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)   Defendants admitted that for the "***six months***" ended June 30, 2021, *i.e.*, beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii)    Defendants Lee's and Eggleton's admissions on the Q1 2021 earnings call that "training" issues existed in the first quarter of 2021 that were hampering "productivity" and driving gross loss;

(iv)    Defendants' admissions in the 2021 Q2 Earnings Release, the Q2 2021 Earnings Presentation, and the 2021 Q2 Earnings Call that "operational" and "executional" challenges—including lower quality production and saleable yield, and higher distribution and shipping expense incurred as a result of rejections—existed for the "initial growing season" and the "full season of harvest as a Company";

(v)    according to CW1 and CW4, AppHarvest did not offer employees adequate (if any) training throughout the Class Period. According to CW1, AppHarvest's inadequately trained workforce contributed to 5-10% of crops being wasted or damaged during CW1's tenure, which resulted in lost sales. According to CW5, up to 50% of AppHarvest's crop was wasted in the first growing season caused by workers in the Greenhouse and Packhouse. Further, CW4 confirmed that tomatoes were wasted "daily" during harvesting season;

(vi)    CW6 explained that during the Class Period, AppHarvest's attrition and retention metrics in the first half of 2021 were far worse than expected because AppHarvest was clearly falling short week over week. Indeed, according to CW1 and CW2, throughout the Class Period AppHarvest suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including:

    a.    dissatisfaction with mandatory expanded working hours—including forced overtime, Saturdays, and holidays, and

    b.    infection and quarantining due to the COVID-19 pandemic,

all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes.

CW4 likewise stated that there was significant turnover throughout CW4's tenure at AppHarvest, with the west side of the Greenhouse losing at least 10 personnel every week. CW4 stated that the turnover resulted in less trained staff and thereby lower yields because there were fewer Crop Care Specialists to do the work.

CW5 confirmed that employee turnover and churn had been consistently high throughout October 2020 and June 2021, causing concern amongst Greenhouse personnel that AppHarvest had inadequate labor to meet production requirements as was discussed at the morning stand-up meetings CW5 attended;

(vii)    according to CW1, CW2, and CW4 throughout the Class Period AppHarvest's own incentive piece rate structure incentivized disruptive and inefficient workmanship that wasted, damaged, and produced low quality tomatoes;

(viii)    CW6 stated that Mastronardi informed AppHarvest that it needed to tighten up specifications because Mastronardi was having to reject a lot of fruit throughout the Class Period—upwards of 30% to 35% during the Company's "toughest times," which was "many times" more than AppHarvest's target which CW6 believed was 6% or 7%;

(ix)    according to CW2, "half" of all tomatoes inspected were USDA Grade No. 2 or not commercially saleable, and CW6 confirmed that AppHarvest was a "long way off" its quality goals;

(x)    CW6 stated that in the "toughest times" of the first growing season AppHarvest was well below 50% in relation to the Company's productivity standards for specific Greenhouse jobs.

163.    Furthermore, the February 1 Press Release was attached to the February 2 Form 8-K as Exhibit 99.1 and was false, misleading, and/or lacked a reasonable basis for the reasons stated in Paragraphs 149 through 152 above.

## V.    False and Misleading Statements in AppHarvest's February 10, 2021 Form S-1

164.    On February 10, 2021, after market close, AppHarvest filed a Registration Statement with the SEC on Form S-1 (the "February 10 Form S-1"), containing a preliminary prospectus, signed by Defendants Webb, Eggleton, and Lee.

165.    The February 10 Form S-1 contained false, misleading, and woefully incomplete risk disclosures with respect to investing in AppHarvest which state, in pertinent part:

**Risks Related to Our Business and Industry**

…Even if [AppHarvest's] investments do result in the growth of our business, **if we do not effectively manage our growth, we may not be able to execute on our business plan** and vision, respond to competitive pressures, **take advantage of market opportunities, satisfy customer requirements or maintain high-quality product offerings, any of which could adversely affect our business, financial condition and results of operations.**

\*\*\*

*We currently rely on a single facility for all of our operations.*

…**Adverse changes or developments affecting the Morehead facility could impair our ability to produce our products and our business, prospects, financial condition and results of operations. Any shutdown or period of reduced production at the Morehead facility**, which may be caused by regulatory noncompliance or other issues, as well as other factors beyond our control, such as severe weather conditions, natural disaster, fire, power interruption, work stoppage, disease outbreaks or pandemics (such as COVID-19), equipment failure or delay in supply delivery, **would significantly disrupt our ability to grow and deliver our produce in a timely manner, meet our contractual obligations and operate our business.**

\*\*\*

*We depend on employing a skilled local labor force, and* **failure to attract and retain qualified employees could negatively impact our business, results of operations and financial condition.**

\*\*\*

…**if we are able to identify, hire and train its [sic] labor force, there is no guarantee that we will be able to retain these employees. Any shortage of labor or lack of regular availability could restrict our ability to operate our greenhouses profitably, or at all.**

\*\*\*

**Any significant or unexpected rejection of our products could negatively impact our results of operations, and we may be unable to sell the rejected products to other third parties.**

\*\*\*

**If our products** fail to gain market acceptance, are restricted by regulatory requirements or **have quality problems, the company may not be able to fully recover costs and expenses incurred in our  operation, and our business, financial condition or results of operations could be materially and adversely affected.**

\*\*\*

**In future periods, revenue growth could slow or revenue could decline for a number of reasons, including** slowing demand for our products, increasing competition, a decrease in the growth of the overall market, or **our failure, for any**

66

**reason, to take advantage of growth opportunities. If our assumptions regarding these risks and uncertainties and future revenue growth are incorrect or change, or if we do not address these risks successfully, our operating and financial results could differ materially from our expectations, and our business could suffer.**

\*\*\*

**The COVID-19 pandemic could negatively impact on our business, results of operations and financial condition**./…/

…**Although we have not experienced material financial impacts due to the pandemic**, the fluid nature of the COVID-19 pandemic and uncertainties regarding the related economic impact are likely to result in sustained market turmoil, which could also negatively impact the company's business, financial condition and cash flows. Although our business is considered an "essential business," **the COVID-19 pandemic could result in labor shortages, which could result in our inability to plant and harvest crops at full capacity and could result in spoilage or loss of unharvested crops.…The extent of COVID-19's effect on our operational and financial performance will depend on future developments**, including the duration, spread and intensity of the pandemic, all of which are uncertain and difficult to predict considering the rapidly evolving landscape. **As a result, it is not currently possible to ascertain the overall impact of COVID-19 on our business. However, if the pandemic continues to persist as a severe worldwide health crisis, the disease could negatively impact our business, financial condition results of operations and cash flows, and may also have the effect of heightening many of the other risks described in this "Risk Factors" section.**

(Underlined emphasis added and challenged, all other emphasis in original).

166.     The above statements were materially false, misleading, and/or lacked a reasonable basis when made because: (a) Defendants speculatively portray their ability to "effectively manage our growth," "execute on our business plan," "satisfy customer requirements or maintain high quality product offerings" as contingent or potential when AppHarvest was already failing to do all of these things resulting in lower saleable yield and quality products, and higher customer rejections and costs; (b) Defendants make boilerplate speculation that vague "developments" or periods of "reduced production at the Morehead facility" could disrupt AppHarvest's ability to "meet our contractual obligations and operate our business" when the Company's operations were

already deteriorating because of the Company's inability to produce USDA Grade No. 1 tomatoes; (c) Defendants speculate that "failure to attract and retain qualified employees could negatively impact" AppHarvest's business when the Company was already suffering massive attrition, and Defendants misrepresent that a potential "shortage of labor or lack of regular availability" or the Company's potential inability to "train its labor force" and "retain" employees could potentially affect AppHarvest, including its "ability to operate our greenhouses profitably," when, in reality, those situations had already transpired; (d) Defendants speculate that "significant or unexpected rejection of our products" could "negatively impact" results when AppHarvest was already experiencing massive customer rejections from Mastronardi because of poor quality that eroded sales and inflated costs, and Defendants speculate further that the Company may not be able to resell rejected products to "other third parties" when AppHarvest was not doing so, but rather was selling "substantially all" of its products to Mastronardi and donating or composting the rejections; (e) Defendants speculate that "quality problems" could "materially and adversely" affect AppHarvest's "business, financial condition or results of operations" when they were already doing so; (f) Defendants make a boilerplate and vague disclaimer that if AppHarvest fails to "take advantage of growth opportunities" "for any reason" it might see declining revenue, when Defendants were already experiencing wide-ranging execution problems for the entire first harvesting season that were doing exactly that; and (g) Defendants falsely misrepresent AppHarvest has "not experienced material financial impacts due to the pandemic" and speculate that the COVID-19 pandemic, due to contingent and vague "future developments," *could* negatively impact AppHarvest's "business, results of operations and financial condition" and "cash flows," *could* "result in labor shortages," *could* cause an "inability to plant and harvest crops at full capacity," and *could* "result in spoilage or loss of unharvested crops" when all of those

things were already happening because COVID-19 had caused AppHarvest to operate severely understaffed during the first growing and harvesting season because employees were quarantining. The material falsity of Defendants' speculative, contingent, and woefully incomplete statements of known risks is supported by ample evidence, given that:

(i)      Defendants admitted that for the "***six months***" ended June 30, 2021, *i.e.*, beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)     Defendants admitted that for the "***six months***" ended June 30, 2021, *i.e.*, beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii)    Defendants Lee's and Eggleton's admissions on the Q1 2021 earnings call that "training" issues existed in the first quarter of 2021 that were hampering "productivity" and driving gross loss;

(iv)    Defendants' admissions in the 2021 Q2 Earnings Release, the Q2 2021 Earnings Presentation, and the 2021 Q2 Earnings Call that "operational" and "executional" challenges—including lower quality production and saleable yield, and higher distribution and shipping expense incurred as a result of rejections—existed for the "initial growing season" and the "full season of harvest as a Company";

(v)     according to CW1 and CW4, AppHarvest did not offer employees adequate (if any) training throughout the Class Period. According to CW1, AppHarvest's inadequately trained workforce contributed to 5-10% of crops being wasted or damaged during CW1's tenure, which resulted in lost sales. According to CW5, up to 50% of AppHarvest's crop was wasted in the first growing season caused by workers in the Greenhouse and Packhouse. Further, CW4 confirmed that tomatoes were wasted "daily" during harvesting season;

(vi)    CW6 explained that during the Class Period, AppHarvest's attrition and retention metrics in the first half of 2021 were far worse than expected because AppHarvest was clearly falling short week over week. Indeed, according to CW1 and CW2, throughout the Class Period AppHarvest suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including:

a.      dissatisfaction with mandatory expanded working hours—including forced overtime, Saturdays, and holidays, and

b.      infection and quarantining due to the COVID-19 pandemic,

all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes.

CW4 likewise stated that there was significant turnover throughout CW4's tenure at AppHarvest, with the west side of the Greenhouse losing at least 10 personnel every week. CW4 stated that the turnover resulted in less trained staff and thereby lower yields because there were fewer Crop Care Specialists to do the work.

CW5 confirmed that employee turnover and churn had been consistently high throughout October 2020 and June 2021, causing concern amongst Greenhouse personnel that AppHarvest had inadequate labor to meet production requirements as was discussed at the morning stand-up meetings CW5 attended;

(vii)     according to CW1, CW2, and CW4 throughout the Class Period AppHarvest's own incentive piece rate structure incentivized disruptive and inefficient workmanship that wasted, damaged, and produced low quality tomatoes;

(viii)    CW6 stated that Mastronardi informed AppHarvest that it needed to tighten up specifications because Mastronardi was having to reject a lot of fruit throughout the Class Period—upwards of 30% to 35% during the Company's "toughest times," which was "many times" more than AppHarvest's target which CW6 believed was 6% or 7%;

(ix)      according to CW2, "half" of all tomatoes inspected were USDA Grade No. 2 or not commercially saleable, and CW6 confirmed that AppHarvest was a "long way off" its quality goals;

(x)       CW6 stated that in the "toughest times" of the first growing season AppHarvest was well below 50% in relation to the Company's productivity standards for specific Greenhouse jobs.

## VI.    False and Misleading Statements in AppHarvest's February 25, 2021 Press Release

167.    On February 25, 2021, after market close, AppHarvest issued a press release via Globe Newswire (the "February 25 Press Release") announcing full-year 2020 financial results, as well as revising its Fiscal Year 2021 guidance for net revenue to a range of $20 million to $25 million and for EBITDA loss to a range of $43 million to $45 million. The February 25 Press

Release also issued a First Quarter 2021 Outlook for the first quarter of 2021 that would end in little over a month. The February 25 Press Release was the first and only time in the history of the Company that AppHarvest publicly issued quarterly, rather than annualized, guidance.

168.     Later that same day, AppHarvest filed a Current Report on Form 8-K with the SEC, signed by Defendant Eggleton, attaching the February 25 Press Release as Exhibit 99.1 thereto.

169.     The February 25 Press Release purported to raise the Company's net revenue guidance—compared to AppHarvest's most recent guidance (in the February 1 Press Release)—specifically as a result the Company's operational performance, which at that time had already deteriorated. Specifically, Defendants stated, in pertinent part:

**First Quarter 2021 Outlook and Fiscal Year 2021 Forecast**

…"**Our favorable crop yields and market pricing currently support a 2021 sales outlook that is better than we expected in December 2020**," said AppHarvest Founder & Chief Executive Officer Jonathan Webb…**In addition to better than anticipated crop yields and pricing**, the Company has benefited from a temporary decline in market supply…

170.     The above statements were materially false, misleading, and/or lacked a reasonable basis when made because such statements touted the Company's "favorable crop yields and market pricing," and "better than anticipated crop yields and pricing" as the basis that underpinned and "support[ed]" Defendants' decision to raise the Company's full-year year net revenue and Adjusted EBITDA guidance. However, AppHarvest's "crop yields," were not "favorable" in either quantity (due to massive undisclosed waste and spoilage) or quality, which had already caused significant deterioration to "pricing" given that:

(i)     Defendants admitted that for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)     Defendants admitted that for the "**six months**" ended June 30, 2021, *i.e.*, beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii)    Defendants Lee's and Eggleton's admissions on the Q1 2021 Earnings Call that "training" issues existed in the first quarter of 2021 that were hampering "productivity" and driving gross loss;

(iv)     Defendants' admissions in the 2021 Q2 Earnings Release, the Q2 2021 Earnings Presentation, and the 2021 Q2 Earnings Call that "operational" and "executional" challenges—including lower quality production and saleable yield, and higher distribution and shipping expense incurred as a result of rejections—existed for the "initial growing season" and the "full season of harvest as a Company";

(v)      according to CW1 and CW4, AppHarvest did not offer employees adequate (if any) training throughout the Class Period. According to CW1, AppHarvest's inadequately trained workforce contributed to 5-10% of crops being wasted or damaged during CW1's tenure, which resulted in lost sales. According to CW5, up to 50% of AppHarvest's crop was wasted in the first growing season caused by workers in the Greenhouse and Packhouse. Further, CW4 confirmed that tomatoes were wasted "daily" during harvesting season;

(vi)     CW6 explained that during the Class Period, AppHarvest's attrition and retention metrics in the first half of 2021 were far worse than expected because AppHarvest was clearly falling short week over week. Indeed, according to CW1 and CW2, throughout the Class Period AppHarvest suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including:

         a.  dissatisfaction with mandatory expanded working hours—including forced overtime, Saturdays, and holidays, and

         b.  infection and quarantining due to the COVID-19 pandemic,

         all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes.

         CW4 likewise stated that there was significant turnover throughout CW4's tenure at AppHarvest, with the west side of the Greenhouse losing at least 10 personnel every week. CW4 stated that the turnover resulted in less trained staff and thereby lower yields because there were fewer Crop Care Specialists to do the work.

         CW5 confirmed that employee turnover and churn had been consistently high throughout October 2020 and June 2021, causing concern amongst Greenhouse

personnel that AppHarvest had inadequate labor to meet production requirements as was discussed at the morning stand-up meetings CW5 attended;

(vii)   according to CW1, CW2, and CW4 throughout the Class Period AppHarvest's own incentive piece rate structure incentivized disruptive and inefficient workmanship that wasted, damaged, and produced low quality tomatoes;

(viii)   CW6 stated that Mastronardi informed AppHarvest that it needed to tighten up specifications because Mastronardi was having to reject a lot of fruit throughout the Class Period—upwards of 30% to 35% during the Company's "toughest times," which was "many times" more than AppHarvest's target which CW6 believed was 6% or 7%;

(ix)   according to CW2, "half" of all tomatoes inspected were USDA Grade No. 2 or not commercially saleable, and CW6 confirmed that AppHarvest was a "long way off" its quality goals;

(x)   CW6 stated that in the "toughest times" of the first growing season AppHarvest was well below 50% in relation to the Company's productivity standards for specific Greenhouse jobs.

171.   Thus, AppHarvest's "crop yields and market pricing" were not "favorable," but rather, were negatively impacted by the foregoing and Defendants' statements that AppHarvest's decision to raise guidance was "support[ed]" by AppHarvest's "favorable crop yields and market pricing" were materially false, misleading and/or lacked a reasonable basis.

**VII.   False and Misleading Statements in AppHarvest's March 1, 2021 Press Release**

172.   On March 1, 2021, after market close, AppHarvest issued a press release via Globe Newswire titled "AppHarvest Acquires Flagship Morehead, Ky. Controlled Environment Agriculture Facility" (the "March 1 Press Release").

173.   The March 1 Press Release contained statements that were materially false, misleading, and/or lacked a reasonable basis concerning Defendants' purported reasons for raising AppHarvest's earnings guidance, as compared to financial guidance contained in the February 1 Press Release. Specifically, Defendants stated, in pertinent part:

**First Quarter 2021 Outlook and Fiscal Year 2021 Forecast**

**AppHarvest raised its revenue outlook range for fiscal year 2021 on February 25, 2021, versus expectations prior to the start of harvesting. "Our favorable crop yields and market pricing currently support a 2021 sales outlook that is better than we expected in December 2020,**" said Webb.

174.    The above statements were materially false, misleading, and/or lacked a reasonable basis when made because such statements touted the Company's "harvesting" and "favorable crop yields and market pricing," as the basis that underpinned and "support[ed]" Defendants' decision to raise the Company's full-year revenue outlook range. However, AppHarvest's "crop yields," were not "favorable" in either quantity (due to massive undisclosed waste and spoilage) or quality, which had already caused significant deterioration to "pricing" given that:

(i)     Defendants admitted that for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)    Defendants admitted that for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii)   Defendants Lee's and Eggleton's admissions on the Q1 2021 Earnings Call that "training" issues existed in the first quarter of 2021 that were hampering "productivity" and driving gross loss;

(iv)    Defendants' admissions in the 2021 Q2 Earnings Release, the Q2 2021 Earnings Presentation, and the 2021 Q2 Earnings Call that "operational" and "executional" challenges—including lower quality production and saleable yield, and higher distribution and shipping expense incurred as a result of rejections—existed for the "initial growing season" and the "full season of harvest as a Company";

(v)     according to CW1 and CW4, AppHarvest did not offer employees adequate (if any) training throughout the Class Period. According to CW1, AppHarvest's inadequately trained workforce contributed to 5-10% of crops being wasted or damaged during CW1's tenure, which resulted in lost sales. According to CW5, up to 50% of AppHarvest's crop was wasted in the first growing season caused by

workers in the Greenhouse and Packhouse. Further, CW4 confirmed that tomatoes were wasted "daily" during harvesting season;

(vi)     CW6 explained that during the Class Period, AppHarvest's attrition and retention metrics in the first half of 2021 were far worse than expected because AppHarvest was clearly falling short week over week. Indeed, according to CW1 and CW2, throughout the Class Period AppHarvest suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including:

     a.   dissatisfaction with mandatory expanded working hours—including forced overtime, Saturdays, and holidays, and

     b.   infection and quarantining due to the COVID-19 pandemic,

all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes.

CW4 likewise stated that there was significant turnover throughout CW4's tenure at AppHarvest, with the west side of the Greenhouse losing at least 10 personnel every week. CW4 stated that the turnover resulted in less trained staff and thereby lower yields because there were fewer Crop Care Specialists to do the work.

CW5 confirmed that employee turnover and churn had been consistently high throughout October 2020 and June 2021, causing concern amongst Greenhouse personnel that AppHarvest had inadequate labor to meet production requirements as was discussed at the morning stand-up meetings CW5 attended;

(vii)    according to CW1, CW2, and CW4 throughout the Class Period AppHarvest's own incentive piece rate structure incentivized disruptive and inefficient workmanship that wasted, damaged, and produced low quality tomatoes;

(viii)   CW6 stated that Mastronardi informed AppHarvest that it needed to tighten up specifications because Mastronardi was having to reject a lot of fruit throughout the Class Period—upwards of 30% to 35% during the Company's "toughest times," which was "many times" more than AppHarvest's target which CW6 believed was 6% or 7%;

(ix)     according to CW2, "half" of all tomatoes inspected were USDA Grade No. 2 or not commercially saleable, and CW6 confirmed that AppHarvest was a "long way off" its quality goals;

(x)      CW6 stated that in the "toughest times" of the first growing season AppHarvest was well below 50% in relation to the Company's productivity standards for specific Greenhouse jobs.

175.    Furthermore, Defendants' "expectations prior to the start of harvesting" were not met or exceeded, thereby warranting a raised sales outlook, as those prior "expectations" preceded the Defendants "operational" and "executional" challenges. Indeed, CW6 confirmed that at weekly forecast meetings during this time, Defendants were considering "ways to close the gap" between AppHarvest's underperformance compared to forecast.

## VIII.    False and Misleading Statements in AppHarvest's March 2, 2021 Form S-1/A

176.    On March 2, 2021, before market open, AppHarvest filed its Amendment No. 1 to Form S-1 Registration Statement with the SEC (the "March 2 Form S-1/A"), containing a preliminary prospectus, signed by Defendants Webb and Eggleton.

177.    A subsection of the March 2 Form S-1/A titled "**Our Solution**" (emphasis in original), **"We believe there is a large population of workers in the Central Appalachian region who are eager to find long-term career opportunities like those being offered by AppHarvest**…**As a result, we believe we can staff and retain our workers with less churn**, immigration challenges **and unfilled positions** that many of our competitors face." These statements were specifically added by Defendants to the March 2 Form S-1/A, and were not contained in, for example, the January 11 Proxy Statement/Prospectus or the February 10 Form S-1.

178.    Relatedly, a subsection of the March 2 Form S-1/A titled "**Our Strengths**," falsely and/or misleadingly stated in pertinent part: "**We were able to efficiently hire many employees as we opened our first facility in Morehead** and have identified talent to join our team at the facilities we are developing in Richmond and Berea." This statement was specifically added by Defendants to the March 2 Form S-1/A, and was not contained in, for example, the January 11 Proxy Statement/Prospectus or the February 10 Form S-1.

179.    The above statements were materially false, misleading, and/or lacked a reasonable basis when made because: (a) Defendants' statements that prospective employees were seeking "long-term" employment, and that AppHarvest was able to "staff and retain" workers with "less churn" and less "unfilled positions," and that AppHarvest was able to "efficiently hire many employees" as it opened the Morehead Facility were not supported by, and/or concealed, known facts that directly contradicted those statements which left AppHarvest's workforce short-staffed, unproductive, and insufficiently trained; and (b) the statements misrepresented AppHarvest's frequent hiring as a "Strength" rather than what it was—a known consequence, born out of necessity, of the significant amount of concealed employee attrition, turnover, and churn that AppHarvest had experienced. The material falsity of the above statements is supported by ample evidence given that:

(i)     as Defendants would later admit, for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, AppHarvest was "adversely impacted" by "labor" challenges which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)    as Defendants would later admit, for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii)   CW6 explained that during the Class Period, AppHarvest's attrition and retention metrics in the first half of 2021 were far worse than expected because AppHarvest was clearly falling short week over week. Indeed, according to CW1 and CW2, throughout the Class Period AppHarvest suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including:

a.  dissatisfaction with mandatory expanded working hours—including forced overtime, Saturdays, and holidays, and

b.  infection and quarantining due to the COVID-19 pandemic,

all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes.

CW4 likewise stated that there was significant turnover throughout CW4's tenure at AppHarvest, with the west side of the Greenhouse losing at least 10 personnel every week. CW4 stated that the turnover resulted in less trained staff and thereby lower yields because there were fewer Crop Care Specialists to do the work.

CW5 confirmed that employee turnover and churn had been consistently high throughout October 2020 and June 2021, causing concern amongst Greenhouse personnel that AppHarvest had inadequate labor to meet production requirements as was discussed at the morning stand-up meetings CW5 attended.

(iv)    As was confirmed in Defendants' post Class Period 10-Q disclosures for Q3 2021, CW5 stated that due to the pervasive staffing issues described above, regional labor was insufficient and AppHarvest had to bring in contract labor to help during times of poor attendance.

