UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In re AppHarvest Securities Litigation

Case No. 1:21-cv-07985-LJL

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
PLAINTIFF'S SECOND CONSOLIDATED AMENDED COMPLAINT**

September 23, 2022

COOLEY LLP
Aric H. Wu
55 Hudson Yards
New York, NY 10001
Tel: (212) 479-6000
ahwu@cooley.com

Peter M. Adams (*pro hac vice*)
Linh K. Nguyen (*pro hac vice*)
4401 Eastgate Mall
San Diego, CA 92121
Tel: (858) 550-6000
padams@cooley.com
lknguyen@cooley.com

Zachary D. Williams
(*pro hac vice forthcoming*)
1144 15th Street Suite 2300
Denver, CO 80202
Tel: (720) 566-4000
zwilliams@cooley.com

*Attorneys for Defendants AppHarvest, Inc.,
Jonathan Webb, Loren Eggleton, and David
Lee*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 3

I.    AppHarvest Redefines Agricultural Production In The United States. ......................... 3

A.    AppHarvest Partners with Mastronardi. ................................................................. 4

B.    AppHarvest Constructs and Opens Its First CEA Facility ....................................... 4

II.    AppHarvest Sells Its First Tomatoes And Reaffirms Its Guidance For 2021 ............... 7

III.    AppHarvest Meets Its Net Sales And Adjusted EBITDA Guidance For Q1 2021. ...... 8

IV.    AppHarvest's Reports Unexpected Q2 Results And Lowers Guidance For 2021. ....... 9

V.    Wall Street Reacts To AppHarvest's Lowered Guidance ........................................... 10

VI.    Post-Class Period Events. ...................................................................................... 11

VII.    This Lawsuit ........................................................................................................ 11

LEGAL STANDARDS ..................................................................................................... 13

ARGUMENT ................................................................................................................... 14

I.    PLAINTIFF FAILS TO ADEQUATELY PLEAD FALSITY .................................... 14

A.    The Challenged Statements Are Not Actionable. ......................................... 14

B.    Defendants Said Nothing Materially False Or Misleading. .......................... 17

1.    The CWs Are Not Reliable. ................................................................. 18

2.    No Alleged Omission Rendered Defendants' Statements Materially False or Misleading When Made ................................................... 20

II.    PLAINTIFF FAILS TO PLEAD ANY FACTS TO SUPPORT AN INFERENCE OF SCIENTER. ................................................................. 29

A.    Plaintiff Does Not Attempt To Plead A Motive To Defraud. ...................... 30

B.    Plaintiff Fails To Plead Facts Showing Conscious Misbehavior Or Recklessness. .... 30

1.    The Allegations About Internal Forecasts And Data Are Too Vague. ......... 31

## TABLE OF CONTENTS
### (continued)

                                                                                    **Page**

2.      Scienter Cannot Be Inferred From The Mastronardi Agreement. ............... 34

3.      Scienter Cannot Be Inferred From Personnel Changes. ............................. 34

4.      Mr. Webb's Infrequent Presence At Morehead Does Not Suggest Scienter. 36

5.      Plaintiff's Core Operations Theory Does Not Suggest Scienter.................. 36

6.      There Are No "Admissions" Of Scienter...................................................... 37

7.      Scienter Cannot Be Inferred From The Individual Defendants' Accurate
        Answers To Analyst Questions..................................................................... 38

8.      Scienter Cannot Be Inferred From Mr. Ubben's Single Stock Sale. ........... 38

C.   The Unreliable And Vague CW Allegations Are Not Indicative of Scienter. ............. 38

D.   The Inference Of Scienter Is Not As Compelling As The Opposing Inference. ......... 39

III.   PLAINTIFF HAS FAILED TO PLEAD LOSS CAUSATION. ................................. 40

IV.   PLAINTIFF FAILS TO STATE A CLAIM UNDER SECTION 20(A)..................... 40

CONCLUSION.................................................................................................................. 40

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adient plc Sec. Litig.*,
2020 WL 1644018, at *21 (S.D.N.Y. Apr. 20, 2020)................................................15, 21, 32

*In re AOL Time Warner, Inc. Sec. Litig.*,
503 F.Supp.2d 666 (S.D.N.Y. 2007).....................................................................................40

*In re Aratana Therapeutics Inc.*,
315 F.Supp.3d 737 (S.D.N.Y. 2018).....................................................................................16

*Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*,
28 F.4th 343 (2d Cir. 2022) ...........................................................................................30, 35

*In re Arrowhead Pharms., Inc. Sec. Litig.*,
2017 WL 5635422 (C.D. Cal. Sept. 20, 2017) .....................................................................20

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..............................................................................................................13

*In re Avon Sec. Litig.*,
2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019)......................................................................37

*In re Banco Bradesco S.A. Sec. Litig.*,
277 F. Supp. 3d 600 (S.D.N.Y. 2017)....................................................................................3

*Basic v. Levinson*,
485 U.S. 224 (1988)..............................................................................................................17

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)..............................................................................................................13

*Boca Raton Firefighters & Police Pension Fund v. Bahash*,
506 F. App'x 32 (2d Cir. 2012) ............................................................................................28

*Boguslavsky v. Kaplan*,
159 F.3d 715 (2d Cir. 1998)..................................................................................................40

*Born v. Quad/Graphics, Inc.*,
521 F.Supp.3d 469 (S.D.N.Y. 2021).........................................................................14, 21, 25

*Bos. Ret. Sys. v. Alexion Pharms., Inc.*,
556 F.Supp.3d 100 (D. Conn. 2021).....................................................................................34

iii

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

*Browning v. Amyris, Inc.*,
    2014 WL 1285175 (N.D. Cal. Mar. 24, 2014).....................................................27

*In re Campbell Soup Co. Sec. Litig.*,
    2020 WL 7022655 (D.N.J. Nov. 30, 2020) .......................................................38

*Campo v. Sears Holdings Corp.*,
    635 F.Supp.2d 323 (S.D.N.Y. 2009).................................................................18

*Chapman v. Mueller Water Prods., Inc.*,
    466 F.Supp.3d 382 (S.D.N.Y. 2020) (Liman, J.) ..................................... *passim*

*In re Chembio Diagnostics, Inc. Sec. Litig.*,
    2022 WL 541891 (E.D.N.Y. Feb. 23, 2022).......................................................37

*Chill v. Gen. Elec. Co.*,
    101 F.3d 263 (2d Cir. 1996).............................................................................30

*In re Citigroup, Inc. Sec. Litig.*,
    330 F.Supp.2d 367 (S.D.N.Y. 2004).................................................................24

*City of Austin Police Ret. Sys. v. Kinross Gold Corp.*,
    957 F.Supp.2d 277 (S.D.N.Y. 2013).................................................................31

*City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan v. Nat'l Gen. Holdings Corp.*,
    2021 WL 212337 (S.D.N.Y. Jan. 21, 2021) .....................................................31

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
    450 F.Supp.3d 379 (S.D.N.Y. 2020).................................................................36

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
    2019 WL 6877195 (N.D. Cal. Dec. 17, 2019)........................................20, 23, 25

*City of Warren Police & Fire Ret. Sys. v. Foot Locker, Inc.*,
    412 F.Supp.3d 206 (E.D.N.Y. 2019) ................................................................16

*Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*,
    433 F.Supp.3d 515 (S.D.N.Y. 2020).................................................................29

*In re Coty Inc. Sec. Litig.*,
    2016 WL 1271065 (S.D.N.Y. Mar. 29, 2016) ...................................................28

*In re DDAVP Direct Purchaser Antitrust Litig.*,
    585 F.3d 677 (2d Cir. 2009).............................................................................38

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Dura Pharms., Inc. v. Broudo,*
    544 U.S. 336 (2005)............................................................................................40

*ECA, Local 134 IBEW Joint Pension Tr. v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)....................................................................13, 30, 31

*In re eSpeed, Inc. Sec. Litig.*,
    457 F.Supp.2d 266 (S.D.N.Y. 2006)................................................................30

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
    986 F.Supp.2d 487 (S.D.N.Y. 2013)................................................................29

*In re Fed Ex Corp. Sec. Litig.*,
    517 F.Supp.3d 216 (S.D.N.Y. 2021)....................................................13, 15, 19

*Ford v. Voxx Int'l Corp.*,
    2016 WL 3982466 (E.D.N.Y. July 22, 2016) ..............................................21, 22

*In re Francesca's Holdings Corp. Sec. Litig.*,
    2015 WL 1600464 (S.D.N.Y. Mar. 31, 2015) ................................................19

*Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*,
    336 F.Supp.3d 196 (S.D.N.Y. 2018)......................................................19, 24, 37

*Frederick v. Mechel OAO,*
    475 F. App'x 353 (2d Cir. 2012) ....................................................................36

*Garber v. Legg Mason, Inc.*,
    537 F.Supp.2d 597 (S.D.N.Y. 2008)................................................................13

*Glaser v. The9, Ltd.*,
    772 F.Supp.2d 573 (S.D.N.Y. 2011)......................................................18, 34, 35

*Gray v. Wesco Aircraft Holdings, Inc.*,
    454 F.Supp.3d 366 (S.D.N.Y. 2020)................................................................15

*Gregory v. ProNAi Therapeutics Inc.*,
    297 F.Supp.3d 372 (S.D.N.Y. 2018)................................................................19

*In re Health Mgmt. Sys., Inc. Sec. Litig.*,
    1998 WL 283286 (S.D.N.Y. June 1, 1998) ..............................................22, 26

*In re IAC/InterActiveCorp Sec. Litig.*,
    478 F.Supp.2d 574 (S.D.N.Y. 2007)................................................................15

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*In re Initial Pub. Offering Sec. Litig.*,
    399 F.Supp.2d 261 (S.D.N.Y. 2005) ...................................................................40

*Jones v. Perez*,
    550 F. App'x 24 (2d Cir. 2013) .........................................................................38

*Kleinman v. Elan Corp.*,
    706 F.3d 145 (2d Cir. 2013) ...............................................................................17

*Loc. No. 38 IBEW Pension Fund v. Am. Express Co.*,
    724 F.Supp.2d 447 (S.D.N.Y. 2010) ................................................18, 21, 38, 39

*In re Lululemon Sec. Litig.*,
    14 F.Supp.3d 553 (S.D.N.Y. 2014) .....................................................................35

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
    26 F.Supp.3d 278 (S.D.N.Y. 2014) .....................................................................24

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011) ..............................................................................................17

*Miao v. Fanhua, Inc.*,
    442 F.Supp.3d 774 (S.D.N.Y. 2020) ........................................................... *passim*

*Nappier v. Pricewaterhouse Coopers LLP*,
    227 F.Supp.2d 263 (D.N.J. 2002) .......................................................................36

*In re Nokia Oyj Sec. Litig.*,
    423 F.Supp.2d 364 (S.D.N.Y. 2006) ......................................................13, 26, 37

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) ..........................................................................30, 33

*In re NVE Corp. Sec. Litig.*,
    551 F. Supp. 2d 871, 895 (D. Minn. 2007) ........................................................22

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015) ............................................................................................16

*In re Omnicom Grp., Inc. Sec. Litig.*,
    597 F.3d 501 (2d Cir. 2010) ...............................................................................13

*Ong v. Chipotle Mexican Grill, Inc.*,
    294 F.Supp.3d 199 (S.D.N.Y. 2018) ..................................................................17

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*In re Pretium Res. Inc. Sec. Litig.*,
    256 F.Supp.3d 459 (S.D.N.Y. 2017)........................................................................24

*In re Progress Energy, Inc.*,
    371 F.Supp.2d 548 (S.D.N.Y. 2005)........................................................................24

*In re Regeneron Pharms., Inc. Sec. Litig.*,
    2005 WL 225288 (S.D.N.Y. Feb. 1, 2005)..............................................................30

*Ret. Sys. v. Mechel OAO*,
    811 F.Supp.2d 853 (S.D.N.Y. 2011)........................................................................40

*Ret. Sys. v. Textron, Inc.*,
    810 F.Supp.2d 434 (D.R.I. 2011), *aff'd*, 682 F.3d 34 (1st Cir. 2012) ....................20

*In re Rhodia S.A. Sec. Litig.*,
    531 F.Supp.2d 527 (S.D.N.Y. 2007)........................................................................40

*Rice v. Intercept Pharm., Inc.*,
    2022 WL 837114 (S.D.N.Y. Mar. 21, 2022) (Liman, J.) ...........................34, 35, 36

*Richman v. Goldman Sachs Grp., Inc.*,
    868 F.Supp.2d 261 (S.D.N.Y. 2012)........................................................................18

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)....................................................................................17

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001) ..................................................................................22

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
    573 F.3d 98 (2d Cir. 2009)......................................................................................30

*In re Sanofi-Aventis Sec. Litig.*,
    774 F.Supp.2d 549 (S.D.N.Y. 2011)........................................................................16

*Set Cap. LLC v. Credit Suisse Grp. AG*,
    996 F.3d 64 (2d Cir. 2021)......................................................................................34

*Singh v. Schikan*,
    106 F.Supp.3d 439 (S.D.N.Y. 2015)........................................................................18

*Slayton v. Am. Express Co.*,
    604 F.3d 758 (2d Cir. 2010)....................................................................................31

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Stadnick v. Vivint Solar, Inc.*,
2015 WL 8492757 (S.D.N.Y. Dec. 10, 2015) .................................................................28

*Steamfitters Loc. 449 Pension Plan v. Skechers U.S.A., Inc.*,
412 F.Supp.3d 353 (S.D.N.Y. 2019)..............................................................................16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)........................................................................................................13

*In re Turkcell Iletisim Hizmetler A.S. Sec. Litig.*,
202 F.Supp.2d 8 (S.D.N.Y. 2001) ..................................................................................28

