**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re AppHarvest Securities Litigation | Case No. 21-cv-7985-LJL |
| | Hon. Lewis J. Liman |

## LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE SECOND AMENDED CLASS ACTION COMPLAINT

Dated: November 22, 2022

**LEVI & KORSINSKY, LLP**
Shannon L. Hopkins (SH-1887)
Gregory M. Potrepka (GP-1275)
1111 Summer Street, Suite 403
Stamford, CT 06905
Telephone: (203) 992-4523
Facsimile: (212) 363-7171
shopkins@zlk.com
gpotrepka@zlk.com

*Counsel for Lead Plaintiff and Lead Counsel for the Class*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................................ 1

BACKGROUND............................................................................................................................. 3

I.     APPHARVEST COMMENCES OPERATIONS OF ITS SOLE LINE OF BUSINESS—THE MOREHEAD FACILITY........................................................................................................................ 3

II.    DEFENDANTS ENTER INTO A 10-YEAR DISTRIBUTION AGREEMENT WITH MASTRONARDI ............ 4

III.   AT ALL RELEVANT TIMES APPHARVEST'S LACK OF TRAINING AND RAMPANT EMPLOYEE ATTRITION AND CHURN CAUSE UNDISCLOSED WASTE, LOW-QUALITY TOMATOES, AND REJECTIONS........................................................................................................................ 5

     A.   Non-Existent Training is a Root Cause of AppHarvest's Problems ....................................... 7

     B.   AppHarvest's Productivity is Plagued by Costly Attrition, Turnover, and Churn ................... 8

IV.   DEFENDANTS KNEW OF APPHARVEST'S LABOR AND PRODUCTIVITY PROBLEMS IN REAL TIME ... 9

V.    DEFENDANTS DISCLOSE THE TRUTH........................................................................................ 12

ARGUMENT ............................................................................................................................... 13

I.     THE SAC ADEQUATELY ALLEGES MATERIALLY FALSE AND MISLEADING STATEMENTS .......... 14

     A.   The SAC is Pled With Particularity and is Not a Puzzle Pleading ....................................... 15

     B.   Misstatements Regarding Operations, Production, and Supply ........................................... 16

     C.   Misstatements Regarding Price Performance..................................................................... 19

     D.   Misstatements Regarding Labor Availability, Recruitment, and Retention .......................... 20

     E.   False and Misleading Purported Justifications for Financial Guidance................................ 22

     F.   Material Misstatements Regarding Speculative Risk Disclosures........................................ 24

     G.   Material Omissions Regarding Net Sales and Violations of Item 303.................................. 25

     H.   Defendants' Additional Arguments Concerning Falsity Fail............................................... 26

II.    THE SAC ALLEGES AN OVERWHELMING INFERENCE OF SCIENTER.......................................... 29

     A.   Actual Knowledge From Meetings.................................................................................... 30

     B.   Actual Knowledge From Mastronardi and Internal Reporting and Forecasting .................... 31

     C.   Webb's Involvement Every Day at Morehead.................................................................... 33

     D.   Defendants' Class Period Personnel Changes.................................................................... 34

     E.   Defendants' Admissions ................................................................................................. 35

     F.   Core Operations ............................................................................................................. 36

     G.   Defendants Held Themselves Out as Knowledgeable About Farm Operations .................... 37

     H.   Plaintiff's Scienter Theory is Cogent and Compelling, Whereas Defendants' is Implausible 37

III.   THE SAC PLAUSIBLY ALLEGES LOSS CAUSATION................................................................. 38

CONCLUSION ............................................................................................................................. 40

ii

**TABLE OF AUTHORITIES**

**Cases**

*Abramson v. Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020) .................................................................. 31, 38, 39, 40

*Akerman v. Arotech Corp.*,
608 F. Supp. 2d 372 (E.D.N.Y. 2009) .................................................................. 29

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*,
19 F.4th 145 (2d Cir. 2021) .................................................................. 14, 20

*AP-Fonden v. Goldman Sachs Grp., Inc.*,
545 F.Supp.3d 120 (S.D.N.Y. 2021) .................................................................. 32

*Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*,
28 F.4th 343 (2d Cir. 2022) .................................................................. 34

*Baker v. SeaWorld Entm't, Inc.*,
423 F.Supp.3d 878 (S.D. Cal. 2019) .................................................................. 22

*Boston Ret. Sys. v. Alexion Pharms. Inc.*,
556 F.Supp.3d 100 (D. Conn. Aug. 19, 2021) .................................................................. 18, 29

*Chapman v. Mueller Water Prods.*,
466 F.Supp.3d 382 (S.D.N.Y. 2020) .................................................................. 25, 31, 33

*Christine Asia Co. v. Ma*,
718 F. App'x 20 (2d Cir. 2017) .................................................................. 31

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
450 F.Supp.3d 379 (S.D.N.Y. 2020) .................................................................. 24, 36

*City of Pontiac Gen. Emples. Ret. Sys. v. Lockheed Martin Corp.*,
875 F. Supp. 2d 359 (S.D.N.Y. July 13, 2012) .................................................................. 16, 29

*City of Providence v. Aeropostale, Inc.*,
2013 WL 1197755 (S.D.N.Y. Mar. 25, 2013) .................................................................. 26

*City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*,
587 F. Supp. 3d 56 (S.D.N.Y. 2022) .................................................................. 30, 40

*Constr. Laborers Pension Tr. For S. Cal. v. CBS Corp.*,
433 F. Supp. 3d 515 (S.D.N.Y. 2020) .................................................................. 15

*Cornwell v. Credit Suisse Grp.*,
689 F. Supp. 2d 629 (S.D.N.Y. 2010) .................................................................. 31

*CVS Pharmacy, Inc. v. Press Am., Inc.*,
377 F. Supp. 3d 359 (S.D.N.Y. 2019) .................................................................. 39

*Emples. Ret. Sys. v. Blanford*,
794 F.3d 297 (2d Cir. 2015) .................................................................. 16, 19, 29

*Employees' Ret. Sys. of Gov't of the V.I. v. Blanford*,
794 F.3d 297 (2d Cir. 2015) .................................................................. 29

*Fresno Cnty. Emples. Ret. Ass'n v. comScore, Inc.*,
268 F. Supp. 3d 526 (S.D.N.Y. 2017) .................................................................. 27

*Freudenberg v. E*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010) .................................................................. 14, 18

*Galestan v. Onemain Holdings, Inc.*,
348 F. Supp. 3d 282 (S.D.N.Y. 2018) .................................................................. 27, 31, 32, 33

*Glaser v. The9, Ltd.*,
   772 F. Supp. 2d 573 (S.D.N.Y. 2011) .......................................................................... 35
*Gray v. Wesco Aircraft Holdings, Inc.*,
   454 F. Supp. 3d 366 (S.D.N.Y. 2020) .......................................................................... 27
*Hall v. Children's Place Retail Stores, Inc.*,
   580 F. Supp. 2d 212 (S.D.N.Y. 2008) .......................................................................... 36
*In re Adient plc Sec. Litig.*,
   2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020) ........................................................... 27, 33
*In re Aphria Sec. Litig.*,
   2020 WL 5819548, (S.D.N.Y. Sept. 30, 2020)........................................... 14, 19, 32, 34
*In re Avon Sec. Litig.*,
   2019 WL 6115349, (S.D.N.Y. Nov. 18, 2019) ........................................................ 34, 37
*In re Bear Stearns Cos., Inc. Sec., Deriv., & ERISA Litig.*,
   763 F.Supp.2d 423 (S.D.N.Y. 2011)............................................................................. 22
*In re Campbell Soup Co. Sec. Litig.*,
   2020 WL 7022655 (D.N.J. Nov. 30, 2020) ................................................................... 37
*In re Chembio Diagnostics, Inc. Sec. Litig.*,
   2022 WL 541891 (E.D.N.Y. Feb. 23, 2022) ................................................................. 36
*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
   2018 WL 2382600 (S.D.N.Y. 2018)............................................................................... 27
*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
   2019 WL 5287980 (S.D.N.Y. Oct. 18, 2019) ............................................................... 40
*In re Citigroup Inc. Sec. Litig.*,
   753 F. Supp. 2d 206 (S.D.N.Y. 2010) .......................................................................... 34
*In re Coty Inc. Sec. Litig.*,
   2016 WL 1271065 (S.D.N.Y. Mar. 29, 2016) .............................................................. 26
*In re CPI Card Grp. Inc. Sec. Litig.*,
   2017 WL 4941597 (S.D.N.Y. Oct. 30, 2017)................................................................ 26
*In re Delcath Sys. Sec. Litig.*,
   36 F. Supp. 3d 320 (S.D.N.Y. 2014).............................................................................. 40
*In re Facebook, Inc. IPO Sec. & Deriv. Litig.*,
   986 F. Supp. 2d 487 (S.D.N.Y. 2013)...................................................................... 26, 27
*In re Guilford Mills, Inc. Sec. Litig.*,
   1999 WL 33248953 (S.D.N.Y. July 21, 1999) .............................................................. 29
*In re Hi-Crush Partners L.P. Sec. Litig.*,
   2013 WL 6233561 (S.D.N.Y. 2013)............................................................... 30, 36, 37
*In re IMAX Sec. Litig.*,
   587 F. Supp. 2d 471 (S.D.N.Y. 2008)........................................................................... 32
*In re Intuitive Surgical Sec. Litig.*,
   65 F. Supp. 3d 821 (N.D. Cal. 2014)............................................................................. 15
*In re Lululemon Sec. Litig.*,
   14 F. Supp. 3d 553 (S.D.N.Y. 2014).............................................................................. 35
*In re MF Global Holdings Sec. Litig.*,
   982 F. Supp. 2d 277 (S.D.N.Y. 2013) ...................................................................... 15, 28
*In re Mylan N.V. Sec. Litig.*,
   2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018) .......................................................... 20, 24

*In re Nielsen Holdings PLC Sec. Litig.*,
  510 F.Supp.3d 217 (S.D.N.Y 2021) ................................................................................... 37
*In re NTL, Inc. Sec. Litig.*,
  347 F. Supp. 2d 15 (S.D.N.Y. 2004) ................................................................................. 15
*In re OSG Sec. Litig.*,
  12 F. Supp. 3d 622 (S.D.N.Y. 2014) ................................................................................. 34
*In re Oxford Health Plans, Inc. Sec. Litig.*,
  187 F.R.D. 133 (S.D.N.Y 1999) ........................................................................................ 23
*In re Pareteum Sec. Litig.*,
  2021 WL 3540779 (S.D.N.Y. Aug. 11, 2021) .................................................................. 34
*In re Petrobras Sec. Litig.*,
  116 F.Supp.3d 368 (S.D.N.Y. 2015) ........................................................................... 27, 28
*In re Regeneron Pharms., Inc. Sec. Litig.*,
  2005 WL 225288 (S.D.N.Y. Feb. 1, 2005) ....................................................................... 29
*In re Rhodia S.A. Sec. Litig.*,
  531 F. Supp. 2d 527 (S.D.N.Y. 2007) ............................................................................... 39
*In re Salix Pharms., Ltd.*,
  2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) ............................................................. 32, 33
*In re Sanofi-Aventis Sec. Litig.*,
  774 F. Supp. 2d 549 (S.D.N.Y. 2011) ......................................................................... 18, 29
*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001) ................................................................................................ 14
*In re Synchrony Fin. Sec. Litig.*,
  988 F.3d 157 (2d Cir. 2021) .............................................................................................. 14
*In re Tenaris S.A. Sec. Litig.*,
  493 F.Supp.3d 143 (E.D.N.Y. 2020) ................................................................................ 24
*In re Turkcell Iletisim Hizmetler A.S. Sec. Litig.*,
  202 F.Supp.2d 8 (S.D.N.Y. 2001) ..................................................................................... 26
*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
  2022 WL 4085677 (S.D.N.Y. Sep. 2, 2022) ............................................................. passim
*In re VEON Ltd. Sec. Litig.*,
  2017 WL 4162342 (S.D.N.Y. 2017) .................................................................................. 26
*In re Vivendi Universal, S.A. Sec. Litig.*,
  765 F.Supp.2d 512 (S.D.N.Y. 2011) ................................................................................ 23
*In re Vivendi Universal, S.A.*,
  381 F. Supp. 2d 158 (S.D.N.Y. 2003) ............................................................................... 28
*In re Vivendi, S.A. Sec. Litig.*,
  838 F. 3d 223 (2d Cir. 2016) ....................................................................................... 15, 24
*In re XL Fleet Corp. Sec. Litig.*,
  2022 WL 493629 (S.D.N.Y. Feb. 17, 2022) ......................................................... 14, 16, 31
*Iowa Pub. Emples.' Ret. Sys. v. MF Global, Ltd.*,
  620 F.3d 137 (2d Cir. 2010) .............................................................................................. 16
*Karimi v. Deutsche Bank Aktiengesellschaft*,
  2022 WL 2114628 (S.D.N.Y. June 13, 2022) ............................................................. 28, 40
*LeMatta v. Casper Sleep, Inc.*,
  2022 WL 4637795 (E.D.N.Y. Sept. 30, 2022) .................................................................. 26

