## Exhibit A

# STATEMENTS ALLEGED TO HAVE BEEN FALSE AND MISLEADING

**False Statement I**[1]

| **Statement Category:**<br>Misstatements Regarding Operations, Production, and Supply<br>False and Misleading Purported Justifications for Financial Guidance |
| :---: |
| **Speaker(s); Date; & Medium**<br>Defendant Lee as to the quoted portion, and all Defendants as to the remaining portion; February 1, 2021; Company Press Release via Globe Newswire, the Investor Relations section of AppHarvest's website, Exhibit 99.1 to Form 8-K signed by Defendant Eggleton and filed with the SEC |
| **False and Misleading Statements or Omissions** [2]<br><br>AppHarvest President David Lee [said,] "…**With our first harvest already underway and produce shipping to major grocery outlets, we reiterate our full-year 2021 guidance.**"<br><br>**Supported by early sales from its first harvest, AppHarvest reaffirms guidance on full-year 2021 net revenue** of $21 million **and Adjusted EBITDA** of ($41) million **provided during its Analyst Day presentation on December 15, 2020.** ¶150) |

| **Reasons Why Statements are False, Misleading, and/or Lacked a Reasonable Basis** | **Facts Giving Rise to Strong Inference of Scienter** |
| :---: | :---: |
| Reasons:<br><br>**False Statement I** gave the false and misleading impression that the Company's "harvest," "shipping," and "sales" to date provided a basis for and "supported" Defendants' decision to "reiterate" and "reaffirm[]" the Company's full-year year net revenue and Adjusted EBITDA guidance. The Company's previous guidance that was being "reiterate[d]" and "reaffirm[ed]" was created in December 2020, before the Company even began harvesting, shipping, or selling tomatoes. | • CW6 met with Defendants Eggleton and Lee weekly concerning the baseline forecast, and upside and downside scenarios. ¶264. These weekly Forecast Meetings got "quite operational" and focused on various productivity metrics, with a key focus on yield and quality which was the basis for AppHarvest's revenue. *Id.* Throughout the first half of 2021, Lee and Eggleton also discussed that attrition and retention metrics that were "far worse than expected" and falling short "week over week." ¶111. During the "toughest times," (end of Q1 through the "summer refresh" at the end of the Class Period) discussions at Forecast Meetings concerned: "ways to |

---

[1] Unless otherwise noted, capitalized terms shall have the same meanings as ascribed to them in the Second Amended Class Action Complaint (ECF 76).

[2] Statements that are alleged to be false and misleading are bolded and underlined. The remaining statements are provided for context.

However, AppHarvest's "harvest," "shipping," and "sales," all of which commenced in January 2021, were already performing poorly and affected by insufficient staffing given that:

Evidence:

(i)    Defendants admitted that for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)   Defendants admitted that for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii)  Defendants Lee's and Eggleton's veiled admissions on the Q1 2021 Earnings Call that "training" issues existed in the first quarter of 2021 that were hampering "productivity" and driving gross loss;

(iv)   Defendants' admissions in the 2021 Q2 Earnings Release, the Q2 2021 Earnings Presentation, and the 2021 Q2 Earnings Call that "operational" and "executional" challenges—including lower quality production and saleable yield, and higher distribution and shipping expense incurred as a result of rejections—existed for the "initial growing season" and the "full season of harvest as a Company";

close the gap" between AppHarvest's underperformance compared to the current forecast; the expected time needed for the closing the gap depending on the various scenarios; and the Company's issues with employee training, turnover, poor work ethic, and inconsistent hiring standards which were "repeatedly cited" as the "root cause" of the overall production challenges. ¶264.

• Labor productivity was identified as a challenge for AppHarvest in 2020, and during the "toughest times," (end of Q1 through the "summer refresh" at the end of the Class Period) Defendants instituted Leadership Meetings twice a week, which included Lee, Eggleton, CW6 and other FP&A personnel, Marcella Butler, and Julie Nelson. ¶268. Labor productivity metrics included yield, quality, rejections from Mastronardi, attrition and employee absences, and productivity metrics for the various Greenhouse workers' particular functions. *Id.*    According to CW6, inadequate training, turnover, poor work ethic and inconsistent hiring standards were "repeatedly cited" as the "root cause" of the Company's productivity challenges at these Leadership Meetings. CW6 recalled the Leadership Meetings occurred usually mid-week and end-of-week so that Defendants could "keep an eye on it." *Id.*

• CW6 confirmed AppHarvest's executive management had information parity, such that "everyone knew what everyone else knew" regarding fundamental financial data. ¶129.

• CW6 confirmed that at the end of each month, results concerning pricing, labor productivity (including yield and quality), construction costs, tomato grades, and other factors would be "pulled into" FP&A models and adjustments would be made to the Company's forecasts. ¶265. CW6 and Defendant Eggleton met for "many hours" each day

(v)    according to CW1 and CW4, AppHarvest did not offer employees adequate (if any) training throughout the Class Period. According to CW1, AppHarvest's inadequately trained workforce contributed to 5-10% of crops being wasted or damaged during CW1's tenure, which resulted in lost sales. According to CW5, up to 50% of AppHarvest's crop was wasted in the first growing season caused by workers in the Greenhouse and Packhouse. Further, CW4 confirmed that tomatoes were wasted "daily" during harvesting season;

(vi)    CW6 explained that during the Class Period, AppHarvest's attrition and retention metrics in the first half of 2021 were far worse than expected because AppHarvest was clearly falling short week over week. Indeed, according to CW1 and CW2, throughout the Class Period, AppHarvest suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including:

    a.    dissatisfaction with mandatory expanded working hours—including forced overtime, Saturdays, and holidays, and

    b.    infection and quarantining due to the COVID-19 pandemic,

all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes.

discussing these near-, medium-, and long-term financial forecasts. *Id.*

- CW6 confirmed that AppHarvest productivity forecasts were sent to Mastronardi on a weekly, and possibly daily basis. ¶266. According to CW6, these forecasts included estimates of labor productivity to determine the volumes of beefsteak and Tomatoes on the Vine that would be harvested in the given period. *Id.*

- Mastronardi provided Defendants with daily updates, regular audits, and negative feedback in response to subpar quality throughout the Class Period. ¶¶60, 67, 275. Mastronardi increased the frequency of its audits on the AppHarvest tomatoes during periods of "weaker" performance by AppHarvest, which resulted in Mastronardi rejecting a lot of tomatoes. ¶275. During the "toughest" periods of rejected tomatoes (the end of Q1 2021 through the "summer refresh"), it was necessary for AppHarvest to lower estimated production forecasts, a process that involved CW6, Eggleton and Lee, which were exchanged with Mastronardi in a shared "portal." *Id.*

- As confirmed by CW3, CW6, and the Mastronardi Morehead Agreement Defendants Eggleton and Lee were intimately involved in various forecasting processes—forecasts which included sales, quality, costs, yield, price, estimated rejections, and estimated damaged tomatoes. ¶263.

- CW3 confirmed that AppHarvest's forecasts existed prior to the commencement of the first growing season and that Defendant Eggleton approved the forecasts. ¶263. CW3 further explained AppHarvest had planning software, Microsoft Dynamics, which tracked operational results and actual costs, and the Individual Defendants had access to this

3

CW4 likewise stated that there was significant turnover throughout CW4's tenure at AppHarvest, with the west side of the Greenhouse losing at least 10 personnel every week. CW4 stated that the turnover resulted in less trained staff and thereby lower yields because there were fewer Crop Care Specialists to do the work.

CW5 confirmed that employee turnover and churn had been consistently high throughout October 2020 and June 2021, causing concern amongst Greenhouse personnel that AppHarvest had inadequate labor to meet production requirements as was discussed at the morning stand-up meetings CW5 attended;

(vii) according to CW1, CW2, and CW4, throughout the Class Period, AppHarvest's own incentive piece rate structure incentivized disruptive and inefficient workmanship that wasted, damaged, and produced low quality tomatoes;

(viii) CW6 stated that Mastronardi informed AppHarvest that it needed to tighten up specifications because Mastronardi was having to reject a lot of fruit throughout the Class Period—upwards of 30% to 35% during the Company's "toughest times," which was "many times" more than AppHarvest's target which CW6 believed was 6% or 7%;

(ix) according to CW2, "half" of all tomatoes inspected were USDA Grade No. 2 or not commercially saleable, and CW6 confirmed that AppHarvest was a "long way off" its quality goals;

(x) CW6 stated that in the "toughest times" of the first growing season AppHarvest was well below 50% in

software. *Id.* CWs 3 and 6 stated that AppHarvest used such real time production data to create and track against AppHarvest's forecasts. ¶¶121, 130, 263.

- CW6 confirmed AppHarvest had real-time access to quality and yield data from the Packhouse based on the types of boxes being shipped (Grade 1 versus Grade 2). ¶267. Further, CW 1 and CW4 stated that AppHarvest had real-time access to productivity metrics from the Greenhouse that were recorded by scanners when workers finished working on a particular row and uploaded to the Company's electronic files. ¶120. CW4 confirmed that such real-time data included information from quality inspectors who recorded their results into a "live" excel spreadsheet so that AppHarvest could "map" quality performance. ¶85.

- Defendant Webb frequently visited the Morehead Facility prior to and throughout the Class Period where he filmed at least 16 interviews, gave tours, and visited operations, and would have, and did, see the Company's dysfunctional production facilities and widespread attrition and churn. ¶289. Indeed, Webb admitted he was at the facility "every morning" and that he was "in the facility, you know, elbow tapping everyone as they come in." ¶287. Webb further admitted that he loves to "sleep on the farms" and "going to our operations." ¶288.

- Webb or his office instructed CW5's team to "hide the waste" when investors and news media visited so that the Greenhouse had "better eye appeal." ¶¶83-84, 291.

- Defendants' admissions that "labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility" existed for the entire "*six months* ended June 30, 2021," which caused

| | |
|---|---|
| relation to the Company's productivity standards for specific Greenhouse jobs. ¶151 | "lower net sales due to lower overall No. 1-grade production yields" as well as "higher related distribution and shipping fees." ¶297 |
| | • Defendants' admissions that "executional challenges" spanned the entire Class Period because as they were "very real in our first major full season of harvest as a company" and the harvest season began in January 2021; and challenges lasted entire "initial growing season" and "first growing season" which began in October 2020. ¶298. |
| | • Lee admitted Defendants assigned new "conservative" assumptions to operational performance with respect to the Company's outlook to investors, and further admitted it was not until the end of the Class Period when AppHarvest's guidance was "balanced" and "achiev[able]." ¶¶255, 328. CW6 confirmed that Defendant Lee always took the most "aggressive" forecast positions, including in instances where he was informed that AppHarvest's challenges still needed to be factored in. ¶¶124, 245. |
| | • Throughout the Class Period the Morehead Facility was the site of the Company's sole production operations and core business. ¶286. |
| | • Defendants frequently spoke in detail regarding staffing issues, tomato production, financial forecasts, and other key metrics every quarter and intermittently in various media interviews, which adds a strong inference of scienter. ¶299. |
| | • AppHarvest was entirely reliant on its sole distributor Mastronardi, which required top-quality Grade 1 tomatoes. ¶270. In fact, AppHarvest filed at least 18 documents with the SEC, including documents signed by the Individual Defendants, stating the Company was "highly dependent" on |

|  | Mastronardi, and Webb signed and initialed every page of the Mastronardi Morehead Agreement which required Mastronardi to accept all USDA Grade 1 tomatoes and saddled AppHarvest with all of the risk and costs of non-Grade 1 tomatoes, which Defendants knew would be rejected by Mastronardi and had "very little to no value." ¶¶271, 270. |
| --- | --- |

**False Statement II**

| **Statement Category:** Misstatements Regarding Operations, Production, and Supply |
|---|
| **Speaker(s); Date; & Medium** Defendants Webb and Lee; February 1, 2021; Interview with Kristen Scholer on Cheddar News |
| **False and Misleading Statements or Omissions** <br><br> Scholer: So Jonathan, I want to bring you in as well because we saw some of this action first hand recently. So your first tomato harvest – just a couple of weeks ago making its way to the different grocery stores – we're talking about Walmart, Publix, Kroger, Food City among others. Your location in Central Appalachia – how is that conducive to business? <u>Have there been any issues with the supply and the distribution of your products</u>? <br><br> Webb: **Oh no, that's our advantage**…Our job right here is to keep charging and build facilities on the ground and David Lee and our Board member Martha Stewart and others are thinking through – you know – what are those [] products that we can be making with this good, healthy, **consistent supply coming out of our facilities** here in Central Appalachia. ¶154. |

| **Reasons Why Statements are False and Misleading, and/or Lacked a Reasonable Basis** | **Facts Giving Rise to Strong Inference of Scienter** |
|---|---|
| Reasons: <br> Defendant Webb's statements, made in Lee's presence, touting the Company's purported "consistent supply" as an "advantage" and refuting "any issues" with AppHarvest's "supply and distribution" were materially false, misleading, and/or lacked a reasonable basis when made because by February 1, 2021, AppHarvest's "supply" and "distribution" was already significantly negatively impacted by *inconsistent* quality and saleable yield, and rejections by Mastronardi, given that: <br><br> Evidence: | • CW6 met with Defendants Eggleton and Lee weekly concerning the baseline forecast, and upside and downside scenarios. ¶264. These weekly Forecast Meetings got "quite operational" and focused on various productivity metrics, with a key focus on yield and quality which was the basis for AppHarvest's revenue. *Id.* Throughout the first half of 2021, Lee and Eggleton also discussed that attrition and retention metrics that were "far worse than expected" and falling short "week over week." ¶111. During the "toughest times," (end of Q1 through the "summer refresh" at the end of the Class Period) discussions at Forecast Meetings concerned: "ways to close the gap" between AppHarvest's underperformance compared to the current forecast; the expected time needed for the closing the gap depending on the various scenarios; and |

(i) Defendants admitted that for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii) Defendants admitted that for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii) Defendants Lee's and Eggleton's veiled admissions on the Q1 2021 Earnings Call that "training" issues existed in the first quarter of 2021 that were hampering "productivity" and driving gross loss;

(iv) Defendants' admissions in the 2021 Q2 Earnings Release, the Q2 2021 Earnings Presentation, and the 2021 Q2 Earnings Call that "operational" and "executional" challenges—including lower quality production and saleable yield, and higher distribution and shipping expense incurred as a result of rejections—existed for the "initial growing season" and the "full season of harvest as a Company";

(v) according to CW1 and CW4, AppHarvest did not offer employees adequate (if any) training throughout the Class Period. According to CW1, AppHarvest's inadequately trained workforce contributed to 5-10% of crops being wasted or damaged during CW1's tenure, which resulted in lost sales. According to CW5, up to 50% of

the Company's issues with employee training, turnover, poor work ethic, and inconsistent hiring standards which were "repeatedly cited" as the "root cause" of the overall production challenges. ¶264.

• Labor productivity was identified as a challenge for AppHarvest in 2020, and during the "toughest times," (end of Q1 through the "summer refresh" at the end of the Class Period) Defendants instituted Leadership Meetings twice a week, which included Lee, Eggleton, CW6 and other FP&A personnel, Marcella Butler, and Julie Nelson. ¶268. Labor productivity metrics included yield, quality, rejections from Mastronardi, attrition and employee absences, and productivity metrics for the various Greenhouse workers' particular functions. *Id.*   According to CW6, inadequate training, turnover, poor work ethic and inconsistent hiring standards were "repeatedly cited" as the "root cause" of the Company's productivity challenges at these Leadership Meetings. CW6 recalled the Leadership Meetings occurred usually mid-week and end-of-week so that Defendants could "keep an eye on it." *Id.*

• CW6 confirmed AppHarvest's executive management had information parity, such that "everyone knew what everyone else knew" regarding fundamental financial data. ¶129.

• CW6 confirmed that at the end of each month, results concerning pricing, labor productivity (including yield and quality), construction costs, tomato grades, and other factors would be "pulled into" FP&A models and adjustments would be made to the Company's forecasts. ¶265. CW6 and Defendant Eggleton met for "many hours" each day discussing these near-, medium-, and long-term financial forecasts. *Id.*

AppHarvest's crop was wasted in the first growing season caused by workers in the Greenhouse and Packhouse. Further, CW4 confirmed that tomatoes were wasted "daily" during harvesting season;

(vi)    CW6 explained that during the Class Period, AppHarvest's attrition and retention metrics in the first half of 2021 were far worse than expected because AppHarvest was clearly falling short week over week. Indeed, according to CW1 and CW2, throughout the Class Period, AppHarvest suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including:

a.   dissatisfaction with mandatory expanded working hours—including forced overtime, Saturdays, and holidays, and

b.   infection and quarantining due to the COVID-19 pandemic,

all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes.

CW4 likewise stated that there was significant turnover throughout CW4's tenure at AppHarvest, with the west side of the Greenhouse losing at least 10 personnel every week. CW4 stated that the turnover resulted in less trained staff and thereby lower yields because there were fewer Crop Care Specialists to do the work.

- CW6 confirmed that AppHarvest productivity forecasts were sent to Mastronardi on a weekly, and possibly daily basis. ¶266. According to CW6, these forecasts included estimates of labor productivity to determine the volumes of beefsteak and Tomatoes on the Vine that would be harvested in the given period. *Id.*

- Mastronardi provided Defendants with daily updates, regular audits, and negative feedback in response to subpar quality throughout the Class Period.   ¶¶60, 67, 275. Mastronardi increased the frequency of its audits on the AppHarvest tomatoes during periods of "weaker" performance by AppHarvest, which resulted in Mastronardi rejecting a lot of tomatoes. ¶275. During the "toughest" periods of rejected tomatoes (the end of Q1 2021 through the "summer refresh"), it was necessary for AppHarvest to lower estimated production forecasts, a process that involved CW6, Eggleton and Lee, which were exchanged with Mastronardi in a shared "portal." *Id.*

- As confirmed by CW3, CW6, and the Mastronardi Morehead Agreement Defendants Eggleton and Lee were intimately involved in various forecasting processes—forecasts which included sales, quality, costs, yield, price, estimated rejections, and estimated damaged tomatoes. ¶263.

- CW3 confirmed that AppHarvest's forecasts existed prior to the commencement of the first growing season and that Defendant Eggleton approved the forecasts. ¶263. CW3 further explained AppHarvest had planning software, Microsoft Dynamics, which tracked operational results and actual costs, and the Individual Defendants had access to this software. *Id.*  CWs 3 and 6 stated that AppHarvest used such real time production data to create and track against AppHarvest's forecasts. ¶¶121, 130, 263.

9

CW5 confirmed that employee turnover and churn had been consistently high throughout October 2020 and June 2021, causing concern amongst Greenhouse personnel that AppHarvest had inadequate labor to meet production requirements as was discussed at the morning stand-up meetings CW5 attended;

(vii) according to CW1, CW2, and CW4, throughout the Class Period, AppHarvest's own incentive piece rate structure incentivized disruptive and inefficient workmanship that wasted, damaged, and produced low quality tomatoes;

(viii) CW6 stated that Mastronardi informed AppHarvest that it needed to tighten up specifications because Mastronardi was having to reject a lot of fruit throughout the Class Period—upwards of 30% to 35% during the Company's "toughest times," which was "many times" more than AppHarvest's target which CW6 believed was 6% or 7%;

(ix) according to CW2, "half" of all tomatoes inspected were USDA Grade No. 2 or not commercially saleable, and CW6 confirmed that AppHarvest was a "long way off" its quality goals;

(x) CW6 stated that in the "toughest times" of the first growing season AppHarvest was well below 50% in relation to the Company's productivity standards for specific Greenhouse jobs. ¶155.

- CW6 confirmed AppHarvest had real-time access to quality and yield data from the Packhouse based on the types of boxes being shipped (Grade 1 versus Grade 2). ¶267. Further, CW 1 and CW4 stated that AppHarvest had real-time access to productivity metrics from the Greenhouse that were recorded by scanners when workers finished working on a particular row and uploaded to the Company's electronic files. ¶120. CW4 confirmed that such real-time data included information from quality inspectors who recorded their results into a "live" excel spreadsheet so that AppHarvest could "map" quality performance. ¶85.

- Defendant Webb frequently visited the Morehead Facility prior to and throughout the Class Period where he filmed at least 16 interviews, gave tours, and visited operations, and would have, and did, see the Company's dysfunctional production facilities and widespread attrition and churn. ¶289. Indeed, Webb admitted he was at the facility "every morning" and that he was "in the facility, you know, elbow tapping everyone as they come in." ¶287. Webb further admitted that he loves to "sleep on the farms" and "going to our operations." ¶288.

- Webb or his office instructed CW5's team to "hide the waste" when investors and news media visited so that the Greenhouse had "better eye appeal." ¶¶83-84, 291.

- Defendants' admissions that "labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility" existed for the entire "*six months* ended June 30, 2021," which caused "lower net sales due to lower overall No. 1-grade production yields" as well as "higher related distribution and shipping fees." ¶297.

|  | <ul><li>Defendants' admissions that "executional challenges" spanned the entire Class Period because as they were "very real in our first major full season of harvest as a company" and the harvest season began in January 2021; and challenges lasted entire "initial growing season" and "first growing season" which began in October 2020. ¶298.</li><li>Throughout the Class Period the Morehead Facility was the site of the Company's sole production operations and core business. ¶286.</li><li>Defendants frequently spoke in detail regarding staffing, labor, and operations, tomato production, pricing, yield, and other key metrics every quarter and intermittently in various media interviews, which adds a strong inference of scienter. ¶¶72-75, 304-308.</li><li>AppHarvest was entirely reliant on its sole distributor Mastronardi, which required top-quality Grade 1 tomatoes. ¶270. In fact, AppHarvest filed at least 18 documents with the SEC, including documents signed by the Individual Defendants, stating the Company was "highly dependent" on Mastronardi, and Webb signed and initialed every page of the Mastronardi Morehead Agreement which required Mastronardi to accept all USDA Grade 1 tomatoes and saddled AppHarvest with all of the risk and costs of non-Grade 1 tomatoes, which Defendants knew would be rejected by Mastronardi and had "very little to no value." ¶¶271, 270.</li></ul> |
|---|---|

**False Statement III**

| Statement Category: |
| --- |
| Misstatements Regarding Operations, Production, and Supply |

| Speaker(s); Date; & Medium |
| --- |
| Defendant Webb, February 1, 2021, Interview with anchor Tom White on the TD Ameritrade Network |

| False and Misleading Statements or Omissions |
| --- |
| White: What kind of contracts do you have with distributors and stores across the country? And do you expect that to grow sequentially moving into 2022 and beyond?<br><br>Webb: …We use less land, less water, and **we have predictable growing practices**, so we can control the environment and **have a predictable supply year-round.** It's a premium product at a conventional price. Uh, **as much as we can build and grow, we'll, we'll be on the top 25 grocery shelves throughout the U.S.** ¶156. |

| Reasons Why Statements are False and Misleading, and/or Lacked a Reasonable Basis | Facts Giving Rise to Strong Inference of Scienter |
| --- | --- |
| Reasons:<br><br>Defendant Webb's statements, touting the Company's purported "predictable growing process" resulting in "a predictable supply," and that AppHarvest was poised to sell "as much as we can build and grow" were materially false, misleading, and/or lacked a reasonable basis when made because by February 1, 2021, AppHarvest's "growing practices" and "supply" were highly unpredictable and AppHarvest's ability to put products on "grocery shelves" was significantly negatively impacted (indeed, much of what AppHarvest attempted to "grow" never made it "grocery shelves" because it was damaged or poor quality), given that:<br><br>Evidence: | • CW6 met with Defendants Eggleton and Lee weekly concerning the baseline forecast, and upside and downside scenarios. ¶264. These weekly Forecast Meetings got "quite operational" and focused on various productivity metrics, with a key focus on yield and quality which was the basis for AppHarvest's revenue. *Id.* Throughout the first half of 2021, Lee and Eggleton also discussed that attrition and retention metrics that were "far worse than expected" and falling short "week over week." ¶111. During the "toughest times," (end of Q1 through the "summer refresh" at the end of the Class Period) discussions at Forecast Meetings concerned: "ways to close the gap" between AppHarvest's underperformance compared to the current forecast; the expected time needed for the closing the gap depending on the various scenarios; and the Company's issues with employee training, turnover, poor work ethic, and inconsistent hiring standards which were |

(i)     Defendants admitted that for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)    Defendants admitted that for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii)   Defendants Lee's and Eggleton's admissions on the Q1 2021 Earnings Call that "training" issues existed in the first quarter of 2021 that were hampering "productivity" and driving gross loss;

(iv)    Defendants' admissions in the 2021 Q2 Earnings Release, the Q2 2021 Earnings Presentation, and the 2021 Q2 Earnings Call that "operational" and "executional" challenges—including lower quality production and saleable yield, and higher distribution and shipping expense incurred as a result of rejections—existed for the "initial growing season" and the "full season of harvest as a Company";

(v)     according to CW1 and CW4, AppHarvest did not offer employees adequate (if any) training throughout the Class Period. According to CW1, AppHarvest's inadequately trained workforce contributed to 5-10% of crops being wasted or damaged during CW1's tenure, which resulted

"repeatedly cited" as the "root cause" of the overall production challenges. ¶264.

- Labor productivity was identified as a challenge for AppHarvest in 2020, and during the "toughest times," (end of Q1 through the "summer refresh" at the end of the Class Period) Defendants instituted Leadership Meetings twice a week, which included Lee, Eggleton, CW6 and other FP&A personnel, Marcella Butler, and Julie Nelson. ¶268. Labor productivity metrics included yield, quality, rejections from Mastronardi, attrition and employee absences, and productivity metrics for the various Greenhouse workers' particular functions. *Id.*    According to CW6, inadequate training, turnover, poor work ethic and inconsistent hiring standards were "repeatedly cited" as the "root cause" of the Company's productivity challenges at these Leadership Meetings. CW6 recalled the Leadership Meetings occurred usually mid-week and end-of-week so that Defendants could "keep an eye on it." *Id.*

- CW6 confirmed AppHarvest's executive management had information parity, such that "everyone knew what everyone else knew" regarding fundamental financial data. ¶129.

- CW6 confirmed that at the end of each month, results concerning pricing, labor productivity (including yield and quality), construction costs, tomato grades, and other factors would be "pulled into" FP&A models and adjustments would be made to the Company's forecasts. ¶265. CW6 and Defendant Eggleton met for "many hours" each day discussing these near-, medium-, and long-term financial forecasts. *Id.*

- CW6 confirmed that AppHarvest productivity forecasts were sent to Mastronardi on a weekly, and possibly daily basis.

in lost sales. According to CW5, up to 50% of AppHarvest's crop was wasted in the first growing season caused by workers in the Greenhouse and Packhouse. Further, CW4 confirmed that tomatoes were wasted "daily" during harvesting season;

(vi)    CW6 explained that during the Class Period, AppHarvest's attrition and retention metrics in the first half of 2021 were far worse than expected because AppHarvest was clearly falling short week over week. Indeed, according to CW1 and CW2, throughout the Class Period, AppHarvest suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including:

a.   dissatisfaction with mandatory expanded working hours—including forced overtime, Saturdays, and holidays, and

b.   infection and quarantining due to the COVID-19 pandemic,

all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes.

CW4 likewise stated that there was significant turnover throughout CW4's tenure at AppHarvest, with the west side of the Greenhouse losing at least 10 personnel every week. CW4 stated that the turnover resulted in less trained staff and thereby lower yields

¶266. According to CW6, these forecasts included estimates of labor productivity to determine the volumes of beefsteak and Tomatoes on the Vine that would be harvested in the given period. *Id.*

- Mastronardi provided Defendants with daily updates, regular audits, and negative feedback in response to subpar quality throughout the Class Period.  ¶¶60, 67, 275. Mastronardi increased the frequency of its audits on the AppHarvest tomatoes during periods of "weaker" performance by AppHarvest, which resulted in Mastronardi rejecting a lot of tomatoes. ¶275. During the "toughest" periods of rejected tomatoes (the end of Q1 2021 through the "summer refresh"), it was necessary for AppHarvest to lower estimated production forecasts, a process that involved CW6, Eggleton and Lee, which were exchanged with Mastronardi in a shared "portal."  *Id.*

- As confirmed by CW3, CW6, and the Mastronardi Morehead Agreement Defendants Eggleton and Lee were intimately involved in various forecasting processes—forecasts which included sales, quality, costs, yield, price, estimated rejections, and estimated damaged tomatoes. ¶263.

- CW3 confirmed that AppHarvest's forecasts existed prior to the commencement of the first growing season and that Defendant Eggleton approved the forecasts. ¶263. CW3 further explained AppHarvest had planning software, Microsoft Dynamics, which tracked operational results and actual costs, and the Individual Defendants had access to this software. *Id.*  CWs 3 and 6 stated that AppHarvest used such real time production data to create and track against AppHarvest's forecasts. ¶¶121, 130, 263.

because there were fewer Crop Care Specialists to do the work.

CW5 confirmed that employee turnover and churn had been consistently high throughout October 2020 and June 2021, causing concern amongst Greenhouse personnel that AppHarvest had inadequate labor to meet production requirements as was discussed at the morning stand-up meetings CW5 attended;

(vii)    according to CW1, CW2, and CW4, throughout the Class Period, AppHarvest's own incentive piece rate structure incentivized disruptive and inefficient workmanship that wasted, damaged, and produced low quality tomatoes;

(viii)    CW6 stated that Mastronardi informed AppHarvest that it needed to tighten up specifications because Mastronardi was having to reject a lot of fruit throughout the Class Period—upwards of 30% to 35% during the Company's "toughest times," which was "many times" more than AppHarvest's target which CW6 believed was 6% or 7%;

(ix)    according to CW2, "half" of all tomatoes inspected were USDA Grade No. 2 or not commercially saleable, and CW6 confirmed that AppHarvest was a "long way off" its quality goals;

(x)    CW6 stated that in the "toughest times" of the first growing season AppHarvest was well below 50% in relation to the Company's productivity standards for specific Greenhouse jobs. ¶157

- CW6 confirmed AppHarvest had real-time access to quality and yield data from the Packhouse based on the types of boxes being shipped (Grade 1 versus Grade 2). ¶267. Further, CW 1 and CW4 stated that AppHarvest had real-time access to productivity metrics from the Greenhouse that were recorded by scanners when workers finished working on a particular row and uploaded to the Company's electronic files. ¶120. CW4 confirmed that such real-time data included information from quality inspectors who recorded their results into a "live" excel spreadsheet so that AppHarvest could "map" quality performance. ¶85.

- Defendant Webb frequently visited the Morehead Facility prior to and throughout the Class Period where he filmed at least 16 interviews, gave tours, and visited operations, and would have, and did, see the Company's dysfunctional production facilities and widespread attrition and churn. ¶289. Indeed, Webb admitted he was at the facility "every morning" and that he was "in the facility, you know, elbow tapping everyone as they come in." ¶287. Webb further admitted that he loves to "sleep on the farms" and "going to our operations." ¶288.

- Webb or his office instructed CW5's team to "hide the waste" when investors and news media visited so that the Greenhouse had "better eye appeal." ¶¶83-84, 291.

- Defendants' admissions that "labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility" existed for the entire "*six months* ended June 30, 2021," which caused "lower net sales due to lower overall No. 1-grade production yields" as well as "higher related distribution and shipping fees." ¶297.

15

|  | • Defendants' admissions that "executional challenges" spanned the entire Class Period because as they were "very real in our first major full season of harvest as a company" and the harvest season began in January 2021; and challenges lasted entire "initial growing season" and "first growing season" which began in October 2020. ¶298. |
|  | • Throughout the Class Period the Morehead Facility was the site of the Company's sole production operations and core business. ¶286. |
|  | • Defendants frequently spoke in detail regarding staffing, labor, and operations, tomato production, pricing, yield, and other key metrics every quarter and intermittently in various media interviews, which adds a strong inference of scienter. ¶¶72-75, 304-308. |
|  | • AppHarvest was entirely reliant on its sole distributor Mastronardi, which required top-quality Grade 1 tomatoes. ¶270. In fact, AppHarvest filed at least 18 documents with the SEC, including documents signed by the Individual Defendants, stating the Company was "highly dependent" on Mastronardi, and Webb signed and initialed every page of the Mastronardi Morehead Agreement which required Mastronardi to accept all USDA Grade 1 tomatoes and saddled AppHarvest with all of the risk and costs of non-Grade 1 tomatoes, which Defendants knew would be rejected by Mastronardi and had "very little to no value." ¶¶271, 270. |

**False Statement IV. A.**

| **Statement Category:** |
| --- |
| Speculative, Contingent, and Incomplete Risk Factors Relating to Growth and Price Performance |

| **Speaker(s); Date; & Medium** |
| --- |
| All Defendants; February 2, 2021; Form 8-K, signed by Defendant Eggleton, filed with the SEC and on the Investor Relations section of AppHarvest's website |

| **False and Misleading Statements or Omissions** |
| --- |
| **Risks Related to AppHarvest**<br><br>…Even if [AppHarvest's] investments do result in the growth of its business, **if AppHarvest does not effectively manage its growth, it may not be able to execute on its business plan** and vision, respond to competitive pressures, **take advantage of market opportunities, satisfy customer requirements or maintain high-quality product offerings, any of which could adversely affect AppHarvest's business, financial condition and results of operations.**<br><br>\*\*\*<br><br>**In future periods, revenue growth could slow or revenue could decline for a number of reasons, including** slowing demand for AppHarvest's products, increasing competition, a decrease in the growth of the overall market, or **AppHarvest's failure, for any reason, to take advantage of growth opportunities. If AppHarvest's assumptions regarding these risks and uncertainties and future revenue growth are incorrect or change, or if it does not address these risks successfully, AppHarvest's operating and financial results could differ materially from its expectations, and its business could suffer.** ¶161. |

| **Reasons Why Statements are False and Misleading, and/or Lacked a Reasonable Basis** | **Facts Giving Rise to Strong Inference of Scienter** |
| --- | --- |
| Reasons:<br><br>The above speculative, contingent, and woefully incomplete statements of known risks were materially false, misleading, and/or lacked a reasonable basis when made because:<br><br>Defendants speculatively portrayed AppHarvest's ability to "effectively manage its growth," "execute on its business plan," | • CW6 met with Defendants Eggleton and Lee weekly concerning the baseline forecast, and upside and downside scenarios. ¶264. These weekly Forecast Meetings got "quite operational" and focused on various productivity metrics, with a key focus on yield and quality which was the basis for AppHarvest's revenue. *Id.* Throughout the first half of 2021, Lee and Eggleton also discussed that attrition and retention metrics that were "far worse than expected" and falling short "week over week." ¶111. During the "toughest times," (end of |

and "satisfy customer requirements or maintain high quality product" offerings as contingent or potential when AppHarvest was already failing to do all of these things resulting in lower saleable yield and quality products, and higher customer rejections and costs.

Defendants made boilerplate and vague disclaimers that "revenue growth could slow or revenue could decline for a number of reasons" and that if AppHarvest fails to "take advantage of growth opportunities" "for any reason" it might see declining revenue, when Defendants were already experiencing wide-ranging execution problems for the entire first harvesting season that were doing exactly that.

Evidence:

The above Reasons are supported by ample evidence, given that:

(i)    Defendants admitted that for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)   Defendants admitted that for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii)  Defendants Lee's and Eggleton's veiled admissions on the Q1 2021 Earnings Call that "training" issues existed in the

Q1 through the "summer refresh" at the end of the Class Period) discussions at Forecast Meetings concerned: "ways to close the gap" between AppHarvest's underperformance compared to the current forecast; the expected time needed for the closing the gap depending on the various scenarios; and the Company's issues with employee training, turnover, poor work ethic, and inconsistent hiring standards which were "repeatedly cited" as the "root cause" of the overall production challenges. ¶264.

• Labor productivity was identified as a challenge for AppHarvest in 2020, and during the "toughest times," (end of Q1 through the "summer refresh" at the end of the Class Period) Defendants instituted Leadership Meetings twice a week, which included Lee, Eggleton, CW6 and other FP&A personnel, Marcella Butler, and Julie Nelson. ¶268. Labor productivity metrics included yield, quality, rejections from Mastronardi, attrition and employee absences, and productivity metrics for the various Greenhouse workers' particular functions. *Id.* According to CW6, inadequate training, turnover, poor work ethic and inconsistent hiring standards were "repeatedly cited" as the "root cause" of the Company's productivity challenges at these Leadership Meetings. CW6 recalled the Leadership Meetings occurred usually mid-week and end-of-week so that Defendants could "keep an eye on it." *Id.*

• CW6 confirmed AppHarvest's executive management had information parity, such that "everyone knew what everyone else knew" regarding fundamental financial data. ¶129.

• CW6 confirmed that at the end of each month, results concerning pricing, labor productivity (including yield and quality), construction costs, tomato grades, and other factors would be "pulled into" FP&A models and adjustments would

18

first quarter of 2021 that were hampering "productivity" and driving gross loss;

(iv)    Defendants' admissions in the 2021 Q2 Earnings Release, the Q2 2021 Earnings Presentation, and the 2021 Q2 Earnings Call that "operational" and "executional" challenges—including lower quality production and saleable yield, and higher distribution and shipping expense incurred as a result of rejections—existed for the "initial growing season" and the "full season of harvest as a Company";

(v)    according to CW1 and CW4, AppHarvest did not offer employees adequate (if any) training throughout the Class Period. According to CW1, AppHarvest's inadequately trained workforce contributed to 5-10% of crops being wasted or damaged during CW1's tenure, which resulted in lost sales. According to CW5, up to 50% of AppHarvest's crop was wasted in the first growing season caused by workers in the Greenhouse and Packhouse. Further, CW4 confirmed that tomatoes were wasted "daily" during harvesting season;

(vi)    CW6 explained that during the Class Period, AppHarvest's attrition and retention metrics in the first half of 2021 were far worse than expected because AppHarvest was clearly falling short week over week. Indeed, according to CW1 and CW2, throughout the Class Period, AppHarvest suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including:

be made to the Company's forecasts. ¶265. CW6 and Defendant Eggleton met for "many hours" each day discussing these near-, medium-, and long-term financial forecasts. *Id.*

- CW6 confirmed that AppHarvest productivity forecasts were sent to Mastronardi on a weekly, and possibly daily basis. ¶266. According to CW6, these forecasts included estimates of labor productivity to determine the volumes of beefsteak and Tomatoes on the Vine that would be harvested in the given period. *Id.*

- Mastronardi provided Defendants with daily updates, regular audits, and negative feedback in response to subpar quality throughout the Class Period. ¶¶60, 67, 275. Mastronardi increased the frequency of its audits on the AppHarvest tomatoes during periods of "weaker" performance by AppHarvest, which resulted in Mastronardi rejecting a lot of tomatoes. ¶275. During the "toughest" periods of rejected tomatoes (the end of Q1 2021 through the "summer refresh"), it was necessary for AppHarvest to lower estimated production forecasts, a process that involved CW6, Eggleton and Lee, which were exchanged with Mastronardi in a shared "portal." *Id.*

- As confirmed by CW3, CW6, and the Mastronardi Morehead Agreement Defendants Eggleton and Lee were intimately involved in various forecasting processes—forecasts which included sales, quality, costs, yield, price, estimated rejections, and estimated damaged tomatoes. ¶263.

- CW3 confirmed that AppHarvest's forecasts existed prior to the commencement of the first growing season and that Defendant Eggleton approved the forecasts. ¶263. CW3

a. dissatisfaction with mandatory expanded working hours—including forced overtime, Saturdays, and holidays, and

b. infection and quarantining due to the COVID-19 pandemic,

all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes.

CW4 likewise stated that there was significant turnover throughout CW4's tenure at AppHarvest, with the west side of the Greenhouse losing at least 10 personnel every week. CW4 stated that the turnover resulted in less trained staff and thereby lower yields because there were fewer Crop Care Specialists to do the work.

CW5 confirmed that employee turnover and churn had been consistently high throughout October 2020 and June 2021, causing concern amongst Greenhouse personnel that AppHarvest had inadequate labor to meet production requirements as was discussed at the morning stand-up meetings CW5 attended;

(vii) according to CW1, CW2, and CW4, throughout the Class Period, AppHarvest's own incentive piece rate structure incentivized disruptive and inefficient workmanship that wasted, damaged, and produced low quality tomatoes;

(viii) CW6 stated that Mastronardi informed AppHarvest that it needed to tighten up specifications because Mastronardi was having to reject a lot of fruit throughout the Class Period—upwards of 30% to 35% during the Company's

further explained AppHarvest had planning software, Microsoft Dynamics, which tracked operational results and actual costs, and the Individual Defendants had access to this software. *Id.* CWs 3 and 6 stated that AppHarvest used such real time production data to create and track against AppHarvest's forecasts. ¶¶121, 130, 263.

- CW6 confirmed AppHarvest had real-time access to quality and yield data from the Packhouse based on the types of boxes being shipped (Grade 1 versus Grade 2). ¶267. Further, CW1 and CW4 stated that AppHarvest had real-time access to productivity metrics from the Greenhouse that were recorded by scanners when workers finished working on a particular row and uploaded to the Company's electronic files. ¶120. CW4 confirmed that such real-time data included information from quality inspectors who recorded their results into a "live" excel spreadsheet so that AppHarvest could "map" quality performance. ¶85.

- Defendant Webb frequently visited the Morehead Facility prior to and throughout the Class Period where he filmed at least 16 interviews, gave tours, and visited operations, and would have, and did, see the Company's dysfunctional production facilities and widespread attrition and churn. ¶289. Indeed, Webb admitted he was at the facility "every morning" and that he was "in the facility, you know, elbow tapping everyone as they come in." ¶287. Webb further admitted that he loves to "sleep on the farms" and "going to our operations." ¶288.

- Webb or his office instructed CW5's team to "hide the waste" when investors and news media visited so that the Greenhouse had "better eye appeal." ¶¶83-84, 291.

"toughest times," which was "many times" more than AppHarvest's target which CW6 believed was 6% or 7%;

(ix) according to CW2, "half" of all tomatoes inspected were USDA Grade No. 2 or not commercially saleable, and CW6 confirmed that AppHarvest was a "long way off" its quality goals;

(x) CW6 stated that in the "toughest times" of the first growing season AppHarvest was well below 50% in relation to the Company's productivity standards for specific Greenhouse jobs. ¶162.

- Defendants' admissions that "labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility" existed for the entire "*six months* ended June 30, 2021," which caused "lower net sales due to lower overall No. 1-grade production yields" as well as "higher related distribution and shipping fees." ¶297.

- Defendants' admissions that "executional challenges" spanned the entire Class Period because as they were "very real in our first major full season of harvest as a company" and the harvest season began in January 2021; and challenges lasted entire "initial growing season" and "first growing season" which began in October 2020. ¶298.

- Throughout the Class Period the Morehead Facility was the site of the Company's sole production operations and core business. ¶286.

- Defendants frequently spoke in detail regarding staffing, labor, and operations, tomato production, pricing, yield, and other key metrics every quarter and intermittently in various media interviews, which adds a strong inference of scienter. ¶¶72-75, 304-308.

- AppHarvest was entirely reliant on its sole distributor Mastronardi, which required top-quality Grade 1 tomatoes. ¶270. In fact, AppHarvest filed at least 18 documents with the SEC, including documents signed by the Individual Defendants, stating the Company was "highly dependent" on Mastronardi, and Webb signed and initialed every page of the Mastronardi Morehead Agreement which required Mastronardi to accept all USDA Grade 1 tomatoes and saddled AppHarvest with all of the risk and costs of non-Grade

| | |
|---|---|
| | tomatoes, which Defendants knew would be rejected by Mastronardi and had "very little to no value." ¶¶271, 270. |

**False Statement IV. B.**

| **Statement Category:** |
| --- |
| Speculative, Contingent, and Incomplete Risk Factors Concerning Quality, Production, and Supply |

| **Speaker(s); Date; & Medium** |
| --- |
| All Defendants; February 2, 2021; Form 8-K, signed by Defendant Eggleton, filed with the SEC  and on the Investor Relations section of AppHarvest's website |

| **False and Misleading Statements or Omissions** |
| --- |
| **Any significant or unexpected rejection of AppHarvest's products could negatively impact AppHarvest's results of operations, and AppHarvest may be unable to sell the rejected products to other third parties.**<br><br>***<br><br>**If AppHarvest's products** fail to gain market acceptance, are restricted by regulatory requirements or **have quality problems, the company** *may* **not be able to fully recover costs and expenses incurred in its operation, and its business, financial condition or results of operations** *could* **be materially and adversely affected**. ¶161. |

| **Reasons Why Statements are False and Misleading, and/or Lacked a Reasonable Basis** | **Facts Giving Rise to Strong Inference of Scienter** |
| --- | --- |
| Reasons:<br><br>The above speculative, contingent, and woefully incomplete statements of known risks were materially false, misleading, and/or lacked a reasonable basis when made because:<br><br>Defendants speculate that "significant or unexpected rejection of AppHarvest's products" could "negatively impact" results when AppHarvest was already experiencing massive customer rejections from Mastronardi because of poor quality that eroded sales and inflated costs, and Defendants speculate further that the Company may not be able to resell rejected products to "other third parties" when AppHarvest was not doing so, but rather was | Plaintiff incorporates the same Facts stated in **False Statement IV.A.**, as if fully set forth herein. |

23

selling "substantially all" of its products to Mastronardi and donating or composting the rejections;

Defendants speculate that "quality problems" could "materially and adversely" affect AppHarvest's "business, financial condition or results of operations" when they were already doing so.

<u>Evidence:</u>

Plaintiff incorporates the same Evidence stated in **False Statement IV. A**., as if fully set forth herein.

24

**False Statement IV. C.**

| **Statement Category:** |
|---|
| Speculative, Contingent, and Incomplete Risk Factors Relating to Labor Availability, Recruitment, and Retention |

| **Speaker(s); Date; & Medium** |
|---|
| All Defendants; February 2, 2021; Form 8-K, signed by Defendant Eggleton, filed with the SEC  and on the Investor Relations section of AppHarvest's website |

| **False and Misleading Statements or Omissions** |
|---|
| *AppHarvest depends on employing a skilled local labor force, and* **failure to attract and retain qualified employees could negatively impact AppHarvest's business, results of operations and financial condition.** <div align="center">\*\*\*</div> …even **if AppHarvest is able to identify, hire and train its labor force, there is no guarantee that AppHarvest will be able to retain these employees. Any shortage of labor or lack of regular availability could restrict AppHarvest's ability to operate its greenhouses profitably, or at all.** <div align="center">\*\*\*</div> **The COVID-19 pandemic could negatively impact on AppHarvest's business, results of operations and financial condition.***[…]* <div align="center">\*\*\*</div> …**Although AppHarvest has not experienced material financial impacts due to the pandemic**, the fluid nature of the COVID-19 pandemic and uncertainties regarding the related economic impact are likely to result in sustained market turmoil, which could also negatively impact the company's business, financial condition and cash flows. Although AppHarvest's business is considered an "essential business," **the COVID-19 pandemic could result in labor shortages, which could result in AppHarvest's inability to plant and harvest crops at full capacity and could result in spoilage or loss of unharvested crops**.…**The extent of COVID-19's effect on AppHarvest's operational and financial performance will depend on future developments**, including the duration, spread and intensity of the pandemic, all of which are uncertain and difficult to predict considering the rapidly evolving landscape. **As a result, it is not currently possible to ascertain the overall impact of COVID-19 on AppHarvest's business. However, if the pandemic continues to persist as a severe worldwide health crisis, the disease could negatively impact AppHarvest's business, financial condition results of operations and cash flows, and may also have the effect of heightening many of the other risks described in this "Risk Factors" section**. ¶¶161. |

| **Reasons Why Statements are False and Misleading, and/or Lacked a Reasonable Basis** | **Facts Giving Rise to Strong Inference of Scienter** |
|---|---|

| | Plaintiff incorporates the same Facts stated in False Statement IV. A., as if fully set forth herein. |
|---|---|
| <u>Reasons:</u><br><br>The above speculative, contingent, and woefully incomplete statements of known risks were materially false, misleading, and/or lacked a reasonable basis when made because:<br><br>Defendants speculate that "failure to attract and retain qualified employees could negatively impact" AppHarvest's business when the Company was already suffering massive attrition, and Defendants misrepresent that a potential "shortage of labor or lack of regular availability" or the Company's potential inability to "train its labor force" and "retain" employees could potentially affect AppHarvest, including its "ability to operate its greenhouses profitably," when, in reality, those situations had already transpired.<br><br>Defendants falsely misrepresent AppHarvest "has not experienced material financial impacts due to the pandemic" and speculate that the COVID-19 pandemic, due to contingent and vague "future developments," *could* negatively impact AppHarvest's "business, results of operations and financial condition" and "cash flows," *could* "result in labor shortages," *could* cause an "inability to plant and harvest crops at full capacity," and *could* "result in spoilage or loss of unharvested crops" when all of those things were already happening because COVID-19 had caused AppHarvest to operate severely understaffed during the first growing and harvesting season because employees were quarantining.<br><br><u>Evidence:</u><br><br>Plaintiff incorporates the same Evidence stated in **False Statement IV. A.**, as if fully set forth herein. | |

**False Statement V. A.**

| **Statement Category:** |
| --- |
| Speculative, Contingent, and Incomplete Risk Factors Relating to Growth and Price Performance |

| **Speaker(s); Date; & Medium** |
| --- |
| All Defendants: February 10, 2021; Form S-1 Registration Statement, signed by Defendants Webb, Eggleton, and Lee, filed with the SEC, and on the Investor Relations section of AppHarvest's website |

| **False and Misleading Statements or Omissions** |
| --- |
| …Even if [AppHarvest's] investments do result in the growth of our business, **if we do not effectively manage our growth, we may not be able to execute on our business plan** and vision, respond to competitive pressures, **take advantage of market opportunities, satisfy customer requirements or maintain high-quality product offerings, any of which could adversely affect our business, financial condition and results of operations.**<br><br>\*\*\*<br><br>**In future periods, revenue growth could slow or revenue could decline for a number of reasons, including** slowing demand for our products, increasing competition, a decrease in the growth of the overall market, or **our failure, for any reason, to take advantage of growth opportunities. If our assumptions regarding these risks and uncertainties and future revenue growth are incorrect or change, or if we do not address these risks successfully, our operating and financial results could differ materially from our expectations, and our business could suffer**. ¶165. |

| **Reasons Why Statements are False and Misleading, and/or Lacked a Reasonable Basis** | **Facts Giving Rise to Strong Inference of Scienter** |
| --- | --- |
| Reasons:<br><br>The above speculative, contingent, and woefully incomplete statements were materially false, misleading, and/or lacked a reasonable basis when made because:<br><br>Defendants speculatively portrayed AppHarvest's ability to "effectively manage its growth," "execute on its business plan," and "satisfy customer requirements or maintain high quality product" offerings as contingent or potential when AppHarvest | • CW6 met with Defendants Eggleton and Lee weekly concerning the baseline forecast, and upside and downside scenarios. ¶264. These weekly Forecast Meetings got "quite operational" and focused on various productivity metrics, with a key focus on yield and quality which was the basis for AppHarvest's revenue. *Id.* Throughout the first half of 2021, Lee and Eggleton also discussed that attrition and retention metrics that were "far worse than expected" and falling short "week over week." ¶111. During the "toughest times," (end of Q1 through the "summer refresh" at the end of the Class Period) discussions at Forecast Meetings concerned: "ways |

was already failing to do all of these things resulting in lower saleable yield and quality products, and higher customer rejections and costs.

Defendants made a boilerplate and vague disclaimers that "revenue growth could slow or revenue could decline for a number of reasons" and that if AppHarvest fails to "take advantage of growth opportunities" "for any reason" it might see declining revenue, when Defendants were already experiencing wide-ranging execution problems for the entire first harvesting season that were doing exactly that.

Evidence:

The above Reasons are supported by ample evidence, given that:

(i)  Defendants admitted that for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)  Defendants admitted that for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii)  Defendants Lee's and Eggleton's veiled admissions on the Q1 2021 Earnings Call that "training" issues existed in the first quarter of 2021 that were hampering "productivity" and driving gross loss;

to close the gap" between AppHarvest's underperformance compared to the current forecast; the expected time needed for the closing the gap depending on the various scenarios; and the Company's issues with employee training, turnover, poor work ethic, and inconsistent hiring standards which were "repeatedly cited" as the "root cause" of the overall production challenges. ¶264.

- Labor productivity was identified as a challenge for AppHarvest in 2020, and during the "toughest times," (end of Q1 through the "summer refresh" at the end of the Class Period) Defendants instituted Leadership Meetings twice a week, which included Lee, Eggleton, CW6 and other FP&A personnel, Marcella Butler, and Julie Nelson. ¶268. Labor productivity metrics included yield, quality, rejections from Mastronardi, attrition and employee absences, and productivity metrics for the various Greenhouse workers' particular functions. *Id.*  According to CW6, inadequate training, turnover, poor work ethic and inconsistent hiring standards were "repeatedly cited" as the "root cause" of the Company's productivity challenges at these Leadership Meetings. CW6 recalled the Leadership Meetings occurred usually mid-week and end-of-week so that Defendants could "keep an eye on it." *Id.*

- CW6 confirmed AppHarvest's executive management had information parity, such that "everyone knew what everyone else knew" regarding fundamental financial data. ¶129.

- CW6 confirmed that at the end of each month, results concerning pricing, labor productivity (including yield and quality), construction costs, tomato grades, and other factors would be "pulled into" FP&A models and adjustments would be made to the Company's forecasts. ¶265. CW6 and Defendant Eggleton met for "many hours" each day

(iv)   Defendants' admissions in the 2021 Q2 Earnings Release, the Q2 2021 Earnings Presentation, and the 2021 Q2 Earnings Call that "operational" and "executional" challenges—including lower quality production and saleable yield, and higher distribution and shipping expense incurred as a result of rejections—existed for the "initial growing season" and the "full season of harvest as a Company";

(v)    according to CW1 and CW4, AppHarvest did not offer employees adequate (if any) training throughout the Class Period. According to CW1, AppHarvest's inadequately trained workforce contributed to 5-10% of crops being wasted or damaged during CW1's tenure, which resulted in lost sales. According to CW5, up to 50% of AppHarvest's crop was wasted in the first growing season caused by workers in the Greenhouse and Packhouse. Further, CW4 confirmed that tomatoes were wasted "daily" during harvesting season;

(vi)   CW6 explained that during the Class Period, AppHarvest's attrition and retention metrics in the first half of 2021 were far worse than expected because AppHarvest was clearly falling short week over week. Indeed, according to CW1 and CW2, throughout the Class Period, AppHarvest suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including:

       a.   dissatisfaction with mandatory expanded working hours—including forced overtime, Saturdays, and holidays, and

discussing these near-, medium-, and long-term financial forecasts. *Id.*

- CW6 confirmed that AppHarvest productivity forecasts were sent to Mastronardi on a weekly, and possibly daily basis. ¶266. According to CW6, these forecasts included estimates of labor productivity to determine the volumes of beefsteak and Tomatoes on the Vine that would be harvested in the given period. *Id.*

- Mastronardi provided Defendants with daily updates, regular audits, and negative feedback in response to subpar quality throughout the Class Period. ¶¶60, 67, 275. Mastronardi increased the frequency of its audits on the AppHarvest tomatoes during periods of "weaker" performance by AppHarvest, which resulted in Mastronardi rejecting a lot of tomatoes. ¶275. During the "toughest" periods of rejected tomatoes (the end of Q1 2021 through the "summer refresh"), it was necessary for AppHarvest to lower estimated production forecasts, a process that involved CW6, Eggleton and Lee, which were exchanged with Mastronardi in a shared "portal." *Id.*

- As confirmed by CW3, CW6, and the Mastronardi Morehead Agreement Defendants, Eggleton and Lee were intimately involved in various forecasting processes—forecasts which included sales, quality, costs, yield, price, estimated rejections, and estimated damaged tomatoes. ¶263.

- CW3 confirmed that AppHarvest's forecasts existed prior to the commencement of the first growing season and that Defendant Eggleton approved the forecasts. ¶263. CW3 further explained AppHarvest had planning software, Microsoft Dynamics, which tracked operational results and

b. infection and quarantining due to the COVID-19 pandemic,

all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes.

CW4 likewise stated that there was significant turnover throughout CW4's tenure at AppHarvest, with the west side of the Greenhouse losing at least 10 personnel every week. CW4 stated that the turnover resulted in less trained staff and thereby lower yields because there were fewer Crop Care Specialists to do the work.

CW5 confirmed that employee turnover and churn had been consistently high throughout October 2020 and June 2021, causing concern amongst Greenhouse personnel that AppHarvest had inadequate labor to meet production requirements as was discussed at the morning stand-up meetings CW5 attended;

(vii) according to CW1, CW2, and CW4, throughout the Class Period, AppHarvest's own incentive piece rate structure incentivized disruptive and inefficient workmanship that wasted, damaged, and produced low quality tomatoes;

(viii) CW6 stated that Mastronardi informed AppHarvest that it needed to tighten up specifications because Mastronardi was having to reject a lot of fruit throughout the Class Period—upwards of 30% to 35% during the Company's "toughest times," which was "many times" more than AppHarvest's target which CW6 believed was 6% or 7%;

actual costs, and the Individual Defendants had access to this software. *Id.* CWs 3 and 6 stated that AppHarvest used such real time production data to create and track against AppHarvest's forecasts. ¶¶121, 130, 263.

- CW6 confirmed AppHarvest had real-time access to quality and yield data from the Packhouse based on the types of boxes being shipped (Grade 1 versus Grade 2). ¶267. Further, CW 1 and CW4 stated that AppHarvest had real-time access to productivity metrics from the Greenhouse that were recorded by scanners when workers finished working on a particular row and uploaded to the Company's electronic files. ¶120. CW4 confirmed that such real-time data included information from quality inspectors who recorded their results into a "live" excel spreadsheet so that AppHarvest could "map" quality performance. ¶85.

- Defendant Webb frequently visited the Morehead Facility prior to and throughout the Class Period where he filmed at least 16 interviews, gave tours, and visited operations, and would have, and did, see the Company's dysfunctional production facilities and widespread attrition and churn. ¶289. Indeed, Webb admitted he was at the facility "every morning" and that he was "in the facility, you know, elbow tapping everyone as they come in." ¶287. Webb further admitted that he loves to "sleep on the farms" and "going to our operations." ¶288.

- Webb or his office instructed CW5's team to "hide the waste" when investors and news media visited so that the Greenhouse had "better eye appeal." ¶¶83-84, 291.

- Defendants' admissions that "labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility"

30

| | | |
|---|---|---|
| (ix) | according to CW2, "half" of all tomatoes inspected were USDA Grade No. 2 or not commercially saleable, and CW6 confirmed that AppHarvest was a "long way off" its quality goals; | existed for the entire "*six months* ended June 30, 2021," which caused "lower net sales due to lower overall No. 1-grade production yields" as well as "higher related distribution and shipping fees." ¶297. |
| (x) | CW6 stated that in the "toughest times" of the first growing season AppHarvest was well below 50% in relation to the Company's productivity standards for specific Greenhouse jobs. ¶166. | • Defendants' admissions that "executional challenges" spanned the entire Class Period because as they were "very real in our first major full season of harvest as a company" and the harvest season began in January 2021; and challenges lasted entire "initial growing season" and "first growing season" which began in October 2020. ¶298.<br><br>• Throughout the Class Period the Morehead Facility was the site of the Company's sole production operations and core business. ¶286.<br><br>• Defendants frequently spoke in detail regarding staffing, labor, and operations, tomato production, pricing, yield, and other key metrics every quarter and intermittently in various media interviews, which adds a strong inference of scienter. ¶¶72-75, 304-308.<br><br>• AppHarvest was entirely reliant on its sole distributor Mastronardi, which required top-quality Grade 1 tomatoes. ¶270. In fact, AppHarvest filed at least 18 documents with the SEC, including documents signed by the Individual Defendants, stating the Company was "highly dependent" on Mastronardi, and Webb signed and initialed every page of the Mastronardi Morehead Agreement which required Mastronardi to accept all USDA Grade 1 tomatoes and saddled AppHarvest with all of the risk and costs of non-Grade 1 tomatoes, which Defendants knew would be rejected by Mastronardi and had "very little to no value." ¶¶271, 270. |

**False Statement V. B.**

| **Statement Category:** |
| --- |
| Speculative, Contingent, and Incomplete Risk Factors Concerning Quality, Production, and Supply |

| **Speaker(s), Date, & Medium** |
| --- |
| All Defendants; February 10, 2021; Form S-1 Registration Statement, signed by Defendants Webb, Eggleton, and Lee, filed with the SEC, and on the Investor Relations section of AppHarvest's website |

| **False and Misleading Statements or Omissions** |
| --- |
| *We currently rely on a single facility for all of our operations.*<br><br>…**Adverse changes or developments affecting the Morehead facility could impair our ability to produce our products and our business, prospects, financial condition and results of operations. Any shutdown or period of reduced production at the Morehead facility,** which may be caused by regulatory noncompliance or other issues, as well as other factors beyond our control, such as severe weather conditions, natural disaster, fire, power interruption, work stoppage, disease outbreaks or pandemics (such as COVID-19), equipment failure or delay in supply delivery, **would significantly disrupt our ability to grow and deliver our produce in a timely manner, meet our contractual obligations and operate our business.**<br><br>***<br><br>**Any significant or unexpected rejection of our products could negatively impact our results of operations, and we may be unable to sell the rejected products to other third parties.**<br>***<br><br>**If our products** fail to gain market acceptance, are restricted by regulatory requirements or **have quality problems, the company** *may* **not be able to fully recover costs and expenses incurred in our  operation, and our business, financial condition or results of operations** *could* **be materially and adversely affected.** ¶165. |

| **Reasons Why Statements are False and Misleading, and/or Lacked a Reasonable Basis**<br><br>Reasons: | **Facts Giving Rise to Strong Inference of Scienter**<br><br>Plaintiff incorporates the same Facts stated in **False Statement V.A.**, as if fully set forth herein. |
| --- | --- |

32

The above speculative, contingent, and woefully incomplete statements of known risks were materially false, misleading, and/or lacked a reasonable basis when made because:

Defendants speculate that "significant or unexpected rejection of AppHarvest's products" could "negatively impact" results when AppHarvest was already experiencing massive customer rejections from Mastronardi because of poor quality that eroded sales and inflated costs, and Defendants speculate further that the Company may not be able to resell rejected products to "other third parties" when AppHarvest was not doing so, but rather was selling "substantially all" of its products to Mastronardi and donating or composting the rejections.

Defendants make boilerplate speculation that vague "developments" or periods of "reduced production at the Morehead facility" could disrupt AppHarvest's ability to "meet our contractual obligations and operate our business" when the Company's operations were already deteriorating because of the Company's inability to produce USDA Grade No. 1 tomatoes;

Defendants speculate that "quality problems" could "materially and adversely" affect AppHarvest's "business, financial condition or results of operations" when they were already doing so.

<u>Evidence</u>:

Plaintiff incorporates the same Evidence in **False Statement V. A.**, as if fully set forth herein.

33

**False Statement V. C.**

| **Statement Category:** |
|---|
| Speculative, Contingent, and Incomplete Risk Factors Relating to Labor Availability, Recruitment, and Retention |

| **Speaker(s); Date; & Medium** |
|---|
| All Defendants; February 10, 2021; Form S-1 Registration Statement, signed by Defendants Webb, Eggleton, and Lee, filed with the SEC, and on the Investor Relations section of AppHarvest's website |

| **False and Misleading Statements or Omissions** |
|---|
| *We depend on employing a skilled local labor force, and* **failure to attract and retain qualified employees could negatively impact our business, results of operations and financial condition.**<br><br>\*\*\*<br>…even **if we  are able to identify, hire and train its [sic] labor force, there is no guarantee that we will be able to retain these employees. Any shortage of labor or lack of regular availability could restrict our ability to operate our greenhouses profitably, or at all.**<br>\*\*\*<br>**The COVID-19 pandemic could negatively impact on our business, results of operations and financial condition***.[…]*<br><br>…**Although we have not experienced material financial impacts due to the pandemic**, the fluid nature of the COVID-19 pandemic and uncertainties regarding the related economic impact are likely to result in sustained market turmoil, which could also negatively impact the company's business, financial condition and cash flows. Although our business is considered an "essential business," **the COVID-19 pandemic could result in labor shortages, which could result in our inability to plant and harvest crops at full capacity and could result in spoilage or loss of unharvested crops.…The extent of COVID-19's effect on our operational and financial performance will depend on future developments**, including the duration, spread and intensity of the pandemic, all of which are uncertain and difficult to predict considering the rapidly evolving landscape. **As a result, it is not currently possible to ascertain the overall impact of COVID-19 on our business. However, if the pandemic continues to persist as a severe worldwide health crisis, the disease could negatively impact our business, financial condition results of operations and cash flows, and may also have the effect of heightening many of the other risks described in this "Risk Factors" section.** ¶165. |

| **Reasons Why Statements are False and Misleading** | **Facts Giving Rise to Strong Inference of Scienter** |
|---|---|

34

| | |
|---|---|
| <div align="center">Reasons:</div><br><br>The above speculative, contingent, and woefully incomplete statements of known risks were materially false, misleading, and/or lacked a reasonable basis when made because:<br><br>Defendants speculate that "failure to attract and retain qualified employees could negatively impact" AppHarvest's business when the Company was already suffering massive attrition, and Defendants misrepresent that a potential "shortage of labor or lack of regular availability" or the Company's potential inability to "train its labor force" and "retain" employees could potentially affect AppHarvest, including its "ability to operate its greenhouses profitably," when, in reality, those situations had already transpired;<br><br>Defendants falsely misrepresent AppHarvest "has not experienced material financial impacts due to the pandemic" and speculate that the COVID-19 pandemic, due to contingent and vague "future developments," *could* negatively impact AppHarvest's "business, results of operations and financial condition" and "cash flows," *could* "result in labor shortages," *could* cause an "inability to plant and harvest crops at full capacity," and *could* "result in spoilage or loss of unharvested crops" when all of those things were already happening because COVID-19 had caused AppHarvest to operate severely understaffed during the first growing and harvesting season because employees were quarantining.<br><br><div align="center">Evidence:</div><br><br>Plaintiff incorporates the same Evidence in **False Statement V.A.**, as if fully set forth herein. | Plaintiff incorporates the same Evidence in **False Statement V.A.**, as if fully set forth herein. |

**False Statement VI**

| **Statement Category:** |
| --- |
| False and Misleading Purported Justifications for Financial Guidance |
| Misstatements Regarding Operations, Production, and Supply |
| Misstatements Regarding Price Performance |

| **Speaker(s); Date; & Medium** |
| --- |
| Defendant Eggleton as to the quoted portion, and all Defendants as to the remaining portion; February 25, 2021; Company Press Release via Globe Newswire, Investor Relations section of AppHarvest's website, and Exhibit 99.1 to Form 8-K; signed by Defendant Eggleton and filed with the SEC |

| **False and Misleading Statements or Omissions** |
| --- |
| **First Quarter 2021 Outlook and Fiscal Year 2021 Forecast** <br><br> …"**Our favorable crop yields and market pricing currently support a 2021 sales outlook that is better than we expected in December 2020**," said AppHarvest Founder & Chief Executive Officer Jonathan Webb…**In addition to better than anticipated crop yields and pricing**, the Company has benefited from a temporary decline in market supply…¶169. |

| **Reasons Why Statements are False and Misleading, and/or Lacked a Reasonable Basis** | **Facts Giving Rise to Strong Inference of Scienter** |
| --- | --- |
| Reasons: <br><br> The above statements were materially false, misleading, and/or lacked a reasonable basis when made because such statements touted the Company's "favorable crop yields and market pricing," and "better than anticipated crop yields and pricing" as the basis that underpinned and "support[ed]" Defendants' decision to raise the Company's full-year year net revenue and Adjusted EBITDA guidance. However, AppHarvest's "crop yields," were not "favorable" in either quantity (due to massive undisclosed waste and spoilage) or quality, which had already caused significant deterioration to "pricing" given that: | • CW6 met with Defendants Eggleton and Lee weekly concerning the baseline forecast, and upside and downside scenarios. ¶264. These weekly Forecast Meetings got "quite operational" and focused on various productivity metrics, with a key focus on yield and quality which was the basis for AppHarvest's revenue. *Id.*  Throughout the first half of 2021, Lee and Eggleton also discussed that attrition and retention metrics that were "far worse than expected" and falling short "week over week." ¶111. During the "toughest times," (end of Q1 through the "summer refresh" at the end of the Class Period) discussions at Forecast Meetings concerned: "ways to close the gap" between AppHarvest's underperformance compared to the current forecast; the expected time needed for |

Evidence:

(i) Defendants admitted that for the "***six months***" ended June 30, 2021, *i.e.*, beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii) Defendants admitted that for the "***six months***" ended June 30, 2021, *i.e.*, beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii) Defendants Lee's and Eggleton's veiled admissions on the Q1 2021 Earnings Call that "training" issues existed in the first quarter of 2021 that were hampering "productivity" and driving gross loss;

(iv) Defendants' admissions in the 2021 Q2 Earnings Release, the Q2 2021 Earnings Presentation, and the 2021 Q2 Earnings Call that "operational" and "executional" challenges—including lower quality production and saleable yield, and higher distribution and shipping expense incurred as a result of rejections—existed for the "initial growing season" and the "full season of harvest as a Company";

(v) according to CW1 and CW4, AppHarvest did not offer employees adequate (if any) training throughout the Class Period. According to CW1, AppHarvest's inadequately

the closing the gap depending on the various scenarios; and the Company's issues with employee training, turnover, poor work ethic, and inconsistent hiring standards which were "repeatedly cited" as the "root cause" of the overall production challenges. ¶264.

• Labor productivity was identified as a challenge for AppHarvest in 2020, and during the "toughest times," (end of Q1 through the "summer refresh" at the end of the Class Period) Defendants instituted Leadership Meetings twice a week, which included Lee, Eggleton, CW6 and other FP&A personnel, Marcella Butler, and Julie Nelson. ¶268. Labor productivity metrics included yield, quality, rejections from Mastronardi, attrition and employee absences, and productivity metrics for the various Greenhouse workers' particular functions. *Id.*    According to CW6, inadequate training, turnover, poor work ethic and inconsistent hiring standards were "repeatedly cited" as the "root cause" of the Company's productivity challenges at these Leadership Meetings. CW6 recalled the Leadership Meetings occurred usually mid-week and end-of-week so that Defendants could "keep an eye on it." *Id.*

• CW6 confirmed AppHarvest's executive management had information parity, such that "everyone knew what everyone else knew" regarding fundamental financial data. ¶129.

• CW6 confirmed that at the end of each month, results concerning pricing, labor productivity (including yield and quality), construction costs, tomato grades, and other factors would be "pulled into" FP&A models and adjustments would be made to the Company's forecasts. ¶265. CW6 and Defendant Eggleton met for "many hours" each day discussing these near-, medium-, and long-term financial forecasts. *Id.*

37

trained workforce contributed to 5-10% of crops being wasted or damaged during CW1's tenure, which resulted in lost sales. According to CW5, up to 50% of AppHarvest's crop was wasted in the first growing season caused by workers in the Greenhouse and Packhouse. Further, CW4 confirmed that tomatoes were wasted "daily" during harvesting season;

(vi)    CW6 explained that during the Class Period, AppHarvest's attrition and retention metrics in the first half of 2021 were far worse than expected because AppHarvest was clearly falling short week over week. Indeed, according to CW1 and CW2, throughout the Class Period, AppHarvest suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including:

a.    dissatisfaction with mandatory expanded working hours—including forced overtime, Saturdays, and holidays, and

b.    infection and quarantining due to the COVID-19 pandemic,

all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes.

CW4 likewise stated that there was significant turnover throughout CW4's tenure at AppHarvest, with the west side of the Greenhouse losing at least 10 personnel every week. CW4 stated that the turnover

- CW6 confirmed that AppHarvest productivity forecasts were sent to Mastronardi on a weekly, and possibly daily basis. ¶266. According to CW6, these forecasts included estimates of labor productivity to determine the volumes of beefsteak and Tomatoes on the Vine that would be harvested in the given period. *Id.*

- Mastronardi provided Defendants with daily updates, regular audits, and negative feedback in response to subpar quality throughout the Class Period.  ¶¶60, 67, 275. Mastronardi increased the frequency of its audits on the AppHarvest tomatoes during periods of "weaker" performance by AppHarvest, which resulted in Mastronardi rejecting a lot of tomatoes. ¶275. During the "toughest" periods of rejected tomatoes (the end of Q1 2021 through the "summer refresh"), it was necessary for AppHarvest to lower estimated production forecasts, a process that involved CW6, Eggleton and Lee, which were exchanged with Mastronardi in a shared "portal." *Id.*

- As confirmed by CW3, CW6, and the Mastronardi Morehead Agreement Defendants Eggleton and Lee were intimately involved in various forecasting processes—forecasts which included sales, quality, costs, yield, price, estimated rejections, and estimated damaged tomatoes. ¶263.

- CW3 confirmed that AppHarvest's forecasts existed prior to the commencement of the first growing season and that Defendant Eggleton approved the forecasts. ¶263. CW3 further explained AppHarvest had planning software, Microsoft Dynamics, which tracked operational results and actual costs, and the Individual Defendants had access to this software. *Id.*  CWs 3 and 6 stated that AppHarvest used such

38

resulted in less trained staff and thereby lower yields because there were fewer Crop Care Specialists to do the work.

CW5 confirmed that employee turnover and churn had been consistently high throughout October 2020 and June 2021, causing concern amongst Greenhouse personnel that AppHarvest had inadequate labor to meet production requirements as was discussed at the morning stand-up meetings CW5 attended;

(vii) according to CW1, CW2, and CW4, throughout the Class Period, AppHarvest's own incentive piece rate structure incentivized disruptive and inefficient workmanship that wasted, damaged, and produced low quality tomatoes;

(viii) CW6 stated that Mastronardi informed AppHarvest that it needed to tighten up specifications because Mastronardi was having to reject a lot of fruit throughout the Class Period—upwards of 30% to 35% during the Company's "toughest times," which was "many times" more than AppHarvest's target which CW6 believed was 6% or 7%;

(ix) according to CW2, "half" of all tomatoes inspected were USDA Grade No. 2 or not commercially saleable, and CW6 confirmed that AppHarvest was a "long way off" its quality goals;

(x) CW6 stated that in the "toughest times" of the first growing season AppHarvest was well below 50% in relation to the Company's productivity standards for specific Greenhouse jobs. ¶170.

real time production data to create and track against AppHarvest's forecasts. ¶¶121, 130, 263.

• CW6 confirmed AppHarvest had real-time access to quality and yield data from the Packhouse based on the types of boxes being shipped (Grade 1 versus Grade 2). ¶267. Further, CW 1 and CW4 stated that AppHarvest had real-time access to productivity metrics from the Greenhouse that were recorded by scanners when workers finished working on a particular row and uploaded to the Company's electronic files. ¶120. CW4 confirmed that such real-time data included information from quality inspectors who recorded their results into a "live" excel spreadsheet so that AppHarvest could "map" quality performance. ¶85.

• Defendant Webb frequently visited the Morehead Facility prior to and throughout the Class Period where he filmed at least 16 interviews, gave tours, and visited operations, and would have, and did, see the Company's dysfunctional production facilities and widespread attrition and churn. ¶289. Indeed, Webb admitted he was at the facility "every morning" and that he was "in the facility, you know, elbow tapping everyone as they come in." ¶287. Webb further admitted that he loves to "sleep on the farms" and "going to our operations." ¶288.

• Webb or his office instructed CW5's team to "hide the waste" when investors and news media visited so that the Greenhouse had "better eye appeal." ¶¶83-84, 291.

• Defendants' admissions that "labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility" existed for the entire "*six months* ended June 30, 2021," which caused "lower net sales due to lower overall No. 1-grade production

yields" as well as "higher related distribution and shipping fees." ¶297.

- Defendants' admissions that "executional challenges" spanned the entire Class Period because as they were "very real in our first major full season of harvest as a company" and the harvest season began in January 2021; and challenges lasted entire "initial growing season" and "first growing season" which began in October 2020. ¶298.

- Lee admitted Defendants assigned new "conservative" assumptions to operational performance with respect to the Company's outlook to investors, and further admitted it was not until the end of the Class Period when AppHarvest's guidance was "balanced" and "achiev[able]." ¶¶255, 328. CW6 confirmed that Defendant Lee always took the most "aggressive" forecast positions, including in instances where he was informed that AppHarvest's challenges still needed to be factored in. ¶¶124, 245.

- Throughout the Class Period the Morehead Facility was the site of the Company's sole production operations and core business. ¶286.

- Defendants frequently spoke in detail regarding staffing, labor, and operations, tomato production, pricing, yield, and other key metrics every quarter and intermittently in various media interviews, which adds a strong inference of scienter. ¶¶72-75, 304-308.

- AppHarvest was entirely reliant on its sole distributor Mastronardi, which required top-quality Grade 1 tomatoes. ¶270. In fact, AppHarvest filed at least 18 documents with the SEC, including documents signed by the Individual Defendants, stating the Company was "highly dependent" on

| | Mastronardi, and Webb signed and initialed every page of the Mastronardi Morehead Agreement which required Mastronardi to accept all USDA Grade 1 tomatoes and saddled AppHarvest with all of the risk and costs of non-Grade 1 tomatoes, which Defendants knew would be rejected by Mastronardi and had "very little to no value." ¶¶271, 270. |
|---|---|

**False Statement VII**

| **Statement Category:**<br>False and Misleading Purported Justifications for Financial Guidance<br>Misstatements Regarding Operations, Production, and Supply<br>Misstatements Regarding Price Performance |
|---|
| **Speaker(s); Date; & Medium**<br>Defendant Webb; March 1, 2021; Company Press Release via Globe Newswire, AppHarvest's Investor Relations website |
| **False and Misleading Statements or Omissions**<br><br>**First Quarter 2021 Outlook and Fiscal Year 2021 Forecast**<br><br>**AppHarvest raised its revenue outlook range for fiscal year 2021 on February 25, 2021, versus expectations prior to the start of harvesting. "Our favorable crop yields and market pricing currently support a 2021 sales outlook that is better than we expected in December 2020**," said Webb. ¶173. |

| **Reasons Why Statements are False and Misleading, and/or Lacked a Reasonable Basis** | **Facts Giving Rise to Strong Inference of Scienter** |
|---|---|
| _Reasons:_<br><br>The above statements were materially false, misleading, and/or lacked a reasonable basis when made because such statements touted the Company's "harvesting" and "favorable crop yields and market pricing," as the basis that underpinned and "support[ed]" Defendants' decision to raise the Company's full-year revenue outlook range. However, AppHarvest's "crop yields," were not "favorable" in either quantity (due to massive undisclosed waste and spoilage) or quality, which had already caused significant deterioration to "pricing" given that:<br><br>_Evidence:_ | • CW6 met with Defendants Eggleton and Lee weekly concerning the baseline forecast, and upside and downside scenarios. ¶264. These weekly Forecast Meetings got "quite operational" and focused on various productivity metrics, with a key focus on yield and quality which was the basis for AppHarvest's revenue. *Id.* Throughout the first half of 2021, Lee and Eggleton also discussed that attrition and retention metrics that were "far worse than expected" and falling short "week over week." ¶111. During the "toughest times," (end of Q1 through the "summer refresh" at the end of the Class Period) discussions at Forecast Meetings concerned: "ways to close the gap" between AppHarvest's underperformance compared to the current forecast; the expected time needed for the closing the gap depending on the various scenarios; and the Company's issues with employee training, turnover, poor |

(i)     Defendants admitted that for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)    Defendants admitted that for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii)   Defendants Lee's and Eggleton's veiled admissions on the Q1 2021 Earnings Call that "training" issues existed in the first quarter of 2021 that were hampering "productivity" and driving gross loss;

(iv)    Defendants' admissions in the 2021 Q2 Earnings Release, the Q2 2021 Earnings Presentation, and the 2021 Q2 Earnings Call that "operational" and "executional" challenges—including lower quality production and saleable yield, and higher distribution and shipping expense incurred as a result of rejections—existed for the "initial growing season" and the "full season of harvest as a Company";

(v)     according to CW1 and CW4, AppHarvest did not offer employees adequate (if any) training throughout the Class Period. According to CW1, AppHarvest's inadequately trained workforce contributed to 5-10% of crops being wasted or damaged during CW1's tenure, which resulted in lost sales. According to CW5, up to 50% of

work ethic, and inconsistent hiring standards which were "repeatedly cited" as the "root cause" of the overall production challenges. ¶264.

• Labor productivity was identified as a challenge for AppHarvest in 2020, and during the "toughest times," (end of Q1 through the "summer refresh" at the end of the Class Period) Defendants instituted Leadership Meetings twice a week, which included Lee, Eggleton, CW6 and other FP&A personnel, Marcella Butler, and Julie Nelson. ¶268. Labor productivity metrics included yield, quality, rejections from Mastronardi, attrition and employee absences, and productivity metrics for the various Greenhouse workers' particular functions. *Id.*   According to CW6, inadequate training, turnover, poor work ethic and inconsistent hiring standards were "repeatedly cited" as the "root cause" of the Company's productivity challenges at these Leadership Meetings. CW6 recalled the Leadership Meetings occurred usually mid-week and end-of-week so that Defendants could "keep an eye on it." *Id.*

• CW6 confirmed AppHarvest's executive management had information parity, such that "everyone knew what everyone else knew" regarding fundamental financial data.  ¶129.

• CW6 confirmed that at the end of each month, results concerning pricing, labor productivity (including yield and quality), construction costs, tomato grades, and other factors would be "pulled into" FP&A models and adjustments would be made to the Company's forecasts. ¶265. CW6 and Defendant Eggleton met for "many hours" each day discussing these near-, medium-, and long-term financial forecasts. *Id.*

43

AppHarvest's crop was wasted in the first growing season caused by workers in the Greenhouse and Packhouse. Further, CW4 confirmed that tomatoes were wasted "daily" during harvesting season;

(vi) CW6 explained that during the Class Period, AppHarvest's attrition and retention metrics in the first half of 2021 were far worse than expected because AppHarvest was clearly falling short week over week. Indeed, according to CW1 and CW2, throughout the Class Period, AppHarvest suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including:

a. dissatisfaction with mandatory expanded working hours—including forced overtime, Saturdays, and holidays, and

b. infection and quarantining due to the COVID-19 pandemic,

all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes.

CW4 likewise stated that there was significant turnover throughout CW4's tenure at AppHarvest, with the west side of the Greenhouse losing at least 10 personnel every week. CW4 stated that the turnover resulted in less trained staff and thereby lower yields because there were fewer Crop Care Specialists to do the work.

- CW6 confirmed that AppHarvest productivity forecasts were sent to Mastronardi on a weekly, and possibly daily basis. ¶266. According to CW6, these forecasts included estimates of labor productivity to determine the volumes of beefsteak and Tomatoes on the Vine that would be harvested in the given period. *Id.*

- Mastronardi provided Defendants with daily updates, regular audits, and negative feedback in response to subpar quality throughout the Class Period. ¶¶60, 67, 275. Mastronardi increased the frequency of its audits on the AppHarvest tomatoes during periods of "weaker" performance by AppHarvest, which resulted in Mastronardi rejecting a lot of tomatoes. ¶275. During the "toughest" periods of rejected tomatoes (the end of Q1 2021 through the "summer refresh"), it was necessary for AppHarvest to lower estimated production forecasts, a process that involved CW6, Eggleton and Lee, which were exchanged with Mastronardi in a shared "portal." *Id.*

- As confirmed by CW3, CW6, and the Mastronardi Morehead Agreement Defendants Eggleton and Lee were intimately involved in various forecasting processes—forecasts which included sales, quality, costs, yield, price, estimated rejections, and estimated damaged tomatoes. ¶263.

- CW3 confirmed that AppHarvest's forecasts existed prior to the commencement of the first growing season and that Defendant Eggleton approved the forecasts. ¶263. CW3 further explained AppHarvest had planning software, Microsoft Dynamics, which tracked operational results and actual costs, and the Individual Defendants had access to this software. *Id.* CWs 3 and 6 stated that AppHarvest used such real time production data to create and track against AppHarvest's forecasts. ¶¶121, 130, 263.

44

CW5 confirmed that employee turnover and churn had been consistently high throughout October 2020 and June 2021, causing concern amongst Greenhouse personnel that AppHarvest had inadequate labor to meet production requirements as was discussed at the morning stand-up meetings CW5 attended;

(vii)     according to CW1, CW2, and CW4, throughout the Class Period, AppHarvest's own incentive piece rate structure incentivized disruptive and inefficient workmanship that wasted, damaged, and produced low quality tomatoes;

(viii)    CW6 stated that Mastronardi informed AppHarvest that it needed to tighten up specifications because Mastronardi was having to reject a lot of fruit throughout the Class Period—upwards of 30% to 35% during the Company's "toughest times," which was "many times" more than AppHarvest's target which CW6 believed was 6% or 7%;

(ix)      according to CW2, "half" of all tomatoes inspected were USDA Grade No. 2 or not commercially saleable, and CW6 confirmed that AppHarvest was a "long way off" its quality goals;

(x)       CW6 stated that in the "toughest times" of the first growing season AppHarvest was well below 50% in relation to the Company's productivity standards for specific Greenhouse jobs. ¶174.

Furthermore, Defendants' "expectations prior to the start of harvesting" were not met or exceeded, thereby warranting a raised sales outlook, as those prior "expectations" preceded the Defendants "operational" and "executional" challenges. Indeed, CW6 confirmed that at weekly forecast meetings during this time,

- CW6 confirmed AppHarvest had real-time access to quality and yield data from the Packhouse based on the types of boxes being shipped (Grade 1 versus Grade 2). ¶267. Further, CW 1 and CW4 stated that AppHarvest had real-time access to productivity metrics from the Greenhouse that were recorded by scanners when workers finished working on a particular row and uploaded to the Company's electronic files. ¶120. CW4 confirmed that such real-time data included information from quality inspectors who recorded their results into a "live" excel spreadsheet so that AppHarvest could "map" quality performance. ¶85.

- Defendant Webb frequently visited the Morehead Facility prior to and throughout the Class Period where he filmed at least 16 interviews, gave tours, and visited operations, and would have, and did, see the Company's dysfunctional production facilities and widespread attrition and churn. ¶289. Indeed, Webb admitted he was at the facility "every morning" and that he was "in the facility, you know, elbow tapping everyone as they come in." ¶287. Webb further admitted that he loves to "sleep on the farms" and "going to our operations." ¶288.

- Webb or his office instructed CW5's team to "hide the waste" when investors and news media visited so that the Greenhouse had "better eye appeal." ¶¶83-84, 291.

- Defendants' admissions that "labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility" existed for the entire "*six months* ended June 30, 2021," which caused "lower net sales due to lower overall No. 1-grade production yields" as well as "higher related distribution and shipping fees." ¶297.

| | |
|---|---|
| Defendants were considering "ways to close the gap" between AppHarvest's underperformance compared to forecast. ¶175. | • Defendants' admissions that "executional challenges" spanned the entire Class Period because as they were "very real in our first major full season of harvest as a company" and the harvest season began in January 2021; and challenges lasted entire "initial growing season" and "first growing season" which began in October 2020. ¶298. |
| | • Lee admitted Defendants assigned new "conservative" assumptions to operational performance with respect to the Company's outlook to investors, and further admitted it was not until the end of the Class Period when AppHarvest's guidance was "balanced" and "achiev[able]." ¶¶255, 328. CW6 confirmed that Defendant Lee always took the most "aggressive" forecast positions, including in instances where he was informed that AppHarvest's challenges still needed to be factored in. ¶¶124, 245. |
| | • Throughout the Class Period the Morehead Facility was the site of the Company's sole production operations and core business. ¶286. |
| | • Defendants frequently spoke in detail regarding staffing, labor, and operations, tomato production, pricing, yield, and other key metrics every quarter and intermittently in various media interviews, which adds a strong inference of scienter. ¶¶72-75, 304-308. |
| | • AppHarvest was entirely reliant on its sole distributor Mastronardi, which required top-quality Grade 1 tomatoes. ¶270. In fact, AppHarvest filed at least 18 documents with the SEC, including documents signed by the Individual Defendants, stating the Company was "highly dependent" on Mastronardi, and Webb signed and initialed every page of the Mastronardi Morehead Agreement which required |

46

| | |
|---|---|
| | Mastronardi to accept all USDA Grade 1 tomatoes and saddled AppHarvest with all of the risk and costs of non-Grade 1 tomatoes, which Defendants knew would be rejected by Mastronardi and had "very little to no value." ¶¶271, 270. |

**False Statement VIII. A**

| |
|---|
| **Statement Category:**<br>Misstatements Regarding Labor Availability, Recruitment, and Retention |
| **Speaker(s); Date; & Medium**<br>All Defendants; March 2, 2021, Amendment No. 1 to Form S-1 Registration Statement, signed by Defendants Webb, Lee, and Eggleton; filed with the SEC and on the Investor Relations section of AppHarvest's website |
| **False and Misleading Statements or Omissions**<br><br>A subsection of the March 2 Form S-1/A titled "**Our Solution**" (emphasis in original), **"We believe there is a large population of workers in the Central Appalachian region who are eager to find long-term career opportunities like those being offered by AppHarvest**…**As a result, we believe we can staff and retain our workers with less churn**, immigration challenges **and unfilled positions** that many of our competitors face." These statements were specifically added by Defendants to the March 2 Form S-1/A, and were not contained in, for example, the January 11 Proxy Statement/Prospectus or the February 10 Form S-1.<br><br>Relatedly, a subsection of the March 2 Form S-1/A titled "**Our Strengths**," falsely and/or misleadingly stated in pertinent part: "**We were able to efficiently hire many employees as we opened our first facility in Morehead** and have identified talent to join our team at the facilities we are developing in Richmond and Berea." This statement was specifically added by Defendants to the March 2 Form S-1/A, and was not contained in, for example, the January 11 Proxy Statement/Prospectus or the February 10 Form S-1. ¶¶177-178 |

| **Reasons Why Statements are False and Misleading, and/or Lacked a Reasonable Basis** | **Facts Giving Rise to Strong Inference of Scienter** |
|---|---|
| <br>Reasons:<br><br>The above statements were materially false, misleading, and/or lacked a reasonable basis when made because: (a) Defendants' statements that prospective employees were seeking "long-term" employment, and that AppHarvest was able to "staff and retain" workers with "less churn" and less "unfilled positions," and that AppHarvest was able to "efficiently hire many employees" as it opened the Morehead Facility were not supported by, and/or | • CW6 met with Defendants Eggleton and Lee weekly concerning the baseline forecast, and upside and downside scenarios. ¶264. These weekly Forecast Meetings got "quite operational" and focused on various productivity metrics, with a key focus on yield and quality which was the basis for AppHarvest's revenue. *Id.* Throughout the first half of 2021, Lee and Eggleton also discussed that attrition and retention metrics that were "far worse than expected" and falling short "week over week." ¶111. During the "toughest times," (end of Q1 through the "summer refresh" at the end of the Class |

concealed, known facts that directly contradicted those statements which left AppHarvest's workforce short-staffed, unproductive, and insufficiently trained; and (b) the statements misrepresented AppHarvest's frequent hiring as a "Strength" rather than what it was—a known consequence, born out of necessity, of the significant amount of concealed employee attrition, turnover, and churn that AppHarvest had experienced.

Furthermore, the above statements were materially false, misleading, and/or lacked a reasonable basis when made in light of the circumstances. As of March 2, 2021, AppHarvest was staffing its first, massive CEA facility and the Morehead Facility's productivity would depend, in part, on Defendants' ability to "efficiently hire" and "retain" staff to minimize "churn" and "unfilled positions"—as evidenced by Defendants' frequent updates and assurances to market participants regarding the Company's hiring efforts (*see* ¶¶64-69, *supra*). It was misleading for Defendants to make the above statements, and thereby paint AppHarvest's hiring in an undeservedly rosy light, without also disclosing adverse circumstances. ¶180.

The material falsity of the above statements is supported by ample evidence given that:

<div align="center">Evidence:</div>

(i)     as Defendants would later admit, for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, AppHarvest was "adversely impacted" by "labor" challenges which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)    as Defendants would later admit, for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, that

Period) discussions at Forecast Meetings concerned: "ways to close the gap" between AppHarvest's underperformance compared to the current forecast; the expected time needed for the closing the gap depending on the various scenarios; and the Company's issues with employee training, turnover, poor work ethic, and inconsistent hiring standards which were "repeatedly cited" as the "root cause" of the overall production challenges. ¶264.

- Labor productivity was identified as a challenge for AppHarvest in 2020, and during the "toughest times," (end of Q1 through the "summer refresh" at the end of the Class Period) Defendants instituted Leadership Meetings twice a week, which included Lee, Eggleton, CW6 and other FP&A personnel, Marcella Butler, and Julie Nelson. ¶268. Labor productivity metrics included yield, quality, rejections from Mastronardi, attrition and employee absences, and productivity metrics for the various Greenhouse workers' particular functions. *Id.*    According to CW6, inadequate training, turnover, poor work ethic and inconsistent hiring standards were "repeatedly cited" as the "root cause" of the Company's productivity challenges at these Leadership Meetings. CW6 recalled the Leadership Meetings occurred usually mid-week and end-of-week so that Defendants could "keep an eye on it." *Id.*

- CW6 confirmed that at the end of each month, results concerning pricing, labor productivity (including yield and quality), construction costs, tomato grades, and other factors would be "pulled into" FP&A models and adjustments would be made to the Company's forecasts. ¶265. CW6 and Defendant Eggleton met for "many hours" each day discussing these near-, medium-, and long-term financial forecasts. *Id.*

<div align="center">49</div>

"investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii)  CW6 explained that during the Class Period, AppHarvest's attrition and retention metrics in the first half of 2021 were far worse than expected because AppHarvest was clearly falling short week over week. Indeed, according to CW1 and CW2, throughout the Class Period AppHarvest suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including:

a.  dissatisfaction with mandatory expanded working hours—including forced overtime, Saturdays, and holidays, and

b.  infection and quarantining due to the COVID-19 pandemic,

all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes.

CW4 likewise stated that there was significant turnover throughout CW4's tenure at AppHarvest, with the west side of the Greenhouse losing at least 10 personnel every week. CW4 stated that the turnover resulted in less trained staff and thereby lower yields because there were fewer Crop Care Specialists to do the work.

- CW6 confirmed that AppHarvest productivity forecasts were sent to Mastronardi on a weekly, and possibly daily basis. ¶266. According to CW6, these forecasts included estimates of labor productivity to determine the volumes of beefsteak and Tomatoes on the Vine that would be harvested in the given period. *Id.*

- Defendant Webb frequently visited the Morehead Facility prior to and throughout the Class Period where he filmed at least 16 interviews, gave tours, and visited operations, and would have, and did, see the Company's dysfunctional production facilities and widespread attrition and churn. ¶289. Indeed, Webb admitted he was at the facility "every morning" and that he was "in the facility, you know, elbow tapping everyone as they come in." ¶287. Webb further admitted that he loves to "sleep on the farms" and "going to our operations." ¶288.

- Defendants' admissions that "labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility" existed for the entire "*six months* ended June 30, 2021," which caused "lower net sales due to lower overall No. 1-grade production yields" as well as "higher related distribution and shipping fees." ¶297.

- Defendants' admissions that "executional challenges" spanned the entire Class Period because as they were "very real in our first major full season of harvest as a company" and the harvest season began in January 2021; and challenges lasted entire "initial growing season" and "first growing season" which began in October 2020. ¶298.

| | |
|---|---|
| CW5 confirmed that employee turnover and churn had been consistently high throughout October 2020 and June 2021, causing concern amongst Greenhouse personnel that AppHarvest had inadequate labor to meet production requirements as was discussed at the morning stand-up meetings CW5 attended.<br><br>(iv)   As was confirmed in Defendants' post Class Period 10-Q disclosures for Q3 2021, CW5 stated that due to the pervasive staffing issues described above, regional labor was insufficient and AppHarvest had to bring in contract labor to help during times of poor attendance. ¶179. | • Throughout the Class Period the Morehead Facility was the site of the Company's sole production operations and core business. ¶286.<br><br>• Defendants frequently spoke in detail regarding staffing, labor, and operations, tomato production, pricing, yield, and other key metrics every quarter and intermittently in various media interviews, which adds a strong inference of scienter. ¶¶72-75, 304-308. |

**False Statement VIII. B. i.**

| **Statement Category:** |
| --- |
| Speculative, Contingent, and Incomplete Risk Factors Relating to Growth and Price Performance |

| **Speaker(s), Date, & Medium** |
| --- |
| All Defendants; March 2, 2021, Amendment No. 1 to Form S-1 Registration Statement, signed by Defendants Webb, Lee, and Eggleton; filed with the SEC and on the Investor Relations section of AppHarvest's website |

| **False and Misleading Statements or Omissions** |
| --- |

**Risks Related to Our Business and Industry**

…Even if [AppHarvest's] investments do result in the growth of our business, **if we do not effectively manage our growth, we may not be able to execute on our business plan** and vision, respond to competitive pressures, **take advantage of market opportunities, satisfy customer requirements or maintain high-quality product offerings, any of which could adversely affect our business, financial condition and results of operations.**

\*\*\*

**In future periods, revenue growth could slow or revenue could decline for a number of reasons, including** slowing demand for our products, increasing competition, a decrease in the growth of the overall market, or **our failure, for any reason, to take advantage of growth opportunities. If our assumptions regarding these risks and uncertainties and future revenue growth are incorrect or change, or if we do not address these risks successfully, our operating and financial results could differ materially from our expectations, and our business could suffer.** ¶181.

| **Reasons Why Statements are False and Misleading, and/or Lacked a Reasonable Basis** | **Facts Giving Rise to Strong Inference of Scienter** |
| --- | --- |
| Reasons:<br>The above speculative, contingent, and woefully incomplete statements were materially false, misleading, and/or lacked a reasonable basis when made because: | • CW6 met with Defendants Eggleton and Lee weekly concerning the baseline forecast, and upside and downside scenarios. ¶264. These weekly Forecast Meetings got "quite operational" and focused on various productivity metrics, with a key focus on yield and quality which was the basis for AppHarvest's revenue. *Id.* Throughout the first half of 2021, Lee and Eggleton also discussed that attrition and retention |

Defendants speculatively portrayed AppHarvest's ability to "effectively manage its growth," "execute on its business plan," and "satisfy customer requirements or maintain high quality product" offerings as contingent or potential when AppHarvest was already failing to do all of these things resulting in lower saleable yield and quality products, and higher customer rejections and costs.

Defendants made a boilerplate and vague disclaimers that "revenue growth could slow or revenue could decline for a number of reasons" and that if AppHarvest fails to "take advantage of growth opportunities" "for any reason" it might see declining revenue, when Defendants were already experiencing wide-ranging execution problems for the entire first harvesting season that were doing exactly that.

<u>Evidence:</u>

The above Reasons are supported by ample evidence, given that:

(i)     Defendants admitted that for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)    Defendants admitted that for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

metrics that were "far worse than expected" and falling short "week over week." ¶111. During the "toughest times," (end of Q1 through the "summer refresh" at the end of the Class Period) discussions at Forecast Meetings concerned: "ways to close the gap" between AppHarvest's underperformance compared to the current forecast; the expected time needed for the closing the gap depending on the various scenarios; and the Company's issues with employee training, turnover, poor work ethic, and inconsistent hiring standards which were "repeatedly cited" as the "root cause" of the overall production challenges. ¶264.

• Labor productivity was identified as a challenge for AppHarvest in 2020, and during the "toughest times," (end of Q1 through the "summer refresh" at the end of the Class Period) Defendants instituted Leadership Meetings twice a week, which included Lee, Eggleton, CW6 and other FP&A personnel, Marcella Butler, and Julie Nelson. ¶268. Labor productivity metrics included yield, quality, rejections from Mastronardi, attrition and employee absences, and productivity metrics for the various Greenhouse workers' particular functions. *Id.*    According to CW6, inadequate training, turnover, poor work ethic and inconsistent hiring standards were "repeatedly cited" as the "root cause" of the Company's productivity challenges at these Leadership Meetings. CW6 recalled the Leadership Meetings occurred usually mid-week and end-of-week so that Defendants could "keep an eye on it." *Id.*

• CW6 confirmed AppHarvest's executive management had information parity, such that "everyone knew what everyone else knew" regarding fundamental financial data. ¶129.

• CW6 confirmed that at the end of each month, results concerning pricing, labor productivity (including yield and

53

(iii)    Defendants Lee's and Eggleton's veiled admissions on the Q1 2021 Earnings Call that "training" issues existed in the first quarter of 2021 that were hampering "productivity" and driving gross loss;

(iv)    Defendants' admissions in the 2021 Q2 Earnings Release, the Q2 2021 Earnings Presentation, and the 2021 Q2 Earnings Call that "operational" and "executional" challenges—including lower quality production and saleable yield, and higher distribution and shipping expense incurred as a result of rejections—existed for the "initial growing season" and the "full season of harvest as a Company";

(v)    according to CW1 and CW4, AppHarvest did not offer employees adequate (if any) training throughout the Class Period. According to CW1, AppHarvest's inadequately trained workforce contributed to 5-10% of crops being wasted or damaged during CW1's tenure, which resulted in lost sales. According to CW5, up to 50% of AppHarvest's crop was wasted in the first growing season caused by workers in the Greenhouse and Packhouse. Further, CW4 confirmed that tomatoes were wasted "daily" during harvesting season;

(vi)    CW6 explained that during the Class Period, AppHarvest's attrition and retention metrics in the first half of 2021 were far worse than expected because AppHarvest was clearly falling short week over week. Indeed, according to CW1 and CW2, throughout the Class Period, AppHarvest suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first

quality), construction costs, tomato grades, and other factors would be "pulled into" FP&A models and adjustments would be made to the Company's forecasts. ¶265. CW6 and Defendant Eggleton met for "many hours" each day discussing these near-, medium-, and long-term financial forecasts. *Id.*

• CW6 confirmed that AppHarvest productivity forecasts were sent to Mastronardi on a weekly, and possibly daily basis. ¶266. According to CW6, these forecasts included estimates of labor productivity to determine the volumes of beefsteak and Tomatoes on the Vine that would be harvested in the given period. *Id.*

• Mastronardi provided Defendants with daily updates, regular audits, and negative feedback in response to subpar quality throughout the Class Period. ¶¶60, 67, 275. Mastronardi increased the frequency of its audits on the AppHarvest tomatoes during periods of "weaker" performance by AppHarvest, which resulted in Mastronardi rejecting a lot of tomatoes. ¶275. During the "toughest" periods of rejected tomatoes (the end of Q1 2021 through the "summer refresh"), it was necessary for AppHarvest to lower estimated production forecasts, a process that involved CW6, Eggleton and Lee, which were exchanged with Mastronardi in a shared "portal." *Id.*

• As confirmed by CW3, CW6, and the Mastronardi Morehead Agreement Defendants Eggleton and Lee were intimately involved in various forecasting processes—forecasts which included sales, quality, costs, yield, price, estimated rejections, and estimated damaged tomatoes. ¶263.

month), and understaffing because of undisclosed reasons, including:

a.  dissatisfaction with mandatory expanded working hours—including forced overtime, Saturdays, and holidays, and

b.  infection and quarantining due to the COVID-19 pandemic,

all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes.

CW4 likewise stated that there was significant turnover throughout CW4's tenure at AppHarvest, with the west side of the Greenhouse losing at least 10 personnel every week. CW4 stated that the turnover resulted in less trained staff and thereby lower yields because there were fewer Crop Care Specialists to do the work.

CW5 confirmed that employee turnover and churn had been consistently high throughout October 2020 and June 2021, causing concern amongst Greenhouse personnel that AppHarvest had inadequate labor to meet production requirements as was discussed at the morning stand-up meetings CW5 attended;

(vii)  according to CW1, CW2, and CW4, throughout the Class Period, AppHarvest's own incentive piece rate structure incentivized disruptive and inefficient workmanship that wasted, damaged, and produced low quality tomatoes;

- CW3 confirmed that AppHarvest's forecasts existed prior to the commencement of the first growing season and that Defendant Eggleton approved the forecasts. ¶263. CW3 further explained AppHarvest had planning software, Microsoft Dynamics, which tracked operational results and actual costs, and the Individual Defendants had access to this software. *Id.* CWs 3 and 6 stated that AppHarvest used such real time production data to create and track against AppHarvest's forecasts. ¶¶121, 130, 263.

- CW6 confirmed AppHarvest had real-time access to quality and yield data from the Packhouse based on the types of boxes being shipped (Grade 1 versus Grade 2). ¶267. Further, CW 1 and CW4 stated that AppHarvest had real-time access to productivity metrics from the Greenhouse that were recorded by scanners when workers finished working on a particular row and uploaded to the Company's electronic files. ¶120. CW4 confirmed that such real-time data included information from quality inspectors who recorded their results into a "live" excel spreadsheet so that AppHarvest could "map" quality performance. ¶85.

- Defendant Webb frequently visited the Morehead Facility prior to and throughout the Class Period where he filmed at least 16 interviews, gave tours, and visited operations, and would have, and did, see the Company's dysfunctional production facilities and widespread attrition and churn. ¶289. Indeed, Webb admitted he was at the facility "every morning" and that he was "in the facility, you know, elbow tapping everyone as they come in." ¶287. Webb further admitted that he loves to "sleep on the farms" and "going to our operations." ¶288.

55

| | | |
|---|---|---|
| (viii) | CW6 stated that Mastronardi informed AppHarvest that it needed to tighten up specifications because Mastronardi was having to reject a lot of fruit throughout the Class Period—upwards of 30% to 35% during the Company's "toughest times," which was "many times" more than AppHarvest's target which CW6 believed was 6% or 7%; | • Webb or his office instructed CW5's team to "hide the waste" when investors and news media visited so that the Greenhouse had "better eye appeal." ¶¶83-84, 291. |
| (ix) | according to CW2, "half" of all tomatoes inspected were USDA Grade No. 2 or not commercially saleable, and CW6 confirmed that AppHarvest was a "long way off" its quality goals; | • Defendants' admissions that "labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility" existed for the entire "*six months* ended June 30, 2021," which caused "lower net sales due to lower overall No. 1-grade production yields" as well as "higher related distribution and shipping fees." ¶297. |
| (x) | CW6 stated that in the "toughest times" of the first growing season AppHarvest was well below 50% in relation to the Company's productivity standards for specific Greenhouse jobs. ¶182. | • Defendants' admissions that "executional challenges" spanned the entire Class Period because as they were "very real in our first major full season of harvest as a company" and the harvest season began in January 2021; and challenges lasted entire "initial growing season" and "first growing season" which began in October 2020. ¶298. |
| | | • Throughout the Class Period the Morehead Facility was the site of the Company's sole production operations and core business. ¶286. |
| | | • Defendants frequently spoke in detail regarding staffing, labor, and operations, tomato production, pricing, yield, and other key metrics every quarter and intermittently in various media interviews, which adds a strong inference of scienter. ¶¶72-75, 304-308. |
| | | • AppHarvest was entirely reliant on its sole distributor Mastronardi, which required top-quality Grade 1 tomatoes. ¶270. In fact, AppHarvest filed at least 18 documents with the SEC, including documents signed by the Individual Defendants, stating the Company was "highly dependent" on Mastronardi, and Webb signed and initialed every page of the |

| | Mastronardi Morehead Agreement which required Mastronardi to accept all USDA Grade 1 tomatoes and saddled AppHarvest with all of the risk and costs of non-Grade 1 tomatoes, which Defendants knew would be rejected by Mastronardi and had "very little to no value." ¶¶271, 270. |
|---|---|

**False Statement VIII. B. ii.**

<table>
<tr><td align="center">

**Statement Category:**
Speculative, Contingent, and Incomplete Risk Factors Concerning Quality, Production, and Supply

</td></tr>
<tr><td align="center">

**Speaker(s), Date, & Medium**
All Defendants; March 2, 2021, Amendment No. 1 to Form S-1 Registration Statement, signed by Defendants Webb, Lee, and Eggleton; filed with the SEC and on the Investor Relations section of AppHarvest's website

</td></tr>
<tr><td>

**False and Misleading Statements or Omissions**

*We currently rely on a single facility for all of our operations.*

…**Adverse changes or developments affecting the Morehead facility could impair our ability to produce our products and our business, prospects, financial condition and results of operations. Any shutdown or period of reduced production at the Morehead facility**, which may be caused by regulatory noncompliance or other issues, as well as other factors beyond our control, such as severe weather conditions, natural disaster, fire, power interruption, work stoppage, disease outbreaks or pandemics (such as COVID-19), equipment failure or delay in supply delivery, **would significantly disrupt our ability to grow and deliver our produce in a timely manner, meet our contractual obligations and operate our business.**

\*\*\*

**Any significant or unexpected rejection of our products could negatively impact our results of operations, and we may be unable to sell the rejected products to other third parties.**
\*\*\*

**If our products** fail to gain market acceptance, are restricted by regulatory requirements or **have quality problems, we may not be able to fully recover costs and expenses incurred in our operations, and our business, financial condition or results of operations could be materially and adversely affected.** ¶181.

</td></tr>
</table>

| **Reasons Why Statements are False and Misleading, and/or Lacked a Reasonable Basis**<br><br>Reasons: | **Facts Giving Rise to Strong Inference of Scienter**<br><br>Plaintiff incorporates the same Facts stated in **False Statement VIII.B.i.**, as if fully set forth herein. |
|---|---|

58

The above speculative, contingent, and woefully incomplete statements of known risks were materially false, misleading, and/or lacked a reasonable basis when made because:

Defendants speculate that "significant or unexpected rejection of AppHarvest's products" could "negatively impact" results when AppHarvest was already experiencing massive customer rejections from Mastronardi because of poor quality that eroded sales and inflated costs, and Defendants speculate further that the Company may not be able to resell rejected products to "other third parties" when AppHarvest was not doing so, but rather was selling "substantially all" of its products to Mastronardi and donating or composting the rejections.

Defendants make boilerplate speculation that vague "developments" or periods of "reduced production at the Morehead facility" could disrupt AppHarvest's ability to "meet our contractual obligations and operate our business" when the Company's operations were already deteriorating because of the Company's inability to produce USDA Grade No. 1 tomatoes.

Defendants speculate that "quality problems" could "materially and adversely" affect AppHarvest's "business, financial condition or results of operations" when they were already doing so.

<u>Evidence:</u>

Plaintiff incorporates the same Evidence stated in **False Statement VIII. B. i.**, as if fully set forth herein.

**False Statement VIII. B. iii.**

| **Statement Category:** |
| Speculative, Contingent, and Incomplete Risk Factors Relating to Labor Availability, Recruitment, and Retention |

| **Speaker(s); Date; & Medium** |
| All Defendants; March 2, 2021, Amendment No. 1 to Form S-1 Registration Statement, signed by Defendants Webb, Lee, and Eggleton; filed with the SEC and on the Investor Relations section of AppHarvest's website |

| **False and Misleading Statements or Omissions** |
| *We depend on employing a skilled local labor force, and* **failure to attract and retain qualified employees could negatively impact our business, results of operations and financial condition.**<br><br>…even **if we are able to identify, hire and train our labor force, there is no guarantee that we will be able to retain these employees. Any shortage of labor or lack of regular availability could restrict our ability to operate our greenhouses profitably, or at all.**<br><div align="center">\*\*\*</div><br>**The COVID-19 pandemic could negatively impact on our business, results of operations and financial condition.** *[…]*<br><br>…**Although we have not experienced material financial impacts due to the pandemic**, the fluid nature of the COVID-19 pandemic and uncertainties regarding the related economic impact are likely to result in sustained market turmoil, which *could* also negatively impact our business, financial condition and cash flows. Although our business is considered an "essential business," **the COVID-19 pandemic could result in labor shortages, which could result in our inability to plant and harvest crops at full capacity and could result in spoilage or loss of unharvested crops.…The extent of COVID-19's effect on our operational and financial performance will depend on future developments**, including the duration, spread and intensity of the pandemic, all of which are uncertain and difficult to predict considering the rapidly evolving landscape. **As a result, it is not currently possible to ascertain the overall impact of COVID-19 on our business. However, if the pandemic continues to persist as a severe worldwide health crisis, the disease could negatively impact our business, financial condition results of operations and cash flows, and may also have the effect of heightening many of the other risks described in this "Risk Factors" section.** ¶181. |

| **Reasons Why Statements are False and Misleading, and/or Lacked a Reasonable Basis** | **Facts Giving Rise to Strong Inference of Scienter** |
|---|---|
| Reasons: | Plaintiff incorporates the same Facts stated in **False Statement VIII.B.i.**, as if fully set forth herein. |

The above speculative, contingent, and woefully incomplete statements of known risks were materially false, misleading, and/or lacked a reasonable basis when made because:

Defendants speculate that "failure to attract and retain qualified employees could negatively impact" AppHarvest's business when the Company was already suffering massive attrition, and Defendants misrepresent that a potential "shortage of labor or lack of regular availability" or the Company's potential inability to "train its labor force" and "retain" employees could potentially affect AppHarvest, including its "ability to operate its greenhouses profitably," when, in reality, those situations had already transpired.

Defendants falsely misrepresent AppHarvest "has not experienced material financial impacts due to the pandemic" and speculate that the COVID-19 pandemic, due to contingent and vague "future developments," *could* negatively impact AppHarvest's "business, results of operations and financial condition" and "cash flows," *could* "result in labor shortages," *could* cause an "inability to plant and harvest crops at full capacity," and *could* "result in spoilage or loss of unharvested crops" when all of those things were already happening because COVID-19 had caused AppHarvest to operate severely understaffed during the first growing and harvesting season because employees were quarantining.

<u>Evidence:</u>

Plaintiff incorporates the same Evidence stated in **False Statement VIII.B.i.**, as if fully set forth herein.

61

**False Statement IX. A.**

| **Statement Category:** |
| :-- |
| Misstatements Regarding Labor Availability, Recruitment, and Retention |

| **Speaker(s), Date, & Medium** |
| :-- |
| All Defendants; March 4, 2021; Rule 424(b)(3) Prospectus filed with the SEC and on the Investor Relations section of AppHarvest's website |

| **False and Misleading Statements or Omissions** |
| :-- |
| In a subsection of the March 4 Prospectus titled "**Our Solution**" (emphasis in original), **"We believe there is a large population of workers in the Central Appalachian region who are eager to find long-term career opportunities like those being offered by AppHarvest**…**As a result, we believe we can staff and retain our workers with less churn**, immigration challenges **and unfilled positions** that many of our competitors face."<br><br>Relatedly, a subsection of the March 4 Prospectus titled "**Our Strengths**[,]" falsely and/or misleadingly stated in pertinent part: "**We were able to efficiently hire many employees as we opened our first facility in Morehead** and have identified talent to join our team at the facilities we are developing in Richmond and Berea." ¶¶184-185. |

| **Reasons Why Statements are False and Misleading, and/or Lacked a Reasonable Basis** | **Facts Giving Rise to Strong Inference of Scienter** |
| :-- | :-- |
| Reasons:<br><br>The above statements were materially false, misleading, and/or lacked a reasonable basis when made because: (a) Defendants' statements that prospective employees were seeking "long-term" employment, and that AppHarvest was able to "staff and retain" workers with "less churn" and less "unfilled positions," and that AppHarvest was able to "efficiently hire many employees" as it opened the Morehead Facility were not supported by, and/or concealed, known facts that directly contradicted those statements which left AppHarvest's workforce short-staffed, unproductive, and insufficiently trained; and (b) the statements misrepresented | • CW6 met with Defendants Eggleton and Lee weekly concerning the baseline forecast, and upside and downside scenarios. ¶264. These weekly Forecast Meetings got "quite operational" and focused on various productivity metrics, with a key focus on yield and quality which was the basis for AppHarvest's revenue. *Id.* Throughout the first half of 2021, Lee and Eggleton also discussed that attrition and retention metrics that were "far worse than expected" and falling short "week over week." ¶111. During the "toughest times," (end of Q1 through the "summer refresh" at the end of the Class Period) discussions at Forecast Meetings concerned: "ways to close the gap" between AppHarvest's underperformance compared to the current forecast; the expected time needed for |

AppHarvest's frequent hiring as a "Strength" rather than what it was—a known consequence, born out of necessity, of the significant amount of concealed employee attrition, turnover, and churn that AppHarvest had experienced.

Furthermore, the above statements were materially false, misleading, and/or lacked a reasonable basis when made in light of the circumstances. As of March 2, 2021, AppHarvest was staffing its first, massive CEA facility and the Morehead Facility's productivity would depend, in part, on Defendants' ability to "efficiently hire" and "retain" staff to minimize "churn" and "unfilled positions"—as evidenced by Defendants' frequent updates and assurances to market participants regarding the Company's hiring efforts (*see* ¶¶69-74, supra). It was misleading for Defendants to make the above statements, and thereby paint AppHarvest's hiring in an undeservedly rosy light, without also disclosing adverse circumstances. ¶187.

The material falsity of the above statements is supported by ample evidence given that:

<div align="center">Evidence:</div>

(i)  as Defendants would later admit, for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, AppHarvest was "adversely impacted" by "labor" challenges which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)  as Defendants would later admit, for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

the closing the gap depending on the various scenarios; and the Company's issues with employee training, turnover, poor work ethic, and inconsistent hiring standards which were "repeatedly cited" as the "root cause" of the overall production challenges. ¶264.

- Labor productivity was identified as a challenge for AppHarvest in 2020, and during the "toughest times," (end of Q1 through the "summer refresh" at the end of the Class Period) Defendants instituted Leadership Meetings twice a week, which included Lee, Eggleton, CW6 and other FP&A personnel, Marcella Butler, and Julie Nelson. ¶268. Labor productivity metrics included yield, quality, rejections from Mastronardi, attrition and employee absences, and productivity metrics for the various Greenhouse workers' particular functions. *Id.*  According to CW6, inadequate training, turnover, poor work ethic and inconsistent hiring standards were "repeatedly cited" as the "root cause" of the Company's productivity challenges at these Leadership Meetings. CW6 recalled the Leadership Meetings occurred usually mid-week and end-of-week so that Defendants could "keep an eye on it." *Id.*

- CW6 confirmed that at the end of each month, results concerning pricing, labor productivity (including yield and quality), construction costs, tomato grades, and other factors would be "pulled into" FP&A models and adjustments would be made to the Company's forecasts. ¶265. CW6 and Defendant Eggleton met for "many hours" each day discussing these near-, medium-, and long-term financial forecasts. *Id.*

- CW6 confirmed that AppHarvest productivity forecasts were sent to Mastronardi on a weekly, and possibly daily basis. ¶266. According to CW6, these forecasts included estimates

<div align="center">63</div>

(iii)   CW6 explained that during the Class Period, AppHarvest's attrition and retention metrics in the first half of 2021 were far worse than expected because AppHarvest was clearly falling short week over week. Indeed, according to CW1 and CW2, throughout the Class Period AppHarvest suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including:

c.  dissatisfaction with mandatory expanded working hours—including forced overtime, Saturdays, and holidays, and

d.  infection and quarantining due to the COVID-19 pandemic,

all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes.

CW4 likewise stated that there was significant turnover throughout CW4's tenure at AppHarvest, with the west side of the Greenhouse losing at least 10 personnel every week. CW4 stated that the turnover resulted in less trained staff and thereby lower yields because there were fewer Crop Care Specialists to do the work.

CW5 confirmed that employee turnover and churn had been consistently high throughout October 2020 and June 2021, causing concern amongst Greenhouse

of labor productivity to determine the volumes of beefsteak and Tomatoes on the Vine that would be harvested in the given period. *Id.*

- Defendant Webb frequently visited the Morehead Facility prior to and throughout the Class Period where he filmed at least 16 interviews, gave tours, and visited operations, and would have, and did, see the Company's dysfunctional production facilities and widespread attrition and churn. ¶289. Indeed, Webb admitted he was at the facility "every morning" and that he was "in the facility, you know, elbow tapping everyone as they come in." ¶287. Webb further admitted that he loves to "sleep on the farms" and "going to our operations." ¶288.

- Defendants' admissions that "labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility" existed for the entire "*six months* ended June 30, 2021," which caused "lower net sales due to lower overall No. 1-grade production yields" as well as "higher related distribution and shipping fees." ¶297.

- Defendants' admissions that "executional challenges" spanned the entire Class Period because as they were "very real in our first major full season of harvest as a company" and the harvest season began in January 2021; and challenges lasted entire "initial growing season" and "first growing season" which began in October 2020. ¶298.

- Throughout the Class Period the Morehead Facility was the site of the Company's sole production operations and core business. ¶286.

| | |
|---|---|
| personnel that AppHarvest had inadequate labor to meet production requirements as was discussed at the morning stand-up meetings CW5 attended.<br><br>(iv)    As was confirmed in Defendants' post Class Period 10-Q disclosures for Q3 2021, CW5 stated that due to the pervasive staffing issues described above, regional labor was insufficient and AppHarvest had to bring in contract labor to help during times of poor attendance. ¶186. | • Defendants frequently spoke in detail regarding staffing, labor, and operations, tomato production, pricing, yield, and other key metrics every quarter and intermittently in various media interviews, which adds a strong inference of scienter. ¶¶72-75, 304-308. |

**False Statement IX. B. i.**

| **Statement Category:** |
|---|
| Speculative, Contingent, and Incomplete Risk Factors Relating to Growth and Price Performance |

| **Speaker(s), Date, & Medium** |
|---|
| All Defendants; March 4, 2021; Rule 424(b)(3) Prospectus filed with the SEC and on the Investor Relations section of AppHarvest's website |

| **False and Misleading Statements or Omissions** |
|---|
| **Risks Related to Our Business and Industry**<br><br>…Even if [AppHarvest's] investments do result in the growth of our business, **if we do not effectively manage our growth, we may not be able to execute on our business plan** and vision, respond to competitive pressures, **take advantage of market opportunities, satisfy customer requirements or maintain high-quality product offerings, any of which could adversely affect our business, financial condition and results of operations.**<br><br><div align="center">\*\*\*</div><br>**In future periods, revenue growth could slow or revenue could decline for a number of reasons, including** slowing demand for our products, increasing competition, a decrease in the growth of the overall market, or our failure, for any reason, to take advantage of growth opportunities. If our **assumptions regarding these risks and uncertainties and future revenue growth are incorrect or change, or if we do not address these risks successfully, our operating and financial results could differ materially from our expectations, and our business could suffer.** ¶188. |

| **Reasons Why Statements are False and Misleading, and/or Lacked a Reasonable Basis** | **Facts Giving Rise to Strong Inference of Scienter** |
|---|---|
| Reasons:<br><br>The above speculative, contingent, and woefully incomplete statements were materially false, misleading, and/or lacked a reasonable basis when made because: | • CW6 met with Defendants Eggleton and Lee weekly concerning the baseline forecast, and upside and downside scenarios. ¶264. These weekly Forecast Meetings got "quite operational" and focused on various productivity metrics, with a key focus on yield and quality which was the basis for AppHarvest's revenue. *Id.* Throughout the first half of 2021, Lee and Eggleton also discussed that attrition and retention metrics that were "far worse than expected" and falling short |

Defendants speculatively portrayed AppHarvest's ability to "effectively manage its growth," "execute on its business plan," and "satisfy customer requirements or maintain high quality product" offerings as contingent or potential when AppHarvest was already failing to do all of these things resulting in lower saleable yield and quality products, and higher customer rejections and costs.

Defendants made a boilerplate and vague disclaimers that "revenue growth could slow or revenue could decline for a number of reasons" and that if AppHarvest fails to "take advantage of growth opportunities" "for any reason" it might see declining revenue, when Defendants were already experiencing wide-ranging execution problems for the entire first harvesting season that were doing exactly that.

Evidence:

The above Reasons are supported by ample evidence, given that:

(i)     Defendants admitted that for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)    Defendants admitted that for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

"week over week." ¶111. During the "toughest times," (end of Q1 through the "summer refresh" at the end of the Class Period) discussions at Forecast Meetings concerned: "ways to close the gap" between AppHarvest's underperformance compared to the current forecast; the expected time needed for the closing the gap depending on the various scenarios; and the Company's issues with employee training, turnover, poor work ethic, and inconsistent hiring standards which were "repeatedly cited" as the "root cause" of the overall production challenges. ¶264.

• Labor productivity was identified as a challenge for AppHarvest in 2020, and during the "toughest times," (end of Q1 through the "summer refresh" at the end of the Class Period) Defendants instituted Leadership Meetings twice a week, which included Lee, Eggleton, CW6 and other FP&A personnel, Marcella Butler, and Julie Nelson. ¶268. Labor productivity metrics included yield, quality, rejections from Mastronardi, attrition and employee absences, and productivity metrics for the various Greenhouse workers' particular functions. *Id.* According to CW6, inadequate training, turnover, poor work ethic and inconsistent hiring standards were "repeatedly cited" as the "root cause" of the Company's productivity challenges at these Leadership Meetings. CW6 recalled the Leadership Meetings occurred usually mid-week and end-of-week so that Defendants could "keep an eye on it." *Id.*

• CW6 confirmed AppHarvest's executive management had information parity, such that "everyone knew what everyone else knew" regarding fundamental financial data. ¶129.

• CW6 confirmed that at the end of each month, results concerning pricing, labor productivity (including yield and quality), construction costs, tomato grades, and other factors

(iii)   Defendants Lee's and Eggleton's veiled admissions on the Q1 2021 Earnings Call that "training" issues existed in the first quarter of 2021 that were hampering "productivity" and driving gross loss;

(iv)   Defendants' admissions in the 2021 Q2 Earnings Release, the Q2 2021 Earnings Presentation, and the 2021 Q2 Earnings Call that "operational" and "executional" challenges—including lower quality production and saleable yield, and higher distribution and shipping expense incurred as a result of rejections—existed for the "initial growing season" and the "full season of harvest as a Company";

(v)   according to CW1 and CW4, AppHarvest did not offer employees adequate (if any) training throughout the Class Period. According to CW1, AppHarvest's inadequately trained workforce contributed to 5-10% of crops being wasted or damaged during CW1's tenure, which resulted in lost sales. According to CW5, up to 50% of AppHarvest's crop was wasted in the first growing season caused by workers in the Greenhouse and Packhouse. Further, CW4 confirmed that tomatoes were wasted "daily" during harvesting season;

(vi)   CW6 explained that during the Class Period, AppHarvest's attrition and retention metrics in the first half of 2021 were far worse than expected because AppHarvest was clearly falling short week over week. Indeed, according to CW1 and CW2, throughout the Class Period, AppHarvest suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first

would be "pulled into" FP&A models and adjustments would be made to the Company's forecasts. ¶265. CW6 and Defendant Eggleton met for "many hours" each day discussing these near-, medium-, and long-term financial forecasts. *Id.*

- CW6 confirmed that AppHarvest productivity forecasts were sent to Mastronardi on a weekly, and possibly daily basis. ¶266. According to CW6, these forecasts included estimates of labor productivity to determine the volumes of beefsteak and Tomatoes on the Vine that would be harvested in the given period. *Id.*

- Mastronardi provided Defendants with daily updates, regular audits, and negative feedback in response to subpar quality throughout the Class Period.   ¶¶60, 67, 275. Mastronardi increased the frequency of its audits on the AppHarvest tomatoes during periods of "weaker" performance by AppHarvest, which resulted in Mastronardi rejecting a lot of tomatoes. ¶275. During the "toughest" periods of rejected tomatoes (the end of Q1 2021 through the "summer refresh"), it was necessary for AppHarvest to lower estimated production forecasts, a process that involved CW6, Eggleton and Lee, which were exchanged with Mastronardi in a shared "portal." *Id.*

- As confirmed by CW3, CW6, and the Mastronardi Morehead Agreement Defendants Eggleton and Lee were intimately involved in various forecasting processes—forecasts which included sales, quality, costs, yield, price, estimated rejections, and estimated damaged tomatoes. ¶263.

- CW3 confirmed that AppHarvest's forecasts existed prior to the commencement of the first growing season and that Defendant Eggleton approved the forecasts. ¶263. CW3

68

month), and understaffing because of undisclosed reasons, including:

a. dissatisfaction with mandatory expanded working hours—including forced overtime, Saturdays, and holidays, and

b. infection and quarantining due to the COVID-19 pandemic,

all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes.

CW4 likewise stated that there was significant turnover throughout CW4's tenure at AppHarvest, with the west side of the Greenhouse losing at least 10 personnel every week. CW4 stated that the turnover resulted in less trained staff and thereby lower yields because there were fewer Crop Care Specialists to do the work.

CW5 confirmed that employee turnover and churn had been consistently high throughout October 2020 and June 2021, causing concern amongst Greenhouse personnel that AppHarvest had inadequate labor to meet production requirements as was discussed at the morning stand-up meetings CW5 attended;

(vii)   according to CW1, CW2, and CW4, throughout the Class Period, AppHarvest's own incentive piece rate structure incentivized disruptive and inefficient workmanship that wasted, damaged, and produced low quality tomatoes;

further explained AppHarvest had planning software, Microsoft Dynamics, which tracked operational results and actual costs, and the Individual Defendants had access to this software. *Id.* CWs 3 and 6 stated that AppHarvest used such real time production data to create and track against AppHarvest's forecasts. ¶¶121, 130, 263.

• CW6 confirmed AppHarvest had real-time access to quality and yield data from the Packhouse based on the types of boxes being shipped (Grade 1 versus Grade 2). ¶267. Further, CW 1 and CW4 stated that AppHarvest had real-time access to productivity metrics from the Greenhouse that were recorded by scanners when workers finished working on a particular row and uploaded to the Company's electronic files. ¶120. CW4 confirmed that such real-time data included information from quality inspectors who recorded their results into a "live" excel spreadsheet so that AppHarvest could "map" quality performance. ¶85.

• Defendant Webb frequently visited the Morehead Facility prior to and throughout the Class Period where he filmed at least 16 interviews, gave tours, and visited operations, and would have, and did, see the Company's dysfunctional production facilities and widespread attrition and churn. ¶289. Indeed, Webb admitted he was at the facility "every morning" and that he was "in the facility, you know, elbow tapping everyone as they come in." ¶287. Webb further admitted that he loves to "sleep on the farms" and "going to our operations." ¶288.

• Webb or his office instructed CW5's team to "hide the waste" when investors and news media visited so that the Greenhouse had "better eye appeal." ¶¶83-84, 291.

| | |
|---|---|
| (viii) CW6 stated that Mastronardi informed AppHarvest that it needed to tighten up specifications because Mastronardi was having to reject a lot of fruit throughout the Class Period—upwards of 30% to 35% during the Company's "toughest times," which was "many times" more than AppHarvest's target which CW6 believed was 6% or 7%;<br><br>(ix) according to CW2, "half" of all tomatoes inspected were USDA Grade No. 2 or not commercially saleable, and CW6 confirmed that AppHarvest was a "long way off" its quality goals;<br><br>(x) CW6 stated that in the "toughest times" of the first growing season AppHarvest was well below 50% in relation to the Company's productivity standards for specific Greenhouse jobs. ¶189. | • Defendants' admissions that "labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility" existed for the entire "*six months* ended June 30, 2021," which caused "lower net sales due to lower overall No. 1-grade production yields" as well as "higher related distribution and shipping fees." ¶297.<br><br>• Defendants' admissions that "executional challenges" spanned the entire Class Period because as they were "very real in our first major full season of harvest as a company" and the harvest season began in January 2021; and challenges lasted entire "initial growing season" and "first growing season" which began in October 2020. ¶298.<br><br>• Throughout the Class Period the Morehead Facility was the site of the Company's sole production operations and core business. ¶286.<br><br>• Defendants frequently spoke in detail regarding staffing, labor, and operations, tomato production, pricing, yield, and other key metrics every quarter and intermittently in various media interviews, which adds a strong inference of scienter. ¶¶72-75, 304-308.<br><br>• AppHarvest was entirely reliant on its sole distributor Mastronardi, which required top-quality Grade 1 tomatoes. ¶270. In fact, AppHarvest filed at least 18 documents with the SEC, including documents signed by the Individual Defendants, stating the Company was "highly dependent" on Mastronardi, and Webb signed and initialed every page of the Mastronardi Morehead Agreement which required Mastronardi to accept all USDA Grade 1 tomatoes and saddled AppHarvest with all of the risk and costs of non-Grade |

| | |
|---|---|
| | tomatoes, which Defendants knew would be rejected by Mastronardi and had "very little to no value." ¶¶271, 270. |

**False Statement IX. B. ii.**

| **Statement Category:** |
|---|
| Speculative, Contingent, and Incomplete Risk Factors Concerning Quality, Production, and Supply |

| **Speaker(s); Date; & Medium** |
|---|
| All Defendants; March 4, 2021; Rule 424(b)(3) Prospectus filed with the SEC and on the Investor Relations section of AppHarvest's website |

| **False and Misleading Statements or Omissions** |
|---|
| *We currently rely on a single facility for all of our operations.*<br><br>….**Adverse changes or developments affecting the Morehead facility could impair our ability to produce our products and our business, prospects, financial condition and results of operations. Any shutdown or period of reduced production at the Morehead facility**, which may be caused by regulatory noncompliance or other issues, as well as other factors beyond our control, such as severe weather conditions, natural disaster, fire, power interruption, work stoppage, disease outbreaks or pandemics (such as COVID-19), equipment failure or delay in supply delivery, **would significantly disrupt our ability to grow and deliver our produce in a timely manner, meet our contractual obligations and operate our business.**<br>*** <br>**Any significant or unexpected rejection of our products could negatively impact our results of operations, and our may be unable to sell the rejected products to other third parties.**<br>*** <br>**If our products** fail to gain market acceptance, are restricted by regulatory requirements or **have quality problems, we may not be able to fully recover costs and expenses incurred in our operations, and our business, financial condition or results of operations could be materially and adversely affected.** ¶188. |

| **Reasons Why Statements are False and Misleading, and/or Lacked a Reasonable Basis** | **Facts Giving Rise to Strong Inference of Scienter** |
|---|---|
| Reasons:<br><br>The above speculative, contingent, and woefully incomplete statements of known risks were materially false, misleading, and/or lacked a reasonable basis when made because: | Plaintiff incorporates the same Facts stated in **False Statement IX. B. i.** as if fully set forth herein. |

Defendants speculate that "significant or unexpected rejection of AppHarvest's products" could "negatively impact" results when AppHarvest was already experiencing massive customer rejections from Mastronardi because of poor quality that eroded sales and inflated costs, and Defendants speculate further that the Company may not be able to resell rejected products to "other third parties" when AppHarvest was not doing so, but rather was selling "substantially all" of its products to Mastronardi and donating or composting the rejections.

Defendants make boilerplate speculation that vague "developments" or periods of "reduced production at the Morehead facility" could disrupt AppHarvest's ability to "meet our contractual obligations and operate our business" when the Company's operations were already deteriorating because of the Company's inability to produce USDA Grade No. 1 tomatoes.

Defendants speculate that "quality problems" could "materially and adversely" affect AppHarvest's "business, financial condition or results of operations" when they were already doing so.

Evidence:

Plaintiff incorporates the same Evidence stated in **False Statement IX. B. i**. as if fully set forth herein.

73

**False Statement IX. B. iii.**

| |
|---|
| **Statement Category:**<br>Speculative, Contingent, and Incomplete Risk Factors Relating to Labor Availability, Recruitment, and Retention |
| **Speaker(s); Date; & Medium**<br>All Defendants; March 4, 2021; Rule 424(b)(3) Prospectus filed with the SEC and on the Investor Relations section of AppHarvest's website |
| **False and Misleading Statements or Omissions**<br><br>*We depend on employing a skilled local labor force, and* **failure to attract and retain qualified employees could negatively impact our business, results of operations and financial condition.**<br>\*\*\*<br>…even **if we are able to identify, hire and train our labor force, there is no guarantee that we will be able to retain these employees. Any shortage of labor or lack of regular availability could restrict our ability to operate our greenhouses profitably, or at all.**<br>\*\*\*<br>**The COVID-19 pandemic could negatively impact on our business, results of operations and financial condition.***[…]*<br><br>\*\*\*<br>….**Although we have not experienced material financial impacts due to the pandemic**, the fluid nature of the COVID-19 pandemic and uncertainties regarding the related economic impact are likely to result in sustained market turmoil, which *could* also negatively impact our business, financial condition and cash flows. Although our business is considered an "essential business," **the COVID-19 pandemic could result in labor shortages, which could result in our inability to plant and harvest crops at full capacity and could result in spoilage or loss of unharvested crops.…The extent of COVID-19's effect on our operational and financial performance will depend on future developments**, including the duration, spread and intensity of the pandemic, all of which are uncertain and difficult to predict considering the rapidly evolving landscape. **As a result, it is not currently possible to ascertain the overall impact of COVID-19 on our business. However, if the pandemic continues to persist as a severe worldwide health crisis, the disease could negatively impact our business, financial condition results of operations and cash flows, and may also have the effect of heightening many of the other risks described in this "Risk Factors" section**. ¶188. |

| **Reasons Why Statements are False and Misleading, and/or Lacked a Reasonable Basis** | **Facts Giving Rise to Strong Inference of Scienter** |
|---|---|
| | |

| | |
|---|---|
| <div align="center">Reasons:</div><br>The above speculative, contingent, and woefully incomplete statements of known risks were materially false, misleading, and/or lacked a reasonable basis when made because:<br><br>Defendants speculate that "failure to attract and retain qualified employees could negatively impact" AppHarvest's business when the Company was already suffering massive attrition, and Defendants misrepresent that a potential "shortage of labor or lack of regular availability" or the Company's potential inability to "train its labor force" and "retain" employees could potentially affect AppHarvest, including its "ability to operate its greenhouses profitably," when, in reality, those situations had already transpired.<br><br>Defendants falsely misrepresent AppHarvest "has not experienced material financial impacts due to the pandemic" and speculate that the COVID-19 pandemic, due to contingent and vague "future developments," *could* negatively impact AppHarvest's "business, results of operations and financial condition" and "cash flows," *could* "result in labor shortages," *could* cause an "inability to plant and harvest crops at full capacity," and *could* "result in spoilage or loss of unharvested crops" when all of those things were already happening because COVID-19 had caused AppHarvest to operate severely understaffed during the first growing and harvesting season because employees were quarantining.<br><br><div align="center">Evidence:</div><br>Plaintiff incorporates the same Evidence stated in **False Statement IX. B. i**. as if fully set forth herein. | Plaintiff incorporates the same Facts stated in **False Statement IX. B. i**. as if fully set forth herein. |

<div align="center">75</div>

**False Statement X**

| **Statement Category:**<br>Misstatements Regarding Operations, Production, and Supply |
|---|
| **Speaker(s); Date; Medium**<br>Defendant Lee; March 4, 2021; Interviewed by Mitch Hoch and Chris Katje on a Benzinga YouTube channel livestream |
| **False and Misleading Statements or Omissions**<br><br>Katje: <u>Can you talk a little bit about that first, you know, crop</u>? So, tomatoes [are] delivered to some national grocer companies. You know, I see Walmart and Kroger listed as partners in that investor presentation. Can you talk a little bit about those partners like Walmart and Kroger, and then maybe some areas or some companies that are being targeted with the tomatoes?<br><br>Lee: …The good news is that we've been able to partner with retailers who indicate that demand is not the problem to solve here. **I think that every tomato that we've produced has been readily put into the market.** ¶190. |

| **Reasons Why Statements are False and Misleading, and/or Lacked a Reasonable Basis** | **Facts Giving Rise to Strong Inference of Scienter** |
|---|---|
| Reasons:<br><br>Defendant Lee's statement that "every tomato" AppHarvest "produced has been readily put into the market" was materially false, misleading, and/or lacked a reasonable basis when made because significant quantities of tomatoes that were being "produced" ended up wasted, spoiled, or rejected. Furthermore, Defendant Lee's statement fraudulently obfuscates that significant quantities of tomatoes "put into the market" were poor quality and thus garnered poor pricing or were rejected. The material falsity of Defendant Lee's statement is supported by ample evidence, given that: | • CW6 met with Defendants Eggleton and Lee weekly concerning the baseline forecast, and upside and downside scenarios. ¶264. These weekly Forecast Meetings got "quite operational" and focused on various productivity metrics, with a key focus on yield and quality which was the basis for AppHarvest's revenue. *Id.* Throughout the first half of 2021, Lee and Eggleton also discussed that attrition and retention metrics that were "far worse than expected" and falling short "week over week." ¶111. During the "toughest times," (end of Q1 through the "summer refresh" at the end of the Class Period) discussions at Forecast Meetings concerned: "ways to close the gap" between AppHarvest's underperformance compared to the current forecast; the expected time needed for the closing the gap depending on the various scenarios; and |

76

Evidence:

(i) Defendants admitted that for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii) Defendants admitted that for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii) Defendants Lee's and Eggleton's veiled admissions on the Q1 2021 Earnings Call that "training" issues existed in the first quarter of 2021 that were hampering "productivity" and driving gross loss;

(iv) Defendants' admissions in the 2021 Q2 Earnings Release, the Q2 2021 Earnings Presentation, and the 2021 Q2 Earnings Call that "operational" and "executional" challenges—including lower quality production and saleable yield, and higher distribution and shipping expense incurred as a result of rejections—existed for the "initial growing season" and the "full season of harvest as a Company";

(v) according to CW1 and CW4, AppHarvest did not offer employees adequate (if any) training throughout the Class Period. According to CW1, AppHarvest's inadequately trained workforce contributed to 5-10% of crops being

the Company's issues with employee training, turnover, poor work ethic, and inconsistent hiring standards which were "repeatedly cited" as the "root cause" of the overall production challenges. ¶264.

• Labor productivity was identified as a challenge for AppHarvest in 2020, and during the "toughest times," (end of Q1 through the "summer refresh" at the end of the Class Period) Defendants instituted Leadership Meetings twice a week, which included Lee, Eggleton, CW6 and other FP&A personnel, Marcella Butler, and Julie Nelson. ¶268. Labor productivity metrics included yield, quality, rejections from Mastronardi, attrition and employee absences, and productivity metrics for the various Greenhouse workers' particular functions. *Id.*  According to CW6, inadequate training, turnover, poor work ethic and inconsistent hiring standards were "repeatedly cited" as the "root cause" of the Company's productivity challenges at these Leadership Meetings. CW6 recalled the Leadership Meetings occurred usually mid-week and end-of-week so that Defendants could "keep an eye on it." *Id.*

• CW6 confirmed AppHarvest's executive management had information parity, such that "everyone knew what everyone else knew" regarding fundamental financial data. ¶129.

• CW6 confirmed that at the end of each month, results concerning pricing, labor productivity (including yield and quality), construction costs, tomato grades, and other factors would be "pulled into" FP&A models and adjustments would be made to the Company's forecasts. ¶265. CW6 and Defendant Eggleton met for "many hours" each day discussing these near-, medium-, and long-term financial forecasts. *Id.*

77

wasted or damaged during CW1's tenure, which resulted in lost sales. According to CW5, up to 50% of AppHarvest's crop was wasted in the first growing season caused by workers in the Greenhouse and Packhouse. Further, CW4 confirmed that tomatoes were wasted "daily" during harvesting season;

(vi)    CW6 explained that during the Class Period, AppHarvest's attrition and retention metrics in the first half of 2021 were far worse than expected because AppHarvest was clearly falling short week over week. Indeed, according to CW1 and CW2, throughout the Class Period, AppHarvest suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including:

a.    dissatisfaction with mandatory expanded working hours—including forced overtime, Saturdays, and holidays, and

b.    infection and quarantining due to the COVID-19 pandemic,

all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes.

CW4 likewise stated that there was significant turnover throughout CW4's tenure at AppHarvest, with the west side of the Greenhouse losing at least 10 personnel every week. CW4 stated that the turnover resulted in less trained staff and thereby lower yields

- CW6 confirmed that AppHarvest productivity forecasts were sent to Mastronardi on a weekly, and possibly daily basis. ¶266. According to CW6, these forecasts included estimates of labor productivity to determine the volumes of beefsteak and Tomatoes on the Vine that would be harvested in the given period. *Id.*

- Mastronardi provided Defendants with daily updates, regular audits, and negative feedback in response to subpar quality throughout the Class Period. ¶¶60, 67, 275. Mastronardi increased the frequency of its audits on the AppHarvest tomatoes during periods of "weaker" performance by AppHarvest, which resulted in Mastronardi rejecting a lot of tomatoes. ¶275. During the "toughest" periods of rejected tomatoes (the end of Q1 2021 through the "summer refresh"), it was necessary for AppHarvest to lower estimated production forecasts, a process that involved CW6, Eggleton and Lee, which were exchanged with Mastronardi in a shared "portal." *Id.*

- As confirmed by CW3, CW6, and the Mastronardi Morehead Agreement Defendants Eggleton and Lee were intimately involved in various forecasting processes—forecasts which included sales, quality, costs, yield, price, estimated rejections, and estimated damaged tomatoes. ¶263.

- CW3 confirmed that AppHarvest's forecasts existed prior to the commencement of the first growing season and that Defendant Eggleton approved the forecasts. ¶263. CW3 further explained AppHarvest had planning software, Microsoft Dynamics, which tracked operational results and actual costs, and the Individual Defendants had access to this software. *Id.* CWs 3 and 6 stated that AppHarvest used such real time production data to create and track against AppHarvest's forecasts. ¶¶121, 130, 263.

because there were fewer Crop Care Specialists to do the work.

CW5 confirmed that employee turnover and churn had been consistently high throughout October 2020 and June 2021, causing concern amongst Greenhouse personnel that AppHarvest had inadequate labor to meet production requirements as was discussed at the morning stand-up meetings CW5 attended;

(vii)   according to CW1, CW2, and CW4, throughout the Class Period, AppHarvest's own incentive piece rate structure incentivized disruptive and inefficient workmanship that wasted, damaged, and produced low quality tomatoes;

(viii)  CW6 stated that Mastronardi informed AppHarvest that it needed to tighten up specifications because Mastronardi was having to reject a lot of fruit throughout the Class Period—upwards of 30% to 35% during the Company's "toughest times," which was "many times" more than AppHarvest's target which CW6 believed was 6% or 7%;

(ix)    according to CW2, "half" of all tomatoes inspected were USDA Grade No. 2 or not commercially saleable, and CW6 confirmed that AppHarvest was a "long way off" its quality goals;

(x)     CW6 stated that in the "toughest times" of the first growing season AppHarvest was well below 50% in relation to the Company's productivity standards for specific Greenhouse jobs. ¶191.

- CW6 confirmed AppHarvest had real-time access to quality and yield data from the Packhouse based on the types of boxes being shipped (Grade 1 versus Grade 2). ¶267. Further, CW 1 and CW4 stated that AppHarvest had real-time access to productivity metrics from the Greenhouse that were recorded by scanners when workers finished working on a particular row and uploaded to the Company's electronic files. ¶120. CW4 confirmed that such real-time data included information from quality inspectors who recorded their results into a "live" excel spreadsheet so that AppHarvest could "map" quality performance. ¶85.

- Defendant Webb frequently visited the Morehead Facility prior to and throughout the Class Period where he filmed at least 16 interviews, gave tours, and visited operations, and would have, and did, see the Company's dysfunctional production facilities and widespread attrition and churn. ¶289. Indeed, Webb admitted he was at the facility "every morning" and that he was "in the facility, you know, elbow tapping everyone as they come in." ¶287. Webb further admitted that he loves to "sleep on the farms" and "going to our operations." ¶288.

- Webb or his office instructed CW5's team to "hide the waste" when investors and news media visited so that the Greenhouse had "better eye appeal." ¶¶83-84, 291.

- Defendants' admissions that "labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility" existed for the entire "*six months* ended June 30, 2021," which caused "lower net sales due to lower overall No. 1-grade production yields" as well as "higher related distribution and shipping fees." ¶297.

|  | <ul><li>Defendants' admissions that "executional challenges" spanned the entire Class Period because as they were "very real in our first major full season of harvest as a company" and the harvest season began in January 2021; and challenges lasted entire "initial growing season" and "first growing season" which began in October 2020. ¶298.</li><li>Throughout the Class Period the Morehead Facility was the site of the Company's sole production operations and core business. ¶286.</li><li>Defendants frequently spoke in detail regarding staffing, labor, and operations, tomato production, pricing, yield, and other key metrics every quarter and intermittently in various media interviews, which adds a strong inference of scienter. ¶¶72-75, 304-308.</li><li>AppHarvest was entirely reliant on its sole distributor Mastronardi, which required top-quality Grade 1 tomatoes. ¶270. In fact, AppHarvest filed at least 18 documents with the SEC, including documents signed by the Individual Defendants, stating the Company was "highly dependent" on Mastronardi, and Webb signed and initialed every page of the Mastronardi Morehead Agreement which required Mastronardi to accept all USDA Grade 1 tomatoes and saddled AppHarvest with all of the risk and costs of non-Grade 1 tomatoes, which Defendants knew would be rejected by Mastronardi and had "very little to no value." ¶¶271, 270.</li></ul> |
| --- | --- |

**False Statement XI**

| **Statement Category:**<br>Misstatements Regarding Operations, Production, and Supply |
| --- |
| **Speaker(s); Date; Medium**<br>Defendant Webb; April 1, 2021; Company Press release via Globe Newswire, AppHarvest's Investor Relations website |
| **False and Misleading Statements or Omissions**<br><br>Defendant Webb misleadingly touted the Company's dysfunctional harvesting efforts, stating, in pertinent part: "**This harvest also has proved the team can handle the production ramp-up at our Morehead facility** as we are now using all grow space at the high-tech farm." ¶193. |

| **Reasons Why Statements are False and Misleading, and/or Lacked a Reasonable Basis** | **Facts Giving Rise to Strong Inference of Scienter** |
| --- | --- |
| Reasons:<br>Webb's statements were materially false, misleading, and/or lacked a reasonable basis when made because AppHarvest's "harvest" had not "proved" the "team" could "handle the production ramp-up" at the Morehead Facility. In reality, the "harvest" had been disastrous because the "team" produced significant quantities of tomatoes that ended up wasted, spoiled, or rejected, given that:<br><br>Evidence:<br><br>(i)    Defendants admitted that for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. | • CW6 met with Defendants Eggleton and Lee weekly concerning the baseline forecast, and upside and downside scenarios. ¶264. These weekly Forecast Meetings got "quite operational" and focused on various productivity metrics, with a key focus on yield and quality which was the basis for AppHarvest's revenue. *Id.* Throughout the first half of 2021, Lee and Eggleton also discussed that attrition and retention metrics that were "far worse than expected" and falling short "week over week." ¶111. During the "toughest times," (end of Q1 through the "summer refresh" at the end of the Class Period) discussions at Forecast Meetings concerned: "ways to close the gap" between AppHarvest's underperformance compared to the current forecast; the expected time needed for the closing the gap depending on the various scenarios; and the Company's issues with employee training, turnover, poor work ethic, and inconsistent hiring standards which were "repeatedly cited" as the "root cause" of the overall production challenges. ¶264. |

1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)  Defendants admitted that for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii)  Defendants' numerous statements in the August 11, 2021 corrective disclosures admitting "labor" and employee "training" issues existed in 2Q 2021, including Webb's statement on the 2021 Q2 Earnings Call admitting AppHarvest's problems were "as simple as training. I don't want to be more blunt than that, but it was training and management protocols";

(iv)  Defendants Lee's and Eggleton's veiled admissions on the Q1 2021 earnings call that "training" issues existed in the first quarter of 2021 that were hampering "productivity" and driving gross loss;

(v)  Defendants' admissions in the 2021 Q2 Earnings Release, the Q2 2021 Earnings Presentation, and the 2021 Q2 Earnings Call that "operational" and "executional" challenges—including lower quality production and saleable yield, and higher distribution and shipping expense incurred as a result of rejections—existed for the "initial growing season" and the "full season of harvest as a Company";

(vi)  according to CW1 and CW4, AppHarvest did not offer employees adequate (if any) training throughout the Class Period. According to CW1, AppHarvest's inadequately trained workforce contributed to 5-10% of crops being

- Labor productivity was identified as a challenge for AppHarvest in 2020, and during the "toughest times," (end of Q1 through the "summer refresh" at the end of the Class Period) Defendants instituted Leadership Meetings twice a week, which included Lee, Eggleton, CW6 and other FP&A personnel, Marcella Butler, and Julie Nelson. ¶268. Labor productivity metrics included yield, quality, rejections from Mastronardi, attrition and employee absences, and productivity metrics for the various Greenhouse workers' particular functions. *Id.*   According to CW6, inadequate training, turnover, poor work ethic and inconsistent hiring standards were "repeatedly cited" as the "root cause" of the Company's productivity challenges at these Leadership Meetings. CW6 recalled the Leadership Meetings occurred usually mid-week and end-of-week so that Defendants could "keep an eye on it." *Id.*

- CW6 confirmed AppHarvest's executive management had information parity, such that "everyone knew what everyone else knew" regarding fundamental financial data.  ¶129.

- CW6 confirmed that at the end of each month, results concerning pricing, labor productivity (including yield and quality), construction costs, tomato grades, and other factors would be "pulled into" FP&A models and adjustments would be made to the Company's forecasts. ¶265. CW6 and Defendant Eggleton met for "many hours" each day discussing these near-, medium-, and long-term financial forecasts. *Id.*

- CW6 confirmed that AppHarvest productivity forecasts were sent to Mastronardi on a weekly, and possibly daily basis. ¶266. According to CW6, these forecasts included estimates of labor productivity to determine the volumes of beefsteak

wasted or damaged during CW1's tenure, which resulted in lost sales. According to CW5 up to 50% of AppHarvest's crop was wasted in the first growing season caused by workers in the Greenhouse and Packhouse. Further, CW4 confirmed that tomatoes were wasted "daily" during harvesting season;

(vii) CW6 explained that during the Class Period, AppHarvest's attrition and retention metrics in the first half of 2021 were far worse than expected because AppHarvest was clearly falling short week over week. Indeed, according to CW1 and CW2, throughout the Class Period AppHarvest suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including:

   a. dissatisfaction with mandatory expanded working hours—including forced overtime, Saturdays, and holidays, and

   b. infection and quarantining due to the COVID-19 pandemic,

   all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes.

   CW4 likewise stated that there was significant turnover throughout CW4's tenure at AppHarvest, with the west side of the Greenhouse losing at least 10 personnel every week. CW4 stated that the turnover resulted in less trained staff and thereby lower yields

and Tomatoes on the Vine that would be harvested in the given period. *Id.*

- Mastronardi provided Defendants with daily updates, regular audits, and negative feedback in response to subpar quality throughout the Class Period. ¶¶60, 67, 275. Mastronardi increased the frequency of its audits on the AppHarvest tomatoes during periods of "weaker" performance by AppHarvest, which resulted in Mastronardi rejecting a lot of tomatoes. ¶275. During the "toughest" periods of rejected tomatoes (the end of Q1 2021 through the "summer refresh"), it was necessary for AppHarvest to lower estimated production forecasts, a process that involved CW6, Eggleton and Lee, which were exchanged with Mastronardi in a shared "portal." *Id.*

- As confirmed by CW3, CW6, and the Mastronardi Morehead Agreement Defendants Eggleton and Lee were intimately involved in various forecasting processes—forecasts which included sales, quality, costs, yield, price, estimated rejections, and estimated damaged tomatoes. ¶263.

- CW3 confirmed that AppHarvest's forecasts existed prior to the commencement of the first growing season and that Defendant Eggleton approved the forecasts. ¶263. CW3 further explained AppHarvest had planning software, Microsoft Dynamics, which tracked operational results and actual costs, and the Individual Defendants had access to this software. *Id.* CWs 3 and 6 stated that AppHarvest used such real time production data to create and track against AppHarvest's forecasts. ¶¶121, 130, 263.

- CW6 confirmed AppHarvest had real-time access to quality and yield data from the Packhouse based on the types of boxes being shipped (Grade 1 versus Grade 2). ¶267. Further, CW 1

because there were fewer Crop Care Specialists to do the work.

CW5 confirmed that employee turnover and churn had been consistently high throughout October 2020 and June 2021, causing concern amongst Greenhouse personnel that AppHarvest had inadequate labor to meet production requirements as was discussed at the morning stand-up meetings CW5 attended;

(viii) according to CW1, CW2, and CW4 throughout the Class Period AppHarvest's own incentive piece rate structure incentivized disruptive and inefficient workmanship that wasted, damaged, and produced low quality tomatoes;

(ix) CW6 stated that Mastronardi informed AppHarvest that it needed to tighten up specifications because Mastronardi was having to reject a lot of fruit throughout the Class Period—upwards of 30% to 35% during the Company's "toughest times," which was "many times" more than AppHarvest's target which CW6 believed was 6% or 7%;

(x) according to CW2, "half" of all tomatoes inspected were USDA Grade No. 2 or not commercially saleable, and CW6 confirmed that AppHarvest was a "long way off" its quality goals;

(xi) CW6 stated that in the "toughest times" of the first growing season AppHarvest was well below 50% in relation to the Company's productivity standards for specific Greenhouse jobs. ¶194.

and CW4 stated that AppHarvest had real-time access to productivity metrics from the Greenhouse that were recorded by scanners when workers finished working on a particular row and uploaded to the Company's electronic files. ¶120. CW4 confirmed that such real-time data included information from quality inspectors who recorded their results into a "live" excel spreadsheet so that AppHarvest could "map" quality performance. ¶85.

• Defendant Webb frequently visited the Morehead Facility prior to and throughout the Class Period where he filmed at least 16 interviews, gave tours, and visited operations, and would have, and did, see the Company's dysfunctional production facilities and widespread attrition and churn. ¶289. Indeed, Webb admitted he was at the facility "every morning" and that he was "in the facility, you know, elbow tapping everyone as they come in." ¶287. Webb further admitted that he loves to "sleep on the farms" and "going to our operations." ¶288.

• Webb or his office instructed CW5's team to "hide the waste" when investors and news media visited so that the Greenhouse had "better eye appeal." ¶¶83-84, 291.

• Defendants' admissions that "labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility" existed for the entire "*six months* ended June 30, 2021," which caused "lower net sales due to lower overall No. 1-grade production yields" as well as "higher related distribution and shipping fees." ¶297.

• Defendants' admissions that "executional challenges" spanned the entire Class Period because as they were "very real in our first major full season of harvest as a company" and

84

| | |
|---|---|
| | the harvest season began in January 2021; and challenges lasted entire "initial growing season" and "first growing season" which began in October 2020. ¶298. |
| | • Throughout the Class Period the Morehead Facility was the site of the Company's sole production operations and core business. ¶286. |
| | • Defendants frequently spoke in detail regarding staffing, labor, and operations, tomato production, pricing, yield, and other key metrics every quarter and intermittently in various media interviews, which adds a strong inference of scienter. ¶¶72-75, 304-308. |
| | • AppHarvest was entirely reliant on its sole distributor Mastronardi, which required top-quality Grade 1 tomatoes. ¶270. In fact, AppHarvest filed at least 18 documents with the SEC, including documents signed by the Individual Defendants, stating the Company was "highly dependent" on Mastronardi, and Webb signed and initialed every page of the Mastronardi Morehead Agreement which required Mastronardi to accept all USDA Grade 1 tomatoes and saddled AppHarvest with all of the risk and costs of non-Grade 1 tomatoes, which Defendants knew would be rejected by Mastronardi and had "very little to no value." ¶¶271, 270. |

**False Statement XII**

| **Statement Category:** |
|---|
| Speculative, Contingent, and Incomplete Risk Factors Relating to Growth and Price Performance; Speculative, Contingent, and Incomplete Risk Factors Concerning Quality, Production, and Supply; and Speculative, Contingent, and Incomplete Risk Factors Relating to Labor Availability, Recruitment, and Retention |

| **Speaker(s); Date; Medium** |
|---|
| All Defendants; April 6, 2021; Form S-8 filed with the SEC, signed by Defendants Webb, Eggleton, and Lee, . |

| **False and Misleading Statements or Omissions** |
|---|
| The April 6 Form S-8 incorporated by reference all of Defendants' false and misleading statements made in the February 2, 2021 Form 8-K and the March 4 Prospectus. Specifically, the April 6 Form S-8 stated, in pertinent part:<br><br>**The following documents filed by AppHarvest, Inc. (the "*Registrant*" ) with the Securities and Exchange Commission (the "*SEC*") are incorporated by reference into this Registration Statement:**<br><br>**…(b) The Registrant's Current Reports on Form 8-K (File No. 001-39288) filed with the SEC on** February 1, 2021, **February 2, 2021** (as amended on March 2, 2021 ), March 2, 2021 and March 29, 2021.<br><br>**(c) The Registrant's Final Prospectus filed with the SEC on March 4, 2021 pursuant to Rule 424(b) under the Securities Act relating to the Registration Statement on Form S-1, as amended (File No. 333-252964).** ¶196. |

| **Reasons Why Statements are False and Misleading** | **Facts Giving Rise to Strong Inference of Scienter** |
|---|---|
| Plaintiff incorporates the same Reasons and Evidence stated in **False Statement IV. A-C.**, and **False Statement IX. A-B** as if fully set forth herein. | Plaintiff incorporates the same Facts stated in **False Statement IV. A-C.**, and **False Statement IX. A-B**, as if fully set forth herein. |

**False Statement XIII**

| **Statement Category:** |
| --- |
| False and Misleading Purported Justifications for Financial Guidance |
| Misstatements Regarding Operations, Production, and Supply |

| **Speaker(s); Date; Medium** |
| --- |
| Defendant Lee; May 17, 2021; Company Press release via Globe Newswire, AppHarvest's Investor Relations website, Exhibit 99.1 to Form 8-K, signed by Defendant Eggleton and filed with the SEC |

| **False and Misleading Statements or Omissions** |
| --- |
| The May 17 Press Release's "Financial Outlook" "reiterated" AppHarvest's full-year net sales outlook. In explaining this "reiterated" outlook, Defendant Lee highlighted the Company's "operating and financial performance" at the Morehead Facility and the "team's ability to scale the business," stating, in pertinent part:<br><br>**Financial Outlook**<br><br>**The Company reiterated its full-year 2021 outlook of net sales** of $20 to $25 million…<br><br>"**We are pleased by our fast start to the year, the encouraging operating and financial performance of our Morehead facility and our team's ability to scale the business**…," said AppHarvest President David Lee. ¶199. |

| **Reasons Why Statements are False and Misleading, and/or Lacked a Reasonable Basis** | **Facts Giving Rise to Strong Inference of Scienter** |
| --- | --- |
| Reasons:<br><br>Defendant Lee's statements above were materially false, misleading, and/or lacked a reasonable basis when made because the "operating and financial performance" and "ability to scale" were misattributed as providing support for AppHarvest's "Financial Outlook" when such "performance" had already deteriorated and, due to its severe operational issues, AppHarvest | • CW6 met with Defendants Eggleton and Lee weekly concerning the baseline forecast, and upside and downside scenarios. ¶264. These weekly Forecast Meetings got "quite operational" and focused on various productivity metrics, with a key focus on yield and quality which was the basis for AppHarvest's revenue. *Id.* Throughout the first half of 2021, Lee and Eggleton also discussed that attrition and retention metrics that were "far worse than expected" and falling short "week over week." ¶111. During the "toughest times," (end of Q1 through the "summer refresh" at the end of the Class |

was unable to "scale" operations in line with expectation given that:

Evidence:

(i)     Defendants admitted that for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)    Defendants admitted that for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii)   Defendants' numerous statements in the August 11, 2021 corrective disclosures admitting "labor" and employee "training" issues existed in 2Q 2021, including Webb's statement on the 2021 Q2 Earnings Call admitting AppHarvest's problems were "as simple as training. I don't want to be more blunt than that, but it was training and management protocols";

(iv)    Defendants Lee's and Eggleton's veiled admissions on the Q1 2021 earnings call that "training" issues existed in the first quarter of 2021 that were hampering "productivity" and driving gross loss;

(v)     Defendants' admissions in the 2021 Q2 Earnings Release, the Q2 2021 Earnings Presentation, and the 2021 Q2

Period) discussions at Forecast Meetings concerned: "ways to close the gap" between AppHarvest's underperformance compared to the current forecast; the expected time needed for the closing the gap depending on the various scenarios; and the Company's issues with employee training, turnover, poor work ethic, and inconsistent hiring standards which were "repeatedly cited" as the "root cause" of the overall production challenges. ¶264.

• Labor productivity was identified as a challenge for AppHarvest in 2020, and during the "toughest times," (end of Q1 through the "summer refresh" at the end of the Class Period) Defendants instituted Leadership Meetings twice a week, which included Lee, Eggleton, CW6 and other FP&A personnel, Marcella Butler, and Julie Nelson. ¶268. Labor productivity metrics included yield, quality, rejections from Mastronardi, attrition and employee absences, and productivity metrics for the various Greenhouse workers' particular functions. *Id.*   According to CW6, inadequate training, turnover, poor work ethic and inconsistent hiring standards were "repeatedly cited" as the "root cause" of the Company's productivity challenges at these Leadership Meetings. CW6 recalled the Leadership Meetings occurred usually mid-week and end-of-week so that Defendants could "keep an eye on it." *Id.*

• CW6 confirmed AppHarvest's executive management had information parity, such that "everyone knew what everyone else knew" regarding fundamental financial data.  ¶129.

• CW6 confirmed that at the end of each month, results concerning pricing, labor productivity (including yield and quality), construction costs, tomato grades, and other factors would be "pulled into" FP&A models and adjustments would be made to the Company's forecasts. ¶265. CW6 and

Earnings Call that "operational" and "executional" challenges—including lower quality production and saleable yield, and higher distribution and shipping expense incurred as a result of rejections—existed for the "initial growing season" and the "full season of harvest as a Company";

(vi)    according to CW1 and CW4, AppHarvest did not offer employees adequate (if any) training throughout the Class Period. According to CW1, AppHarvest's inadequately trained workforce contributed to 5-10% of crops being wasted or damaged during CW1's tenure, which resulted in lost sales. According to CW5 up to 50% of AppHarvest's crop was wasted in the first growing season caused by workers in the Greenhouse and Packhouse. Further, CW4 confirmed that tomatoes were wasted "daily" during harvesting season;

(vii)   CW6 explained that during the Class Period, AppHarvest's attrition and retention metrics in the first half of 2021 were far worse than expected because AppHarvest was clearly falling short week over week. Indeed, according to CW1 and CW2, throughout the Class Period AppHarvest suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including:

a.    dissatisfaction with mandatory expanded working hours—including forced overtime, Saturdays, and holidays, and

Defendant Eggleton met for "many hours" each day discussing these near-, medium-, and long-term financial forecasts. *Id.*

• CW6 confirmed that AppHarvest productivity forecasts were sent to Mastronardi on a weekly, and possibly daily basis. ¶266. According to CW6, these forecasts included estimates of labor productivity to determine the volumes of beefsteak and Tomatoes on the Vine that would be harvested in the given period. *Id.*

• Mastronardi provided Defendants with daily updates, regular audits, and negative feedback in response to subpar quality throughout the Class Period.   ¶¶60, 67, 275. Mastronardi increased the frequency of its audits on the AppHarvest tomatoes during periods of "weaker" performance by AppHarvest, which resulted in Mastronardi rejecting a lot of tomatoes. ¶275. During the "toughest" periods of rejected tomatoes (the end of Q1 2021 through the "summer refresh"), it was necessary for AppHarvest to lower estimated production forecasts, a process that involved CW6, Eggleton and Lee, which were exchanged with Mastronardi in a shared "portal." *Id.*

• As confirmed by CW3, CW6, and the Mastronardi Morehead Agreement Defendants Eggleton and Lee were intimately involved in various forecasting processes—forecasts which included sales, quality, costs, yield, price, estimated rejections, and estimated damaged tomatoes. ¶263.

• CW3 confirmed that AppHarvest's forecasts existed prior to the commencement of the first growing season and that Defendant Eggleton approved the forecasts. ¶263. CW3 further explained AppHarvest had planning software, Microsoft Dynamics, which tracked operational results and

b. infection and quarantining due to the COVID-19 pandemic,

all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes.

CW4 likewise stated that there was significant turnover throughout CW4's tenure at AppHarvest, with the west side of the Greenhouse losing at least 10 personnel every week. CW4 stated that the turnover resulted in less trained staff and thereby lower yields because there were fewer Crop Care Specialists to do the work.

CW5 confirmed that employee turnover and churn had been consistently high throughout October 2020 and June 2021, causing concern amongst Greenhouse personnel that AppHarvest had inadequate labor to meet production requirements as was discussed at the morning stand-up meetings CW5 attended;

(viii) according to CW1, CW2, and CW4 throughout the Class Period AppHarvest's own incentive piece rate structure incentivized disruptive and inefficient workmanship that wasted, damaged, and produced low quality tomatoes;

(ix) CW6 stated that Mastronardi informed AppHarvest that it needed to tighten up specifications because Mastronardi was having to reject a lot of fruit throughout the Class Period—upwards of 30% to 35% during the Company's "toughest times," which was "many times" more than AppHarvest's target which CW6 believed was 6% or 7%;

actual costs, and the Individual Defendants had access to this software. *Id.* CWs 3 and 6 stated that AppHarvest used such real time production data to create and track against AppHarvest's forecasts. ¶¶121, 130, 263.

- CW6 confirmed AppHarvest had real-time access to quality and yield data from the Packhouse based on the types of boxes being shipped (Grade 1 versus Grade 2). ¶267. Further, CW 1 and CW4 stated that AppHarvest had real-time access to productivity metrics from the Greenhouse that were recorded by scanners when workers finished working on a particular row and uploaded to the Company's electronic files. ¶120. CW4 confirmed that such real-time data included information from quality inspectors who recorded their results into a "live" excel spreadsheet so that AppHarvest could "map" quality performance. ¶85.

- Defendant Webb frequently visited the Morehead Facility prior to and throughout the Class Period where he filmed at least 16 interviews, gave tours, and visited operations, and would have, and did, see the Company's dysfunctional production facilities and widespread attrition and churn. ¶289. Indeed, Webb admitted he was at the facility "every morning" and that he was "in the facility, you know, elbow tapping everyone as they come in." ¶287. Webb further admitted that he loves to "sleep on the farms" and "going to our operations." ¶288.

- Webb or his office instructed CW5's team to "hide the waste" when investors and news media visited so that the Greenhouse had "better eye appeal." ¶¶83-84, 291.

- On April 12, 2021, the Board stripped Marcella Butler of her role as an executive officer and transitioned her from Chief Operating Officer to Chief People Officer (a position she had

| | | |
|---|---|---|
| (x) | according to CW2, "half" of all tomatoes inspected were USDA Grade No. 2 or not commercially saleable, and CW6 confirmed that AppHarvest was a "long way off" its quality goals; | been promoted out of only four months prior). ¶279. Butler reported directly to Defendant Webb, who with Defendant Lee were a member of the Board. ¶277. Defendants Webb and Lee admitted during the Q2 Earnings Call that Butler's demotion was a result of operational failures. ¶280. Further, CW6, who was "very familiar" with Ms. Butler, confirmed that Ms. Butler's transition back to Chief People Officer and eventual separation from the Company were due to labor issues, including productivity, attrition, and churn. ¶279. |
| (xi) | CW6 stated that in the "toughest times" of the first growing season AppHarvest was well below 50% in relation to the Company's productivity standards for specific Greenhouse jobs.  ¶200. | • Events such as Ms. Butler's demotion informed Board members (like Webb and Lee) that the extent of the Company's productivity issues were highly material—so much so that Board member Jeffrey Ubben cashed out 3 million shares, or roughly 25% of his holdings, for $49.5 million in proceeds, before the truth was disclosed. ¶¶310-311 |
| | | • Defendants Lee's and Eggleton's veiled admissions on the Q1 2021 earnings call. Lee stated that in the future there would be a "summer refresh," "Morehead 2.0," and "new training" to support increased productivity, and such training would be merely additive to AppHarvest's supposed current "momentum" providing incremental "higher productivity." ¶¶133, 135. Eggleton acknowledged "training" issues and "demands" on the "labor force" affected "productivity" and drove gross loss, but blamed the second half of the Morehead Facility coming online pursuant to a "phased launch." ¶134. Defendants' veiled admissions evidence that they knew undisclosed detail concerning the underlying issues, such as: significant waste and productivity issues, understaffing and churn at the Morehead Facility, and the resulting effects on the Company's operations, product quality, sales, revenue, and costs. ¶133-35. |

|  | <ul><li>Defendants' admissions that "labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility" existed for the entire "***six months*** ended June 30, 2021," which caused "lower net sales due to lower overall No. 1-grade production yields" as well as "higher related distribution and shipping fees." ¶297.</li><li>Defendants' admissions that "executional challenges" spanned the entire Class Period because as they were "very real in our first major full season of harvest as a company" and the harvest season began in January 2021; and challenges lasted entire "initial growing season" and "first growing season" which began in October 2020. ¶298.</li><li>Lee admitted Defendants assigned new "conservative" assumptions to operational performance with respect to the Company's outlook to investors, and further admitted it was not until the end of the Class Period when AppHarvest's guidance was "balanced" and "achiev[able]." ¶¶255, 328. CW6 confirmed that Defendant Lee always took the most "aggressive" forecast positions, including in instances where he was informed that AppHarvest's challenges still needed to be factored in. ¶¶124, 245.</li><li>Throughout the Class Period the Morehead Facility was the site of the Company's sole production operations and core business. ¶286.</li><li>Defendants frequently spoke in detail regarding staffing, labor, and operations, tomato production, pricing, yield, and other key metrics every quarter and intermittently in various media interviews, which adds a strong inference of scienter. ¶¶72-75, 304-308.</li></ul> |
|---|---|

| | |
|---|---|
| | • AppHarvest was entirely reliant on its sole distributor Mastronardi, which required top-quality Grade 1 tomatoes. ¶270. In fact, AppHarvest filed at least 18 documents with the SEC, including documents signed by the Individual Defendants, stating the Company was "highly dependent" on Mastronardi, and Webb signed and initialed every page of the Mastronardi Morehead Agreement which required Mastronardi to accept all USDA Grade 1 tomatoes and saddled AppHarvest with all of the risk and costs of non-Grade 1 tomatoes, which Defendants knew would be rejected by Mastronardi and had "very little to no value." ¶¶271, 270. |

**False Statement XIV. A. i.**

| **Statement Category:** |
| --- |
| Speculative, Contingent, and Incomplete Risk Factors Relating to Growth and Price Performance |

| **Speaker(s); Date; & Medium** |
| --- |
| All Defendants; May 17, 2021; Form 10-Q signed by Defendant Eggleton, certified by Eggleton and Webb, filed with the SEC, and on the Investor Relations section of AppHarvest's website |

| **False and Misleading Statements or Omissions** |
| --- |
| **Risks Related to Our Business and Industry**<br><br>…Even if [AppHarvest's] investments do result in the growth of our business, **if we do not effectively manage our growth, we may not be able to execute on our business plan and vision, respond to competitive pressures, take advantage of market opportunities, satisfy customer requirements or maintain high-quality product offerings, any of which could adversely affect our business, financial condition and results of operations.**<br><br>*** <br><br>**In future periods, revenue growth could slow or revenue could decline for a number of reasons, including** slowing demand for our products, increasing competition, a decrease in the growth of the overall market, or **our failure, for any reason, to take advantage of growth opportunities. If our assumptions regarding these risks and uncertainties and future revenue growth are incorrect or change, or if we do not address these risks successfully, our operating and financial results could differ materially from our expectations, and our business could suffer**. ¶202. |

| **Reasons Why Statements are False and Misleading, and/or Lacked a Reasonable Basis** | **Facts Giving Rise to Strong Inference of Scienter** |
| --- | --- |
| Reasons:<br><br>The above speculative, contingent, and woefully incomplete statements were materially false, misleading, and/or lacked a reasonable basis when made because:<br>Defendants speculatively portrayed AppHarvest's ability to "effectively manage its growth," "execute on its business plan," | • CW6 met with Defendants Eggleton and Lee weekly concerning the baseline forecast, and upside and downside scenarios. ¶264. These weekly Forecast Meetings got "quite operational" and focused on various productivity metrics, with a key focus on yield and quality which was the basis for AppHarvest's revenue. *Id.* Throughout the first half of 2021, Lee and Eggleton also discussed that attrition and retention metrics that were "far worse than expected" and falling short |

and "satisfy customer requirements or maintain high quality product" offerings as contingent or potential when AppHarvest was already failing to do all of these things resulting in lower saleable yield and quality products, and higher customer rejections and costs.

Defendants made a boilerplate and vague disclaimers that "revenue growth could slow or revenue could decline for a number of reasons" and that if AppHarvest fails to "take advantage of growth opportunities" "for any reason" it might see declining revenue, when Defendants were already experiencing wide-ranging execution problems for the entire first harvesting season that were doing exactly that.

Evidence:

The above Reasons are supported by ample evidence, given that:

(i)     Defendants admitted that for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)    Defendants admitted that for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

"week over week." ¶111. During the "toughest times," (end of Q1 through the "summer refresh" at the end of the Class Period) discussions at Forecast Meetings concerned: "ways to close the gap" between AppHarvest's underperformance compared to the current forecast; the expected time needed for the closing the gap depending on the various scenarios; and the Company's issues with employee training, turnover, poor work ethic, and inconsistent hiring standards which were "repeatedly cited" as the "root cause" of the overall production challenges. ¶264.

• Labor productivity was identified as a challenge for AppHarvest in 2020, and during the "toughest times," (end of Q1 through the "summer refresh" at the end of the Class Period) Defendants instituted Leadership Meetings twice a week, which included Lee, Eggleton, CW6 and other FP&A personnel, Marcella Butler, and Julie Nelson. ¶268. Labor productivity metrics included yield, quality, rejections from Mastronardi, attrition and employee absences, and productivity metrics for the various Greenhouse workers' particular functions. *Id.*    According to CW6, inadequate training, turnover, poor work ethic and inconsistent hiring standards were "repeatedly cited" as the "root cause" of the Company's productivity challenges at these Leadership Meetings. CW6 recalled the Leadership Meetings occurred usually mid-week and end-of-week so that Defendants could "keep an eye on it." *Id.*

• CW6 confirmed AppHarvest's executive management had information parity, such that "everyone knew what everyone else knew" regarding fundamental financial data. ¶129.

• CW6 confirmed that at the end of each month, results concerning pricing, labor productivity (including yield and quality), construction costs, tomato grades, and other factors

95

(iii)    Defendants' numerous statements in the August 11, 2021 corrective disclosures admitting "labor" and employee "training" issues existed in 2Q 2021, including Webb's statement on the 2021 Q2 Earnings Call admitting AppHarvest's problems were "as simple as training. I don't want to be more blunt than that, but it was training and management protocols";

(iv)    Defendants Lee's and Eggleton's veiled admissions on the Q1 2021 Earnings Call that "training" issues existed in the first quarter of 2021 that were hampering "productivity" and driving gross loss;

(v)    Defendants' admissions in the 2021 Q2 Earnings Release, the Q2 2021 Earnings Presentation, and the 2021 Q2 Earnings Call that "operational" and "executional" challenges—including lower quality production and saleable yield, and higher distribution and shipping expense incurred as a result of rejections—existed for the "initial growing season" and the "full season of harvest as a Company";

(vi)    according to CW1 and CW4, AppHarvest did not offer employees adequate (if any) training throughout the Class Period. According to CW1, AppHarvest's inadequately trained workforce contributed to 5-10% of crops being wasted or damaged during CW1's tenure, which resulted in lost sales. According to CW5, up to 50% of AppHarvest's crop was wasted in the first growing season caused by workers in the Greenhouse and Packhouse. Further, CW4 confirmed that tomatoes were wasted "daily" during harvesting season;

would be "pulled into" FP&A models and adjustments would be made to the Company's forecasts. ¶265. CW6 and Defendant Eggleton met for "many hours" each day discussing these near-, medium-, and long-term financial forecasts. *Id.*

• CW6 confirmed that AppHarvest productivity forecasts were sent to Mastronardi on a weekly, and possibly daily basis. ¶266. According to CW6, these forecasts included estimates of labor productivity to determine the volumes of beefsteak and Tomatoes on the Vine that would be harvested in the given period. *Id.*

• Mastronardi provided Defendants with daily updates, regular audits, and negative feedback in response to subpar quality throughout the Class Period. ¶¶60, 67, 275. Mastronardi increased the frequency of its audits on the AppHarvest tomatoes during periods of "weaker" performance by AppHarvest, which resulted in Mastronardi rejecting a lot of tomatoes. ¶275. During the "toughest" periods of rejected tomatoes (the end of Q1 2021 through the "summer refresh"), it was necessary for AppHarvest to lower estimated production forecasts, a process that involved CW6, Eggleton and Lee, which were exchanged with Mastronardi in a shared "portal." *Id.*

• As confirmed by CW3, CW6, and the Mastronardi Morehead Agreement Defendants Eggleton and Lee were intimately involved in various forecasting processes—forecasts which included sales, quality, costs, yield, price, estimated rejections, and estimated damaged tomatoes. ¶263.

• CW3 confirmed that AppHarvest's forecasts existed prior to the commencement of the first growing season and that

(vii) CW6 explained that during the Class Period, AppHarvest's attrition and retention metrics in the first half of 2021 were far worse than expected because AppHarvest was clearly falling short week over week. Indeed, according to CW1 and CW2, throughout the Class Period, AppHarvest suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including:

a. dissatisfaction with mandatory expanded working hours—including forced overtime, Saturdays, and holidays, and

b. infection and quarantining due to the COVID-19 pandemic,

all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes.

CW4 likewise stated that there was significant turnover throughout CW4's tenure at AppHarvest, with the west side of the Greenhouse losing at least 10 personnel every week. CW4 stated that the turnover resulted in less trained staff and thereby lower yields because there were fewer Crop Care Specialists to do the work.

CW5 confirmed that employee turnover and churn had been consistently high throughout October 2020 and

Defendant Eggleton approved the forecasts. ¶263. CW3 further explained AppHarvest had planning software, Microsoft Dynamics, which tracked operational results and actual costs, and the Individual Defendants had access to this software. *Id.* CWs 3 and 6 stated that AppHarvest used such real time production data to create and track against AppHarvest's forecasts. ¶¶121, 130, 263.

- CW6 confirmed AppHarvest had real-time access to quality and yield data from the Packhouse based on the types of boxes being shipped (Grade 1 versus Grade 2). ¶267. Further, CW 1 and CW4 stated that AppHarvest had real-time access to productivity metrics from the Greenhouse that were recorded by scanners when workers finished working on a particular row and uploaded to the Company's electronic files. ¶120. CW4 confirmed that such real-time data included information from quality inspectors who recorded their results into a "live" excel spreadsheet so that AppHarvest could "map" quality performance. ¶85.

- Defendant Webb frequently visited the Morehead Facility prior to and throughout the Class Period where he filmed at least 16 interviews, gave tours, and visited operations, and would have, and did, see the Company's dysfunctional production facilities and widespread attrition and churn. ¶289. Indeed, Webb admitted he was at the facility "every morning" and that he was "in the facility, you know, elbow tapping everyone as they come in." ¶287. Webb further admitted that he loves to "sleep on the farms" and "going to our operations." ¶288.

- Webb or his office instructed CW5's team to "hide the waste" when investors and news media visited so that the Greenhouse had "better eye appeal." ¶¶83-84, 291.

| | |
|---|---|
| June 2021, causing concern amongst Greenhouse personnel that AppHarvest had inadequate labor to meet production requirements as was discussed at the morning stand-up meetings CW5 attended;<br><br>(viii) according to CW1, CW2, and CW4, throughout the Class Period, AppHarvest's own incentive piece rate structure incentivized disruptive and inefficient workmanship that wasted, damaged, and produced low quality tomatoes;<br><br>(ix) CW6 stated that Mastronardi informed AppHarvest that it needed to tighten up specifications because Mastronardi was having to reject a lot of fruit throughout the Class Period—upwards of 30% to 35% during the Company's "toughest times," which was "many times" more than AppHarvest's target which CW6 believed was 6% or 7%;<br><br>(x) according to CW2, "half" of all tomatoes inspected were USDA Grade No. 2 or not commercially saleable, and CW6 confirmed that AppHarvest was a "long way off" its quality goals;<br><br>(xi) CW6 stated that in the "toughest times" of the first growing season AppHarvest was well below 50% in relation to the Company's productivity standards for specific Greenhouse jobs. ¶203. | • On April 12, 2021, the Board stripped Marcella Butler of her role as an executive officer and transitioned her from Chief Operating Officer to Chief People Officer (a position she had been promoted out of only four months prior). ¶279. Butler reported directly to Defendant Webb, who with Defendant Lee were a member of the Board. ¶277. Defendants Webb and Lee admitted during the Q2 Earnings Call that Butler's demotion was a result of operational failures. ¶280. Further, CW6, who was "very familiar" with Ms. Butler, confirmed that Ms. Butler's transition back to Chief People Officer and eventual separation from the Company were due to labor issues, including productivity, attrition, and churn. ¶279.<br><br>• Events such as Ms. Butler's demotion informed Board members (like Webb and Lee) that the extent of the Company's productivity issues were highly material—so much so that Board member Jeffrey Ubben cashed out 3 million shares, or roughly 25% of his holdings, for $49.5 million in proceeds, before the truth was disclosed. ¶¶310-311<br><br>• Defendants Lee's and Eggleton's veiled admissions on the Q1 2021 earnings call. Lee stated that in the future there would be a "summer refresh," "Morehead 2.0," and "new training" to support increased productivity, and such training would be merely additive to AppHarvest's supposed current "momentum" providing incremental "higher productivity." ¶¶133, 135. Eggleton acknowledged "training" issues and "demands" on the "labor force" affected "productivity" and drove gross loss, but blamed the second half of the Morehead Facility coming online pursuant to a "phased launch." ¶134. Defendants' veiled admissions evidence that they knew undisclosed detail concerning the underlying issues, such as: significant waste and productivity issues, understaffing and churn at the Morehead Facility, and the resulting effects on |

| | the Company's operations, product quality, sales, revenue, and costs. ¶133-35. |
|---|---|
| | • Defendants' admissions that "labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility" existed for the entire "*six months* ended June 30, 2021," which caused "lower net sales due to lower overall No. 1-grade production yields" as well as "higher related distribution and shipping fees." ¶297. |
| | • Defendants' admissions that "executional challenges" spanned the entire Class Period because as they were "very real in our first major full season of harvest as a company" and the harvest season began in January 2021; and challenges lasted entire "initial growing season" and "first growing season" which began in October 2020. ¶298. |
| | • Throughout the Class Period the Morehead Facility was the site of the Company's sole production operations and core business. ¶286. |
| | • Defendants frequently spoke in detail regarding staffing, labor, and operations, tomato production, pricing, yield, and other key metrics every quarter and intermittently in various media interviews, which adds a strong inference of scienter. ¶¶72-75, 304-308. |
| | • AppHarvest was entirely reliant on its sole distributor Mastronardi, which required top-quality Grade 1 tomatoes. ¶270. In fact, AppHarvest filed at least 18 documents with the SEC, including documents signed by the Individual Defendants, stating the Company was "highly dependent" on Mastronardi, and Webb signed and initialed every page of the Mastronardi Morehead Agreement which required |

| | Mastronardi to accept all USDA Grade 1 tomatoes and saddled AppHarvest with all of the risk and costs of non-Grade 1 tomatoes, which Defendants knew would be rejected by Mastronardi and had "very little to no value." ¶¶271, 270. |
|---|---|

**False Statement XIV. A. ii.**

| **Statement Category:** |
| --- |
| Speculative, Contingent, and Incomplete Risk Factors Concerning Quality, Production, and Supply |

| **Speaker(s); Date; & Medium** |
| --- |
| All Defendants; May 17, 2021; Form 10-Q signed by Defendant Eggleton, certified by Eggleton and Webb, filed with the SEC, and on the Investor Relations section of AppHarvest's website |

| **False and Misleading Statements or Omissions** |
| --- |
| *We currently rely on a single facility for all of our operations.*<br><br>…**Adverse changes or developments affecting the Morehead facility could impair our ability to produce our products and our business, prospects, financial condition and results of operations. Any shutdown or period of reduced production at the Morehead facility**, which may be caused by regulatory noncompliance or other issues, as well as other factors beyond our control, such as severe weather conditions, natural disaster, fire, power interruption, work stoppage, disease outbreaks or pandemics (such as COVID-19), equipment failure or delay in supply delivery, **would significantly disrupt our ability to grow and deliver our produce in a timely manner, meet our contractual obligations and operate our business.**<br><br><div align="center">\*\*\*</div><br>**Any significant or unexpected rejection of our products could negatively impact our results of operations, and we may be unable to sell the rejected products to other third parties.**<br><br><div align="center">\*\*\*</div><br>**If our products** fail to gain market acceptance, are restricted by regulatory requirements or **have quality problems, we may not be able to fully recover costs and expenses incurred in our operations, and our business, financial condition or results of operations could be materially and adversely affected.** ¶202. |

| **Reasons Why Statements are False and Misleading, and/or Lacked a Reasonable Basis** | **Facts Giving Rise to Strong Inference of Scienter** |
| --- | --- |
| Reasons: | Plaintiff incorporates the same Facts stated in **False Statement XIV. A. i**., as if fully set forth herein. |

The above speculative, contingent, and woefully incomplete statements of known risks were materially false, misleading, and/or lacked a reasonable basis when made because:

Defendants speculate that "significant or unexpected rejection of AppHarvest's products" could "negatively impact" results when AppHarvest was already experiencing massive customer rejections from Mastronardi because of poor quality that eroded sales and inflated costs, and Defendants speculate further that the Company may not be able to resell rejected products to "other third parties" when AppHarvest was not doing so, but rather was selling "substantially all" of its products to Mastronardi and donating or composting the rejections.

Defendants make boilerplate speculation that vague "developments" or periods of "reduced production at the Morehead facility" could disrupt AppHarvest's ability to "meet our contractual obligations and operate our business" when the Company's operations were already deteriorating because of the Company's inability to produce USDA Grade No. 1 tomatoes.

Defendants speculate that "quality problems" could "materially and adversely" affect AppHarvest's "business, financial condition or results of operations" when they were already doing so.

Evidence:

Plaintiff incorporates the same Evidence stated in **False Statement XIV. A. i.**, as if fully set forth herein.

**False Statement XIV. A. iii.**

| **Statement Category:** |
| --- |
| Speculative, Contingent, and Incomplete Risk Factors Relating to Labor Availability, Recruitment, and Retention |

| **Speaker(s); Date; & Medium** |
| --- |
| All Defendants; May 17, 2021; Form 10-Q signed by Defendant Eggleton, certified by Eggleton and Webb, filed with the SEC, and on the Investor Relations section of AppHarvest's website |

| **False and Misleading Statements or Omissions** |
| --- |
| *We depend on employing a skilled local labor force, and* **failure to attract and retain qualified employees could negatively impact our business, results of operations and financial condition.** <br> *** <br> …even **if we are able to identify, hire and train our labor force, there is no guarantee that we will be able to retain these employees. Any shortage of labor or lack of regular availability could restrict our ability to operate our greenhouses profitably, or at all.** <br> *** <br> *The COVID-19 pandemic could negatively impact on our business, results of operations and financial condition.[…]* <br><br> *** <br><br> …**Although we have not experienced material financial impacts due to the pandemic**, the fluid nature of the COVID-19 pandemic and uncertainties regarding the related economic impact are likely to result in sustained market turmoil, which *could* also negatively impact our business, financial condition and cash flows. Although our business is considered an "essential business," **the COVID-19 pandemic could result in labor shortages, which could result in our inability to plant and harvest crops at full capacity and could result in spoilage or loss of unharvested crops.…The extent of COVID-19's effect on our operational and financial performance will depend on future developments**, including the duration, spread and intensity of the pandemic and the effectiveness of vaccines against COVID-19 and variants thereof, all of which are uncertain and difficult to predict considering the rapidly evolving landscape. **As a result, it is not currently possible to ascertain the overall impact of COVID-19 on our business. However, if the pandemic continues to persist as a severe worldwide health crisis, the disease could negatively impact our business, financial condition results of operations and cash flows, and may also have the effect of heightening many of the other risks described in this "Risk Factors" section**. ¶202. |

| **Reasons Why Statements are False and Misleading and/or Lacked a Reasonable Basis** | **Facts Giving Rise to Strong Inference of Scienter** |
| --- | --- |

103

| | |
|---|---|
| <div align="center">Reasons:</div><br><br>The above speculative, contingent, and woefully incomplete statements of known risks were materially false, misleading, and/or lacked a reasonable basis when made because:<br><br>Defendants speculate that "failure to attract and retain qualified employees could negatively impact" AppHarvest's business when the Company was already suffering massive attrition, and Defendants misrepresent that a potential "shortage of labor or lack of regular availability" or the Company's potential inability to "train its labor force" and "retain" employees could potentially affect AppHarvest, including its "ability to operate its greenhouses profitably," when, in reality, those situations had already transpired.<br><br>Defendants falsely misrepresent AppHarvest "has not experienced material financial impacts due to the pandemic" and speculate that the COVID-19 pandemic, due to contingent and vague "future developments," *could* negatively impact AppHarvest's "business, results of operations and financial condition" and "cash flows," *could* "result in labor shortages," *could* cause an "inability to plant and harvest crops at full capacity," and *could* "result in spoilage or loss of unharvested crops" when all of those things were already happening because COVID-19 had caused AppHarvest to operate severely understaffed during the first growing and harvesting season because employees were quarantining.<br><br><div align="center">Evidence:</div><br><br>Plaintiff incorporates the same Evidence stated in **False Statement XIV. A. i.**, as if fully set forth herein | Plaintiff incorporates the same Evidence stated in **False Statement XIV. A. i.**, as if fully set forth herein |

**False Statement XIV. B.**

<table>
<tr><td colspan="2">

**Statement Category:**
Material Omissions Regarding Net Sales and Violations of Item 303
</td></tr>
<tr><td colspan="2">

**Speaker(s); Date; Medium**
All Defendants; May 17, 2021; Form 10-Q signed by Defendant Eggleton, certified by Eggleton and Webb, filed with the SEC, and on the Investor Relations section of AppHarvest's website
</td></tr>
<tr><td colspan="2">

**False and Misleading Statements or Omissions**

Further, the May 17 Form 10-Q's "Results of Operations" section gave a false and misleading presentation of AppHarvest's net sales when making its "Comparison of the Three Months Ended March 31, 2021 and 2020." The May 17 Form 10-Q stated in pertinent part:

**The following sections discuss and analyze the changes in the significant line items in our unaudited condensed consolidated statements of operations for the comparison periods identified**.

*Net Sales*

**Net sales for the three months ended March 31, 2021 were $2.3 million compared to $0 for the comparable prior year period, due to initial tomato sales produced at our Morehead CEA facility**. ¶204.
</td></tr>
<tr>
<td>

**Reasons Why Statements are False and Misleading, and/or Lacked a Reasonable Basis**

The above statements were materially misleading when made because Defendants discussed the "changes" in net sales while failing to state, so as not to mislead, known changes affecting net sales with respect to AppHarvest's operations. Indeed, Defendants admitted in the 2Q Form 10-Q that for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which
</td>
<td>

**Facts Giving Rise to Strong Inference of Scienter**

• CW6 met with Defendants Eggleton and Lee weekly concerning the baseline forecast, and upside and downside scenarios. ¶264. These weekly Forecast Meetings got "quite operational" and focused on various productivity metrics, with a key focus on yield and quality which was the basis for AppHarvest's revenue. *Id.* Throughout the first half of 2021, Lee and Eggleton also discussed that attrition and retention metrics that were "far worse than expected" and falling short "week over week." ¶111. During the "toughest times," (end of Q1 through the "summer refresh" at the end of the Class
</td>
</tr>
</table>

105

| | |
|---|---|
| "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees." Thus, Defendants' failure to disclose this information in the May 17 Form 10-Q was misleading or lacked a reasonable basis. Additionally, Defendants' material omission violated Item 303 of SEC Regulation S-K which obligated them to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales…from continuing operations." ¶205. | Period) discussions at Forecast Meetings concerned: "ways to close the gap" between AppHarvest's underperformance compared to the current forecast; the expected time needed for the closing the gap depending on the various scenarios; and the Company's issues with employee training, turnover, poor work ethic, and inconsistent hiring standards which were "repeatedly cited" as the "root cause" of the overall production challenges. ¶264.<br><br>• Labor productivity was identified as a challenge for AppHarvest in 2020, and during the "toughest times," (end of Q1 through the "summer refresh" at the end of the Class Period) Defendants instituted Leadership Meetings twice a week, which included Lee, Eggleton, CW6 and other FP&A personnel, Marcella Butler, and Julie Nelson. ¶268. Labor productivity metrics included yield, quality, rejections from Mastronardi, attrition and employee absences, and productivity metrics for the various Greenhouse workers' particular functions. *Id.*   According to CW6, inadequate training, turnover, poor work ethic and inconsistent hiring standards were "repeatedly cited" as the "root cause" of the Company's productivity challenges at these Leadership Meetings. CW6 recalled the Leadership Meetings occurred usually mid-week and end-of-week so that Defendants could "keep an eye on it." *Id.*<br><br>• CW6 confirmed AppHarvest's executive management had information parity, such that "everyone knew what everyone else knew" regarding fundamental financial data.  ¶129.<br><br>• CW6 confirmed that at the end of each month, results concerning pricing, labor productivity (including yield and quality), construction costs, tomato grades, and other factors would be "pulled into" FP&A models and adjustments would be made to the Company's forecasts. ¶265. CW6 and |

Defendant Eggleton met for "many hours" each day discussing these near-, medium-, and long-term financial forecasts. *Id.*

- CW6 confirmed that AppHarvest productivity forecasts were sent to Mastronardi on a weekly, and possibly daily basis. ¶266. According to CW6, these forecasts included estimates of labor productivity to determine the volumes of beefsteak and Tomatoes on the Vine that would be harvested in the given period. *Id.*

- Mastronardi provided Defendants with daily updates, regular audits, and negative feedback in response to subpar quality throughout the Class Period. ¶¶60, 67, 275. Mastronardi increased the frequency of its audits on the AppHarvest tomatoes during periods of "weaker" performance by AppHarvest, which resulted in Mastronardi rejecting a lot of tomatoes. ¶275. During the "toughest" periods of rejected tomatoes (the end of Q1 2021 through the "summer refresh"), it was necessary for AppHarvest to lower estimated production forecasts, a process that involved CW6, Eggleton and Lee, which were exchanged with Mastronardi in a shared "portal." *Id.*

- As confirmed by CW3, CW6, and the Mastronardi Morehead Agreement Defendants Eggleton and Lee were intimately involved in various forecasting processes—forecasts which included sales, quality, costs, yield, price, estimated rejections, and estimated damaged tomatoes. ¶263.

- CW3 confirmed that AppHarvest's forecasts existed prior to the commencement of the first growing season and that Defendant Eggleton approved the forecasts. ¶263. CW3 further explained AppHarvest had planning software, Microsoft Dynamics, which tracked operational results and

| | |
|---|---|
| | actual costs, and the Individual Defendants had access to this software. *Id.* CWs 3 and 6 stated that AppHarvest used such real time production data to create and track against AppHarvest's forecasts. ¶¶121, 130, 263.<br><br>• CW6 confirmed AppHarvest had real-time access to quality and yield data from the Packhouse based on the types of boxes being shipped (Grade 1 versus Grade 2). ¶267. Further, CW 1 and CW4 stated that AppHarvest had real-time access to productivity metrics from the Greenhouse that were recorded by scanners when workers finished working on a particular row and uploaded to the Company's electronic files. ¶120. CW4 confirmed that such real-time data included information from quality inspectors who recorded their results into a "live" excel spreadsheet so that AppHarvest could "map" quality performance. ¶85.<br><br>• Defendant Webb frequently visited the Morehead Facility prior to and throughout the Class Period where he filmed at least 16 interviews, gave tours, and visited operations, and would have, and did, see the Company's dysfunctional production facilities and widespread attrition and churn. ¶289. Indeed, Webb admitted he was at the facility "every morning" and that he was "in the facility, you know, elbow tapping everyone as they come in." ¶287. Webb further admitted that he loves to "sleep on the farms" and "going to our operations." ¶288.<br><br>• Webb or his office instructed CW5's team to "hide the waste" when investors and news media visited so that the Greenhouse had "better eye appeal." ¶¶83-84, 291.<br><br>• On April 12, 2021, the Board stripped Marcella Butler of her role as an executive officer and transitioned her from Chief Operating Officer to Chief People Officer (a position she had |

been promoted out of only four months prior). ¶279. Butler reported directly to Defendant Webb, who with Defendant Lee were a member of the Board. ¶277. Defendants Webb and Lee admitted during the Q2 Earnings Call that Butler's demotion was a result of operational failures. ¶280. Further, CW6, who was "very familiar" with Ms. Butler, confirmed that Ms. Butler's transition back to Chief People Officer and eventual separation from the Company were due to labor issues, including productivity, attrition, and churn. ¶279.

- Events such as Ms. Butler's demotion informed Board members (like Webb and Lee) that the extent of the Company's productivity issues were highly material—so much so that Board member Jeffrey Ubben cashed out 3 million shares, or roughly 25% of his holdings, for $49.5 million in proceeds, before the truth was disclosed. ¶¶310-311

- Defendants Lee's and Eggleton's veiled admissions on the Q1 2021 earnings call. Lee stated that in the future there would be a "summer refresh," "Morehead 2.0," and "new training" to support increased productivity, and such training would be merely additive to AppHarvest's supposed current "momentum" providing incremental "higher productivity." ¶¶133, 135. Eggleton acknowledged "training" issues and "demands" on the "labor force" affected "productivity" and drove gross loss, but blamed the second half of the Morehead Facility coming online pursuant to a "phased launch." ¶134. Defendants' veiled admissions evidence that they knew undisclosed detail concerning the underlying issues, such as: significant waste and productivity issues, understaffing and churn at the Morehead Facility, and the resulting effects on the Company's operations, product quality, sales, revenue, and costs. ¶133-35.

|  | • Defendants' admissions that "labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility" existed for the entire "*six months* ended June 30, 2021," which caused "lower net sales due to lower overall No. 1-grade production yields" as well as "higher related distribution and shipping fees." ¶297. |
|  | • Defendants' admissions that "executional challenges" spanned the entire Class Period because as they were "very real in our first major full season of harvest as a company" and the harvest season began in January 2021; and challenges lasted entire "initial growing season" and "first growing season" which began in October 2020. ¶298. |
|  | • Throughout the Class Period the Morehead Facility was the site of the Company's sole production operations and core business. ¶286. |
|  | • Defendants frequently spoke in detail regarding staffing, labor, and operations, tomato production, pricing, yield, and other key metrics every quarter and intermittently in various media interviews, which adds a strong inference of scienter. ¶¶72-75, 304-308. |
|  | • AppHarvest was entirely reliant on its sole distributor Mastronardi, which required top-quality Grade 1 tomatoes. ¶270. In fact, AppHarvest filed at least 18 documents with the SEC, including documents signed by the Individual Defendants, stating the Company was "highly dependent" on Mastronardi, and Webb signed and initialed every page of the Mastronardi Morehead Agreement which required Mastronardi to accept all USDA Grade 1 tomatoes and saddled AppHarvest with all of the risk and costs of non-Grade |

| | |
|---|---|
| | tomatoes, which Defendants knew would be rejected by Mastronardi and had "very little to no value." ¶¶271, 270. |

**False Statement XV**

| |
|---|
| **Statement Category:**<br>Misstatements Regarding Price Performance<br>False and Misleading Purported Justifications for Financial Guidance |
| **Speaker(s); Date; Medium**<br>Defendant Lee, accompanied by Defendants Webb and Eggleton; May 17, 2021; Q1 Earnings Call |
| **False and Misleading Statements or Omissions** |

**Jeffrey David Osborne**
*Cowen and Company, LLC, Research Division*

Congratulations on your first earnings call as a public company. Just a couple of questions on my end. One, <u>I was wondering if we could get going on the pricing dynamics that you alluded to. How much of that was due to quality of the output, so non-grade 1 versus just broader market conditions</u>. I thought, historically, the winter months had seasonally higher prices relative to the summer. <u>So I'm just trying to get a sense of what the moving pieces are on the price side.</u>

**David J. Lee**
*President & Director*

Jeff, this is David Lee here at AppHarvest. **What we did well is we anticipated and performed well on -- in market pricing**. A big part of that in Q1 was our relationship with Mastronardi.… ¶207.

| **Reasons Why Statements are False and Misleading, and/or Lacked a Reasonable Basis** | **Facts Giving Rise to Strong Inference of Scienter** |
|---|---|
| Reasons:<br><br>Analysts were acutely interested in information regarding the "quality of the output" in order to get a sense of the pricing that the Company was able to command. Indeed, the very first question sought clarity "on the price side." Defendant Lee falsely and/or misleadingly claimed that AppHarvest's operations | • CW6 met with Defendants Eggleton and Lee weekly concerning the baseline forecast, and upside and downside scenarios. ¶264. These weekly Forecast Meetings got "quite operational" and focused on various productivity metrics, with a key focus on yield and quality which was the basis for AppHarvest's revenue. *Id.* Throughout the first half of 2021, Lee and Eggleton also discussed that attrition and retention metrics that were "far worse than expected" and falling short |

"performed" in such a way that they were: 1) responsible for the Company's purportedly strong "market pricing" in the quarter and 2) the reason that the Company was able to affirm its previously disclosed full-year 2021 net sales guidance—while failing to disclose the operational problems that were plaguing AppHarvest's product quality, and thus, its pricing. In fact, AppHarvest was not providing "quality" USDA Grade No. 1 tomatoes to its Mastronardi. Rather, Mastronardi was increasing its audits and notifying Defendants that the Company's quality was poor and leading to increased rejections. Therefore "pricing" was not "performed well on" given that:

<p style="text-align:center">Evidence:</p>

(i)    Defendants admitted that for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)    Defendants admitted that for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii)    Defendants' numerous statements in the August 11, 2021 corrective disclosures admitting "labor" and employee "training" issues existed in 2Q 2021, including Webb's statement on the 2021 Q2 Earnings Call admitting AppHarvest's problems were "as simple as training. I

"week over week." ¶111. During the "toughest times," (end of Q1 through the "summer refresh" at the end of the Class Period) discussions at Forecast Meetings concerned: "ways to close the gap" between AppHarvest's underperformance compared to the current forecast; the expected time needed for the closing the gap depending on the various scenarios; and the Company's issues with employee training, turnover, poor work ethic, and inconsistent hiring standards which were "repeatedly cited" as the "root cause" of the overall production challenges. ¶264.

- Labor productivity was identified as a challenge for AppHarvest in 2020, and during the "toughest times," (end of Q1 through the "summer refresh" at the end of the Class Period) Defendants instituted Leadership Meetings twice a week, which included Lee, Eggleton, CW6 and other FP&A personnel, Marcella Butler, and Julie Nelson. ¶268. Labor productivity metrics included yield, quality, rejections from Mastronardi, attrition and employee absences, and productivity metrics for the various Greenhouse workers' particular functions. *Id.* According to CW6, inadequate training, turnover, poor work ethic and inconsistent hiring standards were "repeatedly cited" as the "root cause" of the Company's productivity challenges at these Leadership Meetings. CW6 recalled the Leadership Meetings occurred usually mid-week and end-of-week so that Defendants could "keep an eye on it." *Id.*

- CW6 confirmed AppHarvest's executive management had information parity, such that "everyone knew what everyone else knew" regarding fundamental financial data. ¶129.

- CW6 confirmed that at the end of each month, results concerning pricing, labor productivity (including yield and quality), construction costs, tomato grades, and other factors

<p style="text-align:center">113</p>

don't want to be more blunt than that, but it was training and management protocols";

(iv) Defendants Lee's and Eggleton's veiled admissions on the Q1 2021 earnings call that "training" issues existed in the first quarter of 2021 that were hampering "productivity" and driving gross loss;

(v) Defendants' admissions in the 2021 Q2 Earnings Release, the Q2 2021 Earnings Presentation, and the 2021 Q2 Earnings Call that "operational" and "executional" challenges—including lower quality production and saleable yield, and higher distribution and shipping expense incurred as a result of rejections—existed for the "initial growing season" and the "full season of harvest as a Company";

(vi) according to CW1 and CW4, AppHarvest did not offer employees adequate (if any) training throughout the Class Period. According to CW1, AppHarvest's inadequately trained workforce contributed to 5-10% of crops being wasted or damaged during CW1's tenure, which resulted in lost sales. According to CW5 up to 50% of AppHarvest's crop was wasted in the first growing season caused by workers in the Greenhouse and Packhouse. Further, CW4 confirmed that tomatoes were wasted "daily" during harvesting season;

(vii) CW6 explained that during the Class Period, AppHarvest's attrition and retention metrics in the first half of 2021 were far worse than expected because AppHarvest was clearly falling short week over week. Indeed, according to CW1 and CW2, throughout the Class Period AppHarvest suffered significant attrition (which CW1 estimated was two to three employees resigning

would be "pulled into" FP&A models and adjustments would be made to the Company's forecasts. ¶265. CW6 and Defendant Eggleton met for "many hours" each day discussing these near-, medium-, and long-term financial forecasts. *Id.*

- CW6 confirmed that AppHarvest productivity forecasts were sent to Mastronardi on a weekly, and possibly daily basis. ¶266. According to CW6, these forecasts included estimates of labor productivity to determine the volumes of beefsteak and Tomatoes on the Vine that would be harvested in the given period. *Id.*

- Mastronardi provided Defendants with daily updates, regular audits, and negative feedback in response to subpar quality throughout the Class Period.   ¶¶60, 67, 275. Mastronardi increased the frequency of its audits on the AppHarvest tomatoes during periods of "weaker" performance by AppHarvest, which resulted in Mastronardi rejecting a lot of tomatoes. ¶275. During the "toughest" periods of rejected tomatoes (the end of Q1 2021 through the "summer refresh"), it was necessary for AppHarvest to lower estimated production forecasts, a process that involved CW6, Eggleton and Lee, which were exchanged with Mastronardi in a shared "portal."  *Id.*

- As confirmed by CW3, CW6, and the Mastronardi Morehead Agreement Defendants Eggleton and Lee were intimately involved in various forecasting processes—forecasts which included sales, quality, costs, yield, price, estimated rejections, and estimated damaged tomatoes. ¶263.

- CW3 confirmed that AppHarvest's forecasts existed prior to the commencement of the first growing season and that Defendant Eggleton approved the forecasts. ¶263. CW3

114

every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including:

a. dissatisfaction with mandatory expanded working hours—including forced overtime, Saturdays, and holidays, and

b. infection and quarantining due to the COVID-19 pandemic,

all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes.

CW4 likewise stated that there was significant turnover throughout CW4's tenure at AppHarvest, with the west side of the Greenhouse losing at least 10 personnel every week. CW4 stated that the turnover resulted in less trained staff and thereby lower yields because there were fewer Crop Care Specialists to do the work.

CW5 confirmed that employee turnover and churn had been consistently high throughout October 2020 and June 2021, causing concern amongst Greenhouse personnel that AppHarvest had inadequate labor to meet production requirements as was discussed at the morning stand-up meetings CW5 attended;

(viii) according to CW1, CW2, and CW4 throughout the Class Period AppHarvest's own incentive piece rate structure incentivized disruptive and inefficient workmanship that wasted, damaged, and produced low quality tomatoes;

further explained AppHarvest had planning software, Microsoft Dynamics, which tracked operational results and actual costs, and the Individual Defendants had access to this software. *Id.* CWs 3 and 6 stated that AppHarvest used such real time production data to create and track against AppHarvest's forecasts. ¶¶121, 130, 263.

- CW6 confirmed AppHarvest had real-time access to quality and yield data from the Packhouse based on the types of boxes being shipped (Grade 1 versus Grade 2). ¶267. Further, CW 1 and CW4 stated that AppHarvest had real-time access to productivity metrics from the Greenhouse that were recorded by scanners when workers finished working on a particular row and uploaded to the Company's electronic files. ¶120. CW4 confirmed that such real-time data included information from quality inspectors who recorded their results into a "live" excel spreadsheet so that AppHarvest could "map" quality performance. ¶85.

- Defendant Webb frequently visited the Morehead Facility prior to and throughout the Class Period where he filmed at least 16 interviews, gave tours, and visited operations, and would have, and did, see the Company's dysfunctional production facilities and widespread attrition and churn. ¶289. Indeed, Webb admitted he was at the facility "every morning" and that he was "in the facility, you know, elbow tapping everyone as they come in." ¶287. Webb further admitted that he loves to "sleep on the farms" and "going to our operations." ¶288.

- Webb or his office instructed CW5's team to "hide the waste" when investors and news media visited so that the Greenhouse had "better eye appeal." ¶¶83-84, 291.

| | | |
|---|---|---|
| (ix) | CW6 stated that Mastronardi informed AppHarvest that it needed to tighten up specifications because Mastronardi was having to reject a lot of fruit throughout the Class Period—upwards of 30% to 35% during the Company's "toughest times," which was "many times" more than AppHarvest's target which CW6 believed was 6% or 7%; | • On April 12, 2021, the Board stripped Marcella Butler of her role as an executive officer and transitioned her from Chief Operating Officer to Chief People Officer (a position she had been promoted out of only four months prior). ¶279. Butler reported directly to Defendant Webb, who with Defendant Lee were a member of the Board. ¶277. Defendants Webb and Lee admitted during the Q2 Earnings Call that Butler's demotion was a result of operational failures. ¶280. Further, CW6, who was "very familiar" with Ms. Butler, confirmed that Ms. Butler's transition back to Chief People Officer and eventual separation from the Company were due to labor issues, including productivity, attrition, and churn. ¶279. |
| (x) | according to CW2, "half" of all tomatoes inspected were USDA Grade No. 2 or not commercially saleable, and CW6 confirmed that AppHarvest was a "long way off" its quality goals; | |
| (xi) | CW6 stated that in the "toughest times" of the first growing season AppHarvest was well below 50% in relation to the Company's productivity standards for specific Greenhouse jobs. ¶208. | • Events such as Ms. Butler's demotion informed Board members (like Webb and Lee) that the extent of the Company's productivity issues were highly material—so much so that Board member Jeffrey Ubben cashed out 3 million shares, or roughly 25% of his holdings, for $49.5 million in proceeds, before the truth was disclosed. ¶¶310-311 |
| | | • Defendants Lee's and Eggleton's veiled admissions on the Q1 2021 earnings call. Lee stated that in the future there would be a "summer refresh," "Morehead 2.0," and "new training" to support increased productivity, and such training would be merely additive to AppHarvest's supposed current "momentum" providing incremental "higher productivity." ¶¶133, 135. Eggleton acknowledged "training" issues and "demands" on the "labor force" affected "productivity" and drove gross loss, but blamed the second half of the Morehead Facility coming online pursuant to a "phased launch." ¶134. Defendants' veiled admissions evidence that they knew undisclosed detail concerning the underlying issues, such as: significant waste and productivity issues, understaffing and churn at the Morehead Facility, and the resulting effects on |

116

the Company's operations, product quality, sales, revenue, and costs. ¶133-35.

- Defendants' admissions that "labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility" existed for the entire "*six months* ended June 30, 2021," which caused "lower net sales due to lower overall No. 1-grade production yields" as well as "higher related distribution and shipping fees." ¶297.

- Defendants' admissions that "executional challenges" spanned the entire Class Period because as they were "very real in our first major full season of harvest as a company" and the harvest season began in January 2021; and challenges lasted entire "initial growing season" and "first growing season" which began in October 2020. ¶298.

- Lee admitted Defendants assigned new "conservative" assumptions to operational performance with respect to the Company's outlook to investors, and further admitted it was not until the end of the Class Period when AppHarvest's guidance was "balanced" and "achiev[able]." ¶¶255, 328. CW6 confirmed that Defendant Lee always took the most "aggressive" forecast positions, including in instances where he was informed that AppHarvest's challenges still needed to be factored in. ¶¶124, 245.

- Throughout the Class Period the Morehead Facility was the site of the Company's sole production operations and core business. ¶286.

- Defendants frequently spoke in detail regarding staffing, labor, and operations, tomato production, pricing, yield, and other key metrics every quarter and intermittently in various

117

|  | media interviews, which adds a strong inference of scienter. ¶¶72-75, 304-308. |
|  | • AppHarvest was entirely reliant on its sole distributor Mastronardi, which required top-quality Grade 1 tomatoes. ¶270. In fact, AppHarvest filed at least 18 documents with the SEC, including documents signed by the Individual Defendants, stating the Company was "highly dependent" on Mastronardi, and Webb signed and initialed every page of the Mastronardi Morehead Agreement which required Mastronardi to accept all USDA Grade 1 tomatoes and saddled AppHarvest with all of the risk and costs of non-Grade 1 tomatoes, which Defendants knew would be rejected by Mastronardi and had "very little to no value." ¶¶271, 270. |

**False Statement XVI**

| **Statement Category:**<br>Misstatements Regarding Labor Availability, Recruitment, and Retention<br>False and Misleading Purported Justifications for Financial Guidance |
|---|
| **Speaker(s); Date; Medium**<br>Defendant Webb; May 17, 2021; Interview with anchor Brad Smith on Cheddar News |
| **False and Misleading Statements or Omissions**<br><br>Smith: [W]hen you think about what the <u>key performance indicators that you are tracking across the business</u> are, what would you look towards for the rest of 2021 to prove that this has been a successful year and taking some of that momentum into 2022 as well?<br><br>Webb: Well, we, we **hired nearly 500 people, uh, in the middle of a global pandemic. And so our operating team in Morehead, uh, for our first facility, those financial projections virtually didn't change much at all**. ¶210. |

| **Reasons Why Statements are False and Misleading, and/or Lacked a Reasonable Basis** | **Facts Giving Rise to Strong Inference of Scienter** |
|---|---|
| Reasons:<br><br>Defendant Webb's statements above were materially false, misleading, and/or lacked a reasonable basis when made because AppHarvest's efforts to train and staff the Morehead Facility's "operating team" during the Class Period were unsuccessful and did not support or justify AppHarvest's financial projections, given that:<br><br>Evidence:<br><br>(i)    Defendants admitted that for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, net sales | • CW6 met with Defendants Eggleton and Lee weekly concerning the baseline forecast, and upside and downside scenarios. ¶264. These weekly Forecast Meetings got "quite operational" and focused on various productivity metrics, with a key focus on yield and quality which was the basis for AppHarvest's revenue. *Id.* Throughout the first half of 2021, Lee and Eggleton also discussed that attrition and retention metrics that were "far worse than expected" and falling short "week over week." ¶111. During the "toughest times," (end of Q1 through the "summer refresh" at the end of the Class Period) discussions at Forecast Meetings concerned: "ways to close the gap" between AppHarvest's underperformance compared to the current forecast; the expected time needed for the closing the gap depending on the various scenarios; and the Company's issues with employee training, turnover, poor |

119

were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii) Defendants admitted that for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii) Defendants' numerous statements in the August 11, 2021 corrective disclosures admitting "labor" and employee "training" issues existed in 2Q 2021, including Webb's statement on the 2021 Q2 Earnings Call admitting AppHarvest's problems were "as simple as training. I don't want to be more blunt than that, but it was training and management protocols";

(iv) Defendants Lee's and Eggleton's veiled admissions on the Q1 2021 earnings call that "training" issues existed in the first quarter of 2021 that were hampering "productivity" and driving gross loss;

(v) Defendants' admissions in the 2021 Q2 Earnings Release, the Q2 2021 Earnings Presentation, and the 2021 Q2 Earnings Call that "operational" and "executional" challenges—including lower quality production and saleable yield, and higher distribution and shipping expense incurred as a result of rejections—existed for the "initial growing season" and the "full season of harvest as a Company";

work ethic, and inconsistent hiring standards which were "repeatedly cited" as the "root cause" of the overall production challenges. ¶264.

- Labor productivity was identified as a challenge for AppHarvest in 2020, and during the "toughest times," (end of Q1 through the "summer refresh" at the end of the Class Period) Defendants instituted Leadership Meetings twice a week, which included Lee, Eggleton, CW6 and other FP&A personnel, Marcella Butler, and Julie Nelson. ¶268. Labor productivity metrics included yield, quality, rejections from Mastronardi, attrition and employee absences, and productivity metrics for the various Greenhouse workers' particular functions. *Id.* According to CW6, inadequate training, turnover, poor work ethic and inconsistent hiring standards were "repeatedly cited" as the "root cause" of the Company's productivity challenges at these Leadership Meetings. CW6 recalled the Leadership Meetings occurred usually mid-week and end-of-week so that Defendants could "keep an eye on it." *Id.*

- CW6 confirmed AppHarvest's executive management had information parity, such that "everyone knew what everyone else knew" regarding fundamental financial data. ¶129.

- CW6 confirmed that at the end of each month, results concerning pricing, labor productivity (including yield and quality), construction costs, tomato grades, and other factors would be "pulled into" FP&A models and adjustments would be made to the Company's forecasts. ¶265. CW6 and Defendant Eggleton met for "many hours" each day discussing these near-, medium-, and long-term financial forecasts. *Id.*

(vi)  according to CW1 and CW4, AppHarvest did not offer employees adequate (if any) training throughout the Class Period. According to CW1, AppHarvest's inadequately trained workforce contributed to 5-10% of crops being wasted or damaged during CW1's tenure, which resulted in lost sales. According to CW5 up to 50% of AppHarvest's crop was wasted in the first growing season caused by workers in the Greenhouse and Packhouse. Further, CW4 confirmed that tomatoes were wasted "daily" during harvesting season;

(vii)  CW6 explained that during the Class Period, AppHarvest's attrition and retention metrics in the first half of 2021 were far worse than expected because AppHarvest was clearly falling short week over week. Indeed, according to CW1 and CW2, throughout the Class Period AppHarvest suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including:

a.  dissatisfaction with mandatory expanded working hours—including forced overtime, Saturdays, and holidays, and

b.  infection and quarantining due to the COVID-19 pandemic,

all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes.

- CW6 confirmed that AppHarvest productivity forecasts were sent to Mastronardi on a weekly, and possibly daily basis. ¶266. According to CW6, these forecasts included estimates of labor productivity to determine the volumes of beefsteak and Tomatoes on the Vine that would be harvested in the given period. *Id.*

- Mastronardi provided Defendants with daily updates, regular audits, and negative feedback in response to subpar quality throughout the Class Period.  ¶¶60, 67, 275. Mastronardi increased the frequency of its audits on the AppHarvest tomatoes during periods of "weaker" performance by AppHarvest, which resulted in Mastronardi rejecting a lot of tomatoes. ¶275. During the "toughest" periods of rejected tomatoes (the end of Q1 2021 through the "summer refresh"), it was necessary for AppHarvest to lower estimated production forecasts, a process that involved CW6, Eggleton and Lee, which were exchanged with Mastronardi in a shared "portal."  *Id.*

- As confirmed by CW3, CW6, and the Mastronardi Morehead Agreement Defendants Eggleton and Lee were intimately involved in various forecasting processes—forecasts which included sales, quality, costs, yield, price, estimated rejections, and estimated damaged tomatoes. ¶263.

- CW3 confirmed that AppHarvest's forecasts existed prior to the commencement of the first growing season and that Defendant Eggleton approved the forecasts. ¶263. CW3 further explained AppHarvest had planning software, Microsoft Dynamics, which tracked operational results and actual costs, and the Individual Defendants had access to this software. *Id.*  CWs 3 and 6 stated that AppHarvest used such real time production data to create and track against AppHarvest's forecasts. ¶¶121, 130, 263.

121

CW4 likewise stated that there was significant turnover throughout CW4's tenure at AppHarvest, with the west side of the Greenhouse losing at least 10 personnel every week. CW4 stated that the turnover resulted in less trained staff and thereby lower yields because there were fewer Crop Care Specialists to do the work.

CW5 confirmed that employee turnover and churn had been consistently high throughout October 2020 and June 2021, causing concern amongst Greenhouse personnel that AppHarvest had inadequate labor to meet production requirements as was discussed at the morning stand-up meetings CW5 attended;

(viii)    according to CW1, CW2, and CW4 throughout the Class Period AppHarvest's own incentive piece rate structure incentivized disruptive and inefficient workmanship that wasted, damaged, and produced low quality tomatoes;

(ix)    CW6 stated that Mastronardi informed AppHarvest that it needed to tighten up specifications because Mastronardi was having to reject a lot of fruit throughout the Class Period—upwards of 30% to 35% during the Company's "toughest times," which was "many times" more than AppHarvest's target which CW6 believed was 6% or 7%;

(x)    according to CW2, "half" of all tomatoes inspected were USDA Grade No. 2 or not commercially saleable, and CW6 confirmed that AppHarvest was a "long way off" its quality goals;

(xi)    CW6 stated that in the "toughest times" of the first growing season AppHarvest was well below 50% in

- CW6 confirmed AppHarvest had real-time access to quality and yield data from the Packhouse based on the types of boxes being shipped (Grade 1 versus Grade 2). ¶267. Further, CW 1 and CW4 stated that AppHarvest had real-time access to productivity metrics from the Greenhouse that were recorded by scanners when workers finished working on a particular row and uploaded to the Company's electronic files. ¶120. CW4 confirmed that such real-time data included information from quality inspectors who recorded their results into a "live" excel spreadsheet so that AppHarvest could "map" quality performance. ¶85.

- Defendant Webb frequently visited the Morehead Facility prior to and throughout the Class Period where he filmed at least 16 interviews, gave tours, and visited operations, and would have, and did, see the Company's dysfunctional production facilities and widespread attrition and churn. ¶289. Indeed, Webb admitted he was at the facility "every morning" and that he was "in the facility, you know, elbow tapping everyone as they come in." ¶287. Webb further admitted that he loves to "sleep on the farms" and "going to our operations." ¶288.

- Webb or his office instructed CW5's team to "hide the waste" when investors and news media visited so that the Greenhouse had "better eye appeal." ¶¶83-84, 291.

- On April 12, 2021, the Board stripped Marcella Butler of her role as an executive officer and transitioned her from Chief Operating Officer to Chief People Officer (a position she had been promoted out of only four months prior). ¶279. Butler reported directly to Defendant Webb, who with Defendant Lee were a member of the Board. ¶277. Defendants Webb and Lee admitted during the Q2 Earnings Call that Butler's

| | |
|---|---|
| relation to the Company's productivity standards for specific Greenhouse jobs. ¶211. | demotion was a result of operational failures. ¶280. Further, CW6, who was "very familiar" with Ms. Butler, confirmed that Ms. Butler's transition back to Chief People Officer and eventual separation from the Company were due to labor issues, including productivity, attrition, and churn. ¶279.<br><br>• Events such as Ms. Butler's demotion informed Board members (like Webb and Lee) that the extent of the Company's productivity issues were highly material—so much so that Board member Jeffrey Ubben cashed out 3 million shares, or roughly 25% of his holdings, for $49.5 million in proceeds, before the truth was disclosed. ¶¶310-311<br><br>• Defendants Lee's and Eggleton's veiled admissions on the Q1 2021 earnings call. Lee stated that in the future there would be a "summer refresh," "Morehead 2.0," and "new training" to support increased productivity, and such training would be merely additive to AppHarvest's supposed current "momentum" providing incremental "higher productivity." ¶¶133, 135. Eggleton acknowledged "training" issues and "demands" on the "labor force" affected "productivity" and drove gross loss, but blamed the second half of the Morehead Facility coming online pursuant to a "phased launch." ¶134. Defendants' veiled admissions evidence that they knew undisclosed detail concerning the underlying issues, such as: significant waste and productivity issues, understaffing and churn at the Morehead Facility, and the resulting effects on the Company's operations, product quality, sales, revenue, and costs. ¶133-35.<br><br>• Defendants' admissions that "labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility" existed for the entire "*six months* ended June 30, 2021," which caused "lower net sales due to lower overall No. 1- |

grade production yields" as well as "higher related distribution and shipping fees." ¶297.

- Defendants' admissions that "executional challenges" spanned the entire Class Period because as they were "very real in our first major full season of harvest as a company" and the harvest season began in January 2021; and challenges lasted entire "initial growing season" and "first growing season" which began in October 2020. ¶298.

- Lee admitted Defendants assigned new "conservative" assumptions to operational performance with respect to the Company's outlook to investors, and further admitted it was not until the end of the Class Period when AppHarvest's guidance was "balanced" and "achiev[able]." ¶¶255, 328. CW6 confirmed that Defendant Lee always took the most "aggressive" forecast positions, including in instances where he was informed that AppHarvest's challenges still needed to be factored in. ¶¶124, 245.

- Throughout the Class Period the Morehead Facility was the site of the Company's sole production operations and core business. ¶286.

- Defendants frequently spoke in detail regarding staffing, labor, and operations, tomato production, pricing, yield, and other key metrics every quarter and intermittently in various media interviews, which adds a strong inference of scienter. ¶¶72-75, 304-308.

- AppHarvest was entirely reliant on its sole distributor Mastronardi, which required top-quality Grade 1 tomatoes. ¶270. In fact, AppHarvest filed at least 18 documents with the SEC, including documents signed by the Individual Defendants, stating the Company was "highly dependent" on

| | |
|---|---|
| | Mastronardi, and Webb signed and initialed every page of the Mastronardi Morehead Agreement which required Mastronardi to accept all USDA Grade 1 tomatoes and saddled AppHarvest with all of the risk and costs of non-Grade 1 tomatoes, which Defendants knew would be rejected by Mastronardi and had "very little to no value." ¶¶271, 270. |

**False Statement XVII**

| |
|---|
| **Statement Category:**<br>Misstatements Regarding Labor Availability, Recruitment, and Retention |
| **Speaker(s); Date; & Medium**<br>Defendant Webb; May 17, 2021; Interview on Yahoo! Finance Live by Myles Udland and Julie Hyman |
| **False and Misleading Statements or Omissions**<br><br>Udland: You know, Jonathan kind of coming back down from the, from the high-level overview here – which I think is, is a thesis a lot of people can get behind – you know, we're showing the VO of the, the facility build-out that you guys have done. <u>All we hear about are supply bottlenecks, the inability to get the labor needed to get projects off the ground. Have you guys struggled with that as-- at all</u>, as you're trying to build, you know, two more facilities to be done by the end of next year?<br><br>Webb: So we, we will have, this year, four more facilities under construction in total – plan on launching at least five into operations next year, including the, the current operating asset. And, and very proud of this region. You know, Eastern Kentucky that's been known for powering the country in the coal industry. **We, we built this first facility in the middle of a global pandemic, and we stood up the facility, uh, and have 500 people working with us now**, uh, and, and had record ice storms in February **and virtually no impact to operation**. ¶213. |

| **Reasons Why Statements are False and Misleading, and/or Lacked a Reasonable Basis** | **Facts Giving Rise to Strong Inference of Scienter** |
|---|---|
| Reasons:<br><br>Webb's statements above were materially false, misleading, and/or lacked a reasonable basis when made because AppHarvest's efforts to staff the Morehead Facility during the Class Period caused significant adverse "impact" for the Company's "operation", given that:<br><br>Evidence: | • CW6 met with Defendants Eggleton and Lee weekly concerning the baseline forecast, and upside and downside scenarios. ¶264. These weekly Forecast Meetings got "quite operational" and focused on various productivity metrics, with a key focus on yield and quality which was the basis for AppHarvest's revenue. *Id.* Throughout the first half of 2021, Lee and Eggleton also discussed that attrition and retention metrics that were "far worse than expected" and falling short "week over week." ¶111. During the "toughest times," (end of Q1 through the "summer refresh" at the end of the Class Period) discussions at Forecast Meetings concerned: "ways to close the gap" between AppHarvest's underperformance |

(i)     Defendants admitted that for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)    Defendants admitted that for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii)   Defendants' numerous statements in the August 11, 2021 corrective disclosures admitting "labor" and employee "training" issues existed in 2Q 2021, including Webb's statement on the 2021 Q2 Earnings Call admitting AppHarvest's problems were "as simple as training. I don't want to be more blunt than that, but it was training and management protocols";

(iv)    Defendants Lee's and Eggleton's veiled admissions on the Q1 2021 earnings call that "training" issues existed in the first quarter of 2021 that were hampering "productivity" and driving gross loss;

(v)     Defendants' admissions in the 2021 Q2 Earnings Release, the Q2 2021 Earnings Presentation, and the 2021 Q2 Earnings Call that "operational" and "executional" challenges—including lower quality production and saleable yield, and higher distribution and shipping expense incurred as a result of rejections—existed for the

compared to the current forecast; the expected time needed for the closing the gap depending on the various scenarios; and the Company's issues with employee training, turnover, poor work ethic, and inconsistent hiring standards which were "repeatedly cited" as the "root cause" of the overall production challenges. ¶264.

•   Labor productivity was identified as a challenge for AppHarvest in 2020, and during the "toughest times," (end of Q1 through the "summer refresh" at the end of the Class Period) Defendants instituted Leadership Meetings twice a week, which included Lee, Eggleton, CW6 and other FP&A personnel, Marcella Butler, and Julie Nelson. ¶268. Labor productivity metrics included yield, quality, rejections from Mastronardi, attrition and employee absences, and productivity metrics for the various Greenhouse workers' particular functions. *Id.*   According to CW6, inadequate training, turnover, poor work ethic and inconsistent hiring standards were "repeatedly cited" as the "root cause" of the Company's productivity challenges at these Leadership Meetings. CW6 recalled the Leadership Meetings occurred usually mid-week and end-of-week so that Defendants could "keep an eye on it." *Id.*

•   CW6 confirmed AppHarvest's executive management had information parity, such that "everyone knew what everyone else knew" regarding fundamental financial data.  ¶129.

•   CW6 confirmed that at the end of each month, results concerning pricing, labor productivity (including yield and quality), construction costs, tomato grades, and other factors would be "pulled into" FP&A models and adjustments would be made to the Company's forecasts. ¶265. CW6 and Defendant Eggleton met for "many hours" each day

"initial growing season" and the "full season of harvest as a Company";

(vi)     according to CW1 and CW4, AppHarvest did not offer employees adequate (if any) training throughout the Class Period. According to CW1, AppHarvest's inadequately trained workforce contributed to 5-10% of crops being wasted or damaged during CW1's tenure, which resulted in lost sales. According to CW5 up to 50% of AppHarvest's crop was wasted in the first growing season caused by workers in the Greenhouse and Packhouse. Further, CW4 confirmed that tomatoes were wasted "daily" during harvesting season;

(vii)    CW6 explained that during the Class Period, AppHarvest's attrition and retention metrics in the first half of 2021 were far worse than expected because AppHarvest was clearly falling short week over week. Indeed, according to CW1 and CW2, throughout the Class Period AppHarvest suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including:

a.   dissatisfaction with mandatory expanded working hours—including forced overtime, Saturdays, and holidays, and

b.   infection and quarantining due to the COVID-19 pandemic,

discussing these near-, medium-, and long-term financial forecasts. *Id.*

CW6 confirmed that AppHarvest productivity forecasts were sent to Mastronardi on a weekly, and possibly daily basis. ¶266. According to CW6, these forecasts included estimates of labor productivity to determine the volumes of beefsteak and Tomatoes on the Vine that would be harvested in the given period. *Id.*

- Mastronardi provided Defendants with daily updates, regular audits, and negative feedback in response to subpar quality throughout the Class Period.   ¶¶60, 67, 275. Mastronardi increased the frequency of its audits on the AppHarvest tomatoes during periods of "weaker" performance by AppHarvest, which resulted in Mastronardi rejecting a lot of tomatoes. ¶275. During the "toughest" periods of rejected tomatoes (the end of Q1 2021 through the "summer refresh"), it was necessary for AppHarvest to lower estimated production forecasts, a process that involved CW6, Eggleton and Lee, which were exchanged with Mastronardi in a shared "portal." *Id.*

- As confirmed by CW3, CW6, and the Mastronardi Morehead Agreement Defendants Eggleton and Lee were intimately involved in various forecasting processes—forecasts which included sales, quality, costs, yield, price, estimated rejections, and estimated damaged tomatoes. ¶263.

- CW3 confirmed that AppHarvest's forecasts existed prior to the commencement of the first growing season and that Defendant Eggleton approved the forecasts. ¶263. CW3 further explained AppHarvest had planning software, Microsoft Dynamics, which tracked operational results and actual costs, and the Individual Defendants had access to this

all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes.

CW4 likewise stated that there was significant turnover throughout CW4's tenure at AppHarvest, with the west side of the Greenhouse losing at least 10 personnel every week. CW4 stated that the turnover resulted in less trained staff and thereby lower yields because there were fewer Crop Care Specialists to do the work.

CW5 confirmed that employee turnover and churn had been consistently high throughout October 2020 and June 2021, causing concern amongst Greenhouse personnel that AppHarvest had inadequate labor to meet production requirements as was discussed at the morning stand-up meetings CW5 attended;

(viii)   according to CW1, CW2, and CW4 throughout the Class Period AppHarvest's own incentive piece rate structure incentivized disruptive and inefficient workmanship that wasted, damaged, and produced low quality tomatoes;

(ix)   CW6 stated that Mastronardi informed AppHarvest that it needed to tighten up specifications because Mastronardi was having to reject a lot of fruit throughout the Class Period—upwards of 30% to 35% during the Company's "toughest times," which was "many times" more than AppHarvest's target which CW6 believed was 6% or 7%;

(x)   according to CW2, "half" of all tomatoes inspected were USDA Grade No. 2 or not commercially saleable, and CW6 confirmed that AppHarvest was a "long way off" its quality goals;

software. *Id.* CWs 3 and 6 stated that AppHarvest used such real time production data to create and track against AppHarvest's forecasts. ¶¶121, 130, 263.

• CW6 confirmed AppHarvest had real-time access to quality and yield data from the Packhouse based on the types of boxes being shipped (Grade 1 versus Grade 2). ¶267. Further, CW 1 and CW4 stated that AppHarvest had real-time access to productivity metrics from the Greenhouse that were recorded by scanners when workers finished working on a particular row and uploaded to the Company's electronic files. ¶120. CW4 confirmed that such real-time data included information from quality inspectors who recorded their results into a "live" excel spreadsheet so that AppHarvest could "map" quality performance. ¶85.

• Defendant Webb frequently visited the Morehead Facility prior to and throughout the Class Period where he filmed at least 16 interviews, gave tours, and visited operations, and would have, and did, see the Company's dysfunctional production facilities and widespread attrition and churn. ¶289. Indeed, Webb admitted he was at the facility "every morning" and that he was "in the facility, you know, elbow tapping everyone as they come in." ¶287. Webb further admitted that he loves to "sleep on the farms" and "going to our operations." ¶288.

• Webb or his office instructed CW5's team to "hide the waste" when investors and news media visited so that the Greenhouse had "better eye appeal." ¶¶83-84, 291.

• On April 12, 2021, the Board stripped Marcella Butler of her role as an executive officer and transitioned her from Chief Operating Officer to Chief People Officer (a position she had been promoted out of only four months prior). ¶279. Butler

| | |
|---|---|
| (xi)  CW6 stated that in the "toughest times" of the first growing season AppHarvest was well below 50% in relation to the Company's productivity standards for specific Greenhouse jobs ¶214. | reported directly to Defendant Webb, who with Defendant Lee were a member of the Board. ¶277. Defendants Webb and Lee admitted during the Q2 Earnings Call that Butler's demotion was a result of operational failures. ¶280.  Further, CW6, who was "very familiar" with Ms. Butler, confirmed that Ms. Butler's transition back to Chief People Officer and eventual separation from the Company were due to labor issues, including productivity, attrition, and churn. ¶279.<br><br>• Events such as Ms. Butler's demotion informed Board members (like Webb and Lee) that the extent of the Company's productivity issues were highly material—so much so that Board member Jeffrey Ubben cashed out 3 million shares, or roughly 25% of his holdings, for $49.5 million in proceeds, before the truth was disclosed. ¶¶310-311<br><br>• Defendants Lee's and Eggleton's veiled admissions on the Q1 2021 earnings call. Lee stated that in the future there would be a "summer refresh," "Morehead 2.0," and "new training" to support increased productivity, and such training would be merely additive to AppHarvest's supposed current "momentum" providing incremental "higher productivity." ¶¶133, 135. Eggleton acknowledged "training" issues and "demands" on the "labor force" affected "productivity" and drove gross loss, but blamed the second half of the Morehead Facility coming online pursuant to a "phased launch." ¶134. Defendants' veiled admissions evidence that they knew undisclosed detail concerning the underlying issues, such as: significant waste and productivity issues, understaffing and churn at the Morehead Facility, and the resulting effects on the Company's operations, product quality, sales, revenue, and costs. ¶133-35.<br><br>• Defendants' admissions that "labor and productivity challenges associated with the training and development of |

the new workforce at the Morehead, Kentucky facility" existed for the entire "*six months* ended June 30, 2021," which caused "lower net sales due to lower overall No. 1-grade production yields" as well as "higher related distribution and shipping fees." ¶297.

- Defendants' admissions that "executional challenges" spanned the entire Class Period because as they were "very real in our first major full season of harvest as a company" and the harvest season began in January 2021; and challenges lasted entire "initial growing season" and "first growing season" which began in October 2020. ¶298.

- Throughout the Class Period the Morehead Facility was the site of the Company's sole production operations and core business. ¶286.

- Defendants frequently spoke in detail regarding staffing, labor, and operations, tomato production, pricing, yield, and other key metrics every quarter and intermittently in various media interviews, which adds a strong inference of scienter. ¶¶72-75, 304-308.

- AppHarvest was entirely reliant on its sole distributor Mastronardi, which required top-quality Grade 1 tomatoes. ¶270. In fact, AppHarvest filed at least 18 documents with the SEC, including documents signed by the Individual Defendants, stating the Company was "highly dependent" on Mastronardi, and Webb signed and initialed every page of the Mastronardi Morehead Agreement which required Mastronardi to accept all USDA Grade 1 tomatoes and saddled AppHarvest with all of the risk and costs of non-Grade 1 tomatoes, which Defendants knew would be rejected by Mastronardi and had "very little to no value." ¶¶271, 270.

**False Statement XVIII**

| |
|---|
| **Statement Category:**<br>Misstatements Regarding Labor Availability, Recruitment, and Retention<br>False and Misleading Purported Justifications for Financial Guidance |
| **Speaker(s); Date; & Medium**<br>Defendant Lee; May 25, 2021; Videorecorded interview by analyst Mark Connelly |
| **False and Misleading Statements or Omissions**<br><br>**Mark Connelly**: Right. Now, you sold your first crop in January. Um, <u>can you talk about how that startup went and what sort of a learning curve we should be thinking about in terms of optimizing production across the whole facility</u>?<br><br>**David Lee**: Yeah, I mean, in, in many ways, there were critics who thought, how can this company who was pre-revenue, pre-farm a year ago, stand up a farm and produce, you know, millions of pounds of product. And so, the lessons were really valuable for us. One was validation and proof that we could do what we say, you know, being able to hit the expectations, to deliver 2.3 million of net revenue and, and to be at the better end of our negative adjusted EBITDA range was important. So that was a lesson for the corporate center, but in terms of the farm, you know, there was incredibly, challenging set of conditions throughout the country in Q1. You probably read about the ice storms that gripped parts of the country. And **our facility at Morehead proved that it could weather those conditions maybe better than most. We, we learned about what kind of labor we could source locally having, um, 500 plus employees ready to, to join us, if we want, proved and validated the model that we really could hire local talent, give them a living wage, provide full-time employees stock and execute well** within, actually, the adjusted EBITDA range that we expected. So that was an important lesson. **I think the other lesson is we learned that we could hit our numbers and still experiment** and trial a way to optimize what we call Morehead 2.0—this is on the other side of our summer refresh—so that we have more confidence in our ability to produce better in the future. And **it's the reason why we affirmed the expectations we had put out for the year**. ¶216.<br><br>**Mark Connelly**: Okay. I've, I've got a couple, a couple of I think they're COVID related questions. So I want to try, try to put them together here. COVID has hit a rural areas hard lately. AppHarvest doesn't seem to have been too impacted. Can you talk about whether COVID has affected your design and construction timing, and then there's a second question about the ability to get labor, uh, in your plant. We've, we've had a number of companies in, in the, in the food business tell us that they can't get a full second shift. |

**David Lee**: Oh, okay. Well, let's cover both. Um, **thankfully COVID has not in any way impacted our operation**…With regard to labor, we have had absolutely no shortage of interest. I mean multiples of the amount of roles that we wanna fill, have lined up to work with us. And, and a part of that is by design, a part of that is the kind of company we want to be and the part of the country in which we choose to produce. **So we haven't had any challenges with recruiting or staffing**. ¶217.

| **Reasons Why Statements are False and Misleading, and/or Lacked a Reasonable Basis** | **Facts Giving Rise to Strong Inference of Scienter** |
|---|---|
| Reasons: | • CW6 met with Defendants Eggleton and Lee weekly concerning the baseline forecast, and upside and downside scenarios. ¶264. These weekly Forecast Meetings got "quite operational" and focused on various productivity metrics, with a key focus on yield and quality which was the basis for AppHarvest's revenue. *Id.* Throughout the first half of 2021, Lee and Eggleton also discussed that attrition and retention metrics that were "far worse than expected" and falling short "week over week." ¶111. During the "toughest times," (end of Q1 through the "summer refresh" at the end of the Class Period) discussions at Forecast Meetings concerned: "ways to close the gap" between AppHarvest's underperformance compared to the current forecast; the expected time needed for the closing the gap depending on the various scenarios; and the Company's issues with employee training, turnover, poor work ethic, and inconsistent hiring standards which were "repeatedly cited" as the "root cause" of the overall production challenges. ¶264. |
| Defendant Lee was pointedly asked about the Company's performance and "what sort of a learning curve" AppHarvest could expect, if any (*i.e.*, Defendant Lee was asked to provide detail regarding any operational inefficiencies that existed in the first quarter). Defendant Lee concealed that the Company's significant operational challenges— shifting attention solely to certain well-publicized ice storms—and falsely claimed that AppHarvest's purported success, both operationally and from a staffing/labor perspective, were "validation" that the Company could "execute well" and supported Defendants' decision to reaffirm AppHarvest's full-year 2021 financial guidance. | |
| Furthermore, Defendant Lee falsely and unequivocally denied that the Company experienced any "staffing" inefficiencies, including as a result of the Covid-19 pandemic. | |
| Evidence: | • Labor productivity was identified as a challenge for AppHarvest in 2020, and during the "toughest times," (end of Q1 through the "summer refresh" at the end of the Class Period) Defendants instituted Leadership Meetings twice a week, which included Lee, Eggleton, CW6 and other FP&A personnel, Marcella Butler, and Julie Nelson. ¶268. Labor productivity metrics included yield, quality, rejections from Mastronardi, attrition and employee absences, and |
| There is ample evidence that Defendant Lee's statements above were materially false, misleading, and/or lacked a reasonable basis when made when made given that: | |
| (i)     Defendants admitted that for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, net sales | |

were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)   Defendants admitted that for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii)  Defendants' numerous statements in the August 11, 2021 corrective disclosures admitting "labor" and employee "training" issues existed in 2Q 2021, including Webb's statement on the 2021 Q2 Earnings Call admitting AppHarvest's problems were "as simple as training. I don't want to be more blunt than that, but it was training and management protocols";

(iv)   Defendants Lee's and Eggleton's veiled admissions on the Q1 2021 earnings call that "training" issues existed in the first quarter of 2021 that were hampering "productivity" and driving gross loss;

(v)    Defendants' admissions in the 2021 Q2 Earnings Release, the Q2 2021 Earnings Presentation, and the 2021 Q2 Earnings Call that "operational" and "executional" challenges—including lower quality production and saleable yield, and higher distribution and shipping expense incurred as a result of rejections—existed for the "initial growing season" and the "full season of harvest as a Company";

productivity metrics for the various Greenhouse workers' particular functions. *Id.*   According to CW6, inadequate training, turnover, poor work ethic and inconsistent hiring standards were "repeatedly cited" as the "root cause" of the Company's productivity challenges at these Leadership Meetings. CW6 recalled the Leadership Meetings occurred usually mid-week and end-of-week so that Defendants could "keep an eye on it." *Id.*

• CW6 confirmed AppHarvest's executive management had information parity, such that "everyone knew what everyone else knew" regarding fundamental financial data.  ¶129.

• CW6 confirmed that at the end of each month, results concerning pricing, labor productivity (including yield and quality), construction costs, tomato grades, and other factors would be "pulled into" FP&A models and adjustments would be made to the Company's forecasts. ¶265. CW6 and Defendant Eggleton met for "many hours" each day discussing these near-, medium-, and long-term financial forecasts. *Id.*

• CW6 confirmed that AppHarvest productivity forecasts were sent to Mastronardi on a weekly, and possibly daily basis. ¶266. According to CW6, these forecasts included estimates of labor productivity to determine the volumes of beefsteak and Tomatoes on the Vine that would be harvested in the given period. *Id.*

• Mastronardi provided Defendants with daily updates, regular audits, and negative feedback in response to subpar quality throughout the Class Period.   ¶¶60, 67, 275. Mastronardi increased the frequency of its audits on the AppHarvest tomatoes during periods of "weaker" performance by AppHarvest, which resulted in Mastronardi rejecting a lot of

134

(vi)    according to CW1 and CW4, AppHarvest did not offer employees adequate (if any) training throughout the Class Period. According to CW1, AppHarvest's inadequately trained workforce contributed to 5-10% of crops being wasted or damaged during CW1's tenure, which resulted in lost sales. According to CW5 up to 50% of AppHarvest's crop was wasted in the first growing season caused by workers in the Greenhouse and Packhouse. Further, CW4 confirmed that tomatoes were wasted "daily" during harvesting season;

(vii)   CW6 explained that during the Class Period, AppHarvest's attrition and retention metrics in the first half of 2021 were far worse than expected because AppHarvest was clearly falling short week over week. Indeed, according to CW1 and CW2, throughout the Class Period AppHarvest suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including:

   e.   dissatisfaction with mandatory expanded working hours—including forced overtime, Saturdays, and holidays, and

   f.   infection and quarantining due to the COVID-19 pandemic,

        all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes.

tomatoes. ¶275. During the "toughest" periods of rejected tomatoes (the end of Q1 2021 through the "summer refresh"), it was necessary for AppHarvest to lower estimated production forecasts, a process that involved CW6, Eggleton and Lee, which were exchanged with Mastronardi in a shared "portal." *Id.*

- As confirmed by CW3, CW6, and the Mastronardi Morehead Agreement Defendants Eggleton and Lee were intimately involved in various forecasting processes—forecasts which included sales, quality, costs, yield, price, estimated rejections, and estimated damaged tomatoes. ¶263.

- CW3 confirmed that AppHarvest's forecasts existed prior to the commencement of the first growing season and that Defendant Eggleton approved the forecasts. ¶263. CW3 further explained AppHarvest had planning software, Microsoft Dynamics, which tracked operational results and actual costs, and the Individual Defendants had access to this software. *Id.* CWs 3 and 6 stated that AppHarvest used such real time production data to create and track against AppHarvest's forecasts. ¶¶121, 130, 263.

- CW6 confirmed AppHarvest had real-time access to quality and yield data from the Packhouse based on the types of boxes being shipped (Grade 1 versus Grade 2). ¶267. Further, CW 1 and CW4 stated that AppHarvest had real-time access to productivity metrics from the Greenhouse that were recorded by scanners when workers finished working on a particular row and uploaded to the Company's electronic files. ¶120. CW4 confirmed that such real-time data included information from quality inspectors who recorded their results into a "live" excel spreadsheet so that AppHarvest could "map" quality performance. ¶85.

135

CW4 likewise stated that there was significant turnover throughout CW4's tenure at AppHarvest, with the west side of the Greenhouse losing at least 10 personnel every week. CW4 stated that the turnover resulted in less trained staff and thereby lower yields because there were fewer Crop Care Specialists to do the work.

CW5 confirmed that employee turnover and churn had been consistently high throughout October 2020 and June 2021, causing concern amongst Greenhouse personnel that AppHarvest had inadequate labor to meet production requirements as was discussed at the morning stand-up meetings CW5 attended;

(viii) according to CW1, CW2, and CW4 throughout the Class Period AppHarvest's own incentive piece rate structure incentivized disruptive and inefficient workmanship that wasted, damaged, and produced low quality tomatoes;

(ix) CW6 stated that Mastronardi informed AppHarvest that it needed to tighten up specifications because Mastronardi was having to reject a lot of fruit throughout the Class Period—upwards of 30% to 35% during the Company's "toughest times," which was "many times" more than AppHarvest's target which CW6 believed was 6% or 7%;

(x) according to CW2, "half" of all tomatoes inspected were USDA Grade No. 2 or not commercially saleable, and CW6 confirmed that AppHarvest was a "long way off" its quality goals;

(xi) CW6 stated that in the "toughest times" of the first growing season AppHarvest was well below 50% in

- Defendant Webb frequently visited the Morehead Facility prior to and throughout the Class Period where he filmed at least 16 interviews, gave tours, and visited operations, and would have, and did, see the Company's dysfunctional production facilities and widespread attrition and churn. ¶289. Indeed, Webb admitted he was at the facility "every morning" and that he was "in the facility, you know, elbow tapping everyone as they come in." ¶287. Webb further admitted that he loves to "sleep on the farms" and "going to our operations." ¶288.

- Webb or his office instructed CW5's team to "hide the waste" when investors and news media visited so that the Greenhouse had "better eye appeal." ¶¶83-84, 291.

- On April 12, 2021, the Board stripped Marcella Butler of her role as an executive officer and transitioned her from Chief Operating Officer to Chief People Officer (a position she had been promoted out of only four months prior). ¶279. Butler reported directly to Defendant Webb, who with Defendant Lee were a member of the Board. ¶277. Defendants Webb and Lee admitted during the Q2 Earnings Call that Butler's demotion was a result of operational failures. ¶280. Further, CW6, who was "very familiar" with Ms. Butler, confirmed that Ms. Butler's transition back to Chief People Officer and eventual separation from the Company were due to labor issues, including productivity, attrition, and churn. ¶279.

- Events such as Ms. Butler's demotion informed Board members (like Webb and Lee) that the extent of the Company's productivity issues were highly material—so much so that Board member Jeffrey Ubben cashed out 3 million shares, or roughly 25% of his holdings, for $49.5 million in proceeds, before the truth was disclosed. ¶¶310-311

136

| | |
|---|---|
| relation to the Company's productivity standards for specific Greenhouse jobs. ¶218. | • Defendants Lee's and Eggleton's veiled admissions on the Q1 2021 earnings call. Lee stated that in the future there would be a "summer refresh," "Morehead 2.0," and "new training" to support increased productivity, and such training would be merely additive to AppHarvest's supposed current "momentum" providing incremental "higher productivity." ¶¶133, 135. Eggleton acknowledged "training" issues and "demands" on the "labor force" affected "productivity" and drove gross loss, but blamed the second half of the Morehead Facility coming online pursuant to a "phased launch." ¶134. Defendants' veiled admissions evidence that they knew undisclosed detail concerning the underlying issues, such as: significant waste and productivity issues, understaffing and churn at the Morehead Facility, and the resulting effects on the Company's operations, product quality, sales, revenue, and costs. ¶133-35.<br><br>• Defendants' admissions that "labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility" existed for the entire "*six months* ended June 30, 2021," which caused "lower net sales due to lower overall No. 1-grade production yields" as well as "higher related distribution and shipping fees." ¶297.<br><br>• Defendants' admissions that "executional challenges" spanned the entire Class Period because as they were "very real in our first major full season of harvest as a company" and the harvest season began in January 2021; and challenges lasted entire "initial growing season" and "first growing season" which began in October 2020. ¶298.<br><br>• Lee admitted Defendants assigned new "conservative" assumptions to operational performance with respect to the Company's outlook to investors, and further admitted it was |

137

|  | not until the end of the Class Period when AppHarvest's guidance was "balanced" and "achiev[able]." ¶¶255, 328. CW6 confirmed that Defendant Lee always took the most "aggressive" forecast positions, including in instances where he was informed that AppHarvest's challenges still needed to be factored in. ¶¶124, 245.<br><br>• Throughout the Class Period the Morehead Facility was the site of the Company's sole production operations and core business. ¶286.<br><br>• Defendants frequently spoke in detail regarding staffing, labor, and operations, tomato production, pricing, yield, and other key metrics every quarter and intermittently in various media interviews, which adds a strong inference of scienter. ¶¶72-75, 304-308.<br><br>• AppHarvest was entirely reliant on its sole distributor Mastronardi, which required top-quality Grade 1 tomatoes. ¶270. In fact, AppHarvest filed at least 18 documents with the SEC, including documents signed by the Individual Defendants, stating the Company was "highly dependent" on Mastronardi, and Webb signed and initialed every page of the Mastronardi Morehead Agreement which required Mastronardi to accept all USDA Grade 1 tomatoes and saddled AppHarvest with all of the risk and costs of non-Grade 1 tomatoes, which Defendants knew would be rejected by Mastronardi and had "very little to no value." ¶¶271, 270. |
|---|---|

**False Statement XIX**

| **Statement Category:** |
| --- |
| Misstatements Regarding Operations, Production, and Supply |

| **Speaker(s); Date; Medium** |
| --- |
| Defendant Webb; May 26, 2021; Interviewed by host Jason Moser on the Industry Focus podcast presented by The Motley Fool. |

| **False and Misleading Statements or Omissions** |
| --- |
| **Moser**: Yeah. Well, I mean, speaking of publicly traded company, you just, you just released your first quarter results, and I think this was your first full quarter as a publicly traded company. I'm sure it was an exciting time. <u>I just wonder if you could share some of the highlights</u>, some of the things you're proud of in regard to this, to this earnings release and, and, your excitement here for the year to come.<br><br>**Webb**: …We're ramping up this first facility in the middle of a global pandemic. We had an ice storm if people remember that ice storm back in February. **<u>Our facility operated at full, you know, ramping up into full capacity with no issues in the middle of a global pandemic in the middle of an ice storm</u>**. ¶220. |

| **Reasons Why Statements are False and Misleading, and/or Lacked a Reasonable Basis** | **Facts Giving Rise to Strong Inference of Scienter** |
| --- | --- |
| Reasons:<br><br>Defendant Webb was pointedly asked about the Company's performance and to describe "some of the highlights" of AppHarvest's first quarter. Defendant Webb concealed that the Company's significant operational challenges—shifting attention solely to certain well-publicized ice storms—and falsely and/or misleadingly represented that the Company's significantly challenged production "capacity" as running "full" and having "no issues."<br><br>Evidence: | • CW6 met with Defendants Eggleton and Lee weekly concerning the baseline forecast, and upside and downside scenarios. ¶264. These weekly Forecast Meetings got "quite operational" and focused on various productivity metrics, with a key focus on yield and quality which was the basis for AppHarvest's revenue. *Id.* Throughout the first half of 2021, Lee and Eggleton also discussed that attrition and retention metrics that were "far worse than expected" and falling short "week over week." ¶111. During the "toughest times," (end of Q1 through the "summer refresh" at the end of the Class Period) discussions at Forecast Meetings concerned: "ways to close the gap" between AppHarvest's underperformance compared to the current forecast; the expected time needed for the closing the gap depending on the various scenarios; and |

There is ample evidence that Defendant Webb's statements were materially false, misleading, and/or lacked a reasonable basis when made when made given that:

(i)     Defendants admitted that for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)    Defendants admitted that for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii)   Defendants' numerous statements in the August 11, 2021 corrective disclosures admitting "labor" and employee "training" issues existed in 2Q 2021, including Webb's statement on the 2021 Q2 Earnings Call admitting AppHarvest's problems were "as simple as training. I don't want to be more blunt than that, but it was training and management protocols";

(iv)    Defendants Lee's and Eggleton's veiled admissions on the Q1 2021 earnings call that "training" issues existed in the first quarter of 2021 that were hampering "productivity" and driving gross loss;

(v)     Defendants' admissions in the 2021 Q2 Earnings Release, the Q2 2021 Earnings Presentation, and the 2021 Q2 Earnings Call that "operational" and "executional"

the Company's issues with employee training, turnover, poor work ethic, and inconsistent hiring standards which were "repeatedly cited" as the "root cause" of the overall production challenges. ¶264.

•   Labor productivity was identified as a challenge for AppHarvest in 2020, and during the "toughest times," (end of Q1 through the "summer refresh" at the end of the Class Period) Defendants instituted Leadership Meetings twice a week, which included Lee, Eggleton, CW6 and other FP&A personnel, Marcella Butler, and Julie Nelson. ¶268. Labor productivity metrics included yield, quality, rejections from Mastronardi, attrition and employee absences, and productivity metrics for the various Greenhouse workers' particular functions. *Id.*   According to CW6, inadequate training, turnover, poor work ethic and inconsistent hiring standards were "repeatedly cited" as the "root cause" of the Company's productivity challenges at these Leadership Meetings. CW6 recalled the Leadership Meetings occurred usually mid-week and end-of-week so that Defendants could "keep an eye on it." *Id.*

•   CW6 confirmed AppHarvest's executive management had information parity, such that "everyone knew what everyone else knew" regarding fundamental financial data. ¶129.

•   CW6 confirmed that at the end of each month, results concerning pricing, labor productivity (including yield and quality), construction costs, tomato grades, and other factors would be "pulled into" FP&A models and adjustments would be made to the Company's forecasts. ¶265. CW6 and Defendant Eggleton met for "many hours" each day discussing these near-, medium-, and long-term financial forecasts. *Id.*

challenges—including lower quality production and saleable yield, and higher distribution and shipping expense incurred as a result of rejections—existed for the "initial growing season" and the "full season of harvest as a Company";

(vi) according to CW1 and CW4, AppHarvest did not offer employees adequate (if any) training throughout the Class Period. According to CW1, AppHarvest's inadequately trained workforce contributed to 5-10% of crops being wasted or damaged during CW1's tenure, which resulted in lost sales. According to CW5 up to 50% of AppHarvest's crop was wasted in the first growing season caused by workers in the Greenhouse and Packhouse. Further, CW4 confirmed that tomatoes were wasted "daily" during harvesting season;

(vii) CW6 explained that during the Class Period, AppHarvest's attrition and retention metrics in the first half of 2021 were far worse than expected because AppHarvest was clearly falling short week over week. Indeed, according to CW1 and CW2, throughout the Class Period AppHarvest suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including:

g. dissatisfaction with mandatory expanded working hours—including forced overtime, Saturdays, and holidays, and

h. infection and quarantining due to the COVID-19 pandemic,

- CW6 confirmed that AppHarvest productivity forecasts were sent to Mastronardi on a weekly, and possibly daily basis. ¶266. According to CW6, these forecasts included estimates of labor productivity to determine the volumes of beefsteak and Tomatoes on the Vine that would be harvested in the given period. *Id.*

- Mastronardi provided Defendants with daily updates, regular audits, and negative feedback in response to subpar quality throughout the Class Period. ¶¶60, 67, 275. Mastronardi increased the frequency of its audits on the AppHarvest tomatoes during periods of "weaker" performance by AppHarvest, which resulted in Mastronardi rejecting a lot of tomatoes. ¶275. During the "toughest" periods of rejected tomatoes (the end of Q1 2021 through the "summer refresh"), it was necessary for AppHarvest to lower estimated production forecasts, a process that involved CW6, Eggleton and Lee, which were exchanged with Mastronardi in a shared "portal." *Id.*

- As confirmed by CW3, CW6, and the Mastronardi Morehead Agreement Defendants Eggleton and Lee were intimately involved in various forecasting processes—forecasts which included sales, quality, costs, yield, price, estimated rejections, and estimated damaged tomatoes. ¶263.

- CW3 confirmed that AppHarvest's forecasts existed prior to the commencement of the first growing season and that Defendant Eggleton approved the forecasts. ¶263. CW3 further explained AppHarvest had planning software, Microsoft Dynamics, which tracked operational results and actual costs, and the Individual Defendants had access to this software. *Id.* CWs 3 and 6 stated that AppHarvest used such real time production data to create and track against AppHarvest's forecasts. ¶¶121, 130, 263.

all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes.

CW4 likewise stated that there was significant turnover throughout CW4's tenure at AppHarvest, with the west side of the Greenhouse losing at least 10 personnel every week. CW4 stated that the turnover resulted in less trained staff and thereby lower yields because there were fewer Crop Care Specialists to do the work.

CW5 confirmed that employee turnover and churn had been consistently high throughout October 2020 and June 2021, causing concern amongst Greenhouse personnel that AppHarvest had inadequate labor to meet production requirements as was discussed at the morning stand-up meetings CW5 attended;

(viii)    according to CW1, CW2, and CW4 throughout the Class Period AppHarvest's own incentive piece rate structure incentivized disruptive and inefficient workmanship that wasted, damaged, and produced low quality tomatoes;

(ix)    CW6 stated that Mastronardi informed AppHarvest that it needed to tighten up specifications because Mastronardi was having to reject a lot of fruit throughout the Class Period—upwards of 30% to 35% during the Company's "toughest times," which was "many times" more than AppHarvest's target which CW6 believed was 6% or 7%;

(x)    according to CW2, "half" of all tomatoes inspected were USDA Grade No. 2 or not commercially saleable, and

- CW6 confirmed AppHarvest had real-time access to quality and yield data from the Packhouse based on the types of boxes being shipped (Grade 1 versus Grade 2). ¶267. Further, CW 1 and CW4 stated that AppHarvest had real-time access to productivity metrics from the Greenhouse that were recorded by scanners when workers finished working on a particular row and uploaded to the Company's electronic files. ¶120. CW4 confirmed that such real-time data included information from quality inspectors who recorded their results into a "live" excel spreadsheet so that AppHarvest could "map" quality performance. ¶85.

- Defendant Webb frequently visited the Morehead Facility prior to and throughout the Class Period where he filmed at least 16 interviews, gave tours, and visited operations, and would have, and did, see the Company's dysfunctional production facilities and widespread attrition and churn. ¶289. Indeed, Webb admitted he was at the facility "every morning" and that he was "in the facility, you know, elbow tapping everyone as they come in." ¶287. Webb further admitted that he loves to "sleep on the farms" and "going to our operations." ¶288.

- Webb or his office instructed CW5's team to "hide the waste" when investors and news media visited so that the Greenhouse had "better eye appeal." ¶¶83-84, 291.

- On April 12, 2021, the Board stripped Marcella Butler of her role as an executive officer and transitioned her from Chief Operating Officer to Chief People Officer (a position she had been promoted out of only four months prior). ¶279. Butler reported directly to Defendant Webb, who with Defendant Lee were a member of the Board. ¶277. Defendants Webb and Lee admitted during the Q2 Earnings Call that Butler's

| | |
|---|---|
| CW6 confirmed that AppHarvest was a "long way off" its quality goals;<br><br>(xi)   CW6 stated that in the "toughest times" of the first growing season AppHarvest was well below 50% in relation to the Company's productivity standards for specific Greenhouse jobs. ¶221. | demotion was a result of operational failures. ¶280.  Further, CW6, who was "very familiar" with Ms. Butler, confirmed that Ms. Butler's transition back to Chief People Officer and eventual separation from the Company were due to labor issues, including productivity, attrition, and churn. ¶279.<br><br>• Events such as Ms. Butler's demotion informed Board members (like Webb and Lee) that the extent of the Company's productivity issues were highly material—so much so that Board member Jeffrey Ubben cashed out 3 million shares, or roughly 25% of his holdings, for $49.5 million in proceeds, before the truth was disclosed. ¶¶310-311<br><br>• Defendants Lee's and Eggleton's veiled admissions on the Q1 2021 earnings call. Lee stated that in the future there would be a "summer refresh," "Morehead 2.0," and "new training" to support increased productivity, and such training would be merely additive to AppHarvest's supposed current "momentum" providing incremental "higher productivity." ¶¶133, 135. Eggleton acknowledged "training" issues and "demands" on the "labor force" affected "productivity" and drove gross loss, but blamed the second half of the Morehead Facility coming online pursuant to a "phased launch." ¶134. Defendants' veiled admissions evidence that they knew undisclosed detail concerning the underlying issues, such as: significant waste and productivity issues, understaffing and churn at the Morehead Facility, and the resulting effects on the Company's operations, product quality, sales, revenue, and costs. ¶133-35.<br><br>• Defendants' admissions that "labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility" existed for the entire "*six months* ended June 30, 2021," which caused "lower net sales due to lower overall No. 1- |

|  | grade production yields" as well as "higher related distribution and shipping fees." ¶297. |
|  | • Defendants' admissions that "executional challenges" spanned the entire Class Period because as they were "very real in our first major full season of harvest as a company" and the harvest season began in January 2021; and challenges lasted entire "initial growing season" and "first growing season" which began in October 2020. ¶298. |
|  | • Lee admitted Defendants assigned new "conservative" assumptions to operational performance with respect to the Company's outlook to investors, and further admitted it was not until the end of the Class Period when AppHarvest's guidance was "balanced" and "achiev[able]." ¶¶255, 328. CW6 confirmed that Defendant Lee always took the most "aggressive" forecast positions, including in instances where he was informed that AppHarvest's challenges still needed to be factored in. ¶¶124, 245. |
|  | • Throughout the Class Period the Morehead Facility was the site of the Company's sole production operations and core business. ¶286. |
|  | • Defendants frequently spoke in detail regarding staffing, labor, and operations, tomato production, pricing, yield, and other key metrics every quarter and intermittently in various media interviews, which adds a strong inference of scienter. ¶¶72-75, 304-308. |
|  | • AppHarvest was entirely reliant on its sole distributor Mastronardi, which required top-quality Grade 1 tomatoes. ¶270. In fact, AppHarvest filed at least 18 documents with the SEC, including documents signed by the Individual Defendants, stating the Company was "highly dependent" on |

| | |
|---|---|
| | Mastronardi, and Webb signed and initialed every page of the Mastronardi Morehead Agreement which required Mastronardi to accept all USDA Grade 1 tomatoes and saddled AppHarvest with all of the risk and costs of non-Grade 1 tomatoes, which Defendants knew would be rejected by Mastronardi and had "very little to no value." ¶¶271, 270. |

**False Statement XX**

| **Statement Category:** |
| --- |
| Misstatements Regarding Labor Availability, Recruitment, and Retention |

| **Speaker(s), Date, & Medium** |
| --- |
| Defendant Webb; June 3, 2021; interview by Rena Sherbill, posted on the Seeking Alpha YouTube channel |

| **False and Misleading Statements or Omissions** |
| --- |
| Sherbill: [I]n terms of the human labor force, because as you mentioned, you know, working with robotics, working with AI, <u>how does the labor structure work</u>? Do you have, uh data scientists working on that? Do you have agriculture, you know, people coming from the agricultural field? <u>How does that work in terms of the labor structure</u>?<br><br>Webb: We're at about 550 employees right now. We'll be at roughly a thousand employees this time next year. And as we scale that team, out of real self-preservation, we need to be developing talent internally. Uh, and, and I see, we see that as a huge opportunity for us to **not only retain employees**, but recruit employees. We've had, uh, nearly 8,000 people apply to work at AppHarvest this year, um, number might be up to 10,000 now. **And again, in this time where you, you read in the news about labor shortages, you read in the news about, uh, people having issues of people showing up to work. We hired 500 employees in the middle of COVID, uh, and they're showing up every day**. ¶222. |

| **Reasons Why Statements are False and Misleading, and/or Lacked a Reasonable Basis** | **Facts Giving Rise to Strong Inference of Scienter** |
| --- | --- |
| Defendant Webb's statements above were materially false, misleading, and or lacked a reasonable basis when made because AppHarvest suffered significant challenges "retain[ing]" employees, and employees were not "showing up every day" given that:<br><br>(i)    Defendants admitted that for the "***six months***" ended June 30, 2021, *i.e.*, beginning in January 2021, AppHarvest was "adversely impacted" by "labor" challenges; | • CW6 met with Defendants Eggleton and Lee weekly concerning the baseline forecast, and upside and downside scenarios. ¶264. These weekly Forecast Meetings got "quite operational" and focused on various productivity metrics, with a key focus on yield and quality which was the basis for AppHarvest's revenue. *Id.* Throughout the first half of 2021, Lee and Eggleton also discussed that attrition and retention metrics that were "far worse than expected" and falling short "week over week." ¶111. During the "toughest times," (end of Q1 through the "summer refresh" at the end of the Class Period) discussions at Forecast Meetings concerned: "ways to close the gap" between AppHarvest's underperformance |

(ii)  CW6 explained that during the Class Period, AppHarvest's attrition and retention metrics in the first half of 2021 were far worse than expected because AppHarvest was clearly falling short week over week. Indeed, according to CW1 and CW2, throughout the Class Period AppHarvest suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including:

a.  dissatisfaction with mandatory expanded working hours—including forced overtime, Saturdays, and holidays, and

b.  infection and quarantining due to the COVID-19 pandemic.

CW4 likewise stated that there was significant turnover throughout CW4's tenure at AppHarvest, with the west side of the Greenhouse losing at least 10 personnel every week.

CW5 confirmed that employee turnover and churn had been consistently high throughout October 2020 and June 2021, causing concern amongst Greenhouse personnel that AppHarvest had inadequate labor to meet production requirements as was discussed at the morning stand-up meetings CW5 attended. ¶223.

compared to the current forecast; the expected time needed for the closing the gap depending on the various scenarios; and the Company's issues with employee training, turnover, poor work ethic, and inconsistent hiring standards which were "repeatedly cited" as the "root cause" of the overall production challenges. ¶264.

• Labor productivity was identified as a challenge for AppHarvest in 2020, and during the "toughest times," (end of Q1 through the "summer refresh" at the end of the Class Period) Defendants instituted Leadership Meetings twice a week, which included Lee, Eggleton, CW6 and other FP&A personnel, Marcella Butler, and Julie Nelson. ¶268. Labor productivity metrics included yield, quality, rejections from Mastronardi, attrition and employee absences, and productivity metrics for the various Greenhouse workers' particular functions. *Id.* According to CW6, inadequate training, turnover, poor work ethic and inconsistent hiring standards were "repeatedly cited" as the "root cause" of the Company's productivity challenges at these Leadership Meetings. CW6 recalled the Leadership Meetings occurred usually mid-week and end-of-week so that Defendants could "keep an eye on it." *Id.*

• CW6 confirmed AppHarvest's executive management had information parity, such that "everyone knew what everyone else knew" regarding fundamental financial data. ¶129.

• CW6 confirmed that at the end of each month, results concerning pricing, labor productivity (including yield and quality), construction costs, tomato grades, and other factors would be "pulled into" FP&A models and adjustments would be made to the Company's forecasts. ¶265. CW6 and Defendant Eggleton met for "many hours" each day

147

|  | discussing these near-, medium-, and long-term financial forecasts. *Id.* |
|  | • CW6 confirmed that AppHarvest productivity forecasts were sent to Mastronardi on a weekly, and possibly daily basis. ¶266. According to CW6, these forecasts included estimates of labor productivity to determine the volumes of beefsteak and Tomatoes on the Vine that would be harvested in the given period. *Id.* |
|  | • Mastronardi provided Defendants with daily updates, regular audits, and negative feedback in response to subpar quality throughout the Class Period. ¶¶60, 67, 275. Mastronardi increased the frequency of its audits on the AppHarvest tomatoes during periods of "weaker" performance by AppHarvest, which resulted in Mastronardi rejecting a lot of tomatoes. ¶275. During the "toughest" periods of rejected tomatoes (the end of Q1 2021 through the "summer refresh"), it was necessary for AppHarvest to lower estimated production forecasts, a process that involved CW6, Eggleton and Lee, which were exchanged with Mastronardi in a shared "portal." *Id.* |
|  | • As confirmed by CW3, CW6, and the Mastronardi Morehead Agreement Defendants Eggleton and Lee were intimately involved in various forecasting processes—forecasts which included sales, quality, costs, yield, price, estimated rejections, and estimated damaged tomatoes. ¶263. |
|  | • CW3 confirmed that AppHarvest's forecasts existed prior to the commencement of the first growing season and that Defendant Eggleton approved the forecasts. ¶263. CW3 further explained AppHarvest had planning software, Microsoft Dynamics, which tracked operational results and actual costs, and the Individual Defendants had access to this |

148

|  | software. *Id.* CWs 3 and 6 stated that AppHarvest used such real time production data to create and track against AppHarvest's forecasts. ¶¶121, 130, 263.<br><br>• CW6 confirmed AppHarvest had real-time access to quality and yield data from the Packhouse based on the types of boxes being shipped (Grade 1 versus Grade 2). ¶267. Further, CW 1 and CW4 stated that AppHarvest had real-time access to productivity metrics from the Greenhouse that were recorded by scanners when workers finished working on a particular row and uploaded to the Company's electronic files. ¶120. CW4 confirmed that such real-time data included information from quality inspectors who recorded their results into a "live" excel spreadsheet so that AppHarvest could "map" quality performance. ¶85.<br><br>• Defendant Webb frequently visited the Morehead Facility prior to and throughout the Class Period where he filmed at least 16 interviews, gave tours, and visited operations, and would have, and did, see the Company's dysfunctional production facilities and widespread attrition and churn. ¶289. Indeed, Webb admitted he was at the facility "every morning" and that he was "in the facility, you know, elbow tapping everyone as they come in." ¶287. Webb further admitted that he loves to "sleep on the farms" and "going to our operations." ¶288.<br><br>• Webb or his office instructed CW5's team to "hide the waste" when investors and news media visited so that the Greenhouse had "better eye appeal." ¶¶83-84, 291.<br><br>• On April 12, 2021, the Board stripped Marcella Butler of her role as an executive officer and transitioned her from Chief Operating Officer to Chief People Officer (a position she had been promoted out of only four months prior). ¶279. Butler |

149

reported directly to Defendant Webb, who with Defendant Lee were a member of the Board. ¶277. Defendants Webb and Lee admitted during the Q2 Earnings Call that Butler's demotion was a result of operational failures. ¶280. Further, CW6, who was "very familiar" with Ms. Butler, confirmed that Ms. Butler's transition back to Chief People Officer and eventual separation from the Company were due to labor issues, including productivity, attrition, and churn. ¶279.

- Events such as Ms. Butler's demotion informed Board members (like Webb and Lee) that the extent of the Company's productivity issues were highly material—so much so that Board member Jeffrey Ubben cashed out 3 million shares, or roughly 25% of his holdings, for $49.5 million in proceeds, before the truth was disclosed. ¶¶310-311

- Defendants Lee's and Eggleton's veiled admissions on the Q1 2021 earnings call. Lee stated that in the future there would be a "summer refresh," "Morehead 2.0," and "new training" to support increased productivity, and such training would be merely additive to AppHarvest's supposed current "momentum" providing incremental "higher productivity." ¶¶133, 135. Eggleton acknowledged "training" issues and "demands" on the "labor force" affected "productivity" and drove gross loss, but blamed the second half of the Morehead Facility coming online pursuant to a "phased launch." ¶134. Defendants' veiled admissions evidence that they knew undisclosed detail concerning the underlying issues, such as: significant waste and productivity issues, understaffing and churn at the Morehead Facility, and the resulting effects on the Company's operations, product quality, sales, revenue, and costs. ¶133-35.

- Defendants' admissions that "labor and productivity challenges associated with the training and development of

| | |
|---|---|
| | the new workforce at the Morehead, Kentucky facility" existed for the entire "***six months*** ended June 30, 2021," which caused "lower net sales due to lower overall No. 1-grade production yields" as well as "higher related distribution and shipping fees." ¶297.<br><br>• Defendants' admissions that "executional challenges" spanned the entire Class Period because as they were "very real in our first major full season of harvest as a company" and the harvest season began in January 2021; and challenges lasted entire "initial growing season" and "first growing season" which began in October 2020. ¶298.<br><br>• Throughout the Class Period the Morehead Facility was the site of the Company's sole production operations and core business. ¶286.<br><br>• Defendants frequently spoke in detail regarding staffing, labor, and operations, tomato production, pricing, yield, and other key metrics every quarter and intermittently in various media interviews, which adds a strong inference of scienter. ¶¶72-75, 304-308.<br><br>• AppHarvest was entirely reliant on its sole distributor Mastronardi, which required top-quality Grade 1 tomatoes. ¶270. In fact, AppHarvest filed at least 18 documents with the SEC, including documents signed by the Individual Defendants, stating the Company was "highly dependent" on Mastronardi, and Webb signed and initialed every page of the Mastronardi Morehead Agreement which required Mastronardi to accept all USDA Grade 1 tomatoes and saddled AppHarvest with all of the risk and costs of non-Grade 1 tomatoes, which Defendants knew would be rejected by Mastronardi and had "very little to no value." ¶¶271, 270. |

**False Statement XXI. A.**

| **Statement Category:** |
|---|
| Misstatements Regarding Labor Availability, Recruitment, and Retention |

| **Speaker(s); Date; & Medium** |
|---|
| All Defendants; June 4, 2021; Post-Effective Amendment No. 1 to Form S-1 Registration Statement, signed by Defendants Webb, Eggleton, and Lee, filed with the SEC, and on the Investor Relations section of AppHarvest's website |

| **False and Misleading Statements or Omissions** |
|---|
| A subsection of the June 4 Form S-1 titled "**Our Solution**" (emphasis in original), **"We believe there is a large population of workers in the Central Appalachian region who are eager to find long-term career opportunities like those being offered by AppHarvest**…**As a result, we believe we can staff and retain our workers with less churn**, immigration challenges **and unfilled positions** that many of our competitors face." ¶225. <br><br> Relatedly, a subsection of the June 4 Form S-1 titled "**Our Strengths**[,]" falsely and/or misleadingly stated in pertinent part: "**We were able to efficiently hire many employees as we opened our first facility in Morehead** and have identified talent to join our team at the facilities we are developing in Richmond and Berea." ¶226. |

| **Reasons Why Statements are False and Misleading, and/or Lacked a Reasonable Basis** | **Facts Giving Rise to Strong Inference of Scienter** |
|---|---|
| Reasons: <br><br> The above statements were materially false, misleading, and/or lacked a reasonable basis when made because: (a) Defendants' statements that prospective employees were seeking "long-term" employment, and that AppHarvest was able to "staff and retain" workers with "less churn" and less "unfilled positions," and that AppHarvest was able to "efficiently hire many employees" as it opened the Morehead Facility were not supported by, and/or concealed, known facts that directly contradicted those statements which left AppHarvest's workforce short-staffed, unproductive, and insufficiently trained; and (b) the statements misrepresented | • CW6 met with Defendants Eggleton and Lee weekly concerning the baseline forecast, and upside and downside scenarios. ¶264. These weekly Forecast Meetings got "quite operational" and focused on various productivity metrics, with a key focus on yield and quality which was the basis for AppHarvest's revenue. *Id.* Throughout the first half of 2021, Lee and Eggleton also discussed that attrition and retention metrics that were "far worse than expected" and falling short "week over week." ¶111. During the "toughest times," (end of Q1 through the "summer refresh" at the end of the Class Period) discussions at Forecast Meetings concerned: "ways to close the gap" between AppHarvest's underperformance compared to the current forecast; the expected time needed for |

AppHarvest's frequent hiring as a "Strength" rather than what it was—a known consequence, born out of necessity, of the significant amount of concealed employee attrition, turnover, and churn that AppHarvest had experienced.

Furthermore, the above statements were materially false, misleading, and/or lacked a reasonable basis when made in light of the circumstances. As of March 2, 2021, AppHarvest was staffing its first, massive CEA facility and the Morehead Facility's productivity would depend, in part, on Defendants' ability to "efficiently hire" and "retain" staff to minimize "churn" and "unfilled positions"—as evidenced by Defendants' frequent updates and assurances to market participants regarding the Company's hiring efforts (¶¶69-74). It was misleading for Defendants to make the above statements, and thereby paint AppHarvest's hiring in an undeservedly rosy light, without also disclosing adverse circumstances. ¶228.

The material falsity of the above statements is supported by ample evidence given that:

Evidence:

(i)     as Defendants would later admit, for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, AppHarvest was "adversely impacted" by "labor" challenges which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)    as Defendants would later admit, for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

the closing the gap depending on the various scenarios; and the Company's issues with employee training, turnover, poor work ethic, and inconsistent hiring standards which were "repeatedly cited" as the "root cause" of the overall production challenges. ¶264.

• Labor productivity was identified as a challenge for AppHarvest in 2020, and during the "toughest times," (end of Q1 through the "summer refresh" at the end of the Class Period) Defendants instituted Leadership Meetings twice a week, which included Lee, Eggleton, CW6 and other FP&A personnel, Marcella Butler, and Julie Nelson. ¶268. Labor productivity metrics included yield, quality, rejections from Mastronardi, attrition and employee absences, and productivity metrics for the various Greenhouse workers' particular functions. *Id.* According to CW6, inadequate training, turnover, poor work ethic and inconsistent hiring standards were "repeatedly cited" as the "root cause" of the Company's productivity challenges at these Leadership Meetings. CW6 recalled the Leadership Meetings occurred usually mid-week and end-of-week so that Defendants could "keep an eye on it." *Id.*

• CW6 confirmed that at the end of each month, results concerning pricing, labor productivity (including yield and quality), construction costs, tomato grades, and other factors would be "pulled into" FP&A models and adjustments would be made to the Company's forecasts. ¶265. CW6 and Defendant Eggleton met for "many hours" each day discussing these near-, medium-, and long-term financial forecasts. *Id.*

• CW6 confirmed that AppHarvest productivity forecasts were sent to Mastronardi on a weekly, and possibly daily basis. ¶266. According to CW6, these forecasts included estimates

(iii) Defendants' numerous statements in the August 11, 2021 corrective disclosures admitting "labor" and employee "training" issues existed in 2Q 2021, including Webb's statement on the 2021 Q2 Earnings Call admitting AppHarvest's problems were "as simple as training. I don't want to be more blunt than that, but it was training and management protocols";

(iv) CW6 explained that during the Class Period, AppHarvest's attrition and retention metrics in the first half of 2021 were far worse than expected because AppHarvest was clearly falling short week over week. Indeed, according to CW1 and CW2, throughout the Class Period AppHarvest suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including:

    a.  dissatisfaction with mandatory expanded working hours—including forced overtime, Saturdays, and holidays, and

    b.  infection and quarantining due to the COVID-19 pandemic,

all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes.

CW4 likewise stated that there was significant turnover throughout CW4's tenure at AppHarvest, with the west side of the Greenhouse losing at least 10

of labor productivity to determine the volumes of beefsteak and Tomatoes on the Vine that would be harvested in the given period. *Id.*

- Defendant Webb frequently visited the Morehead Facility prior to and throughout the Class Period where he filmed at least 16 interviews, gave tours, and visited operations, and would have, and did, see the Company's dysfunctional production facilities and widespread attrition and churn. ¶289. Indeed, Webb admitted he was at the facility "every morning" and that he was "in the facility, you know, elbow tapping everyone as they come in." ¶287. Webb further admitted that he loves to "sleep on the farms" and "going to our operations." ¶288.

- Defendants' admissions that "labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility" existed for the entire "*six months* ended June 30, 2021," which caused "lower net sales due to lower overall No. 1-grade production yields" as well as "higher related distribution and shipping fees." ¶297.

- Defendants' admissions that "executional challenges" spanned the entire Class Period because as they were "very real in our first major full season of harvest as a company" and the harvest season began in January 2021; and challenges lasted entire "initial growing season" and "first growing season" which began in October 2020. ¶298.

- Throughout the Class Period the Morehead Facility was the site of the Company's sole production operations and core business. ¶286.

| | |
|---|---|
| personnel every week. CW4 stated that the turnover resulted in less trained staff and thereby lower yields because there were fewer Crop Care Specialists to do the work.<br><br>CW5 confirmed that employee turnover and churn had been consistently high throughout October 2020 and June 2021, causing concern amongst Greenhouse personnel that AppHarvest had inadequate labor to meet production requirements as was discussed at the morning stand-up meetings CW5 attended.<br><br>(v)    As was confirmed in Defendants' post Class Period 10-Q disclosures for Q3 2021, CW5 stated that due to the pervasive staffing issues described above, regional labor was insufficient and AppHarvest had to bring in contract labor to help during times of poor attendance. ¶227. | Defendants frequently spoke in detail regarding staffing, labor, and operations, tomato production, pricing, yield, and other key metrics every quarter and intermittently in various media interviews, which adds a strong inference of scienter. ¶¶72-75, 304-308. |

**False Statement XXI. B. i.**

| **Statement Category:** |
| --- |
| Speculative, Contingent, and Incomplete Risk Factors Relating to Growth and Price Performance |

| **Speaker(s); Date; & Medium** |
| --- |
| All Defendants; June 4, 2021; Post-Effective Amendment No. 1 to Form S-1 Registration Statement, signed by Defendants Webb, Eggleton, and Lee, filed with the SEC, and on the Investor Relations section of AppHarvest's website |

| **False and Misleading Statements or Omissions** |
| --- |
| **Risks Related to Our Business and Industry**<br><br>…Even if [AppHarvest's] investments do result in the growth of our business, **if we do not effectively manage our growth, we may not be able to execute on our business plan** and vision, respond to competitive pressures, **take advantage of market opportunities, satisfy customer requirements or maintain high-quality product offerings, any of which could adversely affect our business, financial condition and results of operations.**<br><br>\*\*\*<br><br>**In future periods, revenue growth** *could* **slow or revenue** *could* **decline for a number of reasons, including** slowing demand for our products, increasing competition, a decrease in the growth of the overall market, or **our failure, for any reason, to take advantage of growth opportunities. If our assumptions regarding these risks and uncertainties and future revenue growth are incorrect or change, or if we do not address these risks successfully, our operating and financial results could differ materially from our expectations, and our business could suffer**. ¶229. |

| **Reasons Why Statements are False and Misleading, and/or Lacked a Reasonable Basis** | **Facts Giving Rise to Strong Inference of Scienter** |
| --- | --- |
| Reasons:<br><br>The above speculative, contingent, and woefully incomplete statements were materially false, misleading, and/or lacked a reasonable basis when made because:<br><br>Defendants speculatively portrayed AppHarvest's ability to "effectively manage its growth," "execute on its business plan," | • CW6 met with Defendants Eggleton and Lee weekly concerning the baseline forecast, and upside and downside scenarios. ¶264. These weekly Forecast Meetings got "quite operational" and focused on various productivity metrics, with a key focus on yield and quality which was the basis for AppHarvest's revenue. *Id.* Throughout the first half of 2021, Lee and Eggleton also discussed that attrition and retention metrics that were "far worse than expected" and falling short "week over week." ¶111. During the "toughest times," (end of |

and "satisfy customer requirements or maintain high quality product" offerings as contingent or potential when AppHarvest was already failing to do all of these things resulting in lower saleable yield and quality products, and higher customer rejections and costs.

Defendants made a boilerplate and vague disclaimers that "revenue growth could slow or revenue could decline for a number of reasons" and that if AppHarvest fails to "take advantage of growth opportunities" "for any reason" it might see declining revenue, when Defendants were already experiencing wide-ranging execution problems for the entire first harvesting season that were doing exactly that.

### Evidence

The above Reasons are supported by ample evidence, given that:

(i)     Defendants admitted that for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)    Defendants admitted that for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

Q1 through the "summer refresh" at the end of the Class Period) discussions at Forecast Meetings concerned: "ways to close the gap" between AppHarvest's underperformance compared to the current forecast; the expected time needed for the closing the gap depending on the various scenarios; and the Company's issues with employee training, turnover, poor work ethic, and inconsistent hiring standards which were "repeatedly cited" as the "root cause" of the overall production challenges. ¶264.

- Labor productivity was identified as a challenge for AppHarvest in 2020, and during the "toughest times," (end of Q1 through the "summer refresh" at the end of the Class Period) Defendants instituted Leadership Meetings twice a week, which included Lee, Eggleton, CW6 and other FP&A personnel, Marcella Butler, and Julie Nelson. ¶268. Labor productivity metrics included yield, quality, rejections from Mastronardi, attrition and employee absences, and productivity metrics for the various Greenhouse workers' particular functions. *Id.*    According to CW6, inadequate training, turnover, poor work ethic and inconsistent hiring standards were "repeatedly cited" as the "root cause" of the Company's productivity challenges at these Leadership Meetings. CW6 recalled the Leadership Meetings occurred usually mid-week and end-of-week so that Defendants could "keep an eye on it." *Id.*

- CW6 confirmed AppHarvest's executive management had information parity, such that "everyone knew what everyone else knew" regarding fundamental financial data. ¶129.

- CW6 confirmed that at the end of each month, results concerning pricing, labor productivity (including yield and quality), construction costs, tomato grades, and other factors would be "pulled into" FP&A models and adjustments would

(iii)   Defendants' numerous statements in the August 11, 2021 corrective disclosures admitting "labor" and employee "training" issues existed in 2Q 2021, including Webb's statement on the 2021 Q2 Earnings Call admitting AppHarvest's problems were "as simple as training. I don't want to be more blunt than that, but it was training and management protocols";

(iv)   Defendants Lee's and Eggleton's veiled admissions on the Q1 2021 Earnings Call that "training" issues existed in the first quarter of 2021 that were hampering "productivity" and driving gross loss;

(v)   Defendants' admissions in the 2021 Q2 Earnings Release, the Q2 2021 Earnings Presentation, and the 2021 Q2 Earnings Call that "operational" and "executional" challenges—including lower quality production and saleable yield, and higher distribution and shipping expense incurred as a result of rejections—existed for the "initial growing season" and the "full season of harvest as a Company";

(vi)   according to CW1 and CW4, AppHarvest did not offer employees adequate (if any) training throughout the Class Period. According to CW1, AppHarvest's inadequately trained workforce contributed to 5-10% of crops being wasted or damaged during CW1's tenure, which resulted in lost sales. According to CW5, up to 50% of AppHarvest's crop was wasted in the first growing season caused by workers in the Greenhouse and Packhouse. Further, CW4 confirmed that tomatoes were wasted "daily" during harvesting season;

be made to the Company's forecasts. ¶265. CW6 and Defendant Eggleton met for "many hours" each day discussing these near-, medium-, and long-term financial forecasts. *Id.*

• CW6 confirmed that AppHarvest productivity forecasts were sent to Mastronardi on a weekly, and possibly daily basis. ¶266. According to CW6, these forecasts included estimates of labor productivity to determine the volumes of beefsteak and Tomatoes on the Vine that would be harvested in the given period. *Id.*

• Mastronardi provided Defendants with daily updates, regular audits, and negative feedback in response to subpar quality throughout the Class Period.   ¶¶60, 67, 275. Mastronardi increased the frequency of its audits on the AppHarvest tomatoes during periods of "weaker" performance by AppHarvest, which resulted in Mastronardi rejecting a lot of tomatoes. ¶275. During the "toughest" periods of rejected tomatoes (the end of Q1 2021 through the "summer refresh"), it was necessary for AppHarvest to lower estimated production forecasts, a process that involved CW6, Eggleton and Lee, which were exchanged with Mastronardi in a shared "portal." *Id.*

• As confirmed by CW3, CW6, and the Mastronardi Morehead Agreement Defendants Eggleton and Lee were intimately involved in various forecasting processes—forecasts which included sales, quality, costs, yield, price, estimated rejections, and estimated damaged tomatoes. ¶263.

• CW3 confirmed that AppHarvest's forecasts existed prior to the commencement of the first growing season and that Defendant Eggleton approved the forecasts. ¶263. CW3 further explained AppHarvest had planning software,

(vii)   CW6 explained that during the Class Period, AppHarvest's attrition and retention metrics in the first half of 2021 were far worse than expected because AppHarvest was clearly falling short week over week. Indeed, according to CW1 and CW2, throughout the Class Period, AppHarvest suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including:

a.   dissatisfaction with mandatory expanded working hours—including forced overtime, Saturdays, and holidays, and

b.   infection and quarantining due to the COVID-19 pandemic,

all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes.

CW4 likewise stated that there was significant turnover throughout CW4's tenure at AppHarvest, with the west side of the Greenhouse losing at least 10 personnel every week. CW4 stated that the turnover resulted in less trained staff and thereby lower yields because there were fewer Crop Care Specialists to do the work.

CW5 confirmed that employee turnover and churn had been consistently high throughout October 2020 and

Microsoft Dynamics, which tracked operational results and actual costs, and the Individual Defendants had access to this software. *Id.* CWs 3 and 6 stated that AppHarvest used such real time production data to create and track against AppHarvest's forecasts. ¶¶121, 130, 263.

• CW6 confirmed AppHarvest had real-time access to quality and yield data from the Packhouse based on the types of boxes being shipped (Grade 1 versus Grade 2). ¶267. Further, CW 1 and CW4 stated that AppHarvest had real-time access to productivity metrics from the Greenhouse that were recorded by scanners when workers finished working on a particular row and uploaded to the Company's electronic files. ¶120. CW4 confirmed that such real-time data included information from quality inspectors who recorded their results into a "live" excel spreadsheet so that AppHarvest could "map" quality performance. ¶85.

• Defendant Webb frequently visited the Morehead Facility prior to and throughout the Class Period where he filmed at least 16 interviews, gave tours, and visited operations, and would have, and did, see the Company's dysfunctional production facilities and widespread attrition and churn. ¶289. Indeed, Webb admitted he was at the facility "every morning" and that he was "in the facility, you know, elbow tapping everyone as they come in." ¶287. Webb further admitted that he loves to "sleep on the farms" and "going to our operations." ¶288.

• Webb or his office instructed CW5's team to "hide the waste" when investors and news media visited so that the Greenhouse had "better eye appeal." ¶¶83-84, 291.

• On April 12, 2021, the Board stripped Marcella Butler of her role as an executive officer and transitioned her from Chief

159

June 2021, causing concern amongst Greenhouse personnel that AppHarvest had inadequate labor to meet production requirements as was discussed at the morning stand-up meetings CW5 attended;

(viii)    according to CW1, CW2, and CW4, throughout the Class Period, AppHarvest's own incentive piece rate structure incentivized disruptive and inefficient workmanship that wasted, damaged, and produced low quality tomatoes;

(ix)    CW6 stated that Mastronardi informed AppHarvest that it needed to tighten up specifications because Mastronardi was having to reject a lot of fruit throughout the Class Period—upwards of 30% to 35% during the Company's "toughest times," which was "many times" more than AppHarvest's target which CW6 believed was 6% or 7%;

(x)    according to CW2, "half" of all tomatoes inspected were USDA Grade No. 2 or not commercially saleable, and CW6 confirmed that AppHarvest was a "long way off" its quality goals;

(xi)    CW6 stated that in the "toughest times" of the first growing season AppHarvest was well below 50% in relation to the Company's productivity standards for specific Greenhouse jobs. ¶230.

Operating Officer to Chief People Officer (a position she had been promoted out of only four months prior). ¶279. Butler reported directly to Defendant Webb, who with Defendant Lee were a member of the Board. ¶277. Defendants Webb and Lee admitted during the Q2 Earnings Call that Butler's demotion was a result of operational failures. ¶280. Further, CW6, who was "very familiar" with Ms. Butler, confirmed that Ms. Butler's transition back to Chief People Officer and eventual separation from the Company were due to labor issues, including productivity, attrition, and churn. ¶279.

• Events such as Ms. Butler's demotion informed Board members (like Webb and Lee) that the extent of the Company's productivity issues were highly material—so much so that Board member Jeffrey Ubben cashed out 3 million shares, or roughly 25% of his holdings, for $49.5 million in proceeds, before the truth was disclosed. ¶¶310-311

• Defendants Lee's and Eggleton's veiled admissions on the Q1 2021 earnings call. Lee stated that in the future there would be a "summer refresh," "Morehead 2.0," and "new training" to support increased productivity, and such training would be merely additive to AppHarvest's supposed current "momentum" providing incremental "higher productivity." ¶¶133, 135. Eggleton acknowledged "training" issues and "demands" on the "labor force" affected "productivity" and drove gross loss, but blamed the second half of the Morehead Facility coming online pursuant to a "phased launch." ¶134. Defendants' veiled admissions evidence that they knew undisclosed detail concerning the underlying issues, such as: significant waste and productivity issues, understaffing and churn at the Morehead Facility, and the resulting effects on the Company's operations, product quality, sales, revenue, and costs. ¶133-35.

160

<table>
<tr>
<td></td>
<td>

- Defendants' admissions that "labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility" existed for the entire "*six months* ended June 30, 2021," which caused "lower net sales due to lower overall No. 1-grade production yields" as well as "higher related distribution and shipping fees." ¶297.

- Defendants' admissions that "executional challenges" spanned the entire Class Period because as they were "very real in our first major full season of harvest as a company" and the harvest season began in January 2021; and challenges lasted entire "initial growing season" and "first growing season" which began in October 2020. ¶298.

- Throughout the Class Period the Morehead Facility was the site of the Company's sole production operations and core business. ¶286.

- Defendants frequently spoke in detail regarding staffing, labor, and operations, tomato production, pricing, yield, and other key metrics every quarter and intermittently in various media interviews, which adds a strong inference of scienter. ¶¶72-75, 304-308.

- AppHarvest was entirely reliant on its sole distributor Mastronardi, which required top-quality Grade 1 tomatoes. ¶270. In fact, AppHarvest filed at least 18 documents with the SEC, including documents signed by the Individual Defendants, stating the Company was "highly dependent" on Mastronardi, and Webb signed and initialed every page of the Mastronardi Morehead Agreement which required Mastronardi to accept all USDA Grade 1 tomatoes and saddled AppHarvest with all of the risk and costs of non-Grade

</td>
</tr>
</table>

161

| | |
|---|---|
| | tomatoes, which Defendants knew would be rejected by Mastronardi and had "very little to no value." ¶¶271, 270. |

**False Statement XXI. B. ii.**

| **Statement Category:**<br>Speculative, Contingent, and Incomplete Risk Factors Concerning Quality, Production, and Supply |
| --- |
| **Speaker(s); Date; & Medium**<br>All Defendants; June 4, 2021; Post-Effective Amendment No. 1 to Form S-1 Registration Statement, signed by Defendants Webb, Eggleton, and Lee, filed with the SEC, and on the Investor Relations section of AppHarvest's website |
| **False and Misleading Statements or Omissions**<br><br>*We currently rely on a single facility for all of our operations.*<br><br>…**Adverse changes or developments affecting the Morehead facility could impair our ability to produce our products and our business, prospects, financial condition and results of operations. Any** shutdown or **period of reduced production at the Morehead facility**, which may be caused by regulatory noncompliance or other issues, as well as other factors beyond our control, such as severe weather conditions, natural disaster, fire, power interruption, work stoppage, disease outbreaks or pandemics (such as COVID-19), equipment failure or delay in supply delivery, **would significantly disrupt our ability to grow and deliver our produce in a timely manner, meet our contractual obligations and operate our business.**<br><br>\*\*\*<br><br>**Any significant or unexpected rejection of our products could negatively impact our results of operations, and we may be unable to sell the rejected products to other third parties.**<br>\*\*\*<br>**If our products** fail to gain market acceptance, are restricted by regulatory requirements or **have quality problems, we may not be able to fully recover costs and expenses incurred in our operations, and our business, financial condition or results of operations could be materially and adversely affected**. ¶229. |

| **Reasons Why Statements are False and Misleading and/or Lacked a Reasonable Basis**<br><br>Reasons: | **Facts Giving Rise to Strong Inference of Scienter**<br><br>Plaintiff incorporates the same Facts stated in **False Statement XXI. B. i**., as if fully set forth herein. |
| --- | --- |

The above speculative, contingent, and woefully incomplete statements of known risks were materially false, misleading, and/or lacked a reasonable basis when made because:

Defendants speculate that "significant or unexpected rejection of AppHarvest's products" could "negatively impact" results when AppHarvest was already experiencing massive customer rejections from Mastronardi because of poor quality that eroded sales and inflated costs, and Defendants speculate further that the Company may not be able to resell rejected products to "other third parties" when AppHarvest was not doing so, but rather was selling "substantially all" of its products to Mastronardi and donating or composting the rejections.

Defendants make boilerplate speculation that vague "developments" or periods of "reduced production at the Morehead facility" could disrupt AppHarvest's ability to "meet our contractual obligations and operate our business" when the Company's operations were already deteriorating because of the Company's inability to produce USDA Grade No. 1 tomatoes.

Defendants speculate that "quality problems" could "materially and adversely" affect AppHarvest's "business, financial condition or results of operations" when they were already doing so.

Evidence:

Plaintiff incorporates the same Evidence stated in **False Statement XXI. B. i.**, as if fully set forth herein.

**False Statement XXI. B. iii.**

| |
|---|
| **Statement Category:**<br>Speculative, Contingent, and Incomplete Risk Factors Relating to Labor Availability, Recruitment, and Retention |
| **Speaker(s); Date; & Medium**<br>All Defendants; June 4, 2021; Post-Effective Amendment No. 1 to Form S-1 Registration Statement, signed by Defendants Webb, Eggleton, and Lee, filed with the SEC, and on the Investor Relations section of AppHarvest's website |
| **False and Misleading Statements or Omissions**<br><br>*We depend on employing a skilled local labor force, and* **failure to attract and retain qualified employees could negatively impact our business, results of operations and financial condition.**<br><br>…even **if we are able to identify, hire and train our labor force, there is no guarantee that we will be able to retain these employees. Any shortage of labor or lack of regular availability could restrict our ability to operate our greenhouses profitably, or at all.**<br>\*\*\*<br>**The COVID-19 pandemic could negatively impact on our business, results of operations and financial condition.***[…]*<br><br>…**Although we have not experienced material financial impacts due to the pandemic**, the fluid nature of the COVID-19 pandemic and uncertainties regarding the related economic impact are likely to result in sustained market turmoil, which *could* also negatively impact our business, financial condition and cash flows. Although our business is considered an "essential business," **the COVID-19 pandemic could result in labor shortages, which could result in our inability to plant and harvest crops at full capacity and could result in spoilage or loss of unharvested crops.…The extent of COVID-19's effect on our operational and financial performance will depend on future developments**, including the duration, spread and intensity of the pandemic and the effectiveness of vaccines against COVID-19 and variants thereof, all of which are uncertain and difficult to predict considering the rapidly evolving landscape. **As a result, it is not currently possible to ascertain the overall impact of COVID-19 on our business. However, if the pandemic continues to persist as a severe worldwide health crisis, the disease could negatively impact our business, financial condition results of operations and cash flows, and may also have the effect of heightening many of the other risks described in this "Risk Factors" section**. ¶229. |

| **Reasons Why Statements are False and Misleading and/or Lacked a Reasonable Basis** | **Facts Giving Rise to Strong Inference of Scienter** |
|---|---|
| | |

165

| Reasons:<br><br>The above speculative, contingent, and woefully incomplete statements of known risks were materially false, misleading, and/or lacked a reasonable basis when made because:<br><br>Defendants speculate that "failure to attract and retain qualified employees could negatively impact" AppHarvest's business when the Company was already suffering massive attrition, and Defendants misrepresent that a potential "shortage of labor or lack of regular availability" or the Company's potential inability to "train its labor force" and "retain" employees could potentially affect AppHarvest, including its "ability to operate its greenhouses profitably," when, in reality, those situations had already transpired.<br><br>Defendants falsely misrepresent AppHarvest "has not experienced material financial impacts due to the pandemic" and speculate that the COVID-19 pandemic, due to contingent and vague "future developments," *could* negatively impact AppHarvest's "business, results of operations and financial condition" and "cash flows," *could* "result in labor shortages," *could* cause an "inability to plant and harvest crops at full capacity," and *could* "result in spoilage or loss of unharvested crops" when all of those things were already happening because COVID-19 had caused AppHarvest to operate severely understaffed during the first growing and harvesting season because employees were quarantining.<br><br>Evidence:<br><br>Plaintiff incorporates the same Evidence stated in **False Statement XXI. B. i**., as if fully set forth herein. | Plaintiff incorporates the same Facts stated in **False Statement XXI. B. i.**, as if fully set forth herein. |
|---|---|

**False Statement XXI. C.**

<table>
<tr><td colspan="2">

**Statement Category:**
Material Omissions Regarding Net Sales and Violations of Item 303

</td></tr>
<tr><td colspan="2">

**Speaker(s); Date; & Medium**
All Defendants; June 4, 2021; Post-Effective Amendment No. 1 to Form S-1 Registration Statement, signed by Defendants Webb, Eggleton, and Lee, filed with the SEC, and on the Investor Relations section of AppHarvest's website

</td></tr>
<tr><td colspan="2">

**False and Misleading Statements or Omissions**

The June 4 Form S-1's "Results of Operations" section gave a false and misleading presentation of AppHarvest's net sales when making its "Comparison of the Three Months Ended March 31, 2021 and 2020." The June 4 Form S-1 stated in pertinent part:

**The following sections discuss and analyze the changes in the significant line items in our unaudited condensed consolidated statements of operations for the comparison periods identified**.

*Net Sales*

**Net sales for the three months ended March 31, 2021 were $2.3 million compared to $0 for the comparable prior year period, due to initial tomato sales produced at our Morehead CEA facility**. ¶231.

</td></tr>
<tr><td>

**Reasons Why Statements are False and Misleading, and/or Lacked a Reasonable Basis**

The above statements were materially misleading when made because Defendants discussed the "changes" in net sales while failing to state, so as not to mislead, known changes affecting net sales with respect to AppHarvest's operations. Indeed, Defendants admitted in the 2Q Form 10-Q that for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade

</td><td>

**Facts Giving Rise to Strong Inference of Scienter**

- CW6 met with Defendants Eggleton and Lee weekly concerning the baseline forecast, and upside and downside scenarios. ¶264. These weekly Forecast Meetings got "quite operational" and focused on various productivity metrics, with a key focus on yield and quality which was the basis for AppHarvest's revenue. *Id.* Throughout the first half of 2021, Lee and Eggleton also discussed that attrition and retention metrics that were "far worse than expected" and falling short "week over week." ¶111. During the "toughest times," (end of Q1 through the "summer refresh" at the end of the Class Period) discussions at Forecast Meetings concerned: "ways to

</td></tr>
</table>

167

production yields, including the impact of higher related distribution and shipping fees." Thus, Defendants' failure to disclose this information in the June 4, 2021 S-1 Amendment was misleading or lacked a reasonable basis. Additionally, Defendants' material omission violated Item 303 of SEC Regulation S-K which obligated them to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales…from continuing operations." ¶232.

close the gap" between AppHarvest's underperformance compared to the current forecast; the expected time needed for the closing the gap depending on the various scenarios; and the Company's issues with employee training, turnover, poor work ethic, and inconsistent hiring standards which were "repeatedly cited" as the "root cause" of the overall production challenges. ¶264.

- Labor productivity was identified as a challenge for AppHarvest in 2020, and during the "toughest times," (end of Q1 through the "summer refresh" at the end of the Class Period) Defendants instituted Leadership Meetings twice a week, which included Lee, Eggleton, CW6 and other FP&A personnel, Marcella Butler, and Julie Nelson. ¶268. Labor productivity metrics included yield, quality, rejections from Mastronardi, attrition and employee absences, and productivity metrics for the various Greenhouse workers' particular functions. *Id.* According to CW6, inadequate training, turnover, poor work ethic and inconsistent hiring standards were "repeatedly cited" as the "root cause" of the Company's productivity challenges at these Leadership Meetings. CW6 recalled the Leadership Meetings occurred usually mid-week and end-of-week so that Defendants could "keep an eye on it." *Id.*

- CW6 confirmed AppHarvest's executive management had information parity, such that "everyone knew what everyone else knew" regarding fundamental financial data. ¶129.

- CW6 confirmed that at the end of each month, results concerning pricing, labor productivity (including yield and quality), construction costs, tomato grades, and other factors would be "pulled into" FP&A models and adjustments would be made to the Company's forecasts. ¶265. CW6 and Defendant Eggleton met for "many hours" each day

<table>
<tr><td></td><td>

discussing these near-, medium-, and long-term financial forecasts. *Id.*

- CW6 confirmed that AppHarvest productivity forecasts were sent to Mastronardi on a weekly, and possibly daily basis. ¶266. According to CW6, these forecasts included estimates of labor productivity to determine the volumes of beefsteak and Tomatoes on the Vine that would be harvested in the given period. *Id.*

- Mastronardi provided Defendants with daily updates, regular audits, and negative feedback in response to subpar quality throughout the Class Period.  ¶¶60, 67, 275. Mastronardi increased the frequency of its audits on the AppHarvest tomatoes during periods of "weaker" performance by AppHarvest, which resulted in Mastronardi rejecting a lot of tomatoes. ¶275. During the "toughest" periods of rejected tomatoes (the end of Q1 2021 through the "summer refresh"), it was necessary for AppHarvest to lower estimated production forecasts, a process that involved CW6, Eggleton and Lee, which were exchanged with Mastronardi in a shared "portal."  *Id.*

- As confirmed by CW3, CW6, and the Mastronardi Morehead Agreement Defendants Eggleton and Lee were intimately involved in various forecasting processes—forecasts which included sales, quality, costs, yield, price, estimated rejections, and estimated damaged tomatoes. ¶263.

- CW3 confirmed that AppHarvest's forecasts existed prior to the commencement of the first growing season and that Defendant Eggleton approved the forecasts. ¶263. CW3 further explained AppHarvest had planning software, Microsoft Dynamics, which tracked operational results and actual costs, and the Individual Defendants had access to this

</td></tr>
</table>

software. *Id.* CWs 3 and 6 stated that AppHarvest used such real time production data to create and track against AppHarvest's forecasts. ¶¶121, 130, 263.

- CW6 confirmed AppHarvest had real-time access to quality and yield data from the Packhouse based on the types of boxes being shipped (Grade 1 versus Grade 2). ¶267. Further, CW 1 and CW4 stated that AppHarvest had real-time access to productivity metrics from the Greenhouse that were recorded by scanners when workers finished working on a particular row and uploaded to the Company's electronic files. ¶120. CW4 confirmed that such real-time data included information from quality inspectors who recorded their results into a "live" excel spreadsheet so that AppHarvest could "map" quality performance. ¶85.

- Defendant Webb frequently visited the Morehead Facility prior to and throughout the Class Period where he filmed at least 16 interviews, gave tours, and visited operations, and would have, and did, see the Company's dysfunctional production facilities and widespread attrition and churn. ¶289. Indeed, Webb admitted he was at the facility "every morning" and that he was "in the facility, you know, elbow tapping everyone as they come in." ¶287. Webb further admitted that he loves to "sleep on the farms" and "going to our operations." ¶288.

- Webb or his office instructed CW5's team to "hide the waste" when investors and news media visited so that the Greenhouse had "better eye appeal." ¶¶83-84, 291.

- On April 12, 2021, the Board stripped Marcella Butler of her role as an executive officer and transitioned her from Chief Operating Officer to Chief People Officer (a position she had been promoted out of only four months prior). ¶279. Butler

170

reported directly to Defendant Webb, who with Defendant Lee were a member of the Board. ¶277. Defendants Webb and Lee admitted during the Q2 Earnings Call that Butler's demotion was a result of operational failures. ¶280. Further, CW6, who was "very familiar" with Ms. Butler, confirmed that Ms. Butler's transition back to Chief People Officer and eventual separation from the Company were due to labor issues, including productivity, attrition, and churn. ¶279.

- Events such as Ms. Butler's demotion informed Board members (like Webb and Lee) that the extent of the Company's productivity issues were highly material—so much so that Board member Jeffrey Ubben cashed out 3 million shares, or roughly 25% of his holdings, for $49.5 million in proceeds, before the truth was disclosed. ¶¶310-311

- Defendants Lee's and Eggleton's veiled admissions on the Q1 2021 earnings call. Lee stated that in the future there would be a "summer refresh," "Morehead 2.0," and "new training" to support increased productivity, and such training would be merely additive to AppHarvest's supposed current "momentum" providing incremental "higher productivity." ¶¶133, 135. Eggleton acknowledged "training" issues and "demands" on the "labor force" affected "productivity" and drove gross loss, but blamed the second half of the Morehead Facility coming online pursuant to a "phased launch." ¶134. Defendants' veiled admissions evidence that they knew undisclosed detail concerning the underlying issues, such as: significant waste and productivity issues, understaffing and churn at the Morehead Facility, and the resulting effects on the Company's operations, product quality, sales, revenue, and costs. ¶133-35.

- Defendants' admissions that "labor and productivity challenges associated with the training and development of

171

the new workforce at the Morehead, Kentucky facility" existed for the entire "***six months*** ended June 30, 2021," which caused "lower net sales due to lower overall No. 1-grade production yields" as well as "higher related distribution and shipping fees." ¶297.

- Defendants' admissions that "executional challenges" spanned the entire Class Period because as they were "very real in our first major full season of harvest as a company" and the harvest season began in January 2021; and challenges lasted entire "initial growing season" and "first growing season" which began in October 2020. ¶298.

- Throughout the Class Period the Morehead Facility was the site of the Company's sole production operations and core business. ¶286.

- Defendants frequently spoke in detail regarding staffing, labor, and operations, tomato production, pricing, yield, and other key metrics every quarter and intermittently in various media interviews, which adds a strong inference of scienter. ¶¶72-75, 304-308.

- AppHarvest was entirely reliant on its sole distributor Mastronardi, which required top-quality Grade 1 tomatoes. ¶270. In fact, AppHarvest filed at least 18 documents with the SEC, including documents signed by the Individual Defendants, stating the Company was "highly dependent" on Mastronardi, and Webb signed and initialed every page of the Mastronardi Morehead Agreement which required Mastronardi to accept all USDA Grade 1 tomatoes and saddled AppHarvest with all of the risk and costs of non-Grade 1 tomatoes, which Defendants knew would be rejected by Mastronardi and had "very little to no value." ¶¶271, 270.

172

**False Statement XXII. A.**

| **Statement Category:**<br>Misstatements Regarding Labor Availability, Recruitment, and Retention |
|---|
| **Speaker(s); Date; & Medium**<br>All Defendants; June 9, 2021; Rule 424(b)(3) Prospectus filed with the SEC and on the Investor Relations section of AppHarvest's website |
| **False and Misleading Statements or Omissions**<br><br>A subsection of the June 9 Prospectus titled "**Our Solution**" (emphasis in original), **"We believe there is a large population of workers in the Central Appalachian region who are eager to find long-term career opportunities like those being offered by AppHarvest**…**As a result, we believe we can staff and retain our workers with less churn**, immigration challenges **and unfilled positions** that many of our competitors face."<br><br>Relatedly, a subsection of the June 9 Prospectus titled "**Our Strengths**[,]" falsely and/or misleadingly stated in pertinent part: "**We were able to efficiently hire many employees as we opened our first facility in Morehead** and have identified talent to join our team at the facilities we are developing in Richmond and Berea." ¶¶234-235. |

| **Reasons Why Statements are False and Misleading, and/or Lacked a Reasonable Basis** | **Facts Giving Rise to Strong Inference of Scienter** |
|---|---|
| The above statements were materially false, misleading, and/or lacked a reasonable basis when made because: (a) Defendants' statements that prospective employees were seeking "long-term" employment, and that AppHarvest was able to "staff and retain" workers with "less churn" and less "unfilled positions," and that AppHarvest was able to "efficiently hire many employees" as it opened the Morehead Facility were not supported by, and/or concealed, known facts that directly contradicted those statements which left AppHarvest's workforce short-staffed, unproductive, and insufficiently trained; and (b) the statements misrepresented AppHarvest's frequent hiring as a "Strength" rather than what it was—a known consequence, born out of necessity, of the | • CW6 met with Defendants Eggleton and Lee weekly concerning the baseline forecast, and upside and downside scenarios. ¶264. These weekly Forecast Meetings got "quite operational" and focused on various productivity metrics, with a key focus on yield and quality which was the basis for AppHarvest's revenue. *Id.* Throughout the first half of 2021, Lee and Eggleton also discussed that attrition and retention metrics that were "far worse than expected" and falling short "week over week." ¶111. During the "toughest times," (end of Q1 through the "summer refresh" at the end of the Class Period) discussions at Forecast Meetings concerned: "ways to close the gap" between AppHarvest's underperformance compared to the current forecast; the expected time needed for |

significant amount of concealed employee attrition, turnover, and churn that AppHarvest had experienced.

Furthermore, the above statements were materially false, misleading, and/or lacked a reasonable basis when made in light of the circumstances. As of March 2, 2021, AppHarvest was staffing its first, massive CEA facility and the Morehead Facility's productivity would depend, in part, on Defendants' ability to "efficiently hire" and "retain" staff to minimize "churn" and "unfilled positions"—as evidenced by Defendants' frequent updates and assurances to market participants regarding the Company's hiring efforts (¶¶69-74). It was misleading for Defendants to make the above statements, and thereby paint AppHarvest's hiring in an undeservedly rosy light, without also disclosing adverse circumstances. ¶237.

The material falsity of the above statements is supported by ample evidence given that:

(i)      as Defendants would later admit, for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, AppHarvest was "adversely impacted" by "labor" challenges which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)      as Defendants would later admit, for the "*six months*" ended June 30, 2021, *i.e.*, beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

(iii)      Defendants' numerous statements in the August 11, 2021 corrective disclosures admitting "labor" and employee "training" issues existed in 2Q 2021, including Webb's statement on the 2021 Q2 Earnings Call admitting

the closing the gap depending on the various scenarios; and the Company's issues with employee training, turnover, poor work ethic, and inconsistent hiring standards which were "repeatedly cited" as the "root cause" of the overall production challenges. ¶264.

- Labor productivity was identified as a challenge for AppHarvest in 2020, and during the "toughest times," (end of Q1 through the "summer refresh" at the end of the Class Period) Defendants instituted Leadership Meetings twice a week, which included Lee, Eggleton, CW6 and other FP&A personnel, Marcella Butler, and Julie Nelson. ¶268. Labor productivity metrics included yield, quality, rejections from Mastronardi, attrition and employee absences, and productivity metrics for the various Greenhouse workers' particular functions. *Id.* According to CW6, inadequate training, turnover, poor work ethic and inconsistent hiring standards were "repeatedly cited" as the "root cause" of the Company's productivity challenges at these Leadership Meetings. CW6 recalled the Leadership Meetings occurred usually mid-week and end-of-week so that Defendants could "keep an eye on it." *Id.*

- CW6 confirmed that at the end of each month, results concerning pricing, labor productivity (including yield and quality), construction costs, tomato grades, and other factors would be "pulled into" FP&A models and adjustments would be made to the Company's forecasts. ¶265. CW6 and Defendant Eggleton met for "many hours" each day discussing these near-, medium-, and long-term financial forecasts. *Id.*

- CW6 confirmed that AppHarvest productivity forecasts were sent to Mastronardi on a weekly, and possibly daily basis. ¶266. According to CW6, these forecasts included estimates

AppHarvest's problems were "as simple as training. I don't want to be more blunt than that, but it was training and management protocols";

(iv) CW6 explained that during the Class Period, AppHarvest's attrition and retention metrics in the first half of 2021 were far worse than expected because AppHarvest was clearly falling short week over week. Indeed, according to CW1 and CW2, throughout the Class Period AppHarvest suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including:

a.      dissatisfaction with mandatory expanded working hours—including forced overtime, Saturdays, and holidays, and

b.      infection and quarantining due to the COVID-19 pandemic,

all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes.

CW4 likewise stated that there was significant turnover throughout CW4's tenure at AppHarvest, with the west side of the Greenhouse losing at least 10 personnel every week. CW4 stated that the turnover resulted in less trained staff and thereby lower yields because there were fewer Crop Care Specialists to do the work.

of labor productivity to determine the volumes of beefsteak and Tomatoes on the Vine that would be harvested in the given period. *Id.*

• Defendant Webb frequently visited the Morehead Facility prior to and throughout the Class Period where he filmed at least 16 interviews, gave tours, and visited operations, and would have, and did, see the Company's dysfunctional production facilities and widespread attrition and churn. ¶289. Indeed, Webb admitted he was at the facility "every morning" and that he was "in the facility, you know, elbow tapping everyone as they come in." ¶287. Webb further admitted that he loves to "sleep on the farms" and "going to our operations." ¶288.

• Defendants' admissions that "labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility" existed for the entire "*six months* ended June 30, 2021," which caused "lower net sales due to lower overall No. 1-grade production yields" as well as "higher related distribution and shipping fees." ¶297.

• Defendants' admissions that "executional challenges" spanned the entire Class Period because as they were "very real in our first major full season of harvest as a company" and the harvest season began in January 2021; and challenges lasted entire "initial growing season" and "first growing season" which began in October 2020. ¶298.

• Throughout the Class Period the Morehead Facility was the site of the Company's sole production operations and core business. ¶286.

175

| | |
|---|---|
| CW5 confirmed that employee turnover and churn had been consistently high throughout October 2020 and June 2021, causing concern amongst Greenhouse personnel that AppHarvest had inadequate labor to meet production requirements as was discussed at the morning stand-up meetings CW5 attended.<br><br>(v)  As was confirmed in Defendants' post Class Period 10-Q disclosures for Q3 2021, CW5 stated that due to the pervasive staffing issues described above, regional labor was insufficient and AppHarvest had to bring in contract labor to help during times of poor attendance.  ¶236. | • Defendants frequently spoke in detail regarding staffing, labor, and operations, tomato production, pricing, yield, and other key metrics every quarter and intermittently in various media interviews, which adds a strong inference of scienter. ¶¶72-75, 304-308. |

176

**False Statement XXII. B. i.**

| **Statement Category:** |
| --- |
| Speculative, Contingent, and Incomplete Risk Factors Relating to Growth and Price Performance |

| **Speaker(s);  Date; & Medium** |
| --- |
| All Defendants; June 9, 2021; Rule 424(b)(3) Prospectus filed with the SEC and on the Investor Relations section of AppHarvest's website |

| **False and Misleading Statements or Omissions**<br><br>**Risks Related to Our Business and Industry**<br><br>**…Even if [AppHarvest's] investments do result in the growth of our business, if we do not effectively manage our growth, we may not be able to execute on our business plan and vision, respond to competitive pressures, take advantage of market opportunities, satisfy customer requirements or maintain high-quality product offerings, any of which could adversely affect our business, financial condition and results of operations.**<br><br>\*\*\*<br><br>**In future periods, revenue growth** *could* **slow or revenue** *could* **decline for a number of reasons, including** slowing demand for our products, increasing competition, a decrease in the growth of the overall market, or **our failure, for any reason, to take advantage of growth opportunities. If our assumptions regarding these risks and uncertainties and future revenue growth are incorrect or change, or if we do not address these risks successfully, our operating and financial results could differ materially from our expectations, and our business could suffer.** ¶238. |
| --- |

| **Reasons Why Statements are False and Misleading and/or Lacked a Reasonable Basis** | **Facts Giving Rise to Strong Inference of Scienter** |
| --- | --- |
| Reasons:<br><br>The above speculative, contingent, and woefully incomplete statements were materially false, misleading, and/or lacked a reasonable basis when made because: | • CW6 met with Defendants Eggleton and Lee weekly concerning the baseline forecast, and upside and downside scenarios. ¶264. These weekly Forecast Meetings got "quite operational" and focused on various productivity metrics, with a key focus on yield and quality which was the basis for AppHarvest's revenue. *Id.*  Throughout the first half of 2021, Lee and Eggleton also discussed that attrition and retention metrics that were "far worse than expected" and falling short |

177

Defendants speculatively portrayed AppHarvest's ability to "effectively manage its growth," "execute on its business plan," and "satisfy customer requirements or maintain high quality product" offerings as contingent or potential when AppHarvest was already failing to do all of these things resulting in lower saleable yield and quality products, and higher customer rejections and costs.

Defendants made a boilerplate and vague disclaimers that "revenue growth could slow or revenue could decline for a number of reasons" and that if AppHarvest fails to "take advantage of growth opportunities" "for any reason" it might see declining revenue, when Defendants were already experiencing wide-ranging execution problems for the entire first harvesting season that were doing exactly that.

<u>Evidence</u>

The above Reasons are supported by ample evidence, given that:

(i)    Defendants admitted that for the "***six months***" ended June 30, 2021, *i.e.*, beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees";

(ii)    Defendants admitted that for the "***six months***" ended June 30, 2021, *i.e.*, beginning in January 2021, that "investments in our workforce[,]" and "production processes" caused by operational disruptions resulted in higher costs of goods sold;

"week over week." ¶111. During the "toughest times," (end of Q1 through the "summer refresh" at the end of the Class Period) discussions at Forecast Meetings concerned: "ways to close the gap" between AppHarvest's underperformance compared to the current forecast; the expected time needed for the closing the gap depending on the various scenarios; and the Company's issues with employee training, turnover, poor work ethic, and inconsistent hiring standards which were "repeatedly cited" as the "root cause" of the overall production challenges. ¶264.

- Labor productivity was identified as a challenge for AppHarvest in 2020, and during the "toughest times," (end of Q1 through the "summer refresh" at the end of the Class Period) Defendants instituted Leadership Meetings twice a week, which included Lee, Eggleton, CW6 and other FP&A personnel, Marcella Butler, and Julie Nelson. ¶268. Labor productivity metrics included yield, quality, rejections from Mastronardi, attrition and employee absences, and productivity metrics for the various Greenhouse workers' particular functions. *Id.* According to CW6, inadequate training, turnover, poor work ethic and inconsistent hiring standards were "repeatedly cited" as the "root cause" of the Company's productivity challenges at these Leadership Meetings. CW6 recalled the Leadership Meetings occurred usually mid-week and end-of-week so that Defendants could "keep an eye on it." *Id.*

- CW6 confirmed AppHarvest's executive management had information parity, such that "everyone knew what everyone else knew" regarding fundamental financial data. ¶129.

- CW6 confirmed that at the end of each month, results concerning pricing, labor productivity (including yield and quality), construction costs, tomato grades, and other factors

178

(iii)   Defendants' numerous statements in the August 11, 2021 corrective disclosures admitting "labor" and employee "training" issues existed in 2Q 2021, including Webb's statement on the 2021 Q2 Earnings Call admitting AppHarvest's problems were "as simple as training. I don't want to be more blunt than that, but it was training and management protocols";

(iv)   Defendants Lee's and Eggleton's veiled admissions on the Q1 2021 Earnings Call that "training" issues existed in the first quarter of 2021 that were hampering "productivity" and driving gross loss;

(v)   Defendants' admissions in the 2021 Q2 Earnings Release, the Q2 2021 Earnings Presentation, and the 2021 Q2 Earnings Call that "operational" and "executional" challenges—including lower quality production and saleable yield, and higher distribution and shipping expense incurred as a result of rejections—existed for the "initial growing season" and the "full season of harvest as a Company";

(vi)   according to CW1 and CW4, AppHarvest did not offer employees adequate (if any) training throughout the Class Period. According to CW1, AppHarvest's inadequately trained workforce contributed to 5-10% of crops being wasted or damaged during CW1's tenure, which resulted in lost sales. According to CW5, up to 50% of AppHarvest's crop was wasted in the first growing season caused by workers in the Greenhouse and Packhouse. Further, CW4 confirmed that tomatoes were wasted "daily" during harvesting season;

(vii)   CW6 explained that during the Class Period, AppHarvest's attrition and retention metrics in the first

would be "pulled into" FP&A models and adjustments would be made to the Company's forecasts. ¶265. CW6 and Defendant Eggleton met for "many hours" each day discussing these near-, medium-, and long-term financial forecasts. *Id.*

- CW6 confirmed that AppHarvest productivity forecasts were sent to Mastronardi on a weekly, and possibly daily basis. ¶266. According to CW6, these forecasts included estimates of labor productivity to determine the volumes of beefsteak and Tomatoes on the Vine that would be harvested in the given period. *Id.*

-

- Mastronardi provided Defendants with daily updates, regular audits, and negative feedback in response to subpar quality throughout the Class Period. ¶¶60, 67, 275. Mastronardi increased the frequency of its audits on the AppHarvest tomatoes during periods of "weaker" performance by AppHarvest, which resulted in Mastronardi rejecting a lot of tomatoes. ¶275. During the "toughest" periods of rejected tomatoes (the end of Q1 2021 through the "summer refresh"), it was necessary for AppHarvest to lower estimated production forecasts, a process that involved CW6, Eggleton and Lee, which were exchanged with Mastronardi in a shared "portal." *Id.*

- As confirmed by CW3, CW6, and the Mastronardi Morehead Agreement Defendants Eggleton and Lee were intimately involved in various forecasting processes—forecasts which included sales, quality, costs, yield, price, estimated rejections, and estimated damaged tomatoes. ¶263.

- CW3 confirmed that AppHarvest's forecasts existed prior to the commencement of the first growing season and that

half of 2021 were far worse than expected because AppHarvest was clearly falling short week over week. Indeed, according to CW1 and CW2, throughout the Class Period, AppHarvest suffered significant attrition (which CW1 estimated was two to three employees resigning every week), churn (according to CW2 "50% to 60%" of the Morehead Facility's staff would leave after their first month), and understaffing because of undisclosed reasons, including:

a.  dissatisfaction with mandatory expanded working hours—including forced overtime, Saturdays, and holidays, and

b.  infection and quarantining due to the COVID-19 pandemic,

all of which caused an understaffed and inexperienced workforce that wasted, damaged, and produced low quality tomatoes.

CW4 likewise stated that there was significant turnover throughout CW4's tenure at AppHarvest, with the west side of the Greenhouse losing at least 10 personnel every week. CW4 stated that the turnover resulted in less trained staff and thereby lower yields because there were fewer Crop Care Specialists to do the work.

CW5 confirmed that employee turnover and churn had been consistently high throughout October 2020 and June 2021, causing concern amongst Greenhouse personnel that AppHarvest had inadequate labor to meet production requirements as was discussed at the morning stand-up meetings CW5 attended;

Defendant Eggleton approved the forecasts. ¶263. CW3 further explained AppHarvest had planning software, Microsoft Dynamics, which tracked operational results and actual costs, and the Individual Defendants had access to this software. *Id.* CWs 3 and 6 stated that AppHarvest used such real time production data to create and track against AppHarvest's forecasts. ¶¶121, 130, 263.

- CW6 confirmed AppHarvest had real-time access to quality and yield data from the Packhouse based on the types of boxes being shipped (Grade 1 versus Grade 2). ¶267. Further, CW 1 and CW4 stated that AppHarvest had real-time access to productivity metrics from the Greenhouse that were recorded by scanners when workers finished working on a particular row and uploaded to the Company's electronic files. ¶120. CW4 confirmed that such real-time data included information from quality inspectors who recorded their results into a "live" excel spreadsheet so that AppHarvest could "map" quality performance. ¶85.

- Defendant Webb frequently visited the Morehead Facility prior to and throughout the Class Period where he filmed at least 16 interviews, gave tours, and visited operations, and would have, and did, see the Company's dysfunctional production facilities and widespread attrition and churn. ¶289. Indeed, Webb admitted he was at the facility "every morning" and that he was "in the facility, you know, elbow tapping everyone as they come in." ¶287. Webb further admitted that he loves to "sleep on the farms" and "going to our operations." ¶288.

- Webb or his office instructed CW5's team to "hide the waste" when investors and news media visited so that the Greenhouse had "better eye appeal." ¶¶83-84, 291.

180

| | |
|---|---|
| (viii) according to CW1, CW2, and CW4, throughout the Class Period, AppHarvest's own incentive piece rate structure incentivized disruptive and inefficient workmanship that wasted, damaged, and produced low quality tomatoes;<br><br>(ix) CW6 stated that Mastronardi informed AppHarvest that it needed to tighten up specifications because Mastronardi was having to reject a lot of fruit throughout the Class Period—upwards of 30% to 35% during the Company's "toughest times," which was "many times" more than AppHarvest's target which CW6 believed was 6% or 7%;<br><br>(x) according to CW2, "half" of all tomatoes inspected were USDA Grade No. 2 or not commercially saleable, and CW6 confirmed that AppHarvest was a "long way off" its quality goals;<br><br>(xi) CW6 stated that in the "toughest times" of the first growing season AppHarvest was well below 50% in relation to the Company's productivity standards for specific Greenhouse jobs. ¶239. | • On April 12, 2021, the Board stripped Marcella Butler of her role as an executive officer and transitioned her from Chief Operating Officer to Chief People Officer (a position she had been promoted out of only four months prior). ¶279. Butler reported directly to Defendant Webb, who with Defendant Lee were a member of the Board. ¶277. Defendants Webb and Lee admitted during the Q2 Earnings Call that Butler's demotion was a result of operational failures. ¶280. Further, CW6, who was "very familiar" with Ms. Butler, confirmed that Ms. Butler's transition back to Chief People Officer and eventual separation from the Company were due to labor issues, including productivity, attrition, and churn. ¶279.<br><br>• Events such as Ms. Butler's demotion informed Board members (like Webb and Lee) that the extent of the Company's productivity issues were highly material—so much so that Board member Jeffrey Ubben cashed out 3 million shares, or roughly 25% of his holdings, for $49.5 million in proceeds, before the truth was disclosed. ¶¶310-311<br><br>• Defendants Lee's and Eggleton's veiled admissions on the Q1 2021 earnings call. Lee stated that in the future there would be a "summer refresh," "Morehead 2.0," and "new training" to support increased productivity, and such training would be merely additive to AppHarvest's supposed current "momentum" providing incremental "higher productivity." ¶¶133, 135. Eggleton acknowledged "training" issues and "demands" on the "labor force" affected "productivity" and drove gross loss, but blamed the second half of the Morehead Facility coming online pursuant to a "phased launch." ¶134. Defendants' veiled admissions evidence that they knew undisclosed detail concerning the underlying issues, such as: significant waste and productivity issues, understaffing and churn at the Morehead Facility, and the resulting effects on |

|  | the Company's operations, product quality, sales, revenue, and costs. ¶133-35. |
|---|---|
|  | • Defendants' admissions that "labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility" existed for the entire "*six months* ended June 30, 2021," which caused "lower net sales due to lower overall No. 1-grade production yields" as well as "higher related distribution and shipping fees." ¶297. |
|  | • Defendants' admissions that "executional challenges" spanned the entire Class Period because as they were "very real in our first major full season of harvest as a company" and the harvest season began in January 2021; and challenges lasted entire "initial growing season" and "first growing season" which began in October 2020. ¶298. |
|  | • Throughout the Class Period the Morehead Facility was the site of the Company's sole production operations and core business. ¶286. |
|  | • Defendants frequently spoke in detail regarding staffing, labor, and operations, tomato production, pricing, yield, and other key metrics every quarter and intermittently in various media interviews, which adds a strong inference of scienter. ¶¶72-75, 304-308. |
|  | • AppHarvest was entirely reliant on its sole distributor Mastronardi, which required top-quality Grade 1 tomatoes. ¶270. In fact, AppHarvest filed at least 18 documents with the SEC, including documents signed by the Individual Defendants, stating the Company was "highly dependent" on Mastronardi, and Webb signed and initialed every page of the Mastronardi Morehead Agreement which required |

| | |
|---|---|
| | Mastronardi to accept all USDA Grade 1 tomatoes and saddled AppHarvest with all of the risk and costs of non-Grade 1 tomatoes, which Defendants knew would be rejected by Mastronardi and had "very little to no value." ¶¶271, 270. |

**False Statement XXII. B. ii.**

| **Statement Category:** |
| --- |
| Speculative, Contingent, and Incomplete Risk Factors Concerning Quality, Production, and Supply |

| **Speaker(s), Date, & Medium** |
| --- |
| All Defendants; June 9, 2021; Rule 424(b)(3) Prospectus filed with the SEC and on the Investor Relations section of AppHarvest's website |

| **False and Misleading Statements or Omissions** |
| --- |
| *We currently rely on a single facility for all of our operations.*<br><br>…**Adverse changes or developments affecting the Morehead facility could impair our ability to produce our products and our business, prospects, financial condition and results of operations. Any shutdown or period of reduced production at the Morehead facility**, which may be caused by regulatory noncompliance or other issues, as well as other factors beyond our control, such as severe weather conditions, natural disaster, fire, power interruption, work stoppage, disease outbreaks or pandemics (such as COVID-19), equipment failure or delay in supply delivery, **would significantly disrupt our ability to grow and deliver our produce in a timely manner, meet our contractual obligations and operate our business**.<br><br>***<br><br>**Any significant or unexpected rejection of our products could negatively impact our results of operations, and we may be unable to sell the rejected products to other third parties**.<br>***<br>*If* **our products** fail to gain market acceptance, are restricted by regulatory requirements or **have quality problems, we may not be able to fully recover costs and expenses incurred in our operations, and our business, financial condition or results of operations could be materially and adversely affected**.  ¶238. |

| **Reasons Why Statements are False and Misleading** | **Facts Giving Rise to Strong Inference of Scienter** |
| --- | --- |
| Reasons:<br><br>The above speculative, contingent, and woefully incomplete statements of known risks were materially false, misleading, and/or lacked a reasonable basis when made because: | Plaintiff incorporates the same Facts stated in **False Statement XXII. B. i.**, as if fully set forth herein. |

184

Defendants speculate that "significant or unexpected rejection of AppHarvest's products" could "negatively impact" results when AppHarvest was already experiencing massive customer rejections from Mastronardi because of poor quality that eroded sales and inflated costs, and Defendants speculate further that the Company may not be able to resell rejected products to "other third parties" when AppHarvest was not doing so, but rather was selling "substantially all" of its products to Mastronardi and donating or composting the rejections.

Defendants make boilerplate speculation that vague "developments" or periods of "reduced production at the Morehead facility" could disrupt AppHarvest's ability to "meet our contractual obligations and operate our business" when the Company's operations were already deteriorating because of the Company's inability to produce USDA Grade No. 1 tomatoes.

Defendants speculate that "quality problems" could "materially and adversely" affect AppHarvest's "business, financial condition or results of operations" when they were already doing so.

<div align="center">Evidence:</div>

Plaintiff incorporates the same Evidence stated in **False Statement XXII. B. i**., as if fully set forth herein.

<div align="center">185</div>

**False Statement XXII. B. iii.**

| |
|---|
| **Statement Category:**<br>Speculative, Contingent, and Incomplete Risk Factors Relating to Labor Availability, Recruitment, and Retention |
| **Speaker(s);  Date; & Medium**<br>All Defendants; June 9, 2021; Rule 424(b)(3) Prospectus filed with the SEC and on the Investor Relations section of AppHarvest's website |
| **False and Misleading Statements or Omissions**<br><br>*We depend on employing a skilled local labor force, and* **failure to attract and retain qualified employees could negatively impact our business, results of operations and financial condition.**<br><br>…even **if we are able to identify, hire and train our labor force, there is no guarantee that we will be able to retain these employees. Any shortage of labor or lack of regular availability could restrict our ability to operate our greenhouses profitably, or at all.**<br><br>\*\*\*<br><br>**The COVID-19 pandemic could negatively impact on our business, results of operations and financial condition.***[…]*<br><br>…**Although we have not experienced material financial impacts due to the pandemic**, the fluid nature of the COVID-19 pandemic and uncertainties regarding the related economic impact are likely to result in sustained market turmoil, which *could* also negatively impact our business, financial condition and cash flows. Although our business is considered an "essential business," **the COVID-19 pandemic could result in labor shortages, which could result in our inability to plant and harvest crops at full capacity and could result in spoilage or loss of unharvested crops.…The extent of COVID-19's effect on our operational and financial performance will depend on future developments**, including the duration, spread and intensity of the pandemic and the effectiveness of vaccines against COVID-19 and variants thereof, all of which are uncertain and difficult to predict considering the rapidly evolving landscape. **As a result, it is not currently possible to ascertain the overall impact of COVID-19 on our business. However, if the pandemic continues to persist as a severe worldwide health crisis, the disease could negatively impact our business, financial condition results of operations and cash flows, and may also have the effect of heightening many of the other risks described in this "Risk Factors" section**. ¶238. |

| **Reasons Why Statements are False and Misleading and/or Lacked a Reasonable Basis** | **Facts Giving Rise to Strong Inference of Scienter** |
|---|---|

| | |
|---|---|
| <u>Reasons:</u><br><br>The above speculative, contingent, and woefully incomplete statements of known risks were materially false, misleading, and/or lacked a reasonable basis when made because:<br><br>Defendants speculate that "failure to attract and retain qualified employees could negatively impact" AppHarvest's business when the Company was already suffering massive attrition, and Defendants misrepresent that a potential "shortage of labor or lack of regular availability" or the Company's potential inability to "train its labor force" and "retain" employees could potentially affect AppHarvest, including its "ability to operate its greenhouses profitably," when, in reality, those situations had already transpired.<br><br>Defendants falsely misrepresent AppHarvest "has not experienced material financial impacts due to the pandemic" and speculate that the COVID-19 pandemic, due to contingent and vague "future developments," *could* negatively impact AppHarvest's "business, results of operations and financial condition" and "cash flows," *could* "result in labor shortages," *could* cause an "inability to plant and harvest crops at full capacity," and *could* "result in spoilage or loss of unharvested crops" when all of those things were already happening because COVID-19 had caused AppHarvest to operate severely understaffed during the first growing and harvesting season because employees were quarantining.<br><br><u>Evidence:</u><br><br>Plaintiff incorporates the same Evidence stated in **False Statement XXII. B. i**., as if fully set forth herein. | Plaintiff incorporates the same Facts stated in **False Statement XXII. B. i**., as if fully set forth herein. |

**False Statement XXII. C.**

| |
|---|
| **Statement Category:**<br>Material Omissions Regarding Net Sales and Violations of Item 303 |
| **Speaker(s);  Date; & Medium**<br>All Defendants; June 9, 2021; Rule 424(b)(3) Prospectus filed with the SEC and on the Investor Relations section of AppHarvest's website |
| **False and Misleading Statements or Omissions**<br>The June 9 Prospectus's "Results of Operations" section gave a false and misleading presentation of AppHarvest's net sales when making its "Comparison of the Three Months Ended March 31, 2021 and 2020." The June 4 Form S-1 stated in pertinent part:<br><br>**The following sections discuss and analyze the changes in the significant line items in our unaudited condensed consolidated statements of operations for the comparison periods identified.**<br><br>*Net Sales*<br><br>**Net sales for the three months ended March 31, 2021 were \$2.3 million compared to \$0 for the comparable prior year period, due to initial tomato sales produced at our Morehead CEA facility.** ¶240. |

| **Reasons Why Statements are False and Misleading** | **Facts Giving Rise to Strong Inference of Scienter** |
|---|---|
| The above statements were materially misleading when made because Defendants discussed the "changes" in net sales while failing to state, so as not to mislead, known changes affecting net sales with respect to AppHarvest's operations. Indeed, Defendants admitted in the 2Q Form 10-Q that for the "***six months***" ended June 30, 2021, *i.e.*, beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees." Thus, Defendants' failure to | • CW6 met with Defendants Eggleton and Lee weekly concerning the baseline forecast, and upside and downside scenarios. ¶264. These weekly Forecast Meetings got "quite operational" and focused on various productivity metrics, with a key focus on yield and quality which was the basis for AppHarvest's revenue. *Id.*  Throughout the first half of 2021, Lee and Eggleton also discussed that attrition and retention metrics that were "far worse than expected" and falling short "week over week." ¶111. During the "toughest times," (end of Q1 through the "summer refresh" at the end of the Class Period) discussions at Forecast Meetings concerned: "ways to close the gap" between AppHarvest's underperformance |

disclose this information in the June 9, 2021 Prospectus was misleading or lacked a reasonable basis. Additionally, Defendants' material omission violated Item 303 of SEC Regulation S-K which obligated them to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales…from continuing operations." ¶241.

compared to the current forecast; the expected time needed for the closing the gap depending on the various scenarios; and the Company's issues with employee training, turnover, poor work ethic, and inconsistent hiring standards which were "repeatedly cited" as the "root cause" of the overall production challenges. ¶264.

- Labor productivity was identified as a challenge for AppHarvest in 2020, and during the "toughest times," (end of Q1 through the "summer refresh" at the end of the Class Period) Defendants instituted Leadership Meetings twice a week, which included Lee, Eggleton, CW6 and other FP&A personnel, Marcella Butler, and Julie Nelson. ¶268. Labor productivity metrics included yield, quality, rejections from Mastronardi, attrition and employee absences, and productivity metrics for the various Greenhouse workers' particular functions. *Id.* According to CW6, inadequate training, turnover, poor work ethic and inconsistent hiring standards were "repeatedly cited" as the "root cause" of the Company's productivity challenges at these Leadership Meetings. CW6 recalled the Leadership Meetings occurred usually mid-week and end-of-week so that Defendants could "keep an eye on it." *Id.*

- CW6 confirmed AppHarvest's executive management had information parity, such that "everyone knew what everyone else knew" regarding fundamental financial data. ¶129.

- CW6 confirmed that at the end of each month, results concerning pricing, labor productivity (including yield and quality), construction costs, tomato grades, and other factors would be "pulled into" FP&A models and adjustments would be made to the Company's forecasts. ¶265. CW6 and Defendant Eggleton met for "many hours" each day

189

discussing these near-, medium-, and long-term financial forecasts. *Id.*

- CW6 confirmed that AppHarvest productivity forecasts were sent to Mastronardi on a weekly, and possibly daily basis. ¶266. According to CW6, these forecasts included estimates of labor productivity to determine the volumes of beefsteak and Tomatoes on the Vine that would be harvested in the given period. *Id.*

- Mastronardi provided Defendants with daily updates, regular audits, and negative feedback in response to subpar quality throughout the Class Period.  ¶¶60, 67, 275. Mastronardi increased the frequency of its audits on the AppHarvest tomatoes during periods of "weaker" performance by AppHarvest, which resulted in Mastronardi rejecting a lot of tomatoes. ¶275. During the "toughest" periods of rejected tomatoes (the end of Q1 2021 through the "summer refresh"), it was necessary for AppHarvest to lower estimated production forecasts, a process that involved CW6, Eggleton and Lee, which were exchanged with Mastronardi in a shared "portal." *Id.*

- As confirmed by CW3, CW6, and the Mastronardi Morehead Agreement Defendants Eggleton and Lee were intimately involved in various forecasting processes—forecasts which included sales, quality, costs, yield, price, estimated rejections, and estimated damaged tomatoes. ¶263.

- CW3 confirmed that AppHarvest's forecasts existed prior to the commencement of the first growing season and that Defendant Eggleton approved the forecasts. ¶263. CW3 further explained AppHarvest had planning software, Microsoft Dynamics, which tracked operational results and actual costs, and the Individual Defendants had access to this

190

|  | software. *Id.* CWs 3 and 6 stated that AppHarvest used such real time production data to create and track against AppHarvest's forecasts. ¶¶121, 130, 263.<br><br>• CW6 confirmed AppHarvest had real-time access to quality and yield data from the Packhouse based on the types of boxes being shipped (Grade 1 versus Grade 2). ¶267. Further, CW 1 and CW4 stated that AppHarvest had real-time access to productivity metrics from the Greenhouse that were recorded by scanners when workers finished working on a particular row and uploaded to the Company's electronic files. ¶120. CW4 confirmed that such real-time data included information from quality inspectors who recorded their results into a "live" excel spreadsheet so that AppHarvest could "map" quality performance. ¶85.<br><br>• Defendant Webb frequently visited the Morehead Facility prior to and throughout the Class Period where he filmed at least 16 interviews, gave tours, and visited operations, and would have, and did, see the Company's dysfunctional production facilities and widespread attrition and churn. ¶289. Indeed, Webb admitted he was at the facility "every morning" and that he was "in the facility, you know, elbow tapping everyone as they come in." ¶287. Webb further admitted that he loves to "sleep on the farms" and "going to our operations." ¶288.<br><br>• Webb or his office instructed CW5's team to "hide the waste" when investors and news media visited so that the Greenhouse had "better eye appeal." ¶¶83-84, 291.<br><br>• On April 12, 2021, the Board stripped Marcella Butler of her role as an executive officer and transitioned her from Chief Operating Officer to Chief People Officer (a position she had been promoted out of only four months prior). ¶279. Butler |

reported directly to Defendant Webb, who with Defendant Lee were a member of the Board. ¶277. Defendants Webb and Lee admitted during the Q2 Earnings Call that Butler's demotion was a result of operational failures. ¶280. Further, CW6, who was "very familiar" with Ms. Butler, confirmed that Ms. Butler's transition back to Chief People Officer and eventual separation from the Company were due to labor issues, including productivity, attrition, and churn. ¶279.

- Events such as Ms. Butler's demotion informed Board members (like Webb and Lee) that the extent of the Company's productivity issues were highly material—so much so that Board member Jeffrey Ubben cashed out 3 million shares, or roughly 25% of his holdings, for $49.5 million in proceeds, before the truth was disclosed. ¶¶310-311

- Defendants Lee's and Eggleton's veiled admissions on the Q1 2021 earnings call. Lee stated that in the future there would be a "summer refresh," "Morehead 2.0," and "new training" to support increased productivity, and such training would be merely additive to AppHarvest's supposed current "momentum" providing incremental "higher productivity." ¶¶133, 135. Eggleton acknowledged "training" issues and "demands" on the "labor force" affected "productivity" and drove gross loss, but blamed the second half of the Morehead Facility coming online pursuant to a "phased launch." ¶134. Defendants' veiled admissions evidence that they knew undisclosed detail concerning the underlying issues, such as: significant waste and productivity issues, understaffing and churn at the Morehead Facility, and the resulting effects on the Company's operations, product quality, sales, revenue, and costs. ¶133-35.

- Defendants' admissions that "labor and productivity challenges associated with the training and development of

the new workforce at the Morehead, Kentucky facility" existed for the entire "***six months*** ended June 30, 2021," which caused "lower net sales due to lower overall No. 1-grade production yields" as well as "higher related distribution and shipping fees." ¶297.

- Defendants' admissions that "executional challenges" spanned the entire Class Period because as they were "very real in our first major full season of harvest as a company" and the harvest season began in January 2021; and challenges lasted entire "initial growing season" and "first growing season" which began in October 2020. ¶298.

- Throughout the Class Period the Morehead Facility was the site of the Company's sole production operations and core business. ¶286.

- Defendants frequently spoke in detail regarding staffing, labor, and operations, tomato production, pricing, yield, and other key metrics every quarter and intermittently in various media interviews, which adds a strong inference of scienter. ¶¶72-75, 304-308.

- AppHarvest was entirely reliant on its sole distributor Mastronardi, which required top-quality Grade 1 tomatoes. ¶270. In fact, AppHarvest filed at least 18 documents with the SEC, including documents signed by the Individual Defendants, stating the Company was "highly dependent" on Mastronardi, and Webb signed and initialed every page of the Mastronardi Morehead Agreement which required Mastronardi to accept all USDA Grade 1 tomatoes and saddled AppHarvest with all of the risk and costs of non-Grade 1 tomatoes, which Defendants knew would be rejected by Mastronardi and had "very little to no value." ¶¶271, 270.

193