UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re AppHarvest Securities Litigation | Case No. 1:21-cv-07985-LJL |

**REPLY IN FURTHER SUPPORT OF DEFENDANTS' MOTION TO DISMISS
PLAINTIFF'S SECOND CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

January 13, 2023

COOLEY LLP
Aric H. Wu
55 Hudson Yards
New York, NY 10001
Tel: (212) 479-6000
ahwu@cooley.com

Patrick E. Gibbs (*pro hac vice forthcoming*)
3175 Hanover Street
Palo Alto, CA 94304-1130
Tel: (650) 843-5000
pgibbs@cooley.com

Peter M. Adams (*pro hac vice*)
Linh K. Nguyen (*pro hac vice*)
4401 Eastgate Mall
San Diego, CA 92121
Tel: (858) 550-6000
padams@cooley.com
lknguyen@cooley.com

Zachary D. Williams (*pro hac vice*)
1144 15th Street Suite, 2300
Denver, CO 80202
Tel: (720) 566-4000
zwilliams@cooley.com

*Attorneys for Defendants AppHarvest, Inc.,
Jonathan Webb, Loren Eggleton, and David
Lee*

## TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................................. 1

ARGUMENT ......................................................................................................................... 3

I.     ALL OF THE CHALLENGED STATEMENTS ARE INACTIONABLE AS A
MATTER OF LAW. ............................................................................................... 3

     A.    Plaintiff's attempt to side-step the PSLRA's safe harbor fails. ..................... 3

     B.    Many of the challenged statements are inactionable statements of opinion. ................. 4

     C.    Many of the challenged statements are inactionable puffery ......................... 5

II.    PLAINTIFF FAILS TO PLEAD A MATERIALLY FALSE OR MISLEADING
STATEMENT. ........................................................................................................ 5

     A.    Statements about operations, production, and supply were not misleading. ................. 6

     B.    Statements about market prices were not misleading. .................................... 8

     C.    Statements about AppHarvest's workforce were not misleading. ................. 9

     D.    Statements about guidance justifications were not misleading .................... 10

     E.    AppHarvest's risk disclosures were not false or misleading. ...................... 11

III.   PLAINTIFF FAILS TO PLEAD FACTS TO SUPPORT ANY INFERENCE
OF SCIENTER. ................................................................................................... 12

     A.    The SAC's allegations about meetings, data, and forecasts fail to show that
defendants knew "specific" information contradicting their statements. .................... 13

     B.    The rest of Plaintiff's scattershot scienter allegations fail. .......................... 16

     C.    The non-culpable inferences far outweigh any inference of scienter. ......... 19

IV.   PLAINTIFF FAILS TO ADEQUATELY PLEAD LOSS CAUSATION. ................ 20

CONCLUSION ..................................................................................................... 20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Adient plc Sec. Litig.*,
2020 WL 1644018, at *27 (S.D.N.Y. Apr. 2, 2020)................................................................14

*Bd. of Trs. of City of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO*,
811 F. Supp. 2d 853 (S.D.N.Y. 2011)................................................................................20

*In re Campbell Soup Co. Sec. Litig.*,
2020 WL 7022655 (D.N.J. Nov. 30, 2020) ........................................................................17

*Campo v. Sears Holdings Corp.*,
371 F. App'x 212 (2d Cir. 2010) ......................................................................................15

*Chapman v. Mueller Water Prods., Inc.*,
466 F. Supp. 3d 382 (S.D.N.Y. 2020) (Liman, J.)........................................................2, 13

*In re Citigroup Inc. Sec. Litig.*,
753 F. Supp. 2d 206 (S.D.N.Y. 2010)................................................................................15

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)..........................................................................................................20

*EHang Holdings Ltd. Sec. Litig.*,
2022 WL 17718546 (S.D.N.Y. Dec. 15, 2022) ..................................................................20

*Fishbaum v. Liz Claiborne, Inc.*,
189 F.3d 460 (Table), 1999 WL 568023 (2d Cir. 1999)........................................................2

*Galestan v. OneMain Holdings, Inc.*,
348 F. Supp. 3d 282 (S.D.N.Y. 2018)............................................................................13, 14

*Glaser v. The9, Ltd.*,
772 F. Supp. 2d 573 (S.D.N.Y. 2011)......................................................................10, 15, 18

*Inter-Loc. Pension Fund GCC/IBT v. Gen. Elec. Co.*,
445 F. App'x 368 (2d Cir. 2011) ......................................................................................13

*Kosovich v. Metro Homes, LLC*,
2009 WL 5171737 (S.D.N.Y. Dec. 29, 2009) ......................................................................3

*Long Miao v. Fanhua, Inc.*,
442 F. Supp. 3d at 799 (S.D.N.Y. 2020)..............................................................................18

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*In re Lululemon Sec. Litig.*,
14 F. Supp. 3d. 553 (S.D.N.Y. 2014)......................................................................................16

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011)...................................................................................................................6

*In re Nokia Oyj (Nokia Corp.) Sec. Litig.*,
423 F. Supp. 2d 364 (S.D.N.Y. 2006)......................................................................................5

*New Orleans Emps.' Ret. Sys.  v. Celestica, Inc.*,
455 Fed. App'x. 10 (2d Cir. 2011).........................................................................................15

*Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
367 F. Supp. 3d 16 (S.D.N.Y. 2019).......................................................................................14

*In re Omnicom Grp., Inc. Sec. Litig.*,
597 F.3d 501 (2d Cir. 2010)...................................................................................................20

*In re Oxford Health Plans, Inc. Sec. Litig.*,
187 F.R.D. 133 (S.D.N.Y 1999) ...............................................................................................4

*In re Pareteum Sec. Litig.*,
2021 WL 3540779 (S.D.N.Y. Aug. 11, 2021)........................................................................18

*Pearlstein v. BlackBerry Ltd.*,
93 F. Supp. 3d 233 (S.D.N.Y. 2015).......................................................................................12

*In re PXRE Grp., Ltd., Sec. Litig.*,
600 F. Supp. 2d 510 (S.D.N.Y. 2009).....................................................................................14

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004)...................................................................................................11

*Ronconi v. Larkin*,
253 F.3d 423 (9th Cir. 2001) .........................................................................................1, 6, 11

*Rudani v. Ideanomics, Inc.*,
2020 WL 5770356 (S.D.N.Y. Sept. 25, 2020)...........................................................................4

*S. Ferry LP #2 v. Killinger*,
687 F. Supp. 2d 1248 (W.D. Wash. 2009)..............................................................................17

