UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  7/31/2023
```

-----------------------------------------------------------------X
                                                                 :
                                                                 :
                                                                 :
                                                                 :
IN RE APPHARVEST SECURITIES LITIGATION          :          21-cv-7985 (LJL)
                                                                 :
                                                                 :          OPINION AND ORDER
                                                                 :
                                                                 :
                                                                 :
-----------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

Defendants AppHarvest, Inc. ("AppHarvest" or the "Company"), Jonathan Webb, Loren Eggleton, and David Lee ("Defendants") move to dismiss the second consolidated amended complaint ("Operative Complaint") in this action pursuant to Federal Rule of Civil Procedure 12(b)(6). Dkt. No. 79. Lead plaintiff Alan Narzissenfeld ("Plaintiff") moves, pursuant to Federal Rule of Civil Procedure 12(f), to strike certain exhibits attached to Defendants' motion to dismiss. Dkt. No. 86.

For the following reasons, the motion to strike is denied and the motion to dismiss is granted in part and denied in part.

## BACKGROUND

The Court accepts as true for purposes of this motion the well-pled allegations of the Operative Complaint as supplemented by the documents incorporated by reference.

### I.    Parties and Company Background

AppHarvest was founded on January 19, 2018. Dkt. No. 76 ¶¶ 28, 41. It is a domestic producer of fruits and vegetables and, as opposed to traditional outdoor agriculture, grows all of its crops indoors utilizing Controlled Environment Agriculture ("CEA") technology. *Id.* ¶ 41.

AppHarvest began planting its first crops in November 2020.  *Id.* ¶ 35.  AppHarvest's only operating CEA facility from February 1, 2021 to August 10, 2021 (the "Class Period") was the Morehead Facility in Morehead, Kentucky.  *Id.* ¶¶ 1, 3.  The greenhouse at the Morehead Facility contained nearly 2.8 million square feet of growing space over approximately sixty-three acres. During the Class Period, the Morehead Facility produced two varieties of tomatoes:  Beefsteak and Tomatoes on the Vine.  *Id.* ¶ 52.

Because agriculture is highly labor-intensive, AppHarvest required a labor force that was properly staffed and trained.  *Id.* ¶ 70.  At the beginning of 2020, before operations began, AppHarvest only employed twenty people, although its goal was to staff the Morehead Facility with up to 500 living wage jobs.  *Id.* ¶ 71.  Defendants made frequent statements regarding the progress of the Company's hiring efforts to assuage investors concerning hiring.  For example, Webb stated during an interview on April 9, 2021, "Here at AppHarvest, we have about 550 employees . . . ."  *Id.* ¶¶ 73–74.

Starting on February 1, 2021, AppHarvest's common stock and warrants traded on the NASDAQ under the ticker symbols $APPH and $APPHW, respectively.  *Id.* ¶ 46.

Defendant Webb founded AppHarvest, has served as its Chief Executive Officer and as a member of the Board of Directors since its inception, and served as its President from January 2018 to January 2021.  *Id.* ¶ 29.  Defendant Eggleton has served as AppHarvest's Chief Financial Officer since November 2020, *id.* ¶ 30, and defendant Lee (together with Eggleton and Webb, the "Individual Defendants") has served as its President since January 2021 and on the Board of Directors since August 2020, *id.* ¶ 46.  Plaintiff purchased AppHarvest securities during the Class Period.  *Id.* ¶ 27.

II.     **Mastronardi Agreement**

Mastronardi Produce Limited ("Mastronardi") is the largest producer and distributor of greenhouse-grown produce in North America. *Id.* ¶ 34. In March 2019, AppHarvest and Mastronardi entered into a ten-year agreement ("Mastronardi Agreement") pursuant to which Mastronardi would become AppHarvest's sole, exclusive marketing and distribution partner for all tomatoes, peppers, cucumbers, berries, and leafy greens produced at the Morehead Facility. *Id.* ¶¶ 34, 57. AppHarvest's internal quality ranking system for tomatoes from the Morehead Facility consisted of three grades: USDA Grade No. 1, USDA Grade No. 2, and "Bad." *Id.* ¶ 62. Under the Mastronardi Agreement, Mastronardi was obligated to purchase all AppHarvest's products that are at or above USDA Grade No. 1 standards, which applies to products with characteristics that include being free from damage, decay, and sunscald; Mastronardi was not obligated to purchase any crops that fell below those standards. *Id.* ¶¶ 61, 64. "Bad" tomatoes were thrown away, while Grade No. 2 tomatoes were edible but had an obvious deformity that made them unfit for public display. *Id.* ¶ 62. Defendant Eggleton admitted at the end of the 2021 Q2 Earnings Call that "we get very little to no value in our #2 tomatoes." *Id.* ¶ 68.

A confidential witness ("CW6"), who was a former AppHarvest employee in the Financial Planning and Analysis ("FP&A") Department from the third quarter of 2020 to the fourth quarter of 2021 and reported to Eggleton, stated that AppHarvest exchanged information with Mastronardi concerning plans and forecasts during AppHarvest's first growing season. *Id.* ¶¶ 40, 60. CW6 stated that Mastronardi administered a database, which suppliers like AppHarvest could log-into and provide a daily and weekly forecast of what would be available to be picked-up at the greenhouse so that Mastronardi could plan its logistics. *Id.* ¶ 60 CW6 understood that AppHarvest's forecasts were based on possibly daily—but definitely weekly—

estimates of labor productivity to determine the volumes of Beefsteak and Tomatoes on the Vine that would be harvested.  *Id.*

## III.     Issues at AppHarvest

Between the first harvest in January 2021 through the end of the Class Period, AppHarvest suffered various productivity challenges.

### A.     Waste, Damage, and Poor Quality

According to a confidential witness ("CW1"), a former Crop Care Specialist at the Morehead Facility who was employed from October 2020 through July 2021, AppHarvest workers damaged a "shocking amount" of tomatoes in the Morehead Facility.  *Id.* ¶¶ 35, 78. Throughout CW1's tenure at AppHarvest, CW1 estimated that, on a consistent basis, anywhere from 5% to 10% of the tomatoes on a given vine ended up being damaged by workers.  *Id.* ¶ 78. Another confidential witness ("CW5"), who worked in the Morehead Facility's Maintenance Department from June 2020 to March 2022, estimated that up to 50% of AppHarvest's crop was wasted in the first growing season (October 2020 through August 2021) due to disease, insects, and damage caused by employees.  *Id.* ¶¶ 39, 78

Crops were destroyed in various ways:  If AppHarvest's greenhouse teams could not keep up with the pace of the harvest, overripe tomatoes would fall to the ground, which made them no longer saleable.  *Id.* ¶¶ 79–80, 83.  In addition, confidential witnesses recounted that greenhouse employees often pulled too hard on the plants, damaging or dropping tomatoes.  *Id.* ¶¶ 79, 82.

Another confidential witness ("CW2"), a former AppHarvest Quality Control Specialist at the Morehead Facility from January 2021 through March 2021, stated that the tomatoes that reached the packhouse from the greenhouse "constantly" had holes, cuts, scars, spots, were leaking fluid or flesh, or had other imperfections.  *Id.* ¶ 81.  CW2 stated that, even for those

tomatoes that were not immediately damaged or discarded in the greenhouse, half of the

tomatoes inspected at the packhouse were not USDA Grade No. 1, but instead Grade No. 2 or

"Bad." *Id.*

  One confidential witness ("CW4"), a former Group Lead of Crop Care Specialists who

worked at AppHarvest from October 2020 to September 2021, took the below photos of the

waste at the Morehead Facility in approximately May or June of 2021, which the witness stated

was representative of how the entire greenhouse looked through the duration of the harvesting

season, except for when news media or investors visited and it was deemed necessary to "hide

the waste." *Id.* ¶ 83.



*Id.* CW5 was tasked with preparing and cleaning greenhouse debris before investor and visitor

tours and stated that such requests for cleanup were initiated by Webb's team, if not Webb

himself. *Id.* ¶ 84.

Starting in May 2021, CW4 stated that quality inspectors at the greenhouse carried an electronic tablet and inputted their findings based on inspecting boxes of tomatoes into a live Excel spreadsheet so that AppHarvest could "map" quality performance within the greenhouse. *Id.* ¶ 85.

CW6 stated that AppHarvest targeted "global standards" for labor productivity, which included measuring the percentages of tomatoes that were USDA Grade No. 1 versus Grade No. 2. *Id.* ¶ 84. CW6 believed that the "global standards" were about 84% of USDA Grade No. 1 for Tomatoes on the Vine and 86% for Beefsteak tomatoes. *Id.* CW6 stated that "we" "knew [we] were a long way off" from achieving the standards and, during AppHarvest's "toughest times" of the first growing season, the Company was approximately 50% off the "global standard" for quality. *Id.*

## B.   Failure to Train Employees Properly

CW1 attributed the waste, in large part, to AppHarvest's failure to train its employees adequately. *Id.* ¶ 89. CW1 said orientation only entailed watching a movie lasting a maximum of fifteen minutes dedicated to the greenhouse; the rest of the movie was about AppHarvest as a company, such as its positions on climate change. *Id.* CW1 stated that the orientation did not actually teach employee how to do their job. *Id.* CW1 also stated that, after this orientation video, Crop Care Specialists were required to watch very brief video training materials that lasted approximately fifteen minutes per task on each task that a Crop Care Specialist could perform. *Id.* ¶ 90. CW4 confirmed that inadequate training "absolutely" caused operational issues during the first growing and harvesting seasons and that, prior to June/July 2021, Group Leads and Crop Care Specialists were expected to figure out their assigned tasks simply by "doing it." *Id.* ¶ 91. CW4 believed that this inadequate training impacted quality throughout the first harvest season. *Id.* ¶ 92.

6

CW2 said training in the packhouse was essentially "trial by fire." *Id.* ¶ 93. While the orientation presentation lasted about six to seven hours, only about twenty-five or thirty minutes were spent on quality. *Id.* Furthermore, throughout CW2's tenure, the quality standards were changed "on the fly," with quality standards as to what tomatoes were considered USDA Grade No. 1 changing "day to day" and "week to week." *Id.* Accordingly, the quality of tomatoes shipped to Mastronardi or directly to end customers throughout the Class Period widely fluctuated. *Id.* ¶ 93. Not only did this result in lower net sales if Mastronardi ultimately determined the tomatoes were USDA Grade No. 2 and therefore sold for "little to no value," or "Bad" and therefore discarded, but also it resulted in higher distribution, packaging, and shipping expenses from rejections. *Id.*

CW6 confirmed that Mastronardi rejected AppHarvest fruit during the Class Period. *Id.* ¶ 96. According to CW6, AppHarvest's target was whatever the global standards were for rejected tomatoes, which CW6 believed was 6% or 7%; however, during the "toughest times" for productivity, AppHarvest fruit was rejected upwards of 30% to 35% of the time. *Id.*

CW6 stated that rejected fruits affected the Company's financial forecast because the forecast was based in part on the anticipated percentages of USDA Grade No. 1 and USDA Grade No. 2 tomatoes, but if those percentages were not being achieved in a given week, then it would be necessary to revise the forecast in an ensuing week. The impact on the forecast "depended on the severity" of the trend. *Id.* ¶ 97. CW6 confirmed that during the "toughest" periods (*i.e.*, late in Q1 2021 through the summer refresh when more fruit was being rejected for quality), it was definitely necessary to reforecast. *Id.*

### C. Bonus Structure Resulted in Lower Yield and Quality

CW1 stated that the Company offered Crop Care Specialists a "piece rate" bonus which entitled them to be paid more for meeting productivity goals. *Id.* ¶ 98. CW1 consistently

observed throughout CW1's tenure that this bonus structure caused employees to work too fast, which resulted in damage to the tomato plants. *Id.* CW4 confirmed that this was the impact of the bonus structure and noted that it resulted in damaged and poor-quality tomatoes being sent to the packhouse. *Id.* ¶¶ 100–01.

### D. Impact of Attrition, Churn, and Personnel Absences Due to the COVID-19 Pandemic

CW1 stated that to mitigate lost productivity, AppHarvest increased the Company's hourly requirements, which in turn caused massive worker dissatisfaction and a "shocking" amount of turnover. *Id.* ¶¶ 104–05. CW1 observed that personnel "began jumping ship" as soon as AppHarvest changed its hours policy and that, prior to the first harvest, at least one person a week from CW1's team left the Company. *Id.* ¶ 105. CW1 stated that during the first harvest, one person from CW1's team left the Company approximately every one to two weeks for the remainder of CW1's tenure. *Id.* CW1 estimated that two to three employees left the Company every week throughout CW1's tenure. *Id.*

CW4 confirmed that turnover was significant throughout CW4's tenure at AppHarvest, with the west side of the greenhouse losing at least ten employees every week. *Id.* ¶ 107. The reasons for the turnover ranged from poor working conditions to frustration with the changing standards. CW4 stated that the turnover resulted in fewer trained staff and thereby lower yields because there were fewer Crop Care Specialists to do work like leafing. *Id.* This, in turn, resulted in plants not being harvested fast enough, causing tomatoes to get moldy and infected. *Id.*

CW5 further confirmed high turnover and churn throughout October 2020 to June 2021 and stated that this resulted in AppHarvest having to bring in contract labor to help. *Id.* ¶ 108. CW5 recalled greenhouse personnel being concerned about having adequate labor to meet

production requirements and that such topics were discussed at the morning stand-up meetings CW5 attended. *Id.* CW1 confirmed that the Company had suffered incredibly high attribution, with approximately 50% to 60% of greenhouse personnel leaving after their first month. *Id.* ¶ 110.

This turnover resulted in AppHarvest's failure to meet its goal of having 500 people to operate the Morehead Facility. *Id.* ¶ 108. In AppHarvest's first quarter 2021 earnings statements and during the 2021 Q1 Earnings Call, Webb and Lee bragged that AppHarvest had reached that goal. *Id.* ¶ 109. The next quarter, however, during the 2021 Q2 Earnings Call, Defendants admitted numerous times that the Company's workforce had fallen by 20% to 400 people. *Id.*

The COVID-19 pandemic amplified the productivity losses. *Id.* ¶ 112. CW1 stated that during the Class Period, a "couple" of employees from CW1's team alone would call out sick each week because of COVID-19. *Id.* According to CW1, when an employee would call out of work due to COVID-19, she was required to quarantine for two weeks and was not replaced so teams would be short-staffed by the number of personnel who were out due to COVID-19. *Id.* ¶ 113.

E.    **Class Period Remedial Actions**

During the Class Period, AppHarvest allegedly hired and fired executives to address these issues. On April 14, 2021, Defendants disclosed—without explaining the circumstances to investors—that the Board of Directors relieved Marcella Butler, who was then the Chief Operating Officer ("COO"), of her position on April 12, 2021. Butler had been appointed COO only four months prior to the announcement. *Id.* ¶ 140. CW6 who was hired by Butler confirmed that Butler's transition from COO to Chief People Officer and eventual departure from AppHarvest were related to the Company's labor issues including productivity, attrition, and churn. *Id.* ¶ 141.

AppHarvest also announced on July 26, 2021 that it had hired Mark Keller as Senior Vice President, Software Applications Platform who was tasked with creating a comprehensive technology vision to: (a) "deliver consistent performance"; (b) create "superior flavor driven by genetics to create pricing power"; and (c) utilize a "farm management platform to promote data-driven decision making" at the Morehead Facility. *Id.* ¶ 144. AppHarvest also announced on August 5, 2021, that it had hired Julie Nelson as Executive Vice President of Operations and she would be responsible for "driv[ing] productivity across [AppHarvest]" and "optimiz[ing] operations to support profitable growth." *Id.* ¶ 145.

## IV.   Individual Defendants' Knowledge of these Problems

Starting in February 25, 2021 and in every subsequent filing with the Securities & Exchange Commission ("SEC"), AppHarvest identified the Morehead Facility as the "Address of [its] Principal Executive Offices." *Id.* ¶ 115. Webb spent a significant amount of time at the Morehead Facility and was acquainted with workers there. *Id.* ¶ 116. CW1 stated that Webb gave tours at the greenhouse one to two times every month, *id.* ¶ 115, and Webb stated during an interview on March 15, 2021 that he was at the facility "every morning" at 5:00 am during the Class Period to greet the employees starting their shifts. *Id.* ¶ 116. CW4 noted that the entire Greenhouse floor was covered in decomposing material which was present throughout the entire first de-leafing and harvesting season and would have been visible to Webb during his visits, except when the waste was hidden during investor and news media visits. *Id.* ¶¶ 290–91.

According to CW1 and CW4, scanners were used to track employee's productivity and scanned information was displayed on a so-called leader board located in the canteen area of the greenhouse, which was updated daily and viewed by all employees. *Id.* ¶ 120. CW6 stated that the FP&A Department created standardized times that each greenhouse task was supposed to take. *Id.* ¶ 121. CW6 stated that forecasting productivity for a certain task entailed determining

the amount of work to be done by the number of personnel available to perform the work, which resulted in the estimated number of "people hours" required to do the work.  *Id.*  CW6 recalled that workers' actual performance was compared to such forecasts.  *Id.*

CW6 stated that worker productivity was identified as a challenge beginning in late 2020 and AppHarvest experienced its "toughest times" consistently from late in the first quarter of 2021 through the second quarter of 2021.  *Id.* ¶ 122.  CW6 stated that FP&A's role was to "corral information and disseminate it" to Lee and Eggleton for feedback, including through meetings.  For example, CW6 participated in a call with Lee and Eggleton approximately once a week to discuss the state of the Company's actual financial results compared to the current baseline forecast, as well as upside and downside scenarios.  *Id.* ¶ 123.  During the "toughest times," they discussed at these meetings "ways to close the gap" between AppHarvest's underperformance compared to forecasts; the expected time needed for closing the gap depending on the various scenarios; and the Company's issues with employee training, turnover, poor work ethic, and inconsistent hiring standards, which were "repeatedly cited" as the "root cause" of the overall production challenges.  *Id.* ¶¶ 123, 264.  During the forecast meetings, Lee, Eggleton, CW6, and other participants discussed metrics including yield, quality, rejections from Mastronardi, attrition and employee absences, and productivity metrics for the various greenhouse workers' particular functions.  *Id.* ¶ 124.  CW6 stated that significant attention was paid to yield and quality metrics during these forecast meetings because AppHarvest was "very revenue driven," and yield and quality were the two primary inputs to forecasting and understanding the Company's revenue.  *Id.*  CW6 noted that the "meetings 'got quite operational' with respect to metrics such as yield and quality, and included reviews of the forecasts discussed in the prior meetings and reasons for changes to those forecasts."  *Id.*  At

nearly every other forecast meeting, CW6 stated that the Company's Annual Operating Plan—which was set at the beginning of the year and set targets for the year—was a major topic with respect to where current performance positioned AppHarvest against that Plan.  *Id.* ¶ 122.  CW6 stated throughout the Company's "toughest times," Defendants "knew we were a long way off" from achieving its quality goal—at least 50% off target on one occasion.  *Id.* ¶ 264.

CW6 recalled that throughout the "toughest times" of labor challenges in the first harvesting season there were leadership meetings twice a week to discuss labor productivity and "keep an eye on it."  *Id.* ¶ 126.  Those meetings were attended by Lee, Eggleton, and Butler during her tenure as COO.  *Id.*  CW6 noted that inadequate training, poor work ethic, and inconsistent hiring standards were "repeatedly cited" as the "root cause" of the Company's productivity challenges at both the leadership meetings and at CW6's weekly forecast meetings with Lee and Eggleton, during the Company's "toughest times."  *Id.* ¶ 127.

Moreover, CW6 reported to Eggleton, and the two worked frequently together as part of their jobs and would interact with each other for many hours on a daily basis during the end of each month to discuss near-, medium-, and long-term financial matters related to the forecasts.  *Id.* ¶ 18.  CW6 explained that among the Company's senior leadership—including Lee and Eggleton—information was not segregated in a manner where it was known by some but not by others.  *Id.* ¶ 129.  Rather, everyone knew what everyone else knew regarding fundamental financial data.  *Id.*

In addition, as stated above, the Mastronardi Agreement required AppHarvest to work in consultation with Mastronardi to prepare a detailed forecast before the growing season, including forecasts of "sales" and "delivery dates."  *Id.* ¶ 130.  CW3 confirmed that the Company did prepare such forecasts for the first growing season and that, in connection with that assignment,

Eggleton provided CW3 spreadsheets including detailed profit and loss projection documents which Eggleton had approved.  *Id.*  CW3 confirmed that AppHarvest's projections provided by Eggleton included many details such as forecasted yield, sales (including sales broken down by USDA Grade No. 1 versus USDA Grade No. 2 tomatoes), costs, returns, market price, expected product returns from Mastronardi, and expected damaged tomatoes.  *Id.*  AppHarvest itself admits that these categories of information are tracked and the actual results are compared against the forecasts described by CW3.  *Id.* ¶ 131.  For example, in an advertisement posted by AppHarvest soliciting applications for a "Senior Cost Accountant," the Company described various internal reporting processes including daily, weekly, and monthly greenhouse production and cost reviews and numerous reports that were provided to management including reports of emerging issues related to cost performance.  *Id.*

CW6 confirmed that AppHarvest productivity forecasts were sent to Mastronardi on a weekly, and possibly daily, basis.  According to CW6, these forecasts included estimates of labor productivity to determine the volumes of Beefsteak and Tomatoes on the Vine that would be harvested in the given period.  *Id.* ¶ 266.

