UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re AppHarvest Securities Litigation | Case No. 1:21-cv-07985-LJL |

**DECLARATION OF GREGORY M. POTREPKA IN SUPPORT OF
(1) LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF
CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION
AND FINAL CERTIFICATION OF SETTLEMENT CLASS, AND (2)
LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES
<u>AND REIMBURSEMENT OF EXPENSES</u>**

**TABLE OF CONTENTS**

I.      PRELIMINARY STATEMENT ............................................................................................. 1

II.     FACTUAL AND PROCEDURAL BACKGROUND.......................................................... 6

    A.    Summary of the Claims and Allegations .................................................................... 6

    B.    Procedural History ....................................................................................................... 7

        1.    Commencement of the Action and Appointment of Lead Plaintiff and Lead Counsel ... 7

        2.    Filing the Amended Complaint and Partially Defeating Defendants' Motion to Dismiss ................................................................................................ 8

        3.    The Bankruptcy, and Lead Plaintiffs' Negotiations to Carve the Settlement Class Out of AppHarvest's Third-Party Release ............................ 13

    C.    Mediation and Settlement Negotiations.................................................................... 16

III.    SUMMARY OF THE SETTLEMENT, PLAN OF ALLOCATION, AND NOTICE PROGRAM.................................................................................................................... 17

    A.    Summary of the Settlement Terms ........................................................................... 17

    B.    The Court Has Preliminarily Approved the Settlement........................................... 18

    C.    Dissemination of Notice to the Class Was Adequate and Accomplished in Accordance with the Preliminary Approval Order ................................................... 19

    D.    The Settlement is Fair, Reasonable, and Adequate.................................................. 21

    E.    The Plan of Allocation is Fair, Reasonable, and Adequate ..................................... 26

    F.    The Settlement Class Should be Finally Certified................................................... 28

IV.     LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND EXPENSES IS REASONABLE AND SHOULD BE APPROVED......................................................... 28

    A.    The Fee Application.................................................................................................. 28

    B.    Lead Counsel's Work and Expertise........................................................................ 29

    C.    Standing and Caliber of Opposing Counsel............................................................. 32

    D.    The Risks of Contingent Litigation.......................................................................... 32

    E.    The Reaction of the Settlement Class to the Requested Fee.................................... 33

    F.    Payment of the Requested Expenses and Costs is Fair and Reasonable.................. 33

V.      EXHIBITS ................................................................................................................... 36

VI.     CONCLUSION.............................................................................................................. 37

I, Gregory M. Potrepka, Esq., pursuant to 28 U.S.C. §1746, hereby declare as follows:

1.    I am over the age of eighteen and duly admitted to practice in Connecticut, New York, and before this Court.  I am a partner at the law firm of Court-appointed Lead Counsel Levi & Korsinsky, LLP ("L&K" or "Lead Counsel"), counsel of record for Lead Plaintiff Alan Narzissenfeld ("Lead Plaintiff"), in the above-captioned securities class action (the "Action").[1] I respectfully submit this Declaration in support of (1) Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation and Final Certification of Settlement Class, and (2) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Expenses. On May 8, 2024, counsel for Defendants (defined below), Peter Adams, Esq., confirmed Defendants do not oppose Lead Plaintiff's motion for approval of the Settlement and take no position on Lead Counsel's motion for an award of fees and reimbursement of expenses.

2.    I have personally participated in, overseen, and monitored the prosecution of this Action, and have otherwise been kept informed of developments in this litigation by attorneys working with me and under my supervision. Thus, if called upon, I can testify to the matters set forth herein.

## I.    PRELIMINARY STATEMENT

3.    After over two years of adversarial litigation which included a full-day mediation before a highly-experienced mediator, Michelle Yoshida, Esq. ("Ms. Yoshida" or "Mediator"), and subsequent vigorous negotiations facilitated by Ms. Yoshida resulting in her personal recommendation to settle the Action, Lead Plaintiff reached an agreement memorialized in the Stipulation (the "Settlement") that provides for an immediate payment of $4,850,000 in cash (the "Settlement Amount") for resolution of all claims against defendants Jonathan Webb ("Webb"),

---

[1]  Unless otherwise noted, all capitalized terms not defined herein shall have the same meaning ascribed to them in the Stipulation and Agreement of Settlement dated February 20, 2024 (ECF 117-1, the "Stipulation" or "Stip.").

Loren Eggleton ("Eggleton"), and David Lee (("Lee"), and with Farnsworth and Benson, the "Individual Defendants," who, together with Lead Plaintiff, are the "Parties")), which the Court preliminarily approved on March 6, 2024. ECF 120 (the "Preliminary Approval Order").

4.     While Lead Plaintiff and Lead Counsel believe that the allegations in the Second Consolidated Class Action Complaint (ECF 76, "Operative Complaint") have substantial merit, they submit that the Settlement represents an excellent result for the Settlement Class. For the reasons set forth below, Lead Plaintiff and his counsel believe that the Settlement is fair, reasonable, and adequate and thus final approval of the Settlement and Plan of Allocation and final certification of the Settlement Class is warranted and Lead Counsel's application of an award of attorneys' fees and expenses should be granted.

5.     Indeed, the Settlement was reached only after vigorous litigation efforts including investigating potential claims and preparing two amended complaints, prevailing on a motion for leave to file a second amended complaint, successfully opposing a motion to dismiss the Operative Complaint, letter briefing regarding a stay of this case, engaging specialized bankruptcy counsel and securing a carve out of the Settlement Class from the third party release in the Bankruptcy,[2] attending a full-day mediation before Ms. Yoshida, briefing in connection the mediation, and vigorous subsequent negotiations facilitated by the Mediator.

6.     Further, Lead Counsel's investigation was extensive. This investigation included, among other things, review and analysis of: (i) documents filed publicly by AppHarvest, Inc. ("AppHarvest" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (ii) publicly available information concerning AppHarvest and/or the Individual Defendants, including press releases, news articles, conference call transcripts, and video

---

[2] *In re AppHarvest Products, LLC*, Case No. 23-90745(DRJ) (S.D. Tex. Bankr.).

recorded interviews; (iii) research reports issued by financial and industry analysts concerning AppHarvest; (iv) other publicly available information and data concerning the Company and its subsidiaries, including information concerning AppHarvest's operations; (v) docket entries from various court proceedings concerning AppHarvest and the Individual Defendants, including items filed in the Bankruptcy; (vi) interviews conducted with former employees; (vii) consultations with bankruptcy counsel; (viii) reports prepared by Lead Plaintiff's damages experts in connection with the mediation; (ix) consultation with a Controlled Environment Agricultural expert; and (x) the applicable law governing the claims and potential defenses in this Action.

7.     Lead Counsel's investigation and understanding of the relevant factual and legal issues was honed during settlement discussions. For example, Lead Counsel consulted with damages experts and researched and drafted an extensive mediation statement that addressed liability, damages, collectability, and all other legal and factual considerations pertinent to the case. After the parties exchanged mediation statements, Lead Counsel thoroughly reviewed and analyzed the assertions and authorities within the position statement produced by the Individual Defendants before participating in a full-day mediation with Ms. Yoshida. The mediation ended without an agreement to settle, yet Lead Plaintiff and the Individual Defendants persisted with negotiations in the following weeks through Ms. Yoshida. The Parties agreed to a mediator's proposal to resolve all claims in the Action on December 14, 2023. The proposed Settlement is the result of arm's-length negotiations between and among well-informed, highly experienced counsel, and mitigates the serious risks posed by further litigation, including the very real risk that sources of settlement funding would be depleted.

8.    In view of the foregoing, there is no question that the Settlement is the result of

negotiations by counsel who possessed a full understanding of both the strengths and weaknesses of their respective cases and takes into consideration the significant risks specific to this Action. When balanced against the significant risks Lead Plaintiff faced in bringing the Action to trial, the overall amount of potential damages involved and defending a favorable verdict against appeals, the Settlement of $4,850,000 represents an excellent result for the Class. Substantial investigation, legal research and litigation to date informed Lead Counsel that, while they believe this case is meritorious, there are also weaknesses that had to be carefully evaluated in determining what course of action was in the best interests of the Class (*i.e.*, whether to settle and on what terms, or to continue to litigate through summary judgment and a trial on the merits).