180.    Furthermore, the above statements were materially false, misleading, and/or lacked a reasonable basis when made in light of the circumstances. As of March 2, 2021, AppHarvest was staffing its first, massive CEA facility and the Morehead Facility's productivity would depend, in part, on Defendants' ability to "efficiently hire" and "retain" staff to minimize "churn" and "unfilled positions"—as evidenced by Defendants' frequent updates and assurances to market participants regarding the Company's hiring efforts (see ¶¶64-69, *supra*). It was misleading for Defendants to make the above statements, and thereby paint AppHarvest's hiring in an undeservedly rosy light, without also disclosing adverse circumstances.

181.    The March 2 Form S-1/A, also contained false, misleading, and woefully incomplete risk disclosures with respect to investing in AppHarvest which state, in pertinent part:

**Risks Related to Our Business and Industry**

…Even if [AppHarvest's] investments do result in the growth of our business, **if we do not effectively manage our growth, we may not be able to execute on our business plan** and vision, respond to competitive pressures, **take advantage of market opportunities, satisfy customer requirements or maintain high-quality product offerings, any of which could adversely affect our business, financial condition and results of operations.**

78

\*\*\*

*We currently rely on a single facility for all of our operations.*

…**Adverse changes or developments affecting the Morehead facility could impair our ability to produce our products and our business, prospects, financial condition and results of operations. Any shutdown or period of reduced production at the Morehead facility**, which may be caused by regulatory noncompliance or other issues, as well as other factors beyond our control, such as severe weather conditions, natural disaster, fire, power interruption, work stoppage, disease outbreaks or pandemics (such as COVID-19), equipment failure or delay in supply delivery, **would significantly disrupt our ability to grow and deliver our produce in a timely manner, meet our contractual obligations and operate our business.**

\*\*\*

*We depend on employing a skilled local labor force, and* **failure to attract and retain qualified employees could negatively impact our business, results of operations and financial condition.**

…even **if we are able to identify, hire and train our labor force, there is no guarantee that we will be able to retain these employees. Any shortage of labor or lack of regular availability could restrict our ability to operate our greenhouses profitably, or at all.**

\*\*\*

**Any significant or unexpected rejection of our products could negatively impact our results of operations, and we may be unable to sell the rejected products to other third parties.**

\*\*\*

**If our products** fail to gain market acceptance, are restricted by regulatory requirements or **have quality problems, we may not be able to fully recover costs and expenses incurred in our operations, and our business, financial condition or results of operations could be materially and adversely affected.**

\*\*\*

**In future periods, revenue growth could slow or revenue could decline for a number of reasons, including** slowing demand for our products, increasing competition, a decrease in the growth of the overall market, or **our failure, for any reason, to take advantage of growth opportunities. If our assumptions**

**regarding these risks and uncertainties and future revenue growth are incorrect or change, or if we do not address these risks successfully, our operating and financial results could differ materially from our expectations, and our business could suffer.**

\*\*\*

**The COVID-19 pandemic could negatively impact on our business, results of operations and financial condition.**/…/

…**Although we have not experienced material financial impacts due to the pandemic**, the fluid nature of the COVID-19 pandemic and uncertainties regarding the related economic impact are likely to result in sustained market turmoil, which could also negatively impact our business, financial condition and cash flows. Although our business is considered an "essential business," **the COVID-19 pandemic could result in labor shortages, which could result in our inability to plant and harvest crops at full capacity and could result in spoilage or loss of unharvested crops.…The extent of COVID-19's effect on our operational and financial performance will depend on future developments**, including the duration, spread and intensity of the pandemic, all of which are uncertain and difficult to predict considering the rapidly evolving landscape. **As a result, it is not currently possible to ascertain the overall impact of COVID-19 on our business. However, if the pandemic continues to persist as a severe worldwide health crisis, the disease could negatively impact our business, financial condition results of operations and cash flows, and may also have the effect of heightening many of the other risks described in this "Risk Factors" section.**

(Underlined emphasis added and challenged, all other emphasis in original).

182.    The above statements were materially false, misleading, and/or lacked a reasonable basis when made because: (a) Defendants speculatively portray their ability to "effectively manage our growth," "execute on our business plan," "satisfy customer requirements or maintain high quality product offerings" as contingent or potential when AppHarvest was already failing to do all of these things resulting in lower saleable yield and quality products, and higher customer rejections and costs; (b) Defendants make boilerplate speculation that vague "developments" or periods of "reduced production at the Morehead facility" could disrupt AppHarvest's ability to "meet our contractual obligations and operate our business" when the Company's operations were already deteriorating because of the Company's inability to produce USDA Grade No. 1 tomatoes;

(c) Defendants speculate that "failure to attract and retain qualified employees could negatively impact" AppHarvest's business when the Company was already suffering massive attrition, and Defendants misrepresent that a potential "shortage of labor or lack of regular availability" or the Company's potential inability to "train [its] labor force" and "retain" employees could potentially affect AppHarvest, including its "ability to operate our greenhouses profitably," when, in reality, those situations had already transpired; (d) Defendants speculate that "significant or unexpected rejection of our products" could "negatively impact" results when AppHarvest was already experiencing massive customer rejections from Mastronardi because of poor quality that eroded sales and inflated costs, and Defendants speculate further that the Company may not be able to resell rejected products to "other third parties" when AppHarvest was not doing so, but rather was selling "substantially all" of its products to Mastronardi and donating or composting the rejections; (e) Defendants speculate that "quality problems" could "materially and adversely" affect AppHarvest's "business, financial condition or results of operations" when they were already doing so; (f) Defendants make a boilerplate and vague disclaimer that if AppHarvest fails to "take advantage of growth opportunities" "for any reason" it might see declining revenue, when Defendants were already experiencing wide-ranging execution problems for the entire first harvesting season that were doing exactly that; and (g) Defendants falsely misrepresent AppHarvest has "not experienced material financial impacts due to the pandemic" and speculate that the COVID-19 pandemic, due to contingent and vague "future developments," *could* negatively impact AppHarvest's "business, results of operations and financial condition" and "cash flows," *could* "result in labor shortages," *could* cause an "inability to plant and harvest crops at full capacity," and *could* "result in spoilage or loss of unharvested crops" when all of those things were already happening because COVID-19 had caused AppHarvest to operate severely

understaffed during the first growing and harvesting season because employees were quarantining. The material falsity of Defendants' speculative, contingent, and woefully incomplete statements of known risks is supported by ample evidence, given that:

(i)     Defendants admitted that for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)    Defendants admitted that for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii)   Defendants Lee's and Eggleton's admissions on the Q1 2021 earnings call that "training" issues existed in the first quarter of 2021 that were hampering "productivity" and driving gross loss;

(iv)    Defendants' admissions in the 2021 Q2 Earnings Release, the Q2 2021 Earnings Presentation, and the 2021 Q2 Earnings Call that "operational" and "executional" challenges—including lower quality production and saleable yield, and higher distribution and shipping expense incurred as a result of rejections—existed for the "initial growing season" and the "full season of harvest as a Company";

(v)     according to CW1 and CW4, AppHarvest did not offer employees adequate (if any) training throughout the Class Period. According to CW1, AppHarvest's inadequately trained workforce contributed to 5-10% of crops being wasted or damaged during CW1's tenure, which resulted in lost sales. According to CW5, up to 50% of AppHarvest's crop was wasted in the first growing season caused by workers in the Greenhouse and Packhouse. Further, CW4 confirmed that tomatoes were wasted "daily" during harvesting season;

(vi)    CW6 explained that during the Class Period, AppHarvest's attrition and retention metrics in the first half of 2021 were far worse than expected because AppHarvest was clearly falling short week over week. Indeed, according to CW1 and CW2, throughout the Class Period AppHarvest suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including:

        a.  dissatisfaction with mandatory expanded working hours—including forced overtime, Saturdays, and holidays, and

b.   infection and quarantining due to the COVID-19 pandemic,

all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes.

CW4 likewise stated that there was significant turnover throughout CW4's tenure at AppHarvest, with the west side of the Greenhouse losing at least 10 personnel every week. CW4 stated that the turnover resulted in less trained staff and thereby lower yields because there were fewer Crop Care Specialists to do the work.

CW5 confirmed that employee turnover and churn had been consistently high throughout October 2020 and June 2021, causing concern amongst Greenhouse personnel that AppHarvest had inadequate labor to meet production requirements as was discussed at the morning stand-up meetings CW5 attended;

(vii)   according to CW1, CW2, and CW4 throughout the Class Period AppHarvest's own incentive piece rate structure incentivized disruptive and inefficient workmanship that wasted, damaged, and produced low quality tomatoes;

(viii)   CW6 stated that Mastronardi informed AppHarvest that it needed to tighten up specifications because Mastronardi was having to reject a lot of fruit throughout the Class Period—upwards of 30% to 35% during the Company's "toughest times," which was "many times" more than AppHarvest's target which CW6 believed was 6% or 7%;

(ix)   according to CW2, "half" of all tomatoes inspected were USDA Grade No. 2 or not commercially saleable, and CW6 confirmed that AppHarvest was a "long way off" its quality goals;

(x)   CW6 stated that in the "toughest times" of the first growing season AppHarvest was well below 50% in relation to the Company's productivity standards for specific Greenhouse jobs.

## IX.   False and Misleading Statements in AppHarvest's March 4, 2021 Prospectus

183.   On March 4, 2021, shortly after the market opened, AppHarvest filed a Prospectus with the SEC pursuant to SEC Rule 424(b)(3) promulgated under the Securities Act of 1933 (the "March 4 Prospectus").

184.   A subsection of the March 4 Prospectus titled "**Our Solution**" (emphasis in original), **"We believe there is a large population of workers in the Central Appalachian region who are eager to find long-term career opportunities like those being offered by**

83

**AppHarvest**…**As a result, we believe we can staff and retain our workers with less churn**, immigration challenges **and unfilled positions** that many of our competitors face."

185.    Relatedly, a subsection of the March 4 Prospectus titled "**Our Strengths**[,]" falsely and/or misleadingly stated in pertinent part: "**We were able to efficiently hire many employees as we opened our first facility in Morehead** and have identified talent to join our team at the facilities we are developing in Richmond and Berea."

186.    The above statements were materially false, misleading, and/or lacked a reasonable basis when made because: (a) Defendants' statements that prospective employees were seeking "long-term" employment, and that AppHarvest was able to "staff and retain" workers with "less churn" and less "unfilled positions," and that AppHarvest was able to "efficiently hire many employees" as it opened the Morehead Facility were not supported by, and/or concealed, known facts that directly contradicted those statements which left AppHarvest's workforce short-staffed, unproductive, and insufficiently trained; and (b) the statements misrepresented AppHarvest's frequent hiring as a "Strength" rather than what it was—a known consequence, born out of necessity, of the significant amount of concealed employee attrition, turnover, and churn that AppHarvest had experienced. The material falsity of the above statements is supported by ample evidence given that:

(i)     as Defendants would later admit, for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, AppHarvest was "adversely impacted" by "labor" challenges which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)    as Defendants would later admit, for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii)   CW6 explained that during the Class Period, AppHarvest's attrition and retention metrics in the first half of 2021 were far worse than expected because AppHarvest

was clearly falling short week over week. Indeed, according to CW1 and CW2, throughout the Class Period AppHarvest suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including:

c. dissatisfaction with mandatory expanded working hours—including forced overtime, Saturdays, and holidays, and

d. infection and quarantining due to the COVID-19 pandemic,

all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes.

CW4 likewise stated that there was significant turnover throughout CW4's tenure at AppHarvest, with the west side of the Greenhouse losing at least 10 personnel every week. CW4 stated that the turnover resulted in less trained staff and thereby lower yields because there were fewer Crop Care Specialists to do the work.

CW5 confirmed that employee turnover and churn had been consistently high throughout October 2020 and June 2021, causing concern amongst Greenhouse personnel that AppHarvest had inadequate labor to meet production requirements as was discussed at the morning stand-up meetings CW5 attended.

(iv)   As was confirmed in Defendants' post Class Period 10-Q disclosures for Q3 2021, CW5 stated that due to the pervasive staffing issues described above, regional labor was insufficient and AppHarvest had to bring in contract labor to help during times of poor attendance.

187.   Furthermore, the above statements were materially false, misleading, and/or lacked a reasonable basis when made in light of the circumstances. As of March 4, 2021, AppHarvest was staffing its first, massive CEA facility and the Morehead Facility's productivity would depend, in part, on Defendants' ability to "efficiently hire" and "retain" staff to minimize "churn" and "unfilled positions"—as evidenced by Defendants' frequent updates and assurances to market participants regarding the Company's hiring efforts (*see* ¶¶69-74, *supra*). It was misleading for Defendants to make the above statements, and thereby paint AppHarvest's hiring in an undeservedly rosy light, without also disclosing adverse circumstances.

188.    The March 4 Prospectus, also contained false, misleading, and woefully incomplete risk disclosures with respect to investing in AppHarvest which state, in pertinent part:

**Risks Related to Our Business and Industry**

…Even if [AppHarvest's] investments do result in the growth of our business, **if we do not effectively manage our growth, we may not be able to execute on our business plan** and vision, respond to competitive pressures, **take advantage of market opportunities, satisfy customer requirements or maintain high-quality product offerings, any of which could adversely affect our business, financial condition and results of operations.**

***

*We currently rely on a single facility for all of our operations.*

….**Adverse changes or developments affecting the Morehead facility could impair our ability to produce our products and our business, prospects, financial condition and results of operations. Any shutdown or period of reduced production at the Morehead facility,** which may be caused by regulatory noncompliance or other issues, as well as other factors beyond our control, such as severe weather conditions, natural disaster, fire, power interruption, work stoppage, disease outbreaks or pandemics (such as COVID-19), equipment failure or delay in supply delivery, **would significantly disrupt our ability to grow and deliver our produce in a timely manner, meet our contractual obligations and operate our business.**

***

*We depend on employing a skilled local labor force, and* **failure to attract and retain qualified employees could negatively impact our business, results of operations and financial condition.**

***

…even **if we are able to identify, hire and train our labor force, there is no guarantee that we will be able to retain these employees. Any shortage of labor or lack of regular availability could restrict our ability to operate our greenhouses profitably, or at all.**

***

**Any significant or unexpected rejection of our products could negatively impact our results of operations, and our may be unable to sell the rejected products to other third parties.**

\*\*\*

**If our products** fail to gain market acceptance, are restricted by regulatory requirements or **have quality problems, we may not be able to fully recover costs and expenses incurred in our operations, and our business, financial condition or results of operations could be materially and adversely affected.**

\*\*\*

**In future periods, revenue growth could slow or revenue could decline for a number of reasons, including** slowing demand for our products, increasing competition, a decrease in the growth of the overall market, or our failure, for any reason, to take advantage of growth opportunities. If our **assumptions regarding these risks and uncertainties and future revenue growth are incorrect or change, or if we do not address these risks successfully, our operating and financial results could differ materially from our expectations, and our business could suffer.**

\*\*\*

**The COVID-19 pandemic could negatively impact on our business, results of operations and financial condition.**/…/

\*\*\*

….**Although we have not experienced material financial impacts due to the pandemic**, the fluid nature of the COVID-19 pandemic and uncertainties regarding the related economic impact are likely to result in sustained market turmoil, which could also negatively impact our business, financial condition and cash flows. Although our business is considered an "essential business," **the COVID-19 pandemic could result in labor shortages, which could result in our inability to plant and harvest crops at full capacity and could result in spoilage or loss of unharvested crops….The extent of COVID-19's effect on our operational and financial performance will depend on future developments**, including the duration, spread and intensity of the pandemic, all of which are uncertain and difficult to predict considering the rapidly evolving landscape. **As a result, it is not currently possible to ascertain the overall impact of COVID-19 on our business. However, if the pandemic continues to persist as a severe worldwide health crisis, the disease could negatively impact our business, financial condition results of operations and cash flows, and may also have the effect of heightening many of the other risks described in this "Risk Factors" section**.

(Underlined emphasis added and challenged, all other emphasis in original).

189.    The above statements were materially false, misleading, and/or lacked a reasonable basis when made because: (a) Defendants speculatively portray their ability to "effectively manage our growth," "execute on our business plan," "satisfy customer requirements or maintain high quality product offerings" as contingent or potential when AppHarvest was already failing to do all of these things resulting in lower saleable yield and quality products, and higher customer rejections and costs; (b) Defendants make boilerplate speculation that vague "developments" or periods of "reduced production at the Morehead facility" could disrupt AppHarvest's ability to "meet our contractual obligations and operate our business" when the Company's operations were already deteriorating because of the Company's inability to produce USDA Grade No. 1 tomatoes; (c) Defendants speculate that "failure to attract and retain qualified employees could negatively impact" AppHarvest's business when the Company was already suffering massive attrition, and Defendants misrepresent that a potential "shortage of labor or lack of regular availability" or the Company's potential inability to "train [its] labor force" and "retain" employees could potentially affect AppHarvest, including its "ability to operate our greenhouses profitably," when, in reality, those situations had already transpired; (d) Defendants speculate that "significant or unexpected rejection of our products" could "negatively impact" results when AppHarvest was already experiencing massive customer rejections from Mastronardi because of poor quality that eroded sales and inflated costs, and Defendants speculate further that the Company may not be able to resell rejected products to "other third parties" when AppHarvest was not doing so, but rather was selling "substantially all" of its products to Mastronardi and donating or composting the rejections; (e) Defendants speculate that "quality problems" could "materially and adversely" affect AppHarvest's "business, financial condition or results of operations" when they were already doing so; (f) Defendants make a boilerplate and vague disclaimer that if AppHarvest fails to "take

advantage of growth opportunities" "for any reason" it might see declining revenue, when Defendants were already experiencing wide-ranging execution problems for the entire first harvesting season that were doing exactly that; and (g) Defendants falsely misrepresent AppHarvest has "not experienced material financial impacts due to the pandemic" and speculate that the COVID-19 pandemic, due to contingent and vague "future developments," *could* negatively impact AppHarvest's "business, results of operations and financial condition" and "cash flows," *could* "result in labor shortages," *could* cause an "inability to plant and harvest crops at full capacity," and *could* "result in spoilage or loss of unharvested crops" when all of those things were already happening because COVID-19 had caused AppHarvest to operate severely understaffed during the first growing and harvesting season because employees were quarantining. The material falsity of Defendants' speculative, contingent, and woefully incomplete statements of known risks is supported by ample evidence, given that:

(i)     Defendants admitted that for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)    Defendants admitted that for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii)   Defendants Lee's and Eggleton's admissions on the Q1 2021 earnings call that "training" issues existed in the first quarter of 2021 that were hampering "productivity" and driving gross loss;

(iv)    Defendants' admissions in the 2021 Q2 Earnings Release, the Q2 2021 Earnings Presentation, and the 2021 Q2 Earnings Call that "operational" and "executional" challenges—including lower quality production and saleable yield, and higher distribution and shipping expense incurred as a result of rejections—existed for the "initial growing season" and the "full season of harvest as a Company";

(v)     according to CW1 and CW4, AppHarvest did not offer employees adequate (if any) training throughout the Class Period. According to CW1, AppHarvest's inadequately trained workforce contributed to 5-10% of crops being wasted or damaged during CW1's tenure, which resulted in lost sales. According to CW5, up to 50% of AppHarvest's crop was wasted in the first growing season caused by workers in the Greenhouse and Packhouse. Further, CW4 confirmed that tomatoes were wasted "daily" during harvesting season;

(vi)    CW6 explained that during the Class Period, AppHarvest's attrition and retention metrics in the first half of 2021 were far worse than expected because AppHarvest was clearly falling short week over week. Indeed, according to CW1 and CW2, throughout the Class Period AppHarvest suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including:

     a.   dissatisfaction with mandatory expanded working hours—including forced overtime, Saturdays, and holidays, and

     b.   infection and quarantining due to the COVID-19 pandemic,

all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes.

CW4 likewise stated that there was significant turnover throughout CW4's tenure at AppHarvest, with the west side of the Greenhouse losing at least 10 personnel every week. CW4 stated that the turnover resulted in less trained staff and thereby lower yields because there were fewer Crop Care Specialists to do the work.

CW5 confirmed that employee turnover and churn had been consistently high throughout October 2020 and June 2021, causing concern amongst Greenhouse personnel that AppHarvest had inadequate labor to meet production requirements as was discussed at the morning stand-up meetings CW5 attended;

(vii)   according to CW1, CW2, and CW4 throughout the Class Period AppHarvest's own incentive piece rate structure incentivized disruptive and inefficient workmanship that wasted, damaged, and produced low quality tomatoes;

(viii)  CW6 stated that Mastronardi informed AppHarvest that it needed to tighten up specifications because Mastronardi was having to reject a lot of fruit throughout the Class Period—upwards of 30% to 35% during the Company's "toughest times," which was "many times" more than AppHarvest's target which CW6 believed was 6% or 7%;

(ix)    according to CW2, "half" of all tomatoes inspected were USDA Grade No. 2 or not commercially saleable, and CW6 confirmed that AppHarvest was a "long way off" its quality goals;

(x)     CW6 stated that in the "toughest times" of the first growing season AppHarvest was well below 50% in relation to the Company's productivity standards for specific Greenhouse jobs.

## X.    False and Misleading Statements in a March 4, 2021 Interview with Benzinga

190.    On March 4, 2021, during trading hours, Defendant Lee was interviewed by Mitch Hoch and Chris Katje on a livestream viewable on the YouTube channel for Benzinga, a popular investing news website. During the interview, Defendant Lee gave an update on the Company's operations relating to AppHarvest's "first" harvest stating, in pertinent part:

> Katje: <u>Can you talk a little bit about that first, you know, crop</u>? So, tomatoes [are] delivered to some national grocer companies. You know, I see Walmart and Kroger listed as partners in that investor presentation. Can you talk a little bit about those partners like Walmart and Kroger, and then maybe some areas or some companies that are being targeted with the tomatoes? [Underlined emphasis added to question.]

> Lee: …The good news is that we've been able to partner with retailers who indicate that demand is not the problem to solve here. **<u>I think that every tomato that we've produced has been readily put into the market</u>**.

191.    Defendant Lee's statement that "every tomato" AppHarvest "produced has been readily put into the market" was materially false, misleading, and/or lacked a reasonable basis when made because significant quantities of tomatoes that were being "produced" ended up wasted, spoiled, or rejected. Furthermore, Defendant Lee's statement fraudulently obfuscates that significant quantities of tomatoes "put into the market" were poor quality and thus garnered poor pricing or were rejected. The material falsity of Defendant Lee's statement is supported by ample evidence, given that:

(i)     Defendants admitted that for the "***six months***" ended June 30, 2021, *i.e.*, beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower

overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)    Defendants admitted that for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii)   Defendants Lee's and Eggleton's admissions on the Q1 2021 earnings call that "training" issues existed in the first quarter of 2021 that were hampering "productivity" and driving gross loss;

(iv)    Defendants' admissions in the 2021 Q2 Earnings Release, Q2 2021 Earnings Presentation, and the 2021 Q2 Earnings Call that "operational" and "executional" challenges—including lower quality production and saleable yield, and higher distribution and shipping expense incurred as a result of rejections—existed for the "initial growing season" and the "full season of harvest as a Company";

(v)     according to CW1 and CW4, AppHarvest did not offer employees adequate (if any) training throughout the Class Period. According to CW1, AppHarvest's inadequately trained workforce contributed to 5-10% of crops being wasted or damaged during CW1's tenure, which resulted in lost sales. According to CW5 up to 50% of AppHarvest's crop was wasted in the first growing season caused by workers in the Greenhouse and Packhouse. Further, CW4 confirmed that tomatoes were wasted "daily" during harvesting season;

(vi)    CW6 explained that during the Class Period, AppHarvest's attrition and retention metrics in the first half of 2021 were far worse than expected because AppHarvest was clearly falling short week over week. Indeed, according to CW1 and CW2, throughout the Class Period AppHarvest suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including:

    a.   dissatisfaction with mandatory expanded working hours—including forced overtime, Saturdays, and holidays, and

    b.   infection and quarantining due to the COVID-19 pandemic,

    all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes.

    CW4 likewise stated that there was significant turnover throughout CW4's tenure at AppHarvest, with the west side of the Greenhouse losing at least 10 personnel every week. CW4 stated that the turnover resulted in less trained staff and thereby lower yields because there were fewer Crop Care Specialists to do the work.