*In re Vantive Corp. Sec. Litig.*,
110 F.Supp.2d 1209 (N.D. Cal. 2000) ............................................................................18

*In re Wachovia Equity Sec. Litig.*,
753 F.Supp.2d 326 (S.D.N.Y. 2011)..........................................................................19, 33

*In re WEBMD Health Corp. Sec. Litig.*,
2013 WL 64511 (S.D.N.Y. Jan. 2, 2013) ...................................................................15, 23

*In re Wells Fargo & Co. Sec. Litig.*,
2021 WL 4482102 (S.D.N.Y. Sept. 30, 2021)................................................................32

*Wochos v. Tesla, Inc.*,
2018 WL 4076437 (N.D. Cal. Aug. 27, 2018) ...............................................................36

*Wochos v. Tesla, Inc.*,
985 F.3d 1180 (9th Cir. 2021) ...................................................................................29, 39

*Woodward v. Raymond James Fin., Inc.*,
732 F.Supp.2d 425 (S.D.N.Y. 2010).............................................................................30

**Statutes**

15 U.S.C.
§ 78u-4 ............................................................................................................................30
§ 78u-4(b)(1).....................................................................................................................13
§ 78u-4(b)(1)(B)................................................................................................................17
§ 78u-5(i)(1)(A)-(C)..........................................................................................................14
§ 78u-5(i)(1)(A)-(D) .........................................................................................................15

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| **AppHarvest or Company** | AppHarvest, Inc. |
| **CAC** | Plaintiff's Consolidated Amended Complaint |
| **CEA** | Controlled environment agriculture |
| **CW** | Confidential witness |
| **Defendants** | AppHarvest, Inc., Jonathan Webb, Loren Eggleton, and David Lee |
| **EBITDA** | Earnings Before Interest, Taxes, Depreciation, and Amortization |
| **GAAP** | Generally Accepted Accounting Principles |
| **GMO** | Genetically Modified Organism |
| **Individual Defendants** | Jonathan Webb, Loren Eggleton, and David Lee |
| **Mastronardi** | Mastronardi Produce Limited |
| **Mastronardi Agreement** | AppHarvest's 10-year agreement with Mastronardi, signed on March 18, 2019 (as amended December 20, 2020) |
| **Plaintiff** | Lead Plaintiff Alan Narzissenfeld |
| **Prospectus** | January 1, 2021 Form 424B3 |
| **PSLRA** | Private Securities Litigation Reform Act |
| **SAC** | Plaintiff's Second Consolidated Amended Complaint |
| **SEC** | Securities and Exchange Commission |
| **TOV** | Tomatoes on the Vine |
| **USDA** | United States Department of Agriculture |
| **Wu Declaration** | Declaration of Aric H. Wu in Support of Defendants' Motion to Dismiss Plaintiff's First Consolidated Amended Complaint |

## INTRODUCTION

This case is a textbook example of a plaintiff trying to spin a company's reduction of its annual revenue guidance into a violation of the federal securities laws. Those laws and relevant pleading standards, however, prohibit pleading fraud-by-hindsight. And for good reason: markets are complex, and financial predictions made months or even a year into the future—particularly for a young, public company like AppHarvest—are always uncertain.

AppHarvest is a sustainable food company headquartered in Central Appalachia. Since 2019, AppHarvest has invested hundreds of millions of dollars to further its mission of reliably and sustainably increasing crop yields, improving access to nutritious, non-GMO food, and providing a consistent and safe supply of U.S.-grown produce. In October 2020, AppHarvest opened its flagship 60-acre indoor farm, the first of its kind, in Morehead, Kentucky. This massive undertaking required it to hire and train hundreds of new employees amid a global pandemic. In January 2021, the Company began harvesting produce from the first half of the Morehead farm.

Despite this and other challenges inherent to such an undertaking, AppHarvest reported that its Q1 2021 financial results were in line with its guidance, even though the Morehead farm was not fully operational the entire time. Based on the strength of those results, AppHarvest reaffirmed its guidance for the full year of 2021. And, although it was optimistic, AppHarvest warned investors that its projections were not a guarantee and "were subject to a number of risks and uncertainties" detailed in its SEC filings, including that AppHarvest had "***only just begun [its] first growing season, which ma[de] it difficult to forecast future results of operations***."

Unfortunately, AppHarvest experienced growing pains that impacted its second quarter as an operating company. On August 11, 2021, the Company disclosed disappointing Q2 results stemming from historically low market prices for tomatoes, and unanticipated labor and productivity challenges. These headwinds led to lower quality tomatoes, which compounded the market pricing difficulties and had unexpected adverse effects on distribution costs. As a result, as soon as it announced its Q2 financial results, the Company lowered its full-year guidance. As

Defendants explained, "***starting in July***," they had taken a "hard independent look at everything," which led them to proceed with "more moderated assumptions." Following this news, the Company's stock price declined, which then spawned this litigation.

The 183-page SAC is defective to its core. According to Plaintiff, Defendants somehow knew, six months before it was publicly disclosed, that the Company was experiencing certain challenges that would later materially impact its second quarter financial results and 2021 guidance. That is as implausible as it is unsubstantiated. The vast majority of the challenged statements were made on or before May 17, 2021, when AppHarvest released its positive Q1 results. How did Defendants mislead investors about its business and prospects when the Company just achieved its Q1 forecasts? Plaintiff does not say. He instead borrows the Company's explanation for a disappointing Q2 and reduced guidance, and proclaims that Defendants must have known and appreciated the significance (and long-term effect) of these issues much sooner than announced. This is not enough, and Plaintiff's SAC does not come close to clearing the high hurdles imposed by Rule 8, Rule 9(b), and the PSLRA.

First, Plaintiff has not pled falsity. Many of the challenged statements are forward-looking statements protected by the PSLRA's safe harbor. Others are inactionable puffery, opinions, or are demonstrably true. And none of the alleged omissions rendered any of the statements materially false or misleading when made.

Second, Plaintiff has not pled scienter. There is not a single particularized fact alleged (no documents, no conversations, no emails, nothing) as to the state of mind of any Defendant. Nothing in the SAC suggests contemporaneous knowledge of the material impact of the unspecified training, retention and staffing, or incentive compensation issues alleged by Plaintiff, let alone any well-pled facts showing that any Individual Defendant intended to mislead the investing public. Nor does Plaintiff attempt to plead a plausible motive. Further, no Defendant sold stock, which undercuts any possible inference of recklessness or intent to deceive. Without these facts, Plaintiff cannot plead any inference of scienter, much less a strong one as required under the PSLRA.

Third, Plaintiff has not pled loss causation. The SAC fails to connect any disclosures or comments about AppHarvest's second quarter results and its lowered annual guidance to any alleged false or misleading statement or fraud on the market.

Defendants previously moved to dismiss Plaintiff's CAC for each of these reasons. Instead of opposing that motion, he filed the SAC. However, like the CAC, the SAC relies on Defendants' post-hoc statements about Q2 results and the subjective opinions of CWs. The SAC adds purported statements from three more former employees (for a total of six), but none, aside from CW6, had personal knowledge of farm-wide operations or direct contact with any Individual Defendant, and two did not even work at the Company during the Class Period. As for CW6's purported statements (if you credit them), they are vague, untethered to any of the challenged statements, and imprecise as to time. And tellingly, despite his alleged access to real-time data and the Individual Defendants, CW6 never says ***when*** AppHarvest's public forecasts became impossible to achieve or ***how*** any of the data compared to those forecasts or the challenged statements, much less that any Defendant intended to deceive the investing public. ***Rather, his allegations are entirely consistent with what actually happened and what was publicly disclosed in August 2021***—*i.e.*, the Company encountered a number of headwinds in the second quarter of 2021 which yielded a disappointing quarter, derailed the Company from its projected path, and resulted in reduced annual guidance.

For these reasons, this Court should dismiss Plaintiff's SAC with prejudice.

## **BACKGROUND**

## I.    **AppHarvest Redefines Agricultural Production In The United States.**

AppHarvest is headquartered in Morehead, Kentucky and is incorporated under Delaware law as a public benefit corporation. (¶28; Ex. 4 at 3.)[1] AppHarvest believes that CEA is the solution

---

[1] All "¶" references are to the SAC, and all "Ex." and "App." references are to the exhibits and appendices attached to the Wu Declaration, which are or reflect "statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit" and "matters of which judicial notice may be taken, including documents that both 'bear on the adequacy' of SEC disclosures and are 'public disclosure documents required by law.'" *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 629 (S.D.N.Y. 2017) (citations omitted). Unless otherwise noted, all emphasis is added and all internal quotation marks, ellipses, brackets, and citations are omitted.

to the world's growing food security crisis.[2] (Ex. 4 at 24.) CEA is a high-tech, indoor farming method that "blends a combination of engineering, plant science, and computer managed greenhouse control technologies." (¶41.) High-tech greenhouses can produce up to 30 times more crops compared to traditional open-field agriculture, while using up to 90% less water. (¶43; Ex. 4 at 25.) They can also cultivate crops year-round and optimize supply. (¶42.)

Jonathan Webb founded AppHarvest in 2018 and, at all relevant times, served as the Company's CEO and Chairman of the Board. (¶29.) Loren Eggleton served as the Company's CFO at all relevant times. (¶30.) David Lee served as a director and the Company's President at all relevant times. (¶31.) From the beginning, AppHarvest has cautioned investors that its "management [team] has limited experience in operating a public company." (Ex. 4 at 20.)

### A.   AppHarvest Partners with Mastronardi.

In March 2019, AppHarvest entered into an exclusive 10-year marketing and distribution agreement with Mastronardi, the largest North American distributor of greenhouse-grown produce. (¶34.) Under the Agreement, Mastronardi was obligated to purchase all of AppHarvest's USDA Grade No. 1 tomatoes.[3] (¶61.) However, Mastronardi and its customers may inspect the tomatoes and may return them—at cost to AppHarvest—if they decide they do not qualify as Grade No. 1. (¶64; Ex. 2 at 5.) AppHarvest may sell returned produce. (¶62; Ex. 2 at 2.)

### B.   AppHarvest Constructs and Opens Its First CEA Facility.

In May 2019, AppHarvest announced that it would begin constructing its first and flagship 60-acre (*i.e.*, 2.7 million square feet) indoor greenhouse in Morehead, Kentucky. (See ¶52.) The facility includes the Company's executive offices, a packhouse, and a 10-acre retention pond. (¶¶43, 52; Ex. 4 at 26-27.) Housing approximately 45 football fields of indoor growing space, the

---

[2] The United Nations predicts that by 2050, global food production must increase by at least 50 percent to feed the growing population. (Ex. 4 at 24.) Conventional agriculture techniques, which consume more than 70 percent of the world's freshwater, cannot keep pace with increasing demand for food. (*See id.*)

[3] The USDA's criteria for Grade No. 1 tomatoes are vague and subjective. The requirements include: "Mature," "Not overripe or soft," "Clean," "Well developed," "Fairly well formed," "Fairly smooth," and free from "Decay," "Freezing injury," "Sunscald," and no damage from any other cause. (Ex. 1 at 2-3.) The standard for Grade No. 2 tomatoes is nearly the same as for Grade No. 1: "Mature," "Not overripe or soft," "Clean," "Well developed," "Reasonably well formed," "Not more than slightly rough," and free from "Decay," "Freezing injury," "Sunscald," and "serious[]" damage. (*Id.*)

Morehead farm has many advantages. (Ex. 5 at 2-3.) It runs on recycled rainwater, gets up to 30 times more yield using 90% less water than open field farming, removes harsh pesticides, and avoids soil depletion. (¶43; Ex. 5 at 2-3; Ex. 3 at 5.) The Company's location in Central Appalachia is overall advantageous. Taxes, utilities, transportation, and labor cost are relatively low. (Ex. 4 at 26-29.) AppHarvest was confident it could attract the local workforce because the Company pays competitive salaries, equity grants, and other benefits. (Ex. 23 at 8.)

On November 19, 2020, AppHarvest announced that it had planted its first crop of beefsteak tomatoes on the first half (*i.e.*, 30 acres) of the Morehead farm. (¶53.) On December 15, 2020, AppHarvest issued its first full-year financial guidance. (¶150.) The Company projected $21 million in net revenue and negative $41 million in adjusted EBITDA for 2021. (¶150; Ex. 3 at 6.) But AppHarvest warned investors not to rely on its forecasts because they were forward looking statements based on "*current expectations*," "*inherently uncertain*" "*assumptions*," and were "*subject to . . . risks and uncertainties*." (Ex. 3 at 3-4.) The Company also "*anticipate[d] that subsequent events and developments will cause [its] assessments to change*." (*Id.*)

On January 11, 2021, in connection with its "go-public" reverse merger with Novus, AppHarvest filed its Prospectus, which was replete with robust disclosures about the Company's financial projections, operations; ability to hire, train, and retain employees; growth prospects, and the COVID-19 pandemic.[4] (Ex. 4 at 8-23; *see* **App. A** (cataloguing AppHarvest's risk disclosures).) For example, the Prospectus specifically warned investors that AppHarvest:

- "*is a development stage company with no revenue to date*," and "*has only just begun its first growing season, which makes it difficult to forecast future results of operations*." (Ex. 4 at 3, 6.)

- had a management team with "*limited experience in operating a public company*" and personnel "that *may not have . . . the appropriate level of knowledge, experience, and training . . . required of public companies*." (*Id.* at 20.)

- "*may be unable to successfully execute on its growth strategy*," and that "*if [it did] not effectively manage its growth, it may not be able to . . . satisfy customer requirements or maintain high-quality product offerings*." (*Id.* at 8, 12.)