v

*Long Miao v. Fanhua, Inc.*,
  442 F. Supp. 3d 77 (S.D.N.Y. 2020) .................................................................. 35, 37
*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
  797 F.3d 160 (2d Cir. 2015) .......................................................................... 13
*Matrixx Initiatives, Inc. v. Siracusano, et al.*,
  563 U.S. 27 (2011) .................................................................................. 14, 25
*Meitav Dash Provident Funds & Pension Ltd. v. Spirit AeroSystems Holdings, Inc.*,
  2022 WL 377415 (N.D. Okla. Jan. 7, 2022) ........................................................ 18
*Meyer v. JinkoSolar Holdings Co.*,
  761 F.3d 245 (2d Cir. 2014) ............................................................ 18, 22, 24
*Nappier v. Pricewaterhouse Coopers LLP*,
  227 F. Supp. 2d 263 (D.N.J. 2002) ................................................................. 34
*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
  455 F. App'x 10 (2d Cir. 2011) ...................................................................... 33
*Noto v. 22nd Century Grp., Inc.*,
  35 F.4th 95 (2d Cir. 2022) ........................................................................... 14
*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000) ............................................................. 14, 28, 30
*Okla. Firefighters' Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
  367 F. Supp. 3d 16 (S.D.N.Y. 2019) .............................................................. 31, 37
*Okla. Police Pension Fund & Ret. Sys. v. Teligent, Inc.*,
  2020 WL 3268531 (S.D.N.Y. June 17, 2020) ..................................................... 27
*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  135 S. Ct. 1318 (2015) ............................................................................... 27
*Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V.*,
  89 F. Supp. 3d 602 (S.D.N.Y. 2015) ............................................................... 31
*Plumbers & Pipefitters Nat'l Pension Fund v. Davis*,
  2020 WL 1877821 (S.D.N.Y. Apr. 14, 2020) ................................................... 21, 38
*Public Emples. Ret. Sys. of Miss. v. Mohawk Indus.*,
  564 F.Supp.3d 1272 (N.D. Ga. Sept. 29, 2021) .................................................. 16
*Rice v. Intercept Pharm., Inc.*,
  2022 WL 837114, (S.D.N.Y. Mar. 21, 2022) ..................................................... 34
*Rosi v. Aclaris Therapeutics, Inc.*,
  2021 WL 1177505 (S.D.N.Y. Mar. 29, 2021) .................................... 17, 29, 30, 38
*Rudani v. Ideanomics, Inc.*,
  2020 WL 5770356 (S.D.N.Y. Sept. 25, 2020) .................................................... 23
*S. Ferry LP #2 v. Killinger*,
  687 F. Supp. 2d 1248 (W.D. Wash. 2009) ........................................................ 37
*Schiro v. Cemex, S.A.B. de C.V.*,
  2019 WL 3066487 (S.D.N.Y. 2019) ............................................................... 40
*Set Capital LLC v. Credit Suisse Grp. AG*,
  996 F.3d 64 (2d Cir. 2021) .......................................................................... 32
*Setzer v. Omega Healthcare Inv'rs, Inc.*,
  968 F.3d 204 (2d Cir. 2020) ...................................................................... 18, 29
*Sheet Metal Workers Loc. 32 Pension Fund v. Terex Corp.*,
  2018 WL 1587457 (D. Conn. Mar. 31, 2018) ................................................... 34, 38

*Singh v. Cigna Corp.*,
  918 F.3d 57 (2d Cir. 2019) .......................................................................................... 14
*Sjunde AP-Fonden v. Gen. Elec. Co.*,
  417 F. Supp. 3d 379 (S.D.N.Y. 2019) ........................................................................ 31
*Stadnick v. Vivint Solar, Inc,*
  861 F.3d 31 (2d Cir. 2017) .......................................................................................... 26
*Steamfitters Loc. 449 Pension Plan v. Skechers U.S.A., Inc.*,
  412 F.Supp.3d 353 (S.D.N.Y. 2019) .......................................................................... 29
*Steginsky v. Xcelera Inc.*,
  741 F.3d 365 (2d Cir. 2014) ................................................................................. 13, 23
*Stratte-McClure v. Morgan Stanley*,
  776 F.3d 94 (2d Cir. 2015) .......................................................................................... 26
*Strougo v. Barclays PLC*,
  105 F. Supp. 3d 330 (S.D.N.Y. 2015) ........................................................................ 37
*Tellabs, Inv. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ............................................................................................. 29, 35
*Van Dongen v. CNinsure Inc.*,
  951 F.Supp.2d 457 (S.D.N.Y. 2013) .......................................................................... 39
*Wochos v. Tesla, Inc.*,
  2018 WL 4076437 (N.D. Cal. Aug. 27, 2018) ........................................................... 34
*Yannes v. SCWorx Corp.*,
  2021 WL 2555437 (S.D.N.Y. June 21, 2021) ................................................. 34, 36, 37
*Youngers v. Virtus Inv. Partners Inc.*,
  195 F. Supp. 3d 499 (S.D.N.Y. 2016) ........................................................................ 31

## Statutes

15 U.S.C. § 78u-4(b) ........................................................................................................... 14

## PRELIMINARY STATEMENT[1]

Defendants fundamentally misunderstand Plaintiff's case. Plaintiff is not prosecuting fraud claims because Defendants made incorrect predictions. Rather, the SAC alleges Defendants executed a coordinated blitz over the first half of 2021 across every conceivable media platform to mislead the Class about AppHarvest's operational and labor performance and stave off disclosure of the truth. The federal securities laws do not protect such conduct—they abhor it.

The Class Period coincides with the first growing season at AppHarvest's only operational asset: the Morehead Facility ("Morehead"), an indoor tomato farm. Morehead's first growing season began in November 2020 and ended in the third quarter of 2021. However, throughout that period, Morehead was beset by operational failures and labor unavailability. According to former employees, the orientation process was "a joke" and personnel were not instructed how to perform their occupations. Further, CWs recalled a "shocking" amount of turnover, with as much as ten personnel resigning every week from just one-half of the Greenhouse. Thus, the Individual Defendants knew that AppHarvest was falling short of its attrition and retention metrics "week over week" in the first half of 2021.

AppHarvest's untrained and perpetually churning workforce performed disastrously. According to CWs, AppHarvest workers damaged up to 50% of total tomato production throughout the Class Period. Further, the Company was "a long way off" from achieving its goals, with about "half" of the tomatoes that were inspected being subpar quality. Further, 30% to 35% of AppHarvest's shipments were rejected by its distributor Mastronardi, compared to Defendants' target of 6% or 7%. All such issues caused lower saleable yield, quality, and prices, and higher distribution and transportation fees throughout the first half of 2021.

---

[1] References to "¶" are to the Second Amended Class Action Complaint (ECF 76) ("SAC"). "Motion" refers to the motion to dismiss (ECF 79) filed by Defendants AppHarvest Inc., Jonathan Webb, Loren Eggleton, and David Lee, and Defendants' brief in support thereof (ECF 80) ("DB"). "Ex." refers to Exhibits to the Declaration of Shannon L. Hopkins in Support of Lead Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Second Amended Complaint. Unless otherwise noted, capitalized terms shall have the same meanings as ascribed to them in the SAC, emphasis is added, and internal quotations and citations are omitted.

Despite these considerable headwinds to sales and costs, Defendants affirmatively misrepresented AppHarvest's: (i) production capabilities (*e.g.*, claiming "supply" and "distribution" were "advantage[s],"); (ii) price performance (*e.g.*, claiming the Company "performed well on – in market pricing"); (iii) labor availability (*e.g.*, claiming work force was "showing up every day"); and (iv) its justifications for guidance decisions (*e.g.*, claiming raised guidance was the result of "favorable crop yields and market pricing").

Defendants knew none of their statements were true. CW6 confirmed Lee and Eggleton attended weekly Forecast Meetings and twice-weekly Leadership Meetings (among other reports, meetings, and data) where employee training, turnover, poor work ethic, and hiring were discussed as the "root cause" of AppHarvest's production challenges. In this way, CW6 confirmed AppHarvest's executive team had informational parity and "everyone knew what everyone else knew." Further, Webb concedes he was at Morehead "every morning" where he elbow-tapped every farm worker as they reported to work, and where he "slept at the farm" and observed "operations." Webb also instructed personnel to "hide the waste" at the Greenhouse before any of his regular media interviews and tours throughout the Class Period.

On August 11, 2021, after months of misleading investors, Defendants admitted that for the six months ended June 30, 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees." Defendants explained that such issues were the "primary driver" of AppHarvest's poor earnings and downward-revised FY 2021 sales guidance. AppHarvest's stock and warrant prices dropped 29% and 44% day-over-day, respectively, on heavy trading volume.

Defendants argue the SAC fails to plausibly allege falsity, scienter, and loss causation. However, Defendants misunderstand Plaintiff's theory of falsity, they improperly scrutinize scienter allegations in isolation, and they completely fail to argue that the information alleged in the Company's Q2 2021

disclosures was not new or corrective. Defendants' Motion should be denied.

## BACKGROUND

**I.    AppHarvest Commences Operations of Its Sole Line of Business—the Morehead Facility**

AppHarvest is a Delaware public benefit company and producer of tomatoes using CEA, the process of growing produce indoors which allows firms to cultivate and harvest crops year-round. ¶¶28, 41. AppHarvest's common stock and warrants began trading on the NASDAQ on February 1, 2021, the first day of the Class Period, as the result of a de-SPAC transaction. ¶¶45-46. AppHarvest's strategy of deploying CEA at scale in the U.S. agricultural market was (and is) and unproven concept spearheaded by Webb, its founder, CEO and Board Chairman. ¶¶29, 72. At all relevant times Eggleton served as CFO, and Lee served as President and a member of the Board. ¶30.

Leading into and throughout the Class Period, AppHarvest operations ran entirely out of the Morehead Facility ("Morehead"), consisting of: Defendants' executive offices; a Greenhouse where tomatoes were grown and harvested; and a Packhouse where tomatoes were graded for quality, boxed, and shipped. ¶¶52, 115. AppHarvest's inaugural growing season launched in two phases: the Greenhouse's first thirty acres were planted in November 2020 which began harvesting in January 2021, and the second thirty acres were planted in January/February 2021 which began harvesting in April 2021. ¶53. The growing season ended with a "refresh" in early Q3 2021, when new crops were planted. ¶¶59, 133.

Greenhouse workers were responsible for daily farm activities such as planting, pruning, harvesting, *etc*. ¶35. In the Packhouse, Quality Control Specialists (of which there were four during the Class Period) graded tomatoes as Grade 1 (the highest quality and most valuable), Grade 2, or "Bad" meaning not saleable. ¶¶36, 62. After inspection, tomatoes were packed into boxes marked either Grade 1 or Grade 2. ¶63. The boxes were then weighed and counted before shipment, and the yield and quality data were recorded in real time for analysis by the Financial Planning & Analysis Department. *Id.*

3

Defendants repeatedly acknowledged the paramount importance of Morehead's success, including in six Class Period SEC filings stating AppHarvest's business "rel[ied] solely on the operations at the Morehead Facility." ¶294. Accordingly, throughout the Class Period, Defendants made concerted efforts to visit areas of Morehead used for operations. Indeed, in a March 15, 2021 interview, Webb bragged about being at the facility "every morning" to greet and "elbow tap" employees starting their shifts, and to "do what [he] love[s] the most, which is sleep on the farms" and "go[] to our operations." ¶¶287-88. Webb also regularly took media appearances from within the Greenhouse (at least sixteen prior to and throughout the Class Period), because, as he purported during a June 21, 2021 interview, "what we're trying to show is we're authentic. We're genuine. We, you know, we want to show the consumer, here's the way we're operating." ¶289.

## II.   Defendants Enter into a 10-Year Distribution Agreement with Mastronardi

In March 2019, AppHarvest entered a 10-year agreement with Mastronardi (signed and initialed on every page by Webb). ¶56. Mastronardi agreed to sell all of AppHarvest's Grade 1 tomatoes at market rate, in exchange for sole distribution rights. ¶34. Mastronardi "made it abundantly clear" to Defendants "that they can deliver and put on store shelves [] every tomato" AppHarvest grew. ¶272. However, Mastronardi can reject any non-Grade 1 crops at its discretion. ¶64. If it does so, AppHarvest must accept the rejected produce and bear all associated costs. *Id.*

Thus, as there were no demand limitations during the Class Period, Defendants knew the only constraining factor to AppHarvest's revenue would be its ability to grow Grade 1 tomatoes for Mastronardi. Indeed, Eggleton admitted on the 2021 Q1 Earnings Call that "tomatoes with Grade No. 1 sell[] at a premium[,]" and Webb admitted on the 2021 Q2 Earnings Call, that Grade 2 tomatoes sell for "very little to no value[.]" ¶68. Further, prior to and throughout the Class Period, AppHarvest filed at least eighteen documents with the SEC admitting it was "highly dependent" on Mastronardi and "[s]ubstantially all of the

Company's revenues" for Q1 and Q2 2021 were generated by Mastronardi. ¶¶66, 271. Indeed, AppHarvest did not have other revenue sources during the Class Period. ¶271.

The Mastronardi Morehead Agreement also contains terms regarding required information gathering and communication. For example, Defendants were required to collaborate with Mastronardi to create initial and future forecasts for each growing season. ¶¶59, 130, 263. CW3, a former AppHarvest Senior Cost Accountant responsible for all direct agricultural cost of sales analysis, costing and valuation, and reporting, confirmed AppHarvest's forecasts for Morehead's first growing season were thorough and included information such as expected volume, expected costs, number of plants, yield, market price, estimated rejections, and estimated damaged tomatoes. *Id.* CW3 personally received spreadsheets including detailed profit and loss projection documents directly from Eggleton, which Eggleton had approved. ¶130.

## III.    At All Relevant Times AppHarvest's Lack of Training and Rampant Employee Attrition and Churn Cause Undisclosed Waste, Low-Quality Tomatoes, and Rejections

As Defendants admit, "labor and productivity challenges associated with the training and development of the new workforce" lasted the entire six months ended June 30, 2021 and caused "lower net sales." ¶249. As Lee described it, "executional challenges" were "very real" in AppHarvest's first "full season of harvest." ¶257. Confidential witnesses corroborate this timeline.

**Waste**: CW5, who worked in Morehead's Maintenance Department, estimated that beginning in October 2020 (but worsening in the first two quarters of 2021), up to 50% of AppHarvest's crop was wasted throughout the first growing season due to disease, insects, and damage (*e.g.*, nicks, cuts, and improper harvesting) caused by employees in both the Greenhouse and Packhouse. ¶¶39, 78. CW5's estimates were based on personal observation and discussions with management, including the Vice President of Greenhouse Operations. ¶78. CW1, a former Crop Care Specialist, agreed that there was a "shocking amount" of waste in the Greenhouse—with anywhere from 5% to 10% of the tomatoes on a given vine consistently ending up damaged by Greenhouse workers between October 2020 and August 2021. *Id.*

5

A leading cause of waste was when workers caused tomatoes to touch the ground, rendering them unsanitary and unsaleable. ¶¶79-80, 83. CW4, a Group Lead (manager) of Crop Care Specialists, confirmed tomatoes were wasted "daily" throughout the first harvesting season. ¶83. CW4 provided photographs contained in the SAC which depict wasted tomatoes strewn everywhere and are representative of the conditions of the entire Greenhouse throughout the Class Period except when AppHarvest needed to "hide the waste" from guests such as investors and the media. *Id.*; *see also* ¶80 (CW1 confirmed there were "a lot of tomatoes on the ground"). Indeed, far from being "the way we're operating" as Webb claimed during a June 21, 2021 interview, CW5 confirmed that Webb, or his team, instructed the Maintenance Department at morning stand-up meetings attended by many senior managers in operations roles ("Stand-Up Meetings"), to remove debris so that the Greenhouse had "better eye appeal." ¶¶83-84, 117, 291. CW4 and CW1 also confirmed that AppHarvest's "piece rate" incentive program "absolutely" resulted in Crop Care Specialists working too quickly which damaged tomatoes and entire plants. ¶¶98-102.