*In re Salix Pharms., Ltd.*,
2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016)..........................................................................15

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Schiro v. Cemex, S.A.B. de C.V.*,
   396 F. Supp. 3d 283 (S.D.N.Y. 2019)........................................................................14

*Steamfitters Loc. 449 Pension Plan v. AT&T Inc.*,
   2022 WL 17587853 (2d Cir. Dec. 13, 2022) ..........................................................6, 10

*Stratte-McClure v. Morgan Stanley*,
   776 F.3d 94 (2d Cir. 2015).......................................................................................12

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308, 326 (2007).........................................................................................19

*In re Tenaris S.A. Sec. Litig.*,
   493 F. Supp. 3d 143 (E.D.N.Y. 2020) ......................................................................11

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
   2022 WL 4085677 (S.D.N.Y. Sept. 2, 2022) (Liman, J.)................................. *passim*

*In re Vivendi Universal, S.A. Sec. Litig.*,
   765 F. Supp. 2d 512 (S.D.N.Y. 2011).........................................................................4

*Willard v. UP Fintech Holding Ltd.*,
   527 F. Supp. 3d 609 (S.D.N.Y. 2021).......................................................................12

**Statutes**

15 U.S.C. § 78u-5(i)(1)(D) .............................................................................................3

**Other Authorities**

17 C.F.R. § 229.303(a)(3)(ii) .......................................................................................12

**TABLE OF ABBREVIATIONS**

| | |
|---|---|
| **AppHarvest or the Company** | AppHarvest, Inc. |
| **CEA** | Controlled environment agriculture |
| **App.** | Appendix to the Declaration of Aric H. Wu In Support of Defendants' Motion (ECF No. 81) |
| **CW** | Confidential Witness |
| **Defendants** | AppHarvest, Inc., Jonathan Webb, Loren Eggleton, and David Lee |
| **EBITDA** | Earnings Before Interest, Taxes, Depreciation, and Amortization |
| **Individual Defendants** | Jonathan Webb, Loren Eggleton, and David Lee |
| **Mastronardi** | Mastronardi Produce Limited |
| **Motion or Mot.** | Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiff's SAC (ECF No. 80) |
| **Opposition or Opp.** | Lead Plaintiff's Memorandum of Law in Opposition to Defendants' Motion (ECF No. 84) |
| **Plaintiff** | Lead Plaintiff Alan Narzissenfeld |
| **PSLRA** | Private Securities Litigation Reform Act |
| **SAC or complaint** | Plaintiff's Second Consolidated Amended Complaint |
| **SEC** | Securities and Exchange Commission |
| **¶** | References to paragraphs contained in the SAC |

**<u>INTRODUCTION</u>**[1]

In late 2020—as a pre-revenue company—AppHarvest issued sales and revenue guidance for 2021. This guidance was based on good-faith estimates of what its first-of-its-kind controlled environment agriculture facility would be able to produce in its first year of operations. The Company reaffirmed that guidance in January 2021, after analyzing its "early sales." A month later, with early crop yields and market prices even "better than [] expected," the Company slightly raised its guidance. And in May, after meeting its net sales projections for Q1—its first quarter as an operating entity—the Company reiterated its guidance. AppHarvest achieved these early, positive results even though everything at the Company was new—its technology, its facility, its management team, and its workforce, which swelled from 15 to 500. Unfortunately, the Company did not replicate this success in Q2. During that quarter, the Company faced significant "operational headwinds" (Ex. 35 at 3)—including historically low tomato prices and "labor and productivity challenges"—that adversely impacted its business. As a result, in August, AppHarvest reduced its 2021 guidance.

None of this is remarkable, especially for a new company launching its operations for the first time in a nascent industry. Nevertheless, Plaintiff challenges dozens of statements made during or slightly after Q1, when the Company was indisputably meeting its financial projections. He claims those statements were materially false or misleading because of the mere existence of "waste," "attrition," and supposed subpar training. But these allegations, even taken as true, are not particular enough to satisfy Plaintiff's heavy pleading burden. Every company has problems. Identifying, assessing, and addressing such problems "are the daily work of business people," not fraud. *Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001). Plaintiff ignores this reality and urges

---

[1] Unless otherwise noted, all emphasis is added, and all internal quotation marks, ellipses, brackets, and citations are omitted.

the Court to deny Defendants' motion to dismiss by doing the same. But that is not how the PSLRA works. What Plaintiff must plead is "*specific contemporaneous* information" suggesting that operational issues were just as severe in Q1 and early Q2 as they were in late Q2, that Defendants knew about those issues in Q1 and early Q2, that Defendants understood the magnitude and impact of those issues, and yet decided (for no apparent reason) to deceive the investing public. *Fishbaum v. Liz Claiborne, Inc.*, 189 F.3d 460 (Table), 1999 WL 568023, at *3 (2d Cir. 1999).

The SAC does not allege anything like this. Instead, it assumes that, because Defendants disclosed severe labor and productivity challenges affecting its 2021 sales prospects *after the close of Q2*, the same conditions must have existed—and Defendants must have known about those conditions and fully understood their implications for future financial results—when they previously announced positive news to investors during and just after Q1. But the SAC does not allege particularized facts to support this theory. It is difficult to reconcile with AppHarvest's indisputably positive Q1 results notwithstanding any operational difficulties. It also ignores that challenges can arise with different levels of severity at different points in time. Plaintiff cannot just assume that whatever labor and productivity problems AppHarvest allegedly experienced during and shortly after Q1 were severe simply because they were severe by the end of Q2. And even if such an assumption was warranted, nothing justifies Plaintiff's conjecture that Defendants knew the implications of those problems during and shortly after Q1 simply because they came to understand them after Q2.

In short, Plaintiff alleges nothing more than "the typical type of fraud by hindsight theory" that courts routinely reject. *Chapman v. Mueller Water Prods., Inc.*, 466 F. Supp. 3d 382, 404 (S.D.N.Y. 2020) (Liman, J.) (cleaned up). Therefore, the Court should dismiss the SAC.

## ARGUMENT

### I.    All of the Challenged Statements Are Inactionable As A Matter of Law.

As a threshold matter, all of the challenged statements are inactionable because they are: (A) forward-looking statements protected by the PSLRA safe harbor; (B) statements of opinion; or (C) puffery. Mot. at 14–17.