## V.     Allegedly False Statements

During the Class Period, Defendants made numerous allegedly materially false and/or misleading statements about the Company's performance—in that they misrepresented or failed to disclose the operational problems that were occurring at AppHarvest.  For example, despite issues with quality and attrition and churn, AppHarvest reiterated and raised certain 2021 financial guidance that had been created in December 2020, before the Company even began harvesting, shipping, or selling tomatoes.  *Id.* ¶ 150, 169.  One or more of the Defendants also touted the Company's "predictable supply," and "predictable growing practices," and represented that "every tomato that we've produced has been readily put into the market." *Id.*

¶¶ 154, 156.  Defendants further represented that they had no issues with recruiting or staffing

and that COVID-19 had not impacted their operation.  *Id.* ¶ 217.  They also released various risk

disclosures disclosing certain risks, for example, concerning significant rejection of products and

failure to retain skilled labor, as speculative, when Plaintiff alleges that these risks had, in fact,

already materialized.  *Id.* ¶ 166.

      Specifically, Defendants made the following statements:

- In a February 1, 2021 press release, AppHarvest stated that the "Company reaffirms Full-Year 2021 Guidance[,]" on full-year 2021 net revenue of $21 million and Adjusted EBITDA loss of $41 million, which guidance was originally issued on December 15, 2021.  Lee further stated: " . . . With our first harvest already underway and produce shipping to major grocery outlets, we reiterate our full-year 2021 guidance."  *Id.* ¶ 150.

- In a February 1, 2021 interview with Cheddar News, the anchor asked: "Your location in Central Appalachia—how is that conducive to business?  Have there been any issues with the supply and the distribution of your products?"  Webb responded: "**Oh no, that's our advantage** . . . .  Our job right here is to keep charging and build facilities on the ground and David Lee and our Board member Martha Stewart and others are thinking through—you know—what are those [] products that we can be making with this good, healthy, **consistent supply coming out of our facilities here in Central Appalachia**."  *Id.* ¶ 154 (emphasis in original).[1]

- In a February 1, 2021 interview on the TD Ameritrade Network, Webb stated: "We use less land, less water, and **we have predictable growing practices**, so we can control the environment and **have a predictable supply year round.**  It's a premium product at a conventional price.  Uh, **as much as we can build and grow, we'll, we'll be on the top 25 grocery shelves throughout the U.S.**"  *Id.* ¶ 156 (emphasis in original).

- AppHarvest's February 2, 2021 Form 8-K ("February 2 Form 8-K") directed investors to the "risk factors" in its January 11 Proxy Statement/Prospectus that stated in pertinent part:

---

[1] Plaintiff emphasized certain statements in the Operative Complaint in bold.  Plaintiff notes: "Plaintiff asserts that all statements set forth below that are bolded and underlined were materially false and/or misleading for the reasons set forth therein.  Non-bolded statements are included for context."  Dkt. No. 76 ¶ 148.

- o "Even if [AppHarvest's] investments do result in the growth of its business, **if AppHarvest does not effectively manage its growth, it may not be able to execute on its business plan** and vision, respond to competitive pressures, **take advantage of market opportunities, satisfy customer requirements or maintain high-quality product offerings, any of which could adversely affect AppHarvest's business, financial condition and results of operations**."

- o "***AppHarvest depends on employing a skilled local labor force, and* failure to attract and retain qualified employees could negatively impact AppHarvest's business, results of operations and financial condition**."

- o "[E]ven **if AppHarvest is able to identify, hire and train its labor force, there is no guarantee that AppHarvest will be able to retain these employees. Any shortage of labor or lack of regular availability could restrict AppHarvest's ability to operate its greenhouses profitably, or at all**."

- o "**Any significant or unexpected rejection of AppHarvest's products could negatively impact AppHarvest's results of operations, and AppHarvest may be unable to sell the rejected products to other third parties**."

- o "**If AppHarvest's products** fail to gain market acceptance, are restricted by regulatory requirements or **have quality problems, the company *may* not be able to fully recover costs and expenses incurred in its operation, and its business, financial condition or results of operations *could* be materially and adversely affected**."

- o "**In future periods, revenue growth could slow or revenue could decline for a number of reasons, including** slowing demand for AppHarvest's products, increasing competition, a decrease in the growth of the overall market, or **AppHarvest's failure, for any reason, to take advantage of growth opportunities.  If AppHarvest's assumptions regarding these risks and uncertainties and future revenue growth are incorrect or change, or if it does not address these risks successfully, AppHarvest's operating and financial results could differ materially from its expectations, and its business could suffer**."

- o "**The COVID-19 pandemic could negatively impact on AppHarvest's business, results of operations and financial condition**."

15

- o "**Although AppHarvest has not experienced material financial impacts due to the pandemic**, the fluid nature of the COVID-19 pandemic and uncertainties regarding the related economic impact are likely to result in sustained market turmoil, which could also negatively impact the company's business, financial condition and cash flows.  Although AppHarvest's business is considered an "essential business," **the COVID-19 pandemic could result in labor shortages, which could result in AppHarvest's inability to plant and harvest crops at full capacity and could result in spoilage or loss of unharvested crops**. . . . **The extent of COVID-19's effect on AppHarvest's operational and financial performance will depend on future developments**, including the duration, spread and intensity of the pandemic, all of which are uncertain and difficult to predict considering the rapidly evolving landscape.  **As a result, it is not currently possible to ascertain the overall impact of COVID-19 on AppHarvest's business.  However, if the pandemic continues to persist as a severe worldwide health crisis, the disease could negatively impact AppHarvest's business, financial condition results of operations and cash flows, and may also have the effect of heightening many of the other risks described in this "Risk Factors" section**."

  *Id.* ¶ 161 (emphasis in original).

- AppHarvest made similar risk disclosures in the Registration Statement it filed with the SEC on February 10, 2021 on Form S-1.  *Id.* ¶¶ 164–65.  It also stated:

  - o "***We currently rely on a single facility for all of our operations.* . . .  Adverse changes or developments affecting the Morehead facility could impair our ability to produce our products and our business, prospects, financial condition and results of operations.  Any shutdown or period of reduced production at the Morehead facility**, which may be caused by regulatory noncompliance or other issues, as well as other factors beyond our control, such as severe weather conditions, natural disaster, fire, power interruption, work stoppage, disease outbreaks or pandemics (such as COVID-19), equipment failure or delay in supply delivery, **would significantly disrupt our ability to grow and deliver our produce in a timely manner, meet our contractual obligations and operate our business**."

  - o "**Any significant or unexpected rejection of our products could negatively impact our results of operations, and we may be unable to sell the rejected products to other third parties**."

  *Id.* (emphasis in original).

- Similar risk disclosures were also made in AppHarvest's Amendment No. 1 to its Form S-1 Registration Statement filed with the SEC (the "March 2 Form S-1/A"), *id.* ¶ 181, its March 4, 2021 Prospectus filed with the SEC pursuant to SEC Rule 424(b)(3) ("March 4 Prospectus"), *id.* ¶ 188, its May 17, 2021 Quarterly Report that it filed with the SEC on Form 10-Q ("May 17 Form 10-Q"), *id.* ¶ 201, its June 4, 2021 Post-Effective Amendment No. 1 to Form S-1 Registration Statement ("June 4 Form S-1"), *id.* ¶ 229, and its June 9, 2021 Prospectus filed with the SEC ("June 9 Prospectus"), *id.* ¶ 238.

- On February 25, 2021, AppHarvest issued a press release announcing its full-year 2020 financial results, as well as revising its Fiscal Year 2021 guidance for net revenue to a range of $20 million to $25 million and for EBITDA loss to a range of $43 million to $45 million.  *Id.* ¶ 167.  The press release quoted Webb as stating: "**Our favorable crop yields and market pricing currently support a 2021 sales outlook that is better than we expected in December 2020**."  It continued: "**In addition to better than anticipated crop yields and pricing**, the Company has benefited from a temporary decline in market supply."  *Id.* ¶ 169 (emphasis in original).

  o Webb stated something similar in an AppHarvest press release on March 1, 2021: "**Our favorable crop yields and market pricing currently support a 2021 sales outlook that is better than we expected in December 2020**."  *Id.* ¶ 173 (emphasis in original).

- On March 2, 2021, AppHarvest filed its March 2 Form S-1/A.  *Id.* ¶ 176.  A subsection of the March 2 Form S-1/A states: "**We believe there is a large population of workers in the Central Appalachian region who are eager to find long-term career opportunities like those being offered by AppHarvest**. . . .  **As a result, we believe we can staff and retain our workers with less churn**, immigration challenges **and unfilled positions** that many of our competitors face."  *Id.* ¶ 177.  A subsection titled "Our Strengths" stated: "**We were able to efficiently hire many employees as we opened our first facility in Morehead** and have identified talent to join our team at the facilities we are developing in Richmond and Berea."  *Id.* ¶ 178 (emphasis in original).

  o AppHarvest made similar statements in its March 4 Prospectus, *id.* ¶¶ 184–85, its June 4 Form S-1, *id.* ¶¶ 224–25, and its June 9 Prospectus, *id.* ¶¶ 233–35.

- In a March 4, 2021 interview with Benzinga, Lee stated:  "The good news is that we've been able to partner with retailers who indicate that demand is not the problem to solve here.  **I think that every tomato that we've produced has been readily put into the market**."  *Id.* ¶ 190 (emphasis in original).

- On April 1, 2021, AppHarvest issued a press release via Globe Newswire titled "AppHarvest Announces First Harvest of Tomatoes on the Vine from High-Tech Morehead Farm Shipping to Grocery Stores."  *Id.* ¶ 192.  In the press release, Webb stated:  "**This harvest also has proved the team can handle the production ramp-up at our Morehead facility** as we are now using all grow space at the high-tech farm."  *Id.* ¶ 193 (emphasis in original).

17

- On April 6, 2021, AppHarvest filed a Registration Statement with the SEC on form S-K (the "April 6 Form S-8"), and incorporated by reference all of Defendants' allegedly false and misleading statements made in the February 2 Form 8-K and the March 4 Prospectus. *Id.* ¶ 196.

- On May 17, 2021, AppHarvest issued a press release ("May 17 Press Release") announcing its first quarter results and stated that it "reiterates net sales outlook [$20-$25 million] for the year [2021]." Lee stated: "**We are pleased by our fast start to the year, the encouraging operating and financial performance of our Morehead facility and our team's ability to scale the business . . . .**" *Id.* ¶ 199 (emphasis in original).

- AppHarvest filed its May 17, 2021 Form 10-Q, stating:

    o "**The following sections discuss and analyze the changes in the significant line items in our unaudited condensed consolidated statements of operations for the comparison periods identified.**"

    "*Net Sales*. **Net sales for the three months ended March 31, 2021 were $2.3 million compared to $0 for the comparable prior year period, due to initial tomato sales produced at our Morehead CEA facility.**" *Id.* ¶ 204 (emphasis in original).

    o AppHarvest made similar statements in its June 4 Form S-1, *id.* ¶ 231, and its June 9 Prospectus, *id.* ¶ 240.

- On May 17, 2021, Webb, Eggleton, Lee, and other Company executives held a 2021 Q1 Earnings Call to discuss AppHarvest's first quarter fiscal 2021 quarter results, a recording of which was thereafter uploaded to the Investor Relations page of the Company's website. *Id.* ¶ 206. A research analyst asked: "I was wondering if we could get going on the pricing dynamics that you alluded to. How much of that was due to quality of the output, so non-grade 1 versus just broader market conditions. I thought, historically, the winter months had seasonally higher prices relative to the summer. So I'm just trying to get a sense of what the moving pieces are on the price side." *Id.* ¶ 207. Lee responded: "What we did well is we anticipated and performed well on—in market pricing. A big part of that in Q1 was our relationship with Mastronardi . . . ." *Id.*

- On May 17, 2021, Webb stated during an interview with Cheddar News: "Well, we, we **hired nearly 500 people, uh, in the middle of a global pandemic. And so our operating team in Morehead, uh, for our first facility, those financial projections virtually didn't change much at all**." *Id.* ¶ 210 (emphasis in original).

- On May 17, 2021, Webb was interviewed on Yahoo! Finance Live by Myles Udland and Julie Hyman.  *Id.* ¶ 212.  Udland stated:  "All we hear about are supply bottlenecks, the inability to get the labor needed to get projects off the ground.  Have you guys struggled with that as—at all, as you're trying to build, you know, two more facilities to be done by the end of next year?"  Webb responded: "So we, we will have, this year, four more facilities under construction in total—plan on launching at least five into operations next year, including the, the current operating asset.  And, and very proud of this region.  You know, Eastern  Kentucky that's been known for powering the country in the coal industry.  **We, we built this first facility in the middle of a global pandemic, and we stood up the facility, uh, and have 500 people working with us now,** uh, and, and had record ice storms in February **and virtually no impact to operation**."  *Id.* ¶ 213 (emphasis in original).

- On May 25, 2021, Lee attended the Food & Ag Disrupted Conference hosted by investment bank Stephens Inc. and participated in a video-recorded interview taken by analyst Mark Connelly.  *Id.* ¶ 215.  During the interview, Mark Connelly stated: "Now, you sold your first crop in January.  Um, can you talk about how that startup went and what sort of a learning curve we should be thinking about in terms of optimizing production across the whole facility?"  *Id.* ¶ 216 (emphasis omitted).  Lee responded: "Yeah, I mean, in, in many ways, there were critics who thought, how can this company who was pre-revenue, pre-farm a year ago, stand up a farm and produce, you know, millions of pounds of product.  And so, the lessons were really valuable for us.  One was validation and proof that we could do what we say, you know, being able to hit the expectations, to deliver 2.3 million of net revenue and, and to be at the better end of our negative adjusted EBITDA range was important.  So that was a lesson for the corporate center, but in terms of the farm, you know, there was incredibly, challenging set of conditions throughout the country in Q1.  You probably read about the ice storms that gripped parts of the country.  And **our facility at Morehead proved that it could weather those conditions maybe better than most.  We, we learned about what kind of labor we could source locally having, um, 500 plus employees ready to, to join us, if we want, proved and validated the model that we really could hire local talent, give them a living wage, provide full-time employees stock and execute well** within, actually, the adjusted EBITDA range that we expected.  So that was an important lesson**.  I think the other lesson is we learned that we could hit our numbers and still experiment** and trial a way to optimize what we call Morehead 2.0—this is on the other side of our summer refresh—so that we have more confidence in our ability to produce better in the future.  And **it's the reason why we affirmed the expectations we had put out for the year**."  *Id.* (emphasis in original).

- In the March 25, 2021 interview, Mark Connelly also asked: "Can you talk about whether COVID has affected your design and construction timing, and then there's a second question about the ability to get labor, uh, in your plant. We've, we've had a number of companies in, in the, in the food business tell us that they can't get a full second shift." *Id.* ¶ 217. David Lee responded: Oh, okay. Well, let's cover both. Um, **thankfully COVID has not in any way impacted our operation** . . . . With regard to labor, we have had absolutely no shortage of interest. I mean multiples of the amount of roles that we wanna fill, have lined up to work with us. And, and a part of that is by design, a part of that is the kind of company we want to be and the part of the country in which we choose to produce. **So we haven't had any challenges with recruiting or staffing**." *Id.* (emphasis in original).

- On May 26, 2021, Webb was interviewed by host Jason Moser on a podcast. Moser stated: "Yeah. Well, I mean, speaking of publicly traded company, you just, you just released your first quarter results, and I think this was your first full quarter as a publicly traded company. I'm sure it was an exciting time. I just wonder if you could share some of the highlights, some of the things you're proud of in regard to this, to this earnings release and, and, your excitement here for the year to come." *Id.* ¶ 220 (emphasis omitted). Webb responded: "We're ramping up this first facility in the middle of a global pandemic. We had an ice storm if people remember that ice storm back in February. **Our facility operated at full, you know, ramping up into full capacity with no issues in the middle of a global pandemic in the middle of an ice storm**." *Id.* (emphasis in original).

- On June 3, 2021, Webb was interviewed by Rena Sherbill and a video recording was posted on Seeking Alpha. *Id.* ¶ 222. During the interview, Sherbill stated: "[I]n terms of the human labor force, because as you mentioned, you know, working with robotics, working with AI, how does the labor structure work? Do you have, uh data scientists working on that? Do you have agriculture, you know, people coming from the agricultural field? How does that work in terms of the labor structure?" *Id.* (emphasis omitted). Webb responded: "We're at about 550 employees right now. We'll be at roughly a thousand employees this time next year. And as we scale that team, out of real self-preservation, we need to be developing talent internally. Uh, and, and I see, we see that as a huge opportunity for us to **not only retain employees**, but recruit employees. We've had, uh, nearly 8,000 people apply to work at AppHarvest this year, um, number might be up to 10,000 now. **And again, in this time where you, you read in the news about labor shortages, you read in the news about, uh, people having issues of people showing up to work. We hired 500 employees in the middle of COVID, uh, and they're showing up every day**." *Id.* (emphasis in original).

## VI.   Post-Class Period Developments

On August 11, 2021, before market open, AppHarvest issued its earnings release for the Company's second fiscal 2021 quarter, which was filed on Form 8-K with the SEC that same day. *Id.* ¶ 242. AppHarvest stated that:

20

> For the second quarter of 2021, net sales were $3.1 million, an increase of $0.8 million from the first quarter of 2021, when AppHarvest began its inaugural harvest and launched as a public company.   AppHarvest sold 8.6 million pounds of tomatoes in the second quarter, an increase of 4.8 million pounds from the first quarter.

*Id.* ¶ 243.  The release continued: "The company recorded a net loss of $32.0 million and non-GAAP Adjusted EBITDA loss of $22.6 million in the second quarter of 2021, as compared to a net loss and non-GAAP Adjusted EBITDA loss of $1.6 million in the second quarter of 2020, when the company was still pre-production . . . ."  *Id.*  The release explained the results stating:

> Second quarter 2021 results were adversely impacted by operational headwinds with the ramp up to full production at the company's first CEA facility, including labor and productivity challenges related to the training and development of the new workforce and historically low market prices for tomatoes during the second quarter of 2021 based on USDA reports.   Labor and productivity challenges resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher distribution and shipping fees.

*Id.*

As a result of the results, AppHarvest lowered its full-year 2021 net sales guidance to a range of $7 million to $9 million, from a previous range of $20 million to $25 million, and lowered its full-year 2021 EBITDA guidance to a range of a loss of $70 million to $75 million from a prior range of a loss of $48 million to $52 million.  *Id.* ¶ 244.  The earnings release then explained that its lowered net sales guidance "reflects aforementioned operational headwinds associated with the full ramp up of the Morehead farm and moderated produce market price expectations and a strategic decision to broaden its business model by investing in farm operations technology, operational best practices and value-added products."  *Id.*  It noted that its lowered EBITDA guidance was "driven primarily by operational challenges encountered in the abbreviated initial growing season and the decision to dedicate a portion of the farm to the noted strategic investments."  *Id.*  The earnings release further stated:

> While the company remains on track with the plan to develop 12 farms by the end
> of 2025, the long-term outlook now includes more conservative assumptions based
> on nine CEA facilities in Appalachia.  In terms of the outlook, the company will
> provide guidance on a conservative delivery of nine high-tech indoor farms in
> Appalachia by the end of 2025 while it continues to work toward a network of 12
> farms by 2025.

*Id.* ¶ 247.

On August 11, 2021, before market open, AppHarvest published its Quarterly Report for

the quarter ended June 30, 2021 with the SEC on Form 10-Q.  *Id.* ¶¶ 248–49.  The Quarterly

Report noted that while "low market prices" had affected net sales for "three months,"

"productivity challenges" had affected net sales for "six months."  *Id.*  Under a section titled

"Net Sales," AppHarvest stated:

> Net sales for the three and six months ended June 30, 2021 were $3.1 million and
> $5.4 million, respectively, compared to $0 for the comparable prior year periods,
> with the increase due to the sale of tomatoes produced in the abbreviated first
> planting season at our Morehead CEA facility.  Net sales for the three and six
> months ended June 30, 2021 were adversely impacted by labor and productivity
> challenges associated with the training and development of the new workforce at
> the Morehead, Kentucky facility, and net sales for the three months ended June 30,
> 2021 were adversely impacted by low market prices for tomatoes.  The labor and
> productivity challenges resulted in lower net sales due to lower overall No. 1-grade
> production yields, including the impact of higher related distribution and shipping
> fees.

*Id.* ¶ 249 (emphasis omitted).  Under a section titled "Cost of Goods Sold," AppHarvest stated:

> Cost of goods sold for the three and six months ended June 30, 2021 was $15.7
> million and $22.5 million, respectively, compared to $0 for the comparable prior
> year periods.  Cost of goods sold was impacted by investments in our workforce as
> we develop skills needed in an industry that is new to the Appalachian region and
> investments in our production processes as we capitalize on operational insights
> from our first growing season, as well as costs associated with the early conclusion
> of the first planting season at our Morehead CEA facility.