9.      As set forth in further detail below, despite the fact that Lead Plaintiff's remaining claims were well-founded legally and factually, the specific circumstances involved here presented uncertainties with respect to Lead Plaintiff's ability to prevail through summary judgment and trial, and, even in the event of success at trial, to defend a successful verdict against appeal. Such litigation would presumably incur thousands of hours of the Parties' and this Court's collective time and resources, and even if Lead Plaintiff was successful, this Action would easily have required years of additional litigation before a recovery, if any, was obtained for the Class. Moreover, the ability to collect any such achieved award was questionable as AppHarvest filed for Bankruptcy.

10.     Additional evidence that the Settlement represents an excellent result for the Class is the fact that, as of the filing of this Declaration, to date, Lead Plaintiff has only received three requests for exclusion, and zero purported objections to the settlement.

11.     Likewise, the Plan of Allocation, developed in consultation with Lead Plaintiff's expert on loss causation and damages, should be approved as fair, reasonable, and adequate as it

equitably distributes the proceeds of the Settlement among Settlement Class members. The Plan of Allocation is similar to allocation plans approved and successfully used in other securities class actions; equitably discounts claims that have been dismissed by the Court's Opinion and Order granting in part the motion to dismiss the Operative Complaint (ECF 97, the "MTD Order"); and ensures that each Authorized Claimant will receive his, her, or its *pro rata* share of the Net Settlement Fund. Notably, as of the date of this Declaration, no Settlement Class members have objected to the Plan of Allocation.

12. Finally, Lead Counsel requests attorneys' fees in the amount of $1,212,500, or 25% of the Settlement, and reimbursement of Lead Counsel's litigation expenses in the amount of $166,987.77. Lead Counsel's fee request is within, if not below, the range of fee percentages frequently awarded in the Second Circuit and this District in this type of action and, under the particular facts of this case, is fully justified in light of the substantial benefits that Lead Counsel conferred on the Class, the risks they undertook, the quality of their representation, the nature and extent of their legal services, and the fact that they pursued the case, even though this considerable all-cash Settlement was far from guaranteed at its outset. Lead Counsel expended considerable time and effort prosecuting the Action on a fully contingent basis and have advanced litigation and investigative expenses in the expectation that, as is customary, they will be paid a percentage of the common fund created by their efforts as attorneys' fees and receive payment for their expenses.

13. For all of the reasons discussed herein and in the accompanying memoranda, Lead Plaintiff and Lead Counsel respectfully submit that the Settlement is an excellent result for the Settlement Class, avoiding numerous significant litigation risks and providing an immediate and substantial benefit to the Settlement Class. Lead Plaintiff and Lead Counsel submit that the

Settlement and Plan of Allocation are fair, reasonable, and adequate and should be approved. In addition, Lead Counsel respectfully submit that the requests for attorneys' fees and reimbursement of litigation expenses should be approved.[3]

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.  Summary of the Claims and Allegations

14.    AppHarvest is a former Controlled Environment Agriculture ("CEA") company with, at all relevant times, Webb serving as Chief Executive Officer, Eggleton serving as Chief Financial Officer, and Lee serving as President. Operative Complaint at ¶¶29-31, 43. The Operative Complaint's allegations arise out of undisclosed labor and productivity issues occurring during AppHarvest's first growing season at its sole operating facility located in Morehead, Kentucky (the "Morehead Facility"). *See generally* Operative Complaint.

15.    This is a federal securities class action for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.  The Exchange Act claims were brought against AppHarvest and the Individual Defendants (collectively, "Defendants").

16.    The Operative Complaint alleges that between February 1, 2021 and August 10, 2021, inclusive (the "Settlement Class Period"), Defendants made misrepresentations or omissions of material fact relating to AppHarvest's prospects and business results because of the undisclosed labor and productivity issues at the Morehead Facility during the Settlement Class Period.

17.    Lead Plaintiff alleges the truth was revealed on August 11, 2021, before market

---

[3] Because this Declaration is submitted in support of a Settlement, it is inadmissible in any subsequent proceeding, other than in connection with the Settlement. In the event that the Settlement is not approved by the Court, this Declaration and the statements contained herein are without prejudice to Plaintiffs' positions on the merits of this Action.

open, when Defendants disclosed, among other items, AppHarvest's revenue outlook for Fiscal Year 2021 which had been revised downward and unexpectedly negative financial results for the fiscal quarter ended June 30, 2021, which caused the prices of publicly traded AppHarvest common stock and warrants to significantly depreciate, and thereby, caused economic harm to the Settlement Class. Operative Complaint at ¶242.

18.    Defendants deny that they committed any acts or omissions giving rise to any liability and/or violation of the law.

### B.  Procedural History

#### 1.  Commencement of the Action and Appointment of Lead Plaintiff and Lead Counsel

19.    On September 24, 2021, a purported securities class action was filed in the United States District Court for the Southern District of New York captioned *Ragan v. AppHarvest, Inc.*, et al., Case No. 1:21-cv-07985 (S.D.N.Y) (the "*Ragan* Action") on behalf of all investors who purchased or otherwise acquired AppHarvest securities between May 17, 2021 and August 10, 2021, inclusive. ECF 1.

20.    On November 22, 2021, one day before lead plaintiff applications were due to be filed, a similar securities class action captioned *Plymouth County Retirement Association v. AppHarvest, Inc., et al.*, Case No. 1:21-cv-09676 (S.D.N.Y.) (the "*Plymouth County* Action") was also filed in this Court seeking the same relief against the same defendants on behalf all investors who purchased or otherwise acquired AppHarvest securities between October 9, 2020 and August 10, 2021, inclusive. ECF 39 at 4.

21.    On November 23, 2021, pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. §78u-4(a)(3)(B), four motions were filed seeking consolidation of the *Ragan* and *Plymouth County* Actions, appointment as lead plaintiff, and approval of lead

7

counsel. ECF 6 (filed by John Whitlow), 9 (filed by Brandon York and Marc Pierre), 11 (filed by Lead Plaintiff), and 15 (filed by Plymouth County Retirement Association).

22.     On December 7, 2021, Lead Plaintiff and Plymouth County Retirement Association filed memoranda in opposition to each respective competing motion for appointment as lead plaintiff. ECF 25-26. Lead Plaintiff argued, *inter alia*, that he had the largest financial interest of any lead plaintiff movant and established a *prima facie* showing of typicality and adequacy and that Plymouth County Retirement Association's motion was dependent on a facially implausible class period beginning on October 9, 2020, when the Morehead Facility's first crops were not even planted until November 2020. ECF 25 at 8. Lead Plaintiff filed a reply memorandum and supporting exhibits on December 9, 2021.

23.     On December 13, 2021, the Court entered its Opinion and Order: (i) consolidating the *Ragan* and *Plymouth County* Actions (ii) amending the case caption of the consolidated *Ragan* and *Plymouth County* Actions to *In re AppHarvest Securities Litigation* and ordering that every subsequent filing be made under Master File No. 21-cv-7985-LJL; (iii) appointing Alan Narzissenfeld as Lead Plaintiff; and (iv) appointing Levi & Korsinsky, LLP as Lead Counsel. ECF 39.

### 2.     Filing the Amended Complaint and Partially Defeating Defendants' Motion to Dismiss

24.     On March 2, 2022, Lead Plaintiff filed his First Consolidated Amended Class Action Complaint (the "FAC"), alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and SEC Rule 10b-5 promulgated thereunder, against Defendants, on behalf of himself and all other persons or entities other than Defendants who purchased or otherwise acquired securities of AppHarvest between February 1, 2021 and August 10, 2021, inclusive, and were damaged thereby. ECF 46. The FAC was based on an extensive

investigation and analysis by Lead  Counsel which included review and analysis of: (i) press releases, news articles, transcripts, and other public statements issued by or concerning AppHarvest and the Individual Defendants; (ii) research reports issued by financial analysts concerning AppHarvest's business; (iii) AppHarvest's filings with the SEC; and (iv) other publicly available information and data concerning AppHarvest, its securities, and the markets therefor. Further, Lead Counsel retained a private investigator to locate and interview former employees of AppHarvest who provided accounts to Lead Counsel of the facts and circumstances occurring during the Settlement Class Period at the Company. Lead Counsel also consulted with relevant damages experts and a Controlled Environment Agricultural expert.