CW5 confirmed that employee turnover and churn had been consistently high throughout October 2020 and June 2021, causing concern amongst Greenhouse personnel that AppHarvest had inadequate labor to meet production requirements as was discussed at the morning stand-up meetings CW5 attended;

(vii)    according to CW1, CW2, and CW4 throughout the Class Period AppHarvest's own incentive piece rate structure incentivized disruptive and inefficient workmanship that wasted, damaged, and produced low quality tomatoes;

(viii)   CW6 stated that Mastronardi informed AppHarvest that it needed to tighten up specifications because Mastronardi was having to reject a lot of fruit throughout the Class Period—upwards of 30% to 35% during the Company's "toughest times," which was "many times" more than AppHarvest's target which CW6 believed was 6% or 7%;

(ix)     according to CW2, "half" of all tomatoes inspected were USDA Grade No. 2 or not commercially saleable, and CW6 confirmed that AppHarvest was a "long way off" its quality goals;

(x)      CW6 stated that in the "toughest times" of the first growing season AppHarvest was well below 50% in relation to the Company's productivity standards for specific Greenhouse jobs.

## XI.    False and Misleading Statements in AppHarvest's April 1, 2021 Press Release

192.    On April 1, 2021, before market open, AppHarvest issued a press release via Globe Newswire titled "AppHarvest Announces First Harvest of Tomatoes on the Vine from High-Tech Morehead Farm Shipping to Grocery Stores" (the "April 1 Press Release").

193.    In the April 1 Press Release, Defendant Webb misleadingly touted the Company's dysfunctional harvesting efforts, stating, in pertinent part: "**This harvest also has proved the team can handle the production ramp-up at our Morehead facility** as we are now using all grow space at the high-tech farm."

194.    Webb's statements were materially false, misleading, and/or lacked a reasonable basis when made because AppHarvest's "harvest" had not "proved" the "team" could "handle the production ramp-up" at the Morehead Facility. In reality, the "harvest" had been disastrous

because the "team" produced significant quantities of tomatoes that ended up wasted, spoiled, or

rejected, given that:

(i)     Defendants admitted that for the "***six months***" ended June 30, 2021, *i.e.*, beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)    Defendants admitted that for the "***six months***" ended June 30, 2021, *i.e.*, beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii)   Defendants' numerous statements in the August 11, 2021 corrective disclosures admitting "labor" and employee "training" issues existed in 2Q 2021, including Webb's statement on the 2021 Q2 Earnings Call admitting AppHarvest's problems were "as simple as training. I don't want to be more blunt than that, but it was training and management protocols";

(iv)    Defendants Lee's and Eggleton's admissions on the Q1 2021 earnings call that "training" issues existed in the first quarter of 2021 that were hampering "productivity" and driving gross loss;

(v)     Defendants' admissions in the 2021 Q2 Earnings Release, the Q2 2021 Earnings Presentation, and the 2021 Q2 Earnings Call that "operational" and "executional" challenges—including lower quality production and saleable yield, and higher distribution and shipping expense incurred as a result of rejections—existed for the "initial growing season" and the "full season of harvest as a Company";

(vi)    according to CW1 and CW4, AppHarvest did not offer employees adequate (if any) training throughout the Class Period. According to CW1, AppHarvest's inadequately trained workforce contributed to 5-10% of crops being wasted or damaged during CW1's tenure, which resulted in lost sales. According to CW5 up to 50% of AppHarvest's crop was wasted in the first growing season caused by workers in the Greenhouse and Packhouse. Further, CW4 confirmed that tomatoes were wasted "daily" during harvesting season;

(vii)   CW6 explained that during the Class Period, AppHarvest's attrition and retention metrics in the first half of 2021 were far worse than expected because AppHarvest was clearly falling short week over week. Indeed, according to CW1 and CW2, throughout the Class Period AppHarvest suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including:

a. dissatisfaction with mandatory expanded working hours—including forced overtime, Saturdays, and holidays, and

b. infection and quarantining due to the COVID-19 pandemic,

all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes.

CW4 likewise stated that there was significant turnover throughout CW4's tenure at AppHarvest, with the west side of the Greenhouse losing at least 10 personnel every week. CW4 stated that the turnover resulted in less trained staff and thereby lower yields because there were fewer Crop Care Specialists to do the work.

CW5 confirmed that employee turnover and churn had been consistently high throughout October 2020 and June 2021, causing concern amongst Greenhouse personnel that AppHarvest had inadequate labor to meet production requirements as was discussed at the morning stand-up meetings CW5 attended;

(viii)  according to CW1, CW2, and CW4 throughout the Class Period AppHarvest's own incentive piece rate structure incentivized disruptive and inefficient workmanship that wasted, damaged, and produced low quality tomatoes;

(ix)  CW6 stated that Mastronardi informed AppHarvest that it needed to tighten up specifications because Mastronardi was having to reject a lot of fruit throughout the Class Period—upwards of 30% to 35% during the Company's "toughest times," which was "many times" more than AppHarvest's target which CW6 believed was 6% or 7%;

(x)  according to CW2, "half" of all tomatoes inspected were USDA Grade No. 2 or not commercially saleable, and CW6 confirmed that AppHarvest was a "long way off" its quality goals;

(xi)  CW6 stated that in the "toughest times" of the first growing season AppHarvest was well below 50% in relation to the Company's productivity standards for specific Greenhouse jobs.

## XII.   False and Misleading Statements in AppHarvest's April 6, 2021 Form S-8

195.  On April 6, 2021, after market close, AppHarvest filed a Registration Statement with the SEC on form S-8 (the "April 6 Form S-8"), signed by Defendants Webb, Eggleton, and Lee.

196.    The April 6 Form S-8 incorporated by reference all of Defendants' false and misleading statements made in the February 2 Form 8-K and the March 4 Prospectus. Specifically, the April 6 Form S-8 stated, in pertinent part:

> **The following documents filed by AppHarvest, Inc. (the "*Registrant*") with the Securities and Exchange Commission (the "*SEC*") are incorporated by reference into this Registration Statement:**
>
> **…(b) The Registrant's Current Reports on Form 8-K (File No. 001-39288) filed with the SEC on** February 1, 2021, **February 2, 2021** (as amended on March 2, 2021), March 2, 2021 and March 29, 2021.
>
> **(c) The Registrant's Final Prospectus filed with the SEC on March 4, 2021 pursuant to Rule 424(b) under the Securities Act relating to the Registration Statement on Form S-1, as amended (File No. 333-252964).**

197.    Accordingly, the statements above, incorporating by reference the February 2 Form 8-K and the March 4 Prospectus, were false and misleading for the same reasons described above in Paragraphs 158 through 163 and Paragraphs 183 through 189.

## XIII.    False and Misleading Statements in AppHarvest's May 17, 2021 Press Release

198.    On May 17, 2021, before market open, AppHarvest issued a press release via Globe Newswire announcing its first quarter results and stating it "reiterates net sales outlook for the year" (the "May 17 Press Release"). The May 17 Press Release was also filed with the SEC in a Current Report filed on Form 8-K, singed by Defendant Eggleton.

199.    The May 17 Press Release's "Financial Outlook" "reiterated" AppHarvest's full-year net sales outlook. In explaining this "reiterated" outlook, Defendant Lee highlighted the Company's "operating and financial performance" at the Morehead Facility and the "team's ability to scale the business," stating, in pertinent part:

**Financial Outlook**

**The Company reiterated its full-year 2021 outlook of net sales** of $20 to $25 million…

"**We are pleased by our fast start to the year, the encouraging operating and financial performance of our Morehead facility and our team's ability to scale the business**…," said AppHarvest President David Lee.

200.    Defendant Lee's statements above were materially false, misleading, and/or lacked a reasonable basis when made because the "operating and financial performance" and "ability to scale" were misattributed as providing support for AppHarvest's "Financial Outlook" when such "performance" had already deteriorated and, due to its severe operational issues, AppHarvest was unable to "scale" operations in line with expectation given that:

(i)     Defendants admitted that for the "***six months***" ended June 30, 2021, *i.e.*, beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)    Defendants admitted that for the "***six months***" ended June 30, 2021, *i.e.*, beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii)   Defendants' numerous statements in the August 11, 2021 corrective disclosures admitting "labor" and employee "training" issues existed in 2Q 2021, including Webb's statement on the 2021 Q2 Earnings Call admitting AppHarvest's problems were "as simple as training. I don't want to be more blunt than that, but it was training and management protocols";

(iv)    Defendants Lee's and Eggleton's admissions on the Q1 2021 earnings call that "training" issues existed in the first quarter of 2021 that were hampering "productivity" and driving gross loss;

(v)     Defendants' admissions in the 2021 Q2 Earnings Release, the Q2 2021 Earnings Presentation, and the 2021 Q2 Earnings Call that "operational" and "executional" challenges—including lower quality production and saleable yield, and higher distribution and shipping expense incurred as a result of rejections—existed for the "initial growing season" and the "full season of harvest as a Company";

(vi)    according to CW1 and CW4, AppHarvest did not offer employees adequate (if any) training throughout the Class Period. According to CW1, AppHarvest's inadequately trained workforce contributed to 5-10% of crops being wasted or damaged during CW1's tenure, which resulted in lost sales. According to CW5 up to 50% of AppHarvest's crop was wasted in the first growing season caused by workers in the Greenhouse and Packhouse. Further, CW4 confirmed that tomatoes were wasted "daily" during harvesting season;

(vii)   CW6 explained that during the Class Period, AppHarvest's attrition and retention metrics in the first half of 2021 were far worse than expected because AppHarvest was clearly falling short week over week. Indeed, according to CW1 and CW2, throughout the Class Period AppHarvest suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including:

        a.   dissatisfaction with mandatory expanded working hours—including forced overtime, Saturdays, and holidays, and

        b.   infection and quarantining due to the COVID-19 pandemic,

        all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes.

        CW4 likewise stated that there was significant turnover throughout CW4's tenure at AppHarvest, with the west side of the Greenhouse losing at least 10 personnel every week. CW4 stated that the turnover resulted in less trained staff and thereby lower yields because there were fewer Crop Care Specialists to do the work.

        CW5 confirmed that employee turnover and churn had been consistently high throughout October 2020 and June 2021, causing concern amongst Greenhouse personnel that AppHarvest had inadequate labor to meet production requirements as was discussed at the morning stand-up meetings CW5 attended;

(viii)  according to CW1, CW2, and CW4 throughout the Class Period AppHarvest's own incentive piece rate structure incentivized disruptive and inefficient workmanship that wasted, damaged, and produced low quality tomatoes;

(ix)    CW6 stated that Mastronardi informed AppHarvest that it needed to tighten up specifications because Mastronardi was having to reject a lot of fruit throughout the Class Period—upwards of 30% to 35% during the Company's "toughest times," which was "many times" more than AppHarvest's target which CW6 believed was 6% or 7%;

(x)     according to CW2, "half" of all tomatoes inspected were USDA Grade No. 2 or not commercially saleable, and CW6 confirmed that AppHarvest was a "long way off" its quality goals;

(xi)    CW6 stated that in the "toughest times" of the first growing season AppHarvest was well below 50% in relation to the Company's productivity standards for specific Greenhouse jobs.

## XIV.   False and Misleading Statements in AppHarvest's May 17, 2021 Form 10-Q

201.    On May 17, 2021, after market close, AppHarvest filed a Quarterly Report with the SEC on Form 10-Q (the "May 17 Form 10-Q"), signed by Defendant Eggleton. Additionally, Defendants Webb and Eggleton signed certifications of having reviewed the May 17 Form 10-Q, as required by the Sarbanes-Oxley Act of 2002.

202.    The May 17 Form 10-Q, contained false, misleading, and woefully incomplete risk disclosures with respect to investing in AppHarvest which state, in pertinent part:

**Risks Related to Our Business and Industry**

…Even if [AppHarvest's] investments do result in the growth of our business, **if we do not effectively manage our growth, we may not be able to execute on our business plan and vision, respond to competitive pressures, take advantage of market opportunities, satisfy customer requirements or maintain high-quality product offerings, any of which could adversely affect our business, financial condition and results of operations.**

*** 

*We currently rely on a single facility for all of our operations.*

…**Adverse changes or developments affecting the Morehead facility could impair our ability to produce our products and our business, prospects, financial condition and results of operations. Any shutdown or period of reduced production at the Morehead facility,** which may be caused by regulatory noncompliance or other issues, as well as other factors beyond our control, such as severe weather conditions, natural disaster, fire, power interruption, work stoppage, disease outbreaks or pandemics (such as COVID-19), equipment failure or delay in supply delivery, **would significantly disrupt our ability to grow and deliver our produce in a timely manner, meet our contractual obligations and operate our business.**

\*\*\*

***We depend on employing a skilled local labor force, and <u>failure to attract and retain qualified employees could negatively impact our business, results of operations and financial condition.</u>***

\*\*\*

…even **<u>if we are able to identify, hire and train our labor force, there is no guarantee that we will be able to retain these employees. Any shortage of labor or lack of regular availability could restrict our ability to operate our greenhouses profitably, or at all.</u>**

\*\*\*

**<u>Any significant or unexpected rejection of our products could negatively impact our results of operations, and we may be unable to sell the rejected products to other third parties.</u>**

\*\*\*

**<u>If our products</u>** fail to gain market acceptance, are restricted by regulatory requirements or **<u>have quality problems, we may not be able to fully recover costs and expenses incurred in our operations, and our business, financial condition or results of operations could be materially and adversely affected.</u>**

\*\*\*

**<u>In future periods, revenue growth could slow or revenue could decline for a number of reasons, including</u>** slowing demand for our products, increasing competition, a decrease in the growth of the overall market, or **<u>our failure, for any reason, to take advantage of growth opportunities. If our assumptions regarding these risks and uncertainties and future revenue growth are incorrect or change, or if we do not address these risks successfully, our operating and financial results could differ materially from our expectations, and our business could suffer.</u>**

\*\*\*

**<u>The COVID-19 pandemic could negatively impact on our business, results of operations and financial condition.</u>/…/**

\*\*\*

…**<u>Although we have not experienced material financial impacts due to the pandemic</u>**, the fluid nature of the COVID-19 pandemic and uncertainties regarding

100

the related economic impact are likely to result in sustained market turmoil, which could also negatively impact our business, financial condition and cash flows. Although our business is considered an "essential business," **the COVID-19 pandemic could result in labor shortages, which could result in our inability to plant and harvest crops at full capacity and could result in spoilage or loss of unharvested crops.…The extent of COVID-19's effect on our operational and financial performance will depend on future developments**, including the duration, spread and intensity of the pandemic and the effectiveness of vaccines against COVID-19 and variants thereof, all of which are uncertain and difficult to predict considering the rapidly evolving landscape. **As a result, it is not currently possible to ascertain the overall impact of COVID-19 on our business. However, if the pandemic continues to persist as a severe worldwide health crisis, the disease could negatively impact our business, financial condition results of operations and cash flows, and may also have the effect of heightening many of the other risks described in this "Risk Factors" section**.

(Underlined emphasis added and challenged, all other emphasis in original).

203.    The above statements were materially false, misleading, and/or lacked a reasonable basis when made because: (a) Defendants speculatively portray their ability to "effectively manage our growth," "execute on our business plan," "satisfy customer requirements or maintain high quality product offerings" as contingent or potential when AppHarvest was already failing to do all of these things resulting in lower saleable yield and quality products, and higher customer rejections and costs; (b) Defendants make boilerplate speculation that vague "developments" or periods of "reduced production at the Morehead facility" could disrupt AppHarvest's ability to "meet our contractual obligations and operate our business" when the Company's operations were already deteriorating because of the Company's inability to produce USDA Grade No. 1 tomatoes; (c) Defendants speculate that "failure to attract and retain qualified employees could negatively impact" AppHarvest's business when the Company was already suffering massive attrition, and Defendants misrepresent that a potential "shortage of labor or lack of regular availability" or the Company's potential inability to "train [its] labor force" and "retain" employees could potentially affect AppHarvest, including its "ability to operate our greenhouses profitably," when, in reality,

those situations had already transpired; (d) Defendants speculate that "significant or unexpected rejection of our products" could "negatively impact" results when AppHarvest was already experiencing massive customer rejections from Mastronardi because of poor quality that eroded sales and inflated costs, and Defendants speculate further that the Company may not be able to resell rejected products to "other third parties" when AppHarvest was not doing so, but rather was selling "substantially all" of its products to Mastronardi and donating or composting the rejections; (e) Defendants speculate that "quality problems" could "materially and adversely" affect AppHarvest's "business, financial condition or results of operations" when they were already doing so; (f) Defendants make a boilerplate and vague disclaimer that if AppHarvest fails to "take advantage of growth opportunities" "for any reason" it might see declining revenue, when Defendants were already experiencing wide-ranging execution problems for the entire first harvesting season that were doing exactly that; and (g) Defendants falsely misrepresent AppHarvest has "not experienced material financial impacts due to the pandemic" and speculate that the COVID-19 pandemic, due to contingent and vague "future developments," *could* negatively impact AppHarvest's "business, results of operations and financial condition" and "cash flows," *could* "result in labor shortages," *could* cause an "inability to plant and harvest crops at full capacity," and *could* "result in spoilage or loss of unharvested crops" when all of those things were already happening because COVID-19 had caused AppHarvest to operate severely understaffed during the first growing and harvesting season because employees were quarantining. The material falsity of Defendants' speculative, contingent, and woefully incomplete statements of known risks is supported by ample evidence, given that:

     (i)     Defendants admitted that for the "***six months***" ended June 30, 2021, *i.e.*, beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower

overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)     Defendants admitted that for the "***six months***" ended June 30, 2021, *i.e.*, beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii)    Defendants' numerous statements in the August 11, 2021 corrective disclosures admitting "labor" and employee "training" issues existed in 2Q 2021, including Webb's statement on the 2021 Q2 Earnings Call admitting AppHarvest's problems were "as simple as training. I don't want to be more blunt than that, but it was training and management protocols";

(iv)     Defendants Lee's and Eggleton's admissions on the Q1 2021 earnings call that "training" issues existed in the first quarter of 2021 that were hampering "productivity" and driving gross loss;

(v)      Defendants' admissions in the 2021 Q2 Earnings Release, the Q2 2021 Earnings Presentation, and the 2021 Q2 Earnings Call that "operational" and "executional" challenges—including lower quality production and saleable yield, and higher distribution and shipping expense incurred as a result of rejections—existed for the "initial growing season" and the "full season of harvest as a Company";

(vi)     according to CW1 and CW4, AppHarvest did not offer employees adequate (if any) training throughout the Class Period. According to CW1, AppHarvest's inadequately trained workforce contributed to 5-10% of crops being wasted or damaged during CW1's tenure, which resulted in lost sales. According to CW5 up to 50% of AppHarvest's crop was wasted in the first growing season caused by workers in the Greenhouse and Packhouse. Further, CW4 confirmed that tomatoes were wasted "daily" during harvesting season;

(vii)    CW6 explained that during the Class Period, AppHarvest's attrition and retention metrics in the first half of 2021 were far worse than expected because AppHarvest was clearly falling short week over week. Indeed, according to CW1 and CW2, throughout the Class Period AppHarvest suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including:

     a.    dissatisfaction with mandatory expanded working hours—including forced overtime, Saturdays, and holidays, and

     b.    infection and quarantining due to the COVID-19 pandemic,

     all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes.

CW4 likewise stated that there was significant turnover throughout CW4's tenure at AppHarvest, with the west side of the Greenhouse losing at least 10 personnel every week. CW4 stated that the turnover resulted in less trained staff and thereby lower yields because there were fewer Crop Care Specialists to do the work.

CW5 confirmed that employee turnover and churn had been consistently high throughout October 2020 and June 2021, causing concern amongst Greenhouse personnel that AppHarvest had inadequate labor to meet production requirements as was discussed at the morning stand-up meetings CW5 attended;

(viii)   according to CW1, CW2, and CW4 throughout the Class Period AppHarvest's own incentive piece rate structure incentivized disruptive and inefficient workmanship that wasted, damaged, and produced low quality tomatoes;

(ix)   CW6 stated that Mastronardi informed AppHarvest that it needed to tighten up specifications because Mastronardi was having to reject a lot of fruit throughout the Class Period—upwards of 30% to 35% during the Company's "toughest times," which was "many times" more than AppHarvest's target which CW6 believed was 6% or 7%;

(x)   according to CW2, "half" of all tomatoes inspected were USDA Grade No. 2 or not commercially saleable, and CW6 confirmed that AppHarvest was a "long way off" its quality goals;

(xi)   CW6 stated that in the "toughest times" of the first growing season AppHarvest was well below 50% in relation to the Company's productivity standards for specific Greenhouse jobs.

204.   Further, the May 17 Form 10-Q's "Results of Operations" section gave a false and misleading presentation of AppHarvest's net sales when making its "Comparison of the Three Months Ended March 31, 2021 and 2020." The May 17 Form 10-Q stated in pertinent part:

**The following sections discuss and analyze the changes in the significant line items in our unaudited condensed consolidated statements of operations for the comparison periods identified**.

*Net Sales*

**Net sales for the three months ended March 31, 2021 were $2.3 million compared to $0 for the comparable prior year period, due to initial tomato sales produced at our Morehead CEA facility**.

205.    The above statements were materially misleading when made because Defendants discussed the "changes" in net sales while failing to state, so as not to mislead, known changes affecting net sales with respect to AppHarvest's operations. Indeed, Defendants admitted in the 2Q Form 10-Q that for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees." Thus, Defendants' failure to disclose this information in the May 17 Form 10-Q was misleading or lacked a reasonable basis. Additionally, Defendants' material omission violated Item 303 of SEC Regulation S-K which obligated them to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales…from continuing operations."

## XV.    False and Misleading Statements in AppHarvest's May 17, 2021 Earnings Call

206.    On May 17, 2021, also before market open, Defendants Webb, Eggleton, Lee and other Company executives held the 2021 Q1 Earnings Call with analysts to discuss AppHarvest's first quarter fiscal 2021 quarter results, a recording of which was thereafter uploaded to the Investor Relations page of the Company's website.

207.    During the question-and-answer portion of the 2021 Q1 Earnings Call, analysts were acutely interested in information regarding the "quality of the output" in order to get a sense of the pricing that the Company was able to command. Indeed, the very first question sought clarity "on the price side." Defendant Lee falsely and/or misleadingly claimed that AppHarvest's operations "performed" in such a way that they were: 1) responsible for the Company's purportedly strong "market pricing" in the quarter and 2) the reason that the Company was able to

affirm its previously disclosed full-year 2021 net sales guidance—while failing to disclose the operational problems that were plaguing AppHarvest's product quality, and thus, its pricing. Defendant Lee stated, in pertinent part [underlined emphasis added to question]:

> **Jeffrey David Osborne**
> *Cowen and Company, LLC, Research Division*
>
> Congratulations on your first earnings call as a public company. Just a couple of questions on my end. One, <u>I was wondering if we could get going on the pricing dynamics that you alluded to. How much of that was due to quality of the output, so non-grade 1 versus just broader market conditions</u>. I thought, historically, the winter months had seasonally higher prices relative to the summer. <u>So I'm just trying to get a sense of what the moving pieces are on the price side</u>.
>
> **David J. Lee**
> *President & Director*
>
> Jeff, this is David Lee here at AppHarvest. **What we did well is we anticipated and performed well on -- in market pricing**. A big part of that in Q1 was our relationship with Mastronardi.…

208.    The above statements were materially false, misleading, and/or lacked a reasonable basis when made because AppHarvest was not providing "quality" USDA Grade No. 1 tomatoes to its Mastronardi. Rather, Mastronardi was increasing its audits and notifying Defendants that the Company's quality was poor and leading to increased rejections. Therefore "pricing" was not "performed well on" given that:

(i)    Defendants admitted that for the "***six months***" ended June 30, 2021, *i.e.*, beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)    Defendants admitted that for the "***six months***" ended June 30, 2021, *i.e.*, beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii)    Defendants' numerous statements in the August 11, 2021 corrective disclosures admitting "labor" and employee "training" issues existed in 2Q 2021, including

Webb's statement on the 2021 Q2 Earnings Call admitting AppHarvest's problems were "as simple as training. I don't want to be more blunt than that, but it was training and management protocols";

(iv)     Defendants Lee's and Eggleton's admissions on the Q1 2021 earnings call that "training" issues existed in the first quarter of 2021 that were hampering "productivity" and driving gross loss;

(v)      Defendants' admissions in the 2021 Q2 Earnings Release, the Q2 2021 Earnings Presentation, and the 2021 Q2 Earnings Call that "operational" and "executional" challenges—including lower quality production and saleable yield, and higher distribution and shipping expense incurred as a result of rejections—existed for the "initial growing season" and the "full season of harvest as a Company";

(vi)     according to CW1 and CW4, AppHarvest did not offer employees adequate (if any) training throughout the Class Period. According to CW1, AppHarvest's inadequately trained workforce contributed to 5-10% of crops being wasted or damaged during CW1's tenure, which resulted in lost sales. According to CW5 up to 50% of AppHarvest's crop was wasted in the first growing season caused by workers in the Greenhouse and Packhouse. Further, CW4 confirmed that tomatoes were wasted "daily" during harvesting season;

(vii)    CW6 explained that during the Class Period, AppHarvest's attrition and retention metrics in the first half of 2021 were far worse than expected because AppHarvest was clearly falling short week over week. Indeed, according to CW1 and CW2, throughout the Class Period AppHarvest suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including:

a.   dissatisfaction with mandatory expanded working hours—including forced overtime, Saturdays, and holidays, and

b.   infection and quarantining due to the COVID-19 pandemic,

all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes.