---

[4] As of January 2021, AppHarvest had 350 employees and had received more than 10,000 applications for those positions. (¶74.)

The Company reiterated that its projections:

- were "*forward looking statements that are inherently subject to significant uncertainties and contingencies*," and that they "*should not be relied upon as being indicative of future results*." (*Id*. at 22-23.)

- "*reflect numerous estimates and assumptions . . . which are difficult to predict and many of which are beyond AppHarvest's . . . control*." (*Id*. at 22-23.)

And the Prospectus warned that:

- "*revenue growth could slow or . . . decline for a number of reasons*, including slowing demand for AppHarvest's products . . ." (*Id*. at 15.)

- "*[i]f . . . [its] products . . . have quality problems, the Company may not be able to fully recover costs and expenses . . . [and] could be materially and adversely affected*. (*Id*. at 12.)

- "*there can be no assurance that the projected results will be realized or that actual results will not be significantly . . . lower than projected*." (*Id*. at 23.)

Regarding labor, in particular, the Prospectus expressly cautioned investors that:

- indoor farming is "*labor intensive*" and "*depends on employing a skilled local labor force*," which means that a "*failure to . . . retain qualified employees could negatively impact [its] business, results of operations and financial condition*." (*Id*. at 10.)

- the Company had "*rapidly hired*" employees and that "*even if [it] is able to . . . train its labor force*," it could "*no[t] guarantee that [it would] be able to retain these employees*." (*Id*. at 10-11.)

AppHarvest also disclosed the Mastronardi Agreement terms and cautioned:

- Mastronardi is the Company's "exclusive marketing and distribution partner" and "is only obligated to purchase AppHarvest's products that are at or above USDA Grade 1 standards . . . *and of a quality required by Mastronardi's customers*." (*Id*. at 11.)

- Mastronardi and its customers have a period to inspect AppHarvest's produce and that "*[a]ny significant or unexpected rejection of AppHarvest's products could negatively impact [its] results of operations*." (*Id*. at 11.)

In addition, the Company warned that it was not immune to the COVID-19 pandemic:

- it was relying on "*a single facility for all its operations*," which meant that "*[a]ny . . . period of reduced production at the Morehead facility*" due to "disease outbreaks or pandemics" could "*disrupt AppHarvest's ability to . . . operate its business*." (*Id*. at 9.)

- it warned that the "*pandemic could result in labor shortages, which could result in AppHarvest's inability to plant and harvest crops at full capacity and could result in spoilage or loss of unharvested crops*." (*Id*. at 18.)

These risk warnings and similar cautionary language are repeated or referenced in ***every*** earnings

call, SEC filing, and press release challenged by Plaintiff. (Exs. 6, 9-11, 13-15, 17-20, 23, 30, 31.)

**II.      AppHarvest Sells Its First Tomatoes And Reaffirms Its Guidance For 2021.**

In January 2021, AppHarvest announced that it had completed its first harvest of beefsteak tomatoes and had started shipping to national grocers such as Kroger and Walmart. (¶¶150, 154; Ex. 7 at 2.) Based on those "early sales," the Company reaffirmed its 2021 financial guidance. (¶150; Ex. 6 at 2.) But it again warned investors that its projections were forward-looking and subject to numerous risk and uncertainties as detailed in the Prospectus. (Ex. 6 at 3.)

On February 10, 2021, AppHarvest filed another Registration Statement, which repeated the same warnings contained in the Prospectus. (Ex. 10 at 5-16.) AppHarvest emphasized that it had "*only just begun [its] first growing season, which makes it difficult to forecast future results of operations*"; that "*even if [it is] able to . . . train its labor force, there is no guarantee that [the Company] will be able to retain these employees*"; that its "*business could be adversely affected if [it] fail[ed] to effectively manage [its] future growth*"; that "*[i]f . . . [its] products . . . have quality problems, the Company may not be able to fully recover costs and expenses incurred in operatio*n"; and that it "*rel[ies] on a single facility for all of [its] operations.*" (¶165; Ex. 10 at 5, 7, 9.)

On February 25, 2021, AppHarvest announced that for the first quarter of 2021—its first quarter of production ever—the Company was projecting net revenue of $2.1-2.6 million and an adjusted EBITDA loss of $14-16 million. (Ex. 11 at 2.) For the full year 2021, AppHarvest forecasted $20-25 million in net revenue and an adjusted EBITDA loss of $43-45 million. (Ex. 12 at 3.) At the time, Mr. Webb explained that "favorable crop yields and market pricing" supported an "outlook that is better than [] expected in December 2020." (¶169; Ex. 11 at 2.) In particular, the Morehead farm "exceeded a new performance threshold for the facility, harvesting more than 120,000 pounds of tomatoes in a single day during the week of February 22." (Ex. 13 at 2.) Despite its optimism, AppHarvest cautioned investors that "*its expectations are based on information available at the time*" and "*subject to changing conditions*" and "*uncertainties.*" (Ex. 11 at 3.) It again directed investors to the risk disclosures in its February Registration Statement. (Ex. 12 at 4.) Around the same time, Defendant Lee also reminded investors that they should "not get ahead

of [themselves]" as this was AppHarvest's "first at-scale facility." (Ex. 16 at 2.)[5] A week later, AppHarvest again warned investors that it was "*difficult [for the Company] to forecast future results of operations*" because it had "*not "completed [its] first growing season*." (Ex. 14 at 5.) AppHarvest repeated the risk disclosures and cautionary language about its financial projections, operations, growth prospects, and the COVID-19 pandemic. (¶181; Ex. 14 at 5-17.)

On April 1, 2021, AppHarvest announced that it had harvested its first TOV crop, which had been planted in January on the second 30 acres of the Morehead farm. (¶192; Ex. 17 at 2.) The Company noted that the TOV would be shipped out "on schedule." (Ex. 17 at 2.)

## III.   AppHarvest Meets Its Net Sales And Adjusted EBITDA Guidance For Q1 2021.

On May 17, 2021, AppHarvest announced that it met its guidance for Q1 despite the Morehead farm not being fully operational the entire time. (Ex. 19 at 2.) For the quarter, AppHarvest sold 3.8 million pounds of beefsteak and TOV tomatoes with "*varying levels of quality for each*." (Ex. 23 at 8.) This yielded $2.3 million in net sales (compared to the net sales projection of $2.1-2.6 million) and an adjusted EBITDA loss of $12.4 million (improving on the range of $14-16 million). (Ex. 19 at 2.) AppHarvest disclosed that as of May, it had ramped up production of the farm to its full 60 acres. (*Id*.) Finally, AppHarvest reported that it expected to have five CEA facilities operational by the end of 2022.[6] (Ex. 20 at 4.) Based on these results, AppHarvest reiterated its 2021 net sales guidance of $20-25 million and altered its projected adjusted EBITDA loss to $48-52 million due to the Company's planned investments in growth. (¶199; Ex. 19 at 3.)

Despite these positive results, Defendants candidly acknowledged that Q1 had been challenging given that it was the Company's "first harvest [at] a new facility." (Ex. 23 at 8.) Mr. Eggleton disclosed that employee training costs had been substantial, contributing to a gross loss of $4.5 million, and that despite these efforts, the "blended price per pound [AppHarvest] realized during the first quarter . . . reflect[ed] a mix of *varying grades* of tomatoes." (*Id*.) He expressed

---

[5] By the end of March, AppHarvest employed 500 people. (Ex. 21 at 4.)
[6] AppHarvest disclosed that internal survey results showed that 93% of employees were proud to work for the Company and 87% stated they would recommend the Company as a great place to work. (Ex. 23 at 8.)

hope that "fine-tune[ing]" of operations "would "lead[] to greater labor productivity" and a tomato "grade mix [that would] migrate upward over the coming quarters." (¶134; Ex. 23 at 8.) Mr. Lee added that he believed the Company's "new training" of employees would "support higher productivity in Q4." (¶133; Ex. 23 at 6.)

The market understood that AppHarvest's Q1 results, though positive, were impacted by a lower quality mix. For example, an analyst noted that AppHarvest's price per pound of tomato had been "below [] expectations due to seasonal conditions and quality (*likely lower Grade 1 output*)." (Ex. 34 at 2.) However, analysts expected quality would improve over time. (Ex. 33 at 3.)

## IV.  AppHarvest's Reports Unexpected Q2 Results And Lowers Guidance For 2021.

On August 11, 2021, AppHarvest announced its financial results for the Q2 of 2021. (¶242; Ex. 35 at 2.) Unlike the prior quarter, AppHarvest reported lower-than-expected net sales of $3.1 million. (¶243.) Although the Company sold 8.6 million pounds of tomatoes (a 4.8-million-pound increase over Q1), the average price was only $0.36 per pound (a 41% decrease from Q1). (¶243; Ex. 35 at 2; Ex. 39 at 2.) AppHarvest also reported a Q2 net loss of $32.0 million and a non-GAAP Adjusted EBITDA loss of $22.6 million. (¶243.)

AppHarvest attributed its Q2 performance to "historically low market prices for tomatoes" and "labor and productivity challenges related to the training and development of the new workforce" that the Company did not uncover until July. (¶243; Ex. 35 at 3; Ex. 38 at 10 (Mr. Lee clarifying that his "taking a hard independent look at everything . . . ***starting in July***" led the Company to make "more moderated assumptions.") While AppHarvest "more than doubled production" from Q1, the challenges "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher distribution and shipping fees." (¶249; Ex. 38 at 4; Ex. 36 at 4.) The Company also previewed some organizational changes to improve operations. It revealed that it had "eliminated some layers of the organization to connect leadership more closely to the business." (Ex. 35 at 4.) To that end, Mr. Lee "assumed responsibility for operations in July as part of a reorganization focused on improved accountability and cost containment." (*Id.*)

In light of its Q2 results, AppHarvest lowered its full-year 2021 guidance, projecting net sales of $7-9 million from a prior range of $20-25 million and an adjusted EBITDA loss of $70-75 million from a prior range of $48-52 million. (Ex. 35 at 5.) AppHarvest explained that this was part of a larger "change in [] philosophy" to "significant[ly] reduc[e] risk regarding [the Company's] outlook." (¶¶255, 257; Ex. 38 at 7, 10.)

On a conference call later that day, Defendants expounded on the second quarter results. Although "total production [had] beat expectations, [] problems associated with ramping up [the Morehead] facility adversely affected results." (Ex. 37 at 4.) Mr. Eggleton explained that in the second quarter, the market price for tomatoes hit a "historic[] low" and, on top of that, the Company "realized lower pricing and higher distribution fees." (¶257; Ex. 38 at 10.) Mr. Lee noted that "lower quality [tomatoes] than we anticipated" due to "labor and productivity challenges related to the training and development of the new [Morehead] workforce," drove lower net sales. (¶254; Ex. 38 at 5; Ex. 36 at 3.) The Company also noted that that its "brand has not yet earned a price premium," which also informed the Company's revised guidance. (Ex. 37 at 4.)

Mr. Webb told investors that the problems were "solvable" and noted that management was "aggressively leaning in on the training programs internally." (¶258; Ex. 38 at 12.) Mr. Lee added that, in addition to the changes in operational leadership, AppHarvest was changing its piece rate bonus system "to drive improvements in [] operational productivity and ability to meet surges in demand for plant care." (¶254; Ex. 38 at 5.) He also noted that AppHarvest had "overhauled [its] pack house to minimize bottlenecks while increasing quality checks." (¶254; Ex. 38 at 5.)

## V.     Wall Street Reacts To AppHarvest's Lowered Guidance.

Despite the Company's lowered guidance for 2021, analysts were "confident [that] the business model of [CEA] will work and be able to deliver results, once initial headwinds are overcome." (*E.g.*, Ex. 39 at 2.) They recognized that the Company's "initial organizational structure" stymied the flow of information to leadership, which "limited the immediate and necessary action taken." (Ex. 41 at 3.) They also understood that because AppHarvest rapidly

scaled its business and quadrupled its work force in less than one year, "there were bound to be inefficiencies." (Ex. 44 at 4.) But analysts were confident that the "labor productivity and yield quality" problems were "not unique to [AppHarvest]," were "transitory," and would "improve as the workforce and training programs mature and incorporate a season's worth of experience." (Ex. 44 at 2, 3, 5.) They also noted that AppHarvest continued to have "strong support from qualified parties," including Mastronardi, Equilibrium Capital, and Rabo AgriFinance. (Ex. 40 at 2.)

## VI.    Post-Class Period Events.

AppHarvest leadership continued to believe in the Company and its mission. To that end, on August 16, 2021, Mr. Lee purchased $100,000 worth of AppHarvest stock. (Ex. 42 at 2.) On August 19, 2021, Mr. Eggleton purchased $5,000 worth of AppHarvest stock. (Ex. 43 at 2.)

On November 10, 2021, AppHarvest announced positive Q3 operating and financial results. (Ex. 45 at 2.) The Company reported that it delivered "higher than expected net sales of approximately $543,000 on 1.5 million pounds of tomatoes sold" in July and August, before it refreshed and replanted its crops in September ahead of its second growing season. (*Id.*) AppHarvest also reported that, through the first two weeks of harvesting in the fourth quarter, the Company "exceeded its internal projection for the percentage of USDA No. 1 tomatoes." (*Id.*)

On February 24, 2022, AppHarvest announced its full year 2021 results, reporting that it had achieved $9.1 million in net sales and an adjusted EBITDA loss of $70-75 million, at the "high end" of its revised 2021 guidance range. (Ex. 46 at 2.) The Company noted that the financial results were driven by "higher net sales price per pound in the fourth quarter of 2021" due to "better operating performance and gross market prices for tomatoes as well as cost containment." (*Id.*) For the full year 2022, AppHarvest announced financial guidance that was similar to its original 2021 guidance: $24-32 million in net sales and an adjusted EBITDA loss of $70-80 million, noting that the Company expected to be operating three new farms in 2022 that would contribute "mid-single digit millions of dollars" to the projected total net sales. (*Id.* at 4.)