**Quality**: CW2 confirmed "half" of the tomatoes inspected in the Packhouse were not Grade 1, but rather were either Grade 2 or "Bad." ¶81. According to CW2, tomatoes reaching the Packhouse "constantly" had imperfections. *Id.* CW2 blamed the poor quality, in part, on AppHarvest's "piece rate" bonus which incentivized harvesters to pick as much as they could regardless of quality. ¶102. CW2's recollections of poor quality are supported by CW6, who reported to Eggleton and worked in FP&A. ¶40. CW6 stated AppHarvest suffered its "toughest times" consistently from late in Q1 2021, including March 2021, through the summer refresh. ¶122. Throughout these toughest times, he and AppHarvest's senior leadership, which included the Individual Defendants, "knew we were a long way off" from achieving the Company's quality standards. ¶87; ¶88 (missing standards by approximately 50% in at least one instance). Throughout the "toughest times" AppHarvest was also well below 50% in relation to productivity standards for Greenhouse functions (*e.g.*, picking, lowering, de-leafing, etc.). ¶88.

6

**Rejections**: CW6 confirmed Mastronardi rejected AppHarvest tomatoes during the Class Period. ¶96. During AppHarvest's "toughest times," AppHarvest rejected "many times" more than the Company's goal (6% or 7%), with upwards of 30% to 35% of AppHarvest's tomatoes being rejected. *Id.* CW6 stated that rejections impacted AppHarvest's financial forecast because the forecast was based in part on the anticipated percentages of Grade 1 and Grade 2 tomatoes, but if those percentages were not being achieved in a given week, then it would be necessary to revise the forecast in an ensuing week. ¶97. Thus, FP&A would review reported rejections to try to determine quality trends, and during the "toughest" times (when more fruits were being rejected for quality) it was definitely necessary to reforecast. ¶¶60, 97.

### A. Non-Existent Training is a Root Cause of AppHarvest's Problems

A root cause of AppHarvest's productivity and executional challenges was the lack of training. ¶127. One major issue (corroborated by multiple CWs) was that personnel were not instructed how to perform their occupations. CW1 stated that AppHarvest's orientation was "a joke" and did not explain how Greenhouse employees would perform their job. ¶89. CW2 said that training as a Packer and as a Quality Control Specialist was "trial by fire" with orientation consisting of paperwork and presentations regarding AppHarvest's business strategy. ¶93. CW4 stated that prior to June/July 2021, Greenhouse Group Leads and Crop Care Specialists were expected to figure out their assigned tasks simply by "doing it," not through training. CWs 1, 2, 4, and 6 thus, confirmed that inadequate training "absolutely" caused waste and lowered quality throughout the first growing and harvesting seasons. ¶¶90-94, 127.

Additionally, AppHarvest failed to instruct workers about quality standards. According to CW1, Crop Care Specialists were not given any instruction on how to identify Grade 1 tomatoes. ¶90. CW4 likewise said that the Greenhouse did not have any personnel assigned to inspect quality until May 2021, when AppHarvest began assigning certain Team Leads to inspect boxes of picked tomatoes and record their data in a spreadsheet. ¶85. CW4 stated that although these Greenhouse personnel were given inconsistent instructions regarding quality standards (sometimes changing on an hourly basis) so that they

7

could "map" out quality performance within the Greenhouse, they were instructed to "just send" everything to the Packhouse and "let the Packhouse figure out" the grades for purposes of shipment. ¶¶85, 86, 92. CW2 echoed CW4, reiterating that AppHarvest's inconsistent quality standards changed "day to day" and "week to week." ¶93. CW2 stated that as a result, AppHarvest's Quality Control Specialists had regular disagreement about grading. ¶94.

CW4's allegations regarding this "May 2021" timeline are corroborated by the timing of Defendants' vague statements during the 2021 Q1 Earnings Call on May 17, 2021. Defendants did not disclose AppHarvest's then-present quality deterioration, but instead Lee suggested that in the future there would be a "summer refresh," "Morehead 2.0," and "new training" to support incremental "higher productivity," and such training would be additive to AppHarvest's purported then-present "momentum." ¶¶133, 135.

### B.   AppHarvest's Productivity is Plagued by Costly Attrition, Turnover, and Churn

AppHarvest's "GOAL" was to staff Morehead with five hundred people. ¶109. Defendants bragged they met that threshold in March 2021. ¶74. Yet, at the end of the Class Period, AppHarvest conceded its workforce fell by *20%* to "400 people." ¶109. Defendants confirmed AppHarvest suffered "labor…challenges" throughout the first harvest season. ¶243. CWs corroborated such challenges, including massive turnover, churn, and employee absences. ¶¶103-13.

CW1 stated that prior to the first harvest "at least one person a week" from CW1's team left the Company. ¶105. During the first harvest, one person from CW1's team left AppHarvest every one to two weeks for the remainder of CW1's tenure. *Id.* CW1 recalled personnel were not replaced, and that although CW1's team started with twenty to thirty personnel, that number fell to fourteen or fifteen by the end of CW1's tenure. *Id.* Thus, according to CW1, Greenhouse teams could not keep up with the pace of the harvest, which caused overripe tomatoes to fall to the ground and become waste. ¶79. CW1 also confirmed that "a couple" of employees from CW1's team alone called out sick each week because of COVID-19, which automatically required the employees to take a two-week leave of absence. ¶¶112-13. CW1 stated

8

AppHarvest's policy was to not replace team members out due to COVID-19, so teams were short-staffed and COVID-19 "definitely" negatively affected total employee hours worked, and production. ¶113.

CW2 confirmed AppHarvest suffered very high attrition, with upwards of "50% to 60%" of Greenhouse personnel leaving after their first month. ¶110. CW4 stated that turnover was significant throughout CW4's tenure, with the west side of the Greenhouse losing at least ten personnel every week, which resulted in a less trained staff, plants not being harvested fast enough, and causing the tomatoes to get moldy and infected, all resulting in lower yields. ¶107. CW5 confirmed turnover and churn was consistently high from October 2020 through June 2021 and that information regarding labor issues was discussed daily at morning Stand-Up Meetings, including: the number of employees that called out, the number who had not reported to work at all, and the number of new personnel. ¶108. CW5 also recalled Greenhouse staff complaining AppHarvest lacked adequate labor to meet production requirements. *Id.* Thus, during the Class Period it was necessary for AppHarvest to bring in contract labor during times of poor attendance. *Id.* After the Class Period, Defendants admitted to using contract labor. ¶¶326-27.

## IV.    Defendants Knew of AppHarvest's Labor and Productivity Problems in Real Time

**Meetings**: CW6 was a high-ranking individual within AppHarvest that interacted directly with Defendants. ¶¶40, 123-128. Indeed, CW6 reported directly to Eggleton and the two spent "many hours" daily discussing financial forecasting matters. ¶128. CW6's department, FP&A, was meant to "corral information and disseminate it" to Lee and Eggleton for feedback, including through meetings. ¶¶40, 123-128. In that respect, CW6 and FP&A personnel attended weekly forecast meetings with Lee and Eggleton ("Forecast Meetings") to discuss productivity challenges and metrics, with a key focus on yield and quality which were the two primary inputs to forecasting and understanding AppHarvest's revenue. ¶¶124, 264. Throughout AppHarvest's "toughest times" Forecast Meeting discussions focused on "ways to close the gap" between AppHarvest's underperformance compared to forecasts, and scenarios to do so. ¶123. Lee

got "quite operational" and always took the most "aggressive" forecast positions, including in instances where he was informed that AppHarvest's challenges still needed to be factored in. ¶¶124, 245.

CW6 confirmed that throughout the "toughest times" Lee and Eggleton also instituted twice-weekly meetings with FP&A, the Chief Operating Officer, and other executives ("Leadership Meetings") to "keep an eye on" AppHarvest's poor labor productivity, including yield and quality. ¶126. Throughout the first half of 2021, it was explained at such meetings that attrition and retention metrics were far worse than expected and AppHarvest was falling short "week over week." ¶111. Inadequate training, turnover, poor work ethic, and inconsistent hiring standards were "repeatedly cited" as the "root cause" of AppHarvest's challenges at both Leadership Meetings and Forecast Meetings. ¶127. Thus, as CW6 stated, AppHarvest's executives had information parity, such that "everyone knew what everyone else knew" regarding fundamental financial data. ¶129.

**Reporting**: Defendants received or had access to productivity, labor, and quality reports which were refreshed in real time. CWs 1 and 4 stated Greenhouse employees' performance (*e.g.*, picking a row of tomatoes) was electronically tracked every day in real time, and that such data was immediately uploaded to AppHarvest's electronic files. ¶120. This included Greenhouse quality inspectors who carried an electronic tablet and recorded their results into a "live" excel spreadsheet to "map" quality performance. ¶85. CW6 further confirmed that AppHarvest had real-time access to quality and yield data from the Packhouse based on the types of boxes being shipped out (*i.e.*, Grade 1 or Grade 2) and their weight. ¶63. CWs 3 and 6 stated that AppHarvest used real time production data to create and track against AppHarvest's forecasts, including within the Company's Microsoft Dynamics planning software which the Individual Defendants had access to. ¶¶121, 130, 263. AppHarvest's real time internal data was the basis for numerous reports including reviews of "***daily***, weekly, and monthly greenhouse production" and reports to "senior management" related to "emerging issues" in "cost performance vs. budget [.]" *Id.*, ¶131.

10

Defendants also received reports through Mastronardi's inspection and audit process. ¶67. CW6 confirmed Mastronardi maintained a "portal" where AppHarvest personnel entered daily and weekly production forecasts so that Mastronardi knew how many tomatoes were available for pick-up. ¶¶60, 275. After Mastronardi picked up the tomatoes they were shipped to Michigan for quality assurance. ¶67. Mastronardi increased the frequency of its audits during periods of "weaker" performance by AppHarvest and instructed AppHarvest to tighten up specifications because Mastronardi was having to reject a lot of fruit—upwards of 30% to 35% throughout the "toughest times," which was "many times" more than AppHarvest's target. ¶¶ 67, 96, 275.

**Leadership Changes**: On December 10, 2020, Defendants promoted Marcella Butler to Chief Operating Officer expanding her responsibilities to all "Development, Construction, and *Farm Operations* teams[.]" ¶277. AppHarvest invested significantly in Ms. Butler making her the highest-compensated employee in 2020. ¶¶278-79. Nonetheless, the Board (including Webb, Lee, and Jeffrey Ubben who shortly thereafter unloaded 3 million shares valued at $49.5 million) decided on April 12, 2021 to demote Butler from COO and remove her title as an "executive officer," without explaining the reasons why. ¶¶32, 279, 284. Webb and Lee were involved creating and reviewing Butler's succession plan. ¶¶281-82.

On July 9, 2021, Ms. Butler entered a separation agreement, signed by Defendant Lee, which was disclosed on August 11, 2021. ¶¶32, 284. CW6, who was hired by Ms. Butler and was "very familiar" with her, confirmed that her demotion in April 2021, and eventual separation were related to AppHarvest's labor issues, including productivity, attrition, and churn. ¶¶141, 279. On the 2021 Q2 Earnings Call, Lee confirmed CW6's account, and admitted operational failures at Morehead caused AppHarvest to "eliminate[] a C-level position" (Butler) and were the reasons the Company "*changed operational leadership*[.]" ¶280. Moreover, Defendant Webb stated on the 2021 Q2 Earnings Call that AppHarvest "replaced management" in response to training issues the Company faced when it "ramped up." *Id.*

11

**Defendants' Media Campaign**: Throughout the Class Period Defendants, either on their own or in response to interview questions, regularly provided detailed updates about operations and labor at Morehead based upon their personal knowledge. ¶¶72-75, 210, 213, 222, 304-08. Webb held himself out as knowledgeable about Morehead's operations and labor by touting his presence at the facility and regular employee interaction (¶¶287-89), and by answering, with specificity, direct questions about labor and operations (¶¶72-75, 210, 213, 220, 222). Likewise, Lee held himself out as knowledgeable by answering, with specificity, direct questions about production (¶190), labor (¶¶72-75, 216-17), and pricing (¶306). Indeed, Defendants Webb and Lee consistently provided detailed answers to direct analyst questions regarding the Morehead Facility's operations and labor. ¶¶72-75, 210, 213, 216-17, 220, 222, 304-308.

## V.    Defendants Disclose the Truth

On August 11, 2021, before market open, Defendants disclosed results for Q2 fiscal 2021. ¶¶242-44. Defendants disclosed a net loss of $32.0 million and lowered full year 2021 guidance ranges for net sales and EBITDA. *Id*. Defendants attributed the disappointing results and guidance to, *inter alia*, "operational headwinds…including labor and productivity challenges related to the training and development of the new workforce and historically low market prices for tomatoes." ¶243. Such "headwinds" devastated tomato quality, pricing, and yields—particularly with respect to Grade 1 tomatoes—and therefore depressed sales while simultaneously raising distribution and shipping expense ("*re*-pack and *re*-sort costs") incurred by rejections that were "much higher than expected." ¶¶242-44, 252. Defendants differentiated between market prices, which only affected Q2, and "labor and productivity challenges" which existed the entire first "*six months*" of 2021, eroding net sales due to "lower" Grade 1 "yields" and higher "distribution and shipping fees." ¶249.