#### A.    Plaintiff's attempt to side-step the PSLRA's safe harbor fails.

The SAC challenges many forward-looking statements, including several financial projections. Mot. at 14–15; App. B. Despite bolding and underlining these projections in the SAC,[2] the Opposition now says Plaintiff is not challenging them. Opp. at 1, 22. Instead, it says that he is only challenging the "rosy justification[s]" underlying the projections (Opp. at 22), *i.e.*, the "early sales from [AppHarvest's] first harvest" in January 2021 (¶ 150); the "more favorable crop yields and market pricing" in February (¶ 169); and the Company's "encouraging operating and financial performance" in May (¶ 199). But this untimely[3] effort to avoid the PSLRA's safe harbor fails for two reasons.

*First*, the safe harbor applies not only to projections, but also to "the assumptions underlying or relating to" them. 15 U.S.C. § 78u-5(i)(1)(D). That is because "all statements of projections come with the implied statement that they are believed and are based on recent trends in the industry and the market and the performance of the business." *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 2022 WL 4085677, at *24 (S.D.N.Y. Sept. 2, 2022) (Liman, J.). Accepting Plaintiff's position "would rip a large hole in [the PSLRA] and deprive . . . makers of such statements of the precise protection the safe harbor was intended to provide." *Id.*

---

[2] *See, e.g.*, ¶¶ 150, 173 (identifying statements like the following as subject to challenge: "**we reiterate our full-year 2021 guidance**," "**AppHarvest reaffirms guidance on full-year 2021 net revenue**," "**AppHarvest raised its revenue outlook range for fiscal year 2021**").

[3] "[I]t is axiomatic that the Complaint cannot be amended by the . . . opposition to a motion to dismiss." *Kosovich v. Metro Homes, LLC*, 2009 WL 5171737, at *5 n.6, (S.D.N.Y. Dec. 29, 2009).

***Second***, even if severable from the projections, the challenged justifications—"early sales," "favorable crop yields and market pricing," and "encouraging operating and financial performance" (¶¶ 150, 169, 199)—"are too vague to be actionable separate from the future project[ions]." *Turquoise*, 2022 WL 4085677, at \*25 (finding "on track" and "in line" inactionable even if severed from their projections). Plaintiff's cases do not hold otherwise; they ***all*** involved known, quantifiable, and detailed facts, which are entirely absent here.[4]

Here, the safe harbor applies with full force because the challenged forward-looking statements were accompanied by meaningful cautionary language (*see infra* at II.E.), and were not knowingly false when made (*see infra* at III.).

### B.      Many of the challenged statements are inactionable statements of opinion.

Although Plaintiff concedes that a number of challenged statements are opinions, he insists they are actionable because they omitted "facts regarding production, staffing, and/or pricing." Opp. at 27. But the SAC does not allege that Defendants knew any contrary, material facts when those opinions were expressed. Mot. at 16–17. For instance, Plaintiff attacks Defendants' belief that they could "staff and retain" workers with "less churn" than "many of [their] competitors" because a single, low-level "crop care specialist" thought two or three employees left the Company every week. ¶¶ 105, 177. This is not enough, particularly because the SAC does not say whether and when any Defendant ***ever*** learned about that level of attrition.

Plaintiff also contends that Defendants did not "honestly h[o]ld" their opinions. Opp. at 27–28. But the SAC does not include any facts supporting such rank speculation. Alleging that

---

[4] *See Rudani v. Ideanomics, Inc.*, 2020 WL 5770356, \*6 (S.D.N.Y. Sept. 25, 2020) (basing increased guidance on recently acquired companies that defendants omitted had "collectively lost $475,000" in one quarter and were only acquired "for research purposes, rather than to achieve competitive returns"); *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 541, 568–70 (S.D.N.Y. 2011) (company failed to disclose that half of its EBITDA growth projection was based on "a huge one-time purchase accounting benefit," rather than "improved operations"); *In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 139 (S.D.N.Y 1999) (finding statements actionable when "[t]he factual allegations in the complaint demonstrate … Defendants were aware of the nature and magnitude of … problems and were aware that [the Company] financial statements were based on inherently unreliable data.").

4

Defendants said they would "keep an eye" on "problems" (Opp. at 28) does not even approach recklessness, much less suggest that Defendants ***actually disbelieved*** their opinions when they were made, which is what Plaintiff must plead. *Turquoise*, 2022 WL 4085677, at *32.

        **C.**        **Many of the challenged statements are inactionable puffery.**

Plaintiff also challenges several statements that are plainly puffery. *See* App. C ("consistent supply," "favorable crop yields," "efficiently hire," "less churn," "virtually no impact," "haven't had any challenges," "no issues," "showing up every day"). Plaintiff argues that some of these statements are not puffery because they were made in response to analysts' questions. Opp. at 28.[5] But that is not the law—such answers ***might*** not be puffery, but only if they "reassure[] investors as to specific risks." *Turquoise*, 2022 WL 4085677, at *34. Plaintiff does not identify any such statements, which is unsurprising given how open-ended the analysts' questions were.[6]

**II.**        **Plaintiff Fails to Plead a Materially False or Misleading Statement.**

Even assuming the SAC identifies an actionable statement, Plaintiff fails to plead falsity. He says the challenged statements were all false by omission because the Company experienced, but did not disclose, labor and productivity "issues" in Q1. *E.g.*, ¶ 147; Opp. at 16–25. But the same fatal defect plagues his entire complaint: it does not describe these alleged "issues" with enough particularity to render any challenged statement materially false or misleading when made. *See In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 391–92 (S.D.N.Y. 2006).

Plaintiff must plead more than the mere existence of "issues" like attrition, churn, or waste. He must specifically tie those issues to material information withheld or misrepresented to investors. Operating a business is a bumpy endeavor, rife with risks realized and unrealized. The

---

[5] Plaintiff says the puffing statements are "unequivocal," (Opp. at 28–29), but that is not true. *See, e.g.*, ¶ 190 ("***I think*** that every tomato that we've produced has been readily put into the market."); ¶ 213 ("[R]ecord ice storms in February [had] ***virtually*** no impact to operation").

[6] *See, e.g.*, ¶ 220 ("[C]ould [you] share some of the highlights"); ¶ 190 ("Can you talk a little bit about that first . . . crop"); ¶ 216 ("[C]an you talk about how that startup went"); ¶ 222 ("[H]ow does the labor structure work").

mere fact that commonplace problems cropped up—particularly for a nascent, high-tech indoor farming company that was rapidly scaling its business during a global pandemic—"does not make a lie out of any of the alleged false statements." *Ronconi*, 253 F.3d at 434; Mot. at 22. And the claim that the alleged "issues" existed while AppHarvest was indisputably meeting its publicly announced sales targets undermines the inference that any omission about those issues rendered any statement misleading, or that Defendants had any reason to believe those issues would later worsen. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) ("Disclosure is required [] only when necessary to make [] statements made, in the light of the circumstances under which they were made, not misleading.").