*Id.*

The Individual Defendants also held an earnings call on August 11, 2021, before market

opening.  *Id.* ¶ 250.  In advance of the call, AppHarvest published a slide deck, which included a

slide titled "Q2 2021 Problems."  *Id.* ¶ 251.  It stated under the header "Lower Quality

Production and Saleable Yield" that "Poor quality mix (fewer USDA Grade #1 tomatoes)

lowered our sales price and significantly impacted revenue; total production beat expectations,

but problems with ramping up facility adversely affected results."  *Id.*  The slide also stated

under the header "Higher Distribution and Shipping Expense" that "Distribution costs much

higher than expected; additional re-pack and re-sort costs resulting from poor product mix (fewer

USDA #1 quality tomatoes than expected)."  *Id.*  Webb also stated during the call:

> While true that prices for TOV [Tomatoes on the Vine] and Beefsteak tomatoes hit
> a 10-year low in May, our realized price was also impacted by quality.  Our percent
> of store shelf-ready produce, what we call #1s, came in lower than we expected.
> While disappointing, we launched a set of actions to improve our performance
> immediately, and we're using these key lessons for our operators going forward
> with the AppHarvest 2.0 initiative, which David will discuss in greater detail.

*Id.* ¶ 253.  Lee further noted: "lower quality than we anticipated due to labor training and

productivity challenges was the primary driver of our Q2 results, along with low market prices

for tomatoes" and "[w]e're also implementing changes to our piece rate or bonus system to drive

improvements in our operational productivity and ability to meet surges in demand for plant

care."  *Id.* ¶ 254 (emphasis omitted).  Lee also disclosed that prior statements concerning the

Company's financial outlook had been reported less "conservatively," but that new guidance for

2021 represents "what we believe to be a significant reduction in risk regarding our outlook as

we've incorporated more conservative assumptions regarding our core AppalachiaCo business."

*Id.* ¶ 255.

The revelations shocked investors and analysts who were focused on the operational

issues suffered during the Class Period.  *Id.* ¶ 255.  In response to an analyst question, Webb

stated:

> [S]o training as we ramped up to 400 employees was an issue.  I mean operators
> globally and regardless of the industry have had issues with scaling this year,

obviously, and we were one of those.  It's disappointing.  But the optimistic view we have is we put training programs in place now.  We've replaced management and we put procedures in place on training that we'll see as we scale other facilities. That impact of a #1 versus #2 tomato, we did not realize until we saw it, which is we get great value in our #1 tomatoes, and we get very little to no value in our #2 tomatoes.  And so the #1 is what we have to optimize for, and that's where training and being able to achieve our #1 target on tomatoes.  It's not overall volume that matters, it's the volume of #1 tomatoes, which directly impacts our bottom line.

*Id.* ¶ 257 (footnote omitted).  Eggleton further stated:

And then as we mentioned, because of the quality mix challenges, we realized lower pricing and higher distribution fees.  To your question specifically, I would say approximately 80% of the lower outlook is attributable to net sales.  Within that 80%, we think about 30% of that being due to higher distribution fees.  And then outside of the 80%, the other 20% is due to lower yield expectations.

*Id.*  Lee noted: "So, I think part of it was executional challenges that are very real in our first major full season of harvest as a company."  *Id.*  Webb also stated: "[W]e had a challenge of hiring 400 people and training them and hitting the yield, not only yield, but quality that, that we must get that we can solve for.  And that team that's working on that can solve for that. . . . [I]t was as simple as training.  I don't want to be more blunt than that, but it was training and management protocols. . . .  [I]t's been a matter of putting the right training protocols in place, and that's been taking place."  *Id.* ¶ 258.

During the Company's 2021 Q2 Earnings Call, Lee stated, in pertinent part:

[T]he speed bumps associated with our initial harvest are fixable, and ***we've already deployed solutions against these problems in advance of our next harvest***.  For example, we overhauled our pack house to minimize bottlenecks while increasing quality checks, which helps us deliver our targeted volume of USDA grade #1 tomatoes.  We're ***also implementing changes to our piece rate or bonus system*** to drive improvements in our operational productivity and ability to meet surges in demand for plant care.  And lastly, ***we changed operational leadership*** and the chain of command structure within Morehead and all our future farms going forward.  As of late July, I am now directly accountable for the performance inside our high-tech farms.

*Id.* ¶ 136 (emphasis in original).  AppHarvest also announced on that date that it had hired Adam Reel as Vice President of Supply Chain and Procedure "[e]arlier in the second quarter" "to

improve operational performance." *Id.* ¶ 143.  In that role, Reel was responsible for "ensuring implementation of best practices learned in the first growing season and deploying them as standard operating procedures." *Id.*

On this news, the Company's common stock (Ticker: $APPH) price fell $3.46 per share, or approximately 29%, from $11.97 per share at market close on August 10, 2021, to $8.51 per share at market close on August 11, 2021, on trading volume of more than 20.6 million shares. *Id.* ¶ 259.  The Company's warrant (Ticker: $APPHW) price fell to $1.72 per warrant, or approximately 44%, from $3.87 per warrant at market close on August 10, 2021, to $2.15 per warrant at market close on August 11, 2021, on trading volume of more than 1.3 million warrants.  *Id.*

## PROCEDURAL HISTORY

This action was initiated through a complaint filed on September 24, 2021.  Dkt. No. 1. On December 13, 2021, Plaintiff was appointed lead plaintiff.  Dkt. No. 39.  On March 2, 2022, Plaintiff filed a first consolidated amended class action complaint.  Dkt. No. 46.  On May 2, 2023, Defendants moved to dismiss the amended complaint.  Dkt. Nos. 50–52.  That motion was denied as moot after Plaintiff filed a second consolidated amended class action complaint ("Operative Complaint") on July 25, 2022.  Dkt. Nos. 70–71, 76.[2]  The Operative Complaint is filed on behalf of "a class of all persons or entities that purchased or otherwise acquired AppHarvest publicly traded securities between February 1, 2021 and August 10, 2021."  Dkt. No. 76 ¶ 329.  The Operative Complaint brings two claims for relief: (1) violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 against all

---

[2] The Operative Complaint was refiled on August 12, 2022 to correct a missing citation.  Dkt. Nos. 74–76.

Defendants; and (2) violations of Section 20(a) of the Exchange Act against all the Individual Defendants. *Id.* ¶¶ 343–65.

On September 23, 2022, Defendants moved to dismiss the Operative Complaint. Dkt. No. 79. In support of their motion to dismiss, Defendants filed a memorandum of law and a declaration with supporting exhibits. Dkt. Nos. 80–81. Plaintiff filed a memorandum of law and declaration in opposition to the motion to dismiss on November 22, 2022. Dkt. Nos. 84–85. Plaintiff also filed a motion to strike certain exhibits that Defendants filed in support of their motion to dismiss. Dkt. Nos. 86–87. On January 13, 2023, Defendants filed a memorandum of law in opposition to the motion to strike and a reply memorandum of law in support of their motion to dismiss. Dkt. Nos. 90–91. On January 20, 2023, Plaintiff filed a reply memorandum of law in support of his motion to strike. Dkt. No. 92.

On March 22, 2023, Plaintiff filed a letter of supplemental authority in support of his opposition to the motion to dismiss. Dkt. No. 95. Defendants responded to that letter on March 28, 2023. Dkt. No. 96.

## LEGAL STANDARD

### I. Motion to Dismiss

On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a court must accept as true all factual allegations in the complaint and draw all possible inferences from those allegations in favor of the plaintiff. *See Rombach v. Chang*, 355 F.3d 164, 169 (2d Cir. 2004). This requirement "is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

A complaint must offer more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" or "naked assertion[s]" devoid of "further factual

26

enhancement" in order to survive dismissal. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The ultimate question is whether "[a] claim has facial plausibility, [*i.e.*,] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Put another way, the plausibility requirement "calls for enough fact to raise a reasonable expectation that discovery will reveal evidence [supporting the claim]." *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011) (same).

## II.    Section 10(b) and Rule 10b-5(b)

To plead a claim for damages under Section 10(b) of the Exchange Act and Securities and Exchange Commission Rule 10b-5(b), a plaintiff must satisfy each of the following six elements: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014); *see Matrixx*, 563 U.S. at 37–38; *Waggoner v. Barclays PLC*, 875 F.3d 79, 93 n.23 (2d Cir. 2017).

"'The test for whether a statement or omission is materially misleading' . . . is not whether the statement is misleading in and of itself, but 'whether the defendants' representations, taken together and in context, would have misled a reasonable investor.'" *In re Vivendi S.A. Sec. Litig.*, 838 F.3d 223, 250 (2d Cir. 2016) (quoting *Rombach*, 355 F.3d at 172 n.7). This test is objective and looks to the understanding of the "ordinary investor." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 187 (2015). Moreover, under the federal securities laws, "literal accuracy is not enough. An issuer must also desist from

misleading investors by saying one thing and holding back another." *Id.* at 192.  Companies

have a duty of disclosure "only when necessary 'to make . . . statements made, in light of the

circumstances under which they were made, not misleading.'"  *Matrixx*, 563 U.S. at 44 (quoting

17 C.F.R. 240.10b-5(b)).  "Even when there is no existing independent duty to disclose

information, once a company speaks on an issue or topic, there is a duty to tell the whole truth."

*Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014).

        To be actionable, a misrepresentation or omission also must be material, *i.e.*, a plaintiff

must allege facts showing that there is "a substantial likelihood that the disclosure of the omitted

fact would have been viewed by the reasonable investor as having significantly altered the 'total

mix' of information made available."  *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir.

2000) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988)).  Thus, "[i]n judging

whether an alleged omission was material in light of the information already disclosed to

investors, [the court] consider[s] whether there is 'a substantial likelihood that the disclosure of

the [omitted material] would have been viewed by the reasonable investor as having significantly

altered the total mix of information [already] made available.'"  *In re ProShares Tr. Sec. Litig.*,

728 F.3d 96, 102 (2d Cir. 2013) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449

(1976)).

        However, Section 10(b) and Rule 10b-5(b) "do not create an affirmative duty to disclose

any and all material information."  *Matrixx*, 563 U.S. at 44.  "Materiality alone does not demand

disclosure, nor does the duty to disclose encompass non-material information."  *In re ProShares*,

728 F.3d at 102 (quoting *Panther Partners, Inc. v. Ikanos Comm'ns, Inc.*, 538 F. Supp. 2d 662,

668 (S.D.N.Y. 2008)).

When a claim sounds in fraud, such as claims brought under Section 10(b) and Rule 10b–5, the heightened pleading requirement of Federal Rule of Civil Procedure 9(b) also applies. Under Rule 9(b), a "party must state with particularity the circumstances constituting fraud." A complaint making such allegations must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach*, 355 F.3d at 170 (internal quotation marks and citation omitted).

The Private Securities Litigation Reform Act of 1995 ("PSLRA") imposes additional requirements on a plaintiff bringing a private securities fraud action. *See* 15 U.S.C. § 78u-4(b)(1). The "complaint [must] specify each statement alleged to have been misleading, the reasons or reason why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint [must] state with particularity all facts on which that belief is formed." *Id.* The plaintiff cannot plead "the materiality of the alleged misstatements or omissions . . . in a conclusory or general fashion." *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 626 (S.D.N.Y. 2005).

Moreover, under the PSLRA, where the complaint alleges scienter, the plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind." 15 U.S.C. § 78u-4(b)(2). Under this heightened pleading standard for scienter, a plaintiff will sufficiently allege scienter and a complaint will survive, "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). In determining whether a strong inference exists, the allegations are not to be reviewed independently or in isolation, but the facts alleged must be

"taken collectively," and "the court must take into account plausible opposing inferences." *Id.* at 323.

**DISCUSSION**

Before the Court are the Defendants' motion to dismiss and Plaintiff's motion to strike certain exhibits attached to the declaration of Aric H. Wu in support of Defendants' motion to dismiss.  Dkt. Nos. 79, 86.  The Court will address the motion to strike first and then turn to the motion to dismiss.

**I.      Motion to Strike**

Plaintiff moves, pursuant to Federal Rule of Civil Procedure 12(f), to strike exhibits 43, 44, 45, and 46 attached to the declaration of Aric H. Wu in support of Defendants' motion to dismiss, as well as any references to, and assertions, inferences, or arguments based on them. Dkt. Nos. 86, 86-1.  The exhibits encompass (i) two Forms 4 filed with the SEC after the Class Period, indicating that Lee and Eggleton purchased AppHarvest stock on August 19 and 20, 2021, respectively; and (ii) two press releases from after the Class Period announcing Fiscal Year 2021 Q3 and Q4 results.  Dkt. No. 87 at 2, 4.  Plaintiff argues that these exhibits were improperly submitted because they were not mentioned in or relied upon in the Operative Complaint nor are they judicially noticeable.  *Id.*  Plaintiff further contends that they were impermissibly introduced for the truth of the matters asserted therein.  *Id.*  In response, Defendants argue that Plaintiff's motion to strike is procedurally improper as Rule 12(f) cannot be used to strike material from a motion.  Dkt. No. 90 at 1.  Defendants also argue that, regardless, Plaintiff has no plausible basis to object to the challenged documents, which were publicly filed with the SEC and are routinely considered via judicial notice.  *Id.* at 2.

The Court agrees with Defendants that Plaintiff's motion to strike these exhibits is procedurally improper.  Rule 12(f) states that "[t]he court may strike from a *pleading* an

30

insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R.

Civ. P. 12(f) (emphasis added).  "Fed. R. Civ. P. 7 excludes motions from the definition of

pleadings, and courts in this district have held that Rule 12(f) does not authorize this court to

strike documents other than pleadings."  *Honig v. Hansen*, 2021 WL 4651475, at *3 (S.D.N.Y.

Oct. 6, 2021).  Thus, Rule 12(f) does not allow for the relief requested by Plaintiff—*i.e.*, for the

Court to strike certain materials submitted in support of a motion to dismiss.  *See Burns v. Bank

of Am.*, 2007 WL 1589437, at *11 (S.D.N.Y. June 4, 2007) ("But the reply brief and

accompanying materials of which the plaintiffs complain is not a pleading, and thus is not

properly the subject of a motion under Rule 12(f).").  The Court accordingly denies the motion to

strike these exhibits pursuant to Rule 12(f).  *See Honig*, 2021 WL 4651475, at *3 (denying

motion to strike for this reason); *Latino Quimica-Amtex S.A. v. Akzo Nobel Chemicals B.V.*,

2005 WL 2207017, at *10 (S.D.N.Y. Sept. 8, 2005) (denying motion to strike as it was "directed

to a brief rather than a pleading.").

The Court may also properly consider these documents in ruling on the motion to

dismiss, although only for their existence and not the truth of the matters contained therein.  "In

considering a motion to dismiss for failure to state a claim under [Federal Rule of Civil

Procedure 12(b)(6)], a district court must limit itself to facts stated in the complaint or in

documents attached to the complaint as exhibits or incorporated in the complaint by reference."

*Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991).  "Of course, it may also consider

matters of which judicial notice may be taken under [Federal Rule of Evidence 201]."  *Id.*

Federal Rule of Evidence 201(b) provides that a "court may judicially notice a fact that is not

subject to reasonable dispute because it . . . can be accurately and readily determined from

sources whose accuracy cannot reasonably be questioned."  The Second Circuit has held that

pursuant to Rule 201(b), a district court, in ruling on a motion to dismiss, may "take judicial notice of the contents of relevant public disclosure documents required to be filed with the SEC" and actually filed with the SEC.  *Kramer*, 937 F.2d at 774.  However, "[w]hen a court takes judicial notice of a document on a motion to dismiss, it should generally do so only to determine what statements the documents contain not for the truth of the matters asserted."  *Lateral Recovery*, *LLC v. Cap. Merch. Servs., LLC*, 2022 WL 4815615, at *20 (S.D.N.Y. Sept. 30, 2022) (internal quotation marks and citations omitted); *see also Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (stating that it is proper to take judicial notice of regulatory filings at the motion-to-dismiss stage as long as it is not for the truth of the matter asserted).

Pursuant to Rule 201(b), the Court may take judicial notice of the exhibits containing the Forms 4 that were filed with the SEC after the class period.  *See Donoghue v. Gad*, 2022 WL 3156181, at *4 (S.D.N.Y. Aug. 8, 2022) ("[T]he Court finds that it may take judicial notice of the Form 3 and Form 4s."); *Rice as Tr. of Richard E. & Melinda Rice Revocable Fam. Tr. 5/9/90 v. Intercept Pharms., Inc.*, 2022 WL 837114, at *20 (S.D.N.Y. Mar. 21, 2022) ("[T]he Court takes judicial notice of Pruzanski's SEC Forms 4."); *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 762 n.12 (S.D.N.Y. 2018) ("[P]arties agree that the Court may take judicial notice of the individual defendants' SEC Forms 4.").  That is because Forms 4 are required SEC disclosures.  *See In re Bear Stearns Companies, Inc. Sec.*, *Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 583 (S.D.N.Y. 2011), *on reconsideration*, 2011 WL 4072027

(S.D.N.Y. Sept. 13, 2011), *and on reconsideration*, 2011 WL 4357166 (S.D.N.Y. Sept. 13, 2011).[3]

However, the Court may only take judicial notice that these Forms 4 exist, not for the truth of their contents. *See, e.g.*, *Gad*, 2022 WL 3156181, at *5 n.7 ("[W]hether the Court considers the SEC filings attached to Defendant's declaration because they are integral to the Complaint or because it may take judicial notice of such records, its review is limited to determining what the records state, not whether what the documents state is true."); *Sec. & Exch. Comm'n v. Fiore*, 416 F. Supp. 3d 306, 328–29 (S.D.N.Y. 2019) ("Although courts may take judicial notice of legally required public disclosure documents filed with the SEC, they may not take judicial notice of the documents for the truth of the matters asserted in them, but rather to establish that the matters had been publicly asserted." (cleaned up)); *see also Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) ("If the court takes judicial notice, it does so in order 'to determine what statements [they] contained'—but 'again not for the truth of the matters asserted.'").  The Court thus does not take these documents as proof that Eggleton and Lee made the stock purchases contained therein.[4]

---

[3] In reaching this conclusion, the Court rejects Plaintiff's argument that a court may not take judicial notice of a document if it is not integral to Plaintiff's complaint.  In ruling on a motion to dismiss, the court may consider extrinsic material that is *either* integral to the complaint *or* of which it can take judicial notice.  *See Kramer*, 937 F.2d at 773; *see also Thomas v. Westchester Cnty. Health Care Corp.*, 232 F. Supp. 2d 273, 276 (S.D.N.Y. 2002) ("Even if the Transcript and Report were not integral, such documents could still be considered by the Court because the Court may take judicial notice of the records of state administrative procedures, as these are public records, without converting a motion to dismiss to one for summary judgment." (cleaned up)).

[4] Even if it did take these documents as proof of these stock purchases, it would not change the Court's conclusion on scienter.  These stock purchases were made after the Class Period and thus reflect little on Defendants' mindsets during the time they made the disputed statements.

The Court reaches the same conclusion with respect to the two press releases, which were filed with the SEC as exhibits attached to Forms 8-K. These "SEC filings may be considered for the fact that they contained certain information and that their contents were publicly disclosed, but not for the truth of their contents." *Gagnon v. Alkermes PLC*, 368 F. Supp. 3d 750, 763 (S.D.N.Y. 2019) (reaching this conclusion with respect to exhibits to Form 8-K and Form 10-Q); *see also Donoghue v. Oaktree Specialty Lending Corp.*, 600 F. Supp. 3d 463, 473 n.9 (S.D.N.Y. 2022). Regardless, these press releases—even if taken as true—are irrelevant to the Court's decision. Defendants admit that "[n]o legal argument in Defendants' Motion to Dismiss relies on the press releases, and Defendants merely cited those press releases to provide context for the Court regarding post-Class Period events, not for the truth of their contents." Dkt. No. 90 at 6.

## II.    Motion to Dismiss

As noted, Plaintiff brings a claim for the alleged false statements and omissions under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and under Rule 10b-5(b) promulgated thereunder, 17 C.F.R, § 240.10b-5(b), against all Defendants. Plaintiff also brings a control person claim against the Individual Defendants under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

Defendants move to dismiss the Section 10(b) and Rule 10b-5(b) claim on the basis that Plaintiff has not sufficiently pled falsity, scienter, or loss causation. Dkt. No. 80 at 2–3. Defendants also move to dismiss the Section 20(a) claim arguing that because Plaintiff failed to plead a primary Section 10(b) violation, the Section 20(a) claim necessarily fails. *Id.* at 40.[5]

---

[5] The Court disagrees with Defendants that the Operative Complaint is a "puzzle pleading," which should be dismissed. Dkt. No. 80 at 14 n.7. Although it is true that Plaintiff challenges numerous statements made by Defendants, "the breadth of the [Operative Complaint] alone does not create the type of 'puzzle-like' complaint that warrants dismissal." *In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 831 (N.D. Cal. 2014). The Operative Complaint also, in an

A.      Section 10(b)

1.      Scienter

Defendants move to dismiss the Operative Complaint on the basis that it fails to adequately plead scienter.