25.    In this Action in particular, there was a large trove of information that became publicly available due to: intense interest from shareholders and consumers in AppHarvest's CEA business; the Company's debut on the Nasdaq stock exchange through a combination with a Special Purpose Acquisition Company (a novel form of corporate restructuring during the Settlement Class Period); the Individual Defendants' frequent participation in interviews in every conceivable medium (*e.g.*, television, investor publications, news journalism, podcasts, etc.); the significant rise and fall of AppHarvest's stock price; and the rapid deterioration of the Company's business culminating in the Bankruptcy.

26.    Defendants moved to dismiss the FAC on May 2, 2021. ECF 50-52. Nonetheless, Lead Counsel continued their investigation, including by conducting additional interviews of former AppHarvest employees. As a result of Lead Counsel's steadfast investigation, Lead Plaintiff obtained statements from three additional confidential witnesses who were not available to Lead Plaintiff at the time the FAC was filed.

27.    On June 30, 2022, Lead Plaintiff moved for leave to amend the First Consolidated

Amended Class Action Complaint (Lead Plaintiff's "Motion to Amend") and concurrently filed a memorandum in opposition to Defendants' motion to dismiss the FAC. ECF 57-60. On July 14, 2022, Defendants filed a memorandum in opposition to Lead Plaintiff's motion for leave to amend. ECF 63. On July 21, 2022, Lead Plaintiff filed a reply in support of the Motion to Amend. ECF 67-68. On July 22, 2022, the Court issued a Memorandum and Order granting Lead Plaintiff's Motion to Amend. ECF 69.

28.    On July 25, 2022, Lead Plaintiff filed his Second Consolidated Amended Class Action Complaint, alleging violations of Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder, against Defendants, on behalf of himself and all other persons or entities other than Defendants who purchased or otherwise acquired publicly traded securities of AppHarvest between February 1, 2021 and August 10, 2021, inclusive, and were damaged thereby. ECF 70.

29.    On August 11, 2022, Lead Plaintiff filed an unopposed letter motion for leave to file a corrected Second Consolidated Amended Class Action Complaint, which would be the Operative Complaint. ECF 74. The Court granted the letter motion on August 12, 2022. ECF 75.

30.    On August 12, 2022 Lead Plaintiff filed the Operative Complaint. ECF 76.

31.    On September 23, 2022, Defendants filed their motion to dismiss the Operative Complaint.  ECF 79-81. Lead Plaintiff opposed the motion to dismiss on November 22, 2022, and concurrently filed a motion to strike certain exhibits filed by Defendants in support of their motion to dismiss. ECF 84-87. On January 13, 2023, Defendants filed a reply in further support of their motion to dismiss the Operative Complaint and filed a memorandum in opposition to Lead Plaintiff's motion to strike. ECF 90-91. On January 20, 2023, Lead Plaintiff filed a reply in further support of his motion to strike. ECF 92.

10

32.     On March 22, 2023, Lead Plaintiff filed a letter containing supplemental authority in further opposition to Defendants' motion to dismiss the Operative Complaint. ECF 95. Defendants filed a letter in response and in further support of their motion to dismiss the Operative complaint on March 28, 2023. ECF 96.

33.     Defendants' motion to dismiss the Operative Complaint was voluminous. Indeed, Defendants' opening briefing and exhibits alone totaled 394 pages. Defendants argued, among other things, that the Operative Complaint failed to allege: materiality, falsity, scienter, and loss causation. Defendants contended, *inter alia*:

   a.     none of the statements were materially false or misleading. For example, with respect to statements concerning "Employee Retention and Staffing" Defendants claimed Plaintiff failed to show that "the alleged turnover and COVID-19 absences were material problems, let alone facts indicating how and to what extent they materially impacted the Company's ability to meet its financial guidance" (ECF 80 at 24-25);

   b.     many of the alleged misstatements, including statements made by Defendant Lee on May 25, 2021 during an interview by a Stephens Inc. analyst, were vague statements of optimism amounting to inactionable puffery (*Id.* at 16, ECF 81-3 at C-2);

   c.     the Operative Complaint failed to plead scienter (ECF 80 at 30-40), including because Defendants "believed what they were saying" (*id.* at 39); and

11

d.    the Operative Complaint failed to allege causation because Lead Plaintiff purportedly failed "to identify specific facts revealed" on August 11, 2021 that "corrected a specific, earlier misstatement of material fact" (*id.* at 40).

34.    Defendants asserted these and similar arguments vigorously and continued to do in connection with the mediation and settlement negotiations, and undoubtedly would have done so in further proceedings such as summary judgment, trial, and any appeals.

35.    Because Defendants' arguments were wide-ranging and fact-intensive, Lead Counsel had to devote substantial time and resources to researching and drafting Lead Plaintiff's opposition. For example, Lead Counsel had to research the law on every disputed element of their claims, as well as scour the materials referenced in both the TAC and Defendants' exhibits in order to marshal evidence to counter Defendants' factual assertions. Lead Counsel consulted with experts, including a financial economist, in connection with this work. Lead Counsel's extensive research of the public record, including AppHarvest's SEC filings, other public statements and the market commentary concerning all of these matters, was essential in responding to Defendants' voluminous motions to dismiss.

36.    On July 31, 2023, the Court issued the MTD Order granting the motion as to claims asserted against Defendants Webb and Eggleton and denying the motion only as to two statements made by Defendant Lee during an investment conference held by Stephens Inc., on May 25, 2021. ECF 97. Specifically, the Court sustained Lead Plaintiff's claims as to the following statements made by Defendant Lee: "**Um, thankfully COVID has not in any way impacted our operation**[;]" and "**So we haven't had any challenges with recruiting or staffing**." *Id.* at 69-70, 75-77.

12

### 3. The Bankruptcy, and Lead Plaintiffs' Negotiations to Carve the Settlement Class Out of AppHarvest's Third-Party Release

37. On July 23, 2023, AppHarvest filed a voluntary Chapter 11 Petition in the United States Bankruptcy Court for the Southern District of Texas. *In Re AppHarvest Products, LLC*, Case No. 23-90745-CML (S.D. Tex. Bankr.). On August 1, 2023, Defendants filed a Notice of Suggestion of Bankruptcy and Automatic Stay of Proceedings, thereby automatically staying the Action as to AppHarvest. ECFs 98-99.

38. As originally proposed, the confirmation plan in the Bankruptcy would have released Lead Plaintiff's and the Settlement Class's claims in this Action against the Individual Defendants. Article IX.B. of the *Joint Plan of Liquidation of AppHarvest Products, LLC and its Debtor Affiliates* [Bankruptcy Docket No. 26] (the "Plan") contained a broad third-party release (the "Third-Party Release") stating, in relevant part:

> Except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Effective Date, and with respect to all other Releasing Parties . . . each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released by each Releasing Party from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort, or otherwise, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the capital structure, management, ownership, or operation thereof) . . . or upon any other related act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date . . . .

Plan, Art. IX.B.[4]

---

[4] The Plan also contained an injunction purporting to bar all parties who have held or hold released claims from, among other things, "commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests." *See* Plan, Art. IX.D.

39.     The "Releasing Parties" in the Plan who were deemed to grant the Third-Party Release included, among numerous others, "all Holders of Claims or Interests that vote to reject the Plan or are deemed to reject the Plan and who do not affirmatively opt out of the releases provided by the Plan . . . ." *See* Plan, at 12.

40.     The claims asserted by Lead Plaintiff on behalf of the Settlement Class arise from the purchase or sale of securities of AppHarvest and were classified under the Plan as "Section 510(b) Claims" in Class 8.  Plan, Art. III.B.8.  Holders of claims in Class 8 were not entitled to receive any distribution under the Plan and are therefore deemed to reject the Plan.  *Id*. Accordingly, based on the Plan's original broad definition of Releasing Parties, Lead Plaintiff and the Settlement Class would have been deemed to grant the Third-Party Release unless they took affirmative steps to opt out, even though they were receiving nothing under the Plan and likely did not receive notice of the Plan or the opt-out mechanism.