CW4 likewise stated that there was significant turnover throughout CW4's tenure at AppHarvest, with the west side of the Greenhouse losing at least 10 personnel every week. CW4 stated that the turnover resulted in less trained staff and thereby lower yields because there were fewer Crop Care Specialists to do the work.

CW5 confirmed that employee turnover and churn had been consistently high throughout October 2020 and June 2021, causing concern amongst Greenhouse

personnel that AppHarvest had inadequate labor to meet production requirements as was discussed at the morning stand-up meetings CW5 attended;

(viii)  according to CW1, CW2, and CW4 throughout the Class Period AppHarvest's own incentive piece rate structure incentivized disruptive and inefficient workmanship that wasted, damaged, and produced low quality tomatoes;

(ix)  CW6 stated that Mastronardi informed AppHarvest that it needed to tighten up specifications because Mastronardi was having to reject a lot of fruit throughout the Class Period—upwards of 30% to 35% during the Company's "toughest times," which was "many times" more than AppHarvest's target which CW6 believed was 6% or 7%;

(x)  according to CW2, "half" of all tomatoes inspected were USDA Grade No. 2 or not commercially saleable, and CW6 confirmed that AppHarvest was a "long way off" its quality goals;

(xi)  CW6 stated that in the "toughest times" of the first growing season AppHarvest was well below 50% in relation to the Company's productivity standards for specific Greenhouse jobs.

209.  Additionally, above statements were materially false, misleading, and/or lacked a reasonable basis when made because Lee touted the Company's "pricing," which had deteriorated for the reasons above, as the basis that underpinned Defendants' "affirmation of our guidance in 2021," when in reality, the Company's poor product quality was undermining its financial guidance.

**XVI.  False and Misleading Statements in a May 17, 2021 Interview with Cheddar News**

210.  On May 17, 2021, after releasing AppHarvest's quarterly earnings materials, Defendant Webb participated in a series of interviews with financial news media outlets, including an interview by anchor Brad Smith on Cheddar News. During the interview, when questioned about AppHarvest's first quarter operational performance, and the Company's outlook, Defendant Webb falsely and/or misleadingly stated, in pertinent part:

Smith: [W]hen you think about what the key performance indicators that you are tracking across the business are, what would you look towards for the rest of 2021

to prove that this has been a successful year and taking some of that momentum into 2022 as well? [Underlined emphasis added to question.]

Webb: Well, we, we **hired nearly 500 people, uh, in the middle of a global pandemic. And so our operating team in Morehead, uh, for our first facility, those financial projections virtually didn't change much at all**.

211.     Defendant Webb's statements above were materially false, misleading, and/or lacked a reasonable basis when made because AppHarvest's efforts to train and staff the Morehead Facility's "operating team" during the Class Period were unsuccessful and did not support or validate AppHarvest's financial projections, given that:

(i)      Defendants admitted that for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)     Defendants admitted that for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii)    Defendants' numerous statements in the August 11, 2021 corrective disclosures admitting "labor" and employee "training" issues existed in 2Q 2021, including Webb's statement on the 2021 Q2 Earnings Call admitting AppHarvest's problems were "as simple as training. I don't want to be more blunt than that, but it was training and management protocols";

(iv)     Defendants Lee's and Eggleton's admissions on the Q1 2021 earnings call that "training" issues existed in the first quarter of 2021 that were hampering "productivity" and driving gross loss;

(v)      Defendants' admissions in the 2021 Q2 Earnings Release, the Q2 2021 Earnings Presentation, and the 2021 Q2 Earnings Call that "operational" and "executional" challenges—including lower quality production and saleable yield, and higher distribution and shipping expense incurred as a result of rejections—existed for the "initial growing season" and the "full season of harvest as a Company";

(vi)     according to CW1 and CW4, AppHarvest did not offer employees adequate (if any) training throughout the Class Period. According to CW1, AppHarvest's inadequately trained workforce contributed to 5-10% of crops being wasted or damaged during CW1's tenure, which resulted in lost sales. According to CW5 up

to 50% of AppHarvest's crop was wasted in the first growing season caused by workers in the Greenhouse and Packhouse. Further, CW4 confirmed that tomatoes were wasted "daily" during harvesting season;

(vii)    CW6 explained that during the Class Period, AppHarvest's attrition and retention metrics in the first half of 2021 were far worse than expected because AppHarvest was clearly falling short week over week. Indeed, according to CW1 and CW2, throughout the Class Period AppHarvest suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including:

a.    dissatisfaction with mandatory expanded working hours—including forced overtime, Saturdays, and holidays, and

b.    infection and quarantining due to the COVID-19 pandemic,

all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes.

CW4 likewise stated that there was significant turnover throughout CW4's tenure at AppHarvest, with the west side of the Greenhouse losing at least 10 personnel every week. CW4 stated that the turnover resulted in less trained staff and thereby lower yields because there were fewer Crop Care Specialists to do the work.

CW5 confirmed that employee turnover and churn had been consistently high throughout October 2020 and June 2021, causing concern amongst Greenhouse personnel that AppHarvest had inadequate labor to meet production requirements as was discussed at the morning stand-up meetings CW5 attended;

(viii)   according to CW1, CW2, and CW4 throughout the Class Period AppHarvest's own incentive piece rate structure incentivized disruptive and inefficient workmanship that wasted, damaged, and produced low quality tomatoes;

(ix)    CW6 stated that Mastronardi informed AppHarvest that it needed to tighten up specifications because Mastronardi was having to reject a lot of fruit throughout the Class Period—upwards of 30% to 35% during the Company's "toughest times," which was "many times" more than AppHarvest's target which CW6 believed was 6% or 7%;

(x)     according to CW2, "half" of all tomatoes inspected were USDA Grade No. 2 or not commercially saleable, and CW6 confirmed that AppHarvest was a "long way off" its quality goals;

(xi)    CW6 stated that in the "toughest times" of the first growing season AppHarvest was well below 50% in relation to the Company's productivity standards for specific Greenhouse jobs.

## XVII.   False and Misleading Statements in a May 17, 2021 Interview on Yahoo! Finance Live

212.    On May 17, 2021, Defendant Webb was interviewed on Yahoo! Finance Live by Myles Udland and Julie Hyman.

213.    During the interview Defendant Webb was specifically asked whether AppHarvest had "struggled" with its "labor." In response Defendant Webb falsely and/or misleadingly denied that the Company had experienced adversity. Defendant Webb listed factors that might have been challenges, including that AppHarvest had "five hundred people working with us now" and concluded that such potential challenges had "virtually no impact to operation." Specifically, Defendant Webb falsely and/or misleadingly stated as follows:

> Udland: You know, Jonathan kind of coming back down from the, from the high-level overview here – which I think is, is a thesis a lot of people can get behind – you know, we're showing the VO of the, the facility build-out that you guys have done. All we hear about are supply bottlenecks, the inability to get the labor needed to get projects off the ground. Have you guys struggled with that as-- at all, as you're trying to build, you know, two more facilities to be done by the end of next year? [Underlined emphasis added to question.]

> Webb: So we, we will have, this year, four more facilities under construction in total – plan on launching at least five into operations next year, including the, the current operating asset. And, and very proud of this region. You know, Eastern Kentucky that's been known for powering the country in the coal industry. **We, we built this first facility in the middle of a global pandemic, and we stood up the facility, uh, and have 500 people working with us now**, uh, and, and had record ice storms in February **and virtually no impact to operation**.

214.    Webb's statements above were materially false, misleading, and/or lacked a reasonable basis when made because AppHarvest's efforts to staff the Morehead Facility during the Class Period caused significant adverse "impact" for the Company's "operation", given that:

(i)    Defendants admitted that for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, net sales were "adversely impacted by labor and productivity

challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)     Defendants admitted that for the "***six months***" ended June 30, 2021, *i.e.*, beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii)    Defendants' numerous statements in the August 11, 2021 corrective disclosures admitting "labor" and employee "training" issues existed in 2Q 2021, including Webb's statement on the 2021 Q2 Earnings Call admitting AppHarvest's problems were "as simple as training. I don't want to be more blunt than that, but it was training and management protocols";

(iv)    Defendants Lee's and Eggleton's admissions on the Q1 2021 earnings call that "training" issues existed in the first quarter of 2021 that were hampering "productivity" and driving gross loss;

(v)     Defendants' admissions in the 2021 Q2 Earnings Release, the Q2 2021 Earnings Presentation, and the 2021 Q2 Earnings Call that "operational" and "executional" challenges—including lower quality production and saleable yield, and higher distribution and shipping expense incurred as a result of rejections—existed for the "initial growing season" and the "full season of harvest as a Company";

(vi)    according to CW1 and CW4, AppHarvest did not offer employees adequate (if any) training throughout the Class Period. According to CW1, AppHarvest's inadequately trained workforce contributed to 5-10% of crops being wasted or damaged during CW1's tenure, which resulted in lost sales. According to CW5 up to 50% of AppHarvest's crop was wasted in the first growing season caused by workers in the Greenhouse and Packhouse. Further, CW4 confirmed that tomatoes were wasted "daily" during harvesting season;

(vii)   CW6 explained that during the Class Period, AppHarvest's attrition and retention metrics in the first half of 2021 were far worse than expected because AppHarvest was clearly falling short week over week. Indeed, according to CW1 and CW2, throughout the Class Period AppHarvest suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including:

c.   dissatisfaction with mandatory expanded working hours—including forced overtime, Saturdays, and holidays, and

d.   infection and quarantining due to the COVID-19 pandemic,

112

all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes.

CW4 likewise stated that there was significant turnover throughout CW4's tenure at AppHarvest, with the west side of the Greenhouse losing at least 10 personnel every week. CW4 stated that the turnover resulted in less trained staff and thereby lower yields because there were fewer Crop Care Specialists to do the work.

CW5 confirmed that employee turnover and churn had been consistently high throughout October 2020 and June 2021, causing concern amongst Greenhouse personnel that AppHarvest had inadequate labor to meet production requirements as was discussed at the morning stand-up meetings CW5 attended;

(viii)   according to CW1, CW2, and CW4 throughout the Class Period AppHarvest's own incentive piece rate structure incentivized disruptive and inefficient workmanship that wasted, damaged, and produced low quality tomatoes;

(ix)   CW6 stated that Mastronardi informed AppHarvest that it needed to tighten up specifications because Mastronardi was having to reject a lot of fruit throughout the Class Period—upwards of 30% to 35% during the Company's "toughest times," which was "many times" more than AppHarvest's target which CW6 believed was 6% or 7%;

(x)   according to CW2, "half" of all tomatoes inspected were USDA Grade No. 2 or not commercially saleable, and CW6 confirmed that AppHarvest was a "long way off" its quality goals;

(xi)   CW6 stated that in the "toughest times" of the first growing season AppHarvest was well below 50% in relation to the Company's productivity standards for specific Greenhouse jobs.

## XVIII. False and Misleading Statements in a May 25, 2021 Interview by Stephens Inc.

215.   On May 25, 2021, Defendant Lee attended the Food & Ag Disrupted Conference hosted by investment bank Stephens Inc. During the conference, Defendant Lee participated in a videorecorded interview taken by analyst Mark Connelly, a copy of which was concurrently published on AppHarvest's Investor Relations webpage.

216.   During the interview, Defendant Lee was pointedly asked about the Company's performance and "what sort of a learning curve" AppHarvest could expect, if any (*i.e.*, Defendant Lee was asked to provide detail regarding any operational inefficiencies that existed in the first

quarter). Defendant Lee concealed that the Company's significant operational challenges—shifting attention solely to certain well-publicized ice storms—and falsely claimed that AppHarvest's purported success, both operationally and from a staffing/labor perspective, were "validation" that the Company could "execute well" and supported Defendants' decision to reaffirm AppHarvest's full-year 2021 financial guidance. Defendant Lee stated, in pertinent part:

> **Mark Connelly**: Right. Now, you sold your first crop in January. Um, <u>can you talk about how that startup went and what sort of a learning curve we should be thinking about in terms of optimizing production across the whole facility</u> [emphasis added]?

> **David Lee**: Yeah, I mean, in, in many ways, there were critics who thought, how can this company who was pre-revenue, pre-farm a year ago, stand up a farm and produce, you know, millions of pounds of product. And so, the lessons were really valuable for us. One was validation and proof that we could do what we say, you know, being able to hit the expectations, to deliver 2.3 million of net revenue and, and to be at the better end of our negative adjusted EBITDA range was important. So that was a lesson for the corporate center, but in terms of the farm, you know, there was incredibly, challenging set of conditions throughout the country in Q1. You probably read about the ice storms that gripped parts of the country. And **<u>our facility at Morehead proved that it could weather those conditions maybe better than most. We, we learned about what kind of labor we could source locally having, um, 500 plus employees ready to, to join us, if we want, proved and validated the model that we really could hire local talent, give them a living wage, provide full-time employees stock and execute well</u>** within, actually, the adjusted EBITDA range that we expected. So that was an important lesson**. <u>I think the other lesson is we learned that we could hit our numbers and still experiment</u>** and trial a way to optimize what we call Morehead 2.0—this is on the other side of our summer refresh—so that we have more confidence in our ability to produce better in the future. And **<u>it's the reason why we affirmed the expectations we had put out for the year</u>**.

217.    Furthermore, Defendant Lee falsely and unequivocally denied that the Company experienced any "staffing" inefficiencies, including as a result of the Covid-19 pandemic, stating:

> **Mark Connelly**: Okay. I've, I've got a couple, a couple of I think they're COVID related questions. So I want to try, try to put them together here. COVID has hit a rural areas hard lately. AppHarvest doesn't seem to have been too impacted. Can you talk about whether COVID has affected your design and construction timing, and then there's a second question about the ability to get labor, uh, in your plant. We've, we've had a number of companies in, in the, in the food business tell us that they can't get a full second shift.

**David Lee**: Oh, okay. Well, let's cover both. Um, **thankfully COVID has not in any way impacted our operation**…With regard to labor, we have had absolutely no shortage of interest. I mean multiples of the amount of roles that we wanna fill, have lined up to work with us. And, and a part of that is by design, a part of that is the kind of company we want to be and the part of the country in which we choose to produce. **So we haven't had any challenges with recruiting or staffing**.

218.     Defendant Lee's statements above were materially false, misleading, and/or lacked

a reasonable basis when made when made given that:

(i)     Defendants admitted that for the "***six months***" ended June 30, 2021, *i.e.*, beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)    Defendants admitted that for the "***six months***" ended June 30, 2021, *i.e.*, beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii)   Defendants' numerous statements in the August 11, 2021 corrective disclosures admitting "labor" and employee "training" issues existed in 2Q 2021, including Webb's statement on the 2021 Q2 Earnings Call admitting AppHarvest's problems were "as simple as training. I don't want to be more blunt than that, but it was training and management protocols";

(iv)    Defendants Lee's and Eggleton's admissions on the Q1 2021 earnings call that "training" issues existed in the first quarter of 2021 that were hampering "productivity" and driving gross loss;

(v)     Defendants' admissions in the 2021 Q2 Earnings Release, the Q2 2021 Earnings Presentation, and the 2021 Q2 Earnings Call that "operational" and "executional" challenges—including lower quality production and saleable yield, and higher distribution and shipping expense incurred as a result of rejections—existed for the "initial growing season" and the "full season of harvest as a Company";

(vi)    according to CW1 and CW4, AppHarvest did not offer employees adequate (if any) training throughout the Class Period. According to CW1, AppHarvest's inadequately trained workforce contributed to 5-10% of crops being wasted or damaged during CW1's tenure, which resulted in lost sales. According to CW5 up to 50% of AppHarvest's crop was wasted in the first growing season caused by workers in the Greenhouse and Packhouse. Further, CW4 confirmed that tomatoes were wasted "daily" during harvesting season;

115

(vii)    CW6 explained that during the Class Period, AppHarvest's attrition and retention metrics in the first half of 2021 were far worse than expected because AppHarvest was clearly falling short week over week. Indeed, according to CW1 and CW2, throughout the Class Period AppHarvest suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including:

    e.    dissatisfaction with mandatory expanded working hours—including forced overtime, Saturdays, and holidays, and

    f.    infection and quarantining due to the COVID-19 pandemic,

all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes.

CW4 likewise stated that there was significant turnover throughout CW4's tenure at AppHarvest, with the west side of the Greenhouse losing at least 10 personnel every week. CW4 stated that the turnover resulted in less trained staff and thereby lower yields because there were fewer Crop Care Specialists to do the work.

CW5 confirmed that employee turnover and churn had been consistently high throughout October 2020 and June 2021, causing concern amongst Greenhouse personnel that AppHarvest had inadequate labor to meet production requirements as was discussed at the morning stand-up meetings CW5 attended;

(viii)    according to CW1, CW2, and CW4 throughout the Class Period AppHarvest's own incentive piece rate structure incentivized disruptive and inefficient workmanship that wasted, damaged, and produced low quality tomatoes;

(ix)    CW6 stated that Mastronardi informed AppHarvest that it needed to tighten up specifications because Mastronardi was having to reject a lot of fruit throughout the Class Period—upwards of 30% to 35% during the Company's "toughest times," which was "many times" more than AppHarvest's target which CW6 believed was 6% or 7%;

(x)    according to CW2, "half" of all tomatoes inspected were USDA Grade No. 2 or not commercially saleable, and CW6 confirmed that AppHarvest was a "long way off" its quality goals;

(xi)    CW6 stated that in the "toughest times" of the first growing season AppHarvest was well below 50% in relation to the Company's productivity standards for specific Greenhouse jobs.

**XIX.   False and Misleading Statements in a May 26, 2021 Industry Focus Interview**

219.     On May 26, 2021, Defendant Webb was interviewed by host Jason Moser on a segment of the Industry Focus podcast called Wildcard Wednesday. The Industry Focus podcast is presented by The Motley Fool, a popular investing news website.

220.     During the interview, Defendant Webb was pointedly asked about the Company's performance and to describe "some of the highlights" of AppHarvest's first quarter. Defendant Webb concealed that the Company's significant operational challenges—shifting attention solely to certain well-publicized ice storms—and falsely and/or misleadingly represented that the Company's significantly challenged production "capacity" as running "full" and having "no issues." Defendant Webb stated, in pertinent part [underlined emphasis added to question]:

> **Moser**: Yeah. Well, I mean, speaking of publicly traded company, you just, you just released your first quarter results, and I think this was your first full quarter as a publicly traded company. I'm sure it was an exciting time. <u>I just wonder if you could share some of the highlights</u>, some of the things you're proud of in regard to this, to this earnings release and, and, your excitement here for the year to come.

> **Webb**: …We're ramping up this first facility in the middle of a global pandemic. We had an ice storm if people remember that ice storm back in February. **<u>Our facility operated at full, you know, ramping up into full capacity with no issues in the middle of a global pandemic in the middle of an ice storm.</u>**

221.     Defendant Webb's statements were materially false, misleading, and/or lacked a reasonable basis when made when made given that:

(i)     Defendants admitted that for the "***six months***" ended June 30, 2021, *i.e.*, beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)    Defendants admitted that for the "***six months***" ended June 30, 2021, *i.e.*, beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii)  Defendants' numerous statements in the August 11, 2021 corrective disclosures admitting "labor" and employee "training" issues existed in 2Q 2021, including Webb's statement on the 2021 Q2 Earnings Call admitting AppHarvest's problems were "as simple as training. I don't want to be more blunt than that, but it was training and management protocols";

(iv)  Defendants Lee's and Eggleton's admissions on the Q1 2021 earnings call that "training" issues existed in the first quarter of 2021 that were hampering "productivity" and driving gross loss;

(v)  Defendants' admissions in the 2021 Q2 Earnings Release, the Q2 2021 Earnings Presentation, and the 2021 Q2 Earnings Call that "operational" and "executional" challenges—including lower quality production and saleable yield, and higher distribution and shipping expense incurred as a result of rejections—existed for the "initial growing season" and the "full season of harvest as a Company";

(vi)  according to CW1 and CW4, AppHarvest did not offer employees adequate (if any) training throughout the Class Period. According to CW1, AppHarvest's inadequately trained workforce contributed to 5-10% of crops being wasted or damaged during CW1's tenure, which resulted in lost sales. According to CW5 up to 50% of AppHarvest's crop was wasted in the first growing season caused by workers in the Greenhouse and Packhouse. Further, CW4 confirmed that tomatoes were wasted "daily" during harvesting season;

(vii)  CW6 explained that during the Class Period, AppHarvest's attrition and retention metrics in the first half of 2021 were far worse than expected because AppHarvest was clearly falling short week over week. Indeed, according to CW1 and CW2, throughout the Class Period AppHarvest suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including:

g.  dissatisfaction with mandatory expanded working hours—including forced overtime, Saturdays, and holidays, and

h.  infection and quarantining due to the COVID-19 pandemic,

all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes.

CW4 likewise stated that there was significant turnover throughout CW4's tenure at AppHarvest, with the west side of the Greenhouse losing at least 10 personnel every week. CW4 stated that the turnover resulted in less trained staff and thereby lower yields because there were fewer Crop Care Specialists to do the work.

118

CW5 confirmed that employee turnover and churn had been consistently high throughout October 2020 and June 2021, causing concern amongst Greenhouse personnel that AppHarvest had inadequate labor to meet production requirements as was discussed at the morning stand-up meetings CW5 attended;

(viii)   according to CW1, CW2, and CW4 throughout the Class Period AppHarvest's own incentive piece rate structure incentivized disruptive and inefficient workmanship that wasted, damaged, and produced low quality tomatoes;

(ix)   CW6 stated that Mastronardi informed AppHarvest that it needed to tighten up specifications because Mastronardi was having to reject a lot of fruit throughout the Class Period—upwards of 30% to 35% during the Company's "toughest times," which was "many times" more than AppHarvest's target which CW6 believed was 6% or 7%;

(x)   according to CW2, "half" of all tomatoes inspected were USDA Grade No. 2 or not commercially saleable, and CW6 confirmed that AppHarvest was a "long way off" its quality goals;

(xi)   CW6 stated that in the "toughest times" of the first growing season AppHarvest was well below 50% in relation to the Company's productivity standards for specific Greenhouse jobs.

## XX.   False and Misleading Statements in a June 3, 2021 Interview with Seeking Alpha

222.   On June 3, 2021, Defendant Webb was interviewed by Rena Sherbill, and a video recording of the interview was posted on the YouTube channel for Seeking Alpha, a popular investing news website. During the interview, when questioned about AppHarvest's human resources, Defendant Webb falsely and/or misleadingly stated, in pertinent part:

Sherbill: [I]n terms of the human labor force, because as you mentioned, you know, working with robotics, working with AI, how does the labor structure work? Do you have, uh data scientists working on that? Do you have agriculture, you know, people coming from the agricultural field? How does that work in terms of the labor structure? [Underlined emphasis added to question.]

Webb: We're at about 550 employees right now. We'll be at roughly a thousand employees this time next year. And as we scale that team, out of real self-preservation, we need to be developing talent internally. Uh, and, and I see, we see that as a huge opportunity for us to **not only retain employees**, but recruit employees. We've had, uh, nearly 8,000 people apply to work at AppHarvest this year, um, number might be up to 10,000 now. **And again, in this time where you, you read in the news about labor shortages, you read in the news about, uh,**

**people having issues of people showing up to work. We hired 500 employees in the middle of COVID, uh, and they're showing up every day**.

223.   Defendant Webb's statements above were materially false, misleading, and or lacked a reasonable basis when made because AppHarvest suffered significant challenges "retain[ing]" employees, and employees were not "showing up every day" given that:

(i)   Defendants admitted that for the "***six months***" ended June 30, 2021, *i.e.*, beginning in January 2021, AppHarvest was "adversely impacted" by "labor" challenges;

(ii)   CW6 explained that during the Class Period, AppHarvest's attrition and retention metrics in the first half of 2021 were far worse than expected because AppHarvest was clearly falling short week over week. Indeed, according to CW1 and CW2, throughout the Class Period AppHarvest suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including:

a.   dissatisfaction with mandatory expanded working hours—including forced overtime, Saturdays, and holidays, and

b.   infection and quarantining due to the COVID-19 pandemic.

CW4 likewise stated that there was significant turnover throughout CW4's tenure at AppHarvest, with the west side of the Greenhouse losing at least 10 personnel every week.

CW5 confirmed that employee turnover and churn had been consistently high throughout October 2020 and June 2021, causing concern amongst Greenhouse personnel that AppHarvest had inadequate labor to meet production requirements as was discussed at the morning stand-up meetings CW5 attended.