## VII.    This Lawsuit.

On the heels of the AppHarvest's announcement of its Q2 2021 results and revision of its 2021 financial guidance, purported shareholders raced to the courthouse to capitalize on the Company's stock drop. The first complaint in this case was filed on September 24, 2021, six weeks after the guidance revision. (ECF No. 1.) On March 2, 2022, Plaintiff filed his CAC. And on May 2, Defendants moved to dismiss the CAC. Rather than oppose a motion he knew he would lose, Plaintiff filed his SAC on July 25, adding new CW allegations. The SAC challenges approximately 85 statements made between February 1 and June 9, 2021.

With the benefit of hindsight, Plaintiff contends that Defendants' Class Period statements—about the Company's financial guidance, its labor force, and the Morehead farm's operations—were false or misleading because they omitted material adverse facts about training, employee retention and staffing, and the Company's piece rate bonus structure. (*E.g.*, ¶151.) Nearly all of the 85 challenged statements were made on or before the Company released its positive Q1 results. The SAC relies almost exclusively on statements attributable to former employees of the Company, five of whom are low-level employees who did not have access to firm-wide data and who did not have direct contact with any Individual Defendant. (¶¶53-131.) CW1 was a crop care specialist, *i.e.*, farm laborer, who allegedly tended to and harvested crops at the Morehead farm from October 2020 through July 2021. (¶35.) CW2 was a quality control specialist who worked in the farm's packhouse, was allegedly responsible for "randomly inspect[ing] tomatoes," and left the Company before Q2, *i.e.*, at the end of March. (¶36.) CW3 was a Senior Cost Accountant who allegedly worked on cost of sales analysis and reporting and left the Company before the start of the Class Period. (¶37.) CW4 was a crop care specialist Group Lead who allegedly started as a crop care specialist in October 2020 and was promoted to Group Lead in May 2021. (¶38.) CW4's duties included harvesting, pruning, and de-leafing, as well as supervising others performing the same tasks. (*Id.*) CW5 was a former maintenance employee who was responsible for everyday maintenance, supervised other maintenance employees, and worked at AppHarvest from June 2020 to March 2022. (¶39.) CW6 allegedly analyzed data and financial

projections as part of his work in the Financial Planning and Analysis Department from Q3 2020 until Q4 2021. (¶40.) He allegedly reported to Mr. Eggleton. (*Id.*) CW6's allegations are conspicuously vague and non-specific and do not show that any Individual Defendant knew or recklessly disregarded that any challenged statement was false or misleading when made.

## LEGAL STANDARDS

To state a claim under § 10(b) and Rule 10b-5, the plaintiff must plausibly allege: (1) a material misrepresentation or omission ("falsity"), (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance, (5) loss causation, and (6) economic loss. *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010). Plaintiff must also clear three pleading hurdles.

First, Plaintiff must satisfy Rule 8(a) and allege enough facts to state a plausible claim for relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court must not accept "conclusory statements" as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Nor should it accept unwarranted deductions, unreasonable inferences, or allegations that contradict matters properly subject to judicial notice. *Garber v. Legg Mason, Inc.*, 537 F.Supp.2d 597, 613 (S.D.N.Y. 2008).

Second, Plaintiff must satisfy Rule 9(b), which requires him to "state with particularity the circumstances constituting the alleged fraud." *In re Fed Ex Corp. Sec. Litig.*, 517 F.Supp.3d 216, 228 (S.D.N.Y. 2021). Plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief [] all facts on which that belief is formed." *Id*.

Third, Plaintiff's claims are subject to the PSLRA, which imposes "exacting pleading requirements" for falsity and scienter. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). As to falsity, the Complaint must identify each allegedly false statement, specify with particularity the reasons why the statement was false when made. *See In re Nokia Oyj Sec. Litig.*, 423 F.Supp.2d 364, 391-92 (S.D.N.Y. 2006); 15 U.S.C. § 78u-4(b)(1). As to scienter, the Complaint must plead "with particularity facts giving rise to a *strong* inference that the defendant acted with . . . an intent to deceive, manipulate, or defraud." *ECA, Local 134 IBEW Joint Pension*

*Tr. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (emphasis original).

**ARGUMENT**

**I.      Plaintiff Fails to Adequately Plead Falsity.**

Plaintiff fails to adequately plead falsity for at least two reasons: (A) the challenged statements are inactionable as a matter of law; and (B) the SAC contains no particularized facts showing that any challenged statement was materially false or misleading when made.[7]

**A.      The Challenged Statements Are Not Actionable.**

Most—if not all—of the challenged statements in the SAC (***there are approximately 85***) are not actionable as a matter of law.

**Forward-Looking Statements**. Forward-looking statements are inactionable under the PSLRA's safe harbor provision if: (i) the forward-looking statement is identified and accompanied by meaningful cautionary language, (ii) the forward-looking statement is immaterial, *or* (iii) the plaintiff fails to plead that the forward-looking statement was made with actual knowledge that it was false or misleading. 15 U.S.C. § 78u-5(i)(1)(A)-(C). Forward-looking statements include financial projections, "the plans and objectives of management for future operations," and "the assumptions underlying or relating to" projections, plans, objectives, or future performance. *Id*. Here, many of the challenged statements are forward-looking. (**App. B** (cataloguing forward-looking statements challenged in the SAC).) For example:

- "[W]e reiterate our full-year 2021 guidance." (¶150; *see* ¶199.)

- "[W]e'll be on the top 25 grocery shelves throughout the U.S." (¶156.)

- "Our favorable crop yields and market pricing currently support a 2021 sales outlook that

---

[7] The SAC is a puzzle pleading. It spans 365 paragraphs (183 pages), of which 95 paragraphs (86 pages) are used to excerpt Defendants' statements from nearly all AppHarvest's public disclosure made during the Class Period. (¶¶147-241.) Although Plaintiff claims he is challenging only bolded and underlined text, he bolds and underlines many unchallengeable statements. (*E.g.*, ¶213 ("we built this first facility in the middle of a global pandemic. . .").) And, after each group of challenged statements, Plaintiff repeats a nearly identical laundry list of omissions that supposedly render the statements false or misleading. (*E.g.*, ¶¶151, 162, 182, 208.) But some of the challenged statements are totally unrelated to the alleged omissions. (*E.g.*, ¶¶217-18 (asserting that Mr. Lee's statement that AppHarvest did not have any "challenges with recruiting and staffing" was misleading because Defendants' omitted information about the piece rate bonus structure).) This method of pleading is plainly deficient. *E.g.*, *Born v. Quad/Graphics, Inc.*, 521 F.Supp.3d 469, 478 (S.D.N.Y. 2021) (dismissing puzzle pleading that "plac[ed] the burden on the Court to sort out the alleged misrepresentations and then match them with the corresponding adverse facts").

14

is better than we expected in December 2020." (¶169.)

These statements are, by definition, forward-looking. *See* 15 U.S.C. § 78u-5(i)(1)(A)-(D); *In re IAC/InterActiveCorp Sec. Litig.*, 478 F.Supp.2d 574, 586 (S.D.N.Y. 2007).

All forward-looking statements were accompanied by meaningful cautionary language, *e.g.*, risk disclosures conveying "substantive information about factors that realistically could cause results to differ." *In re Fed Ex*, 517 F.Supp.3d at 233. Disclosures need not include all such factors, just the ones that are "directly relate[d] to the risks that ultimately are alleged to have, in part, brought about Plaintiffs' losses." *In re Adient plc Sec. Litig.*, 2020 WL 1644018, at \*21 (S.D.N.Y. Apr. 20, 2020). Each of the press releases challenged by Plaintiff warned investors that statements regarding AppHarvest's "future financial performance" were forward-looking and based on "assumptions" and "current expectations" that could change. (*E.g.*, Ex. 11 at 3; Ex. 13 at 2; Ex. 17 at 2; Ex. 19 at 3-4.) Defendants made similar warnings at the outset of each Class Period earnings call (*e.g.*, Ex. 23 at 3), which referred investors to additional, detailed risk factors in the Company's SEC filings that highlighted the unique risks it faced. (*Supra* at 5-6; **App. A**.)

Plaintiff does not allege that AppHarvest's risk disclosures were not meaningful. He claims that they were knowingly false or misleading. (*E.g.*, ¶162.) Not so, and also beside the point. This Court has rejected the argument that risk disclosures are "not sufficiently cautionary" if defendants knew they were misleading because it "conflates the actual knowledge and meaningful cautionary language prongs of the PSLRA." *Gray v. Wesco Aircraft Holdings, Inc.*, 454 F.Supp.3d 366, 394 (S.D.N.Y. 2020). But setting that aside, when read in context as the law requires, none of the cautionary language could be understood as guarantees that the risks would not occur. (*Infra* at 29.) And Plaintiff does not allege facts showing that risks had already occurred and had a material effect on AppHarvest's revenues and costs. (*Id.*) Nor does he allege particularized facts showing that Defendants "***actually knew***" their predictions were unreasonable. *In re WEBMD Health Corp. Sec. Litig.*, 2013 WL 64511, at \*7 (S.D.N.Y. Jan. 2, 2013); *see infra* at 31-34.[8]

---

[8] Plaintiff also challenges statements that AppHarvest was "on track" to meet its financial guidance for 2021. (¶306; *see* ¶¶150, 169, 170, 199, 201, 216.) But these statements are also protected by the safe harbor. *See Adient*, 2020 WL 1644018, at \*8-\*9, 19 (concluding that defendants' "repeat[ed] assur[ances]" that the company was "on track" to

**Corporate Optimism**. Many of the challenged statements are inactionable "puffery." For example, Plaintiff challenges:

- ". . . what are those products that we can be making with this *good, healthy, consistent supply* coming out of our facilities here in Central Appalachia." (¶154.)

- "We are pleased by our *fast start* to the year, the *encouraging operating and financial performance* of our Morehead facility and our team's ability to scale the business." (¶199.)

(**App. C** (cataloguing statements of optimism challenged in the SAC).) Because such statements "make[] no specific claims on which reasonable persons can rely," courts have repeatedly found them inactionable as a matter of law. *In re Sanofi-Aventis Sec. Litig.*, 774 F.Supp.2d 549, 565 (S.D.N.Y. 2011); *Steamfitters Loc. 449 Pension Plan v. Skechers U.S.A., Inc.*, 412 F.Supp.3d 353, 363 (S.D.N.Y. 2019) ("it all works" held inactionable); *City of Warren Police & Fire Ret. Sys. v. Foot Locker, Inc.*, 412 F.Supp.3d 206, 223 (E.D.N.Y. 2019) (characterizations as "strong," "positive," and "great" held inactionable).

**Statements of Opinion**. Plaintiff also challenges opinion statements (**App. D** (cataloguing opinions challenged in the SAC), which include "subjective statements that reflect judgements as to values that [are] not objectively determinable" and "express expectations about the future." *In re Aratana Therapeutics Inc.*, 315 F.Supp.3d 737, 758 (S.D.N.Y. 2018). For example:

- "We *believe* there is a large population of workers in the Central Appalachian region who are eager to find long-term career opportunities like those being offered by AppHarvest[.]" (¶177.)

- "[W]e *believe* we can staff and retain our workers with less churn, immigration challenges and unfilled positions that many of our competitors face." (*Id*.)

Opinions are only actionable if Plaintiff alleges that (1) the speaker did not hold the belief professed; (2) the facts supplied in support of the belief are untrue; or (3) the speaker omits information that makes the opinion misleading. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 185-86, 194 (2015). "That is no small task for an investor." *Id*. at 194. Plaintiff cannot meet the first two prongs because the SAC fails to plead that Defendants

---

reach its goals were protected under the safe harbor because they "could not meaningfully be distinguished from the future projection of which they [were] a part").

knew any contradictory information when the challenged statements were made, let alone that they subjectively believed those opinions to be false. (*Infra* at 30-38.) As for the third prong, the SAC does not allege facts suggesting that Defendants omitted any material information that would have contradicted the statements' implications. (*Infra* at 20-29.**)**

*Accurate Statements of Fact*. Many of the alleged misstatements are demonstrably true and presumably not in dispute. (*See* **App. E** (cataloging accurate statements of historical fact challenged in the SAC)). Such statements include:

- "We use less land, less water, and we have predictable growing practices, so we can control the environment and have a predictable supply year-round." (¶156.)
- ". . . Net sales for the three months ended March 31, 2021, were $2.3 million compared to $0 for the comparable prior year period, due to initial tomato sales produced at our Morehead CEA facility." (¶¶204, 231, 240.)

These statements cannot support a §10(b) claim where, as here, Plaintiff does not allege any facts demonstrating that they were inaccurate or untrue at the time they were made. *See Ong v. Chipotle Mexican Grill, Inc.*, 294 F.Supp.3d 199, 232 (S.D.N.Y. 2018) (dismissing complaint because "the alleged misstatements at issue are [] not demonstrably false").