During the 2021 Q2 Earnings Call, Defendants further admitted that AppHarvest's poor Q2 2021 performance and FY 2021 guidance were caused by training and turnover issues which negatively affected

12

product quality and reduced sales. ¶¶253-58; ¶¶254, 256 ("primary driver[s]" were inadequate "labor training" and "productivity challenges"). Lee confirmed the "challenges" were present for the "full season of harvest[.]" ¶257. Accordingly, Defendants assigned new "conservative" assumptions to operational performance going forward. ¶255; ¶328 (Lee admitting that it was not until the end of the Class Period when AppHarvest's guidance was "balanced" and "achiev[able]"). CW6 confirmed that AppHarvest's 2021 guidance revision reflected that Lee's previous "far-fetched ideas" were reconsidered in terms of what was realistically achievable. ¶245.

Investors were surprised and reacted negatively. Barclays thought "results clearly were below expectations" and blamed "lower than expected average sales price." ¶321. Cowen lowered its price target to $14 from $32 and noted the results were "very disappointing" and "ugly." ECF 81-46. Cowen stated that "productivity issues" "resulted in suboptimal mix (*implied net price per pound missed our model by ~50%*) and higher distribution costs." *Id.* On August 22, 2021, a report published on Seeking Alpha argued it was "disingenuous" for Defendants to "raise profitability expectations" in Q1 "ahead of what was clearly going to be a poor quarter." ¶324.

On this news, AppHarvest's common stock price fell $3.46 per share (approximately 29%) to $8.51 per share at close on August 11, 2021. ¶259. Likewise, AppHarvest's warrant price fell $1.72 per warrant (approximately 44%) to $2.15 per warrant at close on August 11, 2021.

## ARGUMENT

On a Rule 12(b)(6) motion, courts accept a complaint's factual allegations as true and "draw[] all reasonable inferences in the plaintiff's favor." *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 368 (2d Cir. 2014). Under Rule 9(b), an "alleged fraud need only be *plausible* based on the complaint; it need not be more likely than other possibilities." *Loreley Fin. (Jersey) No. 3 Ltd. V. Wells Fargo Sec., LLC*, 797 F.3d 160, 174 (2d Cir. 2015) (emphasis in original). "[D]ismissal is appropriate only where [a plaintiff] can prove no

set of facts consistent with the complaint that would entitle them to relief." *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 150 (2d Cir. 2021). Under Section 10(b) of the Exchange Act and SEC Rule 10b-5, a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011).

The Motion attacks falsity, scienter, and loss causation. Because the SAC plausibly states a claim for relief and satisfies all applicable legal standards, the Motion should be denied.

## I.    The SAC Adequately Alleges Materially False and Misleading Statements

Under Rule 9(b) and the PSLRA, falsity is adequately pled by "specify[ing] each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b). However, Plaintiff need not plead "detailed evidentiary matter[.]" *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001); *see also In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 161 (2d Cir. 2021) ("securities plaintiffs need not prove their entire case within the confines of the complaint[,]"). Rather, the SAC need only contain facts sufficient "to support a reasonable belief" that Defendants' statements were materially false or misleading. *Novak v. Kasaks*, 216 F.3d 300, 314 n.1 (2d Cir. 2000). Such inquiry is "evaluated not only by literal truth, but by context and manner of presentation." *Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019). Thus, a statement to investors "is misleading if a reasonable investor would have received a false impression from the statement." *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 180 (S.D.N.Y. 2010). Additionally, federal securities laws obligate speakers to be "both accurate and complete." *Noto v. 22nd Century Grp., Inc.*, 35 F.4th 95, 105 n. 49 (2d Cir. 2022).[2]

---

[2] If securities fraud is "sufficiently alleged" as to at least one misstatement, this "warrants denial of the motion to dismiss" and the Court need not review other alleged misstatements. *In re XL Fleet Corp. Sec. Litig.*, 2022 WL 493629, *3 (S.D.N.Y. Feb. 17, 2022); *In re Aphria Sec. Litig.*, 2020 WL 5819548, *9 (S.D.N.Y. Sept. 30, 2020) (same).

## A.  The SAC is Pled With Particularity and is Not a Puzzle Pleading

The SAC is not a "puzzle pleading" (DB 14 n. 7) simply because Defendants made many false statements. *In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 831 (N.D. Cal. 2014) ("breadth…alone" does not create a puzzle pleading). Such a rule would unfairly benefit prolific makers of false statements. Rather, Rule 9(b) and the PSLRA are satisfied where complaints "specifically identif[y] the date, publication and speaker of each of the alleged misstatements or omissions." *In re NTL, Inc. Sec. Litig.*, 347 F. Supp. 2d 15, 22-23 (S.D.N.Y. 2004); *In re MF Global Holdings Sec. Litig.*, 982 F. Supp. 2d 277, 309 (S.D.N.Y. 2013) (complaint sustained where it identified "each subsection conclud[ing] with a paragraph" explaining why the preceding statements were false).

The SAC identifies each alleged misstatement, who made it, where, when, and why it is false or misleading in a section entitled "Defendants' Material Class Period Misrepresentations and Omissions." ¶¶ 149-241; *see also* Ex. A. to the Hopkins Declaration. This is sufficient to state a claim and not qualify as a "puzzle pleading." *See Constr. Laborers Pension Tr. For S. Cal. v. CBS Corp.*, 433 F. Supp. 3d 515, 530 (S.D.N.Y. 2020). Indeed, Defendants' ability to make detailed arguments about why the alleged false statements are purportedly inactionable further "betrays" their "point." *Id.* at n.3.[3] Defendants' misstatements were often false or misleading by omission for common, overlapping reasons. Thus, Defendants' gripe that evidence supporting those reasons was frequently "identical" (DB 14 n. 7) rings hollow, because the same evidence was probative of falsity for many misstatements.

---

[3] Defendants' purported examples lend no support. DB 14 n. 7. Defendants opportunistically argue that AppHarvest's piece rate bonus described in Paragraph 218 does not pertain to Lee's statements in Paragraph 217 regarding staffing. *Id*. However, Defendants ignore that the evidence recited in Paragraph 218 clearly refers to the previous *two* paragraphs, which both contain Lee's statements *from the same interview*, to save space. Information regarding the Company's waste-causing piece rate system is directly relevant to Lee's claim that AppHarvest "validated the model" and "execute[d] well." ¶¶216, 218. Further, Defendants inappropriately cite to a snippet of Paragraph 213 concerning the "pandemic" without regard to context. DB 14 n. 7; *c.f.*, *In re Vivendi, S.A. Sec. Litig.*, 838 F. 3d 223, 250 (2d Cir. 2016) ("the test" is "whether the defendants' representations, *taken together and in context*, would have misled a reasonable investor.") (emphasis in original). Webb's response must be read in the context of the question he was asked—whether AppHarvest "struggled" "at all" with "labor." ¶ 213. Webb's answer that the Company suffered "virtually no impact," including with respect to staffing during a "pandemic" when analysts and market participants would have been keenly interested in the Company's ability to keep Morehead operating at full force, is unequivocally false. *See* ¶¶ 103-13, 213.

### B.  Misstatements Regarding Operations, Production, and Supply

Defendants affirmatively misrepresented AppHarvest's production capabilities and/or ability to

supply, including by making statements such as:

- Webb denying AppHarvest experienced "any issues with the supply and the distribution of [its] products" by stating "*Oh no*, that's our advantage" and touting "consistent supply coming out of our facilities[.]" ¶154 (2/1/2021); *see City of Pontiac Gen. Emples. Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 366-67 (S.D.N.Y. July 13, 2012) (misleading to deny "performance issues" in face of analyst questioning when reasonably inferred defendants "knew or recklessly disregarded" the truth).

- Webb falsely stating in response to analyst questioning "we have predictable growing practices," that AppHarvest had "a predictable supply year-round],]" and that "as much as we can build and grow, we'll, we'll be" distributing to "grocery shelves." ¶156 (2/1/2021).

- Webb touting AppHarvest's purported "favorable" and "better than anticipated" "crop yields" during AppHarvest's "toughest times." ¶¶169 (2/25/2021), 173 (3/1/2021).[4]

- Lee responding that "*every* tomato that we've produced has been readily put into the market" to analyst question regarding "first crop." ¶190 (3/4/2021); *see Public Emples. Ret. Sys. of Miss. v. Mohawk Indus.*, 564 F.Supp.3d 1272, 1300-1 (N.D. Ga. Sept. 29, 2021) (misleading to state "we have sold all of the [product] that we could make" where failing to disclose the alleged "extraordinarily high rate of defects" in company's products).

- Webb purported the ongoing "harvest" had "*proved* the team can handle the production ramp-up at our Morehead facility[.]" ¶193 (4/1/2021).

- Lee claimed AppHarvest had "execut[ed] well" responding to question about how the "startup went…in terms of optimizing production[.]" ¶216 (5/25/2021); *see In re Turquoise Hill Res. Ltd. Sec. Litig.*, 2022 WL 4085677, **33-35 (S.D.N.Y. Sep. 2, 2022) (Liman, J.) (stating "development has progressed well" could mislead regarding "true state of affairs").

- Webb responding to analyst question that the Morehead "facility operated at full…capacity with *no issues*[.]" ¶220 (5/26/2021).[5]

---

[4] Without the benefit of discovery and AppHarvest's internal records, CW6 could recall the "toughest times" lasted consistently from the end of Q1 2021, including all of March through the summer refresh in Q3 2021. ¶122. The Court can infer the undisclosed issues were occurring in February 2021. *Emples. Ret. Sys. v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015) (existence of undisclosed issues in one period supports "inference of similar circumstances" in other periods); *Iowa Pub. Emples.' Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137, 143 n. 13 (2d Cir. 2010) (same); *XL Fleet*, 2022 WL 493629, at *5 (same).

[5] *See also* ¶150 (2/1/2021) (purporting successful "first harvest" and "ship[ments] "); ¶199 (falsely representing "fast start[,]"

However, throughout the Class Period, production was ***unpredictable*** because of a perpetually revolving, understaffed, and untrained workforce whose "growing practices" ("production," "operat[ions]," *etc.*) caused wasted and low-quality tomatoes that were not "put into the market" (*i.e.*, were not "yield," "suppl[ied] or "distribut[ed]"). Indeed, AppHarvest admitted that for the entire first "***six months***" of 2021, net sales were affected by "lower overall No. 1-Grade production ***yields***." ¶249. Tellingly, the Motion does not dispute that these post-Class Period admissions pertain to the entire first "six months" of 2021—*i.e.*, beginning a full month before the first alleged misstatement. Further, Lee admitted that "executional challenges" existed the entire "full season of harvest" which began in January 2021. ¶257. Far from AppHarvest's operations experiencing "no issues," Lee and Eggleton instituted Leadership Meetings to "keep an eye on it," the Board demoted Butler from COO after just four months, and Lee intentionally disregarded adverse data that "needed to be factored in" to forecasts. ¶¶126, 140-41, 245.

Further, Defendants' misstatements were plainly material. It is implausible that Defendants would disclose the effect that productivity issues had on net sales for the first "six months" of 2021 (*i.e.*, including Q1), if such results were immaterial. Witnesses corroborated AppHarvest's admissions of materiality. According to CW1, productivity failures resulted in up to ten percent of tomatoes being wasted in the Greenhouse throughout his/her tenure. ¶78. CW5, who based his/her estimates on conversations with AppHarvest's Vice President of Greenhouse Operations and the Head Grower (¶78), understood that up to half of all tomatoes in the Greenhouse and Packhouse were wasted during the first growing season. CW6, who, like Defendants, had access to firm-wide data—and discussed the same with Eggleton and Lee each week (if not daily) throughout the Class Period—recalled that Morehead workers' productivity was "well

---

"encouraging operating and financial performance of our Morehead facility[,]" and demonstrated "ability to scale the business"), and that such performance "pleased" defendants); *Cf., Rosi v. Aclaris Therapeutics, Inc.*, 2021 WL 1177505, **11-12 (S.D.N.Y. Mar. 29, 2021) (Liman, J.) (statements that feedback was "very encouraging" and defendants were "pleased" would be actionable if, like here: speaker did not hold the belief professed, the supporting facts that the defendants supplied were untrue, or if the defendant omitted material information).

below 50%" of the Company's standards. ¶¶88, 123-29. It was materially false to positively tout the Company's ability to produce and supply tomatoes, when AppHarvest was having problems doing so. [6]

In addition to the statements being affirmatively false, it was materially misleading for Defendants to speak about AppHarvest's production and supply and omit that such supply consisted of low-quality tomatoes which, at best, commanded "little to no value" and,[7] at worst, resulted in rejections by Mastronardi causing higher distribution and shipping fees. CW6 confirmed rejections occurred during the Class Period "many times" more than the Company's target (upwards of 30% to 35%), and quality targets were "a long way off" (50% in at least one instance, if not more).[8] ¶¶88, 96. CW2, one of only four Quality Control Specialists at Morehead, confirmed that in Q1 2021 "half" of all tomatoes sent to the Packhouse were Grade 2 or "Bad"—data that CW6 confirmed was known by senior leadership in real time. ¶¶36, 63, 81. In other words, Defendants' statements regarding AppHarvest's production not only were false, but also materially "[in]complete" *Setzer v. Omega Healthcare Inv'rs, Inc.*, 968 F.3d 204, 214 n. 15 (2d Cir. 2020).[9]

Defendants' misstatements also bear classic hallmarks of fraud. For example, CW4's Class Period photographs (which the Motion completely ignores) reflected inordinate amounts of wasted crops and were representative of the entire Greenhouse's condition throughout the duration of the first de-leafing and

---

[6] *See Meitav Dash Provident Funds & Pension Ltd. v. Spirit AeroSystems Holdings, Inc.,* 2022 WL 377415, at \*\*7-10 (N.D. Okla. Jan. 7, 2022) (statements highlighting company's current "production levels" misleading where there was a plausible inference that defendants knew a "production cut had already been ordered").

[7] Defendants' claim that they did not "realize[]" Grade 2 tomatoes received little value until Q2 2021 is nonsense, and should not be credited on a motion to dismiss when the SAC plausibly alleges Defendants did know the price disparity between Grade 1 and Grade 2 tomatoes. *See* DB34; ¶257, *id.* at n. 12. Indeed, even analysts on the 2021 Q1 Earnings Call knew the difference in price of "non-grade 1" tomatoes. ¶207-9. Further, Defendants' quarrel with the USDA are irrelevant. DB4 n.3. The SAC alleges Defendants knew they were performing poorly on quality for Mastronardi.