The Opposition merely parrots the SAC's hopelessly vague allegations and mischaracterizes Defendants' public statements. Nothing Defendants said—about (A) operations, production, and supply; (B) price performance; (C) labor availability, recruitment, and retention; (D) financial guidance, or (E) risk disclosures—was materially false or misleading.

### A.    Statements about operations, production, and supply were not misleading.

Plaintiff claims that it "was materially false to positively tout the Company's ability to produce and supply tomatoes, when AppHarvest was having problems doing so." Opp. at 18. But Defendants never promised perfection and identified many risks the Company might encounter. Mot. at 5–8. And critically, when Defendants made those statements, AppHarvest was indisputably meeting its public sales targets. Moreover, just because AppHarvest may have been experiencing problems—of some sort, at some point—does not make Defendants' statements false. Mot. at 21–25. Take the waste allegations. The SAC alleges that, at some unspecified time, there was some unspecified amount of waste at the greenhouse.[7] *See, e.g.*, ¶ 170. Waste is part of farming. And

---

[7] Plaintiff relies on the CWs' conflicting waste estimates, which range from 5% to 50%. ¶ 78; Opp. at 18. This remarkable disparity renders the CWs' allegations unreliable. *See, e.g.*, *Steamfitters Loc. 449 Pension Plan v. AT&T Inc.*, 2022 WL 17587853, at *3 (2d Cir. Dec. 13, 2022) (finding a complaint "alleged inconsistent and irreconcilable facts," "[e]choing the [CWs] it cite[d]").

the SAC never specifies how some amount of waste necessarily meant, for example, that AppHarvest's crop yields were not "favorable" or "better than anticipated," or that AppHarvest did not "execute well."[8] Plaintiff's allegation that "upwards of 30% to 35%" of the Company's tomatoes were rejected (¶ 96) is likewise meaningless because Plaintiff never specifies how this was computed or offers a baseline against which to assess it. For example, the SAC does not say when or for how long those rejections occurred; whether those rejections prevented the Company from meeting its projections; or whether, if so, any Defendant knew about them. Mot. at 18. The Opposition's allegations about "firm-wide data" available to Defendants are similarly hollow; the SAC never articulates what the data said, let alone that it was materially "adverse" in any way. Opp. at 17; Mot. at 31–34; *see infra* at III.A. The Opposition offers no response.

Plaintiff also asserts that the Company was not meeting "global standards" for tomato quality. ¶¶ 87, 96; Opp. at 18. But the SAC never specifies why those "global standards" are a relevant benchmark for AppHarvest's operations; when and for how long the Company failed to achieve them; that hitting them consistently or indeed for any amount of time was essential to meeting its public forecasts (which, again, AppHarvest was meeting when it made the challenged statements); or that any Defendant was aware of such "global standards." *See* Mot. at 23; *e.g.*, ¶ 264 (vaguely alleging that the Company was "a long way off" "on one occasion" during the "toughest times"). Plaintiff's Opposition is silent on this point, too.

Plaintiff also contends that the Company's "relatively low" Q1 guidance suggests that "net sales were being materially impacted by operational and labor issues" in Q1. Opp. at 24. But Plaintiff admits that none of this speculation appears in the SAC. *Id.* ("AppHarvest's Q1 guidance is not alleged to be false, or otherwise at issue."). Further, the fact that Defendants had more modest

---

[8] A picture of two dozen tomatoes on the floor of a commercial farm (¶ 83) is hardly a "classic hallmark[] of fraud" (Mot. at 18).

expectations for Q1, ***when it was ramping up production for the first time and only half the farm was ready for harvest*** (Mot. at 8), says nothing about the extent of any labor or productivity issues in Q1, much less about how (if at all) Defendants expected those issues to impact future periods.

Finally, Plaintiffs' theory of falsity is based on a twisted and mistaken reading of Defendants' statements. For example, the statements regarding "consistent supply" (¶ 154) and "predictable growing practices" (¶ 156) were about the advantages of AppHarvest's controlled environment agriculture—*e.g.*, the potential offered by CEA technology to grow produce "year-round" (*id.*)—not guarantees of any ability to do so flawlessly and without interruption. Opp. at 16–19. Also, Mr. Webb's statement that the Morehead "facility operated at . . . full capacity with no issues" was about how the Company handled a severely disruptive "ice storm back in February" of 2021. ¶¶ 216, 220. And when Mr. Lee said that "every tomato that we've produced has been readily put into the market," he was talking about the tomatoes ***accepted*** by Mastronardi and sold to "retailers." That is, USDA Grade No. 1 tomatoes. He was not making the impossible claim that every tomato AppHarvest ever grew was sold, no matter how defective. ¶ 190; Mot. at 8 (describing "varying grades of tomatoes"). And when Mr. Webb's said, "Oh no, that's our advantage . . ." and mentioned the "good, healthy, consistent supply coming out of our facilities here in Central Appalachia" (¶ 154; Opp. at 16), he was referring to the advantages of the Company's location, including its ability to efficiently deliver product. Plaintiff's effort to willfully misread this as some kind of generalized denial of any issues whatsoever must be rejected.

### B.    Statements about market prices were not misleading.

According to Plaintiff, Defendants' pricing statements—that the Company's "market pricing" and "pricing performance" were "better than anticipated" in Q1 (¶¶ 169, 207)—were false because (a) they "reassured investors that AppHarvest's operational performance was acting as a price driver against any erosion from a market downtown," and (b) the Company omitted its

8

"product quality and rejection issues." Opp. at 19–20. But the SAC never alleges that prices were not favorable in Q1. Nor does it plead specific, contemporaneous facts indicating any quality and rejection issues were severe enough in Q1 to warrant a guidance revision (or to render any of Defendants' statements false or misleading when made). All Plaintiff offers is the non-specific and conclusory (and, frankly, confusing) statement that "pricing was not favorable, better, or performed well on." Opp. at 20. That is not enough to plead falsity.