To plead scienter sufficiently under the PSLRA, a plaintiff must allege "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *ECA v. JP Morgan Chase*, 553 F.3d 187, 198 (2d Cir. 2009) (quoting 15 U.S.C. § 78u–4(b)(2)). The scienter required under Section 10(b) and Rule 10b–5 to sustain a private civil claim is an "an intent to deceive, manipulate or defraud." *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001) (quoting *Ganino*, 228 F.3d at 168). In the Second Circuit, recklessness may also suffice to plead scienter for securities fraud. *See JP Morgan Chase Co.*, 553 F.3d at 198.

To create a strong inference, the inference of scienter must be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* (citation omitted). In assessing whether this inference exists, courts consider both the inferences urged by plaintiffs as well as any reasonable competing inferences drawn. *Id.* "Moreover, the facts alleged must support an inference of an intent to defraud the plaintiffs rather than some other group." *Id.*

"A plaintiff may establish scienter by alleging facts that either (1) show that the defendant had both the 'motive and opportunity' to commit the alleged fraud, or (2) constitute

---

organized fashion, alleges each alleged misstatement, who made it, and where, when, and why it is false or misleading in a section entitled "Defendants' Material Class Period Misrepresentations and Omissions." Dkt. No. 76 ¶¶ 149–241. "In doing so, the [Operative] Complaint describes 'what portion of each quotation constitutes a false representation' and avoids 'placing the burden on the Court to sort out the alleged misrepresentations and then match them with the corresponding adverse facts.'" *Constr. Laborers Pension Tr. for S. California v. CBS Corp.*, 433 F. Supp. 3d 515, 530 (S.D.N.Y. 2020) (citation omitted).

'strong circumstantial evidence of conscious misbehavior or recklessness.'" *Francisco v. Abengoa, S.A.*, 559 F. Supp. 3d 286, 317 (S.D.N.Y. 2021) (quoting *JP Morgan Chase Co.*, 553 F.3d at 198).  A strong inference of scienter through "motive and opportunity" will only be raised where plaintiffs allege that defendants "benefitted in some concrete and personal way from the purported fraud." *JP Morgan Chase Co.*, 553 F.3d at 198 (quoting *Novak v. Kasaks*, 216 F.3d 300, 307–08 (2d Cir. 2000)).  If plaintiffs do not make this showing of "motive and opportunity," they may adequately allege scienter through circumstantial evidence of misbehavior or recklessness "'though the strength of the circumstantial allegations must be correspondingly greater' if there is no motive." *Id.* (quoting *Kalnit*, 264 F.3d at 142).  The Second Circuit has "defined recklessness in the securities fraud context as 'conscious recklessness—*i.e.*, a state of mind approximating actual intent, and not merely a heightened form of negligence.'" *Rotunno v. Wood*, 2022 WL 14997930, at *3 (2d Cir. Oct. 27, 2022) (quoting *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009)).  Reckless conduct in this context is "conduct that at the least . . . is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it; or to evidence that the defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud, and hence should have known that they were misrepresenting material facts." *Hennessee Grp. LLC*, 573 F.3d at 109 (cleaned up)

In opposing the motion to dismiss, Plaintiff does not argue that Defendants had a motive and opportunity to commit the alleged fraud.  Dkt. No. 84 at 29.  Instead, Plaintiff argues that the Operative Complaint pleads conscious misbehavior or recklessness.  *Id.*  In making this argument, Plaintiff points to the allegations concerning: (i) weekly forecast meetings, Dkt.

No. 76 ¶¶ 111, 123, 124, 127, 175, 264, the twice-weekly leadership meetings, *id.* ¶¶ 15, 122, 126, 127, and the informal meetings between Eggleton and CW6, *id.* ¶ 128; (ii) CW6's statements that Company executives had information parity, such that "everyone knew what everyone else knew" regarding fundamental financial data," *id.* ¶ 129; (iii) Defendants' regular receipt and access to productivity, labor, and quality reports, *id.* ¶¶130–31, including the Mastronardi Reports, *id.* ¶¶ 60, 67, 130, 263, 275, and internal reports on labor and productivity, *id.* ¶¶ 65, 119–21, 124, 131, 263, 267; (iv) Webb's visits and interactions at the Morehead Facility, *id.* ¶¶ 103–11, 213, 287–89, 291-92; (v) the timing of Butler's demotion and termination, *id.* ¶¶ 277–85; (vi) Defendants' statements about operational and labor shortfalls at the Morehead Facility, *id.* ¶¶132–35, 245, 255, 297–99, 301–03, 328; (vii) the core operations doctrine; and (viii) Webb and Lee's statements holding themselves out as knowledge about the Company, *id.* ¶¶ 116–17, 190, 210, 213, 216–17, 220, 222, 280. *See* Dkt. No. 84 at 30–37.

### a.     Inferences of Scienter Prior to the End of Q1 2021

The allegations in the Operative Complaint do not give rise to a strong inference that Defendants Lee, Eggleton, and Webb possessed the requisite scienter prior to the end of Q1 2021. Prior to that period of time, the allegations of scienter are too vague and generalized to support a strong inference of scienter. With respect to the weekly forecast meetings, the Operative Complaint alleges generally that Defendants Lee and Eggleton had a weekly call with CW6 in which they "discussed a variety of metrics including yield, quality, rejections from Mastronardi, attrition and employee absences, and productivity metrics for the various Greenhouse workers' particular functions." Dkt. No. 76 ¶¶ 123–24. These allegations are insufficiently particular to support an inference of scienter for each of statements made during the Class Period. Not only does the Operative Complaint fail to state when exactly these meetings started, but it also fails to explain "how said information" discussed during those

meetings throughout the entire Class Period "'contradicted Defendants' public statements,' as is required to show scienter." *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 237 (S.D.N.Y. 2022) (quoting *Maloney v. Ollie's Bargain Outlet Holdings, Inc.*, 518 F. Supp. 3d 772, 781 (S.D.N.Y. 2021)); *see Inter-Loc. Pension Fund GCC/IBT v. Gen. Elec. Co.*, 445 F. App'x 368, 370 (2d Cir. 2011) ("Appellants have not alleged any facts indicating that the content of the reports or data to which Appellees were privy was inconsistent with their statements in the class period."). Moreover, even assuming that contrary information was made available to Lee and Eggleton at these meetings, there would be no way to pinpoint exactly when the contrary information was provided. *See NECA-IBEW Health & Welfare Fund v. Pitney Bowes Inc.*, 2013 WL 1188050, at *28 (D. Conn. Mar. 23, 2013) ("Allegations that are so amorphous as to time periods are not pled with the requisite specificity."); *see also Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 409 (S.D.N.Y.), *aff'd*, 757 F. App'x 35 (2d Cir. 2018). "[A]llegations about an unspecified time period cannot supply specific contradictory facts available to Defendants at the time of an alleged misstatement." *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 352 (S.D.N.Y. 2011) (Sullivan, J.).

The allegations concerning the twice-weekly leadership meetings, and the informal meetings between Eggleton and CW6, *id.* ¶ 128, do not fill the gap as to Defendants' scienter prior to the end of Q1. According to the Operative Complaint, the leadership meetings—the purpose of which was to monitor the Company's poor labor productivity and which were attended by CW6, Lee, and Eggleton—did not start until the "toughest times" or the end of Q1 2021. Dkt. No. 76 ¶¶ 15, 126. And, as to the informal meetings between Eggleton and CW6, the allegations are far too generalized and do not supply what specific contradictory information was available to Eggleton at the time of any alleged misstatement. *See In re Wachovia Equity Sec.*

*Litig.*, 753 F. Supp. 2d at 352.  The allegations merely note that as part of closing the accounting books at the end of each month, CW6 and Eggleton met and "discussed near-, medium-, and long-term financial matters relating to the forecasts."  Dkt. No. 76 ¶ 128.  The Complaint does not provide information as to what exactly was discussed at these meetings, whether they took place at various times throughout the month or only at the end of the month, and, most importantly, what information Eggleton received at such meetings that undercut any public statements he made.  For example, Plaintiff does not allege that CW6 and Eggleton ever discussed the forecasts no longer being feasible or, if they did, when exactly that occurred.  Such allegations therefore do not provide strong circumstantial evidence of recklessness for any particular disputed statement.  *See In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d at 237; *Maloney*, 518 F. Supp. 3d at 781.

Plaintiff also argues that scienter may be inferred from CW6's statements that "'everyone knew what everyone else knew' regarding fundamental financial data," Dkt. No. 76 ¶ 129, and Webb and Lee's statements holding themselves out as knowledgeable about the Company.  The Operative Complaint alleges that CW6's explained that among senior leadership "information was not segregated" and "'everyone knew what everyone else knew' regarding fundamental financial data."  *Id.*  Plaintiff cannot rely on such assertions from CW6 for two reasons.  First, assuming this assertion could support the inference that if one senior leader knew about a piece of financial data, another would also know about that piece of data, Plaintiff has not pleaded with particularity than any senior leader, prior to the end of Q1 2021, had contemporaneous knowledge about fundamental financial data that was contrary to any public statements that any other leader made during that period.  Second, the Operative Complaint does not explain why CW6 was in a position to know exactly what each senior leader knew.  These types of

conclusory allegations that *everyone was aware* of specific information are the types of allegations that courts regularly find "are too vague and conclusory to support a finding that defendants knew they were making false statements or made those statements with reckless disregard for their truth or falsity." *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 245 (S.D.N.Y. 2010) (reaching this conclusion with respect to "assertions that the information presented by confidential witnesses was known or common knowledge within the company"); *see Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 305–06 (S.D.N.Y. 2019) (confidential witness assertions "that 'everyone at Cemex Colombia knew about . . . mismanagement of the Maceo Plant,' . . . and that security employees told them that there were 'inconsistencies' relating to the Plant" were too vague to support strong inference of scienter); *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 591 (S.D.N.Y. 2011) ("[C]onclusory statements that defendants 'were aware' of certain information, and mere allegations that defendants 'would have' or 'should have' had such knowledge is insufficient."). With regard to Webb and Lee's statements holding themselves out to the public as knowledgeable about the Company, "while such facts undoubtedly weigh in favor of a finding of scienter, courts have repeatedly found that such allegations alone are not sufficient." *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d at 238 (collecting cases). "Instead, Plaintiff must allege 'what specific contradictory information the makers of the statements had and the connection (temporal or otherwise) between that information and the statements at issue.'" *Id.* (quoting *In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *28 (S.D.N.Y. Apr. 2, 2020)).

The allegations concerning Webb's visits and interactions at the Morehead Facility are somewhat stronger. According to the Operative Complaint, Webb would visit the Morehead Facility "every morning," enjoyed his visits to the facility, and frequently would conduct

interviews there.  Dkt. No. 76 ¶¶ 287–89.  Plaintiff argues that, due to these visits, Webb would have observed tomato waste and Webb or his team would allegedly instruct others to hide the waste from investors and guests who visited the facility.  *Id.* ¶¶ 291–92.  Plaintiff also implies that Webb would have witnessed a significant amount of worker turnover.  *Id.* ¶¶ 103–11. Although these allegations indicate that Webb was likely aware of some product waste and some turnover throughout the Class Period, they do not, on their own, establish when Webb would have been aware that the product waste and turnover was anything other than routine.  Some product waste and turnover are likely to occur at any agriculture company, and Webb never made any representations that AppHarvest suffered no product waste or turnover whatsoever.  In addition, there are indications in the Operative Complaint that these issues with supply and turnover got significantly worse over time.  For example, with regard to worker turnover, the Operative Complaint states that, at some point, AppHarvest "increased the Company's hourly requirements," which caused " a 'shocking' amount of turnover."  *Id.* ¶ 104.  However, the Operative Complaint is entirely silent on when that occurred.  As for waste, CW5 stated that "wasted tomatoes were 'for the most part' a consistent problem throughout October 2020 through June 2021, but got worse in the first two quarters of 2021."  *Id.*  CW5, though, does not note whether these problems became worse at the beginning of Q1 2021 or not until later in the first two quarters of 2021, or whether they varied throughout the period.  The allegations concerning Webb's visits thus, while supporting the inference that Webb may have had some limited knowledge concerning labor issues and waste at AppHarvest, are insufficiently particular to establish scienter for any particular statement as it is almost impossible to tell from these

allegations when Webb would have had knowledge of what problems, the import of such knowledge, and how it would have contradicted any particular public statement made by Webb.[6]

The Court also rejects Plaintiff's claim that Defendants' regular receipt and access to productivity, labor, and quality reports support a strong inference of scienter prior to late Q1 2021. The Operative Complaint states that AppHarvest had various data available to it concerning productivity and quality as it administered a database providing a daily and weekly forecast of what would be available to be picked up by Mastronardi, which was based on estimates of labor productivity (a process that involved Eggleton and Lee), *id.* ¶¶ 60, 275, Mastronardi would audit AppHarvest fruit, *id.* ¶ 67, and AppHarvest would track worker productivity on its digital file system, *id.* ¶ 120. However, again, the Operative Complaint does not specify how the data and information available from these sources prior to the end of Q1 2021 contradicted Plaintiff's public statements at that time. *See Maloney*, 518 F. Supp. 3d at 781 ("With respect to the Daily Sales Flash Report, the complaint fails to specify exactly what information was contained in the report or how said information contradicted Defendants' public statements, as is required to show scienter." (cleaned up)). To the contrary, the allegations support that the data available from the Mastronardi database would not necessarily have raised concerns until the "toughest period." The Operative Complaint notes: "According to CW6, during the 'toughest' periods of rejected tomatoes (the end of Q1 2021 through the 'summer

---

[6] The allegation that when "investors and news media visited" the Morehouse Facility, Webb or members of his team instructed employees to "hide" the waste, Dkt. No. 76 ¶¶ 291–92, does not support that he believed the waste was unusual or more than AppHarvest had expected or that he was intending to convey a misleading impression to the investing public. Waste generally is unattractive, regardless whether it is unusual. Leaving aside the pejorative characterization that the waste was "hid[den]," the allegation that the clean-up was directed to "investors and guests" alike suggests more that Webb and members of his team were concerned about an image of uncleanliness than that investors would see production that fell below expectations.

refresh'), it was necessary for AppHarvest to reforecast to lower estimated production."  Dkt. No. 76 ¶ 275.  These allegations thus imply that a reforecast was not necessary prior to the end of Q1 2021 and therefore do not support an inference of scienter prior to the end of Q1 2021.

The Court also rejects Plaintiff's attempt to establish scienter prior to late Q1 2021 from allegations concerning the timing of Butler's demotion, or Defendants' statements about operational and labor shortfalls at the Morehead Facility.  Butler was not stripped of her role as COO until April 12, 2021.  *Id.* ¶ 279.  Thus, at best, these allegations support that Defendants may have been aware of some problems at some indefinite time prior to mid-April.  They do not support what Defendants knew prior to late-March of 2021.  In addition, while an employment change "may 'add to a pleading of circumstantial evidence of fraud,' they are 'not themselves sufficient,' and even then are only relevant where they are 'highly unusual and suspicious.'" *Intercept Pharms., Inc.*, 2022 WL 837114, at *23 (quoting *Glaser*, 772 F. Supp. 2d at 598); *see In re Hain Celestial Grp. Inc. Sec. Litig.*, 2022 WL 18859055, at *30 (E.D.N.Y. Nov. 4, 2022). An employment change may be highly unusual and suspicious where "when independent facts indicate that the resignation was somehow tied to the fraud alleged, that the resignation somehow alerted defendants to the fraud, or that defendants' scienter was otherwise evident."  *Glaser*, 772 F. Supp. 2d at 598.  Plaintiff does not allege facts to support the inference that Butler's transition from COO back to Chief People Officer was highly unusual and suspicious.  Although the Operative Complaint alleges that CW6 confirmed that Butler's transition was related to the "Company's labor issues, including productivity, attrition, and churn," it is unclear how CW6 would necessarily be in a position to know this.  Dkt. No. 76 ¶ 141.  The Operative Complaint states that the Board of Directors stripped Butler of her role as COO and CW6 does not appear to have sat on or had any special knowledge of the Board of Directors' decision making.  *Id.* ¶ 279;

*see Janbay v. Canadian Solar, Inc.*, 2013 WL 1287326, at *8 (S.D.N.Y. Mar. 28, 2013) (discounting testimony of confidential witness because "CW3 is not alleged to have attended the November 23, 2009 meeting and could have obtained at most second-hand information about the meeting").  In addition, contrary to Plaintiff's claims, Lee did not "confirm[]" CW6's account and admit that operational failures caused AppHarvest to "eliminate[]" Butler's position as COO. Dkt. No. 76 ¶ 280.  Instead, Lee merely stated that the company was hoping to "move forward with a smaller, more nimble corporate center" and that this had resulted in them eliminating a C-level position, reducing head counts, and streamlining the structure of the corporate office in order to reduce costs and "shift resources toward our best opportunities in operations and tech." *Id.* ¶ 139.

As to the statements about operational and labor shortfalls, Plaintiff notes that Defendants made "vague and highly generic" statements during AppHarvest's 2021 Q1 Earnings Call about the importance of training and how the Morehead Facility will "benefit from new training."  *Id.* ¶¶ 132–35.  These statement plainly do not indicate that Defendants knew that the Morehead Facility was facing issues with training at that time.  Plaintiff also points to the fact that Defendants made certain statements after the Class Period acknowledging that "labor and productivity challenges" existed for the entire 6 months ended June 30, 2021 and caused "lower net sales."  Dkt. No. 84 at 36 (citation omitted).  But these statements were made "retrospectively with the benefit of hindsight" and Defendants do not state that they knew at the time that these issues existed or their magnitude.  *See Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 228 (S.D.N.Y. 2018), *aff'd sub nom. Kapitalforeningen Lægernes Inv. v. United Techs. Corp.*, 779 F. App'x 69 (2d Cir. 2019).

Finally, the core operations doctrine does not save Plaintiff's failure to offer a compelling inference of scienter for statements prior to Q1 2021.  "Under the core operations doctrine, a court may infer that a company and its senior executives have knowledge of information concerning the core operations of a business, such as events affecting a significant source of income."  *Plymouth Cnty. Ret. Ass'n v. Array Techs., Inc.*, 2023 WL 3569068, at *17 (S.D.N.Y. May 19, 2023) (quoting *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 423 (S.D.N.Y. 2020) (Nathan, J.)).  The core operations doctrine, however, "has been thrown into doubt by the enactment of the PSLRA in 1995."  *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d at 239; *see In re Rockwell Med., Inc. Sec. Litig.*, 2018 WL 1725553, at *14 (S.D.N.Y. Mar. 30, 2018) (Sullivan, J.).  "As a result of these doubts as to the doctrine's continuing import, the core operations inference may be considered as part of a court's holistic assessment of the scienter allegations, but it is not independently sufficient to raise a strong inference of scienter."  *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d at 239 (quoting *In re Rockwell Med., Inc. Sec. Litig.*, 2018 WL 1725553, at *14).  Put differently, "core-operations allegations are 'supplementary'; that is, they are not 'independently sufficient means to plead scienter.'"  *Saraf v. Ebix, Inc.*, 2022 WL 4622676, at *5 (S.D.N.Y. Sept. 30, 2022) (citation omitted).  Because Plaintiff's other allegations fall far short of supporting a compelling inference of scienter for statements prior to Q1, Plaintiff's core-operations allegations do not fill the gap.  *See In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 538 (S.D.N.Y.), *aff'd sub nom. Condra v. PXRE Grp. Ltd.*, 357 F. App'x 393 (2d Cir. 2009) ("Plaintiff points to no case in which a court in this District has inferred a 'top executive's' 'access' to contrary facts based on the expression of 'concerns' from one employee to another, a subsequent resignation due to fear

of damage to a professional reputation, and the 'size and culture' of a company.  Indeed, the

recent case law in this District suggests that much more is required.").

### b.  Inferences of Scienter After the End of Q1 2021

Although the allegations do not raise a compelling inference of scienter with respect to

any particular Defendant prior to Q1 2021, additional allegations concerning the post-Q1 2021

period that is labeled in the Operative Complaint as the "toughest times" do raise a compelling

inference of scienter with respect to Defendants Eggleton and Lee.  *See e.g.*, Dkt. No. 76 ¶ 264.

The Operative Complaint states that the "toughest times" corresponds to the period "lasting from

late Q1" through AppHarvest's "summer refresh in Q3 2021."  *Id.* ¶ 15.  According to the

allegations in the Operative Complaint, during the "toughest times" and at the weekly forecast

meetings with Lee, Eggleton, and CW6, AppHarvest's underperformance compared to its

forecasts was specifically discussed.  *Id.* ¶ 123.  The parties also discussed at these meetings

"quality" and "rejections from Mastronardi" and CW6 stated that during the "toughest times"

"Mastronardi was having to reject a lot of fruit . . .—upwards of 30% to 35% . . . which was

'many times' more than AppHarvest's target which CW6 believed was 6% or 7%."  *Id.* ¶¶ 124,

151.  The Operative Complaint further notes that "throughout the 'toughest times'" "there were

leadership meetings twice a week (typically mid-week and end-of-week) to discuss labor

productivity and 'keep an eye on it'" that were attended by CW6, Lee, Eggleton, and Butler, and

that AppHarvest was well below 50% in relation to the Company's productivity standards for

specific Greenhouse jobs.  *Id.* ¶¶ 126, 151.  According to CW6, throughout the toughest times,

inadequate training, turnover, poor work ethic, and inconsistent hiring standards were repeatedly

cited as the "root cause" of the Company's productivity challenges at the weekly forecast

meetings and at the leadership meetings.  *Id.* ¶ 127.  CW6 also stated that during the period of the

toughest periods of rejected tomatoes (the end of Q1 2021 through the summer refresh), it was

necessary for AppHarvest to reforecast to lower estimated production due to the large number of tomatoes that was rejected by Mastronardi; this reforecasting process involved CW6, Eggleton, and Lee.  *Id.* ¶ 275.