41.     Thus, based on the definitions of "Released Party" and "Related Party" in the Plan, absent affirmatively opting out or intervention by Lead Plaintiff in the Bankruptcy Court for the benefit of the Settlement Class, Settlement Class Members' claims against each of the Individual Defendants would have released under the Third-Party Release.  *See* Plan at 11.

42.     Upon learning of the Bankruptcy, Lead Counsel retained Lowenstein Sandler, LLP ("Lowenstein"), a firm with well-regarded expertise in complex bankruptcy matters, to advise Lead Counsel for the benefit of Lead Plaintiff and the Settlement Class. Lowenstein actively participated with Lead Counsel in negotiations with the debtor's counsel in the Bankruptcy and assisted Lead Counsel in drafting an emergency motion for relief from the proposed Plan that would have been filed if Lead Counsel and Lowenstein had been unsuccessful with negotiations.

43.      As a result of Lead Counsel's and Lowenstein's efforts and negotiations with

14

counsel for the debtor, the debtor agreed to include the following language in the Debtor's proposed confirmation order which was approved by the bankruptcy court and resulted in a carve out of the Settlement Class's claims against the Individual Defendants from the bankruptcy release:

> **Release Opt-Out for Lead Plaintiff.** Notwithstanding anything to the contrary set forth in the Plan, Disclosure Statement, solicitation procedures order [ECF No. 72], Plan Supplement or this Confirmation Order, Alan Narzissenfeld ("Lead Plaintiff"), the court-appointed lead plaintiff in the securities class action pending in the United States District Court for the Southern District of New York under the caption, *In re AppHarvest Securities Litigation*, Case No. 1:21-cv-07985 (the "Securities Litigation"), together with each member of the putative class Lead Plaintiff represents in the Securities Litigation (as may be redefined or certified, the "Proposed Class"), is hereby deemed to have opted out of the Third Party Release contained in Article IX.B. of the Plan with respect to all claims asserted or to be asserted against any non-Debtor party in the Securities Litigation (the "Opt-Out Claims"), and shall not be required to execute, complete, or deliver the Release Opt-Out forms in respect of the Opt-Out Claims. Lead Plaintiff and the Proposed Class shall not be deemed Releasing Parties with respect to the Opt-Out Claims.

ECF 117-8 ¶132.

44.    Additionally, Lead Counsel's negotiations with counsel for the Debtor resulted in the bankruptcy court entering the following order, for the benefit of Lead Plaintiff and the Settlement Class, regarding the preservation of records:

> **Preservation of Books and Records.** Until the entry of a final order of judgment or settlement in the Securities Litigation (as defined in paragraph 132 of this Order), the Debtors, Purchaser(s), Plan Administrator, and any other transferee of the Debtors' books, records, documents, files, electronic data (in whatever format, including native format), or any tangible object potentially relevant to the Securities Litigation, wherever stored (collectively, the "Potentially Relevant Books and Records") shall preserve and maintain such Potentially Relevant Books and Records, and shall not destroy, abandon, transfer, or otherwise render unavailable such Potentially Relevant Books and Records without providing counsel to the lead plaintiff in the Securities Litigation at least sixty (60) days' advance written notice and an opportunity to object and be heard by a court of competent jurisdiction. In the event Lead Plaintiff timely objects to any such destruction, abandonment, or transfer, the Potentially Relevant Books and Records shall be preserved until the earlier of (a) a final order of the Court or other court of competent jurisdiction and (b) the date the party in possession, custody, or control of such Potentially Relevant Books and Records provides originals or true copies thereof to counsel for Lead Plaintiff.

15

ECF 117-8 ¶136.

### C. Mediation and Settlement Negotiations

45.     The parties reached the proposed Settlement through a protracted, good faith, arm's-length negotiation facilitated by Ms. Yoshida, an experienced mediator with Phillips ADR Enterprises, P.C., who specializes in mediating complex litigation, including securities class actions.

46.     On October 13, 2023, Lead Plaintiff and the Individual Defendants submitted to the Mediator, and exchanged with each other, mediation statements detailing the strengths and weaknesses of their claims and defenses and competing damages analyses.

47.     On October 25, 2023, counsel for all Parties, as well as counsel for the Individual Defendants' insurers, participated in a full-day, in-person mediation. Lead Plaintiff also attended the mediation telephonically. During discussions, counsel for the Parties and carriers engaged in frank discussions with the Mediator concerning the parties' and carriers' respective positions on all issues relating to liability, damages, defenses, collectability, and Lead Plaintiff's likelihood of success at future stages of the litigation, including discovery, summary judgment, and trial. The Parties did not reach agreement at this mediation session but continued to negotiate via telephonic and written discussions with the assistance of the Mediator.

48.     On December 12, 2023, the Mediator presented the Parties and their counsel with a double-blind Mediator's Recommendation (the "Recommendation") for the cash payment of $4,850,000.00 to resolve all claims in the Action.

49.     On December 14, 2020, the Mediator informed the Parties that each party had accepted the Recommendation.

16

50.    Subsequently, the Parties negotiated a Stipulation more fully documenting the Settlement, and prepared the class notice, postcard notice, summary notice, claim form, and proposed orders for preliminary approval and final approval and entering final judgment. The Parties finalized and executed the Stipulation on February 20, 2024. ECF 117-1.

## III.    SUMMARY OF THE SETTLEMENT, PLAN OF ALLOCATION, AND NOTICE PROGRAM

### A.    Summary of the Settlement Terms

51.    The proposed Settlement Class, stipulated to by the Parties, includes all persons and entities that purchased or otherwise acquired securities of AppHarvest, Inc., during the period from February 1, 2021 and August 10, 2021, inclusive, and were injured thereby (the same Class Period alleged in the Operative Complaint). ECF 117-1 (Stip.), ¶1(ff). Excluded from the Settlement Class are: (1) the Individual Defendants; (2) the Individual Defendants' immediate family members; (3) any firm, trust, corporation, or other entity in which a defendant has or had a controlling interest; and (4) the legal representatives, affiliates, heirs, successors in interest, or assigns of any such excluded person or entity. *Id.* Also excluded from the Settlement Class will be any Person who or which timely and validly seeks exclusion from the Settlement Class. *Id.*

52.    Under the terms of the Settlement, the Individual Defendants were required to pay, or cause to be paid, $4,850,000 into an Escrow Account within 30 calendar days of preliminary settlement approval (the "Settlement Fund"). *Id.* at ¶ 6. In return, the Settlement provides that Lead Plaintiff and the Settlement Class will release all Released Claims against the Released Defendant Parties. *See, e.g.*, *id.* at ¶4.

53.    The Individual Defendants caused to be paid $4,850,000, in cash, into the Escrow Account as of April 3, 2024.

54.     The Settlement Fund, including any interest earned thereon, shall be used to pay the following: (i) any Taxes; (ii) Notice and Administration Expenses; (iii) attorneys' fees and expenses as approved by the Court; (iv) any other fees and expenses awarded by the Court; and (v) the claims of Authorized Claimants. *Id.* at ¶9.

### B.  The Court Has Preliminarily Approved The Settlement

55.     On December 15, 2023, the Parties notified the Court that they had reached a settlement in principle. ECF 112. On February 20, 2024, Lead Plaintiff filed his Motion for Preliminary Approval of Class Action Settlement, along with the Stipulation and related documents. ECF 115-16.

56.     On March 6, 2024, the Court issued the Preliminary Approval Order, thereby preliminarily approving the proposed Settlement, certifying the Settlement Class, and directing dissemination of notice to Settlement Class Members. ECF 120.