## XXI.   False and Misleading Statements in AppHarvest's June 4, 2021 Form S-1

224.   On June 4, 2021, after market close, AppHarvest filed a Post-Effective Amendment No. 1 to Form S-1 Registration Statement with the SEC (the "June 4 Form S-1"), containing a preliminary prospectus, signed by Defendants Webb, Eggleton, and Lee.

225.   A subsection of the June 4 Form S-1 titled "**Our Solution**" (emphasis in original),

**"We believe there is a large population of workers in the Central Appalachian region who**

**are eager to find long-term career opportunities like those being offered by**
**AppHarvest**…**As a result, we believe we can staff and retain our workers with less churn**,
immigration challenges **and unfilled positions** that many of our competitors face."

226.    Relatedly, a subsection of the June 4 Form S-1 titled "**Our Strengths**[,]" falsely
and/or misleadingly stated in pertinent part: "**We were able to efficiently hire many employees**
**as we opened our first facility in Morehead** and have identified talent to join our team at the
facilities we are developing in Richmond and Berea."

227.    The above statements were materially false, misleading, and/or lacked a reasonable
basis when made because: (a) Defendants' statements that prospective employees were seeking
"long-term" employment, and that AppHarvest was able to "staff and retain" workers with "less
churn" and less "unfilled positions," and that AppHarvest was able to "efficiently hire many
employees" as it opened the Morehead Facility were not supported by, and/or concealed, known
facts that directly contradicted those statements which left AppHarvest's workforce short-staffed,
unproductive, and insufficiently trained; and (b) the statements misrepresented AppHarvest's
frequent hiring as a "Strength" rather than what it was—a known consequence, born out of
necessity, of the significant amount of concealed employee attrition, turnover, and churn that
AppHarvest had experienced. The material falsity of the above statements is supported by ample
evidence given that:

(i)    as Defendants would later admit, for the "*six months*" ended June 30, 2021, *i.e.*,
       beginning in January 2021, AppHarvest was "adversely impacted" by "labor"
       challenges which "resulted in lower net sales due to lower overall No. 1-grade
       production yields, including the impact of higher related distribution and shipping
       fees";

(ii)   as Defendants would later admit, for the "*six months*" ended June 30, 2021, *i.e.*,
       beginning in January 2021, that "investments in our workforce[,]" and "production
       processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii)    Defendants' numerous statements in the August 11, 2021 corrective disclosures admitting "labor" and employee "training" issues existed in 2Q 2021, including Webb's statement on the 2021 Q2 Earnings Call admitting AppHarvest's problems were "as simple as training. I don't want to be more blunt than that, but it was training and management protocols";

(iv)    CW6 explained that during the Class Period, AppHarvest's attrition and retention metrics in the first half of 2021 were far worse than expected because AppHarvest was clearly falling short week over week. Indeed, according to CW1 and CW2, throughout the Class Period AppHarvest suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including:

a.    dissatisfaction with mandatory expanded working hours—including forced overtime, Saturdays, and holidays, and

b.    infection and quarantining due to the COVID-19 pandemic,

all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes.

CW4 likewise stated that there was significant turnover throughout CW4's tenure at AppHarvest, with the west side of the Greenhouse losing at least 10 personnel every week. CW4 stated that the turnover resulted in less trained staff and thereby lower yields because there were fewer Crop Care Specialists to do the work.

CW5 confirmed that employee turnover and churn had been consistently high throughout October 2020 and June 2021, causing concern amongst Greenhouse personnel that AppHarvest had inadequate labor to meet production requirements as was discussed at the morning stand-up meetings CW5 attended.

(v)    As was confirmed in Defendants' post Class Period 10-Q disclosures for Q3 2021, CW5 stated that due to the pervasive staffing issues described above, regional labor was insufficient and AppHarvest had to bring in contract labor to help during times of poor attendance.

228.    Furthermore, the above statements were materially false, misleading, and/or lacked a reasonable basis when made in light of the circumstances. As of June 4, 2021, AppHarvest was staffing its first, massive CEA facility and the Morehead Facility's productivity would depend, in part, on Defendants' ability to "efficiently hire" and "retain" staff to minimize "churn" and "unfilled positions"—as evidenced by Defendants' frequent updates and assurances to market

participants regarding the Company's hiring efforts (*see* ¶¶69-74, *supra*). It was misleading for Defendants to make the above statements, and thereby paint AppHarvest's hiring in an undeservedly rosy light, without also disclosing adverse circumstances.

229.    The June 4 Form S-1, also contained false, misleading, and woefully incomplete risk disclosures with respect to investing in AppHarvest which state, in pertinent part:

**Risks Related to Our Business and Industry**

…Even if [AppHarvest's] investments do result in the growth of our business, **if we do not effectively manage our growth, we may not be able to execute on our business plan** and vision, respond to competitive pressures, **take advantage of market opportunities, satisfy customer requirements or maintain high-quality product offerings, any of which could adversely affect our business, financial condition and results of operations.**

*** 

*We currently rely on a single facility for all of our operations.*

…**Adverse changes or developments affecting the Morehead facility could impair our ability to produce our products and our business, prospects, financial condition and results of operations. Any** shutdown or **period of reduced production at the Morehead facility**, which may be caused by regulatory noncompliance or other issues, as well as other factors beyond our control, such as severe weather conditions, natural disaster, fire, power interruption, work stoppage, disease outbreaks or pandemics (such as COVID-19), equipment failure or delay in supply delivery, **would significantly disrupt our ability to grow and deliver our produce in a timely manner, meet our contractual obligations and operate our business.**

***

*We depend on employing a skilled local labor force, and* **failure to attract and retain qualified employees could negatively impact our business, results of operations and financial condition.**

…even **if we are able to identify, hire and train our labor force, there is no guarantee that we will be able to retain these employees. Any shortage of labor or lack of regular availability could restrict our ability to operate our greenhouses profitably, or at all.**

***

**Any significant or unexpected rejection of our products could negatively impact our results of operations, and we may be unable to sell the rejected products to other third parties.**

\*\*\*

**If our products** fail to gain market acceptance, are restricted by regulatory requirements or **have quality problems, we may not be able to fully recover costs and expenses incurred in our operations, and our business, financial condition or results of operations could be materially and adversely affected.**

\*\*\*

**In future periods, revenue growth could slow or revenue could decline for a number of reasons, including** slowing demand for our products, increasing competition, a decrease in the growth of the overall market, or **our failure, for any reason, to take advantage of growth opportunities. If our assumptions regarding these risks and uncertainties and future revenue growth are incorrect or change, or if we do not address these risks successfully, our operating and financial results could differ materially from our expectations, and our business could suffer.**

\*\*\*

**The COVID-19 pandemic could negatively impact on our business, results of operations and financial condition.***[…]*

…**Although we have not experienced material financial impacts due to the pandemic,** the fluid nature of the COVID-19 pandemic and uncertainties regarding the related economic impact are likely to result in sustained market turmoil, which could also negatively impact our business, financial condition and cash flows. Although our business is considered an "essential business," **the COVID-19 pandemic could result in labor shortages, which could result in our inability to plant and harvest crops at full capacity and could result in spoilage or loss of unharvested crops.…The extent of COVID-19's effect on our operational and financial performance will depend on future developments**, including the duration, spread and intensity of the pandemic and the effectiveness of vaccines against COVID-19 and variants thereof, all of which are uncertain and difficult to predict considering the rapidly evolving landscape. **As a result, it is not currently possible to ascertain the overall impact of COVID-19 on our business. However, if the pandemic continues to persist as a severe worldwide health crisis, the disease could negatively impact our business, financial condition results of operations and cash flows, and may also have the effect of heightening many of the other risks described in this "Risk Factors" section.**

(Underlined emphasis added and challenged, all other emphasis in original).

230.    The above statements were materially false, misleading, and/or lacked a reasonable basis when made because: (a) Defendants speculatively portray their ability to "effectively manage our growth," "execute on our business plan," "satisfy customer requirements or maintain high quality product offerings" as contingent or potential when AppHarvest was already failing to do all of these things resulting in lower saleable yield and quality products, and higher customer rejections and costs; (b) Defendants make boilerplate speculation that vague "developments" or periods of "reduced production at the Morehead facility" could disrupt AppHarvest's ability to "meet our contractual obligations and operate our business" when the Company's operations were already deteriorating because of the Company's inability to produce USDA Grade No. 1 tomatoes; (c) Defendants speculate that "failure to attract and retain qualified employees could negatively impact" AppHarvest's business when the Company was already suffering massive attrition, and Defendants misrepresent that a potential "shortage of labor or lack of regular availability" or the Company's potential inability to "train our labor force" and "retain" employees could potentially affect AppHarvest, including its "ability to operate our greenhouses profitably," when, in reality, those situations had already transpired; (d) Defendants speculate that "significant or unexpected rejection of our products" could "negatively impact" results when AppHarvest was already experiencing massive customer rejections from Mastronardi because of poor quality that eroded sales and inflated costs, and Defendants speculate further that the Company may not be able to resell rejected products to "other third parties" when AppHarvest was not doing so, but rather was selling "substantially all" of its products to Mastronardi and donating or composting the rejections; (e) Defendants speculate that "quality problems" could "materially and adversely" affect AppHarvest's "business, financial condition or results of operations" when they were already

doing so; (f) Defendants make a boilerplate and vague disclaimer that if AppHarvest fails to "take advantage of growth opportunities" "for any reason" it might see declining revenue, when Defendants were already experiencing wide-ranging execution problems for the entire first harvesting season that were doing exactly that; and (g) Defendants falsely misrepresent AppHarvest has "not experienced material financial impacts due to the pandemic" and speculate that the COVID-19 pandemic, due to contingent and vague "future developments," *could* negatively impact AppHarvest's "business, results of operations and financial condition" and "cash flows," *could* "result in labor shortages," *could* cause an "inability to plant and harvest crops at full capacity," and *could* "result in spoilage or loss of unharvested crops" when all of those things were already happening because COVID-19 had caused AppHarvest to operate severely understaffed during the first growing and harvesting season because employees were quarantining. The material falsity of Defendants' speculative, contingent, and woefully incomplete statements of known risks is supported by ample evidence, given that:

(i)     Defendants admitted that for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)    Defendants admitted that for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii)   Defendants' numerous statements in the August 11, 2021 corrective disclosures admitting "labor" and employee "training" issues existed in 2Q 2021, including Webb's statement on the 2021 Q2 Earnings Call admitting AppHarvest's problems were "as simple as training. I don't want to be more blunt than that, but it was training and management protocols";

(iv)    Defendants Lee's and Eggleton's admissions on the Q1 2021 earnings call that "training" issues existed in the first quarter of 2021 that were hampering "productivity" and driving gross loss;

(v)      Defendants' admissions in the 2021 Q2 Earnings Release, the Q2 2021 Earnings Presentation, and the 2021 Q2 Earnings Call that "operational" and "executional" challenges—including lower quality production and saleable yield, and higher distribution and shipping expense incurred as a result of rejections—existed for the "initial growing season" and the "full season of harvest as a Company";

(vi)     according to CW1 and CW4, AppHarvest did not offer employees adequate (if any) training throughout the Class Period. According to CW1, AppHarvest's inadequately trained workforce contributed to 5-10% of crops being wasted or damaged during CW1's tenure, which resulted in lost sales. According to CW5 up to 50% of AppHarvest's crop was wasted in the first growing season caused by workers in the Greenhouse and Packhouse. Further, CW4 confirmed that tomatoes were wasted "daily" during harvesting season;

(vii)    CW6 explained that during the Class Period, AppHarvest's attrition and retention metrics in the first half of 2021 were far worse than expected because AppHarvest was clearly falling short week over week. Indeed, according to CW1 and CW2, throughout the Class Period AppHarvest suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including:

          a.      dissatisfaction with mandatory expanded working hours—including forced overtime, Saturdays, and holidays, and

          b.      infection and quarantining due to the COVID-19 pandemic,

          all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes.

          CW4 likewise stated that there was significant turnover throughout CW4's tenure at AppHarvest, with the west side of the Greenhouse losing at least 10 personnel every week. CW4 stated that the turnover resulted in less trained staff and thereby lower yields because there were fewer Crop Care Specialists to do the work.

          CW5 confirmed that employee turnover and churn had been consistently high throughout October 2020 and June 2021, causing concern amongst Greenhouse personnel that AppHarvest had inadequate labor to meet production requirements as was discussed at the morning stand-up meetings CW5 attended;

(viii)   according to CW1, CW2, and CW4 throughout the Class Period AppHarvest's own incentive piece rate structure incentivized disruptive and inefficient workmanship that wasted, damaged, and produced low quality tomatoes;

127

Case 1:21-cv-07985-LJL   Document 76   Filed 08/12/22   Page 137 of 192

(ix)   CW6 stated that Mastronardi informed AppHarvest that it needed to tighten up specifications because Mastronardi was having to reject a lot of fruit throughout the Class Period—upwards of 30% to 35% during the Company's "toughest times," which was "many times" more than AppHarvest's target which CW6 believed was 6% or 7%;

(x)   according to CW2, "half" of all tomatoes inspected were USDA Grade No. 2 or not commercially saleable, and CW6 confirmed that AppHarvest was a "long way off" its quality goals;

(xi)   CW6 stated that in the "toughest times" of the first growing season AppHarvest was well below 50% in relation to the Company's productivity standards for specific Greenhouse jobs.

231.   Further, the June 4 Form S-1's "Results of Operations" section gave a false and misleading presentation of AppHarvest's net sales when making its "Comparison of the Three Months Ended March 31, 2021 and 2020." The June 4 Form S-1 stated in pertinent part:

**The following sections discuss and analyze the changes in the significant line items in our unaudited condensed consolidated statements of operations for the comparison periods identified**.

*Net Sales*

**Net sales for the three months ended March 31, 2021 were $2.3 million compared to $0 for the comparable prior year period, due to initial tomato sales produced at our Morehead CEA facility**.

232.   The above statements were materially misleading when made because Defendants discussed the "changes" in net sales while failing to state, so as not to mislead, known changes affecting net sales with respect to AppHarvest's operations. Indeed, Defendants admitted in the 2Q Form 10-Q that for the "***six months***" ended June 30, 2021, *i.e.*, beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees." Thus, Defendants' failure to disclose this information in

the May 17 Form 10-Q was misleading or lacked a reasonable basis. Additionally, Defendants'
material omission violated Item 303 of SEC Regulation S-K which obligated them to "[d]escribe
any known trends or uncertainties that have had or that are reasonably likely to have a material
favorable or unfavorable impact on net sales…from continuing operations."

## XXII.  False and Misleading Statements in AppHarvest's June 9, 2021 Prospectus

233.    On June 9, 2021, before market open, AppHarvest filed a Prospectus with the SEC
pursuant to SEC Rule 424(b)(3) (the "June 9 Prospectus").

234.    A subsection of the June 9 Prospectus titled "**Our Solution**" (emphasis in original),
**"We believe there is a large population of workers in the Central Appalachian region who
are eager to find long-term career opportunities like those being offered by
AppHarvest**…**As a result, we believe we can staff and retain our workers with less churn**,
immigration challenges **and unfilled positions** that many of our competitors face."

235.    Relatedly, a subsection of the June 9 Prospectus titled "**Our Strengths**[,]" falsely
and/or misleadingly stated in pertinent part: "**We were able to efficiently hire many employees
as we opened our first facility in Morehead** and have identified talent to join our team at the
facilities we are developing in Richmond and Berea."

236.    The above statements were materially false, misleading, and/or lacked a reasonable
basis when made because: (a) Defendants' statements that prospective employees were seeking
"long-term" employment, and that AppHarvest was able to "staff and retain" workers with "less
churn" and less "unfilled positions," and that AppHarvest was able to "efficiently hire many
employees" as it opened the Morehead Facility were not supported by, and/or concealed, known
facts that directly contradicted those statements which left AppHarvest's workforce short-staffed,
unproductive, and insufficiently trained; and (b) the statements misrepresented AppHarvest's

frequent hiring as a "Strength" rather than what it was—a known consequence, born out of necessity, of the significant amount of concealed employee attrition, turnover, and churn that AppHarvest had experienced. The material falsity of the above statements is supported by ample evidence given that:

(i) as Defendants would later admit, for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, AppHarvest was "adversely impacted" by "labor" challenges which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii) as Defendants would later admit, for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii) Defendants' numerous statements in the August 11, 2021 corrective disclosures admitting "labor" and employee "training" issues existed in 2Q 2021, including Webb's statement on the 2021 Q2 Earnings Call admitting AppHarvest's problems were "as simple as training. I don't want to be more blunt than that, but it was training and management protocols";

(iv) CW6 explained that during the Class Period, AppHarvest's attrition and retention metrics in the first half of 2021 were far worse than expected because AppHarvest was clearly falling short week over week. Indeed, according to CW1 and CW2, throughout the Class Period AppHarvest suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including:

    a.    dissatisfaction with mandatory expanded working hours—including forced overtime, Saturdays, and holidays, and

    b.    infection and quarantining due to the COVID-19 pandemic,

all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes.

CW4 likewise stated that there was significant turnover throughout CW4's tenure at AppHarvest, with the west side of the Greenhouse losing at least 10 personnel every week. CW4 stated that the turnover resulted in less trained staff and thereby lower yields because there were fewer Crop Care Specialists to do the work.

CW5 confirmed that employee turnover and churn had been consistently high throughout October 2020 and June 2021, causing concern amongst Greenhouse personnel that AppHarvest had inadequate labor to meet production requirements as was discussed at the morning stand-up meetings CW5 attended.

(v)     As was confirmed in Defendants' post Class Period 10-Q disclosures for Q3 2021, CW5 stated that due to the pervasive staffing issues described above, regional labor was insufficient and AppHarvest had to bring in contract labor to help during times of poor attendance.

237.    Furthermore, the above statements were materially false, misleading, and/or lacked a reasonable basis when made in light of the circumstances. As of June 9, 2021, AppHarvest was staffing its first, massive CEA facility and the Morehead Facility's productivity would depend, in part, on Defendants' ability to "efficiently hire" and "retain" staff to minimize "churn" and "unfilled positions"—as evidenced by Defendants' frequent updates and assurances to market participants regarding the Company's hiring efforts (*see* ¶¶69-74, *supra*). It was misleading for Defendants to make the above statements, and thereby paint AppHarvest's hiring in an undeservedly rosy light, without also disclosing adverse circumstances.

238.    The June 9 Prospectus, contained false, misleading, and woefully incomplete risk disclosures with respect to investing in AppHarvest which state, in pertinent part:

**Risks Related to Our Business and Industry**

…Even if [AppHarvest's] investments do result in the growth of our business**, if we do not effectively manage our growth, we may not be able to execute on our business plan** and vision, respond to competitive pressures, **take advantage of market opportunities, satisfy customer requirements or maintain high-quality product offerings, any of which could adversely affect our business, financial condition and results of operations.**

\*\*\*

*We currently rely on a single facility for all of our operations.*

…**Adverse changes or developments affecting the Morehead facility could impair our ability to produce our products and our business, prospects, financial condition and results of operations. Any shutdown or period of**

**reduced production at the Morehead facility**, which may be caused by regulatory noncompliance or other issues, as well as other factors beyond our control, such as severe weather conditions, natural disaster, fire, power interruption, work stoppage, disease outbreaks or pandemics (such as COVID-19), equipment failure or delay in supply delivery, **would significantly disrupt our ability to grow and deliver our produce in a timely manner, meet our contractual obligations and operate our business.**

\*\*\*

***We depend on employing a skilled local labor force, and* failure to attract and retain qualified employees could negatively impact our business, results of operations and financial condition.**

…even **if we are able to identify, hire and train our labor force, there is no guarantee that we will be able to retain these employees. Any shortage of labor or lack of regular availability could restrict our ability to operate our greenhouses profitably, or at all.**

\*\*\*

**Any significant or unexpected rejection of our products could negatively impact our results of operations, and we may be unable to sell the rejected products to other third parties.**

\*\*\*

***If* our products** fail to gain market acceptance, are restricted by regulatory requirements or **have quality problems, we may not be able to fully recover costs and expenses incurred in our operations, and our business, financial condition or results of operations could be materially and adversely affected.**

\*\*\*

**In future periods, revenue growth *could* slow or revenue *could* decline for a number of reasons, including** slowing demand for our products, increasing competition, a decrease in the growth of the overall market, or **our failure, for any reason, to take advantage of growth opportunities. If our assumptions regarding these risks and uncertainties and future revenue growth are incorrect or change, or if we do not address these risks successfully, our operating and financial results could differ materially from our expectations, and our business could suffer.**

\*\*\*

132

**The COVID-19 pandemic could negatively impact on our business, results of operations and financial condition.**/…/

…**Although we have not experienced material financial impacts due to the pandemic**, the fluid nature of the COVID-19 pandemic and uncertainties regarding the related economic impact are likely to result in sustained market turmoil, which could also negatively impact our business, financial condition and cash flows. Although our business is considered an "essential business," **the COVID-19 pandemic could result in labor shortages, which could result in our inability to plant and harvest crops at full capacity and could result in spoilage or loss of unharvested crops.…The extent of COVID-19's effect on our operational and financial performance will depend on future developments**, including the duration, spread and intensity of the pandemic and the effectiveness of vaccines against COVID-19 and variants thereof, all of which are uncertain and difficult to predict considering the rapidly evolving landscape. **As a result, it is not currently possible to ascertain the overall impact of COVID-19 on our business. However, if the pandemic continues to persist as a severe worldwide health crisis, the disease could negatively impact our business, financial condition results of operations and cash flows, and may also have the effect of heightening many of the other risks described in this "Risk Factors" section**.

(Underlined emphasis added and challenged, all other emphasis in original).

239. The above statements were materially false, misleading, and/or lacked a reasonable basis when made because: (a) Defendants speculatively portray their ability to "effectively manage our growth," "execute on our business plan," "satisfy customer requirements or maintain high quality product offerings" as contingent or potential when AppHarvest was already failing to do all of these things resulting in lower saleable yield and quality products, and higher customer rejections and costs; (b) Defendants make boilerplate speculation that vague "developments" or periods of "reduced production at the Morehead facility" could disrupt AppHarvest's ability to "meet our contractual obligations and operate our business" when the Company's operations were already deteriorating because of the Company's inability to produce USDA Grade No. 1 tomatoes; (c) Defendants speculate that "failure to attract and retain qualified employees could negatively impact" AppHarvest's business when the Company was already suffering massive attrition, and Defendants misrepresent that a potential "shortage of labor or lack of regular availability" or the

Company's potential inability to "train our labor force" and "retain" employees could potentially affect AppHarvest, including its "ability to operate our greenhouses profitably," when, in reality, those situations had already transpired; (d) Defendants speculate that "significant or unexpected rejection of our products" could "negatively impact" results when AppHarvest was already experiencing massive customer rejections from Mastronardi because of poor quality that eroded sales and inflated costs, and Defendants speculate further that the Company may not be able to resell rejected products to "other third parties" when AppHarvest was not doing so, but rather was selling "substantially all" of its products to Mastronardi and donating or composting the rejections; (e) Defendants speculate that "quality problems" could "materially and adversely" affect AppHarvest's "business, financial condition or results of operations" when they were already doing so; (f) Defendants make a boilerplate and vague disclaimer that if AppHarvest fails to "take advantage of growth opportunities" "for any reason" it might see declining revenue, when Defendants were already experiencing wide-ranging execution problems for the entire first harvesting season that were doing exactly that; and (g) Defendants falsely misrepresent AppHarvest has "not experienced material financial impacts due to the pandemic" and speculate that the COVID-19 pandemic, due to contingent and vague "future developments," *could* negatively impact AppHarvest's "business, results of operations and financial condition" and "cash flows," *could* "result in labor shortages," *could* cause an "inability to plant and harvest crops at full capacity," and *could* "result in spoilage or loss of unharvested crops" when all of those things were already happening because COVID-19 had caused AppHarvest to operate severely understaffed during the first growing and harvesting season because employees were quarantining. The material falsity of Defendants' speculative, contingent, and woefully incomplete statements of known risks is supported by ample evidence, given that:

(i)     Defendants admitted that for the "***six months***" ended June 30, 2021, *i.e.*, beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)    Defendants admitted that for the "***six months***" ended June 30, 2021, *i.e.*, beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii)    Defendants' numerous statements in the August 11, 2021 corrective disclosures regarding "labor" and employee "training" issues in 2Q 2021, including Webb's statement on the 2021 Q2 Earnings Call admitting AppHarvest's problems were "as simple as training. I don't want to be more blunt than that, but it was training and management protocols";

(iv)    Defendants Lee's and Eggleton's admissions on the Q1 2021 earnings call that "training" issues existed in the first quarter of 2021 that were hampering "productivity" and driving gross loss;

(v)    Defendants' admissions in the 2021 Q2 Earnings Release, the Q2 2021 Earnings Presentation, and the 2021 Q2 Earnings Call that "operational" and "executional" challenges—including lower quality production and saleable yield, and higher distribution and shipping expense incurred as a result of rejections—existed for the "initial growing season" and the "full season of harvest as a Company";

(vi)    according to CW1 and CW4, AppHarvest did not offer employees adequate (if any) training throughout the Class Period. According to CW1, AppHarvest's inadequately trained workforce contributed to 5-10% of crops being wasted or damaged during CW1's tenure, which resulted in lost sales. According to CW5 up to 50% of AppHarvest's crop was wasted in the first growing season caused by workers in the Greenhouse and Packhouse. Further, CW4 confirmed that tomatoes were wasted "daily" during harvesting season;

(vii)    CW6 explained that during the Class Period, AppHarvest's attrition and retention metrics in the first half of 2021 were far worse than expected because AppHarvest was clearly falling short week over week. Indeed, according to CW1 and CW2, throughout the Class Period AppHarvest suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including:

    a.    dissatisfaction with mandatory expanded working hours—including forced overtime, Saturdays, and holidays, and

b.       infection and quarantining due to the COVID-19 pandemic,

all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes.