### B.    Defendants Said Nothing Materially False Or Misleading.

Even assuming there is a potentially actionable statement in the SAC (there is not), Defendants said nothing materially false or misleading. Plaintiff must "specify each statement alleged to have been misleading," 15 U.S.C. § 78u-4(b)(1)(B), and "must demonstrate with specificity why and how that is so," *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004). And because Plaintiff alleges the omission of material facts, the SAC must adequately plead that Defendants had a duty to disclose the omitted information. *Basic v. Levinson*, 485 U.S. 224, 239 n.17 (1988). Rule 10b-5 does not require the disclosure of *all* material information. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 43 (2011). Disclosure is required "only when necessary to make statements made, in the light of the circumstances under which they were made, not misleading." *Kleinman v. Elan Corp.*, 706 F.3d 145, 153 (2d Cir. 2013). Put differently, an omission is not actionable when a challenged statement is incomplete; it is actionable where the

17

information revealed is "so incomplete as to mislead." *Richman v. Goldman Sachs Grp., Inc.*, 868 F.Supp.2d 261, 273 (S.D.N.Y. 2012). Plaintiff must also plead facts demonstrating the "omitted facts [] existed, and were known" to Defendants when they spoke. *Singh v. Schikan*, 106 F.Supp.3d 439, 446 (S.D.N.Y. 2015). "This [] is the PSLRA's single most important weapon against pleading fraud by hindsight." *In re Vantive Corp. Sec. Litig.*, 110 F.Supp.2d 1209, 1216 (N.D. Cal. 2000).

Plaintiff does not come close to meeting these standards. He relies almost exclusively on the CWs, but their allegations are not reliable and do not show that any of the challenged statements were rendered materially misleading by the alleged omissions.

### 1.    The CWs Are Not Reliable.

The Court should not consider any of the CWs because they are not reliable. Courts generally credit CW allegations in two situations: (i) when they are corroborated with independent, particularized facts; and (ii) when their "positions and/or job responsibilities are described sufficiently to indicate a high likelihood that they actually knew facts underlying their allegations." *Glaser v. The9, Ltd.*, 772 F.Supp.2d 573, 590 (S.D.N.Y. 2011); *accord Miao v. Fanhua, Inc.*, 442 F.Supp.3d 774, 799 (S.D.N.Y. 2020). Five of the six CWs were low-level employees who had no contact with any Defendant and the final CW's allegations are conspicuously vague and non-specific. Thus, no particularized facts corroborate the CWs, and none are reliable on their own.

First, CW3's allegations should not be credited because he was a low-level employee who "left the [C]ompany before the Class Period" began. *See Campo v. Sears Holdings Corp.*, 635 F.Supp.2d 323, 335 (S.D.N.Y. 2009); *see* ¶37.

Second, the job descriptions of CW1, CW2, CW4, and CW5 show they had no personal knowledge of firm-wide operations. CW5 was one of an unspecified number of maintenance workers who worked at an unidentified area of a 60-acre facility. (¶¶39, 84.) CW1 and CW4 were two of an unspecified number of crop care specialists working on the farm. (¶¶35, 38.) Without knowing how many crop care specialists there were, CW4's supervision of other crop care specialists does not suggest knowledge of farm-wide operations. *E.g.*, *Loc. No. 38 IBEW Pension*

*Fund v. Am. Express Co.*, 724 F.Supp.2d 447, 460 (S.D.N.Y. 2010) (refusing to credit the statements of "rank-and-file" employees because none "had . . . access to aggregated data"). CW2 was also another low-level employee and left the Company before Q2 2021 (¶36), the quarter for which the Company released disappointing results. *See In re Francesca's Holdings Corp. Sec. Litig.*, 2015 WL 1600464, at *14 (S.D.N.Y. Mar. 31, 2015) (disregarding CW who left near the "beginning of the Class Period" and "cannot speak to whether the Company's terms with its . . . Vendors changed in any material way" afterwards).) On top of that, CW2 worked in the packhouse and CW5 worked in maintenance, and their job duties do not suggest either had insight into greenhouse operations. *See Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F.Supp.3d 196, 223 (S.D.N.Y. 2018) (disregarding CWs that worked within one unit and did not have insight into other corporate units).

Third, no CW alleges ***when*** and to what extent the training, retention, and piece rate bonus structure issues resulted in tomato quality that was materially worse than what the Company had forecast, or ***how long*** such an effect lasted. *See In re Fed Ex*, 517 F.Supp.3d at 232 (rejecting CW allegation that there was "significant doubt" within company about its ability to meet its target because CW did "not specify when . . . the alleged doubt existed" or "how long [it] persisted").

Fourth, Plaintiff leans heavily on CW6, but his allegations are conspicuously imprecise and "unmoored in time." *Gregory v. ProNAi Therapeutics Inc.*, 297 F.Supp.3d 372, 408-09 (S.D.N.Y. 2018) (rejecting allegations that did not "pinpoint" when it "became apparent" that defendants' clinical study would fail); *Miao*, 442 F.Supp.3d at 799 ("[S]tatements of CWs that cannot situate in time relevant occurrences are . . . disregarded because they cannot establish that the challenged statements were knowingly false when made."). CW6's allegations are purportedly tied to AppHarvest's so-called "toughest times" (late Q1 2021 through the summer refresh in Q3 2021) (¶15), but such an indefinite time period "cannot supply [the] specific contradictory facts available to Defendants *at the time* of an alleged misstatement." *In re Wachovia Equity Sec. Litig.*, 753 F.Supp.2d 326, 352 (S.D.N.Y. 2011) ("after the acquisition" was "indefinite"); *City of*

*Roseville Emps.' Ret. Sys. v. Textron, Inc.*, 810 F.Supp.2d 434, 445 (D.R.I. 2011), *aff'd*, 682 F.3d 34 (1st Cir. 2012) ("late summer" or "fall" is "simply not specific enough to plausibly demonstrate that statements made in July, September, and October[] were false"); *In re Arrowhead Pharms., Inc. Sec. Litig.*, 2017 WL 5635422, at *10 (C.D. Cal. Sept. 20, 2017) (allegations that deaths occurred in "late 2015 or early 2016" were too vague); *City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 2019 WL 6877195, at *14 (N.D. Cal. Dec. 17, 2019) ("report[s] on events within the Class Period [] without tying those reports to each alleged misstatement" are unreliable). Setting that aside, the CW statements are consistent with what the Company said—*i.e.*, it experienced a difficult and disappointing Q2 2021 and lowered annual guidance as a result.

Stripped of the CW allegations, the SAC must be dismissed because it fails entirely to satisfy any of the relevant pleadings standards to establish both falsity and scienter.

### 2. No Alleged Omission Rendered Defendants' Statements Materially False or Misleading When Made.

Even if the Court credits any of the CWs (it should not), their allegations do not render any challenged statement materially false or misleading when made. Plaintiff challenges about 85 statements (¶¶147-241), which can be sorted into five buckets: (a) financial projections, (b) hiring and recruiting, (c) Morehead farm operations, (d) historical financial results, and (e) risk disclosures. He claims the statements were materially misleading because Defendants omitted certain adverse facts. In other words, Plaintiff contends that, during the Class Period (February 1 to August 10, 2021), every time Defendants spoke, they should have disclosed that AppHarvest was: (i) inadequately training employees, (ii) having difficulty staffing and retaining employees, and (iii) were inadvertently incentivizing employees to damage crops. (*E.g.*, ¶¶151-52, 155, 157). But Plaintiff pleads no particularized facts supporting the alleged omissions, much less showing ***when and to what degree*** they impacted AppHarvest's operations, revenues, costs, or forecasts.

### a. AppHarvest's financial projections were not misleading.

Plaintiff challenges forward-looking statements disclosing or affirming AppHarvest's 2021 financial guidance. (*E.g.*, ¶¶150, 173, 199; **App. F** (cataloging financial projections statements

challenged in the SAC).) Setting aside that these forward-looking statements are protected under the PSLRA safe harbor and are not actionable as a matter of law, *supra* at 14-15, none of these statements were false or misleading when made.

To adequately plead the falsity of a projection, a plaintiff must plead particularized facts demonstrating that the company "***knew*** it would be unable to meet [the] projections" when they were made. *Born v. Quad/Graphics, Inc.*, 521 F.Supp.3d 469, 483 (S.D.N.Y. 2021); *Ford v. Voxx Int'l Corp.*, 2016 WL 3982466, at *7 (E.D.N.Y. July 22, 2016) ("Plaintiffs must do more than merely claim Plaintiff's financial estimates were unreasonable. . . Rather, Plaintiff must set forth specific facts showing why Defendants' fiscal guidance was false or misleading, and not merely ambitious."). Specifically, Plaintiff must "establish what specific contradictory information [defendants] received [and] when they received it." *Local No. 38 IBEW*, 724 F.Supp.2d at 461. None of Plaintiff's allegations about employee training, employee retention, and the piece rate bonus system come close to meeting this high bar.

**Employee Training.** Plaintiff relies on CW allegations and Defendants' post-Class Period statements about employee training to claim that inadequate training resulted in poor quality tomatoes, but neither demonstrates when and to what degree AppHarvest's firm-wide training was inadequate, much less how it materially affected AppHarvest's tomato quality, net sales revenue, or costs of goods sold at any point in time. (¶¶89-97; 132-35.)

The "subjective views" of CW1, CW2, CW4, and CW5, four rank-and-file employees, do not demonstrate that AppHarvest's firm-wide employee training was inadequate for everyone during the entire Class Period. *See Adient*, 2020 WL 1644018, at *15.[9] Nothing in the SAC

---

[9] Notably, none of the CWs state that they did not know how to do their own jobs. CW1 admits that crop care specialists like her were told "that they should pick tomatoes that they considered to be 'bright orange with a little bit of green' which would enable the fruit to ripen further." (¶90.) And, CW1 and CW4 were knowledgeable enough to recognize when other employees were doing a task incorrectly. (*E.g.*, ¶99 (alleging CW1 noticed when other Crop Care Specialists "did not adhere to the proper procedures."); ¶82 (alleging CW4 noticed when "employees tasked with positioning truss supports would do so incorrectly").) CW2 likewise admits that he received training on-the-job when he needed help. (¶94.) Moreover, far from confirming that there was a lack of training, CW2's contention that there was disagreement about what qualified as Grade No. 1 merely reflects that the criteria for No. 1 and No. 2 tomatoes are substantially similar, subjective, and evolve with customer preferences. (¶¶93-94). (*See supra* at n.3.) Indeed, CW4 confirmed that "it was the coloring of the tomatoes that was the quality standard that changed most often" (¶101), which could have been due to varying preferences among Mastronardi's customers.

suggests that any CW had prior experience in greenhouse farming or was an authority on what constitutes adequate training. Nor do they say anything regarding anybody's training other than their own or how the training changed over the relevant period.[10]

Given their roles at the Company, it is not surprising that the CWs fail to provide specific facts regarding when and how any alleged lack of training materially affected tomato quality for AppHarvest's entire operation or how it flowed through to net sales and affected the Company's forecasts. Although the CWs allege that inadequate training resulted in higher tomato waste and lower yield and quality, none of them—not even CW6, who allegedly was in a position to know— provide sufficient information to quantify the impact of the alleged training issues in terms of revenue or cost of goods on a specific date during the Class Period. *See In re Health Mgmt. Sys., Inc. Sec. Litig.*, 1998 WL 283286, at *4 (S.D.N.Y. June 1, 1998) (allegations of "financial difficulties" insufficient where plaintiff failed to allege "extent of the alleged lower margins or decreased profitability"); *see Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001) (plaintiff must "allege specific facts that show how these 'problems' and 'difficulties' translated into decreasing revenues").[11] The CWs say nothing about the Company's net sales or distribution costs, let alone that alleged training issues had a material adverse effect on them at a specific point in time.[12] Such facts are necessary given allegations that Defendants tried to fix issues throughout the Class Period. (¶¶14, 104, 108, 123, 136, 258; *In re NVE Corp. Sec. Litig.*, 551 F.Supp.2d 871, 895 (D. Minn. 2007) (problems were not "so [] insurmountable" that defendants knew goals were unachievable where plaintiffs alleged that defendants "continuously attempted to resolve these problems").)

---

[10] None of the allegations suggest that any CW can speak to any training other than the training he or she received, and they give no indication that all employees received the same training throughout the Class Period. For instance, CW1 alleges that crop care specialists received formal training whereas CW4 alleges that prior to June 2021, crop care specialists did not receive any formal training. (¶¶90-91.) Plaintiff also acknowledges that AppHarvest was modifying its training during the Class Period. (*See* ¶¶132-33 (mentioning "new training").)

[11] Along the same lines, CW1 and CW4 claim that the lack of training caused an excessive amount of decomposing plant waste to accumulate on the ground (¶¶79, 83), but neither provides sufficient information to quantify how it affected AppHarvest's ability to produce Grade No. 1 tomatoes or translated into lower net sales. *See Ford*, 2016 WL 3982466, at *6 ("[T]he mere opinions of confidential witnesses . . . untethered to any particular facts about how . . . pricing and advertising actually affected sales[] lacks the [requisite] particularity.").

[12] Notably, "inadequate training" was only one of four alleged issues that contributed to the Company's problems and CW6 never alleges the impact of training alone. (¶127 (alleging that "inadequate training, turnover, *poor work ethic and inconsistent hiring* standards were . . . the 'root cause' of the Company's productivity challenges").)

Instead, Plaintiff repeatedly alleges that AppHarvest's projections must have been false because during the Company's "toughest times," "inadequate training" prevented it from meeting its "***target***" or "***goal***," *i.e.*, the "global standards" for productivity, quality, and rejected tomatoes.[13] (*E.g.*, ¶¶87, 96, 127.) But there are no facts showing that AppHarvest's public forecasts—***for its first growing season ever***—assumed the Company would immediately achieve the "global standards." Thus, CW6's allegations are irrelevant. *Chapman v. Mueller Water Prods., Inc.*, 466 F.Supp.3d 382, 408 (S.D.N.Y. 2020) (Liman, J.) ("CW3's 'estimate' that the Version 3 radios had a 50% failure rate during the 2015/2016 timeframe says nothing about how that estimate compared to Mueller's expected . . . rate.'").[14] No CW alleges that AppHarvest "failed to take into account the appropriate information in the setting of [assumptions underlying its forecasts]." *Id.* at 402-04. Without such facts, there is no reason to believe that AppHarvest's public forecasts failed to account for problems inherent to a young company—with admittedly inexperienced management—opening and operationalizing its first 60-acre indoor farm.