[8] Defendants suggest CW6 offered "inconsistent" quality goals. DB23 n. 13. Not so. AppHarvest's quality goal (84-86%) was for tomatoes produced, which obviously needed to go through quality control. ¶87. AppHarvest's rejection target was for tomatoes that had already been inspected, assigned quality designations, and sent to Mastronardi. ¶96.

[9] *Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014) (speaking "on an issue or topic" creates "a duty to tell the whole truth"); *Boston Ret. Sys. v. Alexion Pharms. Inc.*, 556 F.Supp.3d 100, 124 (D. Conn. Aug. 19, 2021) (discussing "what drove" sole product's "financial success" required disclosure of "all material information"); *In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 564 (S.D.N.Y. 2011) (when a speaker omits facts, a "plaintiff need only demonstrate the materiality of the omitted facts" to demonstrate statement was misleading); *Freudenberg*, 712 F. Supp. 2d at 179 (speakers must do so "truthfully" and must "make such additional disclosures" so as not to mislead).

18

harvesting season, except when Webb told the staff to "hide the waste" from news media and investors. ¶83; *see also* ¶78 (CW1 confirms "shocking amount" of waste), ¶81 (CW2 confirmed produce "constantly" had imperfections). According to CW5, these clean-up jobs, which CW5 participated in, were initiated by Webb's team or Webb himself (who was admittedly at the Morehead Facility "every morning"). ¶¶84, 116. Such facts further support that Defendants' false statements were material and fraudulent. *Blanford*, 794 F.3d at 307 (statements regarding facility conditions misleading where some CWs confirmed actual conditions varied and were hidden from third parties (auditors), and other CWs (like CW6) were in "management positions with broader knowledge" of company-wide data and reported to executives); *Aphria*, 2020 WL 5819548, *8 (pictures evidencing conditions inconsistent with defendants' statements support material falsity).

## C.  Misstatements Regarding Price Performance

For the same reasons, Defendants' statements regarding positive price performance were false and misleading when Defendants knew price margins were suffering from low quality, and higher distribution and transportation fees due to rejections. With one month remaining in Q1, Webb falsely stated that AppHarvest's operational performance resulted in "favorable" and "better than anticipated" "market pricing." ¶¶169, 173. During the 2021 Q1 Earnings Call, a Cowen analyst asked Defendants to elaborate on these "pricing dynamics" (which Eggleton alluded to as an "*operational* highlight[]" during prepared remarks) and explicitly requested detail on "how much of that [blended price per pound result] was due to quality of the output, so non-grade 1 versus broader market conditions." ¶207, ECF 81-29 at 8, 11. Lee did not mince words. Rather, he falsely stated that "[w]hat we did well is we anticipated *and performed well* on – in market pricing." ¶207. Indeed, Defendants make much of a worsening tomato market in Q2 (DB9-10, 39), and Lee contrasted AppHarvest's "pricing" *performance* to competitors who were "less insulated" from a declining "broader market." ECF 81-29 at 11. Thus, Defendants' statements falsely reassured investors that AppHarvest's operational "perform[ance]" was acting as a price driver against any erosion

19

from a market downturn or other negative "pricing dynamics." These statements successfully misled analysts. *See* ECF 81-32 at 4 (Cowen analyst believing that less-than-expected price performance was due to product mix, not quality).

Defendants' statements regarding price performance were false, as "pricing" was not "favorable," "better," or "performed well on." Also, it was misleading to speak favorably about "pricing" of AppHarvest's sole revenue stream (Morehead's tomato crop), including when directly questioned by analysts, without disclosing known product quality and rejection issues affecting prices. *See In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, *6 (S.D.N.Y. Mar. 28, 2018) (statement about "favorable pricing" misleading when put "at issue" but defendant did not "tell the whole truth"); fn. 9, *supra.*

### D.  Misstatements Regarding Labor Availability, Recruitment, and Retention

From the beginning of the first growing season (October 2020) and intensifying throughout the Class Period, AppHarvest suffered "shocking" (¶104) turnover. ¶105 (CW1: from October 2020 through July 2021, 1 employee left CW1's team every 1-2 weeks, and 2-3 employees left Company every week); ¶107 (CW4: from October 2020 through end of Class Period, 10 personnel attritted every week from west half of Greenhouse *alone*); ¶108 (CW5: from October 2020 through June 2021, turnover was "consistently high"); ¶111 (CW6: attrition and retention metrics were "far worse than expected" and falling short "week over week" throughout the "toughest times"). All told, AppHarvest's workforce fell by twenty percent during the Class Period. ¶109.[10] Further, COVID-19 related absences "definitely" negatively affected total employee hours worked, and production. ¶¶112-13 ("a couple" employees called out sick each week on CW1's team alone, with "a lot" more absent Company-wide).

Defendants query whether labor issues were "material." DB24-25.[11] They were. According to

---

[10] The Court must accept Plaintiff's well-pled facts and ignore Defendants' request to draw inferences in their own favor regarding what they purportedly "were likely referring to" (DB25 n. 17). *Turquoise Hill*, 2022 WL 4085677, at *12.

[11] A classic red herring. Materiality "will rarely be dispositive in a motion to dismiss." *Altimeo*, 19 F.4th at 151.

CW5, "consistently high" churn, attrition, and absences were so disruptive that they were frequent conversation topics at daily morning Stand-Up Meetings attended by managerial-level Greenhouse staff who were concerned about having adequate labor to meet production requirements. ¶¶84, 108. Indeed, staffing issues were so pervasive that although AppHarvest pitched its ability to hire locally as a central pillar of its marketing strategy, AppHarvest was required to retain visiting contract laborers. ¶¶108, 326-27. Thus, AppHarvest admitted it had lower net sales and higher labor costs for each of the first "six months" of 2021. ¶249. Lee and Eggleton knew the harm that labor unavailability and churn had on productivity and sales in real time through weekly Forecast Meetings and twice-weekly Leadership Meetings (among other reports, meetings, and data) where turnover and hiring were discussed as the "root cause" of AppHarvest's challenges. ¶¶127, 268. Webb also observed the turnover when he greeted "everyone" at Morehead "every morning." ¶287.

Despite these known issues, Defendants made strikingly false disclosures in March and June of 2021 purporting: (i) AppHarvest's "Strengths" included its ability "to efficiently hire many employees" at Morehead; and (ii) that supposed availability of local workers "eager to find long-term" employment enabled AppHarvest to "staff and retain workers with less churn…and unfilled positions[.]" ¶¶177-78, 184-85, 225-26, 234-35.[12] Of course, hiring was not "efficient" or a "strength," but rather a perpetual, undesired consequence of undisclosed turnover. Thus, Defendants "created an impression" differing from the state of affairs "that actually existed." *Plumbers & Pipefitters Nat'l Pension Fund v. Davis*, 2020 WL 1877821, *7 (S.D.N.Y. Apr. 14, 2020).

Furthermore, Defendants made a barrage of media appearances to falsely assuage investors that they were diligently building out Morehead's workforce. ¶¶70-75. Defendants falsely stated:

- Webb denied AppHarvest "struggled" "at all" with labor availability during Morehead's ramp-up, claiming successful hiring and purporting AppHarvest accordingly saw "virtually ***no impact*** to operation." ¶213 (5/17/2021). *Baker v. SeaWorld Entm't, Inc.*, 423 F.Supp.3d 878, 939-40 (S.D.

---

[12] These disclosures were conspicuously removed after the Class Period. ¶326.

Cal. 2019) (actionable to state concealed information had "no noticeable impact on our business" where evidence to the contrary). Further, reference to "operation" renders the statement false and misleading for the reasons in Argument § I.B, *supra*.

- Lee responding to analyst question asking how the "startup went" by claiming successful hiring despite macroeconomic factors, such that AppHarvest's hiring efforts "***proved*** … the model" (*i.e.*, the plan to "hire locally"). ¶216 (5/25/2021).

- Lee responding to analyst that "COVID has not ***in any way*** impacted our operation"[13] and Defendants generally "haven't had ***any*** challenges with recruiting or staffing." ¶217 (5/25/2021). *In re Bear Stearns Cos., Inc. Sec., Deriv., & ERISA Litig.*, 763 F.Supp.2d 423, 494, 496 (S.D.N.Y. 2011) ("we haven't seen any difficulties" misleading where defendants "knew or should have known" otherwise)

- Webb purporting that AppHarvest had been able to "retain employees" and that unlike other firms in the pandemic "having issues of people showing up to work[,]" AppHarvest was successful in hiring "and they're showing up ***every day***." ¶222 (6/3/2021).

Defendants' statements were undeniably false. Further, having spoken on the issue, Defendants are liable for failing to disclose the "whole truth" about AppHarvest's issues regarding labor unavailability, recruitment, and retention. *Meyer*, 761 F.3d at 250; *see also* fn. 9, *supra*.

### E. False and Misleading Purported Justifications for Financial Guidance

Defendants attack a straw man. DB20-26. Despite their framing, the SAC does not allege Defendants' projections were false. Rather, Plaintiff claims Defendants materially misled investors by asserting purportedly rosy justifications—that were all present or backward-looking, and that Defendants knew were false and not based in fact—for their FY2021 projection decisions. ¶¶169, 173 (attributing guidance to "favorable" and "better than [] expected" "crop yields and market pricing," and "harvesting" performance); ¶199 (attributing guidance to "operating and financial performance" and "ability to scale"); ¶207 (attributing guidance to "market pricing" performance); ¶210 (attributing guidance to purported successful staffing and development of the "operating team" during Morehead's initial ramp-up); ¶216 (supposedly successful labor ramp up and operational execution were "the reason[s] why we affirmed"

---

[13] Defendants' conjecture regarding investors' thoughts about the pandemic is irrelevant. DB25 n. 18. Lee's statement was unequivocal and clearly would have created a misimpression.

FY2021 guidance).[14] Whatever basis Defendants had for their forecasts (if any), it was not their purported justifications regarding historical performance.

As set forth in Argument § I.B-D., *supra.*, AppHarvest's performance with respect to operations, pricing, and labor were material headwinds and did not support its reiterated or raised guidance. Indeed, CW6 confirmed at least once in the Class Period—*i.e.*, by May 17, 2021 at the latest (the last Class Period date Defendants issued FY2021 guidance)—Lee intentionally did not "factor[] in" such performance headwinds. ¶245 (AppHarvest's downgraded FY2021 forecasts included previously omitted productivity assumptions regarding training); *see also* ¶¶255, 257, 328 (Lee admitting same, including that during the Class Period FY2021 guidance was not based on what they "could achieve and hit"). Statements misrepresenting the factual underpinnings of a company's price guidance are actionable. *Rudani v. Ideanomics, Inc.*, 2020 WL 5770356, \*\*5-6 (S.D.N.Y. Sept. 25, 2020); *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F.Supp.2d 512, 568-70 (S.D.N.Y. 2011); *In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133 (S.D.N.Y 1999) (plaintiffs stated a claim where not relying on falsity of "projections and estimates, but rather the defendants' failure to disclose historical and existing material facts").

Defendants' chief defense to Plaintiff's allegations fails. Defendants repeatedly seek immunity for false statements "made during Q1" or when Q1 results were reported because AppHarvest attained its modest Q1 guidance. *See* DB24, 37, 39. Defendants cannot request favorable inferences that they did not have performance issues in Q1. *Steginsky*, 741 F.3d at 368. Moreover, this theory makes no sense.[15] *First*,

---

[14] *See also* ¶150 (attributing guidance to initial "harvest" "shipping" and "sales" performance). Defendants bizarrely misquote the SAC and contend that Plaintiff alleges seven instances where AppHarvest claimed it was "on track" to meet guidance. DB15 n. 8. The SAC does not challenge a single statement containing the phrase "on track." Defendants cannot re-write their own misstatements. Moreover, Defendants' statements provide specific information about the current situation that is severable from the projection, and thus, are dissimilar to an "on track" statement.

[15] Defendants trip up because their arguments are contradictory and implausible. Indeed, in the same sentence Defendants describe Q1 as both "challenging" and as having seen "positive results." DB8. Likewise, Defendants claim they "acknowledged" their challenges in Q1, and elsewhere they deny scienter. *Id.*; DB30-40. Conversely, the SAC's allegations are coherent and grounded in common sense: Defendants knew that performance was declining in Q1, but they misrepresented facts, shifted blame, and concealed the truth until the end of the Class Period.

Defendants knew each challenged statement was materially misleading when made—nothing else is required to state a claim, and AppHarvest's Q1 guidance is not alleged to be false, or otherwise at issue. *Second*, AppHarvest's relatively low Q1 guidance better supports an inference in ***Plaintiff's*** favor that Q1 net sales were materially impacted by operational and labor issues. Defendants issued Q1 2021 guidance (the only instance it has ***ever*** issued quarterly guidance) of $2.1-2.6 million on February 25, 2021, when the end of the quarter was reasonably visible. DB7; ¶167. The same day, AppHarvest ***raised*** FY2021 net sales guidance to $20-25 million. Accordingly, Defendants' Q1 forecast was proportionally low for the full year (only about 8-13% of the FY2021 forecast), especially considering Q3 would be affected by the summer refresh. However, investors had no reason to believe AppHarvest would not compensate for Q1, given: 1) the second half of the Morehead Farm was slated to soon begin harvesting (¶53); 2) AppHarvest raised FY2021 guidance and never (either before or after) broke it out by quarter; and 3) Defendants' false statements denying and concealing productivity, pricing, and labor issues, and purporting to justify FY2021 guidance based upon operational performance. Investors would have viewed the Q1 guidance far more skeptically if the truth was known. *C.f.*, *Vivendi*, 838 F. 3d at 258 (a statement's impact is measured by "what would have happened if [the speaker] had spoken *truthfully*") (emphasis in original).