In addition, Plaintiff contorts Defendants' statements about pricing. Defendants did not say that the Company's "performance" influenced "market pricing." ¶¶ 169, 207; Opp. at 19–20. They simply stated the obvious: AppHarvest had sold tomatoes at a time when market pricing was favorable.[9] And Defendants specifically told investors that the "AppHarvest brand ha[d] not yet earned a price premium." Ex. 37 at 4. The Opposition also attacks, as false, Mr. Lee's statement about AppHarvest's competitors being "less insulated to the broader market." Opp. at 19. But the SAC does not even challenge it, and it has nothing to do with pricing. Mr. Lee was referencing the Company's relationship with Mastronardi and its ability to attract demand from a vast network of large groceries and food service companies, not market pricing. ¶ 306; Ex. 23 at 11.

C.    **Statements about AppHarvest's workforce were not misleading.**

Plaintiff challenges two buckets of workforce statements—those about hiring, and those about retention. *See* App. F. Plaintiff claims the hiring statements were false because Defendants did not disclose employee turnover. Opp. at 20–22. But it should go without saying that hiring and turnover are different concepts. And Plaintiff neither specifies how turnover could render statements about hiring materially misleading, nor disputes that AppHarvest's historical hiring figures were true. *E.g.*, ¶ 210 (AppHarvest "hired nearly 500 people").

---

[9] Ex. 23 at 11 ( "[T]he winter months ha[ve] seasonally higher prices relative to the summer"); *id*. at 8 ("The blended price per pound we realized during [Q1] . . . reflects . . . the price fluctuating by season").

Relying on CWs, Plaintiff challenges Defendants' statements about retention because there was some amount of attrition during the Class Period. Opp. at 20. This claim fails for four reasons. *First*, the SAC does not specify how the attrition described by the CWs[10] renders Defendants' specific statements materially false when made. For example, Plaintiff does not allege that the Company's level of "churn" was higher "than . . . [its] competitors" (¶ 184), much less that Defendants knew that. Opp. at 20. *Second*, the SAC does not contain any well-pled allegations describing the effect of the alleged attrition, *i.e.*, that turnover was high enough to prevent AppHarvest from achieving its 2021 guidance. *Third*, Plaintiff does not plausibly allege that any *Defendant* knew about any specific amount of attrition. *Fourth*, Plaintiff interprets several statements about AppHarvest's workforce as de facto guarantees that not a single employee had ever missed work. Opp. at 20–21. But that is not what those statements say. For example, Mr. Lee's statements that "COVID has not in any way impacted our operations" and "we haven't had any challenges with recruiting or staffing" were made in response to a question about the Company's "ability to get labor." ¶ 217. Further, Plaintiff entirely ignores the fact that investors knew about attrition levels because AppHarvest consistently disclosed its headcount throughout the Class Period. ¶ 74 (listing various Company statements disclosing headcount).

### D.   Statements about guidance justifications were not misleading.

Plaintiff claims the justifications for the Company's guidance, described *supra* at I.A., were misleading because the alleged "operations, pricing, and labor . . . headwinds . . . did not support" the projections. Opp. at 23. However, Plaintiff does not explain how the mere existence of

---

[10] The CW allegations about retention are unreliable because they are contradictory. CW1 alleges that two to three employees left the Company every week (¶ 105), while CW4 states that ten employees left the west half of the greenhouse alone every week (¶ 107); *Steamfitters*, 2022 WL 17587853, at *3 (finding contradictory CW statements unreliable). The CW allegations are also unreliable because the SAC does not explain how CW1, CW4, and CW5— rank-and-file employees—"actually knew facts underlying their allegations" about firm-wide operations. *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 590 (S.D.N.Y. 2011); *see* Mot. at 18–20. Plaintiff's cursory response that all of his CW allegations are "trustworthy because the SAC alleges the business role of each" CW is unavailing. Opp. at 31 n.24. Simply describing the CWs' roles does not mean their testimony is reliable across every subject.

"headwinds"—of unspecified type, force, and direction (which is all the SAC alleges)—meant that, for example, crop yields in Q1 were not "favorable." *See Ronconi*, 253 F.3d at 434 ("That [problems and difficulties] exist does not make a lie out of any of the alleged false statements."); Mot. at 22. And CW6 does not allege, as Plaintiff claims, that that Mr. Lee "intentionally did not factor in" performance headwinds. Opp. at 23. CW6 merely said that Mr. Lee was "aggressive" in forecasting when informed about challenges that "needed to be factored in." ¶ 245. But aggressive forecasting is not actionable. *Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) ("People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future . . . they can be expected to be confident about their stewardship and the prospects of the business that they manage."). And Mr. Lee never admitted, as Plaintiff claims, that AppHarvest's earlier guidance "was not based on what [AppHarvest] 'could achieve and hit.'" Opp. at 23. Rather, Mr. Lee stated that AppHarvest adjusted its guidance after Q2 to what it "could achieve and hit" based on changed circumstances (¶ 328), which he analyzed "***starting in July***" 2021 (¶ 257).

     **E.**     **AppHarvest's risk disclosures were not false or misleading.**

Plaintiff cannot dodge the Company's extensive risk disclosures, which accompanied virtually every challenged statement. Mot. at 28–29; App. A; *see also Turquoise*, 2022 WL 4085677, at *26 (crediting similar cautionary language). Plaintiff argues the risk disclosures were false because they warned of risks that had already transpired. Opp. at 24–25. But again, the mere existence of some "issues"[11] at some point does not mean any warned-of risks had already transpired. The risk disclosures did not warn investors that the Company might not be able to achieve perfection by, for example, retaining every single employee or selling every tomato grown.

---

[11] For example, the SAC's allegation that less than half a percent of the overall workforce left the Company every week (¶ 105) does not render false a risk disclosure that the Company may not "be able to retain [its] employees," App. A at 3–4; the SAC does not even suggest that this was out of the ordinary for a large (pandemic-era) farming operation. Notably, Plaintiff's cases on this point are distinguishable because they involve ***actual*** awareness that risks had transpired. *E.g.*, *In re Tenaris S.A. Sec. Litig.*, 493 F. Supp. 3d 143, 161 (E.D.N.Y. 2020) (finding disclosure warning about risk of failing to comply with the law misleading because the law had already been broken).

Rather, they cautioned investors that challenges regarding, for example, tomato quality or employee retention might rise to a level "adversely affect[ing]" the Company's "business, financial condition and results of operations," *if the Company did not exercise "effective[] manage[ment]" of those risks*. *See, e.g.*, Ex. 10 at 6; App. A; Mot. at 29. And the SAC does not allege that.