These additional allegations specific to the Company's "toughest times" support a strong inference of scienter with respect to Eggleton and Lee during this time period.[7]  "To be sure, 'bare assertions [that the defendants, due to their high-level positions in the Company, had access to adverse undisclosed financial information through internal corporate documents, meetings, and reports], without any further facts or details' will not suffice to create a strong inference of scienter."  *Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 37 (S.D.N.Y. 2019) (quoting *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d at 538).  But, here, reports from a confidential witness support that Defendants Lee and Eggleton participated in numerous meetings during which the problems with hiring, productivity, turnover, and AppHarvest's underperformance relative to its forecasts were discussed.  *See id.* (strong inference of scienter "because the Individual Defendants attended meetings where estimated rising EMEA levels were discussed"); *Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 300 (S.D.N.Y. 2018) (particularized facts giving rise to strong inference of scienter where "[i]ndividual Defendants participated in numerous meetings and conference calls during which the negative effects of integration-related activities were discussed.").  In addition, during this period, Eggleton and Lee were part of a process to reforecast to lower estimated production due

---

[7] Because Plaintiff has successfully pled scienter as to Eggleton and Lee during this time period, they have also pled corporate scienter as to AppHarvest during this time period.  *See Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 195 (2d Cir. 2008) ("In most cases, the most straightforward way to raise such an inference for a corporate defendant will be to plead it for an individual defendant."); *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d at 245.

to quality issues and substantial rejections by Mastronardi and were part of leadership meetings to keep an eye on productivity issues.  Such allegations strongly indicate that Lee and Eggleton were aware, during the toughest times, of the various issues AppHarvest was facing.

This strong inference of scienter is further bolstered by the core operations doctrine. During the Class Period, AppHarvest's only open facility and source of revenue was the Morehead Facility.  The Moorhead Facility's performance was therefore a classic core operation for AppHarvest.  *See In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at *26 (S.D.N.Y. Dec. 2, 2013) (Core operations include matters 'critical to the long term viability' of the company and events affecting a 'significant source of income.'" (citation omitted)).  And, as noted, "allegations of a company's core operations . . . can provide supplemental support for allegations of scienter, even if they cannot establish scienter independently."  *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 n.3 (2d Cir. 2011).  The information at issue—*i.e.*, productivity of the labor and the number of rejections by AppHarvest's largest distributor—was also allegedly critical to the facility's performance.  *See In re Aphria, Inc. Sec. Litig.*, 2020 WL 5819548, at *9 (S.D.N.Y. Sept. 30, 2020) (focus on the "critical" nature of the information in assessing whether there was a strong inference of scienter).

Defendants argue that these allegations concerning the "toughest times" are tied to too indefinite a time period to support a strong inference of scienter.  Dkt. No. 80 at 19.  But, the time period is not indefinite, even if it does constitute a period of several months.  Plaintiff does not allege that these meetings concerning the problems at AppHarvest happened at some unknown, indefinite point during this period—*i.e.*, from late Q1 2021 through the summer refresh.  Instead, Plaintiff argues that these meetings happened "throughout" this period and that throughout that period inadequate training, turnover, poor work ethic, and inconsistent hiring

48

standards were *repeatedly* cited as the "root cause" of the Company's productivity challenges. Dkt. No. 76 ¶ 127; *see also Celestica, Inc.*, 455 F. App'x at 13 (meetings throughout class period supported strong inference of scienter). This case is therefore unlike many of the cases cited by Defendants in support of this argument. For example, in *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, the court held that allegations pegged to the time period "after the acquisition" were too vague as it was "all but impossible to "match[] CW allegations to contrary public statements." *Id.* at 352; *see also In re Arrowhead Pharms., Inc. Sec. Litig.*, 2017 WL 5635422, at *10 (C.D. Cal. Sept. 20, 2017) (allegations too vague where it was alleged that deaths happened *either* in late 2015 or early 2016).

The Court, however, does note that it is somewhat unclear from these allegations when the "toughest times" started exactly. Late-Q1 2021 could mean March 31, 2021 or it could mean any time after February 14, 2021. Because of this vagueness concerning what portion of Q1 2021 constitutes part of the Company's "toughest times," it cannot be said that Plaintiff has plead with *particularity* facts supporting that misstatements made in the period between February 14, 2021 and March 30, 2021 were made with scienter. *JP Morgan Chase Co.*, 553 F.3d at 198 (quoting 15 U.S.C. § 78u–4(b)(2)). Those statements could easily have predated the Company's toughest times. Nothing in the Operative Complaint helps to answer this question. Thus, at earliest, the Operative Complaint has pleaded sufficient facts to allege with particularity that Lee and Eggleton possessed the requisite scienter on March 31, 2021 and that statements on or after that date could have, based on their contents, been material misstatements or omissions. *See Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 799 (S.D.N.Y. 2020) ("[S]tatements of CWs that cannot situate in time relevant occurrences are sometimes disregarded because they cannot establish that the challenged statements were knowingly false when made."); *City of Roseville*

*Employees' Ret. Sys. v. Textron, Inc.*, 810 F. Supp. 2d 434, 445 (D.R.I. 2011), *aff'd sub nom. Auto. Indus. Pension Tr. Fund v. Textron Inc.*, 682 F.3d 34 (1st Cir. 2012) ("Neither witness provides a concrete number of cancellations for any time period, and the vague allegations of an 'increase' in cancellations sometime in 'late summer' or 'fall' is simply not specific enough to plausibly demonstrate that statements made in July, September, and October, were false.").

In reaching this conclusion, the Court rejects Defendants argument that it should disregard the allegations supplied by CW6. With regard to the allegations concerning the meetings—which are central to the inference of scienter—the Operative Complaint provides sufficient detail to support that CW6 would have had a high likelihood of knowing the facts alleged. The Operative Complaint states that CW6 worked in the Company's FP&A Department from the third quarter of 2020 to the fourth quarter of 2021, reported to Eggleton, and worked to analyze different areas of the business and to create projections. Dkt. No. 76 ¶ 40. In addition, as noted, according to the Operative Complaint, CW6 attended the relevant meetings with Eggleton and Lee and thus had firsthand knowledge of what was discussed. "[C]ourts will credit confidential sources whose positions and/or job responsibilities are described sufficiently to indicate a high likelihood that they actually knew facts underlying their allegations." *In re Weight Watchers Int'l Inc. Sec. Litig.*, 504 F. Supp. 3d 224, 246 (S.D.N.Y. 2020) (quoting *Fanhua, Inc.*, 442 F. Supp. 3d at 798).

Although Plaintiff has pleaded enough to support a strong inference of scienter with respect to Eggleton and Lee during this period, the allegations concerning this same period (*i.e.*, the "toughest times") are inadequate to support any such inference with respect to Webb. The Operative Complaint does not allege that Webb attended any of the meetings during this period in which these issues were discussed. Nor was he involved in the process of reforecasting to

lower estimated production.  Plaintiff would thus have the Court infer that Webb knew about the problems discussed at these meetings largely based on CW6's claims that "[c]ompany executives had information parity, such that 'everyone knew what everyone else knew' regarding fundamental financial data."  Dkt. No. 84 at 31.  But, these allegations are inadequate as CW6, who made this statement, appears to have had no interactions with Webb based on the allegations in the Operative Complaint.  CW6 reported to Eggleton and had meetings with Lee and Eggleton.  Dkt. No. 76 ¶ 13.  Thus, while CW6 may have had insight into what Eggleton and Lee both knew, Plaintiff does not allege facts that would support that CW6 had similar insight with respect to Webb.  The allegations are therefore insufficient to support a probability that CW5 would have had knowledge as to what Webb knew concerning the alleged issues at AppHarvest. *See Jones v. Perez*, 550 F. App'x 24, 28 (2d Cir. 2013) ("[C]onfidential witnesses' assertions . . . do not support a cogent and compelling inference of fraud because none of the confidential witnesses assert direct knowledge that this view was held by defendants.").

## 2.   Actionable Statements

Concluding that the Operative Complaint has sufficiently alleged scienter for Defendants AppHarvest, Lee, and Eggleton for the period after March 31, 2021, the Court will next address whether any of the statements made by these Defendants, as opposed to Webb, in this period are actionable and, if so, are adequately alleged to be false.

Defendants claim that Plaintiff has failed to plead any actionable statements as they are either protected by the PSLRA safe harbor, or are statements of opinion, puffery, or accurate statements of fact.  Dkt. No. 80 at 14–17.  Defendants also contend that, even assuming there is a potentially actionable statement, the Operative Complaint does not allege that Defendants said anything materially false or misleading.  *Id.* at 17.  The Court will address each argument in turn.

### a.        PSLRA Safe Harbor

Subject to certain limited exceptions, the PSLRA bars private actions for federal

securities law violations based on "any forward-looking statement, whether written or oral."  15

U.S.C. § 78u-5(c)(1).  Under the PSLRA, forward-looking statements include:

> (A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

> (B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

> (C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;

> (D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);

> (E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or

> (F) a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the Commission.

15 U.S.C. § 78u-5(i)(1).

Under the PSLRA, a defendant is not liable "with respect to any forward-looking

statement, whether written or oral, if and to the extent" that:

> (A) the forward-looking statement is –

>> (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or (ii) immaterial; or

> (B) the plaintiff fails to prove that the forward-looking statement—

>> (i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading; or

>> (ii) if made by a business entity, was—

(I) made by or with the approval of an executive officer of that entity, and

(II) made or approved by such officer with actual knowledge by that officer that the statement was false or misleading.

15 U.S.C. § 78u-5(c). "The safe harbor is written in the disjunctive." *Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 385 (S.D.N.Y. 2020), *aff'd*, 847 F. App'x 35 (2d Cir. 2021) (quoting *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010)). Accordingly, a defendant is not liable for a forward-looking statement if (1) "the forward-looking statement is identified and accompanied by meaningful cautionary language," or (2) the forward-looking statement "is immaterial,) "the plaintiff fails to prove that [the forward-looking statement] was made with actual knowledge that it was false or misleading." *Slayton*, 604 F.3d at 766. "As long as the plaintiff fails to satisfy one of those elements (*e.g.*, the statement is accompanied by meaningful cautionary language or is immaterial), the presence of one of the other elements (e.g., the statement was known to be false or misleading) will not subject to the defendant to liability." *Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d at 385–86; *see also In re Vivendi*, 838 F.3d at 245–46 ("Because the safe harbor is written in the disjunctive, a forward-looking statement is protected under the safe harbor if any of the three prongs applies." (internal quotation marks and citation omitted)).

Defendants claim that the following statements set out in the Operative Complaint and made by either Lee or Eggleton on or after March 31, 2021 are forward-looking statements protected by the PSLRA safe harbor:

- AppHarvest's May 17, 2021 Press Release signed by Eggleton: "The Company reiterated its full-year 2021 outlook of net sales of $20 to $25 million" "We are pleased by our fast start to the year, the encouraging operating and financial performance of our Morehead facility and our team's ability to scale the business. . . ." said AppHarvest president David Lee. Dkt. No. 76 ¶ 199.

- May 17, 2021 Earnings Call:  David Lee stated, "What we did well is we anticipated and performed well on—in market pricing . . . our affirmation of our guidance in 2021 [reflects that we think we're on track]."  *Id.* ¶¶ 207, 306.

Dkt. No. 81-2 (emphasis omitted).

In response, Plaintiff contends that it does not "challenge any sales forecasts" but rather only challenges the "present or backward-looking false justifications for their forecasts."[8]  Dkt. No. 84 at 26 (citing Dkt. No. 76 ¶¶ 150, 169, 173, 199, 209).  Furthermore, Plaintiff argues that every statement attacked as forward-looking was misleading by omission because of Defendants' failure to state material facts regarding production, staffing, and/or pricing and the safe harbor is inapplicable to material omissions.  *Id.*

"[A] statement may contain some elements that look forward and others that do not, and forward-looking elements may be severable from non-forward-looking elements."[9]  *In re Philip Morris Int'l Inc. Sec. Litig.*, 2020 WL 5632901, at *6 (S.D.N.Y. Sept. 21, 2020); *see Iowa Pub. Employees' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 144 (2d Cir. 2010).  Where the forward-looking elements are severable, "[m]ixed present and future statements are not entitled to the

---

[8] Defendants appear to argue that this argument is untimely and cites law to the effect that "[i]t is axiomatic that the Complaint cannot be amended by the . . . opposition to a motion to dismiss." Dkt. No. 91 at 3 n.3 (quoting *Kosovich v. Metro Homes, LLC*, 2009 WL 5171737, at *5 n.6, (S.D.N.Y. Dec. 29, 2009)).  This argument is unavailing.  The Operative Complaint pleads that the non-forward-looking portions of these statements are actionable.  *See* Dkt. No. 76 ¶¶ 200, 207, 209.  This is thus not an instance where a plaintiff seeks to amend the allegations in the complaint through its opposition to a motion to dismiss.

[9] Contrary to Defendants' contention, Dkt. No. 91 at 3, statements of existing or past performance are not subject to the PSLRA as "the assumptions underlying or relating to" projections. 15 U.S.C. § 78u-5(i)(1)(D).  Assumptions are statements about uncertain events or things that are accepted as certain to occur or as true, without proof, for purposes of making a projection.  *See City of Warwick Mun. Emps. Pension Fund v. Rackspace Hosting, Inc.*, 2019 WL 452051, at *3 (S.D.N.Y. Feb. 5, 2019); *Assumption*, Merriam-Webster.com (last visited July 18, 223) ("an assuming that something is true.").  They are not statements of "historical fact." *Baum v. Harman Int'l Indus., Inc.*, 575 F. Supp. 3d 289, 297–98 (D. Conn. 2021).

safe harbor with respect to the part of the statement that refers to the present." *In re Supercom Inc. Sec. Litig.*, 2018 WL 4926442, at *21 (S.D.N.Y. Oct. 10, 2018).

For example, in *In re Vivendi*, the Second Circuit held that the severable, non-forward-looking elements of certain forward-looking representations were not protected by the PSLRA safe harbor.  838 F.3d at 246.  The court gave as an example the following statement: "Vivendi Universal enters its first full year of operations with strong growth prospects and a very strong balance sheet.  This new company is off to a fast start and we are very confident that we will meet the very aggressive growth targets we have set for ourselves both at the revenues and EBITDA levels." *Id.* (citation omitted).  The Circuit noted that "[a]lthough some aspects of this statement could conceivably be characterized as forward-looking, there is nothing prospective about the representation that Vivendi entered 2001 with a 'very strong balance sheet,' which Plaintiffs argued at trial was part of what made Vivendi's February 14, 2001 statement misleading." *Id.*  The Circuit then concluded that "[t]he safe-harbor provision does not protect this and other present representations—about 'very strong 2000 results,' or achievement of '"aggressive" incremental EBITDA targets,' embedded within statements that Vivendi deems forward-looking." *Id.*  Similarly, in *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, the Seventh Circuit held that the company's statements that its sales were "still going strong" was not entitled to the PSLRA safe harbor as "[t]he element of prediction in saying that sales are 'still going strong' does not entitle Tellabs to a safe harbor with regard to the statement's representation concerning current sales."  513 F.3d 702, 705 (7th Cir. 2008).

Yet, while severable and non-forward-looking elements of forward-looking statements are not protected by the PSLRA, the mere fact that a forward-looking statement contains certain non-forward-looking elements does not render it exempt.  "[W]hen the present-tense portion of

mixed present and future statements does not provide specific information about the current situation, but merely says that, whatever the present situation is, it makes the future projection attainable, the present-tense portion of the statement is too vague to be actionable apart from the future projection." *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d at 211 (quoting *In re Supercom Inc. Sec. Litig.*, 2018 WL 4926442, at *21).  Accordingly, courts have found that statements that a company is "on track" or "positioned" to reach its projections are "too vague to be actionable separate from the future projections" and therefore are protected under the PSLRA. *Id.*; *see also Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 255 (3d Cir. 2009) ("[T]he 'on track' and 'position us' portions of the January 25, 2005 statements, when read in context, cannot meaningfully be distinguished from the future projection of which they are a part."); *In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *19 ("[S]tatements that the Company was 'on track' to reach the projected margin expansion and related growth are 'too vague to be actionable apart from the future projection.'  These statements provide no specific information as to Adient's current circumstances, but rather contain information related only to its future projections.").

Here, as in *In re Vivendi* and *Tellabs*, the forward-looking statements that Defendants claim are protected under the PSLRA safe harbor contain non-forward looking elements that are severable.  This is true as to AppHarvest's statement in its May 17 press release, after reiterating its full-year 2021 outlook of net sales, that "[w]e are pleased by our fast start to the year, the encouraging operating and financial performance of our Morehead facility and our team's ability to scale the business . . . ."  Dkt. No. 76 ¶¶ 169, 173, 199.  Although the portion of this statement concerning AppHarvest's net sales outlook is a forward-looking statement protected by the PSLRA, other portions contain representations that "provide specific information about the current [or past] situation" of AppHarvest.  *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F.

Supp. 3d at 211.  AppHarvest represents that it has had a "fast start to the year," "encouraging operating and financial performance," and the team has been able to "scale the business."  Dkt. No. 76 ¶¶ 169, 173, 199.  These non-forward looking portions of the statements—*i.e.*, the only portions that Plaintiff claims to challenge—are not protected under the PSLRA safe harbor.  *See Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*, 432 F. Supp. 3d 131, 166 (D. Conn. 2019) (finding non-forward-looking portion of the statements actionable as "[i]n the challenged statements . . . , the defendants not only discussed future projections but also past performance, which did not include pricing as a factor").

The Court reaches the same conclusion with respect to a portion of the statement at the 2021 Q1 Earnings Call that "[w]hat we did well is we anticipated and performed well on—in market pricing . . . our affirmation of our guidance in 2021 [reflects that we think we're on track]."  Dkt. No. 76 ¶¶ 207, 209.  Although made in connection with a forward-looking statement affirming the Company's 2021 guidance, the statement that the Company "anticipated and performed well on [] market pricing" is a severable statement of past performance that is not subject to the PSLRA.  *See Tellabs*, 513 F.3d at 705 ("[T]he element of prediction in saying that sales are 'still going strong' does not entitle Tellabs to a safe harbor with regard to the statement's representation concerning current sales.").  The Court thus denies the motion to dismiss these challenged portions of the statements as forward-looking statements protected under the PSLRA.

### b.      Opinion Statements

Next, Defendants move to dismiss certain challenged statements arguing that they are inactionable opinion statements.  Dkt. No. 80 at 16; Dkt. No. 81-4 (detailing these statements).  In response, Plaintiff does not dispute that these statements are opinions.  Instead, Plaintiff contends that these opinion statements are actionable because they "omit[ed] material facts about

[each] speaker's inquiry into or knowledge of facts that would support the stated opinion." Dkt. No. 84 at 27 (citation omitted). In addition, Plaintiff contends that the purported opinions regarding productivity, supply, staffing, and pricing were not "honestly held." *Id.* (citation omitted). In its reply, Defendants respond that the Operative Complaint does not sufficiently allege that Defendants knew any contrary, material facts when those opinions were expressed nor does it sufficiently allege that the opinions were not honestly held when they were made. Dkt. No. 91 at 4–5.

"[S]ubjective statements of opinion are generally not actionable as fraud." *Afr. v. Jianpu Tech. Inc.*, 2022 WL 4537973, at *5 (S.D.N.Y. Sept. 28, 2022) (quoting *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 528 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016)). "[F]or a statement of belief or opinion to be actionable under Section 10(b), a plaintiff must allege that (1) 'the speaker did not hold the belief she professed,' (2) 'the supporting fact[s] she supplied were untrue,' or (3) the stated opinion, 'though sincerely held and otherwise true as a matter of fact,' 'omit[ted] information whose omission ma[de] the [stated opinion] misleading to a reasonable investor.'" *Fresno Cnty. Employees' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 547 (S.D.N.Y. 2017) (quoting *N. Collier Fire Control & Rescue Dist. Firefighter Pension Plan & Plymouth Cty. Ret. Ass'n v. MDC Partners, Inc.*, 2016 WL 5794774, at *10 (S.D.N.Y. Sept. 30, 2016)); *see also In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d at 218. "The Supreme Court has emphasized that this standard will not be easy to satisfy." *Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d at 400.