57.     On March 7, 2024, the Court so-ordered Lead Plaintiff's request to adjourn the Settlement Hearing date and scheduled the Settlement Hearing to be held on June 12, 2024 at 3:00 p.m. ECF 122. On April 3, 2024, the Individual Defendants filed a letter informing the Court that they had served the notice required under the Class Action Fairness Act and requesting that the Settlement Hearing be adjourned. ECF 123. On April 4, 2024, the Court granted the Individual Defendants' letter motion and adjourned the Settlement Hearing to July 11, 2024. ECF 124. The Claims Administrator subsequently updated the Settlement website to reflect the date of the hearing and a copy of the Court's April 4, 2024 order was uploaded thereto. *See* Declaration of Josephine Bravata Concerning: (A) Mailing of the Postcard Notice; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion and Objections ("Bravata Decl.") at ¶12.

18

**C. Dissemination of Notice to the Class Was Adequate and Accomplished in Accordance with the Preliminary Approval Order**

58.     Pursuant to the Preliminary Approval Order, to date, Strategic Claims Services, the Claims Administrator, mailed 32,436 copies of the Postcard Notice and emailed 69,644 direct links to the Notice and Claim Form to potential Settlement Class Members. *See* Bravata Decl. ¶¶6-7. The Claims Administrator also sent the Depository Trust Company ("DTC") a Notice of Pendency of Class Action, Proposed Class Action Settlement, Final Approval Hearing, and Motion for Attorneys' Fees and Expenses ("Notice") and Proof of Claim and Release ("Claim Form") (collectively, the "Notice and Claim Form") for the DTC to publish on its Legal Notice System ("LENS") on March 12, 2024. *Id.*, at 3.

59.     The Claims Administrator identified potential Settlement Class Members from transfer records provided by Lead Counsel (who, in turn, received such records from the Individual Defendants), as well as brokerage firms and other banks, financial institutions, and other nominees holding AppHarvest stock in street name for Settlement Class members.

60.     The Postcard Notice directed potential Settlement Class members to the Settlement website, www.strategicclaims.net/apph/, where downloadable versions of the long-form Notice and Claim Form are available.

61.     The Notice provided, *inter alia*:  (i) a description of the nature of the Action and claims asserted; (ii) the definition of the Settlement Class; (iii) the amount of the Settlement; (iv) the reasons for and material terms of the Settlement; (v) the Plan of Allocation; (vi) the maximum amount of attorneys' fees and expenses that will be sought; (vii) the time and manner for requesting an exclusion from the Settlement Class or objecting to the Settlement, Plan of Allocation, or the requested attorneys' fees and expenses; (viii) the date, time, and place of the Settlement Hearing; (ix) the identity and contact information of the representatives of Lead

Counsel and procedures for making inquiries; and (x) the binding effect of a judgment on Settlement Class Members.  Bravata Decl., Exhibit A.

62.     The Claims Administrator also arranged for the Publication Notice to be transmitted over *PR Newswire* and in print in the *Investor's Business Daily* on April 1, 2024.

63.     In addition, the Claims Administrator established and continues to maintain a toll-free telephone number with a live operator during regular business hours dedicated to fielding calls and questions from AppHarvest shareholders. *Id.* at ¶ 12.

64.     The deadline to submit a request for exclusion or an objection is May 22, 2024.  *See* Bravata Decl., Exhibit A at 2. To date, Lead Plaintiff has only received three requests for exclusion, and no objections to the settlement. Out of the three exclusion requests, one is an invalid exclusion request since it did not provide the required transaction information.

65.     On April 25, 2024, the Claims Administrator received a request for exclusion from a putative Settlement Class Member. This request was invalid because it did not include a list of transactions in APPH securities. The Claims Administrator notified this individual of the inadequacy of the exclusion request and provided instructions for addressing the deficiency on April 25, 2024. To date, the Claims Administrator has not received any response.

66.     Attached as Exhibit E to the Bravata Decl. are copies of the two valid exclusion requests received by the Claims Administrator.

67.     To date, Lead Plaintiff has not received a single objection to the Settlement, the Plan of Allocation, or Lead Counsel's requested attorneys' fees and expenses.

68.     The Claims Administrator will submit a supplemental declaration addressing any exclusion requests or objections, if any are received, once the deadlines to do so have passed. Similarly, Lead Plaintiff will address any exclusion requests or objections in his reply papers.

20

### D.  The Settlement is Fair, Reasonable, and Adequate

69.     In light of the considerations discussed in Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation and Final Certification of Settlement Class and accompanying Memorandum of Law, Lead Plaintiff and Lead Counsel (an experienced, nationally-recognized securities class action law firm) submit that the Settlement is fair, reasonable, and adequate, satisfies the standards of Rule 23, and provides a significant recovery for the Settlement Class. Continued litigation would have been costly, risky, and drawn out.

70.     The Settlement was procedurally fair, reached only after arm's-length negotiations, between experienced counsel knowledgeable about the facts and allegations, with the assistance of a skilled mediator after extensive vigorous litigation.

71.     Prior to Settlement, Lead Plaintiff and Lead Counsel conducted an extensive investigation and were sufficiently informed of the case's strengths and weaknesses. *See supra* ¶¶6-7.

72.     The immediate benefits of the proposed Settlement outweigh the substantial risks, delay, and expense of continued litigation. Although, based on the extensive investigation and record, Lead Plaintiff and Lead counsel believe their claims have merit, there are also uncertainties and risks in continuing the litigation.

73.     If the Parties did not agree to settle, they would have faced an expensive discovery process, class certification, and summary judgment briefing, and the risks of trial. A jury would have to determine numerous complex financial and securities law issues and navigate battles of the experts regarding market efficiency, loss causation, damages, and other issues related to Defendant Lee's liability. For example, a jury would have to determine: (i) whether Defendant Lee made false or misleading statements or omissions; (ii) whether the alleged misrepresentations and

21

omissions were material; (iii) whether Defendant Lee acted with scienter; (iv) whether AppHarvest common stock and warrants traded in an efficient market, entitling Lead Plaintiff to a presumption of reliance; and (v) the artificial inflation of AppHarvest common stock and warrants, and how much of the price declines on August 11, 2021, as alleged in the Operative Complaint, resulted from the alleged corrective disclosures. Any recovery would be very uncertain and, because of the near certainty of appeals, inevitably delayed by years. Also, there is no way for Lead Plaintiff to anticipate, given the passage of time, whether the memories of each Confidential Witness cited in the Operative Complaint would be consistent with their earlier statements, and there was no guarantee that any other potential witnesses would testify favorably for Lead Plaintiff.

74.    These risks were not just hypothetical in this Action. For instance, in their motion to dismiss the Defendants challenged falsity by arguing that the surviving misstatements only "concerned the Company's ability to *recruit* and *hire* employees during a global pandemic." ECF 97 at 76. Although the Court found that the Operative Complaint's allegations could be construed as "more general" and that Defendant Lee plausibly misstated "how COVID-19 impacted the Company's operations, including its ability to *staff* its facility," *id.* at 77, discovery could have disproved the inferences that the Court drew in Lead Plaintiff's favor at the pleadings stage. Lead Counsel anticipates that counsel for the Individual Defendants would take the depositions of the Confidential Witnesses cited in the Operative Complaint at deposition and seek to discredit them and challenge their credibility.

75.    Further, proving scienter for Defendant Lee's alleged misstatements is notoriously difficult, risky and uncertain, and, if litigation continued, Defendant Lee was certain to testify that he did not make the surviving misstatements with an intention to deceive or conceal information.

22

76.    Additionally, although Defendant Lee was not entitled to dismissal, the Court observed in its decision on the motion to dismiss that "it is unclear exactly what impact staffing issues had on the Company's ability to meet its financial projections." ECF 97 at 77. In later proceedings, Defendant Lee was certain to argue the specific facts revealed on August 11, 2021, did not "correct" his statements made on May 25, 2021, and that none of the information in the alleged corrective disclosures connected the disappointing results and guidance that were reported to COVID-19, recruiting, or staffing. If Defendant Lee was successful, Lead Plaintiff would have to parse out the fraud-related portion of the stock and warrant price drops, which could have diminished or eliminated recoverable damages entirely.