CW4 likewise stated that there was significant turnover throughout CW4's tenure at AppHarvest, with the west side of the Greenhouse losing at least 10 personnel every week. CW4 stated that the turnover resulted in less trained staff and thereby lower yields because there were fewer Crop Care Specialists to do the work.

CW5 confirmed that employee turnover and churn had been consistently high throughout October 2020 and June 2021, causing concern amongst Greenhouse personnel that AppHarvest had inadequate labor to meet production requirements as was discussed at the morning stand-up meetings CW5 attended;

(viii)   according to CW1, CW2, and CW4 throughout the Class Period AppHarvest's own incentive piece rate structure incentivized disruptive and inefficient workmanship that wasted, damaged, and produced low quality tomatoes;

(ix)    CW6 stated that Mastronardi informed AppHarvest that it needed to tighten up specifications because Mastronardi was having to reject a lot of fruit throughout the Class Period—upwards of 30% to 35% during the Company's "toughest times," which was "many times" more than AppHarvest's target which CW6 believed was 6% or 7%;

(x)     according to CW2, "half" of all tomatoes inspected were USDA Grade No. 2 or not commercially saleable, and CW6 confirmed that AppHarvest was a "long way off" its quality goals;

(xi)    CW6 stated that in the "toughest times" of the first growing season AppHarvest was well below 50% in relation to the Company's productivity standards for specific Greenhouse jobs.

240.    Further, the June 9 Prospectus's "Results of Operations" section gave a false and misleading presentation of AppHarvest's net sales when making its "Comparison of the Three Months Ended March 31, 2021 and 2020." The June 4 Form S-1 stated in pertinent part:

**The following sections discuss and analyze the changes in the significant line items in our unaudited condensed consolidated statements of operations for the comparison periods identified**.

*Net Sales*

**Net sales for the three months ended March 31, 2021 were $2.3 million compared to $0 for the comparable prior year period, due to initial tomato sales produced at our Morehead CEA facility**.

241.    The above statements were materially misleading when made because Defendants discussed the "changes" in net sales while failing to state, so as not to mislead, known changes affecting net sales with respect to AppHarvest's operations. Indeed, Defendants admitted in the 2Q Form 10-Q that for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees." Thus, Defendants' failure to disclose this information in the May 17 Form 10-Q was misleading or lacked a reasonable basis. Additionally, Defendants' material omission violated Item 303 of SEC Regulation S-K which obligated them to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales…from continuing operations."

## THE TRUTH IS REVEALED

242.    On August 11, 2021, before market open, AppHarvest shocked the market when it issued its earnings release for the Company's second fiscal 2021 quarter, which was filed on Form 8-K with the SEC that same day (the "2021 Q2 Earnings Release"). In direct contradiction to Defendants' Class Period statements, Defendants announced that AppHarvest had been plagued by "operational ramp-up challenges," resulting from undisclosed problems affecting AppHarvest's growing and harvesting operations and labor reliability. Such "operational ramp-up challenges" devastated the Company's tomato quality, pricing, and yields—particularly with respect to USDA

Grade No. 1 tomatoes—and therefore depressed sales while simultaneously driving distribution and shipping expense incurred as a result of rejections.

243.    Defendants disclosed the following financial results in the 2021 Q2 Earnings Release:

**Second Quarter 2021 Results**

For the second quarter of 2021, net sales were $3.1 million, an increase of $0.8 million from the first quarter of 2021, when AppHarvest began its inaugural harvest and launched as a public company. AppHarvest sold 8.6 million pounds of tomatoes in the second quarter, an increase of 4.8 million pounds from the first quarter.

The company recorded a net loss of $32.0 million and non-GAAP Adjusted EBITDA loss of $22.6 million in the second quarter of 2021, as compared to a net loss and non-GAAP Adjusted EBITDA loss of $1.6 million in the second quarter of 2020, when the company was still pre-production…*Second quarter 2021 results were adversely impacted by operational headwinds with the ramp up to full production at the company's first CEA facility, including labor and productivity challenges related to the training and development of the new workforce and historically low market prices for tomatoes during the second quarter of 2021 based on USDA reports. Labor and productivity challenges resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher distribution and shipping fees.*

244.    As a result of these poor results, the Company lowered its full-year 2021 net sales guidance to a range of $7 million to $9 million, from a previous range of $20 million to $25 million, and lowered its full-year 2021 EBITDA guidance to a range of a loss of $70 million to $75 million from a prior range of a loss of $48 million to $52 million. The 2021 Q2 Earnings Release explained, in pertinent part:

**Financial Outlook**

The company adjusted its full-year 2021 net sales outlook to the range of $7 million to $9 million from a prior range of $20 million to $25 million. *This reflects aforementioned operational headwinds associated with the full ramp up of the Morehead farm and moderated produce market price expectations and a strategic decision to broaden its business model by investing in* farm operations technology, *operational best practices* and value-added products. The company also updated

its full-year 2021 outlook for Adjusted EBITDA to the range of a loss of $70 million to $75 million from a prior range of a loss of $48 million to $52 million, ***driven primarily by operational challenges encountered in the abbreviated initial growing season*** and the decision to dedicate a portion of the farm to the noted strategic investments.

245.   CW6 stated that AppHarvest's 2021 earnings guidance revision reflected that previous "far-fetched ideas," including ideas from Defendant Lee, that had been considered in previous forecasts were reconsidered in terms of what was realistically achievable. According to CW6, Lee always took the most "aggressive" positions in forecasting meetings during the first harvesting season, including in instances where he was informed the Company's challenges still needed to be factored in. According to CW6, the revised forecasts reflected realistic assumptions for improving labor productivity by way of better training and analysis of how long it would take for improved training to lead to productivity gains.

246.   Moreover, AppHarvest's "operational headwinds" described in the 2021 Q2 Earnings Release caused the Company to change its assumptions underpinning its long-term footprint guidance with respect to the number of CEA facilities that would be constructed, and therefore operate, by 2025. According to CW6, as AppHarvest observed the operational difficulties at the Greenhouse in the first growing season, it became "intuitively impractical" to think AppHarvest could undertake a four-fold expansion of its operations.

247.   While claiming that the revised estimate was part of an effort to be "more conservative," AppHarvest disclosed that its new footprint guidance was for the Company to complete construction of nine CEA facilities by 2025, rather than twelve as previously touted to investors. The 2021 Q2 Earnings Release stated, in pertinent part:

> While the company remains on track with the plan to develop 12 farms by the end of 2025, the long-term outlook now includes more conservative assumptions based on nine CEA facilities in Appalachia. In terms of the outlook, the company will provide guidance on a conservative delivery of nine high-tech indoor farms in

Appalachia by the end of 2025 while it continues to work toward a network of 12 farms by 2025.

248.     On August 11, 2021, also before market open, AppHarvest published its Quarterly Report for the quarter ended June 30, 2021 with the SEC on Form 10-Q (the "2Q2021 Form 10-Q"), which was signed by Defendant Eggleton. The 2Q2021 Form revealed that the Company's "productivity challenges" had existed for the "*six months*" (*i.e.*, from before the beginning of the Class Period) ended June 30, 2021.

249.     In fact, Defendants specifically differentiated *in the same sentence* of the 2Q2021 Form 10-Q between "productivity challenges" and "low market prices for tomatoes." Whereas "low market prices" purportedly affected net sales only for "three months," Defendants admitted that "productivity challenges" were different in that they eroded net sales for "six months." The 2Q2021 Form 10-Q stated, in pertinent part:

> ### Net Sales
>
> Net sales for the three and six months ended June 30, 2021 were $3.1 million and $5.4 million, respectively, compared to $0 for the comparable prior year periods, with the increase due to the sale of tomatoes produced in the abbreviated first planting season at our Morehead CEA facility. Net sales for the three and *six months ended June 30, 2021* were adversely impacted by *labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility*, and net sales for the three months ended June 30, 2021 were adversely impacted by low market prices for tomatoes. The labor and productivity challenges resulted in lower net sales due to *lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees.*
>
> ### Cost of Goods Sold
>
> Cost of goods sold for the three and *six months ended* June 30, 2021 was $15.7 million and $22.5 million, respectively, compared to $0 for the comparable prior year periods. Cost of goods sold was impacted by *investments in our workforce as we develop skills needed in an industry that is new to the Appalachian region and investments in our production processes as we capitalize on operational insights from our first growing season*, as well as costs associated with the early conclusion of the first planting season at our Morehead CEA facility.

250.    On August 11, 2021, also before market open, the Individual Defendants held the 2021 Q2 Earnings Call with analysts to discuss the Company's Q2 2021 quarter results, a recording of which was thereafter uploaded to the Investor Relations page of the Company's website. In advance of, or in connection with the 2021 Q2 Earnings Call, AppHarvest published a slide deck called the "Q2 2021 Earnings Presentation" on the Investor Relations page of the Company's website. The Q2 2021 Earnings Presentation included a slide containing a "Q2 2021 Operations Update" which disclosed "[o]perational issues in first growing season[,]" *i.e.*, the entire Class Period.

251.    The "Q2 2021 Operations Update" slide further disclosed the following problems which "significantly impacted revenue":

| Q2 2021 Problems | |
|---|---|
| **Lower Quality Production and Saleable Yield** | **Higher Distribution and Shipping Expense** |
| Poor quality mix (fewer USDA Grade #1 tomatoes) lowered our sales price and significantly impacted revenue; total production beat expectations, but problems associated with ramping up facility adversely affected results | Distribution costs much higher than expected; additional re-pack and re-sort costs resulting from poor product mix (fewer USDA #1 quality tomatoes than expected) |

252.    AppHarvest's description of "*re*-pack and *re*-sort costs" that were "much higher than expected" is an explicit admission that the Company suffered from rejections, as the Company was required to bear all costs associated with rejections pursuant to the Mastronardi Morehead Agreement.

253.    During the 2021 Q2 Earnings Call, Defendants further admitted that the Company's poor Q2 2021 performance was caused by an untrained and unreliable labor force at the Morehead

Facility which negatively affected product quality (*i.e.*, fewer USDA Grade No. 1 tomatoes) and reduced sales to Mastronardi. Defendant Webb stated, in pertinent part:

> Now let me turn to our second quarter performance. While true that prices for TOV [Tomatoes on the Vine] and Beefsteak tomatoes hit a 10-year low in May, *our realized price was also impacted by quality. Our percent of store shelf-ready produce, what we call #1s, came in lower than we expected.* While disappointing, we launched a set of actions to improve our performance immediately, and we're using these key lessons for our operators going forward with the AppHarvest 2.0 initiative, which David will discuss in greater detail.

254.    Defendant Lee further explained inadequate "labor training" and "productivity challenges" were the "*primary* driver" of the Company's "disappointing" Q2 results and guidance reduction, and that Defendants had known about these issues as they had already implemented remedial measures (including changing the piece rate system that CWs 1, 2 and 4 confirmed resulted in lower yield and quality), stating in pertinent part:

> We achieved several significant milestones at our first facility. But as Jonathan mentioned, *lower quality than we anticipated due to labor training and productivity challenges was the primary driver of our Q2 results, along with low market prices for tomatoes.* We're disappointed with these results, but the good news is that prevailing market prices for tomatoes have already rebounded from the lows we experienced in the second quarter.

> Additionally, the speed bumps associated with our initial harvest are fixable, and we've already deployed solutions against these problems in advance of our next harvest. For example, we overhauled our pack house to minimize bottlenecks while increasing quality checks, which helps us deliver our targeted volume of USDA grade #1 tomatoes. *We're also implementing changes to our piece rate or bonus system to drive improvements in our operational productivity and ability to meet surges in demand for plant care.* And lastly, we changed operational leadership and the chain of command structure within Morehead and all our future farms going forward. As of late July, I am now directly accountable for the performance inside our high-tech farms.

255.    Defendant Lee also disclosed that Defendants' previous statements concerning the Company's financial outlook (including statements made during the Class Period) had been reported less "conservatively" and that, as a result, Defendants had "revised expectations on price,

yield and distribution costs" related to AppHarvest's CEA operations, and further that AppHarvest was revising its guidance with respect to the size of its footprint—down from twelve facilities by 2025 to nine facilities. Defendant Lee specifically assigned Defendants' new "conservative" assumptions regarding the operational performance of AppHarvest's CEA business as the driver of both the Company's reduced sales guidance **and** its reduced footprint. Defendant Lee stated:

> Let me now turn to our 2021 guidance and long-term outlook, which reflects updates from our first full quarter production and our plan to pursue faster growth in CEA through a decentralized structure. ***It also represents what we believe to be a significant reduction in risk regarding our outlook as we've incorporated more conservative assumptions regarding our core AppalachiaCo business***, while leveraging a distinct management team to pursue upside from technology.
>
> For 2021, we've adjusted our full year net sales outlook to $7 million to $9 million from $20 million to $25 million to reflect our revised expectations on price, yield and distribution costs that we expect to achieve in our first year of operations. ***Most of the revision is driven by the quality challenges we experienced in ramping up I discussed earlier***, However, lower-than-expected market pricing for tomatoes and our strategic decision to reserve production space at Morehead to develop commercial technology for the CEA industry at large have also impacted the numbers.
>
> The adjusted EBITDA outlook in 2021, associated with our operational performance to date and strategic investments, is now expected to be minus $70 million to $75 million from minus $48 million to $52 million prior. While disappointing, our near-term adjusted EBITDA outlook has never been reflective of the long-term value we expect to create.
>
> ***
>
> In terms of the outlook, we are providing guidance based on ***a more conservative*** delivery of 9 high-tech indoor farms in Appalachia by the end of 2025.
>
> We are still on track with the full 12 by 25 plan for our Appalachian farm network that we previously discussed, and our long-range plan continues to call for 12. But for the purposes of issuing financial guidance, we are limiting our operational focus to 9, in order to accelerate delivery of our targeted results and ***reduce operational and financial risk***.

256.     Like Defendants Webb and Lee, Defendant Eggleton similarly confirmed that the

Company's Q2 results and guidance reduction were primarily driven by operational and

productivity issues plaguing the Company's crop harvest, stating, in pertinent part:

> Despite the speed bumps and ramping up with our initial harvest, we remain
> confident we are on the right path, and our business model will continue to develop
> into an industry standard for CEA. We believe this because *our performance in the
> quarter was principally due to lower quality*, driven by solvable issues related to
> labor productivity, training as well as lower market prices for tomatoes and higher
> distribution and shipping fees and not any fundamental -- with our business model
> or approach.
>
> ***
>
> Turning now to our full year 2021 outlook. As David mentioned, we are reducing
> our net sales expectation to a range from $7 million to $9 million, and our adjusted
> EBITDA loss expectation to a range from $70 million to $75 million. ***The primary
> driver of the updated outlook is the lower net sales expectation, due to the quality
> challenges we encountered in ramping up our first facility and higher-than-
> expected cost of goods sold with labor farm costs, associated with lower-than-
> expected labor productivity***.

257.     These revelations shocked investors and analysts who were laser focused on the

operational issues suffered during the Class Period. In fact, the very first analyst question during

the 2021 Q2 Earnings Call (from Brian Holland of Cowen) honed in on these issues: specifically

asking about the quantification of higher distribution fees and to what extent product "mix"

(quality) challenges would impact the Company's business going forward. Defendants' responses

elaborated on the product quality issues, including issues of "training" and failing to produce and

deliver USDA Grade No. 1 tomatoes, and that such existed for the "full season of harvest[.]"

Defendants also disclosed that going forward, unlike Defendants' statements during the Class

Period, AppHarvest's financial guidance would be predicated on what it could "absolutely

deliver." Specifically, Defendants disclosed that:

**Brian Holland**
*Cowen & Company, LLC, Research Division*

I'll start with the higher distribution fees, both in the second quarter and to the extent you've revised those fees higher going forward. First, can you quantify the magnitude of impact, more specifically in the quarter? I guess, long term, it's kind of embedded in that $40 million. And then longer term, while I understand the impact of mix in Q2, why are you assuming those -- that persists going forward, given it sounds as though this is an addressable issue?

**Jonathan Webb**
*Chief Executive Officer*

Yes. Thanks, Brian. This is Jonathan. ***So as we mentioned in the call, so training as we ramped up to 400 employees was an issue***. I mean operators globally and regardless of the industry have had issues with scaling this year, obviously, and we were one of those. It's disappointing. But the optimistic view we have is ***we put training programs in place now***. We've replaced management and we put procedures in place on training that we'll see as we scale other facilities. ***That impact of a #1 versus #2 tomato***, we did not realize until we saw it,[12] which is ***we get great value in our #1 tomatoes, and we get very little to no value in our #2 tomatoes. And so the #1 is what we have to optimize for, and that's where training and being able to achieve our #1 target on tomatoes. It's not overall volume that matters, it's the volume of #1 tomatoes, which directly impacts our bottom line***. I'll let Loren talk to the numbers.

**Loren Eggleton**
*Chief Financial Officer*

Sure. Yes. So during Q2, obviously, we saw historically low tomato pricing for TOV and Beefsteak stake tomatoes. And then as we mentioned, ***because of the quality mix challenges, we realized lower pricing and higher distribution fees***. To your question specifically, I would say approximately 80% of the lower outlook is attributable to net sales. Within that 80%, we think about 30% of that being due to higher distribution fees. And then outside of the 80%, the other 20% is due to lower yield expectations.

---

12 Defendant Webb's statement feigning that "we did not realize until we saw it" in reference to the price disparity between grades of tomatoes was misleading, and presumably made to avert (or minimize) pointed questions during the remainder of the Q&A session or to deflect culpability. The statement was also patently false and implausible. The importance of producing USDA Grade No. 1 tomatoes, rather than any other grade, was undeniable given the terms of the Mastronardi Morehead Agreement, which Defendant Webb signed and initialed. Moreover, Defendant Eggleton admitted during the 2021 Q1 Earnings Call that Defendants knew the difference between tomato grade prices when he stated that No. 1s sold "at a premium[.]" Indeed, the Company had entirely different packaging for No. 2 tomatoes versus No. 1 tomatoes, so that AppHarvest and Mastronardi (and/or end customers) would know which products were being shipped and what to charge/pay for those products.

**David J. Lee**
*President*

Brian, this is David Lee. Let me offer to your question of guidance, 2 perspectives. First, there was a transition in leadership of our day-to-day operations of not just Morehead but our future farms. And in my past, taking a hard independent look at everything, which is what I've done starting in July, has led me to help this team guide to, I think, more moderated assumptions. ***I have a strong belief that we need to guide to what we can absolutely deliver. That's part of what you're seeing in our guidance for 2021***. It's certainly one of the reasons why we're building 12 by 2025, but we're clear that we are guiding only to 9 farms.

So, I think ***part of it was executional challenges that are very real in our first major full season of harvest as a company***. But the second is a change in a philosophy and approach to ensure that we can deliver what we promised as part of the leadership change that occurred.

258.    Throughout the remainder of the call Defendants continued to disclose that the Q2 operational issues stemmed from AppHarvest's failure to train employees at the Morehead Facility and its failure to harvest and deliver USDA Grade No. 1 produce—which defendants knew about during the Class Period as they had implemented remedial measures including "overhauling the packhouse" and changing employees' "piece rate" bonus incentives. Defendants stated, in pertinent part:

**Brian Holland**
*Cowen & Company, LLC, Research Division*

Okay. So maybe just last one for me. Again, kind of big picture in nature, but typically, when we see kind of a miss, led in part by execution challenges, the company talks about simplifying things…just help us get comfortable with the notion that now is the right time to lean into this AppHarvest 2.0 restructuring.

**Jonathan Webb**
*Chief Executive Officer*

Yes, Brian. So we've got our team in Morehead laser-focused…And ***we just want to be frank that, yes, we had a challenge of hiring 400 people and training them and hitting the yield, not only yield, but quality that, that we must get that we can solve for***. And that team that's working on that can solve for that.

*** *** ***

146

**John William Rider**
*Stephens Inc., Research Division*

This is John Rider on for Mark. So our first question, could you just talk more about the operational fine-tuning you're doing as you figure out how to get to the optimal results and mix with your tomato crops? And then are there opportunities within the nutrients and greenhouse conditions or something else?

**Jonathan Webb**
*Chief Executive Officer*

No. Mark, ***it was as simple as training. I don't want to be more blunt than that, but it was training and management protocols***. Hiring 400 people that have never done this before, we delivered close to yield. We did not deliver on the #1 quality that we expect to achieve. And ***it's been a matter of putting the right training protocols in place, and that's been taking place***. That is currently taking place, and that is at or on track or above where we would like to currently be. But [Mark it's] as simple as training 400 people to run this facility, that has been a challenge, but the good thing is that's solvable and we're aggressively leaning in on the training programs internally. I'll let David talk to that.

**David J. Lee**
*President*

Yes. Thank you, John. And I'm going to turn you to details because I don't want to repeat everything. But if you look to Slide 7 on the right-hand side, here's the good news. The business model works at Morehead. And if you think about the things we're working on, there are 4 key areas, right? Overhauling the pack house so that we have the ability to check quality to produce more #1s.[13] So remember, operationally, the more #1s we produce, which has significantly better pricing potential, it also has significantly better yield benefit over time because the more we can manage our quality, we can replicate it across many of these other future farms.

What Jonathan was talking about is this -- primarily this productivity savings. We're one of the few companies that have local access to skilled labor. During COVID, so many other companies talk about labor shortages. We proved the business model. There are plenty of very eager skilled labor residents here in Central Appalachia to help us build our farms. So while we prove that, we now need to have a world-class system that's driven by productivity. We talk about piece rate for providing upward incentives to employees, who already get a living wage

---

[13] Defendants Lee's statement suggesting that AppHarvest lacked "the ability to check" quality was false and misleading, and a self-serving statement likely made to deflect culpability. Indeed, the Company hired Quality Control Specialists whose exact purpose was "to check" quality. Further, CW2 confirmed that if the Quality Control Specialists observed any deviations from quality standards, the findings from the inspection would be recorded and this would be followed by a visit to the Greenhouse to inform the pickers responsible that products with deviations had been detected.

but who also need to be incented for performing better. This is an example of what Jonathan was talking about.

***

**Jonathan Webb**
*Chief Executive Officer*

The facility operated as planned. I mean, if you remember the ice storm back in February, we operated through that and continue to operate the facility. So the asset itself is operating the way we had anticipated. ***The one challenge we had was, again, led back to management and training of the new 400 employees we have***, and that's where we're focused.

259.    On this news, the Company's common stock (Ticker: $APPH) price fell $3.46 per share, or approximately 29%, from $11.97 per share at market close on August 10, 2021, to $8.51 per share at market close on August 11, 2021, on exceptionally heavy trading volume of more than 20.6 million shares. Furthermore, this news caused the Company's warrant (Ticker: $APPHW) price to fall $1.72 per warrant, or approximately 44%, from $3.87 per warrant at market close on August 10, 2021, to $2.15 per warrant at market close on August 11, 2021, on exceptionally heavy trading volume of more than 1.3 million warrants.

## ADDITIONAL SCIENTER ALLEGATIONS

260.    As alleged herein, each of the Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public statements and documents issued and disseminated in the name of the Company were materially false and misleading, knew or acted with deliberate recklessness in disregarding that such statements and documents would be issued and disseminated to the investing public, and knowingly and substantially participated and/or acquiesced in the issuance or dissemination of such statements and documents as primary violators of the federal securities laws.

261.    The Individual Defendants had the motive and opportunity to commit and participate in the wrongful conduct complained of herein. Each was a senior executive officer and/or director of AppHarvest and, thus, controlled the information disseminated to the investing public in the Company's press releases and SEC filings. As a result, each of the Individual Defendants could falsify the information that reached the public about the Company's business and performance.

262.    Throughout the Class Period, each of the Individual Defendants acted intentionally, knowingly, or recklessly and participated in and orchestrated the fraudulent schemes alleged herein to conceal the true nature and extent of the Company's operating performance. Such actions allowed AppHarvest to inflate the Company's stock price. The Individual Defendants' scienter may be imputed to AppHarvest as the Individual Defendants were among AppHarvest's most senior management and were acting withing the scope of their employment.