To the extent the CWs are claiming that the alleged training issues (other any other issues) ***materially*** affected tomato quality, and thus net sales and cost of goods sold, for the entire time they worked at the Morehead farm, that is—again—inconsistent with the undisputed fact that ***AppHarvest met (and slightly exceeded) its financial guidance for the first quarter of 2021***. (Ex. 19 at 2; *see* ¶198; *see In re WEBMD*, 2013 WL 64511, at *11 (concluding defendants could not have materially misrepresented customer demand for WebMD's products when plaintiffs "fail[ed] to show *cognizably diminished demand from the beginning of the Class Period*").)

Defendants' statements about training issues made ***after*** the end of the Class Period were not admissions that Defendants knew all along that AppHarvest would not achieve its financial

---

[13] CW6's allegations are inconsistent about AppHarvest's tomato quality target. In one place CW6 says AppHarvest was targeting a 6% or 7% tomato rejection rate (¶96), which would require the Company to produce 94% or 93% Grade 1 tomatoes, but in another place says the Company was targeting only 84% and 86% for Grade 1 TOV and Beefsteak tomatoes, respectively (¶87).

[14] Along the same lines, CW5's allegation that "up to 50%" of AppHarvest's tomatoes were wasted in the first growing season" (¶78), begs the question 50% "of what"? *See City of Sunrise*, 2019 WL 6877195, at *15 (rejecting vague CW allegations).

guidance. Defendants merely identified "Q2 2021 Problems" that they believed, *in hindsight*, lowered the Company's net sales in Q2 and for the year to date. (Ex. 37 at 4; Ex. 38 at 10 (clarifying that AppHarvest's downward revision of its 2021 financial guidance came after Mr. Lee took "a hard independent look at everything . . . *starting in July*"); *see In re Pretium Res. Inc. Sec. Litig.*, 256 F.Supp.3d 459, 479-80 (S.D.N.Y. 2017) ("Prudent managers conduct inquiries rather than jump the gun with half-formed stories as soon as a problem comes to their attention. . . Taking the time necessary to get things right is both proper and lawful.").) "[R]etrospective observations" like these are not "admissions of prior knowledge." *Frankfurt-Tr.*, 336 F.Supp.3d at 220. Although Defendants disclosed that training issues also existed in the first quarter, that is unremarkable given that AppHarvest hired hundreds of employees over a few months, and it does not suggest that the Company's affirmed guidance was fraudulent where, as here, *AppHarvest posted a better than expected Q1*. (Ex. 19 at 2.)[15] The vast majority of the challenged statements were made during Q1 and when the Company released positive Q1 results while also flagging some quality issues. *See In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F.Supp.3d 278, 295 (S.D.N.Y. 2014) ("The fact that defendants recognized problems, announced that they were implementing effective controls and procedures, and then recognized more problems does not indicate that their statements were false at the time that they were made.").

**Employee Retention and Staffing.** Plaintiff speculates that several Company policies, including increased working hours and COVID-19 quarantine requirements, affected labor productivity, which impacted tomato quality.[16] (¶¶103-13.) But Plaintiff does not plead facts

---

[15] Plaintiff cannot claim that Defendants disclosed to the market in May 2021 that AppHarvest had issues with training, and also assert that the information was hidden until August 2021. (*See* ¶¶132-33, 300-01; *see In re Progress Energy, Inc.*, 371 F.Supp.2d 548, 552 (S.D.N.Y. 2005) ("[I]t is indisputable that there can be no omission where the allegedly omitted facts are disclosed.").) Mr. Eggleton warned investors of the "demands required of training our labor force," and made clear that the tomatoes harvested in Q1 were of "varying levels of quality." (Ex. 23 at 8.) He also stated that AppHarvest expected its "grade mix to migrate upward over the coming quarters" as a result of the Company's further investment in training. (*Id.* at 8.) Mr. Lee also told investors that the Morehead farm would "benefit from new training that we anticipate will support higher productivity in Q4." (*Id.* at 6.)

[16] Although the CWs complain that AppHarvest was mismanaged because of alleged scheduling policies and unsanitary conditions in the greenhouse (¶¶80, 83, 98, 104-08), it is well-established that these sorts of issues "fall outside the securities laws." *In re Citigroup, Inc. Sec. Litig.*, 330 F.Supp.2d 367, 376 (S.D.N.Y. 2004) ("[A]llegations of garden-variety mismanagement are not actionable under section 10(b).").

showing that the alleged turnover and COVID-19 absences were material problems, let alone facts indicating how and to what extent they materially impacted the Company's ability to meet its financial guidance, and when the purported impact was known and by whom. *See Born*, 521 F.Supp.3d at 484 (dismissing allegations that were "simply insufficient to allow the Court to infer that [defendant] knew it would be unable to achieve its financial projections").[17] Such facts are especially important because CW6 alleges that Defendants believed that other causes like "poor work ethic" and "inconsistent hiring standards" contributed to low employee productivity. (¶127; *see* ¶122.) At any rate, Plaintiff cannot claim that the alleged employee turnover and COVID-19 absences materially affected productivity and tomato quality during the ***entire*** Class Period given that ***AppHarvest met its financial guidance for the first quarter of 2021***.[18] (Ex. 19 at 2; *see* ¶199.)

Neither do Defendants' post-Class Period statements establish that employee retention and staffing was a material problem during the Class Period. Defendants disclosed after the Class Period that AppHarvest had endured employee "productivity challenges," which contributed to AppHarvest's second quarter results and its reduced guidance for 2021. (*E.g.*, ¶205.) But that disclosure did not reference employee attrition or churn, much less any details regarding when and how it impacted the Company's financial results and who knew about it. (*See* ¶¶242-59.)

**Piece Rate Bonus Structure.** Plaintiff claims—based solely on the CW allegations—that AppHarvest's piece rate bonuses and leaderboard "encouraged" greenhouse personnel to work "fast and careless," which allegedly resulted in more damaged tomatoes. (¶¶98-102.) These allegations are "so vague as to be meaningless." *Miao*, 442 F.Supp.3d at 800 n.21, 803-04. Nothing

---

[17] Plaintiff claims that employees who left were not replaced. But that allegation is not supported by the CWs. The CWs allege only that the employees on their teams were not replaced. (¶¶105, 113; *Sunrise Firefighters'*, 2019 WL 6877195, at *14 (disregarding allegations from CWs that were "limited to each CW's team" and the complaint "fails to otherwise allege that those teams had a significant impact on Oracle's overall revenue").) And, CW5 alleges that AppHarvest sometimes replaced departing workers with contract labor. (¶108.) Defendants' post-Class Period statements that AppHarvest had "ramped up to 400 employees" and "hir[ed] 400 employees" also do not establish that departed employees were not replaced. (¶¶109, 257.) Given that AppHarvest had 69 employees as of the end of September 2020 and did not open the Morehead farm until the end of October 2020, Defendants' statements were likely referring to the employees hired since the Morehead farm opened. In any event, Defendants did not state that AppHarvest lost 20% of its workforce as of August 11, 2021, and even if they had, such a post-hoc statement gives no indication of the employee churn rate during the Class Period.

[18] It also would not have been a surprise to investors to learn that some Company employees would miss work during a global pandemic.

quantifies the damage was caused by the bonus structure, or explains how and when it materially contributed to decreased net sales and increased cost of goods sold. *See In re Health Mgmt. Sys., Inc. Sec. Litig.*, 1998 WL 283286, at *4.

*      *      *

The SAC is simply devoid of particularized facts showing that Defendants had actual and contemporaneous knowledge of contradictory information. (*See infra* at 30-39.) As such, Plaintiff has not adequately pleaded that any of Defendants' forward-looking statements, forecasts, or opinions were false or misleading when made. *See In re Nokia*, 423 F. Supp. 2d 364 at 404–05 ("[T]here is no allegation . . . that Nokia had contrary facts suggesting its sales would drop to the level that they ultimately did. That the sales did later fall, however, does not make an earlier rosy prediction fraudulent.").

### b.      Statements about employee recruiting were not misleading.

Plaintiff challenges statements relating to employee recruiting. (¶¶177-78, 184-85, 210, 213, 216-17, 222, 225-26, 234-35; **App. F** (cataloging statements about AppHarvest's labor force challenged in the SAC).) These statements, however, are unrelated to employee training and retention and the bonus structure. Some praise the strength of the local labor force, which Defendants believed was an advantage. (¶177 ("We believe there is a large population of workers in the Central Appalachian region who are eager to find long-terms career opportunities like those being offered by AppHarvest."); ¶¶184, 216, 222, 225.) The rest discuss the Company's ability to ***recruit and hire*** employees even during a global pandemic. (¶217 ("[T]hankfully COVID has not in any way impacted our operation. . . . With regard to labor, we have had absolutely no shortage of interest. I mean multiples of the amount of roles that we [want to] fill, have lined up to work with us."); ¶¶178, 185, 210, 213, 216, 220, 222, 226, 235.)[19] When read in context, no statement is misleading because of the alleged omissions.

### c.      Statements about Morehead were not misleading.

---

[19] The statements about the workforce in Appalachia and AppHarvest's ability to recruit and hire employees were also demonstrably true or opinion statements. (*See supra* at 16-17.)

Plaintiff fails to plead facts showing that Defendants misled investors about the Morehead farm by omitting the alleged issues with employee training, employee staffing, and the piece rate bonus structure. (¶¶154, 156, 190, 193, 199, 213, 216, 220; **App. F** (cataloging statements about the Morehead farm challenged in the SAC.)

First, Plaintiff challenges statements about the farm's performance in Q1. (*E.g.*, ¶193 ("This harvest also has proved the team can handle the production ramp-up at our Morehead facility"); ¶213 ("we built this first facility in the middle of a global pandemic"); ¶¶154, 156, 190, 216, 220.) But there are no well-pleaded facts showing that the farm was not ramping up during the pandemic and amid an ice storm. Plus, a company can still be "ramping up" even as it encounters operational difficulties along the way. *E.g.*, *Browning v. Amyris, Inc.*, 2014 WL 1285175, at *11 (N.D. Cal. Mar. 24, 2014) ("ramping up quickly" was not inconsistent with the allegation that facility had problems). AppHarvest indisputably ramped up from selling no tomatoes in 2020 to selling 8.6 million pounds of tomatoes in Q2 2021. (*E.g.*, ¶204; Ex. 36 at 3.)

Second, Plaintiff challenges several statements about the predictability of Morehead's crop supply. (*E.g.*, ¶156 ("we use less land, less water, and we have predictable growing practices, so we can control the environment and have a predictable supply year-round.") But these statements are clearly referring to the advantages of the Morehead farm's location and the use of CEA.[20] (*E.g.*, ¶154 (alleging that Mr. Webb stated, in response to a question about the Morehead farm's location in Central Appalachia, "Oh no, that's our advantage"). Far from alleging facts showing the statements are misleading, Plaintiff admits that AppHarvest's growing practices and supply are predictable and consistent due to the Company's use of CEA. (¶42.) Plaintiff also does not, and cannot, dispute that AppHarvest shipped tomatoes to national grocers "on schedule" throughout the Class Period. (Ex. 17 at 2.) Moreover, because all the challenged statements regarding the Morehead facility's operations were made prior to Q2 2021 (*see* **App. F** (cataloging statements about the Morehead facility that are challenged as false in the SAC)), Plaintiff cannot adequately

---

[20] *Compare* ¶154 with Ex. 7 at 2, and ¶156 with Ex. 8 at 2-3.

allege the materiality of any supposed omission.

### d. AppHarvest's historical financial results were not misleading.

Plaintiff challenges statements that accurately report the Company's historical financial and operating results. (*E.g.*, ¶¶204, 231, 240; **App. F** (cataloguing statements about AppHarvest's historical results that are challenged as false in the SAC).) But a "violation of federal securities law cannot be premised upon a company's disclosure of accurate historical data." *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 F. App'x 32, 38-39 (2d Cir. 2012). Recognizing this, Plaintiff instead contends that Defendants violated Item 303 of Regulation S-K, which requires disclosure of "known trends or uncertainties" that Defendants "reasonably expect" will have a material unfavorable impact on earnings. (*E.g.*, ¶¶205.) Plaintiff misunderstands Item 303. A "trend" is an "observed pattern [that] accurately reflects ***persistent conditions*** of the particular registrant's ***business environment***." *Stadnick v. Vivint Solar, Inc.*, 2015 WL 8492757, at *13 (S.D.N.Y. Dec. 10, 2015). That is not alleged here. At best, the SAC alleges that AppHarvest faced operational headwinds in Q2 that required lowering the Company's annual revenue guidance and was promptly disclosed in the Company's Q2 earnings report. *See In re Turkcell Iletisim Hizmetler A.S. Sec. Litig.*, 202 F.Supp.2d 8, 13 (S.D.N.Y. 2001) (a decline in operating income from one quarter to the next is not a trend").

Moreover, Plaintiff does not allege facts showing that any Defendant believed that alleged issues with employee training and retention and the piece rate bonus system were trends that would "materially impact" AppHarvest's "financial condition." *In re Coty Inc. Sec. Litig.*, 2016 WL 1271065, at *5-*7 (S.D.N.Y. Mar. 29, 2016) (plaintiffs must allege management's "specific knowledge" of the trend). Rather, as described below, Plaintiff's allegations "boil[] down to an assertion that [second] quarter revenues were down and management had meetings about the company's performance so, therefore, management must have known of the" trend. *Id.* (rejecting Plaintiff's Item 303 claim); *infra* at 30-40.