## F.  Material Misstatements Regarding Speculative Risk Disclosures

Risk disclosures are actionable where, like here, Defendants are aware that the potential risk they are warning about has already transpired. *Meyer*, 761 F.32 245, 251; *In re Tenaris S.A. Sec. Litig.*, 493 F.Supp.3d 143, 161 (E.D.N.Y. 2020); *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F.Supp.3d 379, 409 (S.D.N.Y. 2020); *In re Allergan PLS Sec. Litig.*, 2019 WL 4686445,*24 (S.D.N.Y. Sept. 20, 2019); *Mylan*, 2018 WL 1595985, *9-*10. Plaintiff alleges that throughout the Class Period (including very late into Q2) Defendants repeatedly made speculative, contingent, and incomplete risk disclosures regarding AppHarvest's: 1) pricing and ability to manage its growth; 2) operations, production and supply, at Morehead; and 3) labor availability, recruitment, and retention. ¶¶161, 165, 181, 188, 196,

24

202, 229, 238; Ex. A at 18-37; 28-37; 54-63; 68-77; 96-106; 158-168; and 179-189.

Defendants simply ignore the SAC's well-pled allegations and instead claim it fails to allege any risk manifested, was material, and was known by Defendants. DB29. That is incorrect and insufficient to defeat falsity. Further, Defendants misplace reliance on *Chapman v. Mueller Water Prods.*, 466 F.Supp.3d 382 (S.D.N.Y. 2020) (Liman, J.). In *Chapman*, the Court recognized that unlike here the plaintiffs failed to allege "whether" the defects warned about "even existed," were material, or whether Defendants even knew of them. *Id.* at 406, *id.* at n.6. Also, the *Chapman* plaintiffs did not allege contemporaneous misleading, unequivocal denials of the underlying issues, as alleged here. *See* Argument § I.B-D, *supra*. Nor did Chapman involve issues plaguing the company's sole business operations or line of business. Given Morehead's centrality to AppHarvest during the Class Period, and Defendants' misrepresentations regarding its performance, "a reasonable investor could have been misled about the nature" of the Company's risks. *Chapman*, 466 F.Supp.3d at 406; *e.g.*, ¶202 ("any…period of reduced production at the Morehead facility" purportedly would be a "change[] or development[]" rather than a present fact).

### G. Material Omissions Regarding Net Sales and Violations of Item 303

Defendants' 2Q2021 Form 10-Q unambiguously differentiates between issues affecting net sales that existed in *both* Q1 and Q2 on the one hand, and issues affecting *only* Q2 on the other. ¶249. Defendants admitted that "labor and productivity challenges associated with the training and development of the new workforce" existed for "the three *and six months* ended June 30, 2021." *Id.* However, in the same exact sentence, Defendants stated that "low market prices" were only present for "the three months ended June 30, 2021." *Id.* Thus, net sales were materially impacted in Q1 by the items affecting the entire "six months." Indeed, "labor and productivity challenges" manifested as early as October 2020. Argument § I.D, *supra*. Accordingly, Defendants' statements in the 1Q2021 Form 10-Q, the June 4 Form S-1, and the June 9 Prospectus reporting on net sales, but omitting information that they deemed material enough to disclose after the Class Period was actionably misleading. *Siracusano*, 563 U.S. at 47.

25

Additionally, Item 303 (17 C.F.R. §229.303), requires companies to disclose trends and uncertainties affecting revenues in any quarterly reports, registration statements, or prospectuses. *See Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015); *see also* Item 11 of SEC Form S-1 (imposing duty to update previously-filed annual statement when a registration statement is filed with all "material changes in the registrant's affairs"). This is what AppHarvest did in the 2021 Q2 Form 10-Q with respect to "labor and productivity." However, since those same trends and uncertainties existed in Q1 and were known by Defendants, they should have been disclosed in the 1Q2021 Form 10-Q, the June 4 Form S-1, and the June 9 Prospectus (filed between 4.5-5.5 months after January 1, 2021—the beginning of the "six months"). *LeMatta v. Casper Sleep, Inc.*, 2022 WL 4637795, *2, *13 (E.D.N.Y. Sept. 30, 2022) (registration statement filed in February required disclosure of known issues occurring in "first quarter").[16]

## H.  Defendants' Additional Arguments Concerning Falsity Fail[17]

*First*, Defendants incorrectly argue the SAC alleges forward-looking statements protected by the PSLRA safe harbor. DB14-15; ECF 81-2. As explained above (Argument § I.G. *supra.*), Plaintiff does not challenge any sales forecasts. Rather, the SAC plausibly alleges Defendants disseminated present or backward-looking false justifications for their forecasts. *See* ¶¶150, 169, 173, 199, 209. Present or backward-looking aspects of such "mixed" statements are not protected. *City of Providence v. Aeropostale, Inc.*, 2013 WL 1197755, *13 (S.D.N.Y. Mar. 25, 2013); *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2018

---

[16] *See also In re Facebook, Inc. IPO Sec. & Deriv. Litig.*, 986 F. Supp. 2d 487, 513 (S.D.N.Y. 2013) (Item 303 triggered when Facebook became "aware" of the trend); *In re CPI Card Grp. Inc. Sec. Litig.*, 2017 WL 4941597, *3 (S.D.N.Y. Oct. 30, 2017) ("whether a pattern or occurrence is sufficiently lengthy to constitute a trend…should not be resolved at the motion to dismiss stage"). Defendants' cases are inapposite. DB28; *Stadnick v. Vivint Solar, Inc.*, 2015 WL 8492757, at *13 (S.D.N.Y. Dec. 10, 2015) (no allegations that the company was harmed by the known trends); *In re Coty Inc. Sec. Litig.*, 2016 WL 1271065, *7 (S.D.N.Y. Mar. 29, 2016) (plaintiffs did not plausibly allege management knew of the trend); *In re Turkcell Iletisim Hizmetler A.S. Sec. Litig.*, 202 F.Supp.2d 8, 13 (S.D.N.Y. 2001) (same, further, unlike in *Turkcell*, the SAC does not allege a one-time "decline in operating income," but rather known operating challenges affecting net sales admittedly since January 2021, and, according to CWs, as early as October 2020).

[17] Plaintiff adequately allege more than mismanagement. DB24 n.16. Where, as here, Plaintiff alleges Defendants concealed and misrepresented material information causing their statements to the market to be false and misleading, Plaintiff's claim rises well beyond mismanagement. *See In re VEON Ltd. Sec. Litig.*, 2017 WL 4162342, *8 (S.D.N.Y. Sept. 19, 2017) (not mismanagement where plaintiffs alleged false and misleading statements); *Freudenberg*, 712 F. Supp. 2d at 192-93 (same); *Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*, 2019 WL 3020946,*2 n.4 (9th Cir. 2019) (same).

WL 2382600, *8 (S.D.N.Y. May 24, 2018).[18] The only other two statements Defendants argue are forward-looking (¶¶156, 210) are not protected by the safe harbor because they were unaccompanied by **any** cautionary language, were plainly material, and were known to be false. *Turquoise Hill*, 2022 WL 4085677, at **38-39. Further, **every** statement attacked as forward-looking (*see* ECF 81-2) was misleading by omission because of Defendants' failure to state material facts regarding production, staffing, and/or pricing. Argument § I.B-D, *supra.* The safe harbor is inapplicable to material omissions. *Galestan v. Onemain Holdings, Inc.*, 348 F. Supp. 3d 282, 304 (S.D.N.Y. 2018).

*Second*, Defendants are wrong that the SAC alleges inactionable opinion statements. DB16-17. Misleading opinions **are** actionable where, like here, they "omit[ed] material facts about [each] speaker's inquiry into or knowledge of facts that would support the stated opinion." *Fresno Cnty. Emples. Ret. Ass'n v. comScore, Inc*., 268 F. Supp. 3d 526, 547 (S.D.N.Y. 2017); *Turquoise Hill*, 2022 WL 4085677, at *32; *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1327 (2015) ("If the real facts are otherwise, but not provided, the opinion statement will mislead"). Each purported opinion statement (ECF 81-4) was misleading by omission because of Defendants' failure to state facts regarding production, staffing, and/or pricing that were necessary so as not to mislead. Argument § I.B-D, *supra.*

Furthermore, the SAC is replete with facts plausibly alleging an inference that Defendants' purported opinions regarding productivity, supply, staffing, pricing (ECF 81-4) were not "honestly held." *In re Petrobras Sec. Litig*., 116 F.Supp.3d 368, 380-81 (S.D.N.Y. 2015) ("sufficient to infer that the Company disbelieved the alleged statements" where defendants "well aware" of issues); *comScore*, 268 F.

---

[18] Thus, Defendants' reliance on *In re Adient plc Sec. Litig*., 2020 WL 1644018, at *21 (S.D.N.Y. Apr. 2, 2020) and *Gray v. Wesco Aircraft Holdings, Inc*., 454 F. Supp. 3d 366, 384 (S.D.N.Y. 2020) is misplaced where, unlike in those cases, Plaintiff does not challenge forward-looking aspects of the alleged misstatements. DB15. Even if cautionary language were relevant, it offers no protection where, like here, Defendants know the language is predicated on speculative warnings of risks that have already transpired. *Compare* DB5-6 *with* ¶¶161-62; *see also Okla. Police Pension Fund & Ret. Sys. v. Teligent, Inc.*, 2020 WL 3268531, *10 (S.D.N.Y. June 17, 2020) ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired"); *Facebook*, 986 F. Supp. 2d at 515 ("To be meaningful, a cautionary statement must discredit the alleged misrepresentations to such an extent that the risk of real deception drops to nil.").

27

Supp. 3d at 547; *see e.g.,* ¶126 (Defendants initiated twice-weekly Leadership Meetings to "keep an eye" on problems concerning such topics); ¶279 (Webb, Lee, and other Board Member demoted Butler due to labor issues, including productivity, attrition, and churn); ¶¶83, 291(Webb's office surreptitiously staged the Greenhouse to conceal wasted tomatoes from guests). Defendants were "well aware" of productivity and labor issues. *Petrobras,* 116 F.Supp.3d at 380-81.

*Third*, Defendants' statements are not "puffery." DB16; ECF 81-3. "Puffery" must be "so vague, broad, and non-specific" that it is "immaterial as a matter of law." *MF Global*, 982 F. Supp. 2d at 305.[19] Statements that "may be mere puffery" in isolation may still be actionable when viewed in context, such as where statements "were made repeatedly in an effort to reassure the investing public" or where they are "at odds" with "what was actually going on" at the company. *Karimi v. Deutsche Bank Aktiengesellschaft*, 2022 WL 2114628, at *6 (S.D.N.Y. June 13, 2022).

Here, Defendants overlook the alleged misstatements' context. Defendants mostly challenge statements that were answers to analysts' or reporters' questions (DB16, citing ¶154; ECF 81-3, citing ¶¶156, 190, 213, 216, 217, 220, and 222), which are not puffery. *Turquoise Hill*, 2022 WL 4085677 at **34-35. Further, Defendants' statements cannot be considered puffery given their concerted campaign of speaking on the very same issues concerning labor, operations, production, supply, and price performance throughout the Class Period so as to "reassure the investing public[.]" *Karimi*, 2022 WL 2114628, at *6; *see also* Background § IV., *supra*, Argument § II.G., *infra*. Furthermore, Defendants' statements were more than optimism when Defendants knew them to be untrue. Argument § II., *infra*.; *Novak*, 216 F.3d at 315 (stating inventory "in good shape" or "under control" not puffery when the contrary was true). Thus, Defendants' statements were also "at odds" with reality. This is especially obvious for Defendants' many

---

[19] *In re Vivendi Universal, S.A*., 381 F. Supp. 2d 158, 182 (S.D.N.Y. 2003) (puffery thus is "generally not an appropriate basis" for dismissal).

unequivocal statements. *See* ¶¶154, 156, 190, 213, 217, 220, 222.[20]

## II.   The SAC Alleges An Overwhelming Inference of Scienter

The PSLRA requires Plaintiff to plead facts "giving rise to a strong inference" regarding Defendants' "state of mind." *Blanford*, 794 F.3d at 305. The inquiry is "whether *all* of the facts alleged, taken collectively," and not in isolation as Defendants attempt, "give rise to a strong inference of scienter[.]" *Tellabs, Inv. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007). Pleading in PSLRA cases occurs "without the benefit of discovery, and therefore," scienter inquiries "must be drawn from limited state of mind evidence augmented by circumstantial facts and logical inferences." *Alexion*, 556 F.Supp.3d at 131. Accordingly, the SAC's inference of scienter need only be cogent and compelling—not the only inference raised by the allegations, the most plausible inference, or irrefutable. *Tellabs*, 551 U.S. at 323-24; *Akerman v. Arotech Corp.*, 608 F. Supp. 2d 372, 382 (E.D.N.Y. 2009) (dismissal inappropriate where competing inferences "in equipoise"). Corporate scienter may be imputed from an individual defendant. *Turquoise Hill*, 2022 WL 4085677 at *52.

It is sufficient to allege an inference of scienter by pleading "conscious misbehavior or recklessness." *Blanford*, 794 F.3d at 306.[21] Recklessness "represents an extreme departure from" ordinary care "to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Rosi*, 2021 WL 1177505, *22. Recklessness is established by alleging "defendants' knowledge of facts or access to information contradicting their public statements." *Setzer*, 968 F.3d at 215.

---

[20] Defendants' cases are inapposite. DB16; *see Sanofi-Aventis,* 774 F.Supp.2d at 565 (statement did not relate to any "specific claims" about product, unlike here where statements address labor, operations, production, supply, and price); *Steamfitters Loc. 449 Pension Plan v. Skechers U.S.A., Inc*., 412 F.Supp.3d 353, 363 (S.D.N.Y. 2019) (same).

[21] Defendants argue they did not sell stock, DB30, but alleging stock sales is "not required to plead scienter[.]" *Freudenberg*, 712 F.Supp.2d at 200; *Lockheed Martin*, 875 F.Supp.2d at 371. Defendants also congratulate themselves for purchasing stock after the Class Period. DB30. This argument is a "non-sequitur" that adds nothing to the analysis because a defendant may purchase stock "for any number of reasons." *In re Guilford Mills, Inc. Sec. Litig.*, 1999 WL 33248953, at *5 (S.D.N.Y. July 21, 1999). Furthermore, the Court should not consider such purchases as they were not cited in or relied on in the SAC. But even if it did, all they show is Defendants bought low after disclosing the truth. That reinforces, not exculpates scienter. Defendants' citation to *Regeneron* is therefore inapposite. *In re Regeneron Pharms., Inc. Sec. Litig.*, 2005 WL 225288, *22 (S.D.N.Y. Feb. 1, 2005) (discussing purchases *during* class period).