\* \* \*

In short, Plaintiff's non-specific allegations regarding Defendants' statements, many of which Plaintiff egregiously mischaracterizes, are not nearly enough to render any challenged statement materially false or misleading when made.[12]

## III.   Plaintiff Fails to Plead Facts to Support Any Inference of Scienter.

Under the PSLRA, Plaintiff must plead particularized facts "giving rise to a *strong* inference of scienter." *See* Mot. at 29–30. And to plead recklessness, which is what Plaintiff is attempting here, the allegations must demonstrate "an extreme departure from ordinary care," *i.e.*, a danger that "was either known to the defendant or so obvious that the defendant must have been aware of it." *Id*.

Plaintiff acknowledges the steep hill he must climb to plead scienter. Opp. at 29. He does not contest that this "uphill battle" is "that much steeper" here because he has not even attempted to plead a motive. Mot. at 30–31. The SAC's underwhelming array of scienter allegations easily buckles under this heavy burden.

---

[12] For similar reasons, Defendants did not violate Item 303 of Regulation S-K, which requires a company to "[d]escribe any known trends . . . that have had . . . a material . . . unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). Plaintiff does not say when any known trend started. *See Willard v. UP Fintech Holding Ltd.*, 527 F. Supp. 3d 609, 620 (S.D.N.Y. 2021). And even if the known trend had started sometime in Q2, that is not long enough before AppHarvest's disclosure in August 2021 to be considered a reportable trend. *Pearlstein v. BlackBerry Ltd.*, 93 F. Supp. 3d 233, 245 (S.D.N.Y. 2015). Also, Plaintiff does not allege specific, contemporaneous facts indicating that Defendants knew in Q1 or early Q2 that any labor or productivity issues were *material*—*i.e.*, would later impact AppHarvest's business such that it could not meet its full-year financial projections. Finally, Plaintiff fails to plead that any Defendant knew about any trend. *See infra* at III; *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 106 (2d Cir. 2015).

> **A.    The SAC's allegations about meetings, data, and forecasts fail to show that defendants knew "specific" information contradicting their statements.**

Plaintiff's principal theory of recklessness is that Defendants acquired information from internal meetings, data, and forecasts that contradicted their public statements. But at least three gaping holes make this theory implausible.[13]

***First***, the SAC does not describe the contents of the data, meetings, or forecasts. *Chapman*, 466 F. Supp. 3d at 399 (explaining that plaintiff must "provide ***specific*** instances in which Defendants received information that was contrary to their public declarations"); Mot. at 32. At most, the SAC says that Defendants (1) "attend[ed] meetings" during which broad topics "were discussed;" (2) had "access" to "data;" and (3) issued new forecasts to Mastronardi. Opp. at 38; *see also* Mot. at 32–33. But Plaintiff does not allege the substance of those data, meetings, and forecasts. And without that basic information, the SAC cannot begin to describe what the Individual Defendants knew, much less that their knowledge was contrary to their statements at the time they were made. *See, e.g.*, *Inter-Loc. Pension Fund GCC/IBT v. Gen. Elec. Co.*, 445 F. App'x 368, 370 (2d Cir. 2011) (rejecting "several vague and general averments that [defendants] had access to . . . real-time customer and sales information" because plaintiffs did not allege "any facts indicating that the content of the reports or data . . . was inconsistent with their statements"); *Turquoise*, 2022 WL 4085677, at \*46 (rejecting scienter theory because "Plaintiffs fail[ed] to specify exactly how said information 'contradicted Defendants' public statements,' as is required to show scienter'").[14]

Plaintiff ignores, and therefore concedes, this fatal defect. He only recites strung-together catch phrases from CW6, including that Defendants discussed "ways to close the gap," meetings

---

[13] The Opposition blatantly mischaracterizes the SAC by saying Defendants (1) "initiated" meetings because of "problems," (Opp. at 17, 28); (2) "accessed" "adverse" data (*id.* at 17, 32); and (3) "regular[ly] recei[ved]" "reports" (*id.* at 31). The SAC does not allege any of this.

[14] Unlike here, the data in Plaintiff's cases (Opp. at 32, n.25) was ***specifically*** described. *See, e.g.*, *Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 299 (S.D.N.Y. 2018) (the data "showed the negative effects").

got "quite operational," Defendants kept "an eye on" labor and productivity,[15] and attrition was "worse than expected." Opp. at 30–32. But these allegations "are so vague as to be meaningless." *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 305 (S.D.N.Y. 2019); Mot. at 33 (explaining that the SAC does not include the most basic details about the so-called "forecast gap").[16]

***Second***, the SAC's allegations about the data, meetings, and forecasts are unmoored in time. *In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *27 (S.D.N.Y. Apr. 2, 2020) (explaining that plaintiff must allege that Defendants had contradictory information "***at the same time*** they made their [challenged] statements"); Mot. at 21, 32–33. Plaintiff argues that Defendants knew their statements were false during "the toughest times," or sometime from "the end of Q1 through the 'summer refresh,'" which occurred "in July and August" 2021. ¶¶ 275, 301; Opp. at 33. But there is nothing "specific[]" about a fluid, six-month time period, particularly where most of the challenged statements were made long before the so-called "toughest times."[17] *See In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 536 (S.D.N.Y. 2009) (rejecting allegations that "involve[d] . . . vague dates, or dates that occurred" after "the last challenged statement"); *see also Turquoise*, 2022 WL 4085677, at *64 (refusing to infer scienter from "reports" because "the Complaint fail[ed] to allege when [the defendant] would have received them and whether it was before or after [the] alleged false statements").

Plaintiff also contends that he does not need to plead a timeframe at all because the SAC alleges the "undisclosed issues . . . occurred consistently over time." Opp. at 33. But this is far too

---

[15] In *Turquoise*, the Court rejected vague allegations that defendants were "plugged in" and had "visibility." 2022 WL 4085677, at *45–46, 58.

[16] Unlike Plaintiff's cases, the SAC does not "point[] to specific numbers" that "Defendants reviewed" during any meetings, *Okla. Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 37 (S.D.N.Y. 2019), nor does it "identif[y] [specific] meetings and conference calls" during which Defendants discussed "specific reports" "detailing" "negative effects," *Galestan*, 348 F. Supp. 3d 282 at 300.