"For an omission from an opinion to be actionable, '[t]he investor must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the

opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Bldg. Trades Pension Fund of W. Pennsylvania v. Insperity*, *Inc.*, 2022 WL 784017, at *7 (S.D.N.Y. Mar. 15, 2022) (quoting *Omnicare*, 575 U.S. at 194).  "As the Supreme Court has explained, 'a reasonable investor, upon hearing a statement of opinion from an issuer, "expects not just that the issuer believes the opinion (however irrationally), but that it fairly aligns with the information in the issuer's possession at a time."'" *Lopez v. Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 24 (S.D.N.Y. 2016) (quoting *Podany v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 146, 156 (S.D.N.Y. 2004)).  "'The core inquiry,' then, 'is whether the omitted facts would "conflict with what a reasonable investor would take from the statement itself."'" *Lopez*, 173 F. Supp. 3d at 24 (quoting *Podany*, 318 F. Supp. 2d at 156).  The Supreme Court has stated that establishing liability on this theory is "no small task for an investor." *Sanofi*, 816 F.3d at 210  (quoting *Omnicare*, 575 U.S. at 194).

The Supreme Court gave an example in *Omnicare* of the types of omitted facts that would render an opinion misleading by omission:  if a company states, "we believe our conduct is lawful," and makes the statement without consulting a lawyer, "it could be misleadingly incomplete."  575 U.S. at 188.  The Court noted: "In the context of the securities market, an investor, though recognizing that legal opinions can prove wrong in the end, still likely expects such an assertion to rest on some meaningful legal inquiry—rather than, say, on mere intuition, however sincere."  *Id.*

The statements that Defendants argue are inactionable opinions are the following:

- April 6, 2021 Form S-8 (signed by Lee and Eggleton):  "**We believe there is a large population of workers in the Central Appalachian region who are eager to find long-term career opportunities like those being offered by AppHarvest . . . .  As a result, we believe we can staff and retain our workers with less churn**, immigration challenges **and unfilled positions** that many of our competitors face."  Dkt. No. 76 ¶¶ 184, 195–96 (emphasis in original).

- April 6, 2021 Form S-8 (signed by Lee and Eggleton):  "**We were able to efficiently hire many employees as we opened our first facility in Morehead** and have identified talent to join our team at the facilities we are developing in Richmond and Berea." *Id.* ¶¶ 185, 195–96 (emphasis in original).

- May 17, 2021 Press Release:  "**We are pleased by our fast start to the year, the encouraging operating and financial performance of our Morehead facility and our team's ability to scale the business . . . ,**"  said AppHarvest President David Lee. *Id.* ¶ 199 (emphasis in original).

- May 17, 2021 Earnings Call:  Lee stated, "**What we did well is we anticipated and performed well on—in market pricing**." *Id.* ¶ 207 (emphasis in original).

- May 25, 2021 Interview of Lee:  "You probably read about the ice storms that gripped parts of the country.  And **our facility at Morehead provided that it could weather those conditions maybe better than most**." *Id.* ¶ 216 (emphasis in original).

- May 25, 2021 Interview of Lee:  "**We, we learned about what kind of labor we could source locally having, um, 500 plus employees ready to, to join us, if we want, proved and validated the model that we really could hire local talent, give them a living wage, provide full-time employees stock and execute well** within, actually, the adjusted EBITDA range that we expected.  So that was an important lesson." *Id.* (emphasis in original).

- May 25, 2021 Interview of Lee:  "**I think the other lesson is we learned that we could hit our numbers and still experiment** and trial a way to optimize what we call Morehead 2.0—this is on the other side of our summer refresh—so that we have more confidence in our ability to produce better in the future.  And **it's the reason why we affirmed the expectations we had put out for the year**." *Id.* (emphasis in original).

Dkt. No. 81-4.

As noted, Plaintiff does not contest that these statements are opinions in his opposition brief.  Because Plaintiff do not oppose this argument in his opposition to Defendants' motion to dismiss, Plaintiff's "silence concedes the point." *AT & T Corp. v. Syniverse Techs., Inc.*, 2014 WL 4412392, at *7 (S.D.N.Y. Sept. 8, 2014); *see also Meridian Autonomous Inc. v. Coast Autonomous LLC*, 2018 WL 4759754, at *5 (S.D.N.Y. Sept. 30, 2018) (deeming argument conceded where plaintiff did not explicitly oppose it); *In re UBS AG Sec. Litig.*, 2012 WL 4471265, at *11 (S.D.N.Y. Sept. 28, 2012), *aff'd sub nom. City of Pontiac Policemen's &*

*Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014) (Sullivan, J.) ("Plaintiff also concedes through silence that Defendant Stuerzinger did not make an actionable material misstatement.").

Instead, Plaintiff claims that each statement is actionable even as an opinion because the speaker either did not sincerely hold the opinion professed or omitted facts that made the statement misleading. Dkt. No. 84 at 27. The Court disagrees. With respect to each statement that Defendants argue are opinions, the Operative Complaint does not support either that the speaker did not sincerely hold the opinion professed or omitted facts that made the statement misleading.

To start, in the April 6, 2021 Form S-8[10] signed by Lee and Eggleton, AppHarvest stated: "We believe there is a large population of workers in the Central Appalachian region who are eager to find long-term career opportunities like those being offered by AppHarvest . . . ." Dkt. No. 76 ¶¶ 184, 195–96 (emphasis in original). Nothing in the Operative Complaint supports that Lee and Eggleton did not believe this statement was true when it was made. While the Operative Complaint alleges facts that support that Lee and Eggleton knew that the Company was having trouble retaining certain workers, nothing in the Operative Complaint indicates what they believed or that they knew there was not a population of workers in the area who were eager to find long-term work. Nor was it materially misleading for Lee and Eggleton to omit information, in making this statement, about AppHarvest's issues with its workforce. No reasonable investor, "reading the statement fairly and in context," would take from this statement

---

[10] This statement also appeared in AppHarvest's June 4, 2021 Form S-1 and AppHarvest's June 9, 2021 Prospectus. The Court reaches the same conclusion with respect to its appearance there. No. 76 ¶¶ 225, 234.

that AppHarvest was having no issues with retaining or training employees or issues with worker productivity. *Omnicare*, 575 U.S. at 194.

The Court reaches the same conclusion with respect to the statement in the April 6, 2021 Form S-8[11] that "[w]e were able to efficiently hire many employees as we opened our first facility in Morehead and have identified talent to join our team at the facilities we are developing in Richmond and Berea." Dkt. No. 76 ¶¶ 185, 195–96. Again, this statement only makes a representation as to AppHarvest's ability to hire employees in the Morehead facility. It makes no representation about AppHarvest's ability to retain or train the employees once they were hired or their productivity. Plaintiff has thus not sufficiently pleaded that this opinion is actionable as the allegations do not support that it was not sincerely held nor does Plaintiff identify particular facts going to the basis for the opinion whose omission makes the statement misleading.

The Court next turns to Lee's statement in the May 17, 2021 Press Release ("We are pleased by our fast start to the year, the encouraging operating and financial performance of our Morehead facility and our team's ability to scale the business"). *Id*. ¶ 199. This statement is also an inactionable opinion. First, the allegations do not plausibly support that Lee did not hold the beliefs he professed. Specifically, although Lee may have been aware of issues with crop damage and quality as well as issues with the workforce around this time, Lee's awareness of those specific issues does not necessarily mean that he did not generally believe that AppHarvest had a "fast start to the year," that the team had the "ability to scale the business," or that the "operating and financial performance of our Moorhead facility" was "encouraging" or that he

---

[11] This statement also appeared in AppHarvest's June 4, 2021 Form S-1 and AppHarvest's June 9, 2021 Prospectus. No. 76 ¶¶ 226, 235. The Court reaches the same conclusion with respect to its appearances there.

was not pleased as a result.  *Id.*  Lee's opinion was expressed in connection with AppHarvest's

announcement of its "Solid Q1 2021 Results," after its "first completed quarter as a public

company," in which it stated that it had met expectations by having "$2.3 million net sales in

first quarter harvesting."  Dkt. No. 81-25.  Thus, in light of the statement's overall context, Lee's

comment clearly expresses that he was pleased with these early results and not that everything at

AppHarvest was running entirely smoothly or that what had begun as a "fast start" would

continue in that fashion.  The allegations further do not support that Lee "omitted facts" that

would "conflict with what a reasonable investor would take from the statement itself."  *Lopez*,

173 F. Supp. 3d at 24 (quoting *Podany*, 318 F. Supp. 2d at 156).  No reasonable investor would

take from this statement—made in connection with the release of AppHarvest's Q1 2021

results—that AppHarvest was having no current issues with its staffing and quality.  The

statements "are properly cast as guardedly optimistic" and are "far from unconditionally positive

or euphoric."  *Oklahoma Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551,

577 (S.D.N.Y. 2018), *aff'd sub nom. Arkansas Pub. Emps. Ret. Sys. v. Xerox Corp.*, 771 F.

App'x 51 (2d Cir. 2019).  Moreover, even if the information concerning crop damage, quality,

and workforce issues cut the other way from Lee's expressions of optimism about the

Company's early performance, "[a] statement of opinion 'is not necessarily misleading when an

issuer knows, but fails to disclose, some fact cutting the other way.'"  *Lopez*, 173 F. Supp. 3d at

24 (citation omitted); *see also In re Express Scripts Holdings Co. Sec. Litig.*, 773 F. App'x 9, 13

(2d Cir. 2019) (dismissing argument that the statements that the relationship between Express

Scripts and Anthem was "great" and "very, very solid" were misleading "because of the state of

the negotiations between Express Scripts and Anthem" and stating "[a]n opinion statement . . . is

not necessarily misleading when an issuer knows, but fails to disclose, some fact cutting the

other way" (quoting *Omnicare*, 575 U.S. at 189)); *Sanofi*, 816 F.3d at 212 (finding no claim

stated where "Plaintiffs' case essentially boils down to an allegation that the statements were

misleading for failure to include a fact that would have potentially undermined Defendants'

optimistic projections").

For similar reasons, the Court dismisses any claims based on the following opinions

expressed by Lee during a May 25, 2021 interview:

- **"We, we learned about what kind of labor we could source locally having, um, 500 plus employees ready to, to join us, if we want, proved and validated the model that we really could hire local talent, give them a living wage, provide full-time employees stock and execute well** within, actually, the adjusted EBITDA range that we expected.  So that was an important lesson." Dkt. No. 76 ¶ 216 (emphasis in original).

- **"I think the other lesson is we learned that we could hit our numbers and still experiment**." *Id.* (emphasis in original).

These opinions were expressed in response to a question about the Company's "first crop in

January" and how its "start up went," Dkt. No. 81-33 at 3–4, and concerned Defendants' Q1

results.  For example, in conjunction with this comment, Lee specifically referenced "being able

to hit the expectations to deliver 2.3 million in net revenue," *id.*, which was AppHarvest's

revenue for its first quarter of 2021, Dkt. No. 81-29.  Therefore, read in context, these optimistic

comments were about AppHarvest's early performance, not its current performance.  And, as

discussed, the fact that Lee may have had reasons to be less-than-optimistic about AppHarvest's

current operations does not necessarily mean that Lee did not sincerely believe that

AppHarvest's early performance provided reason to be optimistic that the Company could work

and be successful, with operational tweaks.  Plaintiff also has offered no allegations of

"particular (and material) facts going to the basis for the issuer's opinion" about AppHarvest's

promising initial performance "whose omission makes the opinion statement at issue misleading

to a reasonable person reading the statement fairly and in context."  *In re Fairway Grp. Holdings*

*Corp. Sec. Litig.*, 2015 WL 4931357, at *11 (S.D.N.Y. Aug. 19, 2015), *report and recommendation adopted*, 2015 WL 5255469 (S.D.N.Y. Sept. 9, 2015) (quoting *Omnicare*, 575 U.S. at 194).

The Court also dismisses any claims based on Lee's statement at the May 17, 2021 Earnings Call that "what we did well is we anticipated and performed well on—in market pricing." Dkt. No. 76 ¶ 207. This statement, read in context, clearly referred to the Q1 2021 period. *See Omnicare*, 575 U.S. at 190 ("The reasonable investor understands a statement of opinion in its full context."). Lee did not state that the Company was currently performing well on market pricing. Instead, Lee expressed an opinion about something that happened in the past—how the Company *performed*. It was made on the Q1 2021 Earnings Call and Lee specifically connected the comment to the Company's "Q1" stating "[a] big part of that in Q1 was our relationship with Mastronardi." Dkt. No. 81-29 at ECF p. 11. This is significant as while allegations support that Lee may have known that the Company was not currently performing well—*i.e.*, during the "toughest period—on pricing due to rejections from Mastronardi when he made the statement, the allegations do not support that he did not truly believe that the Company had performed well on market pricing in Q1 2021. That Lee may have known that the Company was not performing well on market pricing at the time he made the statement also does not render the opinion actionable by omission. Information that AppHarvest was currently struggling with pricing does not "conflict with what a reasonable investor would take from the statement" that AppHarvest had performed well on pricing in Q1 2021. *Lopez*, 173 F. Supp. 3d at 24 (quoting *Podany*, 318 F. Supp. 2d at 156).

The statement in various SEC filings that "we believe we can staff and retain our workers with less churn, immigration challenges and unfilled positions that many of our competitors

face" is also an inactionable opinion.  Dkt. No. 76 ¶¶ 184, 195–96.  Even if the allegations

support that Eggleton and Lee were aware at this time of the issues that the Company was facing

with churn, the allegations do not support that Eggleton and Lee did not honestly believe that

they could have "less churn" or fewer "unfilled positions" than "many of [their] competitors."

*Id.*  In fact, the Operative Complaint is entirely silent on what types of churn or unfilled positions

"many" of AppHarvest's competitors had or were likely to have.  Moreover, the fact that

AppHarvest had issues with churn and did not disclose that fact does not necessarily render the

statement misleading by omission.  While information about some difficulty with attrition and

churn of its employee would certainly cut against the proclaimed belief that AppHarvest could

have less churn or unfilled positions than its competitors, it does not render that statement

"misleadingly incomplete."  *Omnicare*, 575 U.S. at 188.  Defendants did not misrepresent the

"facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not

have."  *Insperity, Inc.*, 2022 WL 784017, at *7 (quoting *Omnicare*, 575 U.S. at 194).  Instead, it

merely constitutes a "fact cutting the other way," which, as noted, is not sufficient on its own to

render a statement of opinion misleading.  *Wilson v. LSB Indus., Inc.*, 2017 WL 7052046, at *2

(S.D.N.Y. Mar. 2, 2017); *see In re Express Scripts Holdings Co. Sec. Litig.*, 773 F. App'x at 13.

Finally, the Court dismisses any claims based on the following statements made by Lee

during his May 25, 2021 interview:  "[y]ou probably read about the ice storms that gripped parts

of the country.  And our facility at Morehead provided that it could weather those conditions

maybe better than most."  Dkt. No. 76 ¶ 216.  Reading the statement fairly and in context, it is

plainly about AppHarvest's ability to withstand ice storms compared to the ability of others to

withstand ice storms.  It is not about Morehead's performance relative to other companies more

generally, and Plaintiff has offered no evidence that Lee did not sincerely believe that Morehead

weathered the ice storm "better than most" or that it omitted "particular (and material) facts going to the basis for the issuer's opinion" and which rendered the opinion misleading. *Omnicare*, 575 U.S. at 194. The opinion is also phrased tentatively: Lee expressed that he believed Morehead "could weather those conditions *maybe* better than most." Dkt. No. 76 ¶ 216 (emphasis added); *see Omnicare*, 575 U.S. at 195 (party can avoid liability for omissions where issuer "make[s] clear the real tentativeness of its belief").

The Court therefore dismisses each of these statements as inactionable opinions.[12] Plaintiff has neither plausibly alleged that they were not honestly believed when said or that they were misleading by omission.

### c.   Puffery[13]

Defendants also move to dismiss the following statement as inactionable puffery.

---

[12] Even if the Court did not dismiss many of these statements as inactionable opinions, the Court would dismiss them as "expressions of puffery and optimism." *In re Express Scripts Holdings Co. Sec. Litig.*, 773 F. App'x at 13. Defendants' statements such as "[w]e are pleased by our fast start to the year, the encouraging operating and financial performance of our Morehead facility . . . ," Dkt. No. 76 ¶ 199, and "what we did well is we anticipated and performed well on—in market pricing," *id.* ¶ 207, constitute puffery and corporate optimism which generally do not give rise to securities violations. *See In re Express Scripts Holdings Co. Sec. Litig.*, 773 F. App'x at 13; *Zhou v. NextCure, Inc.*, 2023 WL 4493541, at *10 (S.D.N.Y. July 12, 2023) ("The Second Circuit has held that words like encouraging are the type of expressions of puffery and corporate optimism that do not generally give rise to securities violations." (internal quotation marks omitted) (quoting *Kleinman v. Elan Corp., plc*, 706 F.3d 145, 153 (2d Cir. 2013))); *Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d 821, 845 (S.D.N.Y. 2019) (Nathan, J.) ("[S]tatements that a strategic move has been 'a success,' that a company is 'moving well forward,' that 'things are going well,' or that operations are 'successful,' will typically be considered puffery unless 'the statements addressed concrete and measurable areas of the defendant company's performance.'" (citation omitted)). This is also true of Defendants' statements expressing vague views on "future expectations" such as "we believe we can staff and retain our workers with less churn, immigration challenges and unfilled positions that many of our competitors face." Dkt. No. 76 ¶¶ 184, 195–99. No reasonable investor would rely on such "general" statements "delivered in corporate jargon, and [that] relate to future expectations." *Evoqua Water Techs. Corp.*, 450 F. Supp. 3d at 400 (quoting *AMC Entm't Holdings, Inc.*, 422 F. Supp. 3d at 845).

[13] The Court does not address statements that Defendants argue are puffery that it already dismissed on the basis that they constitute inactionable opinions.

- Lee's statement during a May 25, 2021 interview: "Um, **thankfully COVID has not in any way impacted our operation** . . . . With regard to labor, we have had absolutely no shortage of interest.  I mean multiples of the amount of roles that we wanna fill, have lined up to work with us. And, and a part of that is by design, a part of that is the kind of company we want to be and the part of the country in which we choose to produce.  **So we haven't had any challenges with recruiting or staffing**."  Dkt. No. 76 ¶ 217 (emphasis in original).

*See* Dkt. No. 81-3.  Plaintiff argues that this statement is not puffery particularly as Defendants knew it to be untrue when stated.  Dkt. No. 84 at 28.

"Statements are non-actionable if they are 'puffery' that is 'too general to cause a reasonable investor to rely upon them,' or 'general expressions of corporate optimism' that are 'too indefinite to be actionable under the securities laws.'"  *Hawaii Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d 821, 845 (S.D.N.Y. 2019) (Nathan, J.) (internal citations omitted).  Examples of statements that are generally considered puffery include that "a strategic move has been 'a success,' that a company is 'moving well forward,' that 'things are going well,' or that operations are 'successful.'"  *Id.* (quoting *Xerox Corp.*, 300 F. Supp. 3d at 570 (citing cases)).

"[T]here is no canonical test for how vague a statement must be to qualify as puffery."  *In re Virtus Inv. Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d 528, 537 (S.D.N.Y. 2016).  However, where a statement is "not verifiable," it is more likely to be deemed puffery.  *Xerox Corp.*, 300 F. Supp. 3d at 570.  On the other hand, statements about "concrete and measurable areas" of a company's performance are more likely to be deemed actionable.  *In re Nevsun Res. Ltd.*, 2013 WL 6017402, at *9 (S.D.N.Y. Sept. 27, 2013); *see also In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 272 (S.D.N.Y. 2010) (statement that Ambac's CDO portfolio was currently outperforming the market and relevant indices is not puffery as it conveys "something concrete and measurable about Ambac's financial situation").

Here, the statements that "we haven't had any challenges with recruiting or staffing" and "thankfully COVID has not in any way impacted our operation" could plausibly be relied upon by a reasonable investor.  These statements appear to convey concrete and verifiable information about AppHarvest's operations.  Dkt. No. 76 ¶ 217.  They convey that the global COVID-19 pandemic has had *no* impact on AppHarvest's operations and that AppHarvest has had *no* problems with recruiting or staffing.  If the pandemic had impacted AppHarvest's operations in any way or AppHarvest had suffered certain problems with recruiting or staffing, these statements would both be false.  *See Duran v. Henkel of Am., Inc.*, 450 F. Supp. 3d 337, 348 (S.D.N.Y. 2020) (holding that statement that product causes "no flakes" is "[f]ar from puffery, this is a testable binary proposition—the gel either leads to flaking, or it does not").  Drawing all inferences in favor of Plaintiff, a reasonable investor could thus rely on these statements in concluding that AppHarvest was suffering no internal problems with staffing, recruiting, or due to the COVID-19 pandemic.  *See In re Lucent Techs., Inc. Sec. Litig.*, 217 F. Supp. 2d 529, 556 (D.N.J. 2002) (no puffery where "Defendants' representations were neither vague nor general. Rather than acknowledge internal problems, Defendants made statements suggesting that no such problems existed.").

That these statements plausibly conveyed concrete information that a reasonable investor could rely on is further supported by their context.  *See Doe v. Uber Techs., Inc.*, 551 F. Supp. 3d 341, 368 (S.D.N.Y. 2021) ("Whether a representation is 'mere puffery' depends, in part, on the context in which it is made." (citation omitted)).  They were made in response to a question from an interview identifying specific issues that other "companies in the food business" had faced regarding staffing and recruiting.  Dkt. No. 81-33 at 5.  In particular, the interview stated: "And then there's a second question about the ability to get labor in your plant, we've had a number of

companies in the in the food business tell us that they can't get a full second shift." *Id.*  By responding to this question and stating that "we haven't had any challenges with our recruiting or staffing," it is plausible that a reasonable investor could interpret this comment to specifically convey that AppHarvest had no issues, as opposed to those companies, in "gett[ing] a full second shift." *Id.*

The Court therefore denies Defendants' motion to dismiss any claims based on these statements on the basis that they constitute inactionable puffery.