77.    Defendants also informed Lead Plaintiff that they would also challenge the fraud-on-the-market presumption of reliance at class certification, potentially precluding Lead Plaintiff's ability to achieve and maintain class certification through trial. Lead Counsel anticipates Defendant Lee would have contended (among other things) that any misstatements he made that survived the motion to dismiss were too generic to have impacted the price of AppHarvest's securities. Bolstering the argument, Lead Counsel is not aware of any analyst reports that remarked upon Defendant Lee's comments during the interview by Stephens, Inc., on May 25, 2021, potentially undermining materiality and front-end price impact. Further, Lead Counsel anticipates Defendant Lee would challenge price impact, arguing, *inter alia*, that any information alleged in the Operative Complaint concerning labor and staffing challenges was available to, and known by, the market prior to May 25, 2021, and thus, was already reflected in the Company's stock price.

78.    Indeed, the Second Circuit's recent decision in *Arkansas Teacher Retirement System v. Goldman Sachs Group, Inc.*, 77 F.4th 74, 81 (2d Cir. 2023) heightened these very same concerns, where the Second Circuit, after approximately 13 years of litigation, decertified the class

23

and effectively ended the case finding statements about Goldman's business practices and approach to conflicts-of-interest management were too "generic" to have impacted Goldman's stock price, and there was an insufficient nexus between the front-end statement and back-end price decline. *Id*. at 104. Defendant Lee would no doubt have challenged price impact at class certification, summary judgment, and trial. While Lead Plaintiff believes that a class would have been certified, there was an ongoing risk that any certified class could have been disturbed prior to trial or on appeal if Defendant Lee successfully moved to decertify the Settlement Class. Furthermore, any appeal pursuant to Federal Rule of Civil Procedure 23(f) would have added considerable delay and complexity.

79.    Additionally, the scope of merits discovery and class certification discovery would be large given the complexity of the allegations in the Operative Complaint, including evidence necessary to establish price impact. The parties would have had to incur substantial costs and engage in prolonged litigation through class certification, summary judgment, trial, and likely appeals. Discovery costs (including document production and hosting fees) would be significant. Lead Counsel would anticipate, given the complexities, reviewing, at least, hundreds of thousands of documents, if not more, and taking many depositions.

80.    In addition to fact discovery, the Parties would have to engage in expert discovery on the merits, class certification, reliance, loss causation, and damages, amongst other topics. The parties would present dueling experts and incur substantial costs (including for expert reports and testimony regarding market efficiency, price impact, loss causation, damages, and merits). Even assuming a favorable trial outcome, Defendant Lee would likely appeal, further delaying any benefit to the Settlement Class. Moreover, even if a larger judgment were recoverable at trial,

24

courts recognize that delay occasioned by trial, post-trial, and appellate processes greatly reduces the value of any award.

81.     Further, Lead Plaintiff faced considerable risks collecting any future judgment or settlement from alternative sources given the Bankruptcy. Lead Plaintiff's and the Settlement Class's claims against AppHarvest were extinguished, without entitlement to payment, in the Bankruptcy. *In Re AppHarvest Products, LLC*, Case No. 23-90745-CML (S.D. Tex. Bankr.) at Dkt. No. 458 (Second Amended Joint Plan of Liquidation of AppHarvest Products, LLC and its Debtor Affiliates, Article III.B.) (stating that all "Class 9 – Section 510(b) Claims," including the claims asserted against AppHarvest in this Action, "shall be cancelled, released, discharged, and extinguished and will be of no further force or effect, and Holders of such Claims shall not receive any distribution, property or other value under the Plan on account of such Claims."); Dkt. 461 ([proposed] Order Approving the Debtors' Disclosure Statement and Confirming the Amended Joint Plan of Liquidation of AppHarvest Products, LLC and its Debtor Affiliates); Dkt 666 (Notice of (I) Entry of Order Confirming the Second Amended Joint Plan of Liquidation of AppHarvest Products, LLC and Its Debtor Affiliates, (II) Somerset Closing, and (III) Occurrence of the Effective Date). Moreover, upon information and belief, Lead Counsel does not believe Defendant Lee would have had adequate personal assets to satisfy a judgment larger than the Settlement Amount. Thus, in this Action, liability insurance policies were likely the only sources of funding for any potential settlement. However, before the Settlement was reached, there was no guarantee that the insurance would be available to Lead Plaintiff if it continued litigation. The wasting policies were paying defense costs and likely would have been exhausted had the case proceeded through trial and appeal(s).

25

82.     The Settlement provides for a recovery of $4,850,000. In consultation with their experts, Lead Counsel estimates if the Court had sustained the Operative Complaint in full (which it did not), and Lead Plaintiff fully prevailed on his alleged claims at both summary judgment and trial, and if the Court and jury accepted Lead Plaintiff's damages theory (including proof of loss causation, which would be hotly contested) over the entire Settlement Class Period from February 1, 2021 through August 10, 2021, Lead Plaintiff's *best case scenario*—the maximum aggregate, theoretical damages—would be approximately $104 million in damages for AppHarvest common stock, and approximately $8 million in damages for AppHarvest warrants, for a combined total of approximately $112 million in damages. Under Lead Plaintiff's estimated best-case scenario, assuming a 100% claims take rate and no disaggregation of confounding information, the Settlement represents approximately a 4.3% recovery, which is well within the zone of reasonableness for a complex securities class action like this one.

83.     However, a full damages recovery was counterfactual and implausible given that the sole remaining alleged misstatements were made on May 25, 2021. Lead Plaintiff's damages expert estimated that for purchases made between May 26, 2021 and August, 10, 2021, inclusive, aggregate damages were approximately $33 million for AppHarvest common stock and $3 million for AppHarvest warrants, for a combined total of approximately $36 million in damages. Accordingly, when accounting for the Court's orders in the Action, the Settlement represents an excellent 13.4% recovery.

### E.   The Plan of Allocation is Fair, Reasonable, and Adequate

84.     As stated in the Notice provided to potential Settlement Class members, Settlement Class members who wish to participate in the Settlement must submit a Claim Form by May 22, 2024. Bravata Decl., Exhibit A at 2. The Notice explains that the Net Settlement Fund, including

any interest earned thereon, after deduction of certain enumerated fees and expenses, shall be paid to Authorized Claimants on a *pro rata* basis according to the Court-approved Plan of Allocation. *Id.* at 12.

85.    Lead Counsel prepared the proposed Plan of Allocation in consultation with Lead Plaintiff's financial and damages experts. Under the Plan of Allocation, a Recognized Loss amount will be calculated for Settlement Class Members' transactions in publicly traded AppHarvest common stock and warrants during the Settlement Class Period based principally on the differences in the estimated amounts of artificial inflation in these securities on the date of purchase and the date of sale. *Id.* at 13-15. Based on Lead Plaintiff's expert's calculations, the Plan of Allocation utilizes the "constant dollar" method and estimates that the alleged artificial inflation in the price of AppHarvest common stock and warrants during the Settlement Class Period is $3.34 per share and $1.68 per warrant, respectively. *Id.* at 12.

86.    The Plan of Allocation also takes into account the Court's dismissal of certain claims asserted by the Settlement Class relating to statements made prior to May 25, 2021. Accordingly, Recognized Loss calculations for purchases of publicly traded AppHarvest common stock and warrants will be multiplied by 10% (i.e., discounting by 90%) to reflect the substantially lower likelihood of success on the dismissed claims, which would be viable only if the Court's dismissal was reversed on appeal, and such claims would then face the additional risk of proof due to passage of time. *Id.* at 13.

87.    Lead Counsel believes that the Plan provides a fair and reasonable method to equitably distribute the settlement proceeds among eligible Settlement Class Members. Indeed, the objective of the proposed Plan is to equitably distribute the net Settlement proceeds to those

members of the Settlement Class who suffered economic losses as a result of the alleged misrepresentations asserted in the Action.

### F. The Settlement Class Should be Finally Certified

88. The Court's Preliminary Approval Order preliminarily certified the Settlement Class for the purposes of Settlement only under Fed. R. Civ. P. 23(a) and (b)(3). ECF 120 at ¶2.A. There have been no changes to alter the propriety of class certification for settlement purposes. Accordingly, Lead Plaintiff and Lead Counsel believe the preliminary certification should be affirmed.