I.      **The Individual Defendants Knowingly and/or Recklessly Made Material Misstatements and/or Omitted Material Facts.**

   A.   **Defendants' Internal Reporting and Forecasts Evidencing Declining Yield and Grade 1 Product Support a Strong Inference That Defendants Knew of Production Shortfalls**

   *Forecasting*

263.    CWs and AppHarvest's own documents confirm that Defendants Eggleton and Lee were intimately involved in various forecasting processes. Pursuant to the Mastronardi Morehead Agreement, AppHarvest was required to create an initial forecast of sales and a "future forecast" of sales for each harvesting season. The forecasts would include "forecasting the type of seeds and products to be grown as well as the quantities that should be cultivated for the next season[.]" CW3 confirmed that such forecasts existed prior to the commencement of the first growing season and that Defendant Eggleton approved the forecasts. Defendant Eggleton personally gave the forecasts

to CW3 for CW3 to use in connection with CW3's work as a Senior Cost Accountant. AppHarvest's forecasts were detailed and included information such as expected volume, expected costs, number of plants, yield, market price, estimated rejections, and estimated damaged tomatoes. CW3 further explained AppHarvest's ERP system, Microsoft Dynamics, tracked operational results and actual costs to compare against the projections. Defendants had complete access to the Company's forecasts and operational result data.

264.    CW6 confirmed that metrics such as those identified by CW3 and AppHarvest's own advertisements were underperforming during the class period compared to forecasts and that Defendants knew as much in real time. For example, according to CW6, AppHarvest was targeting "standard" benchmark for quality (84% of Grade 1 fruit for Tomatoes on the Vine; 86% for beefsteak). However, CW6 stated throughout the Company's "toughest times," Defendants "knew we were a long way off" from achieving its quality goal—at least 50% off target on one occasion. CW6 met with Defendants Eggleton and Lee weekly concerning the baseline forecast, and upside and downside scenarios. According to CW6, these weekly meetings between CW6 and Defendant Lee got "quite operational" and focused on various productivity metrics, with a key focus on yield and quality which was the basis for AppHarvest's revenue. During the "toughest times," discussions at these meetings concerned: "ways to close the gap" between AppHarvest's underperformance compared to the current forecast; the expected time needed for the closing the gap depending on the various scenarios; and the Company's issues with employee training, turnover, poor work ethic, and inconsistent hiring standards which were "repeatedly cited" as the "root cause" of the overall production challenges.

265.    CW6 also confirmed that AppHarvest maintained forecasts, such as an Annual Operating Plan, which included forecasting out pricing, labor productivity (including yield and

quality), construction costs, tomato grades, and other factors. CW6 recalled that at the end of each month, results would be "pulled into" FP&A models and adjustments would be made to the Company's forecasts. CW6 and Defendant Eggleton met for "many hours" each day discussing these near-, medium-, and long-term financial forecasts.

266.    CW6 confirmed that AppHarvest productivity forecasts were sent to Mastronardi on a weekly, and possibly daily basis. According to CW6, these forecasts included estimates of labor productivity to determine the volumes of beefsteak and Tomatoes on the Vine that would be harvested in the given period.

### *Labor Productivity*

267.    CW1 confirmed that employees' performance at the Morehead Facility Greenhouse was electronically tracked every day in real time because employees would use electronic scanners when they had completed a task (*e.g.*, picking a row of tomatoes), and that such data was immediately uploaded to the Company's electronic files. Similarly, CW4 recalled that Greenhouse quality inspectors carried an electronic tablet and recorded their results into a "live" excel spreadsheet so that AppHarvest could "map" quality performance within the Greenhouse. CW6 further confirmed that AppHarvest had real-time access to quality and yield data from the Packhouse based on the types of boxes being shipped out (i.e., Grade 1 or Grade 2) and their weight. Thus, AppHarvest had real time production data to track against the Company's forecasts. Indeed, AppHarvest used this real time data for numerous forms of internal reporting including reviews of "***daily***, weekly, and monthly greenhouse production" and reports to "senior management" related to "cost performance vs. budget [.]" *See* ¶131, *supra*.

268.    CW6 stated that labor productivity was identified as a challenge in 2020, and that throughout the "toughest" times in the first growing season, CW6 attended senior leadership

meetings twice a week, which included Defendants Lee and Eggleton, Marcella Butler, and later on, Julie Nelson. Labor productivity metrics included yield, quality, rejections from Mastronardi, attrition and employee absences, and productivity metrics for the various Greenhouse workers' particular functions. According to CW6, inadequate training, turnover, poor work ethic and inconsistent hiring standards were "repeatedly cited" as the "root cause" of the Company's productivity challenges at these leadership meetings. CW6 recalled the meetings occurred usually mid-week and end-of-week so that leadership could "keep an eye on it."

269.    Accordingly, the Individual Defendants knew and/or consciously disregarded the Company's problems regarding quality, pricing, rejections, and costs during the Class Period, which supports a strong inference of scienter.

**B.      Defendants Were Aware of the Importance of USDA Grade No. 1 Tomatoes to Pricing and Revenue Because Defendant Webb Personally Signed the Mastronardi Morehead Agreement Detailing the Terms of AppHarvest's Agreement with its Sole Distributor**

270.    As set forth above, AppHarvest's exclusive marketing and distribution partner for the Class Period was Mastronardi. Pursuant to the Mastronardi Morehead Agreement, Mastronardi was only required to purchase USDA Grade No. 1 tomatoes from AppHarvest. Defendant Webb signed, and ***initialed every page of***, the Mastronardi Morehead Agreement. Thus, Defendants knew that any tomatoes below Grade No. 1 would, as Defendant Webb admitted on the 2021 Q2 Earnings Call, sell for "very little to no value" and it was critical that AppHarvest produce Grade No. 1 tomatoes to meet sales targets and grow its business.

271.    Defendants regularly acknowledged their reliance on Mastronardi. Prior to and throughout the Class Period AppHarvest filed at least 18 documents with the SEC, including documents signed by the Individual Defendants, stating that the Company was "highly dependent" on its relationship with Mastronardi and that "because Mastronardi acts as an intermediary between

us and the retail grocers or foodservice providers, we do not have short-term or long-term commitments or minimum purchase volumes with them to ensure future sales of our products." Indeed, AppHarvest did not have any other revenue sources during the Class Period. Defendants admitted in the Company's Form 10-Q Quarterly Reports for both the first and second quarters of 2021 that "[s]ubstantially all of the Company's revenues are generated from the sale of tomatoes under an agreement with one customer, Mastronardi Produce Limited[.]"

272.    While Mastronardi was not required to purchase any specific amount of tomatoes, Defendant Webb stated on the 2021 Q1 Earnings Call that Mastronardi "made it abundantly clear that they can deliver and put on store shelves [] every tomato and fruit and vegetable [AppHarvest] grow[s]." Defendants Webb and Lee made similar statements in many interviews and public appearances throughout the Class Period.

273.    Thus, without demand limitations, the only constraining factor to AppHarvest's revenue would be its ability to consistently grow USDA Grade No. 1 tomatoes at the Morehead Facility, a fact Defendants were also acutely aware of from the terms of the Mastronardi Morehead Agreement, numerous SEC filings (that Defendants filed on AppHarvest's behalf) explaining that Mastronardi was required to purchase all the Company's USDA Grade No. 1 produce, and the Individual Defendants' own admissions. As Defendant Eggleton stated on the 2021 Q1 Earnings Call "tomatoes with Grade No. 1 sell[] at a premium[.]"

274.    Furthermore, pursuant to the Mastronardi Morehead Agreement, AppHarvest was required to accept all rejected products and bear all distribution costs incurred if the Company's products were rejected. Thus, AppHarvest would have recorded (and did record) lost sales from rejections and incurred distribution and transportation fees ("re-pack and re-sort costs") throughout the Class Period.

275.     According to CW6, Mastronardi maintained a "Mastronardi Portal" in which AppHarvest provided forecasts of what would be available to be picked-up at the Morehead Facility so that Mastronardi could do "a first cut at logistics planning." CW6 recalled Mastronardi increased the frequency of its audits on the AppHarvest tomatoes during periods of "weaker" performance by AppHarvest, which resulted in Mastronardi rejecting a lot of tomatoes. According to CW6, during the "toughest" periods of rejected tomatoes (the end of Q1 2021 through the "summer refresh"), it was necessary for AppHarvest to reforecast to lower estimated production, a process that involved CW6, Eggleton and Lee.

276.     Accordingly, the Individual Defendants' knowledge of: (i) the materiality of sales to Mastronardi; (ii) the importance of meeting USDA Grade No. 1 to obtain "premium" pricing rather than "very little to no value" from lower grades; (iii) Mastronardi's auditing of the AppHarvest's tomatoes and (iv) the consequences of failing to produce USDA Grade No. 1, including having to reforecast downward to account for lower sales and incremental distribution and transportation costs, demonstrates the Individual Defendants' knowledge and/or conscious disregard of the Company's problems regarding quality, pricing, rejections, and costs during the Class Period, and supports a strong inference of scienter.

C.     **Defendants' Class Period Personnel Changes Support a Strong Inference that Defendants Knew of Undisclosed Operational Problems at the Morehead Facility During the Class Period**

277.     As set forth above, Marcella Butler was promoted to Chief Operating Officer of AppHarvest on December 10, 2020, reporting directly to Defendant Webb. As Chief Operating Officer, Ms. Butler was responsible for the day-to-day operations of AppHarvest, including harvesting. According to her LinkedIn profile, as COO Ms. Butler "lead the Development,

Construction, and **Farm Operations teams for AppHarvest**[.]"[14] Moreover, Ms. Butler oversaw and was responsible for the Company's staffing and human resources (which was plagued by constant churn and inefficiency throughout the Class Period). Indeed, in the Company's Annual Public Benefit Corporation Report for the year ended December 31, 2020, AppHarvest prominently touted Ms. Butler as bringing "operations, consulting, compliance and HR experience to the company" and acting as the Company's point person for accomplishing its "GOAL" of staffing the Morehead Facility up to "500 LIVING WAGE JOBS[.]"

278.    Ms. Butler was also someone who the Company was heavily invested in, having made her AppHarvest's single most compensated employee in the fiscal year preceding the Class Period:

**Summary Compensation Table**

The following table sets forth information concerning the compensation of our named executive officers for the year ended December 31, 2020:

| Name and Principal Position | Salary [1] | Stock Awards [2] | All Other Compensation | Total |
|---|---|---|---|---|
| Jonathan Webb<br>*Chief Executive Officer* | $137,692 | — | $22,717 [3] | $ 160,409 |
| Loren Eggleton<br>*Chief Financial Officer* | $182,468 | $ — | $ 8,209 [4] | $ 190,677 |
| Marcella Butler<br>*Chief Operating Officer* | $ 99,615 | $1,726,788 | $25,605 [5] | $1,852,009 |

279.    However, after just four months in the position, and in the middle of the Morehead Facility's inaugural harvest, Ms. Butler was stripped of her role as Chief Operating Officer by the Board of Directors on April 12, 2021, despite the Company's significant investment in her. AppHarvest gave no explanation for this suspiciously timed demotion at the time, which occurred just one month before the Company's Q1 2021 quarterly disclosures, other than to say Ms. Butler's duties and responsibilities had "evolved." CW6 was "very familiar" with Ms. Butler and confirmed

---

[14] *See* https://www.linkedin.com/in/marcella-butler/ (last visited March 2, 2022).

her transition back to Chief People Officer and eventual separation was due to labor issues, including productivity, attrition, and churn.

280.    In the 2021 Q2 Earnings Call, Defendant Lee, confirming CW6's account, admitted—referring to Ms. Butler—that operational failures at the Morehead Facility caused AppHarvest to "eliminate[] a C-level position" and were the reasons the Company "***changed operational leadership***[.]" Moreover, Defendant Webb stated on the 2021 Q2 Earnings Call that AppHarvest "replaced management" in response to training issues the Company faced when it "ramped up."

281.    Defendants' Webb and Lee were involved in Ms. Butler's demotion as members of the Board of Directors, and thus, would have known all the circumstances pertaining thereto. Moreover, Webb's knowledge of AppHarvest's operational failures can be imputed by his role as Chief Executive Officer because the Company's Corporate Governance Guidelines—adopted by the Board of Directors on January 29, 2021, and effective on that date throughout the remainder of the Class Period—required that Webb work with the Board of Directors on succession plans for all executive officers.

282.    Specifically, AppHarvest's Corporate Governance Guidelines state, in pertinent part:

IX.    Management Succession Planning

The Board or a duly authorized committee of the Board should develop and periodically review with the Chief Executive Officer a plan with respect to executive officers' succession and consider appropriate individuals who might fill those positions. The Chief Executive Officer should also recommend and evaluate potential successors. The Chief Executive Officer will also review any development plans for those potential successors.

283.    Ms. Butler's succession involved the elimination of a "C-level" position and making multiple new hires during the Class Period (at a minimum: Adam Reel, Mark Keller, and

Julie Nelson) to absorb the defunct Chief Operating Officer role. All these hires were intended to resolve the operational issues that had been plaguing the Company throughout the Class Period. Given the senior positions that these individuals filled, Defendants must have begun recruiting for these positions beginning in the first quarter of 2021, or very early in the second quarter. Defendants, as senior executives, were necessarily aware of the reasons for, and involved in, the recruitment of these individuals.

284.    Ms. Butler stayed on as AppHarvest's Chief People Officer, but not an executive officer, through July 9, 2021, when she was terminated and left the company. AppHarvest did not disclose Ms. Butler's termination until August 11, 2021, when it mixed the information among the Company's Q2 2021 quarterly filings, when the truth of Defendants' fraud was finally revealed. A copy of Ms. Butler's separation agreement was attached to the 2Q2021 Form 10-Q.

285.    Thus, Ms. Butler's remarkably short tenure as COO, subsequent demotion, abrupt termination, and the hiring of three new senior personnel during the Class Period to fill operational roles support a strong inference of Defendant's knowledge, recklessness and/or scienter with respect to the operational issues facing the Morehead Facility.

> **D.    Defendants Were Aware of the Severe Operational Issues at the Morehead Facility Because Their Corporate Offices Were Located at the Morehead Facility, Prompting Defendants to Regularly Visit and Host Plant Tours**

286.    Not only was the Morehead Facility the site of AppHarvest's sole production operations during the Class Period, it was also the location of the Company's headquarters. Beginning in a Form 8-K filed by AppHarvest on February 25, 2021, and in every subsequent filing with the SEC, the Company identified the Morehead Facility as the "Address of Principal Executive Offices." Defendants thus would have, and did, see the Company's dysfunctional production facilities and widespread attrition and churn, firsthand. Indeed, CW1 specifically

recalled Defendant Webb would visit the Greenhouse one to two times a month throughout CW1's tenure to host tours for VIPs, such as Martha Stewart.

287.    In addition, Defendant Webb frequently visited the Morehead Facility where he filmed interviews within the facility touting its importance to investors. For example, in a March 15, 2021, interview with Jonah Lupton, Defendant Webb admitted that he was at the Morehead Facility "every morning" and greeted workers daily when they entered the Morehead Facility. Specifically, Mr. Lupton read to Webb a Facebook post purportedly made by an AppHarvest employee stating that Webb "stands outside and greets the team every morning or stops you during the day to shake your hand and thank you for hard work." Defendant Webb agreed the facts in the post were "real" and admitted: "it's great to hear about the, the post that, you know, your friend here in Kentucky, that, you know, saw somebody's post. And, and that's it, *it's real*. I mean, we're up at 5:00 AM *in the facility*, you know, elbow tapping *everyone* as they come in."

288.    As another example, in a June 3, 2021 interview with Seeking Alpha, Defendant Webb stated that during the COVID-19 pandemic he never "left" Kentucky and that he "love[s]" to "sleep on the farms" (the only "farm" being the Morehead Facility) and "[go] to our operations." Specifically, Webb stated, in pertinent part:

> Well, I've been very fortunate because COVID is terrible. No way is it, is it good. Uh, but the one thing for me personally is I've been only in Kentucky. I haven't left. So I've been able to *do what I love the most, which is sleep on the farms*, start construction at three and four in the morning, *going to our operations*.

289.    Defendant Webb took at least 16 interviews from the Morehead Facility prior to and throughout the Class Period. On a June 21, 2021, appearance on the podcast Authentic Avenue, Defendant Webb explained why he conducts interviews from the Morehead Facility:

> If you look at a lot of my interviews, they're held directly inside of our facility. Now, what we're trying to show is we're authentic. We're genuine. **We, you know, we want to show the consumer, here's the way we're operating.**

290.    CW4 confirmed, including through photographs, that the entire Greenhouse floor was covered in decomposing material which was present throughout the entire first de-leafing and harvesting season. Defendant Webb would have seen the huge quantities of rotting and wasted tomatoes and debris during his daily visits to the Greenhouse described above.

291.    CW4 recalled that the sole exception was when investors and news media visited the Greenhouse and Defendant Webb or his office deemed it necessary to "hide the waste."  CW5 confirmed that the instructions to hide the waste from investors and guests were initiated by Webb's team (if not Defendant Webb himself) to "create better eye appeal" at the Morehead Facility, and that the instructions were relayed to CW5's team at morning stand-up meetings attended by many senior personnel in operations-related positions.

292.    Accordingly, as Defendants' executive offices were at the Morehead Facility—the Company's only functioning CEA facility and sole source of revenue—and Defendant Webb regularly observed operational failures there such as widespread tomato wastage that was visibly obvious and surreptitiously hidden from investors by Webb or his team:  Defendants (and particularly Webb) either knew or recklessly disregarded AppHarvest's operational issues, including significant employee turnover, attrition, and churn, as well as the product waste, that were admittedly plaguing the facility throughout the Class Period.

**E.    The Morehead Facility's Production was the Company's Core Operations Because Its Tomatoes Were AppHarvest's Sole Source of Revenue During the Class Period**

293.    As set forth above, AppHarvest's only open facility and source of revenue during the Class Period was the Morehead Facility, which represents the Company's core operations.

294.    Prior to and throughout the Class Period, Defendants repeatedly acknowledged the importance of the Morehead Facility to AppHarvest's operations and financial viability. For

example, in six of the Company's Class Period SEC filings Defendants stated, "For the immediate future, we will rely *solely* on the operations at the Morehead Facility. Adverse changes or developments affecting the Morehead facility could impair our ability to produce our products and our business, prospects, financial condition and results of operation." Defendants further stated in six Class Period SEC filings that any interruption at the Morehead Facility "would significantly disrupt our ability to grow and deliver our produce in a timely manner, meet our contractual obligations and operate our business."

295.   Given that the Morehead Facility was concededly AppHarvest's core business concern, Defendants knew, or recklessly disregarded the admitted "labor and productivity" issues that existed there during the entire Class Period—that AppHarvest suffered severe attrition and churn and that the staff employed lacked proper or sufficient training causing the Company to lose 5-10% of otherwise saleable tomatoes, and causing "half" of the tomatoes to be poor quality.

**F.    Defendants Admit They Were Aware Operational Challenges Negatively Affected the Tomato Harvest at the Morehead Facility for the Entire Class Period**

296.   Defendants admit they were aware throughout the Class Period that AppHarvest experienced "executional challenges" that were negatively impacting the Company's operational and financial results.

297.    In the 2Q2021 Form 10-Q, Defendants admitted that "labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility" existed for the entire "*six months* ended June 30, 2021." According to the 2Q2021 Form 10-Q, these "labor and productivity challenges" for the Company's first "six months" were the cause of "lower net sales due to lower overall No. 1-grade production yields" as well as "higher related distribution and shipping fees."

298.    Defendant Lee further confirmed on the 2Q Earnings Call, where he was accompanied by Defendants Webb and Eggleton, that AppHarvest's "executional challenges" spanned the entire Class Period because they were "very real in our first major ***full season of harvest*** as a company." The "full season of harvest" began in January 2021. Similar explanations regarding the duration of the Company's operational problems were made in the Q2 Earnings Release ("initial growing season") and the Q2 2021 Earnings Presentation ("first growing season").

299.    Given Defendants reported on staffing issues, tomato production, financial forecasts, and other key metrics every quarter and intermittently in various media interviews, their admission that the operational issues existed throughout the Class Period is tantamount to an admission that they knew, or recklessly disregarded the operational issues existing at the time they made the statements.

300.    Furthermore, the Company's Q2 disclosures which explained in great detail the "labor and productivity challenges associated with ***the training*** and development of the new workforce at the Morehead, Kentucky facility" were referring to the same "training" issues that Defendants Lee and Eggleton had obscurely and misleadingly alluded to on the 2021 Q1 Earnings Call.

301.    During the Q1 2021 Earnings Call on May 17, 2021, Defendant Lee vaguely noted the Morehead Facility would "benefit from new training" during the "summer refresh" in July and August (without disclosing why that would be the case, *i.e.*, the devastating operational and productivity problems the Company was experiencing), and that such training would "support higher productivity in Q4." Later during the Q1 2021 Earnings Call, Defendant Eggleton made the

comment that the Company's "[g]ross loss" in Q1 was a reflection of "the demands required of training our labor force of our newly started operations."

302.    These statements were meant to seem innocuous and banal when made because Defendants simultaneously made material misrepresentations about operations, sales, and labor productivity, and concealed all of the detail concerning *how and why* Defendants had identified grounds for training—detail that they would not reveal until after the second quarter in the corrective disclosures. However, Defendants Lee's and Eggleton's admissions during the Q1 2021 Earnings Call, when viewed in context through observations made by CWs and Defendants' subsequent admissions and disclosures, prove that Defendants knew during the Class Period about the underlying productivity issues that existed at the Morehead Facility.

303.    Thus, Defendants' admissions on the 2021 Q1 Earnings Call and in the corrective disclosures reveal that Defendants knew or recklessly disregarded AppHarvest's operational issues—caused by a lack of employee training (including as a result of significant employee turnover, attrition, and churn that resulted in a perpetually novice and untrained workforce)—which plagued the Morehead Facility throughout the Class Period.

### G.    Defendants' Regular Responses to Analyst and Media Questions Concerning the Morehead Facility's Operations Shows They Closely Monitored and Tracked Staffing Levels and Volume of Saleable Tomato Production

304.    As set forth above, Defendants regularly provided updates on, and were asked questions from analysts and media personnel, about the Morehead Facility, AppHarvest's only open CEA Facility during the Class Period. Such updates and question frequently involved topics such as AppHarvest's hiring efforts and product quality. Defendants did not demur or claim ignorance of the matters. Rather, the Individual Defendants repeatedly provided detailed answers to these questions, indicating their personal knowledge on the subject.

305.    For example, during the 2021 Q1 Earnings Call the Individual Defendants made prepared remarks highlighting the Company's hiring efforts (*see also* ¶¶69-74, *supra*), as well as operations, pricing, and ability to produce quality tomatoes:

> **Jonathan Webb**
> We completed construction and **assembled a 500-person operating team in the middle of a global pandemic**.
>
> ***
>
> **Jonathan Webb**
> **We ramped up from about 20 employees last summer to about 500 at the end of Q1 this year that establishes our process to scale up quickly as we grow our network of farms**.
>
> ***
>
> **David J. Lee**
> Through our distribution agreement with Mastronardi Produce, **all of our USDA Grade No. 1 tomatoes are sold in top retail grocery outlets**. Grocers and consumers increasingly are requesting U.S. grown, chemical pesticide-free produce from companies they trust. Despite that, in 2019, more than 2/3 of vine crops for the U.S. market were imported. **And because were doing this at scale, we can deliver this produce for about the same prices standard.**
>
> **David J. Lee**
> First of all, on our operations. At Morehead, our first high-tech farm, our team of expert growers kicked off our first harvest starting in mid-January. And since then, we've ramped up production of all of the 60 acres as of the first week in May. **We've grown our employment from around 20 employees a year ago to 500 by the end of the first quarter of 2021.** We've also put in place the infrastructure to help us grow from 1 to 12 high-tech farms by the end of 2025.
>
> ***
>
> **David J. Lee**
> But at our core, our technology and infrastructure must serve our customers well. **Grocery and food service buyers, consumers and media have all been responding very well to the quality of our tomatoes**.
>
> ***
>
> **Loren Eggleton**
> In terms of actual yield for the first quarter, we were pleased that our Morehead facility generated a total of 3.8 million pounds of tomatoes sold. **This includes a mix of both Beefsteak and TOV tomatoes as well as varying levels of quality for each.**

306.     During the question-and-answer session that followed, the very first question requested clarity regarding AppHarvest's mix of USDA Grade No. 1 Tomatoes and other pricing factors. Defendants Lee and Webb provided thorough and detailed responses:

**Jeffrey David Osborne**
*Cowen and Company, LLC, Research Division*
Congratulations on your first earnings call as a public company. Just a couple of questions on my end. **One, I was wondering if we could get going on the pricing dynamics that you alluded to. How much of that was due to quality of the output, so non-grade 1 versus just broader market conditions.** I thought, historically, the winter months had seasonally higher prices relative to the summer. So I'm just trying to get a sense of what the moving pieces are on the price side.