### e. AppHarvest's risk disclosures were not misleading.

Most of the challenged statements are AppHarvest's risk disclosures. (*E.g.*, ¶¶ 161, 165, 181, 188; **App. F**.) But Plaintiff's challenge to those disclosures fails for a couple reasons.

First, when "read in context, [AppHarvest's] risk disclosures cannot be understood as a guarantee that none of the [disclosed risks would not occur]." *Chapman*, 466 F.Supp.3d at 406. The "main inquiry is whether a reasonable investor could have been misled about the nature of the risk when he invested." *Id*. Here, AppHarvest was a young company with an inexperienced management team undertaking a massive farming endeavor for the first time in a region where workers were transitioning from a different industry. (Ex. 15 at 6, 8.) It "would have been evident to the ordinary investor" that AppHarvest would encounter problems with labor and tomato quality and yield. *Chapman*, 466 F.Supp.3d at 406 ("The disclosures reflected that there would naturally be issues or risks . . . and that the success of those 'new products and systems' would depend on Mueller's 'ability to manage the risks associated with their introduction.'"); *see Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1195-96 (9th Cir. 2021).

Second, risk disclosures are actionable only if a company warns about a risk when that risk has ***already occurred and is material***. *See In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F.Supp.2d 487, 516 (S.D.N.Y. 2013). Plaintiff must also allege Defendants knew the disclosures were inadequate when they were made. *Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*, 433 F.Supp.3d 515, 537 (S.D.N.Y. 2020). Plaintiff's conclusory allegations fall well short. Relying solely on unreliable CWs and post-Class Period statements, Plaintiff baldly claims that the alleged operational issues were "already" happening and material. (*E.g.*, ¶162.) None of this suggests that any material risk had already materialized, and the allegations, even if credited, say nothing about when such risk might have materialized or how it would have been material at that time. (*Supra* at 15.) Nor does Plaintiff say anything to support that any Defendant knew, at any relevant time, that any risk had already occurred and was material. (*infra* at 31-34.)

## II.    Plaintiff Fails To Plead Any Facts To Support An Inference Of Scienter.

The PSLRA requires Plaintiff to state "with particularity" facts giving rise to a "strong

inference" that the defendant acted with the intent to deceive, manipulate, or defraud. 15 U.S.C. §
78u-4. Plaintiff can do this by adequately alleging "(1) that defendants had the motive and
opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or
recklessness." *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 355 (2d Cir.
2022). The "inference of scienter must be more than merely plausible or reasonable—it must be
cogent and at least as compelling as any opposing inference of nonfraudulent intent." *S. Cherry
St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 111 (2d Cir. 2009). The SAC falls short.

### A.     Plaintiff Does Not Attempt To Plead A Motive To Defraud.

Plaintiff does not try to plead that Defendants "benefitted in some concrete and personal
way from the purported fraud." *ECA,* 553 F.3d at 198. And for good reason—no Individual
Defendant did. None sold stock during the Class Period, which "undermines [Plaintiff's] motive
allegations." *In re eSpeed, Inc. Sec. Litig.*, 457 F.Supp.2d 266, 289 (S.D.N.Y. 2006). In fact,
Messrs. Lee and Eggleton **purchased** roughly 15,000 shares immediately after the Company
reported its Q2 results, which "is inconsistent with an intent to commit fraud." *See In re Regeneron
Pharms., Inc. Sec. Litig.*, 2005 WL 225288, at *22 (S.D.N.Y. Feb. 1, 2005); Ex. 42 at 2; Ex. 43 at
2. Plaintiff touts a stock sale by Jeffrey Ubben (¶¶309-12), but because he is not a defendant, it is
irrelevant. *Woodward v. Raymond James Fin., Inc.*, 732 F.Supp.2d 425, 438 (S.D.N.Y. 2010).

### B.     Plaintiff Fails To Plead Facts Showing Conscious Misbehavior Or Recklessness.

The burden to plead "a fraud claim based on recklessness" is "significant." *Chill v. Gen.
Elec. Co.*, 101 F.3d 263, 270 (2d Cir. 1996). Plaintiff must plead "strong circumstantial evidence
of conscious misbehavior or recklessness." *Ark. Pub. Emps.*, 28 F.4th at 355. Something akin to
"deliberate illegal behavior," *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000), *i.e.*, "a state of
mind approximating actual intent," or an "***extreme departure*** from the standards of ordinary care
to the extent that ***the danger was either known to the defendant or so obvious that the defendant
must have been aware of it***," *S. Cherry St.,* 573 F.3d 98 at 109. And without a motive, Plaintiff's
"uphill battle to plead a strong inference of scienter becomes that much steeper." *City of N. Miami*

*Beach Police Officers' & Firefighters' Ret. Plan v. Nat'l Gen. Holdings Corp.*, 2021 WL 212337, at *11 (S.D.N.Y. Jan. 21, 2021); *ECA*, 553 F.3d at 198-99 (without motive, "circumstantial allegations [of conscious misbehavior] must be correspondingly greater").

"[T]he scienter requirement for forward-looking statements"—many of the challenged statements here—"is [also] stricter than for statements of current fact." *Slayton v. Am. Express Co.*, 604 F.3d 758, 773 (2d Cir. 2010). Plaintiff cannot just plead that Defendants "knew facts or had access to information suggesting that their public statements were not accurate" or "failed to check information they had a duty to monitor." *City of Austin Police Ret. Sys. v. Kinross Gold Corp.*, 957 F.Supp.2d 277, 301 (S.D.N.Y. 2013). Plaintiff must allege that Defendants "knew at the time they made the[ir] projections that they were unrealistic or unlikely to come true." *Id.*

Plaintiff asserts eight different buckets of recklessness—a kitchen-sink approach to pleading scienter that is plainly inadequate. Whether taken individually or collectively, these allegations are far too vague and general to give rise to any plausible inference of scienter.

### 1.     The Allegations About Internal Forecasts And Data Are Too Vague.

Plaintiff asks the Court to infer scienter from impermissibly vague allegations regarding forecasts and data tracking:

- According to CW3, ***who left the Company before the Class Period***, "Defendants had . . . access to" initial sales forecasts that the Company prepared for Mastronardi. (¶263.) Those forecasts projected "expected volume, expected costs, number of plants" etc. (*Id.*)

- According to CW6, during the "toughest times," he discussed "productivity" forecasts with Messrs. Eggleton and Lee. (¶264.) In meetings during "the toughest times," they allegedly talked about "ways to close the gap between AppHarvest's underperformance compared to the current forecast." (¶264; *see* ¶¶123-24, 126-29.)

- During "the toughest times," CW6 said "Defendants" knew they "were a long way off" from achieving the Company's targeted tomato "quality goal." (¶264; *see* ¶87.)

- CW6 claims that the Company "maintained forecasts, such as an Annual Operating Plan" that included forecasts about "pricing, labor productivity. . . and other factors." (¶265; *see* ¶¶125.)

- CW6 claims that "AppHarvest had real-time access" to productivity and quality data.

(¶267.)

But there are many reasons why scienter cannot be inferred from any of these allegations.

First, Plaintiff does not "provide *specific* instances in which Defendants received information that was contrary to their public declarations." *Chapman*, 466 F.Supp.3d at 399. Plaintiff has not pleaded any "specific" information at all; he alleged only the *types* of information—"expected volume," "productivity," "pricing," "quality"—that were forecasted or gathered. (¶263-67.) Missing from these allegations are facts showing "***what information was contained in [the] reports or how that information contradicted Defendants' public statements***." *Adient*, 2020 WL 1644018, at *28. Because Plaintiff does not plead what the forecasts or data said, he fails to allege that they contained information "contrary to [Defendants'] public declarations." *Chapman*, 466 F.Supp.3d at 399 (dismissing complaint where plaintiffs "do not specifically identify the reports or statements that [] contradict[] . . . [Defendants'] statements").

Plaintiff cannot bridge the gap with allegations that during the "toughest times," AppHarvest missed certain of its goals or targets for quality and productivity. (¶¶87, 96, 264.) Nothing in the SAC indicates when AppHarvest hoped to achieve any target, whether failing to meet a target made it impossible to achieve the Company's public projections, or when the Company fell short. (¶164 ("on one occasion" during the "toughest times"); *supra* at 23.) Allegations that Defendants knew they fell short of the target is also impermissible group pleading, which violates "the PSLRA's requirement that a plaintiff state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *In re Wells Fargo & Co. Sec. Litig.*, 2021 WL 4482102, at *27 (S.D.N.Y. Sept. 30, 2021).

Second, Plaintiff fails to plead that Defendants knew about the forecasts and data "*at the same time* they made their [challenged] statements."[21] *Adient*, 2020 WL 1644018, at *27; *supra* at 21. Only CW6 allegedly interacted with an Individual Defendant during the Class Period. *See*

---

[21] Plaintiff alleges AppHarvest created several internal forecasts—"baseline," "upside," and "downside" scenarios— in addition to its public forecasts, yet does not allege facts tying any of the alleged benchmarks to any of these forecasts. (¶123; *see* ¶265 (alleging that at the "end of each month, results would be 'pulled into' FP&A models and adjustments would be made to the Company's ***forecasts***").)

*Loc. No. 38 IBEW*, 724 F.Supp.2d at 460 (discounting "rank-and-file" CWs "[who] had no contact with the Individual Defendants"). However, CW6's allegations are temporally tied to "the toughest times," spanning the end of Q1 2021 through the "summer refresh," in "August." (¶¶275, 301.) Courts routinely reject such indefinite timelines because "they render[] the task of matching CW allegations to contrary public statements all but impossible." *Wachovia*, 753 F.Supp.2d at 352; *supra* at 19-20 (collecting cases).[22]

Third, none of CW6's alleged interactions with Messrs. Eggleton and Lee indicate that they knew any challenged statement was false when made. (¶264.) Plaintiff only pleads the topics of their discussions—"training, turnover, . . . work ethic, . . . hiring, . . . overall production challenges"—not concrete facts that contradicted any challenged statement. Although CW6 says that discussions concerned "ways to close the gap" between AppHarvest's performance "compared to the current forecast" (*id.*), this is too vague. What was "the gap" (productivity, yield, pricing, quality, etc.)? How big was it? What did the "current forecast" say? What period was forecasted? How did the "current forecast" compare to Defendants' public statements? When did it become impossible to close the gap? No CW answers any of these questions. *See Novak*, 216 F.3d at 309 (requiring plaintiffs to "specifically identify the reports or statements containing [contradictory] information"). That Defendants allegedly knew that there was some level of "underperformance" at some time during a six-month period does not mean they knew their projections were unattainable, nor does it render any of their other statements knowingly false. *See Chapman*, 466 F.Supp.3d at 400 ("That certain . . . products required repair or replacement—which is what the CWs report—does not speak to whether the already-stated reserves were sufficient or insufficient to address any anticipated costs, much less that Defendants knew any such fact.").

Lastly, Plaintiff does not allege that any Defendant knew about or saw any of the productivity and quality data. (¶¶121-29; *see* ¶267.) Plaintiff says "AppHarvest had real-time access" to it and that it was "uploaded to the Company's electronic files." (¶267.) That is not

---

[22] Plaintiff does not allege **when** Defendants knew that inadequate training and high turnover were problems. (¶122 ("**at first it was extrapolated that the poor labor productivity reflected that the workers were new**").)

enough to establish scienter. *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 83 (2d Cir. 2021). The same goes for CW6's bald allegation that "everyone knew what everyone else knew." (¶129; *see* ¶123); *Chapman*, 466 F.Supp.3d at 399 (rejecting "pretty much everyone was aware").

### 2. Scienter Cannot Be Inferred From The Mastronardi Agreement.

Plaintiff asks the Court to infer fraud because Defendants knew (1) Mastronardi was only required to purchase Grade No. 1 tomatoes, and (2) Grade No. 2 tomatoes offered "very little to no value." (¶¶252-57.) But Plaintiff does not, and cannot, allege that the Mastronardi Agreement required Mastronardi to ***only*** buy Grade No. 1 tomatoes. Mastronardi also purchased Grade No. 2 tomatoes from the Company in Q1. (Ex. 23 at 8 (buying "a mix of varying grades of tomatoes").) And it was only later in Q2 that Defendants realized that AppHarvest got little value from Grade No. 2 tomatoes. (*See id*.).

Plaintiff also alleges that during the "toughest" times, Mastronardi increased its audits and rejected more tomatoes. (¶275.) But Plaintiff fails to plead that any Defendant knew about these audits (let alone their frequency), and the allegation is not sufficiently particularized. CW6 also says that AppHarvest provided "production estimates" to Mastronardi and that those forecasts were "lower" during the "toughest" times. (*Id*.) But as discussed *supra* at 31-33, without facts to show what these forecasts said, they cannot be used to establish scienter.

### 3. Scienter Cannot Be Inferred From Personnel Changes.

Next, Plaintiff asks the Court to infer fraud because Ms. Butler was demoted from COO to CPO in April 2021 and terminated in July 2021. (¶¶277-85.) But, executives leave companies for all sorts of reasons, so an executive departure cannot by itself establish scienter. *Rice v. Intercept Pharm., Inc.*, 2022 WL 837114, at *22 (S.D.N.Y. Mar. 21, 2022) (Liman, J.). Executive departures can supplement other scienter allegations, if they are "highly unusual and suspicious." *Glaser*, 772 F.Supp.2d at 598; *e.g.*, *Bos. Ret. Sys. v. Alexion Pharms., Inc.*, 556 F.Supp.3d 100, 136 (D. Conn. 2021) (executive departure suspicious because he resigned "shortly" after the company launched internal investigation into its "illegal" sales practices and he had been involved in them). Here, the

timing of Ms. Butler's demotion and resignation was not suspicious—she was demoted before the Company announced **positive results** in line with its year-end guidance, and was terminated after she was no longer involved in operations as COO. Plaintiff's conclusory allegation that Ms. Butler's demotion and termination were "abrupt" adds nothing. (¶268.)