Recklessness may also be inferred where "the defendants…failed to check information they had a duty to monitor." *Novak*, 216 F.3d at 311. Scienter is adequately pled "where the corporation chooses to selectively reveal positive information on a specific topic while concealing closely-related negative information." *In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, *22 (S.D.N.Y. Dec. 2, 2013).

### A. Actual Knowledge From Meetings

Throughout the Class Period, Lee and Eggleton attended weekly Forecast Meetings to discuss AppHarvest's productivity challenges, inadequate training, turnover, poor work ethic, and inconsistent hiring standards which were "repeatedly cited" as the "root cause" of AppHarvest's underproduction and forecast "gap."   ¶¶123, 127, 175. During Forecast Meetings throughout the first half of 2021, Lee and Eggleton also discussed attrition and retention metrics that were "far worse than expected" and falling short "week over week." ¶111. The Forecast Meetings got "quite operational" and focused on metrics such as yield and quality which were "primary inputs" to the forecast. ¶124, 264; *see City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*, 587 F. Supp. 3d 56, 98 (S.D.N.Y. 2022) ("detailed knowledge and involvement" support scienter). Further, Lee and Eggleton attended twice-weekly Leadership Meetings with the specific aim of "keeping an eye" on the Company's poor labor productivity, including yield and quality. ¶¶15, 122, 126; *Turquoise Hill*, 2022 WL 4085677, at *51-52 (scienter where defendant had someone "look into" problems); *Rosi*, 2021 WL 1177505, at *24 ("remediation meetings" support scienter). The same "root causes" discussed during Forecast Meetings were also "repeatedly cited" at Leadership Meetings. ¶127. Eggleton was also familiar with the minutiae of AppHarvest's financials and the challenges it faced through meetings with his direct reports, like CW6, where Eggleton spent "many hours" each day discussing financial matters relating to forecasting. ¶128.

Defendants' detailed knowledge of the undisclosed productivity and labor challenges through meetings such as the Forecast Meetings, Leadership Meetings, and CW6's daily interaction with Eggleton, support a strong inference of scienter. *See Okla. Firefighters' Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,

30

367 F. Supp. 3d 16, 36-37 (S.D.N.Y. 2019) (crediting scienter allegations that focused "predominantly" on monthly meetings); *Galestan*, 348 F. Supp. 3d at 300 (defendants "participated in numerous meetings and conference calls" where undisclosed issues "were discussed.").[22] Other executives, including Webb, were also privy to the same information; as CW6 reported, Company executives had information parity, such that "everyone knew what everyone else knew" regarding fundamental financial data.[23] ¶129. *Turquoise Hill*, 2022 WL 4085677, at *51 (crediting allegation that "everyone was always talking about" issues); *Cornwell v. Credit Suisse Grp.*, 689 F. Supp. 2d 629, 637-38 (S.D.N.Y. 2010) (same); *Turquoise Hill*, 2022 WL 4085677, at *52 ("natural to infer" individual would share information it with direct supervisor).

Defendants' attacks on CW6 fail. DB19, 33.[24] As Defendants concede, CW6 ranked high within AppHarvest and interacted directly with Defendants. DB38; ¶¶40, 123-128; *see Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 178-79 (2d Cir. 2020) (crediting CW who spoke to defendants); *c.f., Turquoise Hill*, 2022 WL 4085677 at *52 (CWs need not be "eyewitness or a fly on the wall"). Further, CW6's role corroborates CW6's allegations as the purpose of the FP&A team was to "corral information and disseminate it" to Lee and Eggleton for feedback. ¶123.

### B. Actual Knowledge From Mastronardi and Internal Reporting and Forecasting

Defendants' regular receipt and access to productivity, labor, and quality reports support finding scienter. ¶¶130-31; *Galestan*, 348 F. Supp. 3d at 300 (scienter pled where "Defendants and their direct reports received and had access to…reports detailing [] issues during the Class Period."); *Orthofix*, 89 F. Supp. 3d at 617 (crediting accounting reports in finding scienter).

---

[22] *See also Sjunde AP-Fonden v. Gen. Elec. Co.*, 417 F. Supp. 3d 379, 414 (S.D.N.Y. 2019); *Christine Asia Co. v. Ma*, 718 F. App'x 20, 23-24 (2d Cir. 2017); *Youngers v. Virtus Inv. Partners Inc.*, 195 F. Supp. 3d 499, 517 (S.D.N.Y. 2016); *Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 617 (S.D.N.Y. 2015).

[23] CW6's ***first-hand*** recollection of information parity and regular communication amongst high-ranking executives, including Defendants, is wholly different from a generalized belief or "rumor" that "pretty much everyone" knew something. DB33 (*citing Chapman*, 466 F. Supp. 3d at 399).

[24] All of Plaintiff's CW allegations are trustworthy because the SAC "alleges the business role of each confidential source" and pleads evidence corroborating the CW reports. *XL Fleet*, 2022 WL 493629 at *5. Indeed, corroboration from CWs who "span different levels of the Company hierarchy" bolsters scienter. *Galestan*, 348 F. Supp. 3d at 301.

31

**Mastronardi Reports**: Defendants were obligated to collaborate with Mastronardi to create forecasts for each harvesting season, which included detailed profit and loss documents (including sales, quality, yield, *etc.*) that Eggleton personally approved. ¶130, 263. Mastronardi also provided Defendants regular audits and negative feedback in response to subpar quality throughout the Class Period. ¶¶60, 67, 275. Further, because of the large number of rejections throughout the Class Period, Eggleton and Lee needed to reforecast to lower production expectations which were exchanged daily or weekly in the Mastronardi "portal." ¶¶60, 275.

**Internal Reports**: Defendants had live access to labor and productivity data in real time. ¶¶119-121, 131, 267. The SAC alleges: employees electronically recorded information each time they completed a task (CWs 1 and 4); quality inspections were recorded results in a live Excel (CW4); and quality and yield data from number of boxes shipped out was uploaded in real-time (CW6). *Id.* According to CWs 3 and 6, AppHarvest tracked such operational results which Defendants accessed to compare against the forecasts. ¶¶121, 263. Defendants' access to real-time data they should have been monitoring given their responsibility for creating AppHarvest's forecasts is sufficient to establish scienter. *Galestan*, 348 F. Supp. 3d at 301 (defendants "either had knowledge of information -- or had access to information that they should have monitored").[25]

Moreover, because AppHarvest was a new, small company with only one operating facility, data from Morehead was critical, and that Defendants would have consistently failed to review it defies credibility. *Aphria*, 2020 WL 5819548 at *9 ("critical" nature of data at issue reinforced inference

---

[25] *See also In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *14 (S.D.N.Y. Apr. 22, 2016) (access to inventory data supported scienter); *In re IMAX Sec. Litig.*, 587 F. Supp. 2d 471, 483 (S.D.N.Y. 2008) ("knowledge of, or access to," documents supported scienter); *AP-Fonden v. Goldman Sachs Grp., Inc.*, 545 F.Supp.3d 120, 142-43 (S.D.N.Y. 2021) (duty to monitor documents with "red flags" supported scienter). Defendants' reliance on *Set Capital* is misplaced. DB34; *Set Capital LLC v. Credit Suisse Grp. AG,* 996 F.3d 64 (2d Cir. 2021). There, the defendant company relied on a third party to analyze its data and review by the individual defendants would have been "redundant." *Set Capital*, 996 F.3d at 83-84. Further, there was no allegation the defendants had access to the data. *Id.* Here, Defendants were responsible for the forecasting process and had complete access to operational and forecasting data. ¶¶121, 263, 267.

Defendants knew or recklessly disregarded it). This is particularly true for quality and yield data (the "primary inputs" for revenue) at a time when Defendants were "revenue driven." ¶124. Likewise, reports, audits, and data exchanged with Mastronardi (the source of "substantially all" of AppHarvest's sales) were "critical," and would be known to Defendants. ¶65.

Defendants argue the SAC's allegations regarding "toughest times" are too vague. DB31-33. Not so. The SAC specifically delineates the intended period: late Q1 through AppHarvest's "summer refresh" in Q3 2021. ¶¶15, 122; n.4, *supra*. There is no requirement that the SAC must plead the exact dates of undisclosed issues, particularly if, like here, they occurred consistently over time. *Salix*, 2016 WL 1629341 at *14 (issues occurred and were reported over numerous quarterly reports); *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 13 (2d Cir. 2011) (monthly conference call discussions of inventory buildup "during the class period").[26] *Galestan* is instructive: the court credited CW allegations (only two of whom had contact with the defendants), describing "numerous meetings and conference calls" at which the relevant issues were discussed and reports that were circulated periodically, including to the defendants "during the Class Period." *Galestan*, 348 F. Supp. 3d at 300-302. The SAC's allegations regarding meetings and reports are similarly, if not more, detailed and concrete.

## C. Webb's Involvement Every Day at Morehead

During the Class Period, Defendants' executive offices were in the Morehead Facility. ¶¶291-92. Moreover, Webb confirmed interacting with AppHarvest's labor force "every morning," including "elbow tapping everyone as they come in." ¶287. Webb therefore witnessed the "shocking" amount of turnover, including a loss of 20% of AppHarvest's workforce in Q2 alone. ¶¶103-111. Similarly, Webb witnessed

---

[26] Defendants' cites are inapt. DB32. The *Chapman* plaintiffs failed to identify the "senior management" who received the reports. *Id.*, 466 F. Supp. 3d at 400. Further, Defendants are wrong that the SAC fails to identify information from reports contradicting Defendants' public statements. DB 32 (citing *Adient*, 2020 WL 1644018, at *28). For example, Mastronardi's weekly reports (which were necessary for Lee and Eggleton to reforecast) detailing rejected tomatoes "many times" more than AppHarvest anticipated clearly rendered Defendants' statements regarding operations, production and supply (*see* Argument, §I.B.) misleading. ¶¶60, 67, 96.

operational and productivity failures, including massive amounts of wasted tomatoes throughout the Morehead Facility. Webb took at least 16 interviews at the facility prior to and during the Class Period and bragged he would "sleep on the farms" and "[go] to our operations." ¶¶288-89. Moreover, at the same time he was stating that AppHarvest experienced "no impact to operation" in the first half of 2021, Webb or his office instructed CW5's team to "hide up the waste" when investors and news media visited. ¶¶213, 291-92; *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 238 (S.D.N.Y. 2010) ("incongruity between word and deed establishes a strong inference of scienter"). Courts give significant weight to site visits, like those alleged in the SAC, when analyzing scienter. *See Turquoise Hill*, 2022 WL 4085677 at **50-51 (visiting worksite supported scienter).[27]

### D. Defendants' Class Period Personnel Changes

Butler's suspiciously timed demotion (before many alleged false statements) and termination further support scienter. ¶¶277-85; *Rice v. Intercept Pharm., Inc.*, 2022 WL 837114, at *23 (S.D.N.Y. Mar. 21, 2022) (Liman, J.) ("resignations may add" to inquiry);[28] *In re Pareteum Sec. Litig.*, 2021 WL 3540779 at *17 (S.D.N.Y. Aug. 11, 2021) (timing of personnel change may pose strong inference of scienter "approaching recklessness or even conscious malfeasance"); *In re OSG Sec. Litig.*, 12 F. Supp. 3d 622 (S.D.N.Y. 2014) (same) (collecting cases); *Yannes v. SCWorx Corp.*, 2021 WL 2555437, at *6 (S.D.N.Y. June 21, 2021) ("timing and circumstances" of resignations support fraud allegation).[29]

---

[27] *Aphria*, 2020 WL 5819548 at *9 (site visits strongly supported scienter inference); *In re Avon Sec. Litig.*, 2019 WL 6115349, at *20 (S.D.N.Y. Nov. 18, 2019) ("trips to check on operations" supported scienter); *Sheet Metal Workers Loc. 32 Pension Fund v. Terex Corp.*, 2018 WL 1587457, *11 (D. Conn. Mar. 31, 2018) ("personal trips" supported scienter). Defendants' citations (DB36) are inapt. *Wochos* assessed only whether a statement was forward-looking and never reached scienter. *Wochos v. Tesla, Inc.*, 2018 WL 4076437, at *6 (N.D. Cal. Aug. 27, 2018). *Nappier* concerns observations by an outside auditor only responsible reviewing revenue recognition, not knowledge of company executives. *Nappier v. Pricewaterhouse Coopers LLP*, 227 F. Supp. 2d 263, 277 (D.N.J. 2002).

[28] In *Rice* the alleged resignations occurred after the class period, unlike Butler's demotion which occurred during the Class Period and before many of Defendants' misstatements. 2022 WL 837114, at *2, *23. Thus, unlike here, the *Rice* plaintiffs alleged "no additional facts" about the resignations rendering them suspicious. *Id.* at *23.

[29] *Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343 (2d Cir. 2022) is inapposite. DB35. The terminations there coincided only with negative news and no additional information as to the defendants' knowledge was alleged. *Id.* at 356. By contrast, Webb and Lee demoted (and terminated) Ms. Butler before the fraud was revealed, and according to CW6 and Defendants' own admissions, these decisions were because of the alleged issues. ¶¶277-85.

The circumstances of Butler's demotion and termination were highly suspicious. She was the most highest-compensated AppHarvest employee in 2020 and was stripped of her role as COO just four months after being promoted. ¶¶278-79. By letting Butler go via a two-step process, Defendants were able to postpone disclosure of her termination until after announcing Q1 results. ¶284. Webb and Lee were Board Members and therefore knew the circumstances pertaining to Butler's demotion and termination. ¶281; *see also Turquoise Hill*, 2022 WL 4085677, at *51 (sitting "on the Board of Directors" added to scienter). Far from "conclusory" (DB35), Plaintiff's allegations regarding the reasons for Butler's demotion and termination are supported by CW6's first-hand knowledge and Defendants' admissions. ¶¶141, 279-80.[30]

### E. Defendants' Admissions

In discussing Q1 results, Defendants made veiled and tacit admissions regarding operational and labor shortfalls at the Morehead facility, without disclosing the truth. ¶¶132-35, 301-03. When viewed "collectively" with Plaintiff's other scienter allegations (*Tellabs*, 551 U.S. at 323), these statements evidence that Defendants knew of operational challenges throughout the Class Period. For example, on the Q1 2021 Earnings Call Eggleton discussed anticipated margin "improve[ment]" in coming quarters and "greater labor productivity," while concealing operational issues and blaming a publicly known and already expected "phased launch" for AppHarvest's Q1 gross loss. ¶¶134. Lee presented an upbeat outlook, discussing a "summer refresh," "Morehead 2.0," and "new training" to support incremental "higher productivity," and such training would be merely additive to AppHarvest's supposed current "momentum."