[17] Plaintiff asks to extend "the toughest times" to include February 2021 because, if times were tough in late March, they must have been tough in February, too. Opp. at 16 n.4; ¶ 122. Under Plaintiff's "logic," there would be no temporal limit on his allegations—why not extend the "toughest times" all the way back to the very minute the farm began operating? Allegations this vague must be wholly disregarded, not expanded.

vague, unsupported, and makes no sense. Mot. at 33. Nothing in the SAC says that the alleged "issues" arose simultaneously, instantly reached a certain level of severity, and then did not deviate for the entire Class Period. It would also mean that the "issues" were equally severe in Q1 (when AppHarvest was meeting its goals) through the end of Q2 (when it was not). Because the SAC's allegations are unmoored in time, Plaintiff cannot show that the "issues" were so severe and beyond repair that Defendants knew their statements were false when made. *See Turquoise*, 2022 WL 4085677, at *63 (refusing to infer scienter because the "SAC [did] not allege that [the defendant knew the] delays . . . were so significant that the project had no chance of getting back on track"); Mot. at 33.[18]

**Third,** the SAC does not allege that Defendants "actually accessed or reviewed" any data. *Campo v. Sears Holdings Corp.*, 371 F. App'x 212, 217 (2d Cir. 2010). All CW6 alleges is that "Defendants" had "access" to "data." ¶¶ 114, 267, 314. But that is not enough—Plaintiff must allege that Defendants used their alleged access to that unspecified data to analyze and form conclusions about the Company's operations. *Glaser*, 772 F. Supp. 2d at 591. He has not done so.

In response, Plaintiff points to CW6's assertion that "'everyone knew what everyone else knew' regarding fundamental financial data." ¶ 129. In context, this allegation only says that an unknown group of people had ***equal access*** to information, not that they had identical knowledge or that they analyzed that information and reached similar and unfavorable understandings as to its implications. ¶ 129 ("CW6 explained that . . . ***information*** was not segregated"). Regardless, this allegation is far too vague—what did CW6 know, who is "everyone," what is "fundamental financial data," what did that data say, did any Defendant review it, when was it reviewed, and how did it relate to (and contradict) the information conveyed in any challenged statement? *In re*

---

[18] *In re Salix Pharmaceuticals, Ltd.*, 2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) and *New Orleans Employees' Retirement System v. Celestica, Inc.*, 455 Fed. App'x. 10 (2d Cir. 2011) are distinguishable here for the same reasons the Court identified in Turquoise. 2022 WL 4085677, at *47.

15

*Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 245 (S.D.N.Y. 2010) (holding that CW "assertions that the information . . . was known or common knowledge . . . are too vague and conclusory"). The SAC does not say.

Plaintiff also insists that the data "would [have been] known to Defendants" because it "was critical." Opp. at 32–33. But it would be unreasonable to infer that Defendants reviewed an entire sea of data about half a dozen topics scattered across Excel spreadsheets simply because it related broadly to "revenue" and "sales." Opp. at 32–33; *see, e.g.*, *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d. 553, 572 (S.D.N.Y. 2014) ("An allegation that a defendant merely ought to have known is not sufficient to allege recklessness").

In sum, Plaintiff asks this Court to infer that Defendants had knowledge of severely unfavorable workforce, production, and pricing issues at the end of Q1 and beginning of Q2 because they had access to unspecified types of data relating to unspecified operational metrics at unspecified times, that may have been discussed and analyzed in unspecified ways at unspecified meetings to reach unspecified conclusions about a variety of issues over the course of "the toughest times." That is the opposite of a specific allegation.

**B.     The rest of Plaintiff's scattershot scienter allegations fail.**[19]

**The SAC fails to "identify any contrary facts that [Mr. Webb] . . . observed" during his infrequent greenhouse visits.** *Turquoise*, 2022 WL 4085677, at \*64; Mot. at 36. Plaintiff argues that Mr. Webb "witnessed the 'shocking' amount of [employee] turnover" because he frequently greeted employees as they started work. Opp. at 33; ¶ 287. But the SAC does not allege Mr. Webb noticed any turnover let alone enough turnover to render his statements knowingly false or misleading. Nor would it be reasonable to infer that he noticed the absence of "2–3 employees" out of 500. ¶ 107. Plaintiff also argues that Mr. Webb must have seen waste because he visited the

---

[19] Plaintiff's silence as to Defendants' arguments about Mr. Ubben's single stock sale is a concession. Mot. at 38.

greenhouse once or twice a month. Opp. at 34. Even if Mr. Webb saw some, unspecified amount of waste, that would not render any statement knowingly false. *See supra* at II.A. Nor could it—Plaintiff does not plead with particularity "when [Mr. Webb's] visits occurred." *Turquoise*, 2022 WL 4085677, at \*64.

**Defendants' so-called admissions do not suggest scienter.** According to Plaintiff, Defendants admitted they knew about the "concealed challenges" in Q1 because, during the Q1 earnings call, the Company's referenced its annual, pre-planned training during the summer refresh period. Opp. at 35. But the SAC does not explain how routine training renders any statement knowingly false. Mot. at 35–36. Plaintiff also makes much of Defendants' Q2 disclosure that there were "labor and productivity challenges" during Q1. Opp. at 36. But that was clearly hindsight, not an admission of what Defendants knew about those challenges in Q1. Mot. at 37.

**Defendants' general responses to analysts' questions do not show that they "knew facts contradicting their statements."** *In re Campbell Soup Co. Sec. Litig.*, 2020 WL 7022655, at \*7 n.4 (D.N.J. Nov. 30, 2020). Plaintiff fails to connect the dots between Defendants' high-level "knowledge[] about operations," "production," "pricing," and "labor," and knowledge of specific facts that would render their statements false or misleading at the time they answered the analysts' questions. Mot. at 38. For example, it would be unreasonable to infer that Mr. Lee knew any statements were false just because he truthfully told an analyst that the Company had hired "500 plus employees" and had "affirmed the expectations . . . for the year" because "we . . . hit our numbers." ¶ 216; Opp. at 37. Plaintiff's Opposition does not address these arguments other than by citing a handful of easily distinguishable cases.[20]

**Ms. Butler's demotion and termination are irrelevant and were not highly suspicious.**

---

[20] *See, e.g., S. Ferry LP #2 v. Killinger*, 687 F. Supp. 2d 1248, 1259 (W.D. Wash. 2009) (inferring scienter where a defendant discussed "technology and integrations with a high degree of specificity on more than one occasion," and "in the face of direct questioning about the status of [the] technological woes").