### 3.    Falsity

Defendants also move to dismiss the Section 10(b) claim on the basis that Defendants said nothing materially false or misleading.  Dkt. No. 70 at 17.

### a.    Confidential Witnesses

Defendants notes that, in alleging that Defendants' statements were false, Plaintiff relies almost exclusively on confidential witnesses ("CWs").  *Id.* at 18.  Defendants argue that the allegations from the CWs are not reliable and do not show that any of the challenged statements were rendered materially misleading by the alleged omissions.  Defendants contend that "[f]ive of the six CWs were low-level employees who had no contact with any Defendant and the final CW's allegations are conspicuously vague and non-specific." *Id.*

The Operative Complaint relies heavily on statements made by six CWs.  This, however, on its own, does not make the allegations implausible.  "As a general matter, courts consider and take as true the statements of [confidential] witnesses at this stage, even when applying the heightened standards of Rule 9(b) and the PSLRA." *Evoqua Water Techs. Corp.*, 450 F. Supp. 3d at 405; *see also Novak*, 216 F.3d at 314 ("Thus, we find no requirement in existing law that, in the ordinary course, complaints in securities fraud cases must name confidential sources, and we see no reason to impose such a requirement under the circumstances of this case.").  "But a

plaintiff may rest on information provided by anonymous sources only when they 'are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'" *Evoqua Water Techs. Corp.*, 450 F. Supp. 3d at 405–06 (quoting *Novak*, 216 F.3d at 314).  Put differently, "confidential source allegations must show that individual defendants *actually possessed* the knowledge highlighting the falsity of public statements."  *In re Nielsen Holdings PLC Sec. Litig.*, 510 F. Supp. 3d 217, 228–29 (S.D.N.Y. 2021) (quoting *Glaser*, 772 F. Supp. 2d at 591) (emphasis in original).

Defendants argue that the allegations of one confidential witness ("CW3") should not be credited because he was a low-level employee who left the Company before the Class Period began.  Dkt. No. 80 at 18.  The Operative Complaint relies on information provided by CW3 to support that AppHarvest first planted Tomatoes on the Vine in January/February 2021, Dkt. No. 76 ¶ 53, that the Company prepared forecasts in connection with the first growing season at the Morehead Facility, *id.* ¶¶ 130, 263, and that "Defendants knew about AppHarvest's productivity challenges throughout the Class Period," *id*. ¶ 13.

The Court agrees that the allegations of CW3 have little bearing on the issue of "contemporaneous falsity" during the Class Period.  *In re FuboTV Inc. Sec. Litig.*, 2023 WL 2711826, at *11 (S.D.N.Y. Mar. 30, 2023); *see also Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d 179, 208 (S.D.N.Y. 2020) ("[C]ourts have rejected confidential witness allegations where the confidential witnesses 'left the company before the class period.'" (quoting *Campo v. Sears Holding Corp.*, 635 F. Supp. 2d 323, 335 (S.D.N.Y. 2009), *aff'd*, 371 F. App'x 212 (2d Cir. 2010))).  The Operative Complaint describes CW3 as a "former AppHarvest Senior Cost Accountant who was employed at the Company in that position from October 2020 through

December 2020" and who was "responsible for all direct agricultural cost of sales analysis, costing and valuation, and reporting." Dkt. No. 76 ¶ 37. This description supports that CW3 may have had some knowledge of operations at the Company during the two month period he was employed in 2020. It does not support that he had knowledge of AppHarvest's operations during the Class Period, particularly knowledge about what Defendants *knew or did know* about AppHarvest's productivity challenges. Thus, the Court disregards CW3's allegations to the extent that they represent that AppHarvest first planted Tomatoes on the Vine in January/February 2021, *id.* ¶ 53, that the Company prepared forecasts during the Class Period, *id.* ¶¶ 130, 263, and that "Defendants knew about AppHarvest's productivity challenges throughout the Class Period," *id.* ¶ 13.

The Court, nevertheless, will rely on CW3's allegations that AppHarvest prepared projections with details such as yield, sales, and costs during the time that he was employed as support for the inference that AppHarvest prepared similar projections during the Class Period. CW3, according to the allegations in the Operative Complaint, only left the company about two months before the Class Period started. And, the Second Circuit has stated that "allegations concerning activity in one period can support an inference of similar circumstances in a subsequent period." *Emps.' Ret. Sys. v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015); *see also Greco v. Qudian Inc.*, 2022 WL 4226022, at *13 (S.D.N.Y. Sept. 13, 2022) ("Although CW 4 left Qudian at least a few months prior to the Class Period, the fact that banks were not conducting independent credit assessments in the summer of 2018 supports the inference that the banks continued that practice into the Class Period.").

Second, Defendants argue that the allegations of CW1, CW2, CW4, and CW5 cannot be used as support for firm-wide operations as they were low-level employees and comprised a

small fraction of the total employees at the Company.  Dkt. No. 80 at 18–19.  This Court

disagrees.  "A comprehensive survey of employees is not needed at the pleading stage."

*Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 197 (S.D.N.Y. 2010).  Accordingly,

courts have found at the pleading stage that the accounts of confidential witnesses support a

"[c]ompany-wide inference" where, for example, they "emanate from several geographic areas;

(2) span different levels of the Company hierarchy; and (3) remain consistent across different

time period."  *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1058–59

(C.D. Cal. 2008) (cleaned up); *see also In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 377

(E.D.N.Y. 2013).  Here, the individual accounts of CW1, CW2, CW4, and CW5 of their

experiences at AppHarvest collectively support an inference concerning company-wide

operations at AppHarvest.  Dkt. No. 76.  According to the allegations in the Operative

Complaint, the CWs worked at various time periods during the Class Period and occupied

different roles and positions in the hierarchy of the Company during the Class Period.  *Id.* ¶¶ 35,

36, 38, 39.  Thus, their individual knowledge of the problems that AppHarvest experienced

including regarding training, staffing, and quality collectively—in conjunction with other

evidence including the allegations of CW6—support an inference of company-wide problems at

the pleading stage.

Third, Defendants argue that Plaintiff improperly leans "heavily on CW6, but his

allegations are conspicuously imprecise and 'unmoored in time.'"  Dkt. No. 80 at 19 (citation

omitted).  In connection with its discussion of scienter, the Court has already addressed and

rejected this argument.  *See supra* pp. 50–51.

> **b.    Allegations of Falsity and Materiality**

Next, Defendants argue that the Operative Complaint is devoid of particularized facts

showing that Defendants had actual and contemporaneous knowledge of contradictory

information and thus Plaintiff has not adequately pleaded that any of Defendants' statements were false or misleading when made or material.  Dkt. No. 80 at 20–29.

"A violation of Section 10(b) and Rule 10b-5 premised on misstatements cannot occur unless an alleged material misstatement was false at the time it was made."  *Robeco Cap. Growth Funds SICAV - Robeco Glob. Consumer Trends v. Peloton Interactive, Inc.*, 2023 WL 2711342, at *14 (S.D.N.Y. Mar. 30, 2023).  "[P]laintiffs must do more than say that the statements [] were false and misleading; they must demonstrate with specificity why and how that is so."  *Rombach*, 355 F.3d at 174.

In cases involving omissions, omissions are actionable "only when the defendant is subject to an underlying duty to disclose the omitted information."  *Lachman v. Revlon, Inc.*, 487 F. Supp. 3d 111, 129 (E.D.N.Y. 2020).  A corporation has a duty to be both accurate and complete when it chooses to speak on an issue of topic.  *Id.*  "That obligation does not require a company to 'reveal all facts on the subject,' but the company must ensure that 'what was revealed would not be so incomplete as to mislead.'"  *Id.* (quoting *Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 274 (S.D.N.Y. 2012)).

To be actionable, a misrepresentation or omission also must be material, *i.e.*, the plaintiff must allege facts showing that there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available."  *Ganino*, 228 F.3d at 162 (quoting *Basic Inc.,*485 U.S. at 231–32).[14]  "In judging whether an alleged omission was material in light of the information already disclosed to investors, [the court] consider[s] whether there is 'a substantial likelihood

---

[14] The materiality standards under Section 11 are identical to those under Section 10(b) of the Exchange Act.  *See Rombach*, 355 F.3d 164.

that the disclosure of the [omitted material] would have been viewed by the reasonable investor as having significantly altered the total mix of information [already] made available.'" *In re ProShares*, 728 F.3d at 102 (quoting *Demaria v. Andersen*, 318 F.3d 170, 180 (2d Cir. 2003)). However, as noted above, the law does not "create an affirmative duty to disclose any and all material information." *Matrixx*, 563 U.S. at 44.  Just as the "duty to disclose" does not "encompass non-material information," "[m]ateriality alone does not demand disclosure." *In re ProShares*, 728 F.3d at 101 (quoting *Panther Partners, Inc.*, 538 F. Supp. 2d at 668).

Here, although Defendants move to dismiss all approximately 85 statements in the Operative Complaint for failure to plead that the statements were materially false or misleading when made, Dkt. No. 80, this Court has already dismissed most of these statements for failure to plead scienter or as inactionable opinions.  The Court will therefore only address this issue with respect to the statements that, so far, remain in this case.

The first of these statements are Lee's statements during his April 25, 2021 interview that "thankfully COVID has not in any way impacted our operation" and "we haven't had any challenges with recruiting or staffing."  Dkt. No. 76 ¶ 217.  The Operative Complaint alleges that these statements were false or misleading because Lee falsely and unequivocally denied that the Company had any "staffing" inefficiencies, including as a result of the COVID-19 pandemic, *id.* despite the fact that AppHarvest was suffering significant issues with turnover and COVID-19 absences, *id.* ¶ 218.

In moving to dismiss these statements, Defendants argue that Plaintiff does not plead facts showing that the alleged turnover and COVID-19 absences were "material problems, let alone facts indicating how and to what extent they materially impacted the Company's ability to meet its financial guidance, and when the purported impact was known and by whom."  Dkt. No.

80 at 24–25.  In addition, with regard to the comment regarding COVID-19, Defendants claim

that the statement is not false or misleading as—read in context—it concerned the Company's

ability to recruit and hire employees during a global pandemic.  *Id.* at 26.

      Contrary to Defendants' claim, the Operative Complaint supports that these statements

were false or misleading when made.  The accounts of various CWs support that, during the

Class Period including prior to Lee's interview in April 25, 2021, AppHarvest suffered

significant issues with retention and staffing including due to the COVID-19 pandemic.  One

CW stated that during the first harvest, one person from CW1's team left the Company

approximately every one to two weeks for the remainder of CW1's tenure.  Dkt. No. 76 ¶ 105.

CW5 further confirmed high turnover and churn throughout October 2020 to June 2021 and

stated that this resulted in AppHarvest having to bring in contract labor to help out.  *Id.* ¶ 108.

CW5 also recalled greenhouse personnel being concerned about having adequate labor to meet

production requirements and such topics were discussed at the morning stand-up meetings CW5

attended.  *Id.*  In addition, CW1, an employee at AppHarvest from October 2020 through July

2021, stated that during the Class Period, a "couple" of employees would call out sick each week

because of COVID-19 from CW1's team alone.  *Id.* ¶ 112.  According to CW1, when an

employee would call out of work due to COVID-19, she was required to quarantine for two

weeks and was not replaced, so teams would be short-staffed by the amount of personnel out due

to COVID-19.  *Id.* ¶ 113.

      If the allegations are true and AppHarvest was suffering these issues with staffing, then

Lee's statements during the interview that "thankfully COVID has not in any way impacted our

operation" and "we haven't had any challenges with recruiting or staffing" would be false and

misleading.  *Id*. ¶ 217.

The Court also disagrees that Lee's statement about the impact of COVID-19, when read in context, was only about the Company's ability to recruit and hire employees during a global pandemic.  The statement was made in response to a two-part question inquiring both about the impact of the COVID-19 pandemic on "design and construction timing" and the ability of the Company "to get labor, uh, in your plant."  *Id.*  It also appears, from context, that the second part of the question (concerning labor) was not just about hiring employees but also retaining them.  The interviewer noted "[w]e've, we've had a number of companies in, in the, in the food business tell us that they can't get a full second shift," implying that the issue other companies faced was with retaining workers after their first shift, not with hiring them.  *Id.*  Accordingly, read in context, it is plausible that a reasonable investor would interpret Lee's comment that "thankfully COVID has not in any way impacted our operation" as more general than just a commentary about the Company's ability to hire employee and instead as a representation generally of how COVID-19 impacted the Company's operations, including its ability to staff its facility.  This is further underscored by the fact that Lee later stated, in response to the same question, that "we haven't had any challenges with recruiting or staffing."  *Id.*

Defendants are not entitled to have Plaintiff's claim dismissed at this stage on the theory that these statements were immaterial even if it is unclear exactly what impact staffing issues had on the Company's ability to meet its financial projections.  "A complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance."  *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010) (quoting *JP Morgan Chase*, 553 F.3d at 197).  That is because the issue of whether a statement is material is a fact-specific inquiry.  *See Plumbers, Pipefitters & MES Loc.*

Case 1:21-cv-07985-LJL   Document 97   Filed 07/31/23   Page 78 of 94

*Union No. 392 Pension Fund v. Fairfax Fin. Holdings Ltd.*, 886 F. Supp. 2d 328, 336 (S.D.N.Y.

2012).  In addition, it is entirely plausible that a reasonable shareholder would consider issues

with staffing important in deciding how to act with respect to its investment in AppHarvest.

Based on the allegations in the Operative Complaint, because agriculture is highly labor-

intensive, it was imperative that AppHarvest have a labor force that was properly staffed and

trained.  Dkt. No. 76 ¶ 70.  In accordance with this understanding, it appears that investors and

interviewers frequently asked the Company questions about staffing and AppHarvest's ability to

hire and retain workers, and Defendants sought to reassure investors about its ability to staff the

Morehead Facility.  *See id.* ¶¶ 72, 74.

　　　　The second of these statements are the risk disclosures contained in AppHarvest's April

6, 2021 Form S-8, May 17, 2021 Form 10-Q, June 4, 2021 Form S-1, and June 9, 2021

Prospectus.  Dkt. No. 76 ¶¶ 196, 202, 229, 237.  Those risk disclosures provided that:

> Risks Related to Our Business and Industry
>
> . . . .  Even if [AppHarvest's] investments do result in the growth of our business,
> if we do not effectively manage our growth, we may not be able to execute on our
> business plan and vision, respond to competitive pressures, take advantage of
> market opportunities, satisfy customer requirements or maintain high-quality
> product offerings, any of which could adversely affect our business, financial
> condition and results of operations.
>
> 　　　　　　　　　　　　　　***
>
> *We currently rely on a single facility for all of our operations.*
>
> . . . .  Adverse changes or developments affecting the Morehead facility could
> impair our ability to produce our products and our business, prospects, financial
> condition and results of operations.  Any shutdown or period of reduced production
> at the Morehead facility, which may be caused by regulatory noncompliance or
> other issues, as well as other factors beyond our control, such as severe weather
> conditions, natural disaster, fire, power interruption, work stoppage, disease
> outbreaks or pandemics (such as COVID-19), equipment failure or delay in supply
> delivery, would significantly disrupt our ability to grow and deliver our produce in
> a timely manner, meet our contractual obligations and operate our business.

*We depend on employing a skilled local labor force, and* failure to attract and retain qualified employees could negatively impact our business, results of operations and financial condition.

\*\*\*

. . . . even if we are able to identify, hire and train our labor force, there is no guarantee that we will be able to retain these employees.  Any shortage of labor or lack of regular availability could restrict our ability to operate our greenhouses profitably, or at all.

\*\*\*

Any significant or unexpected rejection of our products could negatively impact our results of operations, and we may be unable to sell the rejected products to other third parties.

\*\*\*

If our products fail to gain market acceptance, are restricted by regulatory requirements or have quality problems, we may not be able to fully recover costs and expenses incurred in our operations, and our business, financial condition or results of operations could be materially and adversely affected.

\*\*\*

In future periods, revenue growth could slow or revenue could decline for a number of reasons, including slowing demand for our products, increasing competition, a decrease in the growth of the overall market, or our failure, for any reason, to take advantage of growth opportunities.  If our assumptions regarding these risks and uncertainties and future revenue growth are incorrect or change, or if we do not address these risks successfully, our operating and financial results could differ materially from our expectations, and our business could suffer.

The COVID-19 pandemic could negatively impact on our business, results of operations and financial condition. . . .

\*\*\*

. . . . Although we have not experienced material financial impacts due to the pandemic, the fluid nature of the COVID-19 pandemic and uncertainties regarding the related economic impact are likely to result in sustained market turmoil, which could also negatively impact our business, financial condition and cash flows. Although our business is considered an "essential business," the COVID-19 pandemic could result in labor shortages, which could result in our inability to plant and harvest crops at full capacity and could result in spoilage or loss of unharvested crops . . . .  The extent of COVID-19's effect on our operational and financial performance will depend on future developments, including the duration, spread

and intensity of the pandemic and the effectiveness of vaccines against COVID-19 and variants thereof, all of which are uncertain and difficult to predict considering the rapidly evolving landscape.  As a result, it is not currently possible to ascertain the overall impact of COVID-19 on our business.  However, if the pandemic continues to persist as a severe worldwide health crisis, the disease could negatively impact our business, financial condition results of operations and cash flows, and may also have the effect of heightening many of the other risks described in this "Risk Factors" section.

Dkt. No. 76 ¶¶ 202, 229, 237 (emphasis omitted).  The Operative Complaint alleges that these risk disclosures were materially false, misleading, and/or lacked a reasonable basis when made because they portrayed various of these risks as contingent or speculative when in fact they had already materialized.  *See id.* ¶ 203.

Defendants move to dismiss Plaintiff's Section 10(b) claim based on these risk disclosures arguing: (1) that AppHarvest's risk disclosures cannot be understood as a guarantee that the disclosed risks would not occur and (2) that the allegations do not support that alleged operational risks were already happening and material at the time of these risk disclosures.  Dkt. No. 80 at 29.

"[C]ourts in this Circuit have held that a risk disclosure can itself constitute a material misrepresentation when it presents as a risk an event that has already transpired."  *Chapman v. Mueller Water Prod., Inc.*, 466 F. Supp. 3d 382, 405 (S.D.N.Y. 2020) (collecting cases); *see also Rombach*, 355 F.3d at 173 ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired."); *Sec. & Exch. Commisison v. DeFrancesco*, 2023 WL 4631449, at *4 (S.D.N.Y. July 20, 2023).  "The classic statement is that it is not sufficient for 'someone [to] warn[ ] his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.'" *Chapman*, 466 F. Supp. 3d at 405 (quoting *In re Prudential Sec. Inc. P'ships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996)).

80

When a risk disclosure will constitute a material misrepresentation, however, is somewhat nuanced.  "'In all cases, [] the court must keep in mind' that the test is whether a 'reasonable investor could have been misled about the nature of the risk when he invested.'"  *In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at *9 (S.D.N.Y. Mar. 28, 2018) (quoting *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002)).  Companies issue risk disclosures all the time, disclosing that certain known risks may impact their performance or operations.  *See* 17 C.F.R. § 229.105 (requiring issuers to, under certain circumstances, "provide under the caption 'Risk Factors' a discussion of the material factors that make an investment in the registrant or offering speculative or risky").  But not every one of these risk disclosures necessarily implies that the event which could create a risk has not occurred to any extent.  A risk disclosure may just be what it purports to be—an identification by the issuer of the type of facts and events that could make the investment risky and not necessarily a representation one way or the other regarding whether the event has occurred to the extent that it presents a risk.  Instead, the potential for the disclosure to mislead often turns on the specificity of the disclosure.  The more specific the caution, the closer it comes to an implied representation of fact and the more likely it is to mislead.  *See Chapman*, 466 F. Supp. 3d at 406.  General or boilerplate disclosures of future regulatory risk will generally not "cause a reasonable investor to believe that the company faced no current regulatory risks."  *In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at *9.