## IV. LEAD COUNSEL'S REQUEST FOR ATTORNEYS' FEES AND EXPENSES IS REASONABLE AND SHOULD BE APPROVED

### A. The Fee Application

89. As compensation for their efforts, Lead Counsel requests an award of attorneys' fees in the amount of 25% of the Settlement Fund, or $1,212,500, and reimbursement of $166,987.77 in expenses reasonably incurred in the prosecution and settlement of the Action. *See* Memorandum of Law in Support of Lead Counsel's Unopposed Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses (the "Fee Memorandum") filed herewith. Lead Counsel has vigorously prosecuted this case on a fully contingent basis for well over two years without any compensation whatsoever and incurring substantial expenses without any guarantee of success.

90. The Notice provides that Lead Counsel would apply for a fee award in an amount up to one-quarter (25%) of the Settlement Fund and that Lead Counsel would request reimbursement of litigation expenses in an amount not to exceed $250,000.

91. As discussed in the Fee Memorandum, the trend in the Second Circuit is to use the percentage-of-fund method (the "percentage method") in determining the appropriate fee recovery

28

as it directly aligns the interests of the class and counsel, incentivizing efficient prosecution and early resolution of litigation. It is also supported by the Supreme Court and the PSLRA. The requested fee is well within the range of fees awarded by courts in the Second Circuit and this District.

92. Based on the time and labor expended by Lead Counsel, the risks and complexities of the litigation, the quality of representation, the results achieved, and the contingent nature of the representation, Lead Counsel respectfully submits the requested fee award is fair and reasonable and should be approved by the Court.

### B. Lead Counsel's Work and Expertise

93. Lead Counsel devoted significant time and effort prosecuting this litigation and achieving the Settlement, supporting the requested fee. Prior to reaching the agreement in principle to settle the Action, Lead Counsel conducted an extensive investigation and analysis of the allegations in preparing the FAC and the Operative Complaint. This investigation and analysis included reviewing: (i) documents filed publicly by AppHarvest with the SEC; (ii) publicly available information concerning AppHarvest and/or the Individual Defendants, including press releases, news articles, conference call transcripts, and video recorded interviews; (iii) research reports issued by financial and industry analysts concerning AppHarvest; (iv) other publicly available information and data concerning the Company and its subsidiaries, including information concerning AppHarvest's operations; (v) docket entries from various court proceedings concerning AppHarvest and the Individual Defendants, including items filed in the Bankruptcy; (vi) interviews conducted with former employees; (vii) consultations with bankruptcy counsel; (viii) reports prepared by Lead Plaintiff's damages experts in connection with the mediation; (ix)

consultation with a Controlled Environment Agricultural expert; and (x) the applicable law governing the claims and potential defenses in this Action.

94.    Furthermore, Lead Counsel contacted and interviewed numerous former employees of AppHarvest and consulted with relevant damages experts and CEA experts.

95.    Lead Counsel also performed extensive legal research and analysis at the pleading stage, in moving for leave to amend, and in opposing Defendants' motion to dismiss the Operative Complaint. These efforts included addressing complex issues on falsity, materiality, scienter, and loss causation. Lead Counsel also performed extensive research of factual and legal issues relating to AppHarvest's Bankruptcy, including: determining the effect(s) of AppHarvest's Bankruptcy on the Action (i.e., any application of the automatic stay or the merits of a discretionary stay); and with respect to negotiations Lead Counsel and Lowenstein undertook to carve the Settlement Class out of the third-party release, including drafting an emergency motion for relief from the proposed confirmation plan.

96.    Lead Counsel further expended considerable time engaging in the extensive, good faith, arm's-length negotiations leading to the Settlement, including: (i) finding an appropriate mediator; (ii) drafting Lead Plaintiff's mediation statement; (iii) analyzing the Individual Defendants' mediation statement and damages analyses; (iv) preparing for and participating in an all-day mediation; (v) consulting with damages experts as to the value of the Settlement Class's damages; and (vi) participating in additional negotiations via telephone and email in regards to the Settlement Amount.

97.    Subsequent to the settlement in principle, Lead Counsel negotiated the final settlement terms, and drafted and finalized the Settlement documents. Lead Counsel also consulted with experts regarding the Plan of Allocation and prepared the documents required for preliminary

30

and final approval of the Settlement. Lead Counsel will continue to expend necessary time and resources in ensuring the finalization of the claims process.

98.     The expertise and experience of Lead Counsel is an important factor to be weighed in assessing a fair fee. As demonstrated in Lead Counsel's firm resume (Ex. 2), Lead Counsel is comprised of experienced and skilled practitioners in the securities litigation field and are responsible for significant settlements as well as legal decisions that enable litigation such as this to be successfully prosecuted.

99.     At all times, Lead Counsel provided comprehensive and focused efforts to achieve the best possible results for the Class, with no certainty of reimbursement for their time.  As set forth herein and in Lead Counsel's lodestar report (Ex. 3.A), Lead Counsel undertook 2,439.93 hours in connection with this matter for a total lodestar of $1,609,971.25. The hourly rates for Lead Counsel range from $900 to $1,000 for partners, and $500 to $550 for other attorneys. Ex. 3.A. The hourly rate for professional staff is $325.  Ex. 3.A. These rates are comparable to those normally charged by securities action law firms. In the exercise of Lead Counsel's billing judgment, Lead Counsel's total lodestar figure is exclusive of any billing entries for attorneys and other professionals who expended less than ten hours in total on this matter.

|  | HOURS | Rate | LODESTAR |
|---|---|---|---|
| Amanda Foley (Associate) | 580.5 | $550 | $319,275.00 |
| Amanda Herda (Legal Assistant) | 89.1 | $325 | $28,957.50 |
| Arden Westphalen (Legal Assistant) | 29.35 | $325 | $9,538.75 |
| Cole von Richthofen (Associate) | 29.35 | $500 | $14,675.00 |
| Gregory Potrepka (Partner) | 944.5 | $900 | $850,050.00 |
| Kaitlyn Goetten (Legal Intern) | 42.2 | $325 | $13,715.00 |

31

| | | | |
|---|---|---|---|
| Michael Keating (Associate) | 308 | $500 | $154,000.00 |
| Rachel Berger (Associate) | 141.08 | $500 | $70,540.00 |
| Samantha Phillips (Legal Assistant) | 187.6 | $325 | $60,970.00 |
| Shannon Hopkins (Partner) | 88.25 | $1,000 | $88,250.00 |
| **TOTAL** | **2,439.93** | | **$1,609,971.25** |

100.   The requested fee represents an approximately 25% discount from the total lodestar here, and as discussed in the Fee Memorandum, represents a negative multiplier which is on the very low end of multipliers commonly awarded in securities class actions and other complex litigation in this Circuit and District and strongly indicates the reasonableness of the proposed fee. Moreover, the lodestar multiplier does not include additional time that was expended in moving for final approval of the Settlement and that will be expended in completing the claims process.

### C.   Standing and Caliber of Opposing Counsel

101.   The quality of the work performed by Lead Counsel in attaining the Settlement should also be evaluated in light of the quality of the opposition. Defendants were represented by experienced and qualified attorneys well-versed in securities litigation at Cooley LLP. In the face of this knowledgeable and formidable opposition, Lead Counsel was nevertheless able to develop a case that was sufficiently strong to persuade the Individual Defendants to settle it on terms that are favorable to the Settlement Class.

### D.   The Risks of Contingent Litigation

102.   Lead Counsel undertook and prosecuted this Action for over two years on an entirely contingent basis with no guarantee of any compensation. Lead Counsel knew from the outset that they would expend a substantial amount of time prosecuting this Action yet receive no compensation if the Action ultimately proved unsuccessful. Thus, the contingent nature of

payment of fees and expenses and the risks and complexity of the Action should be given substantial weight by the Court in considering the instant application for fees and expenses.

103.    As described above, this Action involved serious legal and practical hurdles that could have resulted in no recovery at all. Continued litigation would have entailed significant risks to the Settlement Class, as the Action could be derailed in any number of ways before a final judgment in Lead Plaintiff's favor was entered (and withstood possible appeal).

104.    As a result of consistent and persistent efforts in the face of substantial risks and uncertainties, Lead Counsel achieved a significant recovery for the benefit of the Settlement Class.

### E.    The Reaction of the Settlement Class to the Requested Fee

105.    As discussed above, the Postcard Notice has been mailed to 32,436 potential Settlement Class members and emails included direct links to the Notice and Claim Form on the Settlement website have been sent to an additional 69,644 potential Settlement Class Members. The Notice and Postcard Notice contain information regarding the 25% fee award requested by Lead Counsel.

106.    As of the date of this filing, there have been no objections to any aspect of the proposed Fee Application.

### F.    Payment of the Requested Expenses and Costs is Fair and Reasonable

107.    Lead Counsel is also moving for payment of $166,987.77 in litigation expenses reasonably and actually incurred in connection with commencing and prosecuting the claims against Defendants, as outlined in the accompanying declarations and summarized below. *See* Ex. 3 and 3.B. Lead Counsel advanced all of the litigation expenses. Pursuant to the Preliminary Approval Order, Lead Plaintiff notified Settlement Class members that Lead Counsel would seek

a maximum of $250,000.00 in expenses. Thus, Lead Counsel's requested expenses is over $83,000 *less* than what was included in the Notice.

108.    A categorical breakdown of the expenses for which Lead Counsel seeks reimbursement follows:

| CATEGORY | EXPENSES |
| --- | --- |
| Filing Fees | $301.35 |
| Expert Fees | $20,053.25 |
| Process Server Fees | $682.20 |
| Outside Counsel | $90,400.00 |
| Mediation Fees | $11,250.00 |
| Postage Fees | $51.22 |
| Computer Research Fees | $3,760.25 |
| Investigator Fees | $40,489.50 |
| **TOTAL EXPENSES** | **$166,987.77** |

109.    To the extent certain of the above categories may require additional information to clarify their meaning and scope, Lead Counsel provides the following explication:

a.    <u>Expert Fees</u>: Lead Counsel collectively incurred $15,849.75 in expenses paid to Forensic Economics, Inc., Crowninshield Financial Research, and Matthew D. Cain, Ph.D. These entities are experts in the fields of financial economics, market efficiency, loss causation, and damages. They provided Lead Counsel with advice and counsel as to numerous complex issues concerning the markets for AppHarvest common stock and warrants, and further assisted Lead Counsel during the mediation and settlement negotiations with the Defendants. In addition, Lead Counsel incurred $4,203.50 in expenses for the retention of and consultation with a Controlled Environment Agricultural expert to inform its understanding of AppHarvest's operations and develop the allegations in the Operative Complaint.

b.    <u>Outside Counsel Fees</u>: Lead Counsel collectively incurred fees of $90,400 for external counsel. Of this amount, over 98% was paid to Lowenstein in connection with protecting

34

the rights of the settlement class in AppHarvest's bankruptcy. Lowenstein actively participated with Lead Counsel in negotiations with the debtor's counsel in the Bankruptcy and assisted Lead Counsel in drafting an emergency motion for relief from the proposed Plan. As a result of Lead Counsel's and Lowenstein's efforts and negotiations with counsel for the debtor, the debtor agreed to include a carve-out for the putative class in this Action from the third-party release included in the bankruptcy confirmation plan. Absent these efforts, any recovery for the Settlement Class would likely have been impossible. The remainder of the Outside Counsel fees that Lead Counsel incurred in this Action regarding the retention of Tornatore Law, LLC for representation of Confidential Witnesses in connection with this Action.

c.    Investigation Fees: Lead Counsel incurred $40,489.50 in expenses paid to L.R. Hodges & Associates, LTD ("L.R. Hodges"). Lead Counsel retained L.R. Hodges to provide private investigation services and conduct numerous fact interviews with former AppHarvest employees, including individuals who were cited by plaintiffs as Confidential Witnesses, and other relevant third parties in the preparation of the amended complaints in the Action.

d.    Mediation Fees: The total $11,250.00 mediation fee for which Lead Counsel request reimbursement was paid to Phillips ADR Enterprises, P.C. for the services of Ms. Yoshida, who conducted a full-day mediation sessions and numerous follow up discussions with the parties leading to the settlement of the litigation.

e.    Computer Research Fees: This category includes fees paid to vendors such as LexisNexis, Thomson Reuters-Westlaw, CapitalIQ, and Pacer.

110.    The expenses requested are reflected in the records of Lead Counsel, prepared in the normal course of business and are an accurate record of the expenses incurred. *See* Exs. 3 and 3.B. The expenses noted are reasonable and were incurred for items necessary to the prosecution

35

of the Action. The expenses were incurred largely in conjunction with experts, mediation, private investigation, computer-based legal research, and the services of external, expert bankruptcy counsel. These expenses were all incurred for the benefit of the Settlement Class, and as explained in the Fee Memorandum, are of the type generally billed to, and reimbursed by, individual clients in standard billing arrangements.

111.    From the beginning of the case, Lead Counsel were aware that they might never recover any of their expenses, and, at the very least, would not recover anything until the Action was successfully resolved. Lead Counsel also understood that, even assuming the case was ultimately successful, reimbursement for expenses would not compensate them for the lost use of funds advanced by them to prosecute this Action. Thus, Lead Counsel were motivated to, and did, take steps to assure that only necessary expenses were incurred for the vigorous and efficient prosecution of the case.

112.    In view of the complex nature of the Action, the litigation expenses incurred were reasonable and necessary to pursue the interests of the Class. Accordingly, Lead Counsel respectfully submit that the request for expenses be granted.

## V.    EXHIBITS

113.    Attached hereto as Exhibit 1 is a true and correct copy of the Declaration of Lead Plaintiff Alan Narzissenfeld in Support of: (a) Lead Plaintiff's Unopposed Motion for Final Approval of Class Action Settlement and Plan of Allocation and Final Certification of Settlement Class; and (b) Lead Counsel's Unopposed Motion for Award of Attorney's Fees and Reimbursement of Litigation Expenses.

114.    Attached hereto as Exhibit 2 is a current, true, and correct copy of the firm resume of Levi & Korsinsky, LLP.

115.    Attached hereto as Exhibit 3 is the Declaration of Gregory M. Potrepka on Behalf of Levi & Korsinsky, LLP in Support of Application for an Award of Attorneys' Fees and Expenses ("Fee Application Decl.").

116.    Attached as Exhibit A to the Fee Application Decl. is a true and correct schedule of the amount of time spent by attorneys and professional support staff members at Levi & Korsinsky LLP on the prosecution of the Action, and the lodestar calculation based on Levi & Korsinsky LLP's current hourly rates.

117.    Attached as Exhibit B to the Fee Application Decl. is a true and correct summary of the expenses incurred by Lead Counsel in litigating this Action for which Lead Counsel seeks reimbursement.

118.    Attached as Exhibit 4 is the Declaration of Josephine Bravata Concerning: (A) Mailing of the Postcard Notice; (B) Publication of the Summary Notice; and (C) Report on Requests for Exclusion and Objections.

## VI.    CONCLUSION

119.    In view of the significant recovery to the Settlement Class, the substantial risks of this litigation, the substantial efforts of Lead Counsel, the quality of the work performed, the contingent nature of the fee, and the standing and experience of Lead Counsel, Plaintiffs and Lead Counsel respectfully submit that: the Settlement should be finally approved as fair, reasonable, and adequate; the Plan of Allocation should be approved as fair and reasonable; the Settlement Class be finally certified for settlement purposes only; a fee in the amount of 25% of the Settlement Fund, or $1,212,500.00, should be awarded to Lead Counsel; and litigation expenses in the amount of $166,987.77 should be reimbursed in full.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: May 8, 2024                              _/s/ Gregory M. Potrepka_
                                                Gregory M. Potrepka

**CERTIFICATE OF SERVICE**

I, Gregory M. Potrepka, hereby certify that this document was filed through the CM/ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on this 8th day of May, 2024.

/s/ *Gregory M. Potrepka*
Gregory M. Potrepka

39