**David J. Lee**
Jeff, this is David Lee here at AppHarvest. **What we did well is we anticipated and performed well on -- in market pricing.** A big part of that in Q1 was our relationship with Mastronardi. Mastronardi has the benefit of having a pretty full basket of other produce items. And so you may hear of others who are less insulated to the broader market versus what we have demonstrated in Q1. And our affirmation of our guidance in 2021 reflects that we think we're on track. So hopefully, that answers a bit of the question.

Jonathan is here with me, and he created the relationship with Mastronardi from the very beginning. So I'm going to turn to him to have him give some commentary to you on how we did in the market as well.

**Jonathan Webb**
Yes, Jeff, just to follow up on that, it's important that a tomato is not a tomato is not a tomato. And for the AppHarvest tomato, **Mastronardi Produce has made it abundantly clear that they can deliver and put on store shelves and want every tomato and fruit and vegetable we grow. So good thing for us is in a market that -- where we're at currently, and we still hit our Q1 guidance and continue to be very optimistic about the year ahead.**

307.     Defendants' detailed discussions about the Company's productivity and quality during the 2021 Q1 Earnings call was not an anomaly. Throughout the Class Period, the Individual Defendants participated numerous interviews and were asked and provided detailed responses regarding these subjects including, but not limited to, the following:

| Date | Defendant | Publisher | Title |
|---|---|---|---|
| 2/1/2021 | Jonathan Webb | Yahoo Finance | Agtech company AppHarvest Goes Public |
| 2/1/2021 | Jonathan Webb & David Lee | Cheddar News | AppHarvest Stock Soars on Farming startup's First Trading Day |
| 2/1/2021 | Jonathan Webb | TD Ameritrade Network YouTube Page | Jonathan Webb Talks #AppHarvest's (APPH) Nasdaq Debut |
| 2/1/2021 | Jonathan Webb | The Claman Countdown on Fox Business | AppHarvest Makes Wall Street Debut |
| 2/8/2021 | Jonathan Webb | CBS-Affiliate WMNT | Issues and Answers: AppHarvest |
| 3/4/2021 | David Lee | Bloomberg Business Week | AppHarvest President on Going Public Via Spac |
| 3/4/2021 | David Lee | SPACs Attack Podcast | AppHarvest APPH Sustainable Growth SPAC |
| 3/10/2021 | Jonathan Webb | Everyone Talks to Liz Claman | Sprouting From Self-Educated to CEO with Jonathan Webb |
| 3/22/2021 | David Lee | Motley Fool Industry Podcast | Financials: An Interview with AppHarvest President David Lee |
| 3/31/2021 | David Lee | Forward Fooding YouTube | 2021 Food Tech 500 Vertical Farming |
| 04/13/2021 | David Lee | Tech Bites Podcast | Talking AgTech, Indoor Farming, and Robots with David Lee of AppHarvest |
| 4/18/2021 | Jonathan Webb | Future Food Finance | Interview with Jonathan Webb, Founder and CEO of AppHarvest |
| 05/17/2021 | Jonathan Webb | Cheddar News | Indoor Farming Biz AppHarvest Delivered Sales in First Earnings as Public Company |
| 05/17/2021 | Jonathan Webb | Yahoo Finance | "The general Thesis is controlled environment agriculture is really the third wave of sustainable infrastructure," AppHarvest CEO and founder @JonathanWebbKy says. |
| 05/20/2021 | Jonathan Webb | Fox Business | Agriculture, Food Sector "Ripe for Disruption" |

| 05/21/2021 | Jonathan Webb | Bloomberg Business Week Podcast | AppHarvest CEO on Shrinking the Farming Footprint |
|---|---|---|---|
| 05/26/2021 | Jonathan Webb | Industry Focus Podcast | Wildcard an Interview with AppHarvest Founder and CEO Jonathan Webb |
| 06/03/2021 | Jonathan Webb | Seeking Alpha | AppHarvest CEO Jonathan Webb – The Future of Farming |
| 06/10/2021 | Jonathan Webb | K-Love News Podcast | The Future of Farming, Growing Food 24/7/365, Weather Doesn't Matter |
| 06/21/2021 | Jonathan Webb | Authentic Avenue Podcast | "Greenwashing" Doesn't Work: Jonathan Webb, Founder & CEO, AppHarvest |
| 08/08/2021 | Jonathan Webb | CNN | We Call Ourselves Farmers & Futurists |

308.    Defendants' numerous, detailed discussions with analysts, media, and investors regarding the Morehead Facility's operations and labor during the Class Period are probative of Defendants' knowledge of those subjects and support a strong inference of scienter.

**H.    AppHarvest Board Member Jeffrey Ubben's Suspicious Stock Sales Supports Scienter**

309.    Jeffrey Ubben joined the AppHarvest Board of Directors in March 2019. As a member of the board, Ubben had access to relevant inside information about the operations of the Morehead Facility, including information on the productivity of the Morehead Facility and the quality of tomatoes being produced.

310.    For example, Marcella Butler was demoted from her position as Chief Operating Officer on April 12, 2021, when the *Board of Directors* "determined that the duties and responsibilities of Marcella Butler have evolved[.]" As a board member who necessarily participated in the "determin[ation]" of Ms. Butler's "duties and responsibilities[,]" or as Defendant Lee described on the 2021 Q2 Earnings Call eliminating her "C-level position," Ubben

was necessarily aware of the issues that led to Butler's demotion and subsequent departure from AppHarvest, including the operational and productivity issues.

311.    Armed with the truth about AppHarvest's operational issues, Ubben looked to cash out. On June 10, 2021, Ubben sold 3 million shares, or roughly 25% of his holdings, at an average price of $16.5 per share for $49.5 million in proceeds shortly before AppHarvest announced poor Q2 results. The average price of Ubben's sale was nearly $8 per share higher than the closing price of AppHarvest securities after the fraud was revealed on August 11, 2021, saving Ubben roughly $24 million.

312.    The fact that sufficient information concerning AppHarvest's operational and productivity issues had reached its way to non-employee board members like Ubben, such that they were able to make suspiciously timed decisions (*e.g.*, the demotion of Ms. Butler and Ubben's decision to unload millions of shares of stock) creates a strong inference that Defendants, the Company's actual executives, knew this information even earlier and acted with scienter throughout the Class Period.

## II.    AppHarvest Acted with Corporate Scienter

313.    The allegations above also establish a strong inference that AppHarvest, as an entity, acted with corporate scienter throughout the Class Period, as its officers, management, and agents, including, but not limited to, the Individual Defendants, had actual knowledge of the misrepresentations and omissions of material facts set forth herein (for which they had a duty to disclose), or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them.

314.    Corporate scienter is supported by the fact that AppHarvest was a small company who had only one operating facility throughout the Class Period, at which Defendants received, or

had access to, real-time reports on the quality, labor productivity, and hiring issues plaguing the Morehead Facility throughout the Class Period.  Given the details of the representations made by the Individual Defendants throughout the Class Period regarding the quality, labor productivity and hiring practices, each of the Individual Defendants either made himself aware of the Company's actual (but undisclosed) issues related to the Morehead Facility or had no factual basis to make such statements. In either event, the Individual Defendants were at least reckless with respect to the truth, and their scienter is imputable to the Company.

## **LOSS CAUSATION**

315.    During the Class Period, and as detailed herein, the Defendants materially misled the investing public, thereby inflating the price of AppHarvest's securities, by publicly issuing false and/or misleading statements and/or omitting material facts necessary to make their own statements, as set forth herein, not false and/or misleading. Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about AppHarvest's business, operations, and prospects as alleged herein.

316.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, the Defendants made or caused to be made a series of materially false and/or misleading statements about the prospects and success of the Morehead Facility and its impact on the business of AppHarvest. These material misstatements and/or omissions had the cause and effect of creating, in the market, an unrealistically positive assessment of the Company and its

well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.

317.    The materially false and/or misleading statements made by the Defendants during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

318.    The corrective disclosures occurred prior to market open on August 11, 2021, when AppHarvest issued an earnings release, the Company's Quarterly Report for 2Q 2021, the Q2 2021 Earnings Presentation, and statements on an earnings call announcing, among other items, the Company's 2Q 2021 results and updated fiscal year 2021 outlook. AppHarvest announced net sales of $3.1 million, a $32 million net loss, lowered its full year sales guidance to a range of $7 million to $9 million, from a prior range of $20 million to $25 million, and lowered its full-year 2021 EBITDA guidance to a range of a loss of $70 million to $75 million from a prior range of a loss of $48 million to $52 million.

319.    AppHarvest attributed the disappointing results to, *inter alia*, "operational headwinds with the full ramp up to full production at the company's first CEA facility, including labor and productivity challenges related to the training and development of the new workforce and historically low market prices for tomatoes." *See also* "THE TRUTH IS REVEALED," *supra* (reciting Defendants' basket of corrective disclosures).

320.    On this news, the Company's common stock (Ticker: $APPH) price fell $3.46 per share, or approximately 29%, from $11.97 per share at market close on August 10, 2021, to $8.51 per share at market close on August 11, 2021, on exceptionally heavy trading volume of more than 20.6 million shares. Furthermore, this news caused the Company's warrant (Ticker: $APPHW) price to fall $1.72 per warrant, or approximately 44%, from $3.87 per warrant at market close on

August 10, 2021, to $2.15 per warrant at market close on August 11, 2021, on exceptionally heavy trading volume of more than 1.3 million warrants.

321.    The Company's corrective disclosures roiled the markets for AppHarvest's stock and warrants. Barclays analyst Benjamin M. Theurer issued a report on August 11, 2021 titled "First Look: APPH 2Q21: Not as expected." Theurer explained that AppHarvest's financial results were "well below [investor's] expectations" and stated that "[w]e expect a negative reaction." This report highlighted that "the company now guides to only 9 facilities by 2025" and that "2Q sales of $3.1mn was well below expectations, mainly on the back of a lower than expected average sales price. Realized price during the quarter was ~$0.36/lbs, which compares unfavorably with our expectations of $0.73/lbs." Barclays stated that "…results clearly were below expectations and disappointing[.]"

322.    Later in the day on August 11, 2021, Bloomberg reported on AppHarvest's second quarter results, noting that "sales were hurt by lower-than-expected quality" and that "[p]roduction was slowed by the training and development of the new workforce, and rising costs included higher distribution and shipping fees" which resulted in lowered fiscal year 2021 guidance.

323.    An August 22, 2021 report from Seeking Alpha stated that "Q2 Results and Full-Year Guidance Were Awful[.]" An August 11, 2021 article from the Financial Times worried that "near term forecasts disappear[ed] faster than a sugar cube in water[.]"

324.    In the August 22, 2021 Seeking Alpha report, market researchers were able to specifically link the Company's reported results and guidance reduction to "poor employee training" that negatively impacted the pricing available for its tomatoes. According to the report, given that Company's "miss[ed] estimates this badly" it "erod[ed] trust" in management—

particularly because it was "disingenuous" for Defendants to "raise profitability expectations" in the first quarter "ahead of what was clearly going to be a poor quarter."

325.    As a result of their purchases of AppHarvest securities during the Class Period at artificially inflated prices, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. The timing and magnitude of the price decline in AppHarvest shares, the statements in Defendants corrective disclosures, and the market's reaction negate any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the Defendants' fraudulent conduct.

## POST CLASS PERIOD EVENTS

326.    On November 11, 2021, AppHarvest filed its 10-Q for Q3 2021 with the SEC. The 10-Q contained numerous differences compared to the disclosures Defendants made during the Class Period. For example, Defendants removed the language concerning their ability to staff and retain workers with "less churn" (statements that they had falsely ***added*** to the Company's statements during the Class Period), and added the following wholly new risk factor acknowledging that labor was a "primary component" of the Company's business and stating that the labor market was "tightening" (*i.e.*, conceding AppHarvest experienced labor shortages caused by "turnover" and COVID-19 which resulted in higher labor costs including overtime and wages for "contract laborers"):

> ***Our results of operations can be adversely affected by labor shortages, turnover and labor cost increases.***
>
> ***Labor is a primary component of operating our business***. A number of factors may adversely affect the labor force available to us or increase labor costs, including high employment levels, federal unemployment subsidies, including unemployment benefits offered in response to the COVID-19 pandemic, and other government regulations. [***W]e have recently observed an overall tightening and***

***increasingly competitive local labor market. A sustained labor shortage or increased turnover rates within our employee base, caused by COVID-19, or measures taken to address COVID-19, or as a result of general macroeconomic factors, could lead to increased costs, such as increased overtime to meet demand and increased wage rates to attract and retain employees, and could negatively affect our ability to efficiently operate our greenhouse equipment and overall business***.

If we are unable to hire and retain employees capable of performing at a high-level, or if mitigation measures we may take to respond to a decrease in labor availability, such as overtime and contract laborers, have unintended negative effects, our business could be adversely affected. An overall labor shortage, lack of skilled labor, increased turnover or labor inflation, caused by COVID-19 or as a result of general macroeconomic factors, could have a material adverse impact on our operations, results of operations, liquidity or cash flows.

327.   In addition, Defendants further disclosed the "skilled local labor force," which they consistently touted as a competitive advantage throughout the Class Period, was no longer sufficient to fully run its operations at the Morehead Facility and instead AppHarvest had "hired contract laborers from ***outside of the region*** to help complete our next harvest."

328.   On the February 24, 2022, Defendants Webb, Lee, and Eggleton, among others, participated in an earnings call to review Q4 2021 and FY 2021 results. Among other things, Defendants discussed the August 11, 2021 corrective disclosures and gave additional explanation regarding how the Company historically calculated guidance, essentially admitting that Defendants' Class Period projections were not attainable:

**Brian Holland**
*Cowen & Company, LLC, Research Division*

Appreciate the color. Mindful there are others on the line, I'll ask one more and then get back in the queue. But just thinking about the construct of the fiscal '22 revenue guide. I'm wondering what's being assumed to the extent you can discuss from the yield side and from the price side. So how those two factors come together?

Just thinking about kind of level of conservatism that's being built in. Because obviously, that's going to be a question that gets asked as you think about the kind

of growth that you're projecting. Hey, how are they going to get there? Are they getting there from yield? Or is there an assumption of getting price through. So just wondering if you can help us segment those two factors into the revenue number.

**David Lee**
*President*

Sure. It's a great question. **First, Brian, it's important since we're a new public company to reiterate our overall philosophy on guidance. You recall that in the summer, we changed our guidance for 2021 because we wanted to have a balanced view and guide to numbers we believe we could achieve and hit**. And that has not changed in the guidance that we've offered today.

## CLASS ACTION ALLEGATIONS

329.    Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class of all persons or entities that purchased or otherwise acquired AppHarvest publicly traded securities between February 1, 2021 and August 10, 2021, inclusive, seeking to pursue remedies under the Exchange Act. Excluded from the Class are AppHarvest and its subsidiaries and affiliates, and their respective officers and directors at all relevant times, and any of their immediate families, legal representatives, heirs, successors, or assigns, and any entity in which any Defendant has or had a controlling interest.

330.    Because AppHarvest securities were actively traded on the NASDAQ, the members of the Class are so numerous that joinder of all Class members is impracticable. While the exact number of Class members is unknown at this time and can only be ascertained through discovery, Plaintiff believes that there are hundreds or thousands of Class members. Members of the Class may be identified from records maintained by AppHarvest or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice customarily used in securities class actions.

331.    Plaintiff's claims are typical of those of the members of the Class, as all Class members have been similarly affected by Defendants' wrongful conduct as alleged herein.

Moreover, Plaintiff will fairly and adequately protect the interests of the Class and has retained competent counsel who is highly experienced in class action and securities litigation.

332. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. These common questions include:

a. Whether Defendants violated the federal securities laws as alleged herein;

b. Whether Defendants' statements to the investing public during the Class Period misrepresented material facts about AppHarvest's business and operations;

c. Whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

d. Whether the Individual Defendants caused AppHarvest to issue false and misleading SEC filings and public statements during the Class Period;

e. Whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

f. Whether the prices of AppHarvest securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

g. Whether the members of the Class have sustained damages and, if so, the proper measure of damages.

333. A class action is superior to all other available methods for the fair and efficient adjudication of this matter as joinder of all Class members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## PRESUMPTION OF RELIANCE

334.   Plaintiff, like all Class members, is presumed to have relied on Defendants' misrepresentations and omissions under the fraud-on-the-market doctrine. At all times, the market for the Company's securities was an efficient market that promptly digested current information related to the Company from all publicly available sources and reflected such information in the prices of the Company's securities. Throughout the Class Period:

a.   AppHarvest's common stock and warrants were actively traded on the NASDAQ;

b.   The market price of AppHarvest common stock and warrants reacted promptly to the dissemination of public information regarding the Company;

c.   The Company's securities were followed by financial analysts, including those cited in this Complaint;

d.   The average weekly trading volume for AppHarvest common stock during the Class Period was approximately 6.2 million shares;

e.   The average weekly trading volume for AppHarvest warrants during the Class Period was approximately 1 million warrants;

f.   As a regulated issuer, AppHarvest filed with the SEC periodic public reports during the Class Period;

g.   AppHarvest regularly communicated with public investors via established market communication mechanisms; and

h.   According to the AppHarvest 10-Q filed with the SEC, on May 17, 2021 the Company's had 100,253,268 shares of common stock outstanding and market capitalization of unaffiliated shares was over $1.3 billion.

335.    Throughout the Class Period, the Company was consistently followed by the market, including securities analysts. The market relied upon the Company's financial results and management to accurately present the Company's financial results. During this period, AppHarvest and the Individual Defendants continued to pump materially false and misleading information into the marketplace regarding the Company and the operations of the Morehead Facility. This information was promptly reviewed and analyzed by analysts and institutional investors and assimilated into the price of the Company's securities.

336.    As a result of the misconduct alleged herein, including Defendants' false and misleading statements and omissions, the market for AppHarvest securities was artificially inflated. Under such circumstances, the presumption of reliance available under the "fraud-on-the-market" theory applies. Thus, Class members are presumed to have indirectly relied upon the misrepresentations and omissions for which Defendants are responsible.

337.    Plaintiff and other Class members justifiably relied on the integrity of the market price for the Company's securities and were substantially damaged as a direct and proximate result of their purchases of AppHarvest securities at artificially inflated prices and the subsequent decline in the price of those securities when the truth was disclosed.

338.    Plaintiff and the other Class members are also entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) because claims asserted in this Complaint against Defendants are predicated upon omissions of material fact for which there was a duty to disclose.

339.    Had Plaintiff and other members of the Class known of the material adverse information not disclosed by Defendants or otherwise been aware of the truth behind Defendants'

material misstatements, they would not have purchased AppHarvest securities at artificially inflated prices.

## NO STATUTORY SAFE HARBOR

340.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.

341.    In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

342.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of AppHarvest who knew that the statement was false when made.

## CLAIMS FOR RELIEF

### COUNT I

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5**
*Against All Defendants*

343.    Plaintiff realleges each allegation as if fully set forth herein.

344.     This claim is brought under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, against all Defendants named herein.

345.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of AppHarvest securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire AppHarvest securities at artificially inflated prices.   In furtherance of this unlawful scheme, plan, and course of conduct, the Defendants, and each of them, took the actions set forth herein.

346.     During the Class Period, Defendants, by the use of means and instrumentalities of interstate commerce: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon Plaintiff and the Class, all in an effort to maintain artificially high market prices for AppHarvest securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendants acted individually and in concert in a continuous course of conduct to conceal non-public, adverse material information about the Company's outlook, operations, and business, as reflected in the misrepresentations and omissions set forth above.

347.     During the Class Period, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced

in the issuance or dissemination of such statements or documents as primary violations of the securities laws. By virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, Defendants participated in the fraudulent scheme alleged herein.

348.    As a result of their making and/or their substantial participation in the creation of affirmative statements and reports to the investing public, Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, as embodied in SEC Regulation S-K (17 C.F.R. § 229.10, et seq.) including, but not limited to Subsection of Regulation S-K, such as Item 303 of SEC Reg. S-K (17 C.F.R. § 229.303(a)(3)(ii)), and other SEC regulations, including accurate and truthful information with respect to the Company's operations and performance so that the market prices of the Company's publicly traded securities would be based on truthful, complete, and accurate information.  Defendants' material misrepresentations and omissions as set forth herein violated that duty.

349.    The Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material misstatements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them, or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

350.    As a result of the foregoing, the market prices of AppHarvest securities were artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market prices of AppHarvest securities during the Class Period in purchasing AppHarvest securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

351.    Had Plaintiff and the other members of the Class been aware that the market prices of AppHarvest securities had been artificially and falsely inflated by the Defendants' misleading statements and by the material adverse information which the Defendants did not disclose, they would not have purchased AppHarvest securities at the artificially inflated prices that they did, or at all.

352.    Plaintiff's and Class members' losses were proximately caused by Defendants' scheme to defraud the investing public by, among other things, failing to fully and accurately disclose to investors adverse material information regarding the Company despite a duty to do so. Plaintiff's and Class members' losses were a direct and foreseeable consequence of Defendants' fraudulent misstatements and concealment.

353.    As a result of the wrongful conduct alleged herein, Plaintiff and the other members of the Class have suffered damages in an amount to be established at trial.

354.    By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of AppHarvest securities during the Class Period.

**Count II**

**For Violations of Section 20(a) of the Exchange Act**
*Against the Individual Defendants*

355.     Plaintiff realleges each allegation as if fully set forth herein.

356.     This claim is brought under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t, against the Individual Defendants.

357.     AppHarvest and the Individual Defendants are liable as primary violators of Section 10(b) of the Exchange Act and Rule 10b-5 as set forth herein.

358.     The Individual Defendants acted as controlling persons of AppHarvest within the meaning of Section 20(a) of the Exchange Act. Because of their positions, the Individual Defendants had the power and authority to cause AppHarvest to engage in the wrongful conduct complained of herein. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

359.     Specifically, the Individual Defendants, by reason of their status as senior executive officers and/or directors of AppHarvest, directly or indirectly, controlled the conduct of the Company's business and its representations to Plaintiff and the Class, within the meaning of Section 20(a) of the Exchange Act.  The Individual Defendants directly or indirectly controlled the content of the Company's SEC filings, press releases and interviews with various news sources cited herein related to Plaintiff's and Class members' investments in AppHarvest securities within the meaning of Section 20(a) of the Exchange Act.  Therefore, the Individual Defendants are jointly and severally liable for the Company's fraud, as alleged herein.

360.     The Individual Defendants controlled and had the authority to control the content of the Company's SEC statements, press releases and other public statements. Because of their close involvement in the everyday activities of the Company, and because of their wide-ranging

supervisory authority, the Individual Defendants reviewed or had the opportunity to review these documents prior to their issuance or could have prevented their issuance or caused them to be corrected.

361.    The Individual Defendants knew or recklessly disregarded the fact that AppHarvest's representations were materially false and misleading and/or omitted material facts when made. In so doing, the Individual Defendants did not act in good faith.

362.    By virtue of their high-level positions and their participation in and awareness of AppHarvest's operations and public statements, the Individual Defendants were able to and did influence and control the Company's decision-making, including controlling the content and dissemination of the documents that Plaintiff and the Class contend contained materially false and misleading information and on which Plaintiff and the Class relied.

363.    The Individual Defendants had the power to control or influence the statements made giving rise to the securities violations alleged herein, and as set forth more fully above.

364.    As set forth herein, the Individual Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5, thereunder, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants are further liable pursuant to Section 20(a) of the Exchange Act.

365.    As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and the Class suffered damages in connection with their purchase of AppHarvest securities to be determined at trial.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying the Plaintiff as the Class representatives;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as reasonable attorneys' fees, expert fees, and other costs;

D.      Granting Plaintiff leave to amend the complaint to conform to the evidence; and

E.      Awarding such equitable/injunctive or other relief in Plaintiff's favor as the Court may deem just and proper.

## JURY DEMAND

In accordance with Fed. R. Civ. P. 38(b), Plaintiff demand a jury trial of all issues involved, now, or in the future, in this action.

DATED: August 12, 2022              Respectfully submitted,
                                    **LEVI & KORSINSKY, LLP**

                                    By:   _/s/Shannon L. Hopkins_
                                        Shannon L. Hopkins (SH-1887)
                                        Gregory M. Potrepka (GP-1275)
                                        Michael J. Keating (*Pro Hac Vice*)
                                        1111 Summer Street, Suite 403
                                        Stamford, CT 06905
                                        Telephone: (203) 992-4523
                                        Facsimile: (212) 363-7171
                                        shopkins@zlk.com
                                        gpotrepka@zlk.com
                                        mkeating@zlk.com

                                        *Counsel for Lead Plaintiff and Lead Counsel for the Class*