Plaintiff also claims that Defendants knew the alleged employee training, retention, and incentive issues were material problems because Ms. Butler was demoted and terminated. (¶279-85.) But this theory fails because Plaintiff does not plead with specific facts that (1) Ms. Butler was responsible for training; or that (2) she was demoted and later terminated because of the operational issues. While CW6 claims that Ms. Butler was demoted and terminated because "the fit was not there" and because of "tough times dealing with productivity" (¶141), he was not "in a position to know the[se] facts." *Miao*, 442 F.Supp.3d at 799. The Board of Directors demoted and terminated Ms. Butler, not CW6. (¶279.) Ms. Butler reported to Mr. Webb. (¶277.) And beyond attending some meetings together, CW6 does not allege that he worked with Ms. Butler. (¶268.) In short, CW6's uninformed opinion as to why the Board demoted and fired Ms. Butler is irrelevant to any Defendant's state of mind. *In re Lululemon Sec. Litig.*, 14 F.Supp.3d 553, 580 (S.D.N.Y. 2014) ("it is the facts known to, and the intent of, the maker of the statements"—not a CW— "which is ultimately relevant"). Regardless, his allegations are insufficiently particular. *Glaser*, 772 F.Supp.2d at 589 ("intimately involved" says nothing about whether the CW communicated with management about the issue); ¶¶141, 279 (CW6 was "very familiar with Ms. Butler").

But setting that aside, even if the termination were "related" to the alleged operational issues, that by itself "is not . . . suspicious." *Rice*, 2022 WL 837114, at *23; *see Ark. Pub. Emps.*, 28 F.4th at 356 ("[T]he departure of two high-level employees responsible for the trial . . . is no reason to doubt the veracity . . . of [the defendant's] disclosures."). The most that could possibly be inferred from Ms. Butler's demotion and termination is that Defendants believed there was room for improvement with respect to farm operations, a fact that Defendants disclosed following the Company's successful first quarter. Nothing suggests that Defendants knew that statements

they made about the Company's financial performance were materially incomplete because training and productivity issues were having a material effect on net sales.

Plaintiff also claims that hiring "three new senior personnel" suggests that Defendants knew about the alleged operational issues. (¶285.) But those allegations lack particularity and are insufficient—AppHarvest announced those hires in late July and early August 2021, well after the challenged statements were made. Plaintiff only speculates that they were recruited earlier.

### 4. Mr. Webb's Infrequent Presence At Morehead Does Not Suggest Scienter.

Plaintiff alleges that Mr. Webb must have known or recklessly disregarded the alleged issues at the greenhouse because he (1) gave tours at the greenhouse once or twice a month; (2) filmed several interviews there; and (3) the Company's executive offices are located there. (¶¶286-92.) These allegations are simply too vague and speculative. *E.g.*, *Wochos v. Tesla, Inc.*, 2018 WL 4076437, at *6 (N.D. Cal. Aug. 27, 2018) (rejecting "allegation that Defendants must have known from visiting the plants that Tesla's goals were impossible to reach"); *Nappier v. Pricewaterhouse Coopers LLP*, 227 F.Supp.2d 263, 277 (D.N.J. 2002) ("general allegations that, in conducting its inventory inspection, [defendant] must have seen" the problem "are simply insufficient").

### 5. Plaintiff's Core Operations Theory Does Not Suggest Scienter.

Plaintiff starts with a core-operations theory—that Defendants must have known their statements were false because the Morehead facility was "AppHarvest's core business." (¶¶293-95.) But even assuming the core operations doctrine survived the PSLRA,[23] it "is plainly insufficient to raise a strong inference of . . . scienter" on its own. *Rice*, 2022 WL 837114, at *22. Because Plaintiff fails to plead the usual hallmarks of scienter "indicating that [D]efendants might have known their statements were false," his core operations theory fails on its face. *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F.Supp.3d 379, 424 (S.D.N.Y. 2020).

In any case, Plaintiff fails to plead any "contradictory facts of critical importance" that

---

[23] *Frederick v. Mechel OAO*, 475 F. App'x 353, 356 (2d Cir. 2012) (Second Circuit has "not yet expressly addressed whether, and in what form, the 'core operations' doctrine survive[d] [the PSLRA] as a viable theory of scienter")

were so "apparent" that the Individual Defendants should have known about them "by virtue of their positions with the company." *In re Chembio Diagnostics, Inc. Sec. Litig.*, 2022 WL 541891, at \*10 n.9 (E.D.N.Y. Feb. 23, 2022). Nothing in the SAC suggests the alleged labor and productivity issues were so widespread and severe that it would have been obvious to the Individual Defendants that their statements were materially false or misleading. *Compare In re Avon Sec. Litig.*, 2019 WL 6115349, at \*20 (S.D.N.Y. Nov. 18, 2019) (crediting core operations theory where plaintiff alleged "a widespread delinquency problem in the company's single largest market" and because a defendant made "multiple trips to check on operations").

### 6.    There Are No "Admissions" Of Scienter.

Plaintiff incorrectly contends that, during the Q1 earnings call, Messrs. Lee and Eggleton "admitted" that the Company had been suffering from productivity issues. (¶¶301-02.) But Mr. Lee's disclosure—that the Company would conduct its annual, pre-planned training during the refresh period (¶¶133, 301)—does not confess knowledge of the alleged operational headwinds that derailed the Company in Q2. Similarly, Mr. Eggleton said only that the time and resources initially spent on training the Company's roughly 500 new employees required an initial investment and therefore contributed to gross loss. Plaintiff's supposition is even less convincing considering these statements were made in Q1, and the Company indisputably met its Q1 targets.

Plaintiff also alleges that after Q2 results were released, Defendants "admitted" they knew about the material impact of the operation challenges since January 2021 (¶¶297-98.) Again, these statements were made "retrospectively with the benefit of hindsight," and did not say that anyone knew the omitted information at some earlier date. *Frankfurt-Tr.*, 336 F.Supp.3d at 228; *supra* 23-24. Nor do the statements suggest that Defendants admitted they understood the magnitude and impact of the operational issues when the challenged statements were made. *In re Nokia*, 423 F.Supp.2d at 406 (knowledge of "room for improvement" is not knowledge of "contrary facts suggesting sales would drop to the level that they ultimately did").

7.     **Scienter Cannot Be Inferred From The Individual Defendants' Accurate Answers To Analyst Questions.**

Plaintiff alleges that Defendants knew about the alleged operational setbacks because they gave "detailed answers" to analysts' questions about AppHarvest's operations. (¶¶304-08.) This makes no sense. An Individual Defendant's knowledge of certain Company details does not mean that he also knew in real time about the materiality of the alleged operational issues or their ultimate impact on Q2 performance and the Company's 2021 guidance. Plaintiff does not allege that the Individual Defendants "knew facts contradicting their statements in response to analyst questions." *See In re Campbell Soup Co. Sec. Litig.*, 2020 WL 7022655, at *7 n.4 (D.N.J. Nov. 30, 2020). Accepting Plaintiff's position would deem executives of even the largest public companies knowledgeable of virtually every problem. That's why it is "hornbook law that 'accusations' such as these . . . are entitled to no weight." *E.g.*, *Miao*, 442 F.Supp.3d at 806.

8.     **Scienter Cannot Be Inferred From Mr. Ubben's Single Stock Sale.**

Plaintiff's final theory of recklessness is a patchwork of defunct inferences that borders on conspiracy. Plaintiff contends that Mr. Ubben, a non-party board member, (1) must have known about the alleged operational issues because he "had access to relevant inside information,"[24] (2) and must have known about Ms. Butler's demotion and termination, (3) which must have occurred because of the alleged operational issues,[25] and (4) must have induced him to sell AppHarvest stock. (¶311.) Moreover, because Mr. Ubben must have known all of this, the Individual Defendants must have known it too, and "even earlier" than Mr. Ubben did. (¶¶309-12.) Aside from being almost incomprehensible, Plaintiff's "guilt by association" theory is not permissible as a matter of law. *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 695 (2d Cir. 2009).

C.     **The Unreliable And Vague CW Allegations Are Not Indicative of Scienter.**

Scienter cannot be inferred from the CW allegations because they do not purport to have "direct knowledge that [a certain] view was held by defendants." *See Jones v. Perez*, 550 F. App'x 24, 28 (2d Cir. 2013). Nor could they. Aside from CW6, no CW is alleged to have interacted with

---

[24] *See supra* at 36-37.
[25] *See supra* at 34-36.

any Individual Defendant. And for all of CW6's allegations about meetings and discussions with Messrs. Eggleton and Lee regarding the alleged issues and ways to "close the gap," CW6 never alleges a specific statement, report, or interaction showing any Defendant did not believe his public statements at the time they were made. *See Wochos*, 985 F.3d 1180, 1194 (no scienter where plaintiff alleged that two employees told defendant that Tesla's goal was impossible where plaintiff "failed to plead any facts showing that [defendant] ever accepted those employees' views"). Plus, the CW allegations, especially CW6's, are unreliable, vague, and unmoored in time, and therefore fail to "establish what ***specific contradictory information*** the Individual Defendants received or when they received it." *Local No. 38 IBEW*, 724 F.Supp.2d at 461; *see also supra* at 19-20.

> **D.** **The Inference Of Scienter Is Not As Compelling As The Opposing Inference.**

Taking a holistic view of the SAC, the more cogent and compelling inference by far is that Defendants believed what they were saying. During the Class Period, AppHarvest was a new public company, led by inexperienced management that had hired hundreds of employees during a global pandemic to grow, harvest, evaluate, and process millions of pounds of tomatoes from the Company's inaugural crop in a newly constructed high-tech greenhouse. Despite all of this, AppHarvest met its ambitious Q1 projections. Encouraged and validated by that, Defendants reaffirmed AppHarvest's year-end guidance. But due to a 10-year-low market price for tomatoes and unforeseen operational setbacks related to employee training and productivity, AppHarvest unexpectedly fell short of its Q2 and year-end projections. It proved difficult to apply the subjective Grade No. 1 standard. And it was even harder to predict how Mastronardi and its retailers would apply that Grade No. 1 standard since the Company's relationship with them was—like everything else—new. Nevertheless, the Individual Defendants bet on themselves to course correct by buying stock shortly after the Q2 results were released. And Mastronardi also continued to bet on AppHarvest by deepening its partnership with the Company. And they bet right—the Company exceeded its more conservative year-end guidance for 2021. And for 2022, AppHarvest guided right back to where it initially started. Put simply, Defendants did not intentionally, or even

recklessly, mislead the investing public, and Plaintiff's conjecture and supposition cannot change that. *See Bd. of Trs. of City of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO*, 811 F.Supp.2d 853, 882 (S.D.N.Y. 2011) ("[T]he inability to anticipate future events, no matter how costly, does not amount to fraudulent intent or conscious recklessness under the PSLRA.").

## III.   Plaintiff Has Failed To Plead Loss Causation.

To plead loss causation, Plaintiff must allege that Defendants' fraud "proximately caused [Plaintiff's] economic loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005). This is ordinarily done by identifying, on the day of a significant stock price decline, a "corrective disclosure"—*i.e.*, a statement that corrects an earlier misrepresentation. Unless the disclosure "addressed the specific fact allegedly concealed," it was not "corrective." *In re Rhodia S.A. Sec. Litig.*, 531 F.Supp.2d 527, 545 (S.D.N.Y. 2007). Here, Plaintiff claims that AppHarvest's August 11, 2021, press release was a corrective disclosure because it attributed disappointing Q2 results to employee training issues, higher than expected shipping costs, and unusually low market prices for tomatoes, and revised 2021 year-end guidance. (¶¶318-19.) But Plaintiff fails to identify specific facts revealed on that day that were both new to investors and that corrected a specific, earlier misstatement of material fact. As a matter of law, "the mere failure to meet earnings forecasts is insufficient to establish loss causation." *In re AOL Time Warner, Inc. Sec. Litig.*, 503 F.Supp.2d 666, 678-79 (S.D.N.Y. 2007). If it were, "then any investor who loses money in the stock market could sue to recover for those losses without alleging that a fraudulent scheme was ever disclosed." *In re Initial Pub. Offering Sec. Litig.*, 399 F.Supp.2d 261, 266-67 (S.D.N.Y. 2005).

## IV.   Plaintiff Fails To State A Claim Under Section 20(a).

Because Plaintiff fails to plead a primary §10(b) violation, his § 20(a) claim necessarily fails. *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998).

## <u>CONCLUSION</u>

For these reasons, AppHarvest respectfully requests that the Court dismiss the SAC.

Dated:    September 23, 2022

Respectfully submitted,

By: */s/ Aric H. Wu*

COOLEY LLP
Aric H. Wu
55 Hudson Yards
New York, NY 10001
Tel: (212) 479-6000
ahwu@cooley.com

Peter M. Adams (*pro hac vice*)
Linh K. Nguyen (*pro hac vice*)
4401 Eastgate Mall
San Diego, CA 92121
Tel: (858) 550-6000
padams@cooley.com
lknguyen@cooley.com

Zachary D. Williams
(*pro hac vice forthcoming*)
1144 15th Street Suite 2300
Denver, CO 80202
Tel: (720) 566-4000
zwilliams@cooley.com

*Attorneys for Defendants AppHarvest, Inc.,
Jonathan Webb, Loren Eggleton, and David
Lee*