---

[30] Under Defendants' own authority (DB35), CW6 was "in a position to know" why Butler was demoted and terminated given: (1) the SAC specifies CW6's role, length of employment, reporting structure, and job responsibilities (¶40); (2) Plaintiff's counsel had personal contact with the CW (SAC at 1); (3) and the CW allegations are corroborated by other facts including Defendants' admissions (¶280). *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 800-01 (S.D.N.Y. 2020). Defendants' remaining authority is far afield. *Lululemon* concerned the defendant's subjective state of mind when analyzing the falsity of an opinion. *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 580 (S.D.N.Y. 2014). *Glaser* paraphrased allegations from another case where the CW at issue was simply a neurologist associated with a medical trial, not in the defendants' reporting chain, and potentially not even an employee of the company. *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 589 (S.D.N.Y. 2011). Defendants also: 1) ignore that "everyone knew what everyone else knew" among executive management (which included CW6); and 2) entirely discount the possibility that Butler told CW6, her close colleague, why she was demoted and terminated.

¶¶133, 135. In reality, the future "productivity" Defendants referenced was not incremental, but rather, was to be gained by addressing concealed challenges that Defendants did not disclose until August 11, 2021.

Further, at the end of the Class Period Defendants acknowledged that "labor and productivity challenges" existed for *the entire 6 months* ended June 30, 2021 and caused "lower net sales." ¶297. Lee confirmed executional challenges were "very real" in AppHarvest's first "full season" of harvest. ¶298. Similarly, Lee admitted AppHarvest's revised FY2021 guidance reflected new "conservative" productivity assumptions. ¶255; ¶328 (only after Class Period guidance was "balanced" and "achiev[able]"). The revision contrasted to prior guidance, which reflected "far-fetched ideas" and ignored challenges Lee had been informed were not yet accounted for. ¶245. Such admissions support scienter Defendants were aware operational issues existed throughout the Class Period. ¶299; *Hall v. Children's Place Retail Stores, Inc.*, 580 F. Supp. 2d 212, 227 (S.D.N.Y. 2008) ("[A]dmissions of misrepresentations, coupled with defendants'… knowledge of company affairs is enough to adequately infer scienter.").

### F.  Core Operations

Plaintiff's scienter allegations are bolstered by the "core operations doctrine," which provides that "the fact that [] statements concern[] the core operations of the company supports the inference that the defendant knew or should have known the statements were false when made." *Yannes*, 2021 WL 2555437 at \*5; *see also Turquoise Hill*, 2022 WL 4085677 at \*47 (core operations doctrine "may be considered as part of a court's holistic assessment").[31] Core operations include matters "critical to [a company's] long-term viability" or affecting a "significant source of income." *Hi-Crush*, 2013 WL 6233561 at \*26. Defendants acknowledged in several Class Period filings that AppHarvest "will rely solely on the operations at the Morehead Facility." ¶¶293-94. Thus, the Morehead Facility—AppHarvest's lone

---

[31] Both *Evoqua*, 450 F. Supp. 3d at 424 and *In re Chembio Diagnostics, Inc. Sec. Litig.*, 2022 WL 541891, at \*10 n.9 (E.D.N.Y. Feb. 23, 2022) are inapposite because those complaints alleged no other plausible allegations supporting scienter.  DB36-37.

operating facility and source of ***100%*** of its revenue—is a prototypical core operation. ¶¶293-95.[32]

### G.  Defendants Held Themselves Out as Knowledgeable About Farm Operations

Webb held himself out as knowledgeable about operations and labor retention at Morehead by touting his regular presence and interaction with employees (¶¶116-17) and by answering, with specificity, questions concerning those issues (¶¶210, 213, 220, 222). Likewise, Lee held himself out as knowledgeable by answering, with specificity, direct questions about production (¶190), labor (¶¶216-17), and pricing (¶280). *See also* ¶¶74, 304-308. These facts support scienter.[33] *In re Nielsen Holdings PLC Sec. Litig.*, 510 F.Supp.3d 217, 237 (S.D.N.Y 2021) (frequent discussion on topic probative of scienter) (citing cases); *Avon*, 2019 WL 6115349 at *11 (same).[34]

### H.  Plaintiff's Scienter Theory is Cogent and Compelling, Whereas Defendants' is Implausible

Plaintiff's theory of scienter is far more compelling than Defendants' countertheory. AppHarvest was a brand-new company, incorporated in 2018, and was Webb's brainchild. ¶28. AppHarvest was also in its first growing season, was recently listed on the Nasdaq, was using an exotic corporate form, and was executing a novel business plan—all of its crops are grown domestically, indoors, using capital-intensive CEA. ¶41. Thus, AppHarvest's production and labor were both of personal importance to the Individual Defendants and were being scrutinized by a curious and potentially skeptical investor base. The first quarter of 2021, in particular—*i.e.*, the first quarter AppHarvest would report financial results to Wall Street—was of nearly existential importance to Defendants. But AppHarvest's growing season was beset with

---

[32] *Compare Avon*, 2019 WL 6115349 at *20 (problem in company's "single largest market" a core operation); *Yannes*, 2021 WL 2555437 at *5 (deal valued at $840 million "core" when total reported tangible assets approximated $1.2 million); *Lexmark*, 367 F. Supp. 3d at 38 (subdivision of company sufficiently "core"); *Hi-Crush*, 2013 WL 6233561 at *26 (agreement constituting 18% of projected revenues "core").

[33] Defendants' contention that this argument "makes no sense" lacks merit. DB38. Defendants' citations are inapt.  *See In re Campbell Soup Co. Sec. Litig.*, 2020 WL 7022655, at *7 n.4 (D.N.J. Nov. 30, 2020) (plaintiffs failed to show defendants knew facts contradicting their statements); *Miao*, 442 F. Supp. 3d at 806 (allegations were "founded on nothing more than a defendant's corporate position").

[34] *See also Yannes*, 2021 WL 2555437 at *5 (scienter where defendant "held himself out" as knowledgeable); *Strougo v. Barclays PLC*, 105 F. Supp. 3d 330, 351 (S.D.N.Y. 2015) (same); *See S. Ferry LP #2 v. Killinger*, 687 F. Supp. 2d 1248, 1259 (W.D. Wash. 2009) (discussion "in the face of direct questioning" indicate actual knowledge).

challenges, and Defendants wished to avoid appearing as though they were stumbling out of the gate. Accordingly, Defendants knowingly or recklessly misled investors, while gambling that they would turn the business around or that the market price for tomatoes would rebound and throw them a life raft. But "[t]he fact that a gamble—concealing bad news in the hope that it will be overtaken by good news—fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble." *Davis*, 2020 WL 1877821, *13; *Terex*, 2018 WL 1587457, *11 n. 16.

Conversely, Defendants' theory is implausible. Under their theory, Defendants were blissfully ignorant of issues that admittedly were material in Q2 until June 10 (the day after the last false statement). They managed to maintain this ignorance despite regularly visiting "operations" and encountering physical evidence (¶¶83, 287-89), attending meetings where the issues were discussed in detail (¶¶14-15), ready access to all pertinent data (¶¶263, 267, 309), an entire FP&A team whose role was to corral financial for them (¶123); demoting AppHarvest's COO (¶¶32, 279), and speaking regularly about the issues in detail. At the very minimum, these facts demonstrate Defendants' recklessness.

## III.    The SAC Plausibly Alleges Loss Causation

A plaintiff's burden in alleging loss causation is a "low one at the pleading stage" *Rosi*, 2021 WL 1177505, at *25-26. The SAC need only allege that "the subject of the fraudulent statement or omission was the cause of the actual loss suffered." *Abramson*, 965 F.3d at 179. This occurs when a plaintiff "allege[s] that their share's price fell significantly after the truth became known through" disclosure of the fraud. *Id.* at 179-80. Plaintiff has done so.

The SAC alleges that the truth concealed by Defendants' Class Period misrepresentations was revealed on August 11, 2021, by Defendants' disclosures in the 2021 Q2 Earnings Release, the 2021 Q2 Earnings Presentation, the 2021 Q2 Earnings Call and the 2Q2021 Form 10-Q. ¶¶242-44, 248, 250-56. Defendants argue in conclusory fashion that Plaintiff failed to plead "a specific fact" which the alleged

38

corrective disclosure revealed.[35] DB40. However, the Motion fails to grapple with the fact-rich corrective disclosures in the SAC or explain why such highly detailed disclosures do not relate to the same "subject" as the alleged misrepresentations. This is fatal to Defendants' loss causation challenge. *CVS Pharmacy, Inc. v. Press Am., Inc.*, 377 F. Supp. 3d 359, 383 (S.D.N.Y. 2019) (a party is "deemed to have conceded an argument by failing to address it").

Furthermore, even a cursory review of the SAC reveals that such disclosures concerned the same "subject of the fraudulent statement[s] or omission[s]" alleged. *Abramson*, 965 F.3d at 179. For example, the 2Q2021 Form 10-Q revealed, *inter alia*, that the Company's "labor and productivity challenges" due to lower quality yields and higher related distribution and shipping fees had existed for the "***six months***" ended June 30, 2021. ¶249. *See also* ¶¶242-43 (2021 Q2 Earnings Release disclosing "operational headwinds…including labor and productivity challenges related to the training and development of the new workforce" resulting in lower net sales and revised full-year 2021 net sales guidance); ¶¶250-52 (2021 Q2 Earnings Presentation explaining "operational issues in first growing season" that "significantly impacted revenue"); ¶¶253-58 (2021 Q2 Earnings Call describing "labor training and productivity challenges" — including lower quality production and saleable yield, and higher distribution and shipping expense incurred as a result of rejections—which were "the primary driver of our Q2 results" and existed for the "full season of harvest as a Company"). *See Van Dongen v. CNinsure Inc.*, 951 F.Supp.2d 457, 476-78 (S.D.N.Y. 2013) (loss causation well-pled where press release "contained several statements" linking results to concealed issues); *id.* (corrective disclosure need not be a "mirror image").

To the extent Defendants contend the corrective disclosures were not "new to investors" (DB40), again, they fail to explain why that is so, thus their argument is conceded. *CVS Pharmacy*,

---

[35] Defendants' reliance on *Rhodia* is misplaced not only because the SAC does allege "specific facts," but also because the plaintiff in *Rhodia* sought recovery not from a "sharp drop" (as alleged here), but for gradual losses incurred over an entire thirty-five-month period. DB40. *In re Rhodia S.A. Sec. Litig.*, 531 F. Supp. 2d 527, 545-46 (S.D.N.Y. 2007). *Rhodia* acknowledged that "a public disclosure…is the incident which satisfies the loss causation requirement." *Id.* at 545.

377 F. Supp. 3d at 383. Further, it is "inappropriate" to argue "truth on the market" on a Rule 12(b)(6) motion. *Karimi*, 2022 WL 2114628, at *8. Defendants also lack support for their "truth on the market" argument. Eggleton's statement regarding "varying levels" of quality in Q1 (DB8) is the type of vague, "general disclaimer" that does not substantiate a truth on the market defense. *Id.* Especially so when Lee "publicly denied" problems with price performance on the same call, and Defendants continued to make false statements. *Reckitt Benckiser*, 587 F.Supp.3d at 82-83. Moreover, the Cowen analyst Defendants cite (DB9)[36] lowered Cowen's price target 56.25% and noted "productivity issues" were "very disappointing" and "resulted in suboptimal mix (***implied net price per pound missed our model by ~50%***) and higher distribution costs." ECF 81-46. Defendants cannot demonstrate any corrective information was "conveyed to the public with a degree of intensity and credibility" during the Class Period sufficient to "counter-balance" their misstatements. *Karimi*, 2022 WL 2114628, at *8; *Reckitt Benckiser*, 587 F.Supp.3d at 82.

In response to the corrective disclosures, AppHarvest's common stock price fell $3.46 per share (approximately 29% day-over-day), and AppHarvest's warrant price fell $1.72 per warrant (approximately 44%), on exceptionally heavy trading volume. ¶259. Thus, the Court should find the SAC adequately pleads loss causation because the price of AppHarvest's securities "fell significantly after the truth became known[.]" *Abramson*, 965 F.3d at 179.

## CONCLUSION

For the foregoing reasons, Defendants' Motion should be denied in its entirety.[37]

DATED: November 22, 2022                    Respectfully submitted,

**LEVI & KORSINSKY, LLP**

---

[36] Cowen's speculation regarding quality does not prevent Defendants' detailed corrective disclosures from containing "new" information. ECF 81-46 (surmising "*likely* lower Grade 1 output"); *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.,* 2019 WL 5287980, *33 (S.D.N.Y. Oct. 18, 2019), (defendant confirmation of analyst expectation is "sufficient to make the information contained in the disclosure new to the market, and therefore a corrective disclosure").

[37] Because the SAC adequately alleges Section 10(b) claims, the SAC adequately alleges Section 20(a) claims. *In re Delcath Sys. Sec. Litig.*, 36 F. Supp. 3d 320, 336 (S.D.N.Y. 2014). If the Court grants any part of the Motion, Plaintiff respectfully requests leave to amend. *See Schiro v. Cemex, S.A.B. de C.V.*, 2019 WL 3066487,*15 (S.D.N.Y. July 12, 2019).

By: __/s/ Shannon L. Hopkins__
Shannon L. Hopkins (SH-1887)
Gregory M. Potrepka (GP-1275)
1111 Summer Street, Suite 403
Stamford, CT 06905
Telephone: (203) 992-4523
Facsimile: (212) 363-7171
shopkins@zlk.com
gpotrepka@zlk.com

*Counsel for Lead Plaintiff and Lead Counsel for
the Class*

41