Plaintiff concedes that Ms. Butler's demotion and termination cannot independently establish scienter and can only supplement standalone scienter theories if those personnel actions were "highly unusual and suspicious." *Glaser*, 772 F. Supp. 2d at 598; Opp. at 34–35. And Plaintiff has not pled facts suggesting that Ms. Butler's demotion and termination were highly suspicious. Plaintiff identifies three allegedly "high[ly] suspicious" "circumstances": (1) Ms. Butler was "the highest-compensated AppHarvest employee in 2020"; (2) she was demoted "four months after being promoted"; and (3) she was demoted before she was terminated. Opp. at 35. But Plaintiff does not explain how any of those circumstances are highly unusual or suspicious.[21] Neither does he cite a single case supporting his position.[22]

**The core operations doctrine, which "has been thrown into doubt by . . . the PSLRA," does not apply here.** *Turquoise*, 2022 WL 4085677, at *47 (holding that the core operations doctrine "did not raise a strong inference of scienter"). Plaintiff concedes that the core operations doctrine is yet another supplemental form of scienter that cannot stand on its own. Opp. at 36. In any case, Plaintiff stretches the core operations doctrine well past its breaking point by arguing that Defendants should have known about all of the operational issues because Morehead was the Company's only facility. Opp. at 36–27. But it would not be reasonable to infer that Defendants knew, for example, that 2–3 out of 500 employees left the Company on that basis alone. *See* Opp. at 20. Regardless, the SAC has not identified a specific, contemporaneous, contradictory fact that could be imputed to Defendants under the core operations doctrine. Mot. at 36–37.

---

[21] The SAC fails to allege that Ms. Butler's demotion and termination were even related to the alleged operational issues. Mot. at 35. CW6 opined that Ms. Butler was demoted and terminated because of "tough times dealing with productivity" (¶ 141), but the SAC does not explain how CW6 was "in a position to know" that. *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d at 799 (S.D.N.Y. 2020), 442 F. Supp. 3d at 799; Mot. at 35. Recognizing this deficiency, Plaintiff relies on "the ***possibility*** that Butler told CW6, her close colleague, why she was demoted and terminated." Opp. at 35, n.30. Plaintiff does not plead that "possibility." But ultimately, even if Ms. Butler's demotion and termination were related to the allegedly undisclosed issued, that does not make them highly unusual or suspicious. Mot. at 35.

[22] *See, e.g.*, *In re Pareteum Sec. Litig.*, 2021 WL 3540779, at *17 (S.D.N.Y. Aug. 11, 2021) (finding that the terminations of the company's COO, CFO, and CEO "occurring within a few weeks of the Company's announcement of a substantial restatement of its financial condition and operations" only "approach[ed] recklessness").

C.      **The non-culpable inferences far outweigh any inference of scienter.**

Under *Tellabs*, the Court must assess the SAC's scienter "allegations holistically" and "consider plausible, nonculpable explanations for the defendant's conduct." 551 U.S. 308, 326 (2007). Here, the nonculpable inferences abound. Plaintiff himself acknowledges that:

- AppHarvest was a "brand-new company" with a "novel business plan" based on an "unproved concept," Opp. at 3, 37;

- The Company's 2021 guidance was announced in late 2020, "*i.e.*, before the Company even began its first harvest," ¶ 150;

- "AppHarvest was essentially attempting to build [its] labor force from scratch at the beginning of the Company's first growing season in late 2020. Indeed, at the beginning of 2020 before operations began, AppHarvest only employed twenty people," ¶ 71;

- Q1 was "the first quarter AppHarvest report[ed] financial results." Opp. at 37.

Despite all of this, the Company did not "stumbl[e] out the gate." Opp. at 37–38. Rather, AppHarvest's early sales were better than expected, and it met its Q1 guidance. Mot. at 8–9. Based on those objectively positive results, the Company increased and reaffirmed its 2021 guidance. Ex. 19 at 2. Thus, it is hard to see how these decisions were a "reckless gamble" made in the hopes that Defendants "would turn the business around." Opp. at 38. At that point, there was nothing to turn around. Plaintiff does not attempt to plead a motive to defraud because none exists—why would Defendants "stave off disclosure of the truth" in Q1 only to disclose it a few months later? Nor did Defendants sell any stock. In fact, Messrs. Eggleton and Lee bought shares less than a week after the Company announced its disappointing Q2 results. Mot. at 11.

The much more compelling inference is that Defendants believed the success they achieved in Q1, notwithstanding some bumps along the way, would continue. But despite Defendants' best efforts, a 10-year-low market price for tomatoes coupled with unforeseen operational setbacks hindered the Q2 results and the Company's prospects for 2021. At most, Defendants did not "anticipate future events," but that "does not amount to fraudulent intent or conscious recklessness

19

under the PSLRA." *Bd. of Trs. of City of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 882 (S.D.N.Y. 2011).

## IV.    Plaintiff Fails to Adequately Plead Loss Causation.

The SAC fails to allege that any fraud was the proximate cause of Plaintiff's economic loss. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005) (a plaintiff carries "the burden of proving that the defendant's misrepresentations caused the loss for which the plaintiff seeks to recover."). Here, the Company's stock price declined **because it released disappointing Q2 results and significantly reduced its annual guidance**. This is undisputed. (¶¶ 242–44). Plaintiff now disclaims any challenge to the Company's previous guidance (Opp. at 22), so what false statement did the August disclosures correct? Plaintiff cannot have his cake and eat it too. To be sure, Defendants reported that the Company experienced "operational headwinds" and "labor and productivity challenges" in Q2. Ex. 35 at 3. But Defendants did not describe these "headwinds" and "challenges" in any more detail than they had before (Mot. 8–9 (Defendants' descriptions of challenges at the end of Q1)); and nothing they said corrected a prior, alleged misstatement. *See EHang Holdings Ltd. Sec. Litig.*, 2022 WL 17718546, at *12 (S.D.N.Y. Dec. 15, 2022) (no loss causation where "[m]any of the 'facts' . . . 'revealed' were openly disclosed to investors and the market"); *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010) (no corrective disclosure where that disclosure did not reveal "some **then-undisclosed** fact with regard to the specific misrepresentations alleged in the complaint").

## CONCLUSION

For these reasons (and those set forth in Defendants' Motion), the Court should dismiss the SAC **with prejudice**.

20

Dated:    January 13, 2023                    Respectfully submitted,

                                              By: */s/ Aric H. Wu*

                                              COOLEY LLP
                                              Aric H. Wu (2963387)
                                              55 Hudson Yards
                                              New York, NY 10001
                                              Tel: (212) 479-6000
                                              ahwu@cooley.com

                                              *Attorneys for Defendants AppHarvest, Inc.,
                                              Jonathan Webb, Loren Eggleton, and David
                                              Lee*

21