    *In re Mylan* is instructive on this distinction.  In that case, the court gave two examples illustrating when a risk disclosure plausibly would mislead a reasonable investor and when it would not.  The court noted: "a caution that 'input prices may rise next quarter' would not cause a reasonable investor to conclude that the prices of all inputs had remained flat or declined in the

previous quarter," but "a caution that 'the price of our primary input may rise above $5 next quarter' could certainly cause a reasonable investor to conclude that the price was, at present, $4.99 or less." *Id.* The court then concluded that the statements at issue in the case fell on the "potentially misleading side of the line." *Id.* at *10. The courted noted that "[a] reasonable investor could have concluded from Mylan's statement that although the government . . . 'could' open an investigation, such unfavorable events had not yet occurred" even though it already had. *Id.*

This Court's prior decision in *Chapman* is also instructive. In that case, the Court dismissed a claim that risk disclosure "language concerning the 'risk that new products may have quality or other defects or deficiencies' was false and misleading because it did not reveal that 'significant risks, deficiencies and failures associated with new products were already occurring.'" 466 F. Supp. 3d at 405. The Court noted that "[s]ignificantly, and read in context, Mueller's risk disclosures cannot be understood as a guarantee that none of the 'new products and systems' that Mueller shipped or expected to ship would have defects or deficiencies that would require repair or replacement" as "[t]he language it used was generic." *Id.* at 406. The Court continued:

> It is evident and would have been evident to the ordinary investor that Mueller was not warranting that every one of its newer technologies was defect-free or would not incur a warranty charge. The disclosures reflected that there would naturally be issues or risks associated with the introduction of new technologies and that the success of those "new products and systems" would depend on Mueller's "ability to manage the risks associated with their introduction."

*Id.*

The Court grants Defendants' motion to dismiss the Section 10(b) claim based on AppHarvest's risk disclosures. The risk disclosures at issue are more similar to the disclosures in *Chapman* than those in *In re Mylan*. They are generic. They warned investors of the types of

risks inherent to businesses similar to AppHarvest's and in generic term.  Among other things, they warned investors: "there is no guarantee that we will be able to retain [] employees," and that "[i]f our product[s] . . . have quality problems, we may not be able to fully recover costs and expenses."  Dkt. No. 76 ¶¶ 202, 229, 237.  No ordinary investor would understand such general disclosures to signify that AppHarvest had been able to retain all of its employees or that all of its products were flawless.  Importantly, this conclusion would be different if AppHarvest had represented that "there is no guarantee that we will be able to retain all 500 employees" or "quality problems greater than we have forecasted could impact our ability to fully recover costs and expenses."  These more specific disclosures could reasonably lead an investor to believe that these risks had not already occurred.  If, on that hypothetical, AppHarvest had fewer than 500 employees or had quality problems greater than forecasted, the risk disclosures could be actionable.

The Court reaches the same conclusion with respect to the risk disclosure providing that "significant or unexpected rejection of our products could negatively impact our results of operations."  Dkt. No. 76 ¶¶ 202, 229, 237.  Although this statement is more specific as the phrase "rejection of our products" is modified by the words "significant" or "unexpected," it is not so specific to mislead an investor into believing that only less than a specific percentage of AppHarvest's products had ever been previously rejected.  The words "significant" or "unexpected," although broadly specifying an amount, are, for the most part, generic and unspecific.  They are nowhere near as specific as the $5 input price mentioned in the example in *In re Mylan*.  In fact, because these words are so unspecific, the disclosure is almost a tautology—it is necessarily true that if a company like AppHarvest suffers a large number of rejections of its products or rejections that are unexpected, those rejections will negatively

impact its results of operations.  No reasonable investor would view this generic statement as making any type of implied representation of fact about the Company.

Plaintiff also has not plausibly alleged that the statements in the risk disclosures concerning COVID-19, including that "we have not experienced material financial impacts due to the pandemic" and that the "COVID-19 pandemic could negatively impact on our business, results of operations and financial condition" were materially misleading or a misstatement.  The Operative Complaint alleges that the COVID-19 pandemic amplified the productivity losses as, according to a CW, a "couple" of employees would call out sick each week because of COVID-19 from CW1's team alone during Class Period.  Dkt. No. 76 ¶ 112.  The Operative Complaint, however, does not allege that a couple of employees calling out sick each week resulted in "material financial impacts" on the Company or negative impacts on its results of operations and financial condition.  "Accordingly, this case is unlike the materialization of risk cases cited by plaintiffs, in which the adverse effects at issue had in fact been realized."  *Nurlybayev v. ZTO Express (Cayman) Inc.*, 2021 WL 1226865, at *7 (S.D.N.Y. Mar. 31, 2021) (quoting *Williams v. Globus Med., Inc.*, 869 F.3d 235, 243 (3d Cir. 2017)).

Moreover, the risk disclosures did not falsely portray the labor issues caused by COVID-19 as merely a risk rather than something that had already happened.  Instead, directly under the statement that "COVID-19 pandemic could negatively impact on our business . . . ," AppHarvest specifically alerted investors to the fact that the company had faced "decreased availability of labor" to COVID-19.  Dkt. No. 81-36 at 22.  It provided:  "If the disruptions caused by COVID-19, including decreased availability of labor, *continue* despite the increasing availability of vaccines, our ability to meet the demands of distributors and customers may be materially

impacted." *Id.* (emphasis added).  By using the word "continue," this disclosure implied that labor availability was not merely a risk for the future but something that had occurred already.

The final remaining statements are those also made in AppHarvest's May 17, 2021 Form 10-Q, June 4, 2021 Form S-1, and June 9, 2021 Prospectus.  Dkt. No. 76 ¶¶ 204, 231, 240.  In those documents, AppHarvest stated in pertinent part:

> The following sections discuss and analyze the changes in the significant line items in our unaudited condensed consolidated statements of operations for the comparison periods identified.
>
> *Net Sales*
>
> Net sales for the three months ended March 31, 2021 were $2.3 million compared to $0 for the comparable prior year period, due to initial tomato sales produced at our Morehead CEA facility.

Dkt. No. 76 ¶¶ 204, 231, 240 (emphasis omitted).  The Operative Complaint alleges that these statements were "materially misleading when made" because Defendants discussed the "'changes' in net sales while failing to state, so as not to mislead, known changes affecting net sales with respect to AppHarvest's operations."  *Id.* ¶ 241.  In support of this claim, the Operative Complaint points to Defendants' admission in its 2Q Form 10-Q that for the "six months" ended June 30, 2021, *i.e.*, beginning in January 2021, net sales were "adversely impacted by labor and productivity challenges associated with the training and development of the new workforce at the Morehead, Kentucky facility," which "resulted in lower net sales due to lower overall No. 1-grade production yields, including the impact of higher related distribution and shipping fees."  *Id.*  Plaintiff also alleges that this omission violated Item 303 of SEC Regulation S-K.  *Id.*

In moving to dismiss these statements, Defendants argue that such statements cannot support a Section 10(b) claim as Plaintiff does not allege any facts demonstrating that they were inaccurate or untrue at the time that they were made.  Dkt. No. 80 at 17.  In response, Plaintiff

reiterates what it alleges in the Operative Complaint—*i.e.*, that Defendants' 2Q Firm 10-Q made clear that its net sales were "adversely impacted by labor and productivity challenges" as early as January 2021.  Dkt. No. 84 at 25–26.  Thus, according to Plaintiff, it was misleading for Defendants to report on net sales for the first quarter of 2021, but omit information "that they deemed material enough to disclose after the Class Period." *Id.* at 25.  Plaintiff also argues that this omission violates "Item 303 (17 C.F.R. §229.303), [which] requires companies to disclose trends and uncertainties affecting revenues in any quarterly reports, registration statements, or prospectuses." *Id.* at 26.

Defendants' failure to disclose certain negative impacts on its sales in conjunction with these statements was not misleading.  Dkt. No. 76 ¶¶ 204, 231, 240 (emphasis omitted). "[R]evealing one fact about a subject does not trigger a duty to reveal all facts on the subject, so long as 'what was revealed would not be so incomplete as to mislead.'" *Richman*, 868 F. Supp. 2d at 274 (quoting *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 160 (S.D.N.Y. 2008)); *see also Jiajia Luo v. Sogou, Inc.*, 465 F. Supp. 3d 393, 407 (S.D.N.Y. 2020) (same).  And, here, Defendants' factual statement on net sales for the first quarter of 2021 "did not leave investors with the misleading impression that" AppHarvest faced no challenges impacting its sales for that quarter, including challenges related to labor and productivity. *Wandel v. Gao*, 590 F. Supp. 3d 630, 646 (S.D.N.Y. 2022).

The allegations also do not sufficiently support that Defendants were under an obligation to disclose this information pursuant to Item 303 as early as late-May or early June.  *See Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015) ("Item 303's affirmative duty to disclose in Form 10–Qs can serve as the basis for a securities fraud claim under Section

10(b).").[15]  "Item 303 requires issuers to '[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.'"  *Gutman v. Lizhi Inc.*, 2022 WL 4646471, at *4 (E.D.N.Y. Oct. 1, 2022) (quoting *Panther Partners, Inc.*, 538 F. Supp. 2d at 698–99).  "Disclosure is required where the trend is both (1) known to management and (2) reasonably likely to have material effects on the registrant's financial condition or results of operations."  *Id.* (quoting *In re Proshares Tr. II Secs. Litig.*, 2020 WL 71007, at *9 (S.D.N.Y. Jan. 3, 2020), *aff'd*, 839 F. App'x 649 (2d Cir. 2021)).  "Knowledge of a trend is an essential element triggering disclosure under Item 303."  *In re Noah Educ. Holdings, Ltd. Sec. Litig.*, 2010 WL 1372709, at *6 (S.D.N.Y. Mar. 31, 2010) (Sullivan, J.).

Here, while there is evidence supporting that by end of Q1 of 2021, Defendants started to become aware that AppHarvest was suffering from certain challenges related to labor and productivity, *see supra* Discussion Section II.A.1.b, Defendants were not required to disclose such information under Item 303 immediately upon learning of these challenges.  Item 303 does not require a company to disclose any potential adverse effects on a company's net sales, revenues, or income, but only "known trends" that could have a material effect on the registrant's financial conditions.  The word "trend" implies a change in behavior or activity that indicates a new direction for the company.  Accordingly, to determine whether or not something is a trend, it is generally necessary to wait some time to investigate its longevity.  The change may be passing or momentary or may be quickly addressed and put a stop to before it develops

---

[15] The Court notes that there is a petition for a writ of *certiorari* pending in the Supreme Court as to whether the Second Circuit erred in holding that a failure to make a disclosure required under Item 303 can support a private claim under Section 10(b) in the absence of an otherwise misleading statement.  *See Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, No. 22-1165. The Court follows the current Second Circuit law.

into something more.  Premature disclosure of an event as a trend that turns out to be a passing

occurrence can have as much potential to mislead as the failure to disclose what is a true trend.

Courts in this District thus have repeatedly held that events occurring within a few

months prior to a defendants' public filing "do not establish a 'trend' for purposes of the

discloses required by Item 303."  *Nguyen v. MaxPoint Interactive, Inc.*, 234 F. Supp. 3d 540, 546

(S.D.N.Y. 2017) ("[E]vents occurring within a two month period of time do not establish a

'trend' for purposes of the discloses required by Item 303."); *see, e.g.*, *Steamfitters Loc. 449

Pension Plan v. Skechers U.S.A., Inc.*, 412 F. Supp. 3d 353, 368 (S.D.N.Y. 2019), *aff'd sub nom.

Cavalier Fundamental Growth Fund v. Skechers U.S.A., Inc.*, 826 F. App'x 111 (2d Cir. 2020)

("[T]hese alleged effects on a single quarter's revenues do not constitute 'trends' under Item

303."); *Pearlstein v. BlackBerry Ltd.*, 93 F. Supp. 3d 233, 245 (S.D.N.Y. 2015), *aff'd sub nom.

Cox v. Blackberry Ltd.*, 660 F. App'x 23 (2d Cir. 2016), *and on reconsideration*, 2017 WL

4082306 (S.D.N.Y. Sept. 13, 2017) ("The two- and five-month periods preceding defendants'

public filings were insufficient to establish a reportable trend in device performance given the

pleaded volatility of the smartphone market."); *Abuhamdan v. Blyth, Inc.*, 9 F. Supp. 3d 175, 206

(D. Conn. 2014) ("[A] two-month decline in sales (or less—the Complaint does not say when in

June sales began to slow) is not a 'trend' that must be disclosed."); *Blackmoss Invs. Inc. v. ACA

Cap. Holdings, Inc.*, 2010 WL 148617, at *10 (S.D.N.Y. Jan. 14, 2010) ("As a matter of law, a

two month period of time does not establish a 'trend' for purposes of the disclosures required by

Item 303."); *see also Arfa v. Mecox Lane Ltd.*, 2012 WL 697155, at *12 (S.D.N.Y. Mar. 5,

2012), *aff'd*, 504 F. App'x 14 (2d Cir. 2012); *In re Focus Media Holding Ltd. Litig.*, 701 F.

Supp. 2d 534, 540 (S.D.N.Y. 2010) ("[T]he case law reflects that 'courts have been reluctant to

impose liability based upon a failure to disclose financial data for a fiscal quarter in progress.'" (citation omitted)).

With this in mind, the Court concludes that Defendants disclosure of this "trend" in August instead of late-May or June of 2021 did not violate Item 303 based on the allegations in the Operative Complaint.  Although Defendants may have started to worry about AppHarvest's labor and productivity as early as the end of the Q1 2021, Defendants reasonably would have needed to take a few months to watch and investigate these issues and to understand whether they signified a trend for the company or something that would be quickly corrected.  In addition, even assuming that Defendants did recognize that these issues constituted a trend prior to August 2021, the Operative Complaint does not allege when this trend was reasonably likely to have material effects on AppHarvest's financial condition or results of operations.  The Operative Complaint states that at some point during the "toughest" periods, it was necessary to reforecast based on the issues AppHarvest faced.  Dkt. No. 76 ¶ 97.  But the Operative Complaint is silent on when exactly that occurred.  If Defendants did not become aware that AppHarvest's labor and productivity issues were likely to have a material effect on its financial condition until closer to end of Q2 2021, then it would have made sense for Defendants to have not made such a disclosure under Item 303 until after late-May or June of 2021.  *See In re Turkcell Iletisim Hizmetler A.S. Sec. Litig.*, 202 F. Supp. 2d 8, 13 (S.D.N.Y. 2001) (declining to find a trend, stating "[w]e cannot see how the small decline in operating income represents an extreme departure from the expected range of results presented by Turkcell's Prospectus, particularly given the reluctance of courts to require companies to release results before, or within days of, the end of fiscal quarters.").

The Court therefore concludes, based on the Operative Complaint, that Defendants did not violate Item 303 when they failed to disclose these issues in its public filings prior to August 2021.  The Court therefore dismisses any Section 10(b) claim based on such a duty.

### 4.      Loss Causation

Defendants also move to dismiss the Section 10(b) claim on the basis that Plaintiff has failed to plead loss causation.  Dkt. No. 80 at 40.  Defendants note that Plaintiff claims that AppHarvest's August 11, 2021 press release was a corrective disclosure because it attributed disappointing second quarter of 2021 results to employee training issues, higher than expected shipping costs, and unusually low market prices for tomatoes and revised 2021 year end guidance.  *Id.*  Defendants argue, however, that Plaintiff fails to identify specific facts that were revealed in that press release that were both new to investors and that corrected a specific earlier misstatement of material fact.  *Id.*  Defendants contend that failure to meet earnings forecasts alone is insufficient to establish loss causation.  *Id.*

Plaintiff responds that the Operative Complaint points to multiple corrective disclosures on August 11, 2021 including the 2021 Q2 Earnings Release, the 2021 Q2 Earnings Presentation, the 2021 Q2 Earnings Call, and the 2Q2021 Form 10-Q.  Dkt. No. 84 at 38.  Plaintiff also notes that Defendants fail to explain why these "fact-rich corrective disclosures" do not relate to the same subject as the alleged misrepresentations or were not new to investors.  *Id.* at 39.

Under the PSLRA, "the plaintiff [has] the burden of proving that the act or omission of the defendant alleged . . . caused the loss for which the plaintiff seeks to recover damages."  15 U.S.C.A. § 78u-4.  "To establish loss causation, Plaintiffs must show that 'the subject of the fraudulent statement or omission was the cause of the actual loss suffered.'"  *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 179 (2d Cir. 2020) (quoting *In re Vivendi*, 838 F.3d at 261).  "Plaintiffs must allege not only the but-for causation of their losses but also the proximate

causation, or that the fraud 'concealed something from the market that, when disclosed,' would foreseeably and 'negatively affect[ ] the value of the security.'" *Id.* (quoting *Lentell*, 396 F.3d at 173). To meet this standard, "a plaintiff can allege either (1) 'the existence of a cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the fraud' or (2) 'that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement.'" *Rosi v. Aclaris Therapeutics, Inc.*, 2021 WL 1177505, at *25 (S.D.N.Y. Mar. 29, 2021) (quoting *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 233–34 (2d Cir. 2014)). "To plead loss causation through a corrective disclosure, plaintiffs must establish that the latter disclosure 'reveal[ed] to the market the falsity' of the prior disclosure and that the market reacted negatively to the revelation that that prior disclosure had been false." *In re Omega Healthcare Invs., Inc. Sec. Litig.*, 563 F. Supp. 3d 259, 267 (S.D.N.Y. 2021) (quoting *Lentell*, 396 F.3d at 175 & n.4).

"Plaintiffs' burden in pleading loss causation is 'not a heavy one,' and they need only 'give [d]efendants "some indication" of the actual loss suffered and of a plausible causal link between that loss and the alleged misrepresentations.'" *Id.* at 266 (quoting *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015)). "Indeed, at the pleading stage, plaintiffs need not establish that the disclosure of the truth underlying the alleged fraud was the sole cause of their losses nor must they conclusively rule out the role of potentially intervening events in the causal chain, as those are issues of proof reserved for the merits stage of the case." *Id.*

Plaintiff adequately allege loss causation through allegations that the market reacted negatively to corrective disclosures of the alleged fraud. Plaintiff alleges that for the first time

on August 11, 2021, Defendants made a series of corrective disclosure that disclosed to the

market that second quarter results were:

> adversely impacted by operational headwinds with the ramp up to full production
> at the company's first CEA facility, including labor and productivity challenges
> related to the training and development of the new workforce and historically low
> market prices for tomatoes during the second quarter of 2021 based on USDA
> reports. Labor and productivity challenges resulted in lower net sales due to lower
> overall No. 1-grade production yields, including the impact of higher distribution
> and shipping fees.

Dkt. No. 76 ¶ 243.  Among other things, Defendants also disclosed for the first time that "[n]et

sales for the three and six months ended June 30, 2021 were adversely impacted by labor and

productivity challenges associated with the training and development of the new workforce at the

Morehead, Kentucky facility," and that "[t]he labor and productivity challenges resulted in lower

net sales due to lower overall No. 1-grade production yields, including the impact of higher

related distribution and shipping fees."  *Id.* ¶ 249.  These corrective disclosures, which concerned

the same subject as Defendants' prior allegedly false or misleading statements, plausibly

revealed to the market the falsity of those earlier statements.  They revealed, according to the

allegations in the Operative Complaint, that the prior problems Defendants had seemingly denied

had actually already transpired and existed.  *See Freudenberg*, 712 F. Supp. 2d at 202 (corrective

disclosure need not "be a 'mirror image' tantamount to a confession of fraud"); *see also Aclaris*

*Therapeutics, Inc.*, 2021 WL 1177505, at *26 (finding loss causation adequately plead because,

while the fact that "ESKATA might not be commercialized successfully was extensively

disclosed before the Class Period," "[d]efendants here have also concealed 'far more' than the

possibility that ESKATA would not be commercially viable—it concealed the truth about its

misleading advertising").  The Operative Complaint also plausibly pleads that the market reacted

negatively to these corrective disclosures.  The Company's common stock fell approximately

29% between market close on August 10, 2021, to market close on August 11, 2021, and the Company's warrant fell approximately 44% during that same period.  Dkt. No. 76 ¶ 259.

In response, Defendants contend that its alleged corrective disclosures did not describe the labor challenges it faced "in any more detail than it had before."  Dkt. No. 91 at 20.  In making this argument, Defendants point to statements that AppHarvest made during its Q1 2021 Earnings Call.  Dkt. No. 81-29.  But, contrary to Defendants' argument, Defendants did not disclose in that call that its sales had been negatively impacted due to labor and productivity challenges related to the training and development of the new workforce.  While Defendants noted that it had incurred costs due to training its labor force, it did not state that it was having unexpected challenges related to such training, as it again did in the alleged corrective disclosures, or that it was having trouble retaining employees.  In fact, Defendants painted AppHarvest's early operational performance as a positive on that call, noting that, based in part on their "latest view on [their] operational performance," they were "raising [its] long-term illustrative performance on adjusted EBITDA."  *Id.* at 9.  The Court therefore rejects Defendants' claim that Plaintiff fails to plead loss causation.  *See In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 766 (S.D.N.Y. 2017) (rejecting argument that defendants did not plead loss causation where problems where risk was allegedly far greater than previously disclosed).

### B.    Section 20(a)

Defendants move to dismiss the Section 20(a) claim on the basis that "[b]ecause Plaintiff fails to plead a primary §10(b) violation, his § 20(a) claim necessarily fails."  Dkt. No. 80 at 40.  Here, however, Plaintiff has successfully pleaded a Section 10(b) violation with respect to certain statements.  Thus, the Court denies Defendants' motion to dismiss the Section 20(a) claim on this basis.

**CONCLUSION**

The motion to strike is DENIED.  The motion to dismiss is GRANTED IN PART and

DENIED IN PART.

The Clerk of Court is respectfully directed to close Dkt. Nos. 79, 86.


SO ORDERED.

Dated: July 31, 2023
      New York, New York               _____
                                     LEWIS J. LIMAN
                          United States District